# Exhibit 1

Liza M. Walsh
Christine I. Gannon
Gerhard W. Buehning
**WALSH PIZZI O'REILLY FALANGA LLP**
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
(973) 757-1100

*Of counsel:*
Adam P. Samansky (admitted *pro hac vice*)
Peter J. Cuomo (admitted *pro hac vice*)
Joseph Rutkowski (admitted *pro hac vice*)
James Thomson (admitted *pro hac vice*)
Gabriella Flick (admitted *pro hac vice*)
Simone Yhap (admitted *pro hac vice*)
**MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO PC**
One Financial Center
Boston, MA 02111
(617) 542-5000

*Attorneys for Defendant/Counterclaimant Teva Pharmaceuticals, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JAZZ PHARMACEUTICALS IRELAND LIMITED,**<br><br>**Plaintiff/Counterdefendant,**<br><br>**v.**<br><br>**TEVA PHARMACEUTICALS, INC.,**<br><br>**Defendant/Counterclaimant.** | **Honorable Stanley R. Chesler, U.S.D.J.**<br>**Honorable Jessica S. Allen, U.S.M.J.**<br><br>**Civil Action No. 2:23-cv-01617-SRC-JSA**<br><br>**DEFENDANT TEVA PHARMACEUTICALS, INC.'S INVALIDITY CONTENTIONS** |

**CONFIDENTIAL**

Pursuant to Local Patent Rules 3.3 and 3.6(c), and the Scheduling Order entered in this case, Defendant Teva Pharmaceuticals, Inc. ("Teva" or "Defendant") hereby serves Plaintiff Jazz Pharmaceuticals Ireland, Ltd. ("Jazz" or "Plaintiff") the following Invalidity Contentions ("Contentions") with respect to each of the claims asserted in Jazz's July 18, 2023 Disclosure of Asserted Claims: claims 1-12, 14-16, and 21-29 of U.S. Patent No. 8,591,922 (the "'922 patent"); claims 1-5, 7-16, 18-26, and 28-34 of U.S. Patent No. 8,772,306 (the "'306 patent"); claims 1-12, 14-16, 18-19 and 21-33 of U.S. Patent No. 8,901,173 (the "'173 patent"); claims 1-31 of U.S. Patent No. 9.050,302 (the "'302 patent"); claims 1-12, 14-18, and 20-29 of U.S. Patent No. 9.132.107 (the "'107 patent"); claims 1-31 of U.S. Patent No. 9.486,426 (the "'426 patent"); claims 1-4 of U.S. Patent No. 10,195,168 (the "'168 patent"); claims 1-20 of U.S. Patent No. 10,213,400 (the "'400 patent"); claims 1-12, 14-20, 22-30, 32 and 33 of U.S. Patent No. 10,675,258 (the "'258 patent"); claims 1-12 of U.S. Patent No. 10.864,181 (the "'181 patent"); claims 1-30 of U.S. Patent No. 11,253,494 (the "'494 patent"); claims 1-11 of U.S. Patent 11,426,373 (the "'373 patent"); and claims 1-11 of U.S. Patent 11,554,102 (the "'102 patent") (collectively, the "Asserted Claims"). Teva contends that each of the Asserted Claims is invalid under one or more of 35 U.S.C. §§ 102, 103 and/or 112, as further detailed below. Teva's Contentions are based on currently available information and subject to change following the benefit of full discovery. Teva reserves the right to supplement its Local Patent Rule 3.6 contentions as may be permitted by cause, Local Rule, precedent and/or Order of this Court.

The Court has not yet construed any claim terms of the patents-in-suit. Fact discovery has only just begun, and expert discovery has not yet begun in this case. Teva's investigation into the invalidity of the patents-in-suit is therefore ongoing. Accordingly, Teva reserves the right to seek leave to amend its invalidity contentions as discovery progresses and the claims are construed

pursuant to Local Patent Rule 3.7 or otherwise for good cause.

These Contentions should not be taken as an indication of Teva's position with regards to the proper construction of any claim term. Rather, Teva has made reasonable assumptions, to the extent necessary and appropriate, as to the meaning of the claim terms for the purposes of these Contentions only and have used those meanings to prepare their Contentions. Teva reserves the right to seek to amend its contentions following the Court's claim construction rulings, or any other subsequent clarification or alteration of the meaning of any relevant claim terms, including those in related actions involving the patents-in-suit or related patents.

These Contentions are provided without prejudice to Teva's right to introduce at trial, *inter alia*, any subsequently-discovered evidence, or evidence or expert opinions relating to currently-known facts, and to produce and introduce at trial all evidence supporting Teva's invalidity contentions, whenever discovered. Furthermore, nothing in these Contentions limits any of Teva's experts from relying upon any information in this case, in support of any defense, or from providing opinions and testimony in support of any defense. Moreover, facts, documents, and things now known may be imperfectly understood and, accordingly, such facts, documents, and things may not have been included in this disclosure. Teva reserves its right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, expert opinion testimony, documents, and things, notwithstanding this disclosure of Teva's contentions. Teva further reserves its right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, documents, and things that are not currently recalled but might be recalled at some time in the future. Teva also reserves the right to rely upon any other grounds of invalidity that need not be recited in these invalidity contentions under the Court's orders or the Local Patent Rules. Additionally, Teva hereby relies on and incorporates by reference all invalidity

arguments presented in any expert reports to be served in this matter.

To the extent these Contentions contain any information protected from discovery under the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity, such disclosure is inadvertent and does not constitute a waiver of any such privilege or immunity.

## I. Invalidity under 35 U.S.C. § 102/103

While, based on the Asserted Claims provided by Jazz under Local Patent Rule 3.6(b) (incorporating Local Patent Rule 3.3), Teva anticipates that it will dispute at least certain aspects of Jazz's infringement contentions (and the constructions[1] that Jazz must necessarily apply to assert those claims), for the purposes of these invalidity contentions, Teva reserves the right to (and in many cases does) argue in the alternative, to rely on prior art disclosures similar to those that Teva assumes Jazz will identify in the Accused Product as allegedly meeting a limitation of an asserted claim, without conceding that any of Jazz's constructions necessary for the purposes of infringement are proper under *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), or that under a proper construction, the structure(s) identified in the Accused Product and/or the same or similar structure(s) in the prior art would meet any such limitation of an asserted claim.

"Because the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) (citations omitted). And "[a] century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'" *Upsher-Smith Labs. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) (quoting *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373,

[1] Unless otherwise indicated, Teva has applied an ordinary meaning to all claim limitations.

1379 (Fed. Cir. 2003)). Thus, to the extent that Jazz identifies a particular element of the Accused Product that purportedly meets a certain limitation of an asserted claim, and to the extent that Jazz has construed such a limitation broadly enough to cover that element in the Accused Product, the same or a similar element disclosed in the prior art must necessarily also meet that limitation for the purposes of any analysis of invalidity under 35 U.S.C. §§ 102/103. It is through that lens that Teva has viewed ample prior art that would invalidate any of the Asserted Claims to the extent that such claims would purportedly be met by the Accused Product. Thus, by asserting that the prior art meets the limitations of the Asserted Claims in its invalidity contentions, Teva is applying the terms to the prior art in the same way Jazz must be applying those terms to the Teva ANDA Product in order to allege that Teva's ANDA Product infringes. In addition, by advocating that a particular reference discloses a particular limitation of any asserted claim, Teva does not in any way concede that such limitation informs, with reasonable certainty, those skilled in the art about the scope of the invention. Again, while Teva contends that several terms in the Asserted Claims are indefinite, to the extent that Jazz identifies a particular element of the Accused Product and contends that it meets a certain limitation of an asserted claim, that same or a similar element disclosed in the prior art must necessarily also meet that limitation for the purposes of any analysis of invalidity under 35 U.S.C. §§ 102/103 even if that disputed claim term fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### A. Obviousness Under 35 U.S.C. § 103

A patent claim is invalid for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains." 35 U.S.C. § 103. The objective standard for determining obviousness

under 35 U.S.C. § 103, as set forth in *Graham v. John Deere, Co.*, 383 U.S. 1 (1966), requires a factual determination to ascertain: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; and (3) the differences between the claimed subject matter and the prior art. Based on these factual inquiries, it must then be determined, as a matter of law, whether the claimed subject matter as a whole would have been obvious to one of ordinary skill in the art at the time the alleged invention was made. *Id*. at 17.

In determining obviousness under 35 U.S.C. § 103, "the test is whether the combined teachings of the prior art, taken as a whole, would have rendered the claimed invention obvious to one of ordinary skill in the art." *In re Napier*, 55 F.3d 610, 613 (Fed. Cir. 1995) (citation omitted). From the teachings, the prior art must create a reasonable expectation, not an absolute prediction, of success in producing the claimed invention. *See, e.g., Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) ("Indeed, a rule of law equating unpredictability to patentability ... cannot be the proper standard since the expectation of success need only be reasonable, not absolute."); *see also In re O'Farrell*, 853 F.2d. 894, 903-904 (Fed. Cir. 1988) (internal citations omitted). Both the suggestion and the expectation of success must be in the prior art, not in applicant's disclosure. *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1207 (Fed. Cir. 1991) (citing *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988)).

A claim may be proven obvious in view of a single prior art reference or in view of a combination of prior art references. When the prior art references are combined to invalidate a claim under 35 U.S.C. § 103, there must be some reason or motivation to do so. That reason or motivation need not be expressly stated in one or all of the references used to show obviousness, but rather "may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem *itself*." *Dystar Textilfarben GmbH v. C.H. Patrick Co.*,

464 F.3d 1356, 1361 (Fed. Cir. 2006) (emphasis added); *see also In re Beattie*, 974 F.2d 1309, 1311-12 (Fed. Cir. 1992). Moreover, "the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

"In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls." *Id.* at 419. *See also Beattie*, 974 F.2d at 1312. "The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art." *KSR*, 550 U.S. at 420. "Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* Thus, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416. Under some circumstances, obviousness under § 103 may be proved merely by showing that a combination of elements was "obvious to try."

When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious over § 103. *Id.* at 420. "[W]hile patentability of an invention is not negated by the manner in which it was made, 'the converse is equally true: patentability is not imparted where 'the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable

likelihood of success.'" *See Pfizer*, 480 F.3d at 1369 (discussing obvious-to try and routine experimentation in the context of obviousness under 35 U.S.C. § 103) (internal citations omitted).

Secondary considerations of nonobviousness, such as commercial success, long-felt but unsolved needs, failure of others, and unexpected results, if present, must also be considered. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983). These secondary considerations, however, do not control the analysis when there is an otherwise strong case of obviousness, such as one based upon prior art not considered by the PTO during prosecution. *Pfizer*, 480 F.3d at 1372 (citing *Newell Cos, Inc. v. Kenny Mfg. Co.*, 864 F.2d 757, 768-69 (Fed. Cir. 1988)).

As in the case of any alleged secondary indicia of non-obviousness, a claimed invention's commercial success will be given substantial weight only if a nexus is established between the merits of the claimed invention and the commercial success. *Cable Elec.*, 770 F.2d. at 1027; *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006). Thus, if the commercial success is due to an unclaimed feature of the device, the commercial success is irrelevant. So too, if the feature that creates the commercial success was known in the prior art, the success is not pertinent. *Id.* at 1312. The patentee bears the burden of establishing a prima facie case of such a nexus. *Demaco Corp. v. F. Von Langsdorf Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

Unexpected results, such as an unexpectedly superior property or unexpected synergy resulting from a combination of elements, may be considered as evidence of nonobviousness. This requires the court to first consider what was expected. *Pfizer*, 480 F.3d at 1371 (citation omitted). Additionally, the Federal Circuit has stated that "when unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art." *Kao Corp. v. Unilever US., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006) (quoting *In re Baxter Travenol*

*Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991)). In general, subject matter arrived at through routine optimization that works for its intended purpose is not patentable, even if it is better or more desirable than the prior art, unless it is unexpectedly superior. *See Pfizer*, 480 F.3d at 1371 ("The fact that amlodipine besylate was the best of the seven acid addition salts actually tested proves nothing more than routine optimization that would have been obvious to one of ordinary skill in the art.").

**B. Scope and Content of the Prior Art**

In addition to the arguments above and the exemplary charts attached hereto and references cited therein, Teva reserves the right to further demonstrate that the asserted claims are invalid under § 102 over any of the following references, and/or invalid under § 103 over any of the following references, either alone or in combination:

- Xyrem® (sodium oxybate) oral solution, CIII, FDA Approval 2002 (Rev. November 2005);
- NDA 21-196/S-005 FDA Approved Labeling Text, Nov. 18, 2005, Xyrem® (sodium oxybate) oral solution;
- FDA, NDA 21-196, 2002, Xyrem® (sodium oxybate) oral solution label;
- Xyrem® (sodium oxybate) oral solution 2008. Prescribing Information;
- FDA, Xyrem® 500 mg/m oral solution, Product Information Label;
- Xyrem, INN-Sodium oxybate, Scientific Discussion, 2006, https://www.ema.europa.eu/en/documents/scientific-discussion/xyrem-epar-scientific-discussion_en.pdf;
- U.S. Patent No. 8,952,062 to Cook, et al.;
- U.S. Patent Application Pub No. 2003/0125385 to Cook, et al.;
- U.S. Patent Application Pub. No. 2006/0210630 to Liang, et al.;
- U.S. Patent Application Pub No. 2003/0134868A1 to Dewey, et al.;
- U.S. Patent Application Pub No. 2009/0137565A1 to Frucht;

- EP Patent Publication EP0183736B1 to Belohlawek, et al.;
- JP 2000060506A, to Noro, J. (translated);
- U.S. Patent No. 5,594,030 to Conte, et al.;
- U.S. Patent No. 6,780,889 to Cook, et al.;
- U.S. Patent No. 8,591,922 to Allphin, et al;
- Maitre, M. (1997). The γ-hydroxybutyrate signalling system in brain: organization and functional implications. *Progress in neurobiology*, *51*(3), 337-361;
- Waszkielewicz, A., & Bojarski, J. (2004). Γ-hydroxybutyric acid (GHB) and its chemical. J. Pharmacol, 56, 43-49;
- Wedin, G. P., et al. (2006). The clinical development of γ-hydroxybutyrate (GHB). Current Drug Safety, 1 (1), 99-106;
- Szarfman, A., et al. (1995). Declaring the sodium content of drug products. *New England Journal of Medicine*, *333*(19), 1291-1291;
- Okun, M. S., et al. (2001). GHB: an important pharmacologic and clinical update. *J Pharm Pharm Sci*, *4*(2), 167-75;
- Bighley, L. D., Berge, S. M., & Monkhouse, D. C. (1996). Salt forms of drugs and absorption. *Encyclopaedia of pharmaceutical Technology*, (Eds: J. Swarbrick, JC Boylan) Vol. 13;
- Borgen, L. A., et al. (2003). The influence of gender and food on the pharmacokinetics of sodium oxybate oral solution in healthy subjects. *The Journal of Clinical Pharmacology*, 43(1), 59-65;
- Karppanen, H., Karppanen, P., & Mervaala, E. (2005). Why and how to implement sodium, potassium, calcium, and magnesium changes in food items and diets? *Journal of human hypertension*, *19*(3), S10-S19;
- Federal Register, Vol. 69, No. 57, Mar. 24, 2004, Rules and Regulations, pp. 13717-13725;
- Federal Register, Vol. 61, No. 78, Apr. 22, 1995, Rules and Regulations, pp. 17798-17806.
- WO 2014/093791 PCT to Allphin;
- Additional references that reflect general knowledge in the art at the time of the alleged invention include at least.
    - Abanades, S., et al. (2006). γ-Hydroxybutyrate (GHB) in humans: pharmacodynamics and pharmacokinetics. *Annals of the New York Academy of*

*Sciences*, 1074(1), 559-576.

- Angell, S. Y., & Farley, T. A. (2012). Can we finally make progress on sodium intake? *American journal of public health*, 102(9), 1625-1627.
- Badr, M. S. (2012). *Essentials of Sleep Medicine*. Springer.
- Swarbrick, J., & Boylan, J. C. (1996). Preservation of Pharmaceutical Products to Salt Forms of Drugs Absorption.
- Bowker, M. J. (2002). A procedure for salt selection and optimization. *Handbook of Pharmaceutical Salt*s Properties Selection and Use. Verlag Helvetica Chemica Acta/Wiley–VCH, Switzerland/Federal Republic of Germany.
- Cagnin, A.,et al. (2011). γ-Hydroxybutyric acid-induced psychosis and seizures. *Epilepsy & Behavior*, 21(2), 203-205.
- Centers for Disease Control and Prevention (CDC. (2011)). Usual sodium intakes compared with current dietary guidelines---united states, 2005-2008. *MMWR. Morbidity and mortality weekly report*, 60(41), 1413-1417.
- Chateauvieux, S., Morceau, F., Dicato, M., & Diederich, M. (2010). Molecular and therapeutic potential and toxicity of valproic acid. *Journal of Biomedicine and Biotechnology*, 2010.
- Ferris, T. J., & Went, M. J. (2012). Synthesis, characterisation and detection of gamma-hydroxybutyrate salts. *Forensic Science International,* 216(1-3), 158-162.
- George, J., et al. (2013). Association between cardiovascular events and sodium-containing effervescent, dispersible, and soluble drugs: nested case-control study. *BMJ,* 347.
- Havas, S., Dickinson, B. D., & Wilson, M. (2007). The urgent need to reduce sodium consumption. *Jama*, 298(12), 1439-1441.
- Hechler, V., Ratomponirina, C., & Maitre, M. (1997). γ-Hydroxybutyrate conversion into GABA induces displacement of GABAB binding that is blocked by valproate and ethosuximide. *Journal of Pharmacology and Experimental Therapeutics*, 281(2), 753-760.
- Kaufman, E. E., & Nelson, T. (1987). Evidence for the Participation of a Cytosolic NADP+-Dependent Oxidoreductase in the Catabolism of γ-Hydroxybutyrate In Vivo. *Journal of neurochemistry*, 48(6), 1935-1941.
- Lemon, M. D., Strain, J. D., & Farver, D. K. (2006). Formulary Forum: Sodium Oxybate for Cataplexy. *Annals of Pharmacotherapy*, 40(3), 433-440.
- Litvinovich, E. (2007). MODULATION OF GAMMA-HYDROXY EUTYRATE

(Doctoral dissertation, University of Toronto).

- Makary, P., Principles of Salt Formation, *UK Journal of Pharmaceutical and Biosciences*, 2014, 2(4), pp. 1 -4.

- Mamelak, M., Scharf, M. B., & Woods, M. (1986). Treatment of narcolepsy with γ-hydroxybutyrate. A review of clinical and sleep laboratory findings. *Sleep*, 9(1), 285-289.

- Mason, P. E., & Kerns, W. P. (2002). Gamma hydroxybutyric acid (GHB) intoxication. *Academic Emergency Medicine*, 9(7), 730-739.

- Mervaala, E. M., et al. (1994). Improvement of cardiovascular effects of metoprolol by replacement of common salt with a potassium-and magnesium-enriched salt alternative. *British journal of pharmacology*, 112(2), 640-648.

- Mervaala, E. M., et al. (1994). Replacement of salt by a novel potassium-and magnesium-enriched salt alternative improves the cardiovascular effects of ramipril. *British journal of pharmacology*, 111(4), 1189-1197.

- Morris, K. R., et al. (1994). An integrated approach to the selection of optimal salt form for a new drug candidate. *International journal of pharmaceutics*, 105(3), 209-217.

- Pal, R., & Teotia, A. K. (2010). Date rape drugs and their forensic analysis: An update. *International Journal of Medical Toxicology & Legal Medicine*, 12(3), 36-47.

- Rodriguez, C. J., et al. (2011). Association of sodium and potassium intake with left ventricular mass: coronary artery risk development in young adults. *Hypertension*, 58(3), 410-416.

- Rumigny, J. F., et al. (1980). Specific and non-specific succinic semialdehyde reductases from rat brain: Isolation and properties. *FEBS letters*, 117 (1-2), 111-116.

- Fm, S. (2001). Effects on blood pressure of reduced dietary sodium and the Dietary Approaches to Stop Hypertension (DASH) diet. DASH-Sodium Collaborative Research Group. *N Engl J Med*, 344, 3-10.

- Shinka, T., et al. (2003). Effect of valproic acid on the urinary metabolic profile of a patient with succinic semialdehyde dehydrogenase deficiency. *Journal of Chromatography*, 792(1), 99-106.

- Strazzullo, P. (2013). Sodium in drugs and hypertension. *BMJ,* 347.

- Strazzullo, P., et al. (2009). Salt intake, stroke, and cardiovascular disease: meta-analysis of prospective studies. *BMJ,* 339.

- Studies, D.I., 2012. Study Design, Data Analysis, Implications for Dosing, and Labeling Recommendations (Draft Guidance). *US FDA*, February.

- Tobinai, K. E. N. S. E. I., Kobayashi, Y., & Shimoyama, M. (1995). Interferon alfa and zidovudine in adult T-cell leukemia-lymphoma. *N Engl J Med*, 333, 1285-6.

- U.S. Dept. of Justice, Drug Enforcement Administration, *Microgram Journal*, Vol. 3, Numbers 1-2, Jan.-Jun. 2005, pp. 1-104

- Vickers, M. D. (1968). Gamma hydroxybutyric acid: Clinical pharmacology and current status.

- Wang, Y. G., et al. (2009). Safety overview of postmarketing and clinical experience of sodium oxybate (Xyrem): abuse, misuse, dependence, and diversion. *Journal of clinical sleep medicine*, 5(4), 365-371.

- Weiss, T., Müller, D., Marti, I., Happold, C., & Russmann, S. (2013). Gamma-hydroxybutyrate (GHB) and topiramate—clinically relevant drug interaction suggested by a case of coma and increased plasma GHB concentration. *European journal of clinical pharmacology*, 69, 1193-1194.

- Whelton, P. K., et al. (2012). Sodium, blood pressure, and cardiovascular disease: further evidence supporting the American Heart Association sodium reduction recommendations. *Circulation*, 126 (24), 2880-2889;

- Yang, Q., et al. (2011). Sodium and potassium intake and mortality among US adults: prospective data from the Third National Health and Nutrition Examination Survey. *Archives of internal medicine*, 171(13), 1183-1191;

- Zhou, X., et al. (2009). Compound ion salt, a novel low-sodium salt substitute: from animal study to community-based population trial. *American journal of hypertension*, 22(9), 934-942;

- U.S. Patent No. 4,393,236 to Klosa, J.;

- U.S. Patent No. 5,126,430 to Senga, et al.;

- U.S. Application Pub. No. 2011/0111027 to Rourke, et al.

These prior art references and additional references that inform the state of the art at the time of the patents are being produced contemporaneously and have been marked with the Bates numbers listed in the chart below:

| Reference | Pub. Date | Prior Art Status under Title 35 of the US Code | Beg Bates |
|---|---|---|---|
| Abanades, S., et al. (2006). γ-Hydroxybutyrate (GHB) in humans: pharmacodynamics and pharmacokinetics. *Annals of the New York Academy of Sciences*, *1074*(1), 559-576. | 2006 | 102(b) to all asserted patents | TEVA_XWAV_00022728 |
| Angell, S. Y., & Farley, T. A. (2012). Can we finally make progress on sodium intake? *American journal of public health*, *102*(9), 1625-1627. | 2012 | 102(b) to all asserted patents | TEVA_XWAV_00025793 |
| Badr, M. S. (2012). *Essentials of Sleep Medicine*. Springer. | 2012 | 102(b) to all asserted patents | TEVA_XWAV_00023386 |
| Bighley, L. D., Berge, S. M., & Monkhouse, D. C. (1977). Pharmaceutical salts. *Journal of pharmaceutical sciences*, *66*(1), 1-19. | 1977 | 102(b) to all asserted patents | TEVA_XWAV_00025807 |
| Borgen, L. A., et al. (2003). The influence of gender and food on the pharmacokinetics of sodium oxybate oral solution in healthy subjects. *The Journal of Clinical Pharmacology*, *43*(1), 59-65. | 2003 | 102(b) to all asserted patents | TEVA_XWAV_00022521 |
| Bowker, M. J. (2002). A procedure for salt selection and optimization. *Handbook of Pharmaceutical Salts Properties Selection and Use. Verlag Helvetica Chemica Acta/Wiley–VCH, Switzerland/Federal Republic of Germany*. | 2002 | 102(b) to all asserted patents | TEVA_XWAV_00022689 |
| Cagnin, A.,et al. (2011). γ-Hydroxybutyric acid-induced psychosis and seizures. *Epilepsy & Behavior*, *21*(2), 203-205. | 2011 | 102(b) to all asserted patents | TEVA_XWAV_00022952 |
| Carter, L. P., Pardi, D., Gorsline, J., & Griffiths, R. R. (2009). Illicit gamma-hydroxybutyrate (GHB) and pharmaceutical sodium oxybate (Xyrem®): differences in characteristics and misuse. *Drug and alcohol dependence*, *104*(1-2), 1-10. | 2009 | 102(b) to all asserted patents | TEVA_XWAV_00024037 |
| Castelli, M. P., Pibiri, F., Carboni, G., & Piras, A. P. (2004). A Review of | 2004 | 102(b) to all asserted patents | TEVA_XWAV_00023150 |

| Reference | Pub. Date | Prior Art Status under Title 35 of the US Code | Beg Bates |
|---|---|---|---|
| Pharmacology of NCS-382, a Putative Antagonist of γ-Hydroxybutyric Acid (GHB) Receptor. *CNS drug reviews*, *10*(3), 243-260. | | | |
| Centers for Disease Control and Prevention (CDC. (2011)). Usual sodium intakes compared with current dietary guidelines---united states, 2005-2008. *MMWR. Morbidity and mortality weekly report*, *60*(41), 1413-1417. | 2011 | 102(b) to all asserted patents | TEVA_XWAV_00023168 |
| Chateauvieux, S., Morceau, F., Dicato, M., & Diederich, M. (2010). Molecular and therapeutic potential and toxicity of valproic acid. *Journal of Biomedicine and Biotechnology*, *2010*. | 2010 | 102(b) to all asserted patents | TEVA_XWAV_00023284 |
| EP Patent Publication EP0183736B1 to Belohlawek, et al. | July 18, 1990 | 102(b) to all asserted patents | TEVA_XWAV_00023312 |
| FDA, NDA 21-196, 2002, Xyrem® (sodium oxybate) oral solution label. | 2002 | 102(b) to all asserted patents | TEVA_XWAV_00025927 |
| FDA, NDA 21-196/S-005, Nov. 18, 2005, Xyrem® (sodium oxybate) oral solution label. | Nov. 18, 2005 | 102(b) to all asserted patents | TEVA_XWAV_00023318 |
| Center for Drug Evaluation and Research (CDER). Guidance for Industry: Drug Interaction Studies—Study Design, Data Analysis, Implications for Dosing, and Labeling Recommendations, *USFDA* (2012). | February 2012 | 102(a) to '922, '107, '173, '168, '258, '295 / 102(b) to '102, '302,'306, '426, '400, '181,'494 and '373 patents | TEVA_XWAV_00025826 |
| Federal Register, Vol. 61, No. 78, Apr. 22, 1995, Rules and Regulations, pp. 17798-17806. | April 22, 1995 | 102(b) to all asserted patents | TEVA_XWAV_00022680 |
| Federal Register, Vol. 69, No. 57, Mar. 24, 2004, Rules and Regulations, pp. 13717-13725. | Mar. 24, 2004 | 102(b) to all asserted patents | TEVA_XWAV_00026064 |
| Ferris, T. J., & Went, M. J. (2012). Synthesis, characterisation and detection of gamma-hydroxybutyrate salts. *Forensic Science International*, *216*(1-3), 158-162. | Mar. 2012 | 102(a) to '922, '107, '173, '168, '258, '295 / 102(b) to '102, '302,'306, '426, '400, '181,'494 and '373 patents | TEVA_XWAV_00022660 |

CONFIDENTIAL

| Reference | Pub. Date | Prior Art Status under Title 35 of the US Code | Beg Bates |
|---|---|---|---|
| Gamma Hydroxybutyrate (GHB) Fact Sheet | October 1998 | 102(b) to all asserted patents | TEVA_XWAV_00023803 |
| George, J., et al. (2013). Association between cardiovascular events and sodium-containing effervescent, dispersible, and soluble drugs: nested case-control study. *Bmj*, *347.* | 2013 | 102(a) to '102, '302,'306, '426, '400, '181, and '494 patents/ 102(b) to '373 patent | TEVA_XWAV_00025775 |
| Havas, S., Dickinson, B. D., & Wilson, M. (2007). The urgent need to reduce sodium consumption. *Jama*, *298*(12), 1439-1441. | 2007 | 102(b) to all asserted patents | TEVA_XWAV_00026080 |
| Hechler, V., Ratomponirina, C., & Maitre, M. (1997). γ-Hydroxybutyrate conversion into GABA induces displacement of GABAB binding that is blocked by valproate and ethosuximide. *Journal of Pharmacology and Experimental Therapeutics*, *281*(2), 753-760. | 1997 | 102(b) to all asserted patents | TEVA_XWAV_00026048 |
| Jazz Pharmaceuticals Announces FDA Acceptance of New Drug Application for JZP-258 for Cataplexy and Excessive Daytime Sleepiness Associated with Narcolepsy, Jazz Pharmaceuticals plc, (Mar, 25, 2020) | May 2020 | | TEVA_XWAV_00026042 |
| Jazz settles with Amneal over generic, S&P Global Market Intelligence (Oct 12, 2018) | Oct. 2018 | | TEVA_XWAV_00025612 |
| JP 2000060506A, to Noro, J. | Feb. 2, 2000 | 102(b) to all asserted patents | TEVA_XWAV_00024070 |
| Karppanen, H., Karppanen, P., & Mervaala, E. (2005). Why and how to implement sodium, potassium, calcium, and magnesium changes in food items and diets? *Journal of human hypertension*, *19*(3), S10-S19. | 2005 | 102(b) to all asserted patents | TEVA_XWAV_00025783 |
| Kaufman, E. E., & Nelson, T. (1987). Evidence for the Participation of a Cytosolic NADP+-Dependent Oxidoreductase in the Catabolism of γ-Hydroxybutyrate In Vivo. *Journal of* | 1987 | 102(b) to all asserted patents | TEVA_XWAV_00026088 |

CONFIDENTIAL

| Reference | Pub. Date | Prior Art Status under Title 35 of the US Code | Beg Bates |
|---|---|---|---|
| *neurochemistry*, *48*(6), 1935-1941. | | | |
| Lemon, M. D., Strain, J. D., & Farver, D. K. (2006). Formulary Forum: Sodium Oxybate for Cataplexy. *Annals of Pharmacotherapy*, *40*(3), 433-440. | 2006 | 102(b) to all asserted patents | TEVA_XWAV_00022803 |
| Litvinovich, E. (2007). *MODULATION OF GAMMA-HYDROXY EUTYRATE* (Doctoral dissertation, University of Toronto). | 2007 | 102(b) to all asserted patents | TEVA_XWAV_00022811 |
| Maitre, M. (1997). The γ-hydroxybutyrate signalling system in brain: organization and functional implications. *Progress in neurobiology*, *51*(3), 337-361. | 1997 | 102(b) to all asserted patents | TEVA_XWAV_00022955 |
| Makary, P., Principles of Salt Formation, *UK Journal of Pharmaceutical and Biosciences,* 2014, 2(4), pp. 1 -4. | 2014 | 102(b) to '373 patent | TEVA_XWAV_00024058 |
| Malic Acid Compound Summary https://pubchem.ncbi.nlm.nih.gov/#query=malic%20acid | 2023 | | TEVA_XWAV_00025657 |
| Mamelak, M., Scharf, M. B., & Woods, M. (1986). Treatment of narcolepsy with γ-hydroxybutyrate. A review of clinical and sleep laboratory findings. *Sleep*, *9*(1), 285-289. | 1986 | 102(b) to all asserted patents | TEVA_XWAV_00026083 |
| Mason, P. E., & Kerns, W. P. (2002). Gamma hydroxybutyric acid (GHB) intoxication. *Academic Emergency Medicine*, *9*(7), 730-739. | 2002 | 102(b) to all asserted patents | TEVA_XWAV_00025796 |
| Mervaala, E. M., et al. (1994). Improvement of cardiovascular effects of metoprolol by replacement of common salt with a potassium-and magnesium-enriched salt alternative. *British journal of pharmacology*, *112*(2), 640-648. | 1994 | 102(b) to all asserted patents | TEVA_XWAV_00026033 |
| Mervaala, E. M., et al. (1994). Replacement of salt by a novel potassium-and magnesium-enriched salt alternative improves the cardiovascular effects of | 1994 | 102(b) to all asserted patents | TEVA_XWAV_00023894 |

| Reference | Pub. Date | Prior Art Status under Title 35 of the US Code | Beg Bates |
|---|---|---|---|
| ramipril. *British journal of pharmacology*, *111*(4), 1189-1197. | | | |
| Morris, K. R., et al. (1994). An integrated approach to the selection of optimal salt form for a new drug candidate. *International journal of pharmaceutics*, *105*(3), 209-217. | 1994 | 102(b) to all asserted patents | TEVA_XWAV_00023303 |
| Okun, M. S., et al. (2001). GHB: an important pharmacologic and clinical update. *J Pharm Pharm Sci*, *4*(2), 167-75. | 2001 | 102(b) to all asserted patents | TEVA_XWAV_00022980 |
| Pal, R., & Teotia, A. K. (2010). Date rape drugs and their forensic analysis: An update. *International Journal of Medical Toxicology & Legal Medicine*, *12*(3), 36-47. | 2010 | 102(b) to all asserted patents | TEVA_XWAV_00025915 |
| Rodriguez, C. J., et al. (2011). Association of sodium and potassium intake with left ventricular mass: coronary artery risk development in young adults. Hypertension, 58(3), 410-416. | 2011 | 102(b) to all asserted patents | TEVA_XWAV_00026073 |
| Rowe, R. C., Sheskey, P., & Quinn, M. (2009). Handbook of pharmaceutical excipients. Libros Digitales-Pharmaceutical Press. | 2009 | 102(b) to all asserted patents | TEVA_XWAV_00023828 |
| Rumigny, J. F., et al. (1980). Specific and non-specific succinic semialdehyde reductases from rat brain: Isolation and properties. *FEBS letters*, *117* (1-2), 111-116. | 1980 | 102(b) to all asserted patents | TEVA_XWAV_00022512 |
| Sacks, F.M., et alm, S. (2001). Effects on blood pressure of reduced dietary sodium and the Dietary Approaches to Stop Hypertension (DASH) diet. DASH-Sodium Collaborative Research Group. *N Engl J Med*, *344*, 3-10. | 2001 | 102(b) to all asserted patents | TEVA_XWAV_00024062 |
| Shinka, T., et al. (2003). Effect of valproic acid on the urinary metabolic profile of a patient with succinic semialdehyde dehydrogenase deficiency. *Journal of Chromatography B*, *792*(1), 99-106. | 2003 | 102(b) to all asserted patents | TEVA_XWAV_00026056 |

| Reference | Pub. Date | Prior Art Status under Title 35 of the US Code | Beg Bates |
|---|---|---|---|
| Strazzullo, P. (2013). Sodium in drugs and hypertension. *BMJ*, *347*. | 2013 | 102(b) to '373 patent | TEVA_XWAV_00023811 |
| Strazzullo, P., et al. (2009). Salt intake, stroke, and cardiovascular disease: meta-analysis of prospective studies. *Bmj*, *339*. | 2009 | 102(b) to all asserted patents | TEVA_XWAV_00022678 |
| Studies, D.I., 2012. Study Design, Data Analysis, Implications for Dosing, and Labeling Recommendations (Draft Guidance). US FDA, February. | 2012 | 102(a) to '922, '107, '173, '168, '258, '295,'102, '302,'306, '426, '400, '181, and '494 patents/ 102(b) to '373 patent | TEVA_XWAV_00025826 |
| Bighley, L. D., Berge, S. M., & Monkhouse, D. C. (1996). Salt forms of drugs and absorption. *Encyclopedia of Pharmaceutical Technology*, *13*, 453-499. | 1996 | 102(b) to all asserted patents | TEVA_XWAV_00022989 |
| Szarfman, A., et al. (1995). Declaring the sodium content of drug products. *New England Journal of Medicine*, *333*(19), 1291-1291. | 1995 | 102(b) to all asserted patents | TEVA_XWAV_00025650 |
| U.S. Application Pub. No. 2011/0111027 to Rourke, et al. | May 12, 2011 | 102(a) to '922, '107, '173, '168, '258, '295 / 102(b) to '102, '302,'306, '426, '400, '181, '494 and '373 patents | TEVA_XWAV_00022786 |
| U.S. Dept. of Justice, Drug Enforcement Administration, Microgram Journal, Vol. 3, Numbers 1-2, Jan.-Jun. 2005, pp. 1-104 | Jan. 2005 | 102(b) to all asserted patents | TEVA_XWAV_00023903 |
| U.S. Patent Application Pub No. 2003/0125385 to Cook, et al., | July 3, 2003 | 102(b) to all asserted patents | TEVA_XWAV_00022746 |
| U.S. Patent Application Pub No. 20030/134868A1 to Dewey, et al. | July 17, 2003 | 102(b) to all asserted patents | TEVA_XWAV_00022718 |
| U.S. Patent Application Pub No. US2009/0137565A1 to Frucht | May 28, 2009 | 102(b) to all asserted patents | TEVA_XWAV_00022923 |
| U.S. Patent Application Pub. No. 2006/0210630 to Liang, et al. | September 30, 2005 | 102(b) to all asserted patents | TEVA_XWAV_00026095 |

| Reference | Pub. Date | Prior Art Status under Title 35 of the US Code | Beg Bates |
|---|---|---|---|
| U.S. Patent No. 4,393,236 to Klosa | Jul. 12, 1983 | 102(b) to all asserted patents | TEVA_XWAV_00022946 |
| U.S. Patent No. 5,126,430 to Senga, et al. | June 30, 1992 | 102(b) to all asserted patents | TEVA_XWAV_00025905 |
| U.S. Patent No. 5,594,030 to Conte, et al. | Jan. 14, 1997 | 102(b) to all asserted patents | TEVA_XWAV_00022640 |
| U.S. Patent No. 6,780,889 to Cook, et al. | Aug. 24, 2004 | 102(b) to all asserted patents | TEVA_XWAV_00025613 |
| U.S. Patent No. 8,952,062 to Cook, et al. | Feb. 10, 2015 | 102(e) to ’922, ’107, ’173, ’168, ’258, ’295,’102, ’302,’306, ’426, ’400, ’181, and ’494 patents/ 102(b) to ’373 patent | TEVA_XWAV_00023242 |
| U.S. Patent File History No. 8,952,062 to Cook, et al. | Feb. 10, 2015 | 102(e) to ’922, ’107, ’173, ’168, ’258, ’295,’102, ’302,’306, ’426, ’400, ’181, and ’494 patents/ 102(b) to ’373 patent | TEVA_XWAV_00024107 |
| United States. Dietary Guidelines Advisory Committee. (2010). *Dietary guidelines for Americans, 2010* (No. 232). US Department of Health and Human Services, US Department of Agriculture. | 2010 | 102(b) to all asserted patents | TEVA_XWAV_00023038 |
| US Food and Drug Administration. (2013). FDA Drug Safety Communication: Warning against use of Xyrem (sodium oxybate) with alcohol or drugs causing respiratory depression. | 2013 | 102(a) to ’302,’306, ’426, ’400, ’181, and ’494 patents/102(b) to ’373 patent | TEVA_XWAV_00022518 |
| Vickers, M. D. (1968). Gamma hydroxybutyric acid: Clinical pharmacology and current status. | 1968 | 102(b) to all asserted patents | TEVA_XWAV_00023807 |
| Wang, Y. G., et al. (2009). Safety overview of postmarketing and clinical experience of sodium oxybate (Xyrem): abuse, misuse, dependence, | 2009 | 102(b) to all asserted patents | TEVA_XWAV_00022528 |

CONFIDENTIAL

| Reference | Pub. Date | Prior Art Status under Title 35 of the US Code | Beg Bates |
|---|---|---|---|
| and diversion. *Journal of clinical sleep medicine*, *5*(4), 365-371. | | | |
| Waszkielewicz, A., & Bojarski, J. (2004). γ-hydroxybutyric acid (GHB) and its chemical. *J. Pharmacol*, *56*, 43-49. | 2004 | 102(b) to all asserted patents | TEVA_XWAV_00024100 |
| Wedin, G. P., et al. (2006). The clinical development of γ-hydroxybutyrate (GHB). *Current Drug Safety*, *1* (1), 99-106. | 2006 | 102(b) to all asserted patents | TEVA_XWAV_00022652 |
| Weiss, T., Müller, D., Marti, I., Happold, C., & Russmann, S. (2013). Gamma-hydroxybutyrate (GHB) and topiramate—clinically relevant drug interaction suggested by a case of coma and increased plasma GHB concentration. *European journal of clinical pharmacology*, *69*, 1193-1194. | 2013 | 102(a) to ’302,’306, ’426, ’400, ’181, and ’494 patents/102(b) to ’373 patent | TEVA_XWAV_00023282 |
| Whelton, P. K., et al. (2012). Sodium, blood pressure, and cardiovascular disease: further evidence supporting the American Heart Association sodium reduction recommendations. *Circulation*, *126* (24), 2880-2889. | 2012 | 102(a) to ’922, ’107, ’173, ’168, ’258, ’295 / 102(b) to ’102, ’302,’306, ’426, ’400, ’181,’494 and ’373 patents | TEVA_XWAV_00023212 |
| WO 2014/093791 PCT to Allphin, C.P., et. al. | June 19, 2014 | 102(b) to ’373 patent | TEVA_XWAV_00022866 |
| World Health Organization. (2005). *Clinical guidelines for the management of hypertension*. | 2005 | 102(b) to all asserted patents | TEVA_XWAV_00022543 |
| Xyrem, EPAR-Sodium oxybate, Scientific Discussion, 2006. | 2006 | 102(b) to all asserted patents | TEVA_XWAV_00024007 |
| Xyrem® (sodium oxybate) oral solution 2008. Prescribing Information | 2008 | 102(b) to all asserted patents | TEVA_XWAV_00023820 |
| Xyrem® (sodium oxybate) oral solution, CIII, FDA Approval 2002 (Rev. November 2005) | 2005 | 102(b) to all asserted patents | TEVA_XWAV_00023318 |
| Yang, Q., et al. (2011). Sodium and potassium intake and mortality among US adults: prospective data from the Third National Health and Nutrition Examination Survey. *Archives of* | 2011 | 102(b) to all asserted patents | TEVA_XWAV_00023885 |

| Reference | Pub. Date | Prior Art Status under Title 35 of the US Code | Beg Bates |
|---|---|---|---|
| *internal medicine*, *171*(13), 1183-1191. | | | |
| Zhou, X., et al. (2009). Compound ion salt, a novel low-sodium salt substitute: from animal study to community-based population trial. *American journal of hypertension*, *22*(9), 934-942. | 2009 | 102(b) to all asserted patents | TEVA_XWAV_00023377 |

**1) The Nature of the Alleged Inventions**

The Asserted Claims of the Asserted Patent are directed to pharmaceutical compositions and formulations comprising mixed salts (i.e., calcium, magnesium, potassium, and sodium) of GHB, and to methods of treatment that involve administering the same to a patient in combination with divalproex sodium/valproate/valproic acid or after the patient has consumed food.

**2) The State of the Prior Art**

GHB has been the subject of research since at least by 1963 and has been available as an approved pharmaceutical, to treat cataplexy attacks in patients with narcolepsy, since 2002. The specification of the ’922 Patent, for example, discusses the state of the art at the time the patent was filed and acknowledges that oral solutions of GHB and treatments were described in prior patents, which the ’922 Patent incorporated by reference:

> GHB treatment substantially reduces the signs and symptoms of narcolepsy, i.e., daytime sleepiness, cataplexy, sleep paralysis, and hypnagogic hallucinations. In addition, GHB increases total sleep time and REM sleep, and it decreases REM latency, reduces sleep apnea, and improves general anesthesia (see, e.g., U.S. Pat. Nos. 6,472,431; 6,780,889; 7,262,219; 7,851,506; 8,263,650; and 8,324,275; each of which is incorporated herein by reference in its entirety).

’922 Patent, 1:37-46. Additionally, the ’922 Patent acknowledges that an oral solution of GHB,

"[s]odium oxybate (N.GHB, commercially solid as Xyrem®, [was] approved for the treatment of excessive sleepiness and cataplexy in patients with narcolepsy. *Id.* at 1:47-49. Notwithstanding the patent's characterization that, "[l]ittle research has been done on salts of GHB, other than Na.GHB" and the patentee's unawareness of "combing multiple salts," the prior art shows that the state of the art was well developed and overlapping with the claims of the Asserted Patents.

**C. Level of Ordinary Skill in the Art**

The subject matter of the '922; '306; '173; '302; '107; '426; '168; '400; '258; '181; '494 and '373 patents falls within the field of the chemical/pharmaceutical arts. The level of skill in the art is relatively high, and a person of ordinary skill in the art ("POSA") to whom the Asserted Patents pertain would be an individual having at least a Bachelor's degree, and more likely a Master's degree or Doctoral degree, in the field of pharmaceutical chemistry/formulation, pharmaceutics, organic chemistry, medicine, or a related discipline, and several years of experience in developing and formulating pharmaceutically active compounds, including oral dosage formulations and/or in treating patients and/r research related to the treatment of patients with neurologic disorders including but not limited to narcolepsy, cataplexy, daytime sleepiness, myoclonis, epilepsy, bipolar depression and/or bipolar disorder. Moreover, since drug development is a multi-disciplinary effort, a POSA would have had access to and been able to interface or consult with individuals having specialized expertise in other areas relevant to drug development. For example, an artisan with personal expertise in pharmaceutical chemistry/formulation would have had access to one or more individuals with experience in treating patients with sleep disorders, bipolar disorder and/or bipolar depression. Similarly, an artisan with personal experience in the treatment of patients with neurologic disorders would have had access to one or more individuals with experience in the formulation of pharmaceuticals. *See*

*E.I. DuPont de Demours & Co. v. Monsanto*, 903 F. Supp. 680, 751 (D. Del. 1995), *affd*, 92 F.3d 1208 (Fed. Cir. 1996). A POSA would have easily understood the prior art references referred to here, and would have had the capability to draw inferences from them.

### D. Comparison of the Prior Art to the Claims

#### a. Jazz's Asserted Claims

On July 18, 2023, Jazz asserted 293 claims across 13 patents. Jazz's U.S. Patent Nos. 8,591,922, 9,132,107, 8,901,173, 10,195,168; 10,675,258 and 11,554,102 (collectively the "mixed salt patents") are all related and claim the benefit of U.S. Provisional Patent Application No. 61/737,695, filed Dec. 14, 2012. This family of patents collectively claims pharmaceutical compositions and formulations of mixed gamma-hydroxybutyrate ("GHB") salts and methods of using the same to treat cataplexy or daytime sleepiness in patients diagnosed with narcolepsy. More specifically, the mixed salt patents claim one or more of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.(GHB)2), and a calcium salt of gamma-hydroxybutyrate (Ca.(GHB)2), along with routines excipients. While some of the mixed salt patents recite wt/wt % values, ratios and ranges of various combinations of the mixed salts, Teva knows of no unexpected results attributable to those assigned values ratios and ranges. These claims are simply directed to different low-sodium salt formulations that have been claimed. All of the different claimed GHB salts were known in the art, as was the use of GHB to treat cataplexy or daytime sleepiness in patients diagnosed with narcolepsy. Additional claim limitations directed to liquid formulations, solvents such as water, suitability for oral administration, pH adjusting or buffering agents, or chemically stable and resistance to microbial growth were all also either generally well known, and/or explicitly disclosed in the prior art. Teva knows of no novel features in the asserted claims

of the mixed salt patents. Moreover, the motivation to reduce the glaring sodium load attendant from prior art sodium oxybate formulations was found throughout the prior art.

Jazz's U.S. Patent Nos. 9,050,302, 8,772,306, 9,486,426, 10,213,400, 10,864,181; and 11,253,494 (collectively the "co-administration patents") are related and claim the benefit of U.S. Provisional Application No. 61/771,557, filed Mar. 1, 2013, and U.S. Provisional Application No. 61/777,873, filed Mar. 12, 2013. This family of patents collectively claims methods for the treatment of various conditions (e.g., excessive daytime sleepiness, cataplexy, sleep paralysis, apnea, narcolepsy, sleep time disturbances, hypnagogic hallucinations, sleep arousal, insomnia, or nocturnal myoclonus) by administering a reduced dosage of GHB to a patient who is currently taking divalproex sodium. Many references discuss or contemplate such a co-administration and/or the manner in which GHB's plasma levels are increased as a result. The asserted claims of the co-administration patents are thus directed to an obvious modification that prescribing physicians would have made when confronted with one active ingredient that inhibited the metabolism of a second co-administered active ingredient. Jazz's claim directed to reducing the GHB dosage to counteract the effects of divalproex sodium/valproic acid is a product of common sense rather than innovation. The asserted claims of the co-administration patents would have been obvious to a POSA in view of ample prior art teaching that divalproex sodium/valproic acid potentiates the effects of GHB when the two are concomitantly or co-administered.

Finally, U.S. Pat. No. 11,426,373 ("the '373 patent") claims methods of reducing a food effect that occurs when GHB is administered after a meal. The asserted claims of the '373 patent generally involve administration of GHB to a patient having cataplexy in narcolepsy or excessive daytime sleepiness within four hours after eating. While Jazz purports to have discovered that by timing the administration of GHB relative to the patient's meal, there will be less of a food effect

and better metabolism of GHB, this was already known in the prior art and even the subject of research article exploring the effects of a high-fat meal on GHB metabolism. Thus, the '373 patent teachings nothing new, as the prior art describes how high-fat meal (e.g., food) lowers blood plasma levels of GHB and the '373 patent teaches and claims obvious timing effects. The claims dictating periods of delay for the administration of GHB after a meal simply follow those teachings of the prior art. Moreover, while some embodiments claim pharmacokinetic values and measurements (e.g., AUC or $C_{max}$) and known methods of measuring the same after GHB is administered to a patient who has consumed food, these are merely inherent properties or effects seen after such administration, as described by the prior art.

**b. GHB was well known prior to Xyrem® and Xywav®**

GHB, the active pharmaceutical ingredient used in the purported "inventions" claimed by the Asserted Patents is a naturally occurring compound that is not new. As the '922 patent notes, GHB "is an endrogenous compound with hypnotic properties that is found in many human body tissues." '922 patent, 1:27-29. Although GHB exists in a dissociated state in liquid formulations, "oxybate salts" are the salt forms of GHB and are approved for the treatment of cataplexy (a condition where patients suddenly lose muscle tone, including voluntary muscle control, while awake) and excessive daytime sleepiness in patients with narcolepsy. GHB has a molecular weight of 103.097 g/mol and is the deprotonated form of gamma-hydroxybutyric acid, which has an empirical formula of $C_4H_80_3$, a molecular weight of 104.105 g/mol, and the following molecular structure:



GHB can form salts with alkali metals, such as sodium and potassium, and alkaline earth metals, such as magnesium and calcium. Sodium and potassium form mono-oxybate salts, as they have a valence of +1, and magnesium and calcium can form either mono- or di-oxybate salts, as they have a valence of +2. Sodium gamma-hydroxybutyrate, also known as sodium oxybate, has an empirical formula of $C_4H_7NaO_3$, a molecular weight of 126.087 g/mol, and the following molecular structure:



Potassium gamma-hydroxybutyrate, also known as potassium oxybate, has an empirical formula of $C_4H_7KO_3$, a molecular weight of 142.195 g/mol, and the following molecular structure:



Magnesium gamma-hydroxybutyrate, also known as magnesium oxybate, is a di-acid salt, has an empirical formula of $C_8H_{14}MgO_6$, a molecular weight of 230.499 g/mol, and the following molecular structure:



Calcium gamma-hydroxybutyrate, also known as calcium oxybate, is also a di-acid salt, has an empirical formula of $C_8H_{14}CaO_6$, a molecular weight of 246.272 g/mol, and the following

molecular structure:



According to the mixed salt patents, the magnesium and calcium oxybate salts used in the patented formulations are di-oxybate salts. *See e.g.,* '922 patent, 13:39-45. Thus, while each mole of sodium or potassium oxybate provides one molar equivalent of GHB, each mole of magnesium or calcium oxybate provides two molar equivalents of GHB. *See id.*

Gamma-hydroxybutyrate compositions were reportedly first synthesized in the 1920's. *See Gamma Hydroxybutyrate (GHB),* Office of National Drug Control Policy fact sheet ("GHB NDCP") at 1. In the late 1900's, GHB was sold by health food stores as a performance enhancing supplement in bodybuilding formulas until the Food and Drug Administration (FDA) banned it in 1990. *Id.* Since that time, GHB has been widely investigated to treat a variety of conditions, including as an anesthetic agent, a treatment for depression, epilepsy and muscle disorders, alcohol and substance withdrawal, and as a treatment for narcolepsy and other sleep disorders. *Okun*, 167. Sodium oxybate is approved in Germany as the anesthetic, Somsanit® (Dr. F. Köhler Chemie), and in Austria and Italy for the treatment of opioid and alcohol withdrawal as Alcover® syrup (Laboratorio Farmaceutico). *See e.g., Conte,* 9:49-52; *Carter*, 1. In the 1990s, an Italian group affiliated with the Laboratorio Farmaceutico patented controlled release GHB formulations to treat food and drug addiction and depressive and anxious states. *See Conte*, Abstract. Later in 2002, sodium oxybate was approved in the U.S. as Xyrem® to treat cataplexy associated with narcolepsy. *See e.g., Xyrem label*, 1.

**a. GHB was previously approved to treat conditions of narcolepsy**

As discussed, the prior art, and primarily the *Xyrem label*, taught the oral administration of an aqueous liquid solution of the sodium salt of GHB for the treatment of cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy. The *Xyrem label* discloses that the concentration of the aqueous sodium GHB solution prior to dilution is 0.5 g/mL, and that dosing is typically between 6 g to 9 g per day, which can be divided into 2 equal doses. *Xyrem label,* 2 and 22-23. The *Xyrem label* further teaches that the first dose should be taken at bedtime and the second dose administered 2.5 to 4 hours later. *Id.* at 23.

The *Xyrem label* disclosed the use of sodium oxybate in the form of an aqueous oral solution for the treatment of cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy sleep disorders. *Id.,* 2. The *Xyrem label* discloses that the concentration of the aqueous sodium GHB solution prior to dilution is 0.5 g/mL, and that dosing is typically between 6 g to 9 g per day, which can be divided into 2 equal doses. *Id.,* 2 and 22-23. The *Xyrem label* further teaches that the first dose should be taken at bedtime and a second dose administered 2.5 to 4 hours later. *Id.* at 23. The aqueous oral solution has a pH adjusted to 7.5 using malic acid. *Id.,* 2.

The *Xyrem label* discloses an adult dosage of 6 g to 9 g of sodium oxybate per night in two equal doses 2.5 to 4 hours apart. *See e.g., id.,* 2-3. Initially, the dosage can be 4.5 g per night in two equal doses, which can then be increased, or decreased depending on the patient, then increased to 6 g per night, 7.5 g per night, and/or 9 g per night, in two equal doses. *See e.g., id.,* 22-23. For patients sensitive to high sodium intake, the Jazz Xyrem ® label recommended reduced dosages below 6 g per night, including 3 g per night and 4.5 g per night. *Id.,* 12-13.

The *Xyrem label* also discloses the protocol and results of the clinical studies as well as the adverse reactions that occurred. *See generally id.,* 4-20. The *Xyrem label* reports a dose-response

relationship noting that "[d]iscontinuations of treatment due to adverse events were most common at the highest dose of sodium oxybate. A dose-response relationship was observed for nausea, vomiting, paresthesia, disorientation, irritability, disturbance in attention, feeling drunk, sleepwalking and enuresis." *Id.*, 17.

The *Xyrem label* also discloses drug interactions. *Id.,* 16. "Xyrem is contraindicated for use in combination with alcohol or sedative hypnotics. Use of other CNS depressants may potentiate the CNS-depressant effects of Xyrem [see Warnings and Precautions (5.1)]." *Id.*

The *Xyrem label* also provides information about use in specific populations. *Id.*, 16-18. For example, in patients with hepatic impairment, "[b]ecause of an increase in exposure to Xyrem, the starting dose should be reduced by half in patients with hepatic impairment [see Dosage and Administration (2.4) and Clinical Pharmacology (1 2.3)]." *Id.,*18. The *Xyrem label* also provided information relating to pharmacokinetics. "Following oral administration of Xyrem, GHB is absorbed rapidly across the clinical dose range, with an absolute bioavailability of about 88%. The average peak plasma concentrations ($C_{max}$) following administration of each of the two 2.25 g doses given under fasting conditions 4 hours apart were similar. The average time to peak plasma concentration ($T_{max}$) ranged from 0.5 to 1.25 hours. Following oral administration of Xyrem, the plasma levels of GHB increased more than dose-proportionally, with blood levels increasing 3.7-fold as total daily dose is doubled from 4.5 g to 9 g. Single doses greater than 4.5 g have not been studied…. Administration of Xyrem immediately after a high-fat meal resulted in delayed absorption (average $T_{max}$ increased from 0.75 hr to 2 hr) and a reduction in $C_{max}$ of GHB by a mean of 59% and of systemic exposure (AUC) by 37%." *Id.*

Thus, most of the same indications treated by Xywav® were previously treated by Xyrem® and the *Xyrem label* in particular, would have provided a POSA with a broad base of knowledge.

Another reference, U.S. Patent 8,952,062 to Cook et al. ("the '062 patent), entitled Microbiologically Sound and Stable Solutions of Gamma-hydroxybutyrate Salt for the Treatment of Narcolepsy that published on October 10, 2013 disclosed pharmaceutical compositions of gamma-hydroxybutyrate (GHB) and methods of using the same to treat a number of disorders including apnea, sleep time disturbances, narcolepsy, cataplexy, sleep paralysis, hypnagogic hallucination, sleep arousal, insomnia, and nocturnal myoclonus. The '062 patent also teaches the production of pharmaceutical compositions of gamma-hydroxybutyrate (GHB), the sodium salt of GHB (**sodium oxybate**), **magnesium** salt of GHB, **potassium** salt of GHB , and **calcium** salt of GHB. *See generally*, the '062 patent. The '062 patent specification also describes Xyrem® and its clinical trials including and dosage levels from 1.5-9 grams, concentrations including 500 mg/ml, pH values adjusted with malic acid, and the use of other well known excipients. *See e.g.,* '062 patent, 17:16-19:52.

The '062 patent specification also published years earlier as US Patent Pub. 2003/0125385 ("*Cook*"), entitled Microbiologically Sound and Stable Solutions of Gamma-hydroxybutyrate Salt for the Treatment of Narcolepsy, which published on July 3, 2003. *Cook* disclosed the same subject matter as the '062 patent, including the details about mixed GHB salts in various formulations, the treatment of the same conditions, dosing, etc. The Jazz XYREM® European Public Assessment Report - Scientific Discussion published in 2006 ("*Jazz XYREM EPAR*") also provides similar details about the use of GHB to treat narcolepsy and other conditions. *See generally, id.*

**b. Xyrem® (sodium oxybate)'s problematic sodium load**

A major drawback of Xyrem® is the large amounts required for dosing and the attendant sodium load. The *Xyrem label* recommends dosing from 4.5 to 9 ***grams*** per day. Where each gram

of Xyrem® contains 183 mg of sodium, this equals 823.5-1,647[2] milligrams of sodium ingested each day by patients, outside of their normal diet. Notwithstanding this problem and its small patient population as an orphan drug, Xyrem® achieved blockbuster status with revenues of $1.19 billion in 2017. *See Jazz settles with Amneal over generic version of blockbuster sleep disorder drug,* S&P Global Market Intelligence (Oct. 12, 2018), *available at* https://www.spglobal.com/marketintelligence/en/news-insights/blog/insight-weekly-september-12-2023.

Notwithstanding its ability to charge a premium for Xyrem® for many years due to its FDA-provided market exclusivity, Jazz reformulated its GHB pharmaceutical composition by replacing some of the sodium oxybate with mixed alternative salt forms of GHB, which was approved as Xyrem®. Teva is not aware of any therapeutic benefits resulting from the mixed GHB salts beyond a reduced sodium load. That was an issue that even Jazz highlighted in its marketing materials in order to help promote the higher priced Xywav® as an alternative to Xyrem®. In one adverstisement, Jazz compared taking 9 grams of Xyrem® to consuming **more than four (4)** orders of **large** French fries.




[2] While Jazz publicly reports 820-1640 milligrams of sodium for these dosages, the differences are inconsequential.

*See* https://www.xywav.com/narcolepsy/lower-sodium-oxybate-treatment-option/ (annotated).

But patients and prescribers did not need to see an advertisement from Jazz to highlight the fact that ingesting gram quantities of sodium each day is sub-optimal, and potentially dangerous. This would have been obvious to a POSA and even to a layman. Americans have long been encouraged to monitor their sodium intake as part of a healthy diet. For example, 2010 dietary guidelines from the U.S. Department of Health and Human Services recommends reducing daily sodium intake to less than 2,300 milligrams a day for all Americans, and less than 1,500 milligrams for people 51 and older. *See e.g., Dietary Guidelines for Americans 2010 available at* https://health.gov/sites/default/files/2019-10/DietaryGuidelines2010.pdf at 20 ("The 1,500 mg recommendation applies to about half of the U.S. population, including children, and the majority of adults.").

In 2012, the American Heart Association (AHA) recommended a sodium intake <1500 mg/d ***for the entire US population***. *See* Whelton, P.K. et. al, *Sodium, potassium, blood pressure, and cardiovascular disease in humans.* Current hypertension reports, 16:1-8 (2014). The World Health Organization has estimated that high blood pressure causes one in eight deaths globally, making hypertension the third leading cause of death in the world. *See* Clinical Guidelines for the Management of Hypertension, *available at* https://applications.emro.who.int/dsaf/dsa234.pdf at 5. A 2012 editorial in the American Journal of Public Health also noted that "mean sodium intake in the United States today remains more than twice the recommended daily limit for half of all adults," highlighting an ongoing health problem. *See* Angell, S.Y. and Farley, T.A., *Can we finally make progress on sodium intake?* American Journal of Public Health, 102:1625-1627 (2012). The article goes on to note that in addition to the health benefits, reducing daily sodium intake would also deliver large economic benefits. *Id.* ("Reducing the average intake by 1200 milligrams per

day would save up to an estimated 92 000 lives and up to $24 billion in health care costs annually, and would thus be one of the most effective steps this country could take to promote health."); *see also* Havas, S., et.al, *The urgent need to reduce sodium consumption*. JAMA, 298:1439-1441 (2007) ("In the United States, more than 27% of adults have hypertension and another 31% have prehypertension. The lifetime probability of developing hypertension in the United States approaches 90%.").

Within the medical community, physicians have alerted their colleagues and the public to the specific risks posed by sodium levels, including in pharmaceuticals. In a letter to the editor of the New England Journal of Medicine, a group of physicians at the FDA raised concerns about the sodium content of over the counter ("OTC") and prescription drugs. *Szarfman A.*, et. al, *Declaring the sodium content of drug products*. NEJM, 333(19), 1291-1291 (1995) ("*Szarfman*") at 1291. *Szarfman* points out that the sodium load delivered by some medicinals may be large and underappreciated. *Id.* ("Those who prescribe medications may be unaware that they may contain substantial amounts of sodium."). *Szarfman* also discusses rules proposed by the FDA and that would require "the labeling of the sodium content of over-the-counter drugs" with the additional promise "working with pharmaceutical organizations to develop voluntary sodium labeling for prescription drugs." *Id.* (citing Fed. Reg. 1991; 56:1922 (Drug labeling: sodium labeling for over-the-counter drugs: proposed amendment). *Szarfman* encourages physicians to learn about the sodium load that prescriptions carry, including getting that information directly from the manufacturer if necessary. The proposed FDA rules that *Szarfman* discusses were published in the Federal Register with docket number [90N–0309] and they addressed sodium labeling for over-the-counter drugs. Drug Labeling; Sodium Labeling for Over-the-Counter Drugs, 61 Fed. Reg. 17,798 (Apr. 22, 1995).

That guidance was updated in 2004 and again published in the Federal Register. *See Drug Labeling; Sodium Labeling for Over-the-Counter Drugs; Technical Amendment*; Termination of Delay of Effective Date; Compliance Dates**,** 69 Fed. Reg. 13,717 (Mar. 24, 2004). The FDA Regulations teach that sodium should be monitored on both a single and daily dosage level and provide low thresholds for triggering warning labels (e.g., 5 mg of sodium per dose or 140 mg of sodium per day). 61 Fed. Reg. at 17,798. The FDA Regulations also endorse the disclosure of sodium contents by prescription drug makers so that "physicians, pharmacists, and consumers" can all make informed decisions. *Id.* However, the FDA determined that "prescription drug labeling is outside the scope of this rulemaking for OTC drug products" and instead encouraged "sodium content labeling of prescription drugs on a voluntary basis" by prescription drug makers. *Id.* From these FDA regulations, a POSA would have been alerted and reminded that sodium content can be issue for pharmaceuticals. A POSA would have also appreciated that at 9 g/day, a single dose of Xyrem® could have **819 mg** of sodium, which is more than 150 times greater than the 5 mg limit necessary to trigger a warning label for OTC drugs. The daily load of **1638 mg** (1.64 grams!) is also more than ten (10) times higher than the 140 mg limit necessary to trigger a warning label for OTC drugs. These sodium loads are reported directly on the *Xyrem label* and they would have been squarely in front of a POSA.

**Table 5**
**Sodium Content per Total Nightly Dose**

| Xyrem Dose (g) | Xyrem (mL) | Sodium Content/Dose |
|---|---|---|
| 3 | 6 | 546 mg |
| 4.5 | 9 | 819 mg |
| 6 | 12 | 1092 mg |
| 7.5 | 15 | 1365 mg |
| 9 | 18 | 1638 mg |

*Xyrem label,* 11.

Moreover, even at the lower daily doses the sodium load is still extremely high, with more than half a gram of sodium accompanying the lowest 3 gram dose. *Id.* Although Xyrem® is not an OTC drug, the huge sodium load would have been impossible to ignore, especially where the FDA was requesting voluntary disclosures of sodium levels in pharmaceuticals made by prescription drug makers.

Jazz has itself acknowledged a "broad scientific consensus that reducing daily sodium consumption is associated with clinically meaningful reductions in blood pressure and cardiovascular disease risk," and a POSA would have been mindful of that information as well. *See e.g., Jazz Pharmaceuticals Announces FDA Acceptance of New Drug Application for JZP-258 for Cataplexy and Excessive Daytime Sleepiness Associated with Narcolepsy, available* at https://www.prnewswire.com/news-releases/jazz-pharmaceuticals-announces-fda-acceptance-of-new-drug-application-for-jzp-258-for-cataplexy-and-excessive-daytime-sleepiness-associated-with-narcolepsy-301029906.html. That was not new information in 2020, but it reflects the near-universal understanding that excess sodium was bad, and it therefore only follows that a patient taking 9 grams of Xyrem® a day would exceed the recommended daily sodium limits before any food consumption was even accounted for.

Moreover, a POSA would have already appreciated the general need to reduce the sodium loads to help promote clinically meaningful reductions in blood pressure and cardiovascular disease risk. There were scientific articles highlighting the problem of too much sodium consumption, as well as joint USDA and DHHS guidelines that, *inter alia*, advised that about half of the U.S. population, including children, and the majority of adults, should reduce sodium consumption to less than 1,500 milligrams per day. *See generally e.g.,* Havas, S., et. al,. *The urgent need to reduce sodium consumption,* JAMA, 298:1439-1441 (2007); United States Dietary

Guidelines Advisory Committee, *Dietary guidelines for Americans, 2010*, US Department of Health and Human Services, US Department of Agriculture (2010).

Accordingly, a POSA would have searched for alternatives that reduce the attendant sodium load being delivered by Xyrem®. Fortunately, the solution was clear and it involves straightforward salt switches that were well known and documented in the prior art. *See e.g.,* Karppanen, H., et. al, *Why and how to implement sodium, potassium, calcium, and magnesium changes in food items and diets?,* Journal of human hypertension, 19(3), S10-S19 (2005) ("Karppanen"), Abstract ("For the prevention and basic treatment of elevated blood pressure, various methods to decrease the intake of sodium and to increase the intakes of potassium, calcium, and magnesium should be comprehensively applied in the communities."). For example, Karppanen discusses "the role of dietary sodium, potassium, calcium, and magnesium in the pathogenesis, prevention, and treatment of elevated blood pressure (hypertension)" and recommends less sodium in favor of the other three. *See e.g., id.* at S10; *see also id.* at S16 ("The best scientifically based and technically suitable possibility, which has already been shown to be useful, is offered by the known beneficial effects of increased intakes of potassium, calcium, and magnesium."). *Karppanen* taught that excessive sodium causes increased blood pressure, which is a mechanism that assists the body's ability to excrete excess sodium. *Id.*, S11. Karppanen therefore recommended reducing sodium intake and increasing intake of potassium, magnesium and calcium. *Id.*, S12-S14. *Karppanen* also taught that reducing sodium intake reduces both systolic and diastolic blood pressure. *Id.*, S12. *Karppanen* further taught that increasing intake of each of potassium, magnesium and calcium alone also reduces systolic and diastolic blood pressure. *Id.*, S13. *Karppanen* concluded that reducing sodium intake combined with increasing the intake of potassium, magnesium and calcium would provide the best pathway to reducing high blood

pressure. *Id.*

These types of salt adjustments were already underway for different food additives. *See e.g.,* JP2000060506A, *Composition of highly concentrated mineral solution for addition and its production*, published on February 29, 2000 ("Noro"). For example, Noro showed that salt compositions having various ratios of sodium, potassium, magnesium, and calcium within various ranges can be made, optimized, and used in ratios to enhance the taste of water. (*See* Abstract). Noro taught that by adjusting salt ratios within suitable range(s), a healthier solution of calcium, magnesium, sodium, and potassium salts could be produced. *Id.*

A POSA would have also been aware of the generally availability of alternative salt forms, of which calcium, magnesium and potassium would have been top choices. *See e.g.,* Bighley, L. D., et. al, *Salt forms of drugs and absorption*, Encyclopedia of Pharmaceutical Technology, (Eds: J. Swarbrick, JC Boylan) Vol. 13 (1996) ("*Bighley*"). *Bighley* discusses the salt selection process for drugs as well as the ease of switching between different salt forms. *See id.* at 453 ("Salt formation is frequently performed on weak acidic or basic drugs because it is a relatively simple chemical manipulation which may alter the physicochemical, formulation, biopharmaceutical, and therapeutic properties of a drug without modifying the basic chemical structure."). This certainly would have been the case for switching from sodium oxybate to an alternative salt, and especially calcium, magnesium, and potassium salts which *Bighley* identified as the most common. *See id.,* 456 (Table 2 below) (reporting sodium (57.7%), calcium (12.2%), potassium (9.8%) and magnesium (4.5%)).

**TABLE 2** Cationic Pharmaceutical Salt Forms Currently in Use

| Organic Cation | Percent[a] | Metallic Cation | Percent[a] |
|---|---|---|---|
| Ammonium | 1.95 | Aluminum | 1.35 |
| Benethamine (*N*-Benzylphenethylamine) | 0.15 | Bismuth | 0.30 |
| Benzathine (*N,N'*-Dibenzylethylenediamine) | 0.45 | Calcium | 12.18 |
| Betaine ((Carboxymethyl)trimethylammonium hydroxide) | 0.15 | Lithium | 0.90 |
| Carnitine | 0.15 | Magnesium | 4.51 |
| Clemizole[b] | 0.15 | Neodymium | 0.15 |
| Chlorcyclizine 1-(4-Chorobenzyhydryl)-4-methylpiperazine) | 0.15 | Potassium | 9.77 |
| Choline | 0.60 | Rubidium | 0.15 |
| Dibenzylamine | 0.15 | Sodium | 57.74 |
| Diethanolamine | 0.45 | Strontium | 0.30 |
| Diethylamine | 0.60 | Zinc | 1.05 |
| Diethylammonium | 0.15 | | |
| Eglumine (*N*-Ethylglucamine) | 0.15 | | |
| Erbumine (*t*-Butylamine) | 0.15 | | |
| Ethylenediamine | 0.15 | | |
| Heptaminol (6-Amino-2-methylheptan-2-ol) | 0.15 | | |
| Hydrabamine (*N,N'*-Di(dihydroabietyl)ethylenediamine | 0.15 | | |
| Hydroxyethylpyrrolidone | 0.15 | | |
| Imidazole | 0.30 | | |
| Meglumine (*N*-Methylglucamine) | 2.41 | | |
| Olamine | 0.45 | | |
| Piperazine | 0.90 | | |
| 4-Phenylcyclohexylamine | 0.51 | | |
| Procaine | 0.15 | | |
| Pyridoxine | 0.15 | | |
| Triethanolamine | 0.15 | | |
| Tromethamine (Tris(hydroxymethyl)aminomethane) | 0.90 | | |

In addition, *Bighley* provides specific guidance that would have further motivated a POSA to make mixed GHB salt forms. *Bighley* instructs that for acidic drugs, the first salt to select is the sodium salt before moving on to a very short list of alternative cations that includes calcium, magnesium, and potassium salts.

> ***The first salt form that should be prepared is the sodium salt*** if the patient does not have a restriction on sodium intake.
> ***
> ***If the sodium salt proves to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium,*** or zinc. As the ionic cation potential increases, the bond distances become shorter and can result in higher melting points, and perhaps lower solubility and higher chemical

> stability. Cations such as lithium, copper, or aluminum should be avoided because they may produce pharmacological effects.

*Bighley*, 482-83 (emphasis added). Thus, *Bighley* instructs a POSA to start with sodium before moving on to one of the other four metallic cations if there are dietary restrictions. *Bighley* diagrams this process in its "Decision tree for salt selection." *See id.,* 481 (Table 1).




**FIG. 1.** Decision tree for salt selection.

While *Bighley* notes that "[c]ases recording the adverse consequences of sodium salts per se are rare and the sodium salt therefore continues to be the salt form of choice," a POSA would appreciate that dietary restrictions do not need to be present before drugs delivering **gram**

quantities of sodium approach or exceed the recommended daily limit and become a health concern. A POSA would have recognized the need in those situations to reduce the sodium load by switching to, or including alternative salt forms of GHB.

Another reference that would have been known to a POSA was Berge, S. M., et. al, *Pharmaceutical salts*. Journal of pharmaceutical sciences, 66:1-19 (1977) ("*Berge*"). Table 1 of *Berge* shows 14 FDA-approved, commercially marketed cations, that are useful for making pharmaceutically-acceptable salts along with their relative frequency based on the total number of anions or cations in use through 1974. *Berge* breaks that list of 14 cations into 2 groups: Organic and metallic.

| Cation | Percent[a] | Cation | Percent[a] |
|---|---|---|---|
| Organic: | | Metallic: | |
| Benzathine[k] | 0.66 | Aluminum | 0.66 |
| Chloroprocaine | 0.33 | Calcium | 10.49 |
| Choline | 0.33 | Lithium | 1.64 |
| Diethanolamine | 0.98 | Magnesium | 1.31 |
| Ethylenediamine | 0.66 | Potassium | 10.82 |
| Meglumine[l] | 2.29 | Sodium | 61.97 |
| Procaine | 0.66 | Zinc | 2.95 |

[a] Percent is based on total number of anionic or cationic salts in use through 1974. [b]

Sodium is known metallic cation, and *Berge* discloses a short list of 6 alternative metallic cations, all of which had been previously used in pharmaceutically-acceptable salts. Thus, *Berge* would have showed a POSA that there was a limited number of alternative cations, and an even shorter list of metallic cations. Moreover, a POSA would have appreciated the fact that *Berge*'s use data largely aligns with *Bighley*'s teachings of salt forms currently in use. One exception is magnesium which became more common according to the later-published, *Bighley*.

A POSA would have also appreciated from direct examples that synthesizing different GHB salts was easy and routine. U.S. Patent Application Pub. 2006/0210630 to Liang et al. ("*Liang*"), entitled Controlled release compositions of gamma-hydroxybutyrate discusses GHB salts in the prior art, including Xyrem® and Alcover syrups which are both liquid formulations. *See id.,* ¶ [0003]-[0004] (acknowledging Xyrem® and other dosage forms of "gamma

hydroxybutyric acid salts" and citing U.S. Pat. No. 5,594,030 as prior art that discloses mixed salts. U.S. Pat. No. 5,594,030, to Conte et al. ("*Conte*"), entitled "Controlled release pharmaceutical compositions based on one or more pharmaceutically acceptable salts of gamma hydroxybutyric acid," (the "'030 patent") and references the use of Alcover® syrup (containing GHB as the active ingredient) while claiming pharmaceutical compositions with one or more salts selected from a group consisting of sodium, lithium, potassium, magnesium and calcium salts; *see also e.g., Cook,* ¶ [0003] ("The present invention particularly relates to the field of pharmaceutical production of microbiologically resistant and chemically stable preparations or solutions of gamma-hydroxybutyrate (GHB), also known as 4-hydroxybutyrate, and the sodium salt of GHB (sodium oxybate) and other salts such as magnesium, ammonium and calcium, e.g."); *Ferris, T. J., & Went, M. J., Synthesis, characterisation and detection of gamma-hydroxybutyrate salts,* Forensic Science International, 216:158-162 (2012), 1 ("Sodium, potassium, magnesium and calcium salts of gamma-hydroxybutyrate have been synthesised from gamma-butyrolactone and the corresponding group 1 or 2 hydroxide.") and 2 ("GHB is commonly encountered forensically as gamma-hydroxybutyric acid or in salt form as gamma-hydroxybutyrate typically as a sodium salt also known as sodium oxybate. …Other salts including lithium, potassium, magnesium and calcium are known.").

Teva is also unaware of any difficulties or cost barriers involved with synthesizing these alternatives salts, particularly where GHB was characterized as "inexpensive and easy to synthesize" by the prior art. *See e.g.,* Pal, R., & Teotia, A. K., *Date rape drugs and their forensic analysis: An update,* International Journal of Medical Toxicology & Legal Medicine, 12:36-47 (2010) at 36; *see also* GHB NDCP at 1 (noting that GHB typically costs $5-10 per dose). Thus, the GHB salt switching would have been easy and affordable.

A POSA would have also understood that the different salts of gamma-hydroxybutyrate exist in a dissociated state in a liquid formulation and that the oxybate anion is the active component, with the sodium ion providing no therapeutic value. *See e.g., Xyrem label* at Medication Guide section, 1 ("The active ingredient of Xyrem is gamma-hydroxybutyrate (GHB)."); Waszkielewicz, A. et. al, *γ-hydroxybutyric acid (GHB) and its Chemical Modifications: A Review Of the GHBergic System*, J. Pharmacol, 56, 43-49 (2004) ("*Waszkielewicz*"), 44 (explaining that GHB is an endogenous substance that binds to a specific presynaptic GHB receptor); Wong, C. G. T., et. al, *From the street to the brain: neurobiology of the recreational drug γ-hydroxybutyric acid*, Trends in Pharmacological Sciences, 25:29-34 (2004), 29 ("GHB is a short-chain fatty acid that occurs naturally in the mammalian brain at a concentration of 1–4 mM"); Maitre, M., *The γ-hydroxybutyrate signaling system in brain: organization and functional implications*, Prog. Neurobiol. 51:337–361 (1997), Abstract ("γ-Hydroxybutyrate is a metabolize of GABA which is synthesized and accumulated by neurons in brain."); Wedin, G. P., et. al, *The clinical development of γ-hydroxybutyrate (GHB)*, Current Drug Safety, 1:99-106 (2006) ("*Wedin*") at Fig. 1 ("Metabolism of gamma-hydroxybutyric acid."); Vickers, M.D. (1969). *Gammahydroxybutyric acid. Proc. Roy. Soc. Med.*, 61:821-24 (1967) ("*Vickers*") ("Gamma-OH exists partly in the body as its internal ester gamma butyrolactone.").




**Fig 1** ***Chemical structure of gamma-OH and its re-arrangement as an internal ester***

*Vickers*, Fig. 1

Thus, it is clear that the sodium ion is only included to yield a water-soluble salt compound, which alternative salts also provide. *See e.g., Xyrem label*, 2 ("Sodium oxybate is a white to off-white, crystalline powder that is very soluble in aqueous solutions."); *Cook* ¶ [0003] ("The present invention particularly relates to the field of pharmaceutical production of microbiologically resistant and chemically stable preparations or ***solutions of gamma-hydroxybutyrate (GHB)***, also known as 4-hydroxybutyrate, and the sodium salt of GHB (sodium oxybate) ***and other salts*** such as magnesium, ammonium and calcium, e.g."); ¶ [0056] (describing pharmaceutically acceptable salts); ¶ [0307] (discussing table 6 disclosing calcium oxybate solutions of 500 mg/ml at pH 6.0 and 700 mg/ml at pH 8.4 and 25 degrees Celsius (room temperature) for both); U.S. Pat. No. 4,393,236, to Klosa, J., entitled *Production of nonhygroscopic salts of 4-hydroxybutyric acid* (Jul. 12, 1983) ("*Klosa*"), 4:39-47 ("The calcium and magnesium salts of the present invention derived from 4-hydroxybutyric acid are solid, nonhygroscopic and storable and they can be recrystallized. They can be pressed to tablets in combination with tablet additives, they can be coated or as a powder they can be filled into capsules. They dissolve in water to a clear solution and they can be dispensed as injection solutions, but also as drops, or in drinks or as suppositories while maintaining a stable situation."); *id.* at 6:60-62 ("1 g of the magnesium salt dissolves in 2 ml water at room temperature, the pH of the aqueous solution is 7.") and Example 3 (calcium salt). Thus, it was well known that all of these different GHB salt forms were readily soluble and could be formulated into an aqueous solution.

Moreover, *Cook* teaches that pH and temperature are the primary variables that influence solubility and dissolution. *See Cook,* ¶ [0013] ("The amount of GHB that may be mixed or dissolved into an aqueous medium and still be resistant to microbial growth depends upon the pH of the aqueous medium."); *id,* ¶ [0016] ("At the medium to high end of the concentration or content

of GHB that may be dissolved or mixed in the aqueous medium, the maximal pH that may be used is reduced at room temperature. This is shown in FIG. 1, a graphical presentation of acceptable formulation ranges. … At a concentration or content of about 500 mg/ml GHB, the pH may be of about 4.75 to about 10.3.”).




*Fig. 1*

Accordingly, a POSA would have recognized that the ratio of the amounts of the various counterions are inconsequential to the absolute amount and availability of the active ingredient, i.e., gamma-hydroxybutyric acid. Therefore, a POSA would have understood from the teachings in the art that altering the salt form of GHB would not compromise its ability to be formulated in solution or its pharmacological properties, and that there were alternative stable salt forms already described in the art. *See e.g., Cook,* ¶ [0011] (“The compositions of the present invention are stable compositions of GHB that improve shelf-life, and provide a titratable formulation of GHB for easy

dose measurement."); *Conte*, 4:3-6 ("Gamma hydroxybutyric salts used in compositions having a controlled release according to the present invention are preferably selected from the group consisting of sodium, lithium, potassium, magnesium and calcium salts."). Therefore a POSA motivated by the well-documented need to reduce the heavy sodium load delivered by the sodium salt for of GHB, would have synthesized alternative GHB salts and substituted them for the sodium salt form of GHB.

A POSA synthesizing alternative GHB salts or mixtures of alternative salts would have also been guided by the prior art concerning which salt forms to choose. A POSA would have understood that potassium, magnesium and calcium salts were preferred alternatives for GHB. *See e.g., Conte*, 4:3-6*; Cook,* ¶ [0056]. A POSA would have also had direction concerning appropriate ratios for those alternative salts. *Noro* disclosed highly concentrated mineral solutions containing sodium, potassium, magnesium, and calcium chloride salts that can be used to improve the taste, health and safety of water. *See id.,* Abstract. *Noro* taught "dissolving calcium chloride ($CaCl_2$), magnesium chloride ($MgCl_2$), potassium chloride (KCl) and sodium chloride (NaCl) in water" and, specifically, "mixing and dissolving $MgCl_2$, $CaCl_2$, NaCl and KCl in water in a $MgCl_2$:$CaCl_2$:NaCl:KCl ratio of 1:(4-10):(0.3-1.1):(0.3-0.6)." *See Noro,* Abstract, ¶¶ [0007]-[0009] and [0018]-[0029]. *Noro* specifically disclosed a $MgCl_2$:$CaCl_2$:NaCl:KCl ratio of 1: 4: 0.3: 0.6, wherein (1) the amount of calcium salt is greater than the amount of each of the other salts, respectively, (2) the amount of calcium salt is about 6 times greater than the amount of sodium salt, (3) the amount of magnesium salt is about 3 times greater than the amount of sodium salt, (4) the amount of sodium salt is significantly lower than the amount of each of the other salts, respectively, and (5) the amount of magnesium salt is similar to the amount of potassium salt. *Id.* Thus, Noro showed that salt compositions having various ratios of sodium, potassium, magnesium,

and calcium can be made, optimized, and used to enhance the taste of water. *See id.,* Abstract. Noro also provided motivation and guidance for adjusting salt ratios within suitable ranges and including an amount of calcium that is greater than the amounts of each of sodium, potassium, and magnesium, with the amount of calcium being at least 4 times the amount of sodium. EP0183736A1, to Belohlawek *et al.,* entitled "Salt mixture having a low sodium content, used as substitute for cooking salt," published on June 11, 1986 ("*Belohlawek*"). *Belohlawek* taught a low sodium cooking salt comprising sodium, potassium, magnesium and calcium salts as a substitute for sodium chloride. *See Belohlawek,* ¶¶ [0017], [0018] and [0027]. *Belohlawek* references various prior art salt mixtures that include potassium chloride and sodium chloride (¶ [0005]), sodium chloride, potassium chloride, and potassium sulfate (¶ [0011]), potassium and magnesium (¶ [0012]), sodium chloride and potassium chloride (¶ [0013]). *Belohlawek* further notes that "[t]he essential components of the salt mixture are potassium chloride (KCl) and potassium dihydrogen phosphate…. In addition, if necessary, glutamate and yeast extract and possibly a lower quantity of sodium chloride…". *Id.,* ¶ [0018]. *Belohlawek* also disclosed an embodiment in which "[t]he calcium, magnesium and potassium salts of glutamic acid, which are preferably used in combination in a weight ratio of 5: 2: 1, are suitable as glutamate." *Id.,* ¶ [0027]. Belohlawek taught "[a] particularly preferred salt mixture" that contains, *inter alia,* potassium chloride, potassium dihydrogen phosphate, calcium, magnesium and potassium glutamate, sodium chloride, dipotassium tartrate, and tricalcium phosphate. *Id.,* ¶¶ [0048]-[0056].

*Noro* and *Belohlawek* demonstrate that salt compositions having various ratios of sodium, potassium, magnesium, and calcium within various ranges can be made, optimized, and used to provide enhanced water, or a salt substitute having good taste. These references provide a clear motivation to explore and optimize salt compositions that contain a potassium salt, calcium salt,

and magnesium salt in amounts that are each greater than the amount of sodium salt in the mixture. In view of these references and the availability of alternative salt forms of GHB with good solubility and stability, reducing the sodium load by substituting in calcium, potassium, and/or magnesium salts would have been obvious to try, and an exercise in routine optimization to complete. Moreover, aside from the different salts used, Teva is unaware of any differences between the gamma-hydroxybutyric acid that becomes bioavailable to patients following administration of Xyrem® or Xywav®.

**c. Xyrem® received a black box warning to address instances of recreational and/or illegal abuse with alcohol**

Despite its well-documented therapeutic potentials, GHB is also well-known as a drug of abuse, particularly among younger people.

> On the other hand, GHB is a recreational drug commonly consumed at nightclubs and "raves" in conjunction with alcohol, cannabis and drugs, such as 3,4-methylenedioxymethamphetamine (MDMA, ecstasy), or ketamine, also known as "club drugs." In humans, -butyrolactone and 1,4-butanediol have also been abused. During the last years, GHB has become a major concern in emergency rooms of some countries due to an important increase in the number of cases of intoxications. GHB has also been used for narcotizing victims in drug-facilitated sexual assaults because its capacity to induce short-term antegrade amnesia, increased libido, and suggestibility. Recreational users of GHB experience euphoria, relaxation, reduction of social inhibitions, decreased motor skills, and other effects similar to those reported for a moderate alcohol intoxication. These effects can explain its abuse liability in humans, but this aspect has not been yet characterized under controlled administration. After GHB ingestion, a mild intoxication may be observed with nausea, dizziness, and difficulty in focusing the eyes. Acute severe intoxications have been reported, where individuals may experience vomiting, extreme dizziness, disorientation, amnesia, and unconsciousness that may evolve to convulsions, deep coma, and rarely death. The range between high recreational doses and overdose is narrow; and acute intoxications are quite common in humans.

*Abanades*, 559; *see also Xyrem label* at 1 ("Sodium oxybate is GHB, a known drug of abuse. Abuse has been associated with some important central nervous system (CNS) adverse events (including death)."). The 1998 fact sheet from the Office of National Drug Control Policy notes

that "the illicit use of GHB is characterized by its consumption in combination with alcohol by young adults and teens at night clubs and parties. GHB is reportedly ***taken primarily by younger users as a pleasure enhancer*** that depresses the central nervous system, thereby inducing an intoxicated state and it can be toxic and even deadly when mixed together with alcohol." GHB NDCP at 1; *see also Okun*, 167. The GHB NDCP explicitly notes that the vast majority of GHB-related emergency room visits surveyed nationwide involved young people who had taken GHB recreationally in a club setting. *See* GHB NDCP at 1 (The "majority of the episodes occurred among 18- to 25- year-olds (66 percent), Caucasians (94 percent), and males (79 percent). When a motive for GHB use was reported, 91 percent reported using the drug recreationally. … . The majority of calls involved teenagers and young adults ingesting GHB in night clubs on weekends"). The *Xyrem label* confirms this noting that "[t]he use ***of illicit GHB*** has been associated with a number of serious central nervous system adverse clinical events, including seizures, respiratory depression, decreases in level of consciousness, confusion, and psychotic events. Because of these events, Xyrem has been approved for marketing under a risk management program that was developed in agreement with the Food & Drug Administration; this program is intended to educate physicians and patients and to prevent diversion." *Id.* at FDA Approved Labeling Text dated 11/18/05 ("Dear Doctor" letter) at 1.

Consistent with these observations and data, the FDA issued a safety announcement in late 2012 about Xyrem® and the dangers associated with mixing it recreationally with alcohol.

> The U.S. Food and Drug Administration (FDA) is reminding healthcare professionals and patients that the combined use of Xyrem (sodium oxybate) with alcohol or central nervous system (CNS) depressant drugs can markedly impair consciousness and may lead to severe breathing problems (respiratory depression). The use of alcohol with Xyrem is a new contraindication (FDA warns against combined use) added to the Xyrem label, which already contraindicates its use with insomnia drugs. The use of Xyrem with other CNS depressant drugs (drugs that affect the CNS and may lead to breathing problems) such as opioid analgesics,

benzodiazepines, sedating antidepressants or antipsychotics, general anesthetics, and muscle relaxants should generally be avoided.

*FDA Drug Safety Communication: Warning against use of Xyrem (sodium oxybate) with alcohol or drugs causing respiratory depression* (Dec. 17, 2012). Accordingly, the *Xyrem label* advises against mixing GHB with alcohol, which previously been a common means for masking the taste of GHB in instances where it was abused and used as a "date rape" drug. *See Okun*, 167-68; *Xyrem label* at 1**)**.

The FDA safety communication further notes that the contraindications section of the Xyrem *label* was being revised to include the statement that "[p]atients should not drink alcohol when using Xyrem." *Id.* However, the FDA black box warning was not a prohibition on using any CNS depressants with Xyrem®. Quite to the contrary, the FDA safety communication reports that the label was also being revised with "[t]he addition of a statement recommending that, ***when concomitant use of Xyrem with a central nervous system depressant <u>is required</u>, a reduction in dose*** or discontinuation of one or more central nervous system depressants (***including Xyrem) should be considered."*** *Id.* (emphasis added). Thus, the FDA ***in 2012*** publicly recognized that there would be situations where concomitant use of Xyrem® together with another CNS depressant (e.g., valproic acid for epilepsy) would be required, and suggested reducing the dose of GHB as the first way to manage that interaction. *Id.; see also id.* ("Patients who drink alcohol or take CNS depressant drugs while they are taking Xyrem are at increased risk of depressed breathing, loss of consciousness, coma, and death."). Moreover, postmarketing studies have shown that "the prevalence of illicit use of GHB is very low, has declined since 2000," and dispelled the "perception among some physicians and patients that all of the risks associated with illicit GHB also apply to sodium oxybate." *See* Wang, Y. G., et. al, *Safety overview of postmarketing and clinical experience of sodium oxybate (Xyrem): abuse, misuse, dependence, and diversion*, Journal

of clinical sleep medicine, 5:365-371 (2009) at 366. Moreover, the data showed that the concentration or doses of illicitly produced GHB, which can result in greater than intended effects in combination with alcohol, were unknown, and that daily illicit supratherapeutic doses of 18 to 250 g/day had been documented. *Id.* at 365. Therefore, a POSA would read the warnings about administering sodium oxybate with "CNS depressants" in context, and would have understood that the primary safety risk was using sodium oxybate together with alcohol. *See Xyrem label*, 8 ("The combined use of alcohol (ethanol) with sodium oxybate may result in potentiation of the central nervous system-depressant effects of sodium oxybate and alcohol. Therefore, patients should be warned strongly against the use of any alcoholic beverages in conjunction with sodium oxybate."), *id.* at 20 ("The rapid onset of sedation, coupled with the amnestic features of sodium oxybate, particularly when combined with alcohol, has proven to be dangerous for the voluntary and involuntary (assault victim) user.").

**d. GHB's interactions with divalproex sodium/valproic acid/valproate were well known**

The FDA's 2012 guidance and recognition that concomitant use of Xyrem® with a central nervous system depressant might be "required" was not a revelation. The prior art literature contemplates this and describes how valproic acid, which is used as a treatment for epilepsy and different types of seizures, inhibits GHB dehydrogenase and amplifies or potentiates GHB plasma levels when the two are co-administered. *See e.g., Waszkielewicz,* 48 ("The GHB dehydrogenase inhibitors, valproic acid (Depakene, Valproate, Valrelease) …, which are common antiepileptic medicines, intensify all the effects observed after administration of GHB…. The effect is observed due to inhibited GHB metabolism."); *Okun*, 170 ("Valproate and ethosuximide are thought to decrease the GABA like effect at the GABA B receptor by inhibition of GHB dehydrogenase."); *Maitre*, 340 (disclosing that "compounds including anti-epileptic drugs (valproate, …[w]hen

administered *in vivo,* … induce an increase in brain GHB levels" and that "valproate and related compounds … lead to the accumulation of GHB in brain.").

The *Jazz XYREM EPAR* and disclosed the potential drug-drug interaction between GHB and valproate. Moreover, the *Jazz XYREM EPAR* specifically contemplated co-administration of GHB and valproate.

> On the basis of available information, the lack of conventional safety pharmacology studies is considered acceptable. However, since co-medication is probable, the effects of GHB on respiratory pattern in the presence of other CNS depressing agents like ethanol, and *inhibitors of GHB metabolism like valproic acid* and ethosuximide *are mentioned in the SPC.*

*Id.,* 4 (emphasis added); *see also id.* ("Formal studies of pharmacodynamic drug interactions have not been conducted. According to the published literature, concomitant administration of GHB and other CNS depressants (benzodiazepines, barbiturates, alcohol) results in an additive increase in sedation.").

The *Jazz XYREM EPAR* also discloses the potential mechanism for why valproate amplifies the effects of GHB:

> Metabolism of GHB is rapid and complete and proceeds via succinic semialdehyde, succinate and the Krebs cycle or through γ-hydroxybutyrate and β-oxidation. The potential for inhibition of CYP isozymes was tested in pooled human liver microsome fractions using standard markers for CYP1A2, 2C9, 2C19, 2D6, 2E1 and 3A. In all cases, the IC50 was > 3000 μM (> 378 μg/ml). Since the average maximum human exposure is 142 μg/ml, GHB is not expected to show pharmacokinetic interactions with drugs metabolised by these isozymes. Non P450 mediated effects on GHB metabolism are unclear. A rat study found that *co-administration of compounds* stimulating or *inhibiting GHB dehydrogenase* were able to decrease or *increase plasma levels of GHB by up to 1/3.* The interactions resulting from the stimulation or inhibition of GHB dehydrogenase, namely with anticonvulsivant drugs and L-dopa are considered to be clinically relevant and are mentioned in the SPC.

*Id.,* 5 (emphasis added).

The Jazz *XYREM EPAR* further highlights potential drug-drug interactions and the dangers of GHB administration with alcohol:

> In addition to its sedative properties, GHB is a potent CNS depressant and may increase growth hormone secretion. The potential for acute respiratory depression after reintroduction of treatment in patients who might have developed tolerance is mentioned in the SPC (4.2) as well as a warning in case of concomitant administration with other CNS depressant, and especially alcohol. (SPC, 4.4 and 4.5)
>
> The interactions resulting from the stimulation or inhibition of GHB dehydrogenase, namely with anticonvulsivant drugs and L-dopa are considered to be potentially relevant in the clinic and are mentioned in the SPC.(section 4.5 and 5.3).

*Id.,* 8 (emphasis added).

The *Jazz XYREM EPAR* also noted that a potential interaction between GHB and valproate may occur when the latter is used as an anticonvulsivant drug (i.e., to treat epilepsy), further suggesting their coadministration:

> There is also a suggestion in primates that the antiepileptic drugs valproate, ethosuximide and phenytoin can influence activity of gamma-hydroxybutyrate dehydrogenase in the initial conversion of gamma-hydroxybutyrate to succinic semialdehyde (Snead 1978a, 1978b). As GHB is metabolised by gamma hydroxybutyrate (GHB) dehydrogenase, there is a potential interaction with drugs that inhibit this enzyme. These drugs include but are not limited to valproate, phenytoin, ethosuximide, salicylate, amobarbital, disulfiram and cyanide, and trimethadione. As the interaction of Xyrem with drugs that inhibit GHB dehydrogenase was not studied in human subjects, it is not known clinically what effects these drugs would have if administered concurrently (i.e. in patients being treated with anticonvulsants).

*Id.,* 13 (emphasis added).

The *Jazz XYREM EPAR* also disclosed clinical trials in which various doses of GHB were administered to patients, from a low dose of 4.5 grams divided into two equal doses of 2.25 grams taken 4 hours apart, a next higher dose of 6 grams divided into two doses of 3 grams taken 4 hours apart, a still higher dose of 7.5 grams divided into two equal doses, and a maximum dose of 9 grams divided into two equal doses of 4.5 grams. *Id.,* 14, 15, 21, and 22.

The *Jazz XYREM EPAR* further disclosed that "a careful monitoring upon individual dose

titration is recommended and is reflected in the SPC." *Id.,* 12. *Jazz XYREM EPAR* also disclosed that "the potential toxic dose is close to the highest therapeutic dose of 9 g/day and makes the adherence to a strict up-titration extremely important." *Id.,* 30. "Warnings and recommendations in order to use Xyrem are explained in the SPC, especially the dosing regimen (daily dose divided in two and not in fasting conditions), and several warnings in particular the risk of respiratory depression." *Id.*

*Maitre* disclosed the dangers of potential drug-drug interactions between GHB and valproate. In particular, *Maitre* disclosed that "[t]he high *Km* SSA reductase of human and rat brain have been reported to be inhibited by several compounds including anti-epileptic drugs (valproate, ethosuximide, barbiturates) and some branched chain fatty acids (Cash et al*.,* 1979; Vayer et al., 1985c). When administered *in vivo,* most of these compounds induce an increase in brain GHB levels (Snead et al*.,* 1980)." *Id.,* 340. *Maitre* further disclosed that "valproate and related compounds …lead to the accumulation of GHB in brain." *Id.* Thus, *Maitre* provided motivation to reduce the dose of sodium oxybate when concomitantly administered with valproate, i.e., to avoid potentially dangerous accumulation of GHB in the brain.

*Okun* also disclosed the dangers of potential drug-drug interactions between GHB and valproate. *Okun* discussed the dangers associated with GHB intoxication and the need to consider possible adverse effects of GHB, noting that:

> Gamma-hydroxybutyrate (GHB) intoxication is a significant cause of morbidity and mortality in patients taking the drug for recreational purposes. Due to the recent increase in emergency room visits, hospital admissions, and deaths, it has become necessary to re-examine the pharmacology, pharmacokinetics, pharmacodynamics, clinical manifestations, and potential adverse effects associated with GHB use.

*Okun*, 167, Abstract

*Okun* also disclosed that "Some of the medicinal uses of GHB include narcolepsy, depression, alcohol withdrawal, epilepsy, and anesthesia." *Id.,* 167; *see also id.* at 168 ("GHB and

morphine have similar clinical effects, including euphoria, respiratory depression, and potential for dependence with prolonged use."). *Okun* further taught that "[a] small, double-blind crossover study examined the effect of GHB in patients with narcolepsy. A therapeutic effect with decreased cataplexy, as well as improved nocturnal sleep quality was demonstrated. GHB rapidly induced sleep without suppressing REM sleep in both normal and narcoleptic patients." *Id.,* 169. *Okun* also disclosed co-administration of GHB and valproate and taught that "[v]alproate and ethosuximide are thought to decrease the GABA-like effect at the GABA B receptor by *inhibition of GHB dehydrogenase.*" *Id.,* 170 (emphasis added). Because it was known that GHB is metabolized and enzymatically broken down by GHB dehydrogenase, the skilled person would reasonably expect valproate to increase the effects of GHB, including the dangers associated with overdose. Thus, *Okun* provided motivation to reduce the dose of sodium oxybate when concomitantly administered with valproate, i.e., to avoid potentially dangerous increase in GHB intoxication and respiratory depression.

*Waszkielewicz* also disclosed drug-drug interactions between GHB and valproate.

> γ-Hydroxybutyric acid (GHB) is a naturally occurring substance with function of an inhibitory neurotransmitter in the central nervous system in mammals. GHB can be used as a medicine in narcolepsy (Xyrem) and for general anesthesia (sodium oxybate). It is also a popular drug of abuse, causing coma, addiction and severe withdrawal syndrome, and, therefore, demanding thorough studies on the GHBergic system and expanded research on toxicology of this compound. The aim of this review is to present the proved and some suggested mechanisms of its action from pharmacological point of view, which may help to properly treat intoxication or other pathological states caused by GHB ingestion.

*Id.,* 43. *Waszkielewicz* also disclosed that valproate intensifies the effects of GHB:

> The GHB dehydrogenase inhibitors, valproic acid (Depakene, Valproate, Valrelease) and ethosuximide (Zarontin), which are common antiepileptic medicines, intensify all the effects observed after administration of GHB [11, 23]. The effect is observed due to inhibited GHB metabolism.

*Id.,* 48. Thus, *Waszkielewicz* provided motivation to reduce the dose of sodium oxybate (GHB)

when administered with valproate, i.e., to avoid intensified effects of GHB via inhibition of GHB metabolism.

Thus, the prior art, including at least the *Jazz XYREM EPAR*, *Maitre*, *Okun* and *Waszkielewicz*, disclosed the dangers of potential drug-drug interactions between GHB and valproate due to the ability of valproate to inhibit enzymatic breakdown of GHB, which increases the effects of GHB. Moreover, the selection of a particular percent reduction or reduced amount of GHB is, nothing more than simply optimizing a result-effective variable following the teachings described in the prior art, was well within the capabilities of one of ordinary skill in the art, and does not render the claim non-obvious. *See e.g., In re Aller,* 220 F.2d 454, 456 (C.C.P.A. 1955). A person of ordinary skill in the art would have used the disclosure in the prior art, discussed above, as guidance in selecting suitable reduced amounts of GHB to mitigate the drug intensifying effects of valproate. It would have been known and/or would have been obvious to a POSA to recommend reductions in the dose of GHB administered to the patient.

**e. GHB's slower metabolism with food was previously documented**

The asserted claims of the '373 patent are directed towards a method for reducing a food effect by timing the administration of at least one salt of GHB after a meal. The fact that Jazz observed that food can affect the metabolism of GHB is unsurprising. A POSA would have appreciated that food intake can result in various physiological changes in the human gastrointestinal tract, which can then affect the pharmacokinetic profile of drugs by influencing absorption, distribution, metabolism and/or elimination. Moreover, a physician from Jazz's partner, Orphan Medical, had already documented this food effect and published it in the Journal of Clinical Pharmacology more than a decade before the '373 patent was even filed.

Claim 1, the only independent claim, recites administering "a pharmaceutically effective amount of a pharmaceutical composition of GHB in a unit dosage comprising at least one salt of

GHB and a pharmaceutically acceptable carrier within four hours after eating;wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.$(GHB)_2$; and about 20% to about 25% of Mg.$(GHB)_2$."

While Jazz purports to have discovered that by timing the administration of GHB relative to the patient's meal, there will be a reduced food effect and better metabolism of GHB, this was already known in the prior art. *See e.g., Xyrem label,* 11-12 ("Food significantly decreases the bioavailability of sodium oxybate (see Pharmacokinetics). Whether sodium oxybate is taken in the fed or fasted state may affect both the efficacy and safety of sodium oxybate for a given patient. Patients should be made aware of this and try to take the first dose several hours after a meal."). It was even the subject of research article where the effects of a high-fat meal on GHB metabolism was explored, and the GHB was administered in the fasting state and 30 minutes after a meal. *See* Borgen et al., *The influence of Gender and Food on the Pharmacokinetics of Sodium Oxybate Oral Solution in Healthy Subjects,* Journal of Clinical Pharmacology, 43:59-65 (2003). The first author, Lowell A. Borgen, was from Orphan Medical, Inc., the original developer of Xyrem® and the article preceded the filing of the '373 patent by more than a decade. There is nothing novel claimed by the '373 patent that is not taught by *Borgen* and the prior art.

Indeed, *Borgen* analyzed and documented the effect of food on the bioavailability, pharmacokinetic and pharmacodynamic properties (i.e., $C_{max}$, AUC etc.) of a GHB composition taken about 30 minutes after eating a meal. *Id.* at 60. *Borgen* specifically analyzed the effects of food on the bioavailability, pharmacokinetic and pharmacodynamic properties (i.e., $C_{max}$, AUC etc.) of a Na-GHB composition taken about 30 minutes after eating a high fat meal. *Id. Borgen* reported a "significant" food effect for the GHB composition including reductions in GHB plasma

concentrations in the fed state as compared to the fasted state (as indicated by reduced $C_{max}$ and AUC). *See e.g., id.* at 62. Those results were consistent with the information on the *Xyrem label*. *See e.g., Xyrem label*, at 11-12 ("Food significantly decreases the bioavailability of sodium oxybate …"). *Borgen* also reported that patients reached a maximum GHB concentration in a median time of 2 hours after a high-fat meal versus 45 minutes when GHB was taken without food. *Id.* at 63 *Borden* further noted that food "delayed the absorption of oxybate on average by more than an hour compared to the fasted state." *Id. Borgen* further observed that "[s]ince the bioavailability was lower when oxybate was ingested immediately after a meal, there were fewer adverse events compared to the ingestion of oxybate in a fasted state." *Id.* at 64. Therefore, *Borgen* directly discloses the influence of food on GHB's effects.

Additionally, it was general knowledge that it normally takes around 1.5-2 hours for food to move out of the stomach and into the small intestine, but that it can also take up to 4 hours. *Borgen* also reported fewer adverse events when oxybate was ingested immediately after a meal, compared to the ingestion of oxybate in a fasted state. *Id.* at 64. Therefore, it would have been understood by a POSA that administering GHB after a meal had particular advantages, but that waiting longer than about 2 hours after a meal to administer might diminish the benefit of fewer adverse events, and that after 4 hours there would likely be no benefit. Thus, the effects of administering a GHB dosage comprising at least one salt of GHB and a pharmaceutically acceptable carrier within four hours after eating was known in the art.

Thus, the '373 patent teachings nothing new, as the prior art describes how high-fat meal (e.g., food) lowers blood plasma levels of GHB and the '373 patent merely teaches and claims obvious timing effects and routine measurements, none of which are novel or confer patentability onto the asserted claims of the '373 patent.

In view of this background, and for the additional reasons detailed in the attached claim charts appended hereto and served herewith, there is nothing non-obvious about any of the Asserted Claims.

| Appendix No. | Grounds |
|---|---|
| 1. | Invalidity Chart for U.S. Patent 8,591,922 - Anticipated by U.S. Patent 8,952,062 or obvious over U.S. Patent Application Pub. 2003/0125385 |
| 2. | Invalidity Chart for U.S. Patent 8,901,173 - Anticipated by U.S. Patent 8,952,062 or obvious over U.S. Application Patent Pub. 2003/0125385 |
| 3. | Invalidity Chart for U.S. Patent 9,132,107 - Anticipated by U.S. Patent 8,952,062 or obvious over U.S. Patent Application Pub. 2003/0125385 |
| 4. | Invalidity Chart for U.S. Patent 10,195,168 - Anticipated by U.S. Patent 8,952,062 or obvious over U.S. Patent Application Pub. 2003/0125385 |
| 5. | Invalidity Chart for U.S. Patent 10,675,258 - Anticipated by U.S. Patent 8,952,062 or obvious over U.S. Patent Application Pub. 2003/0125385 |
| 6. | Invalidity Chart for U.S. Patent 11,554,102 - Anticipated by U.S. Patent 8,952,062 or obvious over U.S. Patent Application Pub. 2003/0125385 |
| 7. | Invalidity Chart for U.S. Patent 8,591,922 - Obvious over Jazz Xyrem label (2005) in view of *Szarfman,* and U.S. Patent Pub. 2003/0125385 |
| 8. | Invalidity Chart for U.S. Patent 8,901,173 - Obvious over Jazz Xyrem label (2005) in view of *Szarfman,* and U.S. Patent Pub. 2003/0125385 |
| 9. | Invalidity Chart for US Patent 9,132,107 - Obvious over Jazz Xyrem label (2005) in view *Szarfman,* and U.S. Patent Pub. 2003/0125385 |
| 10. | Invalidity Chart for U.S. Patent 10,195,168 - Obvious over Jazz Xyrem label (2005) in view of *Szarfman*, and U.S. Patent Pub. 2003/0125385 |
| 11. | Invalidity Chart for U.S. Patent 10,675,258 - Obvious over Jazz Xyrem label (2005) in view of *Szarfman*, and U.S. Patent Pub. 2003/0125385 |
| 12. | Invalidity Chart for U.S. Patent 11,554,102 - Obvious over Jazz Xyrem label (2005) in view of *Szarfman*, and U.S. Patent Pub. 2003/0125385 |
| 13. | Invalidity Chart for U.S. Patent 8,591,922 - Obvious over U.S. Patent Application Pub. 2006/0210630, in view of FDA Regulations, *Noro* and *Bighley*. |

| Appendix No. | Grounds |
|---|---|
| 14. | Invalidity Chart for U.S. Patent 8,901,173 - Obvious over U.S. Patent Application Pub. 2006/0210630, in view of FDA Regulations, *Noro* and *Bighley* |
| 15. | Invalidity Chart for US Patent 9,132,107 - Obvious over U.S. Patent Application Pub. 2006/0210630, in view of FDA Regulations, *Noro* and *Bighley* |
| 16. | Invalidity Chart for U.S. Patent 10,675,258 - Obvious over U.S. Patent Application Pub. 2006/0210630, in view of FDA Regulations, *Noro* and *Bighley*. |
| 17. | Invalidity Chart for U.S. Patent 10,195,168 - Obvious over U.S. Patent Application Pub. 2006/0210630, in view of FDA Regulations, *Noro* and *Bighley* |
| 18. | Invalidity Chart for U.S. Patent 11,554,102 - Obvious over U.S. Patent Application Pub. 2006/0210630, in view of FDA Regulations, *Noro* and *Bighley* |
| 19. | Invalidity Chart for U.S. Patent 8,591,922 - Obviousness-type Double Patenting in view of claims of U.S. Patent 8,952,062 |
| 20. | Invalidity Chart for U.S. Patent 8,901,173 - Obviousness-type Double Patenting in view of claims of U.S. Patent 8,952,062 |
| 21. | Invalidity Chart for U.S. Patent 9,132,107 - Obviousness-type Double Patenting in view of claims of U.S. Patent 8,952,062 |
| 22. | Invalidity Chart for U.S. Patent 10,195,168 - Obviousness-type Double Patenting in view of claims of U.S. Patent 8,952,062 |
| 23. | Invalidity Chart for U.S. Patent 10,675,258 - Obviousness-type Double Patenting in view of claims of U.S. Patent 8,952,062 |
| 24. | Invalidity Chart for U.S. Patent 11,554,102- Obviousness-type Double Patenting in view of claims of U.S. Patent 8,952,062 |
| 25. | Invalidity Chart for U.S. Patent 8,772,306 - Obvious over Jazz XYREM EPAR in view of *Okun* |
| 26. | Invalidity Chart for U.S. Patent 9,050,302 - Obvious over Jazz XYREM EPAR in view of Okun |
| 27. | Invalidity Chart for U.S. Patent 9,486,426 - Obvious over Jazz XYREM EPAR in view of *Okun* |
| 28. | Invalidity Chart for U.S. Patent 10,213,400 - Obvious over Jazz XYREM EPAR in view of *Okun* |
| 29. | Invalidity Chart for U.S. Patent 10,864,181 - Obvious over Jazz XYREM EPAR in view of *Okun* |
| 30. | Invalidity Chart for U.S. Patent 11,253,494 - Obvious over Jazz XYREM EPAR in view of *Okun* |

| Appendix No. | Grounds |
|---|---|
| 31. | Invalidity Chart for U.S. Patent 8,772,306 - Obvious over Jazz XYREM label (2005), *Waszkielewicz*, in view of U.S. Patent Application Publication No. 2009/0137565 |
| 32. | Invalidity Chart for U.S. Patent 9,050,302 - Obvious over Jazz XYREM label (2005) in view of *Waszkielewicz* and U.S. Patent Application Publication No. 2009/0137565 |
| 33. | Invalidity Chart for U.S. Patent 9,486,426 - Obvious over Jazz XYREM label (2005) in view of *Waszkielewicz* and U.S. Patent Application Publication No. 2009/0137565 |
| 34. | Invalidity Chart for U.S. Patent 10,213,400 - Obvious over Jazz XYREM label (2005) in view of *Waszkielewicz* and U.S. Patent Application Publication No. 2009/0137565 |
| 35. | Invalidity Chart for U.S. Patent 10,864,181 - Obvious over Jazz XYREM label (2005) in view of *Waszkielewicz* and U.S. Patent Application Publication No. 2009/0137565 |
| 36. | Invalidity Chart for U.S. Patent 11,253,494 - Obvious over Jazz XYREM label (2005) under *Waszkielewicz* and U.S. Patent Application Publication No. 2009/0137565 |
| 37. | Invalidity Chart for U.S. Patent 8,772,306 - Obvious over U.S. Application Patent Pub. 2003/0125385 in view of *Wedin* and U.S. Patent Application Patent Pub. 2003/0134868 |
| 38. | Invalidity Chart for U.S. Patent 9,050,302 - Obvious over U.S. Application Patent Pub. 2003/0125385 in view of *Wedin* and U.S. Patent Application Patent Pub. 2003/0134868 |
| 39. | Invalidity Chart for U.S. Patent 9,486,426 - Obvious over U.S. Application Patent Pub. 2003/0125385 in view of *Wedin* and U.S. Patent Application Patent Pub. 2003/0134868 |
| 40. | Invalidity Chart for U.S. Patent 10,213,400 - Obvious over U.S. Application Patent Pub. 2003/0125385 in view of *Wedin* and U.S. Patent Application Patent Pub. 2003/0134868 |
| 41. | Invalidity Chart for U.S. Patent 10,864,181 - Obvious over U.S. Application Patent Pub. 2003/0125385 in view of *Wedin* and U.S. Patent Application Patent Pub. 2003/0134868 |
| 42. | Invalidity Chart for U.S. Patent 11,253,494 - Obvious over U.S. Application Patent Pub. 2003/0125385 in view of *Wedin* and U.S. Patent Application Patent Pub. 2003/0134868 |
| 43. | Invalidity Chart for U.S. Patent 11,426,373 - Obvious over U.S. Patent 8,591,922 in view of *Borgen* |

| Appendix No. | Grounds |
|---|---|
| 44. | Invalidity Chart for U.S. Patent 11,426,373 - Obvious over U.S. Patent No. 8,952,062 in view of Xyrem® (sodium oxybate) oral solution, CIII, FDA Approval 2002 (Rev. November 2005) |
| 45. | Invalidity Chart for U.S. Patent 11,426,373 - Obvious over U.S. Patent 8,591,922 in view of Xyrem® (sodium oxybate) oral solution, CIII, FDA Approval 2002 (Rev. November 2005) |

### E. **No Secondary Indicia of Nonobviousness**

Teva is not aware of any secondary indicia that could rebut the *prima facie* case set forth above.

## II. **Invalidity Under 35 U.S.C. § 112**

35 U.S.C. § 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor[.]" The provision, however, "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). The Supreme Court, setting up a two-stage framework, has held that a claim falls outside § 101 where (1) it is "directed to" a patent-ineligible concept, i.e., a law of nature, natural phenomenon, or abstract idea, and (2), if so, the particular elements of the claim, considered "both individually and 'as an ordered combination,'" do not add enough to "'transform the nature of the claim' into a patent-eligible application." *Id.* at 2355; *Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* 132 S. Ct. 1289, 1297–98 (2012). In *Alice*, the Supreme Court spelled out a two-part test for assessing patent eligibility under Section 101.

Step 1 – Patent Ineligible Concept

To determine whether the claims at issue are directed to a patent-ineligible concept, *Alice*, 134 S.Ct. at 2355, courts analyze whether the claim's "character as a whole," or their "focus," is an abstract idea. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

Information as such is an intangible. *Id.* (quoting *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 451 n. 12 (2007); Accordingly, the Federal Circuit has treated claims directed to the collection of information as within the realm of abstract ideas. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016), (internal citations omitted). In a similar vein, the Federal Circuit has treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category, and has recognized that merely presenting the results of abstract processes of collecting and analyzing information without more is abstract as an ancillary part of such collection and analysis. *Id.* (internal citations omitted).

In *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), the Supreme Court held claims to a method for treatment of an immune-mediated disorder by **administering** a drug to a subject, **determining** the level of 6-thioguanine in the subject, and **applying** an algorithm to indicate whether to increase or decrease a subsequent amount of the drug depending on whether the level is low or high ineligible. The Court concluded that all the claimed process added to natural laws were "well-understood, routine, conventional activity previously engaged in by researches in the field," reasoning:

> "[T]he claims inform a relevant audience about certain laws of nature; any additional steps consist of **well understood, routine, conventional activity already engaged in by the scientific community; and those steps, when viewed as a whole, add nothing significant beyond the sum of their parts taken separately**. For these reasons we believe that the steps are not sufficient to transform unpatentable natural correlations into patentable applications of those regularities"

*Id.* at 79-80 (emphasis added). And in *Association for Molecular Pathology v. Myriad Genetics, Inc.*, the Supreme Court held claims directed to "[a]n isolated DNA coding for a BRCA1 polypeptide" having a specific amino acid sequence ineligible because naturally-occurring DNA

sequences are natural phenomena. 133 S. Ct. 2107 (2013) (noting "[g]roundbreaking, innovative, or even brilliant discovery does not by itself satisfy the § 101 inquiry.").

Applying *Alice* and *Myriad*, in *Ariosa Diagnostics, Inc. v. Seqenom, Inc.*, the Federal Circuit affirmed that claims reciting methods for detecting inherited cell-free fetal NDA mutations ineligible because the claims were "generally directed to detecting the present of a naturally occurring thing or a natural phenomenon. . . ." 788 F.3d 1371, 1376 (Fed. Cir. 2015). Applying that same Supreme Court precedent in *In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litigation*, the Federal Circuit held that the at issue directed to an ineligible law of nature because the claimed "methods [were] directed to identification of alteration of the gene require[d] merely comparing the patient's gene with the wild-type gene and identifying any differences that ar[o]se." 774 F.3d 755, 763 (Fed. Cir. 2014). In *Genetic Veterinary Sciences, Inc. v. Laboklin GmbH & Co. GK*, held that claims directed to in vitro methods for genotyping Labrador Retrievers to determine whether the dog might be a carrier for HNPK disease ineligible "because they begin and end with the point discovery of the HNPK mutation in the SUV39H2 gene." 933 F.3d 1302, 1317-18 (Fed. Cir. 2019). And recently in *In re Board of Trustees of the Leland Stanford Junior University*, the Federal Circuit affirmed that claims directed to "a method for resolving haplotype phase" by "'receiving allele data and pedigree data and 'determining an inheritance state' based on the received data 'using [an HMM],'" are patent-ineligible because the claim "recites no concrete application for the haplotype phase beyond storing it and providing it upon request." 989 F.3d 1367, 1370-73 (Fed. Cir. 2021) (noting "process [that] yields a greater number of haplotype phase predictions, may constitute a new or different use of a mathematical process, but we are not persuaded that the process is an improved technological process."). In sum, the Federal Circuit has applied the Supreme Court's *Alice* and *Mayo* precedent "to find claims 'directed to a patent-

ineligible concept when they amounted to nothing more than observing or identifying the ineligible concept itself.'" *Genetic Veterinary Scis., Inc.*, 933 F.3d at 1316 (quoting *Rapid Litig. Mgmt. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048 (Fed. Cir. 2016)).

Step 2 – Transformation Sufficient for Patent Eligibility

If the claims focus on abstract ideas, then the court advances to the second step of *Alice* ("Step Two"), where the *Mayo/Alice* inquiry asks the court to "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Enfish, LLC v. Microsoft Corp.,* 822 F.3d 1327, 1334 (Fed. Cir. 2016) (quoting *Mayo*, 132 S. Ct. at 1289, 1297). The second step of the *Alice* inquiry asks if nevertheless there is some inventive concept in the application of the abstract idea. *Id.* (quoting *Alice*, 134 S. Ct. at 2355, 2357-59). But "[s]imply appending well-understood, routine and conventional activities previously known to the industry, specified at a high level of generality" to an abstract idea does not make that idea patentable. *Mayo,* 132 S. Ct. at 1297–99. And "[w]here claims of a method patent are directed to an application that starts and ends with a naturally occurring phenomenon, the patent fails to disclose patent eligible subject matter if the methods themselves are conventional, routine and well understood applications in the art." *Ariosa*, 788 F.3d at 1378.

Under this precedent in *Genetic Veterinary Sciences, Inc.*, the Federal Circuit held that:

> Conducting conventional detection in a laboratory does not transform the discovery of a natural phenomenon into patent eligible subject matter. Rather similar to the claims at issue in *Mayo*, a natural phenomenon, together with will-understood, conventional activity, is not patent-eligible under § 101." 933 F.3d at 1319 (citing *Mayo*, 66 U.S. at 73, 79-80).
>
> ***
>
> [W]e have recognized that laboratory techniques, such as using '[PCRs] to amplify and detect. . .' are well-understood, routine, conventional activities in the life sciences when they are claimed in a merely generic manner (e.g., at a high level of

> generality) or as insignificant extra-solution activity, *Genetic Techs. v. Merial LLC*, 818 F.3d 1369, 1377-78 (Fed. Cir. 2016); *see* [*Mayo*, 566 U.S.] at 1379-80 (finding claims patent-ineligible and stating that the physical steps of 'detecting a coding region of a person's genome by amplifying and analyzing a linked non-coding region of that person's genome' did not provide an inventive concept necessary to render the claim patent eligible).

933 F.3d at 1319; *see also University of Florida Research Foundation, Inc. v. General Electric. Co.*, 916 F.3d 1363, 1369 (Fed. Cir. 2019) (quoting *Alice*, 573 U.S. at 225).

Applying these principles, claims 1-11 of the '373 patent are ineligible subject matter under § 101. These claims are directed to no more than the use of well-known parameters (i.e., AUC and $C_{max}$) to compare the pharmacokentics and pharmacodynamics of known compounds (i.e., the mixed oxybates of the prior art '922 patent with sodium oxybate).

## III. <u>Invalidity under 35 U.S.C. § 112(a) – Lack of Enablement and Insufficient Written Description</u>

35 U.S.C. § 112(a) requires that "the specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . ." 35 U.S.C. § 112(a). That section includes two separate requirements: an adequate written description and enablement. *See Abbvie Deutschland GMBH v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1297-98 (Fed. Cir. 2014) (citing *Ariad Pharmaceuticals v. Eli Lilly & Co.*, 598 F.3d 1336, 1344 (Fed. Cir. 2010)).

### A. Lack of Enablement

To the extent Jazz contends that the limitations of the '373 Patent—requiring that "a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy" be given "a pharmaceutically effective amount of…GHB…within four hours after eating…wherein the pharmaceutical composition of GHB has reduced food effect"—are enabled, "undue experimentation" would be required for a POSA to be able to practice the allegedly claimed

"reduced food effect" from the recited limitations rendering these claims invalid under 35 U.S.C. § 112 (a) for lack of enablement.

The so-called *Wands* factors are used as a framework to assess whether undue experimentation would be required to practice a claimed invention in the context of the enablement requirement of 35 U.S.C. § 112 (a). *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988); *see also Liebel-Flarsheim v. Medrad*, 481 F.3d 1371, 1378-80 (Fed. Cir. 2007) and *AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1243-4 (Fed. Cir. 2003). These factors include:

(a) The breadth of the claims,

(b) The nature of the invention,

(c) The state of the prior art,

(d) The level of one of ordinary skill,

(e) The level of predictability in the art,

(f) The amount of direction provided by the inventor,

(g) The existence of working examples, and

(h) The quantity of experimentation needed to make or use the invention based on the content of the disclosure.

**1) The Breadth of the Claims**

The Asserted Claims of the '373 patent are directed to pharmaceutical compositions comprising, *inter alia*, GHB. All of the '373 patent claims also require administration of the GHB composition within two or four hours after eating to. *See e.g.,* '373 patent, claim 1 ("administering to a patient…a pharmaceutically effective amount of…GHB…within four hours after eating…wherein the pharmaceutical composition of GHB has reduced food effect").

The specification teaches that the pharmacokinetic behavior of the formulation depends on the specific amounts of sodium and other cations present in the pharmaceutical composition, as well as the amount of water. '373 Patent at 6:57-65. Claim 1 requires a range of amounts of

various salts of GHB, but the specification fails to enable compositions having the claimed reduced food effect over the full range of mixed-salt compositions encompassed by the claim.

**2) The Nature of the Invention**

As discussed, *supra § D(a)*, the Asserted Claims of the '373 patent are directed to formulations of GHB and to methods of treatment that involve administering the same to a patient within a certain period of time after eating.

**3) The State of the Prior Art**

As discussed, *supra § D(b)*, GHB is naturally occurring and was first synthesized in the 1920's. Additionally, GHB was previously approved to treat conditions of narcolopesy.

However, nowhere to Teva's knowledge in the prior art is there any guidance in the art to enable one skilled in the art to use in selecting the exact compositions having the claimed reduced food effect over the full range of mixed-salt compositions encompassed by the asserted claims of the '373 Patent. Thus, while the state of the art was sophisticated with a crowded field of GHB formulations, this would not have aided a POSA in practicing the claimed invention.

**4) The Level of Ordinary Skill in the Art**

*See* Section 1.C., *supra*.

Although the level of skill in the art is high, the Asserted Patents do not provide enough meaningful guidance or working examples, across the full scope of the claim, to allow a POSA to select the exact compositions having the claimed reduced food effect.

**5) The Level of Predictability in the Art**

The level of predictability in the art for making a stable formulation of GHB as of the priority date of '373 patent was high, particularly as evidenced by Jazz's own commercialization of Xyrem® to treat cataplexy associated with narcolepsy, which was introduced to the market in

2002. However, nowhere in the art is there any guidance regarding how to determine the exact dosages and timing for administration to achieve the desired food effects. A POSA's evaluation of this limitation would require undue experimentation and depend heavily on individualized conclusions. As a result, those determinations would be highly unpredictable.

**6) The Amount of Direction Provided by the Inventor**

The '373 patent provides little if any guidance as to how to select the exact compositions having the claimed reduced food effect over the full range of mixed-salt compositions encompassed by the claims of the '373 Patent. The '373 patent, therefore, does not define how one should select from the array of mixed-salt compositions to achieve the desired reduced food effects.

**7) The Existence of Working Examples**

The working examples of the '373 patent are also of limited scope and, thus, only provide narrow guidance. Specifically, Figures 5A-5B purport to show the $C_{max}$ measurements in of various claimed compositions in comparison to Xyrem®, however, the specification offers a scant description of the claimed testing.

Indeed, the recited $C_{max}$ measurements of a reduced food effect are merely an inherent property or effect of administering the claimed mixed GHB salt composition on an empty stomach, are not positively recited method steps, and do not further limit the claimed method.

**8) The Quantity of Experimentation Needed to Make or Use the Invention Based on the Content of the Disclosure**

As discussed, the $C_{max}$ measurements recited in Asserted Claims are simply an inherent result that naturally flow from administering the claimed GHB salts compositions on an empty stomach. If, however, the $C_{max}$ measurements are not an inherent result that naturally flows from administering the claimed mixed GHB salt composition, then these functional limitations must

be the result of identifying and selecting specific excipients for administration at various intervals within a certain period of time after eating, using a specific structure and/or how the food effects are measured. The '373 patent specification does not provide sufficient guidance or direction that would enable a POSA to identify and select the variables that are critical or essential so as to provide a dosage form meeting the food effect limitation(s) recited in the claims. The specification adds nothing to the prior art which already notes the bioavailability of GHB under fasting conditions.

Accordingly, the only way that a POSA would have any possibility of selecting the exact compositions having the claimed reduced food effect over the full range of mixed-salt compositions encompassed by the claims of the '373 Patent would be to prepare the various formulations and then compare them to Xyrem®, or some other reference solution, using a controlled reliable measurement method. But there is no such control method identified or otherwise known to a POSA. In the absence of such an objective standard, a POSA would perform endless trial-and-error experimentation without ever knowing how to meet the claim limitations. That type of excessive experimentation to achieve an unreliable and subjective determination, even if routine, constitutes undue experimentation. *Wyeth and Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380 (Fed. Cir. 2013).

## IV. <u>Invalidity under pre-AIA 35 U.S.C. § 112, Second Paragraph or AIA § 112(b)– Indefiniteness</u>

Certain claims of the Asserted Patents fail to particularly point out and distinctly claim the subject matter which the applicant regarded as the invention, as required under pre-AIA 35 U.S.C. § 112, Second Paragraph or 35 U.S.C. § 112(b). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014). It is not enough that "a court can ascribe *some* meaning to a patent's claims; the definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters *post hoc.*" *Id.* (emphasis in original).

**a. The Molecular Weight Per Oxybate Equivalent of The Mixture of GHB Salts Is About The Same as a Formulation of Sodium Oxybate. (claim 33 of the '173 Patent)**

The phrase "the molecular weight per oxybate equivalent of the mixture of GHB salts is about the same as a formulation of sodium oxybate" as used in claim 33 of the '173 Patent, is undecipherable and cannot be reasonably construed. Claim 1, from which claim 33 depends, recites a mixture of salts of GHB selected from a group consisting of sodium, potassium, calcium and magnesium salts of gamma-hydroxybutyrate. The only time the phrase "molecular weight per oxybate equivalent" is used in the specification is in passing to describe the results of a characterization step. *See id.,* 29:35-38 ("The solutions were characterized for final pH, assay by titration, solids content by evaporation at 150° C. (4 h) followed by equilibration at 60° C., and purity by reverse-phase gradient HPLC. The molecular weight per oxybate equivalent of each mixture was calculated from the assay and solids content results, and were in reasonable agreement with sodium oxybate (127.0 and 126.4 g/mol-equiv vs. 126.09 for sodium oxybate)."). Without a definition for "oxybate equivalent," or further guidance as to what this term means in relation to a mixture of GHB salts, and further, how it is assessed, claim 33 is indefinite.

**b. Food effect (claims 1-11 of the '373 Patent)**

Claims 1-11 of the '373 Patent is also indefinite because a person of ordinary skill in the art could not reasonably discern what percentage reduction in $C_{max}$ constitutes a "food effect" as used by the claim. The specification does not provide adequate guidance to a person of ordinary

skill to determine what constitutes a "food effect" as claimed.

**c. At Least Four Hours After Eating and Within Four Hours After Eating (claims 7, 9 and 10 of the '373 Patent)**

The term "at least four hours after eating and within four hours after eating," as used in claim 1 of the '373 Patent, is indefinite and contradictory. The time for administration cannot be both at least, or *greater than*, four hours after eating and also *within* four hours after eating. With no guidance for assessing the period for administration that falls within, "at least four hours after eating and within four hours after eating," in the specification and the contradictory teaching within the claim itself, the term fails to inform a POSA with reasonable certainty about the scope of the invention and is indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014).

**d. Wherein the Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$ Salts are Present in a wt/wt % Ratio of About . . . Respectively (claims 12 and 14 of the '922, '107, '173, and '258 patents)**

Claims 12 and 14 of the '922, '107, '173, and '258 patents, each of which asserted against the single formulation of Teva ANDA Product in the Teva ANDA, claim non-overlapping ranges of wt/wt % ratios of Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$ salts. By asserting each of these claims against the Teva ANDA Product, it appears that Jazz is adopting some sort of construction of limitations within these claims that would allow these ranges to overlap, because otherwise, it would be impossible for any particular pharmaceutical formulation (i.e., the Teva ANDA Product) to have, for example, both 32% and 28% wt/wt % K.GHB or 40% and 48% wt/wt % Ca.$(GHB)_2$. As such, the limitations in these claims fail to inform a POSA with reasonable certainty about the scope of the invention rendering the claims indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014). In addition, and/or in the alternative, to the extent Jazz argues that these ranges are overlapping, Jazz would run afoul of the fourth paragraph of pre-AIA Section 112 as well.

**e. Monitoring Patent Response and Adjusting the Dose of GHB Dose (claims 2 and 16 of the '400 patent, claim 26 of the '426 patent, claim 18 of the '302 patent, claim 6 of the '181 patent) and Adjusting the GHB Dose to Treat the Patient (claim 20 of the '426 patent)**

Here, "the claims, the written description, and the prosecution history fail to give . . . any guidance as to what one of ordinary skill in the art would interpret the claim to require." *Honeywell International, Inc. v ITC*, 341 F.3d 1332, 1340 (Fed. Cir. 2003). Neither the claims nor the specification describe how a physician should monitor a patient, for what response and how far to adjust dosing (and in the case of claim 20 of the '426 patent, how to "treat" said patient). Moreover, these terms are entirely subjective, and with no guidance in the specification, "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 134 S. Ct. at 2124.

**f. Monitoring , Patient Response and Adjusting the GHB dose to Maintain the Effect of the GHB (claim 2 of the '302 patent)**

For the same reasons as with the analysis for claims 2 and 16 of the '400 patent, claim 26 of the '426 patent, claim 18 of the '302 patent, claim 6 of the '181 patent, and claim 20 of the '426 patent, this term is indefinite. In addition, "adjusting the GHB does to maintain the effect of the GHB" is also indefinite in that it does not specific what of the multiple effects of GHB should be maintained, and/or how those effects should be assessed.

**g. Decrease in an Effective Dosage Amount of the GHB or salt thereof (all asserted claims of '306 patent)**

The specification of the '306 patent does not use or define the term "decrease in an effective dosage amount." A POSA would not know how to assess a percent decrease in "an effective dosage amount." A POSA would not know, for example, whether to assess for a percent reduction in a dosage amount that shows any physiologic effect, or whether to assess for a percent reduction in a dosage amount for a particular effect. This limitation is thus undefined and subjective and so

"fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus,* 134 S. Ct. at 2124.

**h. "Would Otherwise Have Been Recommended to the Patient if the Patient Was Not Currently Taking Divalproex Sodium (claim 26 of the '302 patent and claim 22 of the '426 patent)**

Physicians prescribe and dose medications based on a variety of factors, including polypharmacy. Approved formulations of GHB, for example, have a dosing range of 4.5 -9 grams per day. It is impossible for a physician to reliably assume a hypothetical for a patient or class of patients, and know with reasonable certainty what dose of GHB would otherwise have been recommended if one of several variables were hypothetically removed without knowing, for example, how the patient was responding to other therapies and/or conditions. In addition, different physicians may prescribe different doses in such a patient based on both the patient's particular needs and medical history and that physician's experience. Claims whose scope depends on the subjective opinions of a particular individual cannot be sufficiently definite. *See Datamize LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1350, (Fed. Cir. 2005), *abrogated on other grounds by, Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014); *see also Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373 (Fed. Cir. 2014) (holding the claim phrase "unobtrusive manner" indefinite because the specification did not "provide a reasonably clear and exclusive definition, leaving the facially subjective claim language without an objective boundary").

**i. Normally Given to the Patient (claim 4 of the '306 patent)**

As with the analysis for claim 26 of the '306 patent and claim 22 of the '426 patent, prescribing practices vary among physicians, especially for pharmaceuticals with a dosing range as wide as 4.5-9 grams per day. The term "normally given to the patient" is undefined in the specification, and would have been a totally subjective criteria for any given prescriber. Claims

whose scope depends on the subject opinion of a particular individual cannot be sufficiently definite. *See Datamize LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1350, (Fed. Cir. 2005); see also *Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1373 (Fed. Cir. 2014) (holding the claim phrase "unobtrusive manner" indefinite because the specification did not "provide a reasonably clear and exclusive definition, leaving the facially subjective claim language without an objective boundary").

**j. "Unit Dosage" (claims 1-11 of the '373 patent)**

Claim 1 of the '373 patent uses the term "unit dosage," however, the specification provides no definition or other guidance as to what that term means or how it would be understood by a POSA. Especially where claims of the '373 patent talk about "divided doses," one skilled in the art would be unable to determine whether the "unit dosage" of claim 1 refers to a single dose or multiple doses, and to which dose any time periods recited would pertain. Where this limitation is undefined, it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus,* 134 S. Ct. at 2124.

**k. "Pharmaceutical Composition Comprises about 5% to about 10% Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.$(GHB)_2$; and about 20% to about 25% of Mg.$(GHB)_2$ (claims 1 and 11 of the '373 patent)**

Claims 1 and 11 each claim 5% to about 10% Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.$(GHB)_2$; and about 20% to about 25% of Mg.$(GHB)_2$, but no units are disclosed, and so where a POSA would know of multiple different units to make sure comparisons (i.e., % wt/wt, molarity, molar equivalent, etc.) without a unit disclosed in the claim, there is no way to know what the percentages are directed toward. Even the specification is unclear. One cannot say 409 mg/mL mixed salt concentration or 409 mg/mL oxybate. Those are different.

With no units delineated, and more than one available test to determine potential

infringement, this limitation is indefinite. *Honeywell International, Inc.,* 341 F.3d at 1338-42; *see generally*, *Teva Pharms USA, Inc. v Sandoz, Inc.*, 789 F.3d 1335 (Fed. Cir. 2015).

## V. Invalidity under pre-AIA 35 U.S.C. § 112, Fourth Paragraph Improper Dependent Claims

**[00235] EXAMPLE 2.1: Testing of Formulation "O"**

**[00236]** Formulation "O" was manufactured as (equivalent%) 8% sodium, 23% potassium, 48% calcium, and 21% magnesium oxybate at 409 mg/mL mixed salt concentration or 409 mg/mL oxybate. The four bases were suspended or dissolved in water, then gamma butyrolactone was added and the reaction mixture was held at 80 °C for about 3 hours. Subsequently, mixture was cooled and then depth filtered, carbon filtered, and then flowed through a polishing filter. Finally, sucralose was added to a level of 0.1% w/v in the final solution.

"[A] claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed." *See* pre-AIA 35 U.S.C. § 112, ¶ 4. Claims that fail to do so are invalid. *See Pfizer, Inc. v. Ranbaxy Laboratories Ltd.*, 457 F.3d 1284, 1292 (Fed. Cir. 2006) (holding claim invalid for not failure to comply with § 112, ¶ 4 and further limit the dependent claim and noting that doing so is not hyper-technical but "is consistent with the overall statutory scheme that requires applicants to satisfy certain requirements before obtaining a patent[.]"); *Network-1 Techs v. Hewlett-Packard Co.*, 981 F.3d 1015, 1029-30 (Fed. Cir. 2020) ("[O]ur precedent is clear that 'dependent claims cannot broaden an independent claim from which they depend.'") (citing cases).

Claim 16 of the '302 patent is invalid for failing to further limit the subject matter of a previous claim. Claim 16 depends from claim 15, which depends from claim 14. Claim 14 recites "[t]he method of claim 13 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient is lower than 4.5 g." Claim 15 requires that claim 14's dosage of lower than 4.5 be divided into two equal doses, which means that each of the two equal doses must be lower than 2.25 g (half of 4.5). This is precisely what is claimed by claim 16, which does not

further limit claim 15 and which is invalid as a result. Claims 17, 23, 24, 29 and 30 of the ’302 patent are invalid under pre-AIA 35 U.S.C. § 112 for the same reason.

Claim 18 of the ’426 patent is invalid under pre-AIA 35 U.S.C. § 112 for failing to further limit the subject matter of a previous claim. Claim 18 depends from claim 17, which depends from claim 16. Claim 16 recites “[t]he method of claim 15 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient is lower than 4.5 g.” Claim 17 requires that claim 16’s dosage of lower than 4.5 be divided into two equal doses, which means that each of the two equal doses must be lower than 2.25 g (half of 4.5). This is precisely what is claimed by claim 18, which does not further limit claim 17 and which is invalid as a result. At least claims 25, 30, and 31 of the ’426 patent are invalid under pre-AIA 35 U.S.C. § 112 for the same reason.

Claim 5 of the ’424 patent is also invalid under pre-AIA 35 U.S.C. § 112 for failing to further limit the subject matter of a previous claim. Claim 5 depends from claim 4, which depends from claim 2. Claim 2 requires a daily dosage amount of GHB or salt thereof administered to a patient that is lower than 4.5 g. Claim 4 requires that claim 2’s dosage of lower than 4.5 be divided into two equal doses, which means that each of the two equal doses must be lower than 2.25 g (half of 4.5). This is precisely what is claimed by claim 5, which does not further limit claim 4 and which is invalid under pre-AIA 35 U.S.C. § 112 as a result.

Claims 32 and 34 of the ‘306 patent are similarly invalid under 35 U.S.C. § 112 for failing to further limit the subject matter of a previous claim. Claim 32 depends from claim 30 and claim 34 depends from claim 33. Each of claims 32 and 34 purport to limit the claim from which it depends by adding only an optional step regarding dilution. But adding only an optional step does not further limit the scope of the claims 30 and 33 from which claims 32 and 34 depend, and thus claims 32 and 34 of the ’306 patent are invalid under pre-AIA 35 U.S.C. § 112 as a result.

As such, at least claims 16, 17, 23, 24, 29 and 30 of the '306 patent, claims 18, 25, 30, and 31 of the '426 patent, claim 5 of the '494 patent and claims 32 and 34 of the '306 patent are invalid. *See* pre-AIA 35 U.S.C. § 112; *Network-1 Tecchs*, 981 F.3d at 1030.

Dated: September 22, 2023

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.

Liza M. Walsh
Hector D. Ruiz
William T. Walsh, Jr.
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
Telephone: (973) 757-1100
lwalsh@walsh.law
hruiz@walsh.law
wwalsh@walsh.law

*/s/ Adam P. Samansky*
Adam P. Samansky (admitted *pro hac vice*)
Peter J. Cuomo (admitted *pro hac vice*)
Joseph Rutkowski (admitted *pro hac vice*)
James Thomson (admitted *pro hac vice*)
Gabriella Flick (admitted *pro hac vice*)
Simone Yhap (admitted *pro hac vice*)
**MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO PC**
One Financial Center
Boston, MA 02111
(617) 542-5000
apsamansky@mintz.com
pjcuomo@mintz.com
jjthomson@mintz.com
jdrutkowski@mintz.com
gjflick@mintz.com
sbyhap@mintz.com

*Attorneys for Defendant/Counterclaimant Teva Pharmaceuticals, Inc.*

**CERTIFICATE OF SERVICE**

I, Adam P. Samansky, do hereby certify that on September 22, 2023, I caused the foregoing document to be served on counsel of record.

*/s/ Adam P. Samansky*______
Adam P. Samansky

# Exhibit 2

MIDLIGE RICHTER, LLC
645 Martinsville Road
Basking Ridge, New Jersey 07920
(908) 626-0622
James S. Richter

*Attorneys for Defendants,*
*Lupin Inc., and Lupin Pharmaceuticals, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JAZZ PHARMACEUTICALS IRELAND LIMITED,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**LUPIN INC. and LUPIN PHARMACEUTICALS INC.,**<br><br>**Defendants.** | **Civil Action No. 21-14271 (SRC)(JSA)**<br><br>**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER** |

**DEFENDANTS' SECOND AMENDED INVALIDITY CONTENTIONS FOR U.S. PATENT NOS. 8,591,922, 8,901,173, 9,132,107, 10,195,168, 10,675,258, 9,050,302, 9,486,426, 8,772,306, 10,213,400, AND 10,864,181**

# TABLE OF CONTENTS

Page

I. General Statements ........ 4

A. Claim Construction ........ 4

B. Ongoing Discovery and Disclosures ........ 5

C. Prior Art Identification and Citation ........ 5

D. Reservation of Rights ........ 6

II. Legal Standards ........ 6

A. Anticipation Under 35 U.S.C. § 102 ........ 6

B. Obviousness Under 35 U.S.C. § 103 (Pre-AIA) ........ 8

C. Invalidity under 35 U.S.C. § 112 (Pre-AIA) ........ 10

1. Lack of Written Description ........ 10

2. Lack of Enablement ........ 11

3. Indefiniteness ........ 12

III. Invalidity of the composition patents ........ 13

A. The ’922 Patent ........ 13

1. The ’922 Patent Specification ........ 14

2. Asserted Claims of the ’922 Patent ........ 15

3. Invalidity of the ’922 Patent ........ 17

B. The ’173 Patent ........ 87

1. The ’173 Patent Specification ........ 88

2. Asserted Claims of the ’173 Patent ........ 88

3. Invalidity of the ’173 Patent ........ 91

C. The ’107 Patent ........ 139

1. The ’107 Patent Specification ........ 140

2. Asserted Claims of the ’107 Patent ........ 140

3. Invalidity of the ’107 Patent ........ 142

D. The ’168 Patent ........ 191

1. The ’168 Patent Specification ........ 192

2. Asserted Claims of the ’168 Patent ........ 192

3. Invalidity of the ’168 Patent ........ 193

E. The ’258 Patent ........ 226

1. The ’258 Patent Specification ........ 226

2. Asserted Claims of the ’258 Patent ........ 227

3. Invalidity of the ’258 Patent ........ 230

IV. Invalidity of the Drug-Drug Interaction Patents ........ 279

A. The ’306 Patent ........ 279

1. The ’306 Patent Specification ........ 280

2. Asserted Claims of the ’306 Patent ........ 282

3. Invalidity of the ’306 Patent ........ 286

B. The ’302 Patent ........ 343

1. The ’302 Patent Specification ........ 344

2. Asserted Claims of the ’302 Patent ........ 344

3. Invalidity of the ’302 Patent ........ 347

C. The ’426 Patent ........ 369

1. The ’426 Patent Specification ........ 370

2. Asserted Claims of the ’426 Patent ........ 370

3. Invalidity of the ’426 Patent ........ 373

D. The ’400 Patent ........ 394

1. The ’400 Patent Specification ........ 395

2. Asserted Claims of the ’400 Patent ........ 395

3. Invalidity of the ’400 Patent ........ 398

E. The ’181 Patent ........ 419

1. The ’181 Patent Specification ........ 420

2. Asserted Claims of the ’181 Patent ........ 420

3. Invalidity of the ’181 Patent ........ 421

V. Claim Charts ........ 279

A. The ’922 Patent ........ 443

B. The ’173 Patent ........ 462

C. The ’107 Patent ........ 466

D. The ’168 Patent ........ 470

E. The ’258 Patent ........ 471

F. The ’306 Patent ........ 478

G. The ’302 Patent ........ 500

H. The ’426 Patent ........ 506

I. The ’400 Patent ........ 511

J. The ’181 Patent ........ 515

Pursuant to Local Patent Rules 3.3 and 3.6(c), and the Scheduling Order entered in this case, Defendant Lupin Inc. and Lupin Pharmaceuticals, Inc. ("Lupin" or "Defendant")[1] hereby serves Plaintiff Jazz Pharmaceuticals, Inc. ("Jazz" or "Plaintiff") with the following invalidity contentions for the asserted claims of U.S. Patent Nos. 8,591,922 ("the '922 patent"); 8,901,173 ("the '173 patent"); 9,132,107 ("the '107 patent"); 10,195,168 ("the '168 patent"); 10,675,258 ("the '258 patent"); 8,772,306 ("the 306 patent"); 9,050,302 ("the '302 patent"); 9,486,426 ("the '462 patent"); 10,213,400 ("the '400 patent"); and 10,864,181 ("the '181 patent").

As identified in Plaintiff's Amended Disclosure of Asserted Claims dated April 18, 2022, Plaintiff has stated that it is asserting the following claims ("the asserted claims").

| **Patent** | **Asserted Claims** |
|---|---|
| The '922 patent | 1-12, 14-16, 21-24, and 27-29 |
| The '173 patent | 1-12, 14-16, 18-19, 21-24, and 27-33 |
| The '107 patent | 1-12, 14-18, 20-23, and 26-29 |
| The '168 patent | 1-4 |
| The '258 patent | 1-12, 14-20, 22-30, and 32-33 |
| The '306 patent | 1-5, 7-16, 18-26, 28-34 |
| The '302 patent | 1-31 |
| The '462 patent | 1-31 |
| The '400 patent | 1-20 |
| The '181 patent | 1-12 |

[1] On March 16, the court entered a Stipulation and Order dismissing Lupin Ltd. as a defendant. D.I. 40.

Lupin reserves the right to seek to amend or respond with supplemental contentions if Plaintiff attempts to assert additional claims.

Lupin has prepared these contentions based on information and discovery currently available to it. The Court has not yet construed any claim terms of the patents-in-suit. Fact discovery has only just begun, and expert discovery has not yet begun in this case. Lupin's investigation into the invalidity of the asserted patents is therefore ongoing. Accordingly, Lupin reserves the right to seek leave to amend its invalidity contentions as discovery progresses and the claims are construed pursuant to Local Patent Rule 3.7 or otherwise for good cause.

These contentions should not be taken as an indication of Lupin's position with regard to the proper construction of any claim term. Rather, Lupin has made reasonable assumptions, to the extent necessary and appropriate, as to the meaning of the claim terms for the purposes of these contentions only and has used those meanings to prepare its contentions. Lupin reserves the right to seek to amend its contentions following the Court's claim-construction rulings, or any other subsequent clarification or alteration of the meaning of any relevant claim terms, including those in related actions involving the asserted patents or related patents. Furthermore, each of the defenses disclosed in these contentions and in Lupin's Noninfringement Contentions is set forth in the alternative.

Lupin also expressly reserves the right to assert and rely upon any invalidity defense(s), including any defense pursuant to any of 35 U.S.C. §§ 101, 102, 103, or 112, asserted by any other defendant that may be added to this litigation or by any party in another action involving the asserted patents or a related patent, including, but not limited to, any prior art or other evidence identified by that party.

These contentions are provided without prejudice to Lupin's right to introduce at trial, *inter alia*, any subsequently discovered evidence, or evidence or expert opinions relating to currently known facts, and to produce and introduce at trial all evidence supporting Lupin's invalidity contentions, whenever discovered. Furthermore, nothing in these contentions limits any of Lupin's experts from relying upon any information in this case, in support of any defense, or from providing opinions and testimony in support of any defense. Moreover, facts, documents, and things now known may be imperfectly understood, and accordingly, such facts, documents, and things may not have been included in this disclosure. Lupin reserves its right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, expert opinion testimony, documents, and things, notwithstanding this disclosure of Lupin's contentions. Lupin further reserves its right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, documents, and things that are not currently recalled but might be recalled at some time in the future. Lupin also reserves the right to rely upon any other grounds of invalidity that need not be recited in these invalidity contentions under the Court's orders or the Local Patent Rules. Additionally, Lupin hereby relies on and incorporates by reference all invalidity arguments presented in any expert reports to be served in this matter.

To the extent these contentions contain any information protected from discovery under the attorney–client privilege, the attorney work-product immunity, or any other applicable privilege or immunity, such disclosure is inadvertent and does not constitute a waiver of any such privilege or immunity.

The information set forth below is provided without waiving Lupin's rights to object to the use of any statement for any purpose, in this action or any other action, on the grounds of privilege, relevance, materiality, or any other appropriate ground; the right to object to any request involving

or relating to the subject matter of these statements; or the right to revise, correct, supplement, or clarify any of the statements provided below at any time.

Pursuant to Local Patent Rule 3.6(c), these contentions contain each of the disclosures required by Local Patent Rule 3.3. Specifically, these contentions disclose (a) the identity of each item of prior art that anticipates each asserted claim or renders it obvious; (b) whether each item of prior art anticipates each asserted claim or renders it obvious and, with respect to obviousness, an explanation of why the prior art renders the asserted claim obvious, including an identification of any combinations of prior art showing obviousness; (c) a chart identifying where specifically in each item of prior art each limitation of each asserted claim is found; and (d) a detailed explanation of other grounds of invalidity; e.g., defenses based on the requirements for patentability set forth in 35 U.S.C. §§ 101 and 112, as well as under the doctrine of nonstatutory anticipation or obviousness-type double patenting. In addition, pursuant to Local Patent Rule 3.4(b) Lupin is contemporaneously producing copies of the prior art identified herein.

# I. General Statements

## A. Claim Construction

These contentions should not be interpreted as a statement of Lupin's position on the proper claim construction of any claim term. Instead, Lupin has made certain assumptions, if necessary and appropriate, on the meaning of claim terms for the purpose of these contentions, including any claim terms that are indefinite. By making these assumptions, Lupin does not admit that any claim language satisfies 35 U.S.C. § 112, ¶ 2. Likewise, the use of claim terms herein should not be understood to suggest or imply a common, usual, ordinary, customary, plain, or accepted meaning in the art for any such term. If Lupin determines that a different meaning is appropriate for any claim term, or that any claim term does not constitute a claim limitation, Lupin reserves the right to assert that meaning in connection with claim construction proceedings. If Lupin determines

that a different meaning is appropriate for any claim term, or that any claim term does not constitute a claim limitation, Lupin reserves the right to assert that meaning later in this litigation. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

Lupin reserves the right to amend, supplement, or modify these contentions based on Jazz's allegations of infringement and validity, claim construction proceedings in this or any related action, and on any other arguments Jazz may advance in this case.

### B. Ongoing Discovery and Disclosures

Expert discovery in this case is in its early stages, and Lupin's investigation, including Lupin's search for prior art, is ongoing. Lupin therefore reserves the right to supplement or alter the positions taken and information disclosed in these Invalidity Contentions including, without limitation, the prior art, and grounds of invalidity set forth herein, and to supplement the information or defenses that may come to light as a result of these continuing efforts.

Moreover, Lupin reserves the right to amend these Invalidity Contentions as a result of new information disclosed through the parties' experts. Lupin thus reserves all rights to supplement or amend these Invalidity Contentions if further information becomes available.

### C. Prior Art Identification and Citation

A person of ordinary skill in the art ("POSA") would generally read a prior art reference as a whole and in the context of other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a POSA would rely upon other information including other publications and general knowledge relevant to the subject matter of the Patents-in-Suit. Lupin therefore reserves the right to rely upon other unidentified portions of the prior art references, other publications, other relevant knowledge, and expert testimony to provide context and to aid understanding and interpretation of any identified portions. Lupin also reserves the right to rely upon other portions of the prior art references, other

publications, and the testimony of experts to establish that the alleged inventions were inherently disclosed in the prior art and/or would have been obvious to a POSA, including based on modifying or combining certain cited references. Lupin also reserves the right to rely upon any admissions relating to prior art in the Patents-in-Suit or their prosecution histories.

Lupin reserves the right to rely on all prior art and all evidence of the relevant state of the art and prior sales produced by Jazz.

### D. Reservation of Rights

Lupin reserves all rights to supplement or modify these Invalidity Contentions, including the prior art disclosed and the stated grounds of invalidity. Lupin reserves the right to prove the invalidity any of the Asserted Claims on bases other than those disclosed in these disclosures and contentions and/or amend these contentions at a later date. Lupin otherwise reserves the right to supplement and/or amend these contentions as necessary and appropriate and as provided under any applicable Rules or order of the Court.

## II. LEGAL STANDARDS

### A. Anticipation Under 35 U.S.C. § 102

"Under 35 U.S.C. § 102, a claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference." *See King Pharm., Inc. v. Eon Labs., Inc.*, 616 F.3d 1267, 1274 (Fed. Cir. 2010) (internal citation and quotation marks omitted); *see also ClearValue, Inc. v. Pearl River Polymers, Inc.,* 668 F.3d 1340, 1344 (Fed. Cir. 2012). While the anticipating reference must be enabling, *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1341 (Fed. Cir. 2011), additional references and extrinsic evidence can be used to show the reference contains an enabled disclosure. *In re Donohue*, 766 F.2d 531, 534 (Fed. Cir. 1985); *In re Samour*, 571 F.2d 559, 562 (C.C.P.A. 1978) ("[T]he disclosure . . . must be considered together with the knowledge of one of ordinary skill in the pertinent art."). Additional references or other

evidence also can be used to show meaning of a term used in the primary reference. *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991).

The classic test for anticipation is often stated in terms of an infringement analysis, namely, "[t]hat which would literally infringe if later in time anticipates if earlier than the date of invention." *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1348 (Fed. Cir. 2009) (quoting *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987), *cert. denied*, 484 U.S. 1007 (1988)). Thus, a reference may be relied upon for all that it would have reasonably suggested to one having ordinary skill in the art, including non-preferred embodiments. *Celeritas Techs. Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998) (holding that the prior art anticipated the claims even though it taught away from the claimed invention); *Merck & Co. v. Biocraft Labs.*, 874 F.2d 804 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 975 (1989); *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1322 (Fed. Cir. 2012).

"Moreover, a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citation omitted); *see also Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958 (Fed. Cir. 2014). The Federal Circuit has explained that the standard of certainty required for inherent anticipation is not whether a party can prove by clear and convincing evidence that the claimed invention existed in the prior art as an absolute certainty, but rather "merely that the disclosure is sufficient to show that the natural results flowing from the operation as taught would result in the claimed product." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005) (internal citation and quotation marks omitted). Additional references or evidence can be used to show that a person of ordinary skill in the art would recognize the inherent characteristic of the thing taught by the

primary reference. *E.g.*, *Teleflex, Inc.*, 299 F.3d at 1335 (recognizing that courts permit "the use of additional references to confirm the contents of the allegedly anticipating reference"); *Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991); *Scripps Clinic & Res. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed Cir. 1991) *overruled on other grounds by Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1293 (Fed. Cir. 2009), *cert. denied,* 558 U.S. 1136 (2010) ("The role of extrinsic evidence is to educate the decision-maker to what the reference meant to persons of ordinary skill in the field of the invention, not to fill gaps in the reference."). Inherent anticipation, however, "does not require a person of ordinary skill in the art to recognize the inherent disclosure in the prior art at the time the prior art is created." *SmithKline Beecham*, 403 F.3d at 1343; *see also Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 471 F.3d 1363, 1367 (Fed. Cir. 2006) ("[A] reference may anticipate even when the relevant properties of the thing disclosed were not appreciated at the time.").

**B. Obviousness Under 35 U.S.C. § 103 (Pre-AIA)**

Under 35 U.S.C. § 103(a), "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

Obviousness is ultimately a legal conclusion, based upon underlying factual inquiries. *McNeil-PPC, Inc. v. L. Perrigo Co*., 337 F.3d 1362, 1368 (Fed. Cir. 2003). The required factual inquiry considers: (1) what is the level of ordinary skill in the pertinent art, (2) what was the scope and content of the prior art, (3) what are the differences between the prior art and the asserted

claims, and (4) are there any secondary considerations of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).

When, from the perspective of a person of ordinary skill in the art, the differences between the prior art and the claimed invention as a whole would be obvious, a prima facie case of obviousness is established under § 103, thus rendering the subject claim invalid. *See In re Dillon*, 919 F.2d 688, 692-93 (Fed. Cir. 1990).

Obviousness may be based on one or more references. However, either the prior art as a whole, or knowledge generally available to one of ordinary skill in the art, should suggest the desirability, and thus, the obviousness of combining and modifying the prior art to arrive at the claimed invention. *See SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp*., 225 F.3d 1349, 1356 (Fed. Cir. 2000). This requirement for a showing of motivation to combine references ensures that a combination is not improperly made in hindsight. *See In re Gartside*, 203 F.3d 1305, 1318-19 (Fed. Cir. 2000). Moreover, a "combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416. More specifically, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 417.

In order to determine obviousness, a court can look to: 1) "interrelated teachings of multiple patents"; 2) "the effects of demands known to the design community or present in the marketplace"; and 3) "the background knowledge possessed by a person having ordinary skill in the art." *Id*. at 418. The determination should be based upon "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id*. The analysis of obviousness "need not seek out precise teachings directed to the specific subject matter

of the challenged claim"—a court can take into account "inferences and creative steps that a person of skill in the art would employ." *Id.*

**C. Invalidity under 35 U.S.C. § 112 (Pre-AIA)**

**1. Lack of Written Description**

To satisfy the written description requirement, "the patent specification must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (internal quotations and citation omitted). This means that "the disclosure must . . . convey with reasonable clarity to those skilled in the art that . . . [the inventor] was in possession of the invention." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000) (internal quotations and citation omitted) (affirming district court's finding that the patent claims were invalid); *see also Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005); *In re Curtis*, 354 F.3d 1347, 1350-52 (Fed. Cir. 2004) (affirming Board's finding that a prior application "did not provide an adequate written description of the later-claimed genus of friction enhancing coatings"). Under this requirement, the patent's specification must describe what is claimed with sufficient detail such that a person of ordinary skill in the art can conclude that "the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed Cir. 2010) (citation omitted); *see also Carnegie Mellon Univ. v. Hoffmann–La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008) ("[T]he applicant must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention,' and demonstrate that by disclosure in the specification of the patent." (citation omitted)).

"[T]he hallmark of written description is disclosure. Thus, 'possession as shown in the disclosure' is a more complete formulation." *Ariad*, 598 F.3d at 1351. The test for written

description involves an objective inquiry into whether the specification describes the invention sufficiently to allow a person of ordinary skill in the art to understand it and know that the inventor actually invented the claimed invention. *Id*. The operative time for this determination is the date of the patent's filing. *Id.* ("The law must be applied to each invention at the time it enters the patent process, for each patented advance has a novel relationship with the state of the art from which it emerges."). The Federal Circuit has stated that, when determining whether a patent specification complies with the written description requirement:

> the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology. For generic claims, we have set forth a number of factors for evaluating the adequacy of the disclosure, including "the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, [and] the predictability of the aspect at issue.

*Id.* (quoting *Capon*, 418 F.3d at 1359). Finally, "actual 'possession' or reduction to practice outside of the specification is not enough . . . it is the specification itself that must demonstrate possession." *Id.* at 1352.

**2. Lack of Enablement**

Under 35 U.S.C. § 112, ¶ 1, an inventor is obligated to set forth in the specification "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out of his invention."

"To be enabling, the specification of a patent much teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *ALZA Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010) (quoting *Genentech, Inc. v. Novo*

*Nordisk, A/S*, 108 F. 3d 1361, 1365 (Fed. Cir. 1997)); *see also Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195-96 (Fed. Cir. 1999); *In re Goodman*, 11 F.3d 1046, 1050 (Fed. Cir. 1993); 35 U.S.C. § 112, ¶ 1. "Whether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations," including the quantity of experimentation necessary and the amount of direction or guidance presented. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). Enablement of one mode of practicing the invention will not satisfy the enablement requirement if the invention is broadly claimed. *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1285 (Fed. Cir. 2007); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1378-79 (Fed. Cir. 2007).

Whether a patent complies with the enablement requirement is a question of law and is determined from the perspective of a person of ordinary skill in the art as of the filing date of the specification. *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1371-72 (Fed. Cir. 1999). The Court must make an enablement determination "*retrospectively,* i.e., by looking back to the filing date of the patent application and determining whether undue experimentation *would have been* required to make and use the claimed invention at that time." *Id*. Although the enablement inquiry is viewed from the perspective of a person of ordinary skill in the art, that person's knowledge is not a "substitute for a basic enabling disclosure." *Genentech*, 108 F.3d at 1366 (recognizing that the specification, not knowledge of a person of ordinary skill in the art, must supply novel aspects of an invention to constitute adequate enablement).

**3. Indefiniteness**

Paragraph 2 of § 112 provides that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. A patent claim is invalid for indefiniteness if the claim, "read in light of the specification delineating the patent, and the prosecution history, fail[s]

to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). "The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

Indefiniteness is a question of law and "[t]he inquiry 'trains on the understanding of a skilled artisan at the time of the patent application.'" *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1260 (Fed. Cir. 2014) (citing *Nautilus*, 134 S. Ct. at 2130).

## III. INVALIDITY OF THE COMPOSITION PATENTS

U.S. Patent Nos. 8,591,922 ("the '922 patent"); 8,901,173 ("the '173 patent"); 9,132,107 ("the '107 patent"); 10,195,168 ("the '168 patent"); and 10,675,258 ("the '258 patent") (collectively the "composition patents") are invalid for at least the reasons discussed below.

### A. The '922 Patent

U.S. Patent No. 8,591,922 B1 ("the '922 patent"), entitled "Gamma-hydroxybutyrate compositions and their use for the treatment of disorders," issued on or about November 26, 2013. Clark P. Allphin and Michael Desjardin are identified as the purported inventors on the face of the '922 patent. According to the records of the Patent Office, the '922 patent is purportedly assigned to Jazz Pharmaceuticals Ireland Limited. The '922 patent issued from U.S. Patent Application Serial No. 13/739,886 ("the '886 application"), filed on January 11, 2013, and also purports to claim the benefit of priority of U.S. Provisional Patent Application Serial Nos. 61/737,695 ("the '695 provisional application"), filed on December 14, 2012.

Plaintiff has the burden to establish that the asserted claims of the '922 patent are entitled to the priority date of any earlier-filed application. *See Dynamic Drinkware, LLC v. National Graphics, Inc.* 800 F.3d 1375, 1380 (Fed. Cir. 2015). Absent specific evidence of entitlement to

an earlier priority date, the ’922 patent must be assigned its actual filing date of January 11, 2013. *Id*. To establish an earlier priority date, each earlier application in the chain must fully disclose the claimed invention by meeting all requirements of 35 U.S.C. §112. *In re NTP, Inc.,* 654 F.3d 1268, 1277 (Fed. Cir. 2011). Lupin does not concede that the ’922 patent has made a proper claim of priority to an earlier- filed application, and reserves the right to (i) challenge the ’922 patent’s entitlement to claim priority to any previous application, (ii) challenge any alleged date of conception or reduction to practice; and (iii) identify additional prior art thereto.

**1. The ’922 Patent Specification**

The specification of the ’922 patent purports to disclose “pharmaceutical compositions comprising salts of gamma-hydroxybutyrate (GHB) which are useful in the treatment of conditions responsive to GHB, for example, fibromyalgia and sleep disorders such as apnea, sleep time disturbances, narcolepsy, cataplexy, sleep paralysis, hypnagogic hallucination, sleep arousal, insomnia, and nocturnal myoclonus” *See* ’922 patent at 2:21-27. Similarly, the ’922 patent asserts that “the pharmaceutical compositions provided herein are reduced in sodium content, which would render them particularly suitable for the treatment of patients with hypertension, heart disease, or renal disease, or who are at risk of stroke.” *See* ’922 patent at 2:28-32. The ’922 patent also states that “the mixture comprises two or more salts selected from the group consisting of a sodium salt of hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca.(GHB)_2$).” *Id*. at 2:33-39.

The ’922 patent also states:

> In certain embodiments, the pharmaceutical composition is formulated as a liquid formulation. In certain embodiments, the formulation is chemically stable and resistant to microbial growth, and is free of preservatives. In certain embodiments, the level of gamma-butyrolacetone (GBL) is 0.1% or less of the formulation. In certain embodiments, the formulation is suitable for oral administration. In certain

> embodiments, the formulation additionally comprises a flavoring agent. In certain embodiments, the formulation is administered in a single or multiple dosage regimen.

*Id*. at 3:62-4:4.

The ’922 patent specification further states that “Sodium oxybate (Na.GHB), commercially sold as Xyrem®, is approved for the treatment of excessive daytime sleepiness and cataplexy in patients with narcolepsy,” and that “[t]he amount of sodium intake from the drug significantly increases the dietary sodium intake for patients, which is undesirable for patients with hypertension, heart disease, renal disease or at risk of stroke.” *Id*. at 1:47-2:3.

As detailed further below, the inventor’s assertion that “[l]ittle research has been done on salts of GHB, other than Na.GHB” and that there was no research on “combining multiple salts” is incorrect. *Id*. at 2:4-6.

### 2. Asserted Claims of the ’922 Patent

Plaintiff asserts claims 1-12, 14-16, 21-24, and 27-29 of the ’922 patent, of which claim 1 is independent. These claims are reproduced below:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca.(GHB)_2$); and optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier.
>
> 2. The pharmaceutical composition of claim 1, wherein the pharmaceutically acceptable carrier comprises more of a solvent, dispersion medium, coating, antibacterial agent, antifungal agent, isotonic agent, or absorption delaying agent.
>
> 3. The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of 5% to 10%, 10% to 15%, 15% to 20%, 20% to 25%, 25% to 30%, 30% to 35%, or 35% to 40%.
>
> 4. The pharmaceutical composition of claim 2, wherein the K.GHB salt is present in a wt/wt % of 5% to 10%, 10% to 15%, 15% to 20%, 20% to 25%, 25% to 30%, 30% to 35%, or 35% to 40%.

5. The pharmaceutical composition of claim 2, wherein the $Mg.(GHB)_2$ salt is present in a wt/wt % of 5% to 10%, 10% to 15%, 15% to 20%, 20% to 25%, 25% to 30%.

6. The pharmaceutical composition of claim 2, wherein the $Ca.(GHB)_2$ salt is present in a wt/wt % of 20% to 25%, 25% to 30%, 30% to 35%, 35% to 40%, 40% to 45%, 45% to 50%, 50% to 55%, 55% to 60%, 60% to 65%, 65% to 70%, 70% to about 75%, or 75% to 80%.

7. The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%.

8. The pharmaceutical composition of claim 2, wherein the K.GHB salt is present in a wt/wt % of about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%.

9. The pharmaceutical composition of claim 2, wherein the $Mg.(GHB)_2$ salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, or about 30%.

10. The pharmaceutical composition of claim 2, wherein the $Ca.(GHB)_2$ salt is present in a wt/wt % of about 20%, about 25%, about 30%, about 35%, about 40%, about 45%, about 50%, about 55%, about 60%, about 65%, about 70%, about 75%, or about 80%.

11. The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of 5% to 40%, the K.GHB salt is present in a wt/wt % of 10% to 40%, the $Mg(GHB)_2$ salt is present in a wt/wt % of 5% to 30%, and the $Ca.(GHB)_2$ salt is present in a wt/wt % of 20% to 80%.

12. The pharmaceutical composition of claim 2, wherein the Na.GHB, K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$ salts are present in a wt/wt % ratio of about 8%:32%:20%:40%, respectively.

* * *

14. The pharmaceutical composition of claim 2, wherein the Na.GHB, K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$ salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively.

15. The pharmaceutical composition of claim 2, wherein the solvent comprises one or more of water, ethanol, polyol, or vegetable oil.

16. The pharmaceutical composition of claim 15, wherein the Na.GHB salt is present in a wt/wt % of 5% to 40%, the K.GHB salt is present in a wt/wt % of 10% to 40%, and the $Ca.(GHB)_2$ salt is present in a wt/wt % of 20% to 80%.

* * *

> 21. The pharmaceutical composition of claim 1, comprising an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.
>
> 22. The pharmaceutical composition of claim 21, wherein the composition has a pH of about 7.3 to about 8.5.
>
> 23. The pharmaceutical composition of claim 21, wherein the composition additionally comprises a pH adjusting or buffering agent.
>
> 24. The pharmaceutical composition of claim 23, wherein the pH adjusting or buffering agent is an acid.

* * *

> 27. The pharmaceutical composition of claim 1, wherein the composition is formulated as a liquid formulation.
>
> 28. The formulation of claim 27, wherein the formulation is chemically stable and resistant to microbial growth, and wherein the formulation is free of preservatives.
>
> 29. The formulation of claim 27, which is suitable for oral administration.

### 3. Invalidity of the ’922 Patent

The Asserted Claims of the ’922 patent are invalid at least under 35 U.S.C. § 102 for being anticipated by the prior art and/or § 103 for being obvious over the prior art. Further, to the extent Plaintiff argues that the asserted claims of the ’922 patent are not anticipated/obvious over the prior art, then they are invalid under 35 U.S.C. § 112 for lack of enablement.

#### a. Anticipation/Obviousness

In addition to the prior art references found on the face of the ’922 patent, which Lupin identifies and incorporates fully herein, Lupin identifies the following items of prior art which, separately or in any reasonable combination, anticipate or render obvious one or more of the asserted claims of the ’922 patent under 35 U.S.C. §§ 102 or 103 (Pre-AIA). In addition, Lupin reserves the right to rely on all prior art, evidence of the relevant state of the art, and evidence of

prior sales, produced by Plaintiff during fact discovery and all prior art identified in the ’922 patent or its prosecution history. Lupin further incorporates by reference, in full, all references cited in the following prior art references and their prosecution histories, where applicable.

The citations provided are representative of the references and are not exhaustive. To the extent that similar claim limitations occur in one or more claims, the disclosures below should be read to apply to all similar claim limitations. Moreover, many of the references discussed herein are representative of additional prior art references in the relevant field. It should be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of the other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information, including other publications and general scientific, medical or engineering knowledge. Lupin therefore reserves the right to rely upon other unidentified portions of the prior art references and on other publications and expert testimony to provide context and to aid understanding and interpretation of any identified portions. Lupin also reserves the right to rely upon other portions of the prior art references, other publications, and the testimony of experts to establish that the alleged inventions were expressly or inherently disclosed in the prior art and/or would have been obvious to a person of ordinary skill in the art, including on the basis of modifying or combining certain cited references. It should also be recognized that the various concepts may be discussed in numerous references and that citation to one particular reference does not exclude later citation to other references discussing the same concept. Lupin also reserves the right to rely upon any admissions relating to prior art or the state of the art in the ’922 patent or its prosecution history, as well as any admissions relating to prior art or the statement of the art in foreign counterparts and their prosecution histories. Lupin further reserves the right to

modify these Invalidity Contentions to add additional prior art references in light of the information gained through fact discovery, expert discovery, arguments or positions advanced by Plaintiff, or the Court's claim construction rulings.

Lupin reserves the right to rely upon any related patents and patent applications, foreign patent counterparts and foreign patent applications of U.S. patents or applications identified in these Invalidity Contentions, U.S. counterparts of foreign patents or foreign patent applications identified in these Invalidity Contentions, or U.S. and foreign patents or applications corresponding to articles and publications identified in these Invalidity Contentions. For prior art patents and publications identified in these Invalidity Contentions, Lupin reserves the right to rely on inherency, public use, offer for sale, and/or sale of the products described in those prior art patents or publications once Lupin has had an opportunity to take discovery on these subjects.

### i. Identification of the Prior Art

Subject to the above, at least the following prior art is relevant to the invalidity of the asserted claims of the '922 patent:

- Xyrem® (sodium oxybate) oral solution, CIII, FDA Approval 2002 (Rev. November 2005) ("Xyrem Label");
- Eero M.A. Mervaala et al., Improvement of cardiovascular effects of metoprolol by replacement of common salt with a potassium- and magnesium-enriched salt alternative, Br. J. Pharmacol. (1994), 112, 640-648 ("Mervaala I");
- Eero M.A. Mervaala et al., Replacement of salt by a novel potassium- and magnesium-enriched salt alternative improves the cardiovascular effects of ramipril, Br. J. Pharmacol. (1994), 111, 1189-1197 ("Mervaala II")
- Quanhe Yang, PhD et al., Sodium and Potassium Intake and Mortality Among US Adults, Arch Intern Med. 2011;171(13):1183-1191 ("Quanhe")
- U.S. Patent Application No. 2003/0125385 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (published July 3, 2003) ("Cook Application")

- U.S. Patent No. 6,780,889 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (issued Aug. 24, 2004) ("Cook Patent")

- Van Leer EM, Seidell JC, Kromhout D., Dietary calcium, potassium, magnesium and blood pressure in the Netherlands. Int J Epidemiol. 1995;24(6):1117-1123 ("Van Leer")

- Smith KM, et al., Club drugs: methylenedioxymethamphetamine, flunitrazepam, ketamine hydrochloride, and γ-hydroxybutyrate, Am J Health-Syst Pharm—Vol 59 Jun 1, 2002 ("Smith")

- Ferris and Went, 2012, Forensic Science International 216: 158-162 ("Ferris")

- U.S. Patent No. 4,983,632, Use of gamma-hydroxybutyric acid salts for preparing pharmaceutical compositions for use in the treatment of alcoholism, and the compositions obtained, to Gian Luigi Gessa, Fabio Fadda, and Chiara Mormile di Campochiaro ("the '632 patent")

- European Patent No. EP0616804, Gamma-hydroxybutyric acid salts possessing anxiolytic activity and suitable for the treatment of states of depression, to Giuseppe Tessitore and Roberto Cacciaglia ("the '804 patent")

- U.S. Patent No. 4,393,236, Production of nonhygroscopic salts of 4-hydroxybutyric acid, to Joseph Klosa ("the '236 patent")

- Great Britain Patent No. 922,029, Therapeutic Composition, to Henri Marie Laborit, published March 27, 1963 ("GB '029")

- U.S. Patent Application No. 2011/0111027, Immediate release formulations and dosage forms of gamma-hydroxybutyrate, to Andrea Marie Rourke, Maura Patricia Murphy, James Frederick Pfeiffer, Clark Patrick Allphin, and Alya Khan Mcginlay ("the '027 application")

- U.S. Patent No. 8,197,878, Method for producing a low sodium salt composition, to Sambasiva Rao Chigurupati ("the '878 patent")

- U.S. Patent No. 5,594,030, Controlled release pharmaceutical compositions based on one or more pharmaceutically acceptable salts of gamma hydroxy-butyric acid, to Ubaldo Conte, Aldo La Manna, and Giuseppe Tessitore ("the '030 patent")

- Amalia Ubeda et al., Blood pressure reduction in hypertensive patients after withdrawal of effervescent medication, J of PDS, Vol 18, Issue 5 (May 2009) Pages 417-419 ("Ubeda")

- Intersalt Cooperative Research Group, 'Intersalt: an international study of electrolyte excretion and blood pressure. Results for 24 hour urinary sodium and potassium excretion', BMJ, Vol. 297, 1988, p. 319-328 ("Intersalt")

- Sarkkinen, E.S., Kastarinen, M.J., Niskanen, T.H. et al. Feasibility and antihypertensive effect of replacing regular salt with mineral salt -rich in magnesium and potassium- in subjects with mildly elevated blood pressure. Nutr J 10, 88 (2011). https://doi.org/10.1186/1475-2891-10-88 ("Sarkkinen")

- Karppanen, H., Karppanen, P. & Mervaala, E. Why and how to implement sodium, potassium, calcium, and magnesium changes in food items and diets?. J Hum Hypertens 19, S10–S19 (2005). https://doi.org/10.1038/sj.jhh.1001955 ("Karppanen")

- Houston, M.C. and Harper, K.J. (2008), Potassium, Magnesium, and Calcium: Their Role in Both the Cause and Treatment of Hypertension. The Journal of Clinical Hypertension, 10: 3-11 ("Houston")

- H Kesteloot and J V Joossens Relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure, Hypertension. 1988;12:594–599 ("Kesteloot")

- U.S. Department of Agriculture, Dietary Guidelines for Americans, 2010, https://health.gov/sites/default/files/2020-01/DietaryGuidelines2010.pdf ("Dietary Guidelines 2010")

- Institute of Medicine. 2010. Strategies to Reduce Sodium Intake in the United States. Washington, DC: The National Academies Press. https://doi.org/10.17226/12818 ("Institute of Medicine")

- He, F. J., and G. A. MacGregor. 2009. A comprehensive review on salt and health and current experience of worldwide salt reduction programmes. Journal of Human Hypertension 23(6):363-384 ("MacGregor")

- Lyle D. Bighley et al., Salt Forms of Drugs and Absorption, in 13 Encyclopedia of Pharmaceutical Technology 453 (James Swarbrick & James C. Boylan eds., 1995) ("Bighley")

- Pandit, N.K., Strykowski, J.M., and Shtohryn, L., The effect of salts on the distribution and solubility of an acidic drug. Int. J. Pharm. 1989, 50, 7–13 ("Pandit")

- Chowhan, Z.T. , J. Pharm. Sci. , pH–Solubility Profiles of Organic Carboxylic Acids and Their Salts 67 :1257-1260 (1978) ("Chowhan")

- Sanjeev Kothare et al., Pharmacotherapy of Narcolepsy: Focus on Sodium Oxybate, Clinical Medicine Insights: Therapeutics 2010:2 37–52 ("Kothare")

- Lois E. Krahn, MD, Sodium oxybate: A new way to treat narcolepsy, Current Psychiatry 2003 August;2(8):65-69 ("Krahn")

- Remington: the Science and Practice of Pharmacy (Alfonso R. Gennaro et al. eds., 20th ed. 2000) ("Remington's 2000")
- Rowe et al., Handbook of Pharmaceutical Excipients, Fifth Edition, Amer Pharmacists Assn. ("Rowe 2006")
- Scientific Panel on Dietetic Products, Nutrition and Allergies, Tolerable Upper Intake Levels For Vitamins and Minerals, European Food Safety Authority (February 2006). ("EFSA 2006")
- S. Davis et al., Transit of pharmaceutical dosage forms through the small intestine, Gut, 1986, 27, 886-892 ("Davis")

Lupin expressly reserves the right to modify and/or supplement the prior art discussed herein. Each of the above is prior art to the '922 patent. To the extent that the patentee and/or inventors attempt to swear behind or otherwise remove as prior art any of the art identified herein, Lupin specifically reserves its right to, *inter alia*, add additional prior art to the list. Furthermore, to the extent that the patentee argues that any of the cited references are not prior art under 35 U.S.C. § 102, many of the referenced patents and/or patent applications have foreign or U.S. equivalents which also qualify as prior art. Such foreign and U.S. equivalents are incorporated herein, and Lupin reserves the right to rely upon them. Additionally, as previously noted, Lupin reserves its right to, *inter alia*, supplement or amend its list of prior art references based upon, among other things, Plaintiff's disclosure of its alleged infringement proofs; disclosure of the Plaintiff's proposed construction of the claims of the '922 patent; issuance of a claim construction ruling by a court,should the court be able to construe the claims of the '922 patent; Plaintiff's response to any of Lupin's defenses, including, but not limited to, Plaintiff's interpretation of the prior art; the discovery (fact or expert) during litigation; and/or further investigation. Moreover, Lupin does not admit, or otherwise concede, that the claims of the '922 patent are entitled to an effective filing date earlier than the patent's filing date, and therefore reserves the right to, *inter alia*, challenge the effective filing date of the patent and to assert additional prior art references

and/or products based on any such challenge. Nevertheless, as discussed herein, each claim of the patent is invalid even if the ’922 patent is entitled to claim priority to an earlier-filed application.

### ii. Description and Content of the Prior Art

#### (1) Xyrem Label

Xyrem Label teaches that sodium oxybate (chemically known as sodium γ-hydroxybutyrate) “is a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy.” Xyrem Label at 1. The recommended starting dose for Xyrem is 4.5 g/night, which can be increased (recommended in 1.5 g increments) to a maximum of 9 g/night. Xyrem Label at 22–23. According to Xyrem Label, the pharmacokinetics of sodium oxybate “are nonlinear with blood levels increasing 3.7-fold as dose is doubled from 4.5 to 9 grams (g).” Xyrem Label at 2.

Under the section on “Precautions” Xyrem Label warns that “[d]aily sodium intake in patients taking sodium oxybate … should be considered in patients with heart failure, hypertension or compromised renal function.” Xyrem Label at 11. Xyrem Label further reports “hypertenson” as a “[f]requent” “[v]ascular disorder[].” Xyrem Label at 20. Xyrem Label also warns patients to tell their doctor if they “are on a salt-restricted diet, have high blood pressure, heart failure, or kidney problems” because “Xyrem contains a lot of sodium (salt) and may not be right for [them].” Xyrem Label Medication Guide at 2.

Xyrem oral solution is “neutralized to pH 7.5 with malic acid,” a pH buffer. Xyrem Label at 2.

#### (2) Mervaala I

Mervaala I teaches that “[i]ncreased dietary sodium chloride intake produced a marked rise in blood pressure and induced left ventricular and renal hypertrophy. By contrast, the [sodium-

reduced, potassium-, magnesium-, and L-lysine-enriched] salt alternative did not increase blood pressure and caused remarkably less cardiac and renal hypertrophy than did sodium chloride." Mervaala I at Abstract. Further, Mervaala I teaches that "[a]n adverse influence of dietary sodium chloride on the effects of β-adrenoceptor blocking drugs has been reported." Mervaala I at 646. Mervaala I also discloses that "[a] crucial cardiovascular interaction between sodium and calcium is also suggested by the finding that calcium supplementation decreased blood pressure and improved vascular relaxation." Mervaala I at 647. Mervaala I concluded:

> [R]eplacement of common salt by a potassium-, and magnesium-enriched salt alternative in the diet produces beneficial cardiovascular effects and improves the antihypertensive efficacy of metoprolol in stroke-prone spontaneously hypertensive rats. Increased intake of potassium and/or magnesium and L-lysine from the salt alternative is involved in the beneficial effects of the salt alternative. The NaCl-induced myocardial and renal hypertrophies appear to be partially mediated by β-adrenoceptor activation."

Mervaala I at Abstract.

Mervaala I discloses the composition of a sodium-reduced, potassium-, magnesium-, and L-lysine-enriched salt alternative as containing "a sodium chloride concentration [that] was 43% lower" and having 28% KCl and 12% MgSO4-7$H_2O$. *See Id*. at 641, Table 1.

Mervaala I also discloses that "The urinary excretion of calcium was markedly increased in all groups" (*id*. at 644) and also teaches the importance of calcium intake:

> [T]he intake of sodium chloride was associated with a 3 to 4 fold increase in the urinary excretion of calcium. The urinary excretion of calcium correlated very strongly with the urinary excretion of sodium. On the other hand, increased calcium intake dosedependently augmented urinary excretion of sodium and reduced the arterial wall sodium/potassium ratio suggesting an important interaction between these two electrolytes in the regulation of blood pressure and vascular responses (Wuorela et al., 1992).

Mervalla I at 647.

**(3) Mervaala II**

Mervaala II teaches that "reduction in the intake of sodium chloride has an antihypertensive effect." Mervaala II at 1189. Further, Mervaala II discloses that potassium supplementation … lowers blood pressure … and protects against stroke," and that "[i]ncreased intake of magnesium may … reduce blood pressure and produce a variety of other favourable cardiovascular and metabolic effects." Mervaala II at 1189. Mervaala II teaches the benefits of a salt alternative over sodium chloride, stating that "unlike normal salt, a novel potassium-, magnesium-, and L-lysine-enriched salt alternative, even in high doses did not raise blood pressure and produced little if any left ventricular hypertrophy" in a rat study. Mervaala II at 1189.

The Mervaala II study teaches that "[sodium] produced a marked rise in blood pressure and induced cardiac hypertrophy and significant mortality, while the salt alternative neither increased blood pressure nor caused any mortality and produced less cardiac hypertrophy than salt." Mervaala II at Abstract. Further, Mervaala II discloses that the "vascular relaxation enhancing effect of ramipril was blocked by salt but only slightly attenuated by the salt alternative." Mervaala II at Abstract. Mervaala II concludes:

> [T]he present sodium-reduced, potassium- and magnesium-enriched salt alternative was virtually devoid of the hypertensive and cardiac hypertrophy producing effects, typical of NaCl. Replacement of salt in the diet by the salt alternative remarkably improved the cardiovascular effects of ramipril. This effect was due to increased intake of potassium and/or magnesium and L-lysine. The present salt alternative with moderate content of potassium did not produce any tendency to hyperkalaemia, even when combined with ACEI treatment.

Mervaala II at 1196.

**(4) Quanhe**

Quanhe teaches that "a higher sodium-potassium ratio is associated with significantly increased risk of [cardiovascular diseases] and all-cause mortality, and that higher sodium intake is associated with increased total mortality in the general US population." Quanhe at 1183. The results of the study conducted in Quanhe showed that "higher sodium intake was associated with

increased all-cause mortality …, whereas higher potassium intake was associated with lower mortality risk." Quanhe at 1183. Quanhe further discloses that reduced sodium intake accompanied by increased potassium intake could achieve greater health benefits. Quanhe concludes that "[p]ublic health recommendations should emphasize simultaneous reduction in sodium intake and increase in potassium intake." Quanhe at 1189. Quanhe teaches that "[s]odium-potassium ratios can be improved by lowering sodium intake, by raising potassium intake, or both." Quanhe at 1191.

**(5) Cook Application**

Cook Application discloses a pharmaceutical composition of multiple salts of gamma-hydroxybutyrate in an aqueous medium for the treatment of sleep disorders, including narcolepsy, as well as alcohol and opiate withdrawal, reduced levels of growth hormone, increased intracranial pressure, and physical pain in a patient. Cook Application at abstract. Further, Cook Application teaches formulations of gamma-hydroxybutyrate that are resistant to microbial growth are also resistant to the conversion into GBL, a potentially harmful degradation product of GHB. Cook Application at ¶¶ 10-11.

Cook Application also teaches that a composition of GHB "may contain one or more salts," and that these salts may "be derived from inorganic bases such as, for example, sodium, potassium, … calcium, magnesium and the like." Cook Application at ¶ 22. Cook Application discloses that "[p]referred GHB salts of the present invention include sodium, ammonium and calcium." Cook Application at ¶ 12. Cook Application also discloses that "[m]agnesium and calcium salt have been produced to reduce the hygroscopic nature of GHB or powdered forms (U.S. Pat. No. 4,393,236; British Patent No. 922,029)." Cook Application at ¶ 10.

Cook Application also discloses that "[s]alts, excipients, pH adjusting agents such as acids, bases and buffering agents, flavoring agents, and other agents that may be combined with the

compositions of the present invention, or may be used to prepare the compositions of the present invention, are well known in the art, (see for example, 'Remington's Pharmaceutical Sciences' 8th and 15th Editions, and Nema et al., 1997, incorporated herein in their entirety), and are encompassed by the invention." Cook Application at ¶ 27. Cook Application also teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about 6 to about 7.5 but may be from about 3.0 to about 10.3. Cook Application at ¶ 14.

Further, Cook Application teaches that the composition of various salts of GHB "may be dissolved or dispersed in a pharmaceutically acceptable carrier and/or an aqueous medium" which "includes any and all solvents, dispersion media, coatings, antibacterial and antifungal agents, isotonic and absorption delaying agents and the like. The use of such media and agents for pharmaceutical active substances is well known in the art. Insofar as any conventional media or agent is incompatible with the active ingredient, its use in the therapeutic compositions is not appropriate." Cook Application at ¶¶ 52-53. Cook Application additionally teaches that "[t]he carrier can also be a solvent or dispersion medium containing, for example, water, ethanol, polyol (for example, glycerol, propylene glycol, and liquid polyethylene glycol, or the like), suitable mixtures thereof, and vegetable oils." Cook Application at ¶ 58.

Cook Application discloses that gamma-hydroxybutyrate may be formulated at a final concentration of about 150 mg/ml to 750 mg/ml. Cook Application at ¶ 18. Cook Application further teaches that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus,

Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied to achieve a suitable dosage.

Cook Application teaches that the composition of multiple GHB salts may be formulated for oral consumption. Cook Application at ¶ 26. Cook Application further teaches liquid form preparations of the composition of GHB salts, e.g. syrups, aromatic powders, honey, and various elixirs. Cook Application at ¶ 23.

Cook Application discloses drawbacks of Na.GHB, including that "A number of patients have also complained about the flavor" associated with administration of Na.GHB. Cook Application at ¶ 85.

Cook Application also teaches that the composition may comprise malic acid, citric acid, acetic acid, boric acid, lactic acid, hydrochloric acid, phosphoric acid, sulfuric acid, sulfonic acid, and nitric acid. Cook Application at claim 35. Cook Application further teaches that the composition may be free of preservatives. Cook Application at claim 63.

**(6) Cook Patent and Cook Patent Family**

Cook Application issued as Cook Patent on Aug. 24, 2004. Cook Patent is also related to U.S. Patent Applications and Patents including application No. 13/182,324, filed on Jul. 13, 2011, now Pat. No. 8.461.203, which is a continuation of application No. 12/913,644, filed on Oct. 27, 2010, now abandoned, which is a continuation of application No. 11/777,877, filed on Jul. 13, 2007, now Pat. No. 7.851.506, which is a division of application No. 10/841,709, filed on May 7, 2004, now Pat. No. 7.262.219, which is a division of application No. 10/194,021 (Cook Application), filed on Jul. 11, 2002, now Pat. No. 6,780.889 (Cook Patent), which is a division of application No. 09/470,570, filed on Dec. 22, 1999, now Pat. No. 6,472.431, which claims priority to U.S. Provisional application No. 60/113,745, filed on Dec. 23, 1998 (collectively the "Cook Patent Family"). The Cook Patent and Cook Patent Family share the same or similar specifications

as the Cook Application. Thus, any citations herein with respect to Cook Application are also made with respect to the same or similar disclosures in the Cook Patent and Cook Patent Family.

**(7) Van Leer**

Van Leer studied the "relation between blood pressure and dietary calcium, potassium and magnesium and the combined effect of these minerals on blood pressure" and concluded that "diets rich in calcium, potassium and magnesium are associated with lower blood pressure." Van Leer at Abstract.

**(8) Smith**

Smith discloses sodium oxybate "has an unpleasant, salty taste that is often described as soapy." Smith at 1074.

**(9) Ferris**

The '922 patent discloses that Ferris teaches "[s]everal different methods of making" "the compositions or formulations comprising mixed salts GHB disclosed herein" and that a POSA "w[ould] recognize that these methods can be incorporated in the making of the compositions or formulations comprising mixed salts GHB disclosed" in the '922 patent. '922 patent at 23:56-64.

Ferris teaches method of making salts of GHB and states that "[s]odium, potassium, magnesium and calcium salts of gamma-hydroxybutyrate have been synthesised from gamma-butyrolactone and the corresponding group 1 or 2 hydroxide." Ferris at abstract.

**(10) The '632 patent**

The '922 patent discloses that the '632 patent teaches "[s]everal different methods of making" "the compositions or formulations comprising mixed salts GHB disclosed herein" and that a POSA "w[ould] recognize that these methods can be incorporated in the making of the compositions or formulations comprising mixed salts GHB disclosed" in the '922 patent. '922 patent at 23:56-64.

The ’632 patent notes that the compositions disclosed therein relate “to the use of an organic or inorganic salt of gamma-hydroxybutyric acid for preparing pharmaceutical compositions suitable for oral or parenteral administration.” ’632 patent 1:16-20. The ’632 patent further states that “[g]amma-hydroxy butyric acid derivatives, which include its simple salts, are substances already known for certain therapeutic uses due for example to their narcotic, hypnotic or anticonvulsive effect.” (*Id.* at col. 3, ll. 29-32).

The ’632 patent teaches preparing aqueous pharmaceutical compositions comprising GHB salts, including “the sodium, potassium, calcium or magnesium salt.” *Id.* at 7:47-50; *see also* claims 2, 7, and 9. Further, the ’632 patent teaches that pharmaceutical compositions “can be formed using various gamma-hydroxy butyric acid salts.” *Id*. at 7:26-31.

The ’632 patent discloses that “[t]he GHB salt content of the compositions according to the present invention can vary from 12.5 to 50% by weight.” *Id.* Furthermore, the ‘632 patent discloses that “[t]he typical dosage for a GHB salt is from 0.025 to 0.10 g/kg.” *Id.* at 7:44-46. The ‘632 patent also discloses multiple compositions comprising Na.GHB, including one composition with a concentration of 302.5mg/ml and another with a concentration of 200 mg/ml. *Id.* at 7:59-8:59. This latter composition is also free of preservatives. *Id.* at 8:57-59. The ‘632 patent teaches preparing compositions in the “form of syrup, effervescent tablets, sachets containing effervescent powder, fruit jellies or injectable vials” for the treatment of alcoholism. *Id.* at 7:51-55.

**(11) The ’804 patent**

EP ‘804 discloses “[p]referred pharmaceutically acceptable salts of gamma-hydroxybutyric acid for use in the present compositions are lithium-, sodium-, potassium-, calcium-, and magnesium salts.” (EP ‘804 at 2, ll. 37-39).

EP ‘804 states the compositions of GHB salts are “generally administered by the oral way, preferably in the form of a single or multi-dose liquid solutions,” and “compositions (per os and

for injection) . . . preferably contain 20 to 500 mg active ingredient/dosage unit." (*Id.* at 6, ll. 32-36). EP '804 also discloses four exemplary aqueous formulations comprising sodium GHB, including one formulation for administration by injection comprising sodium GHB and citric acid (a pH adjusting agent). (*Id.* at Formulation 4). Other formulations also disclose the use of flavorings, e.g., sour cherry flavour. *Id.* at Formulation 2.

**(12) The '236 patent**

The '236 patent claims "[a] method for the production of magnesium and[] calcium salts of 4-hydroxybutyric acid comprising … reacting … 4-hydroxybutyric acid, … magnesium hydroxide, … [and] calcium hydroxide … in an aqueous solution." '236 at claims 6 and 14.

The '236 patent discloses methods of producing magnesium and calcium salts of 4-hydroxybutyric acid. (The '236 patent at Abstract). The '236 patent further discloses that the "calcium and magnesium salts . . . from 4-hydroxybutyric acid are solid, nonhygroscopic and storable and they can be recrystallized. . . . They dissolve in water to a clear solution and they can be dispensed as injection solutions, but also as drops, or in drinks or as suppositories while maintaining a *stable situation*." (*Id.* at col. 4, ll. 39-47 (emphasis added)). In addition, the '236 patent discloses an aqueous solution comprising the calcium salt of GHB with a pH of 7 to 7.5. (*Id.* at col. 5, ll. 30-33). The '236 patent discloses a solution of magnesium 4-hydroxybutyrate with a concentration of 500 mg/ml and a pH of 7. (*Id.* at col. 6, ll. 51-63).

**(13) GB '029**

GB '029 discloses therapeutic compositions comprising "4- hydroxybutyric acid or one of its therapeutically administrable salts," and said composition, "when liquid, being … a liquid containing a flavrouring agent." GB '029 at 1:23-29. GB '029 teaches using salts of GHB and "especially the alkaline-earth metal salts," including "the sodium salt" and "the calcium salt." GB '029 at 2:53-75.

GB '029 discloses the "pharmacological properties of the composition … with reference to sodium [GHB]" but notes, that these properties are "also true for the other salts of [GHB]," such as "the calcium salt." GB '029 at 4:83-87. The pharmacological properties described include that GHB demonstrates "an hypnogenic and sedative effect" and that in man, it "promotes … deep sleep." GB '029 at 3:36-49.

GB '029 discloses example oral liquid formulations of salts of GHB containing flavoring agents such as "sugar (glucose, levulose or sorbitol)." GB '029 at 5:22-30.

**(14) The '027 application**

The '027 application discloses an oral dosage form of GHB comprising "at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate." '027 application at claim 4. Similarly, the '027 application teaches that "one or more of a GHB drug" can be formulated into an oral dosage form. '027 application ¶ 39. The '027 application also discloses numerous formulation methods and examples to prepare oral dosage forms of GHB salts. See '027 application at Examples 1-13.

**(15) The '878 patent**

The '878 patent teaches "a low sodium salt composition and the methods used to make it." '878 patent at abstract. The '878 patent discloses that while "[sodium] salt imparts a desirable flavor to food, too much use can result in long term adverse health risks." *Id.* at 1:24-26. For instance, "[e]xceeding the recommended daily intake of sodium is a significant risk factor in developing high blood pressure and a cause or contributing factor in the rising incidence of heart disease. As such, medical professionals and governmental authorities recommend a reduction in per capita salt consumption." '878 patent at 1:29-35.

The ’878 patent also teaches that dietary guidelines “recommend[] a potassium consumption limit of 4,700 mg per day,” but notes that “[t]ypically potassium consumption is less than half of that level.” ’878 patent at 1:36-42.

Because of the negative impacts associated with high daily consumption of sodium and that typical consumption of other salts such as potassium is usually well below the daily recommended limits (’878 patent at 1:36-42), “there are a variety of salt substitutes in the market” and “[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios.” ’878 patent at 1:43-46. The ’878 patent teaches that suitable low sodium compositions “preferably” include salts of “potassium, magnesium, calcium, ammonium, and combinations thereof.” ’878 patent at 2:63-67; see also claims 7, 28, 48 (“potassium, magnesium, calcium, ammonium, and a mixture thereof”). Thus, the “low sodium salt composition of the invention has lower sodium content” and “low sodium salt composition of the invention has lower sodium content,” and “[m]ore preferably, the composition contains about 25%, 30%, 35%, 45%, 50%, 55% or 75% lower sodium than regular salt.” ’878 patent at 3:61-67. The ’878 patent teaches that “the resultant low sodium salt composition … may be any single compound such as a chloride of potassium, magnesium, calcium, lithium, ammonium, or a mixture thereof” that is blended or mixed “with sodium chloride … to form the salt composition.” ’878 patent at 4:26-45. Further, the ’878 patent discloses that “[t]he resultant salt composition includes from about 10% to about 90% by weight sodium chloride, from about 2.5% to about 80% by weight [modified] chloride salt [(i.e., a salt comprised of magnesium chloride, potassium chloride, or a combination thereof)], from about 1% to about 75% by weight carrier, and from about 0.1% to about 5% by weight modifier. Preferably, the resultant salt composition includes about 50% by weight sodium chloride, about 40% by weight

potassium chloride, about 8% by weight maltodextrin, and about 1% by weight citric acid." '878 patent at 7:18-24. The '878 patent discloses several example formulations of low sodium compositions. '878 patent at Examples 1-3.

The '878 patent also teaches that "salt substitutes containing potassium" can be associated with a "generally metallic/bitter taste" than can be "reduce[d]" or "mask[ed]" with certain additives. '878 patent at 1:48-53

**(16) The '030 patent**

The '030 patent discloses "Gamma hydroxy butyric salts used in compositions … preferably selected from the group consisting of sodium, lithium, potassium, magnesium and calcium salts." '030 patent at 4:3-6. The '030 patent claims "pharmaceutical compositions … wherein the salts of gamma-hydroxy-butyric acid are selected from the group consisting of sodium, lithium, potassium, magnesium and calcium salts." '030 patent at claim 6. Further, '030 patent discloses that the inventors "found pharmaceutical compositions administrable by oral route, having controlled release containing one or more salts of the gamma hydroxy butyric acid with pharmaceutically acceptable cations which can overcome … drawbacks" associated with sodium gamma hydroxy butyrate. '030 patent at 3:9-13.

**(17) Ubeda**

Ubeda discloses a study aimed at "[r]aised blood pressure associated with the sodium … content" of an orally administered drug. Ubeda at abstract. Ubeda observed patients that were administered paracetamol with sodium content and followed by administration of paracetamol with "no sodium content." Ubeda at abstract. Ubeda observed that "[s]witching to paracetamol tablets (no sodium content) was associated with both lowered systolic pressure of 13.1 mmHg (95%CI: 11.9–14.3, $p < 0.0001$) and a moderate reduction of diastolic pressure of 2.5 mmHg (95%CI: 2.1–2.9, $p < 0.0001$)." Ubeda at abstract. Ubeda concluded that "[a]

relationship of causality between the intake of high sodium excipients and high blood pressure in elderly hypertensive individuals, without chloride ions, was found" and warned that "[c]linicians should be aware of possible raised blood pressure" when these high sodium drugs "are prescribed to hypertensive patients." Ubeda at abstract.

**(18) Intersalt**

Intersalt studied the relationship between "electrolyte excretion and blood pressure" and showed that "sodium was significantly related to the slope of blood pressure" but that "[p]otassium excretion was negatively correlated with blood pressure in individual subjects after adjustment for confounding variables." Intersalt at abstract. Intersalt concludes that increasing long-term intake of dietary sodium was shown to increase blood pressure across all study populations and age ranges. Intersalt at abstract.

**(19) Sarkkinen**

Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension whereas a restriction of dietary salt lowers blood pressure (BP)" and that "[s]ubstituting potassium and/or magnesium salts for sodium chloride (NaCl) may enhance the feasibility of salt restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. "The aim of this study was to determine the feasibility and effect on blood pressure of replacing NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract.

Sarkkinen further teaches that "a daily sodium reduction of at least 53 mmol (3.1 g/day as sodium chloride (NaCl)) can lead to a reduction of [blood pressure] in hypertensive subjects" and that "[t]he supplementation of potassium and magnesium to a low-sodium diet may enhance the antihypertensive effect of a low-sodium diet, and thus be useful in treating hypertension. Potassium has a natriuretic effect, promoting the excretion of sodium salts in the urine. Intake of magnesium

may also support BP lowering by reducing vascular resistance." Sarkkinen at 1-2. Sarkkinen concluded "that potassium and magnesium could potentiate the effect of sodium restriction on reducing [blood pressure]" and that "[t]his effect is in line with earlier clinical trials with mineral salts." Sarkkinen at 6.

Sarkkinen also noted that "[t]he taste profile of test products was good" for the potassium and magnesium substituted salts. Sarkkinen at 7-8.

**(20) Karppanen**

Karppanen discloses that "[t]he present average sodium intakes, approximately 3000–4500 mg/day in various industrialised populations, are very high, that is, 2–3-fold in comparison with the current Dietary Reference Intake (DRI) of 1500 mg." Karppanen at abstact. "By contrast, the present average potassium, calcium, and magnesium intakes are remarkably lower than the recommended intake levels (DRI). In USA, for example, the average intake of these mineral nutrients is only 35–50% of the recommended intakes." Karppanen at abstract.

Karpannen further teaches that "[t]here is convincing evidence, which indicates that this imbalance, that is, the high intake of sodium on one hand and the low intakes of potassium, calcium, and magnesium on the other hand, produce and maintain elevated blood pressure in a big proportion of the population." Karppanen at abstract. Further, "[d]ecreased intakes of sodium alone, and increased intakes of potassium, calcium, and magnesium each alone decrease elevated blood pressure. A combination of all these factors, that is, decrease of sodium, and increase of potassium, calcium, and magnesium intakes, which are characteristic of the so-called Dietary Approaches to Stop Hypertension diets, has an excellent blood pressure lowering effect." Karppanen at abstract.

Karpannen also discloses that the "Dietary Reference Intakes (DRIs)" "for sodium is 1500 mg a day, while 2500 mg has been given as the maximum level of daily intake that is likely

to pose no risk of adverse effects;" "potassium for adolescents and adults is 4700 mg/day. Recommended intake of potassium for children 1–3 years of age is 3000 mg/day, for 4–8 years of age it is 3800 mg/day, and for 9–13 years of age it is 4500 mg/day;" "for calcium are 1000–1300 mg per day. Therefore, the usual USA intakes are only 35–40% of the DRIs;" and "magnesium intake recommendation is 420 mg for adult men" and that "the usual USA intake of 180 mg is only approximately 50% of the recommended level." Karpannen at S12.

**(21) Houston**

Houston provides a review on the role of potassium, magnesium, and calcium in the cause and treatment of hypertension. Houston describes the "DASH study" and states that a diet "rich in calcium, magnesium, and [potassium]" contributed to a reduction in blood pressure. Houston at 4.

Houston also describes that "the daily rates of intake of potassium and sodium for members of industrialized societies consuming large amounts of processed foods are 80 to 250 mmol/d for sodium and 30 to 70 mmol/d for potassium. In the modern Western diet, therefore, the potassium-to-sodium intake ratio on a molar basis is usually <0.4." Houston at 5. Further, Houston also reports on dietary guidelines for potassium, stating:

> Maintaining an adequate intake of dietary potassium (>90 mmol [3500 mg]/d) has been recommended for the primary prevention of hypertension by the JNC 7.13 The Institute of Medicine has recommended a sodium intake <65 mmol/d (3.8 g/d) and an increase in potassium to 120 mmol/d. In 2006, the American Heart Association issued new guidelines suggesting an increase in potassium intake to 120 mmol/d (4.7 g/d), which is the level provided in the DASH diets in which all food is supplied. The Canadian Hypertension Society recommends that the daily dietary intake of potassium should be ≥60 mmol, since this intake has been associated with a reduced risk of stroke-related mortality. The most recent European Society of Hypertension guidelines also support an increased potassium intake based on the DASH diet. In addition, the 2003 World Health Organization/International Society of Hypertension statement recommends a diet high in fruits and vegetables, a reduction of dietary sodium intake, and increased dietary potassium intake for reducing the incidence of hypertension.

Houston at 7 (citations omitted).

Houston also describes that "[e]pidemiologic, observational, and clinical trial data indicate that a diet high in magnesium (at least 500–1000 mg/d) may lower BP." Houston at 7. Further, Houston states that "[p]opulation studies indicate that high intakes of calcium from the diet are linked with low BP" and that "high dietary intake of calcium has been associated with [] a decrease in BP." Houston at 8. Houston concludes that populations could "benefit from increased potassium, magnesium, and calcium in the diet." Houston at 10.

**(22) Kesteloot**

Kesteloot describes the relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure and confirms that these "dietary cations are related to the regulation of blood pressure." Kesteloot at abstract. Kesteloot reports on the daily intake of these cations, and states that the daily intake for men/women of sodium, potassium, calcium, and magnesium was 2496±1318/1710±826, 3859±1262/3155±930, 841±528/748±413, and 397±145/306±100 mg/day respectively. Kesteloot at Table 2. Kesteloot concludes that "[a] higher sodium intake increases blood pressure, whereas a higher intake of calcium and magnesium, whenever significant, decreases blood pressure" and that a "negative relationship between urinary 24-hour potassium excretion and blood pressure have been found." Kesteloot at 598.

**(23) Dietary Guidelines 2010**

Dietary Guidelines 2010 reports the recommended daily allowances for calcium, magnesium, potassium, and sodium as 700-1200, 80-420, 3000-4700, and <1500-<2,300 mg/day. Dietary Guidelines 2010 at Appendix 5. Dietary Guidelines 2010 also reports on how "typical American diets compare to recommended intake levels" and states that Americans should "eat more" potassium and calcium and "eat less" sodium." Dietary Guidelines 2010 at 46, Figure 5-1.

Dietary Guidelines 2010 also reports on the "Dash Eating Plan" which "focuses on increasing intake of [] potassium, calcium, [and] magnesium" and "contains less sodium," and states that the plan "has documented health benefits." Dietary Guidelines 2010 at 53.

**(24) Institute of Medicine**

Institute of Medicine provide strategies and "health initiatives to address the high levels of sodium." Institute of Medicine at Preface. Institute of Medicine discloses that "sources of dietary sodium" includes drugs which "can contribute to sodium intake." Institute of Medicine at 122.

Institute of Medicine teaches that "potassium" is "often used in lowered-sodium formulations" as an alternative to sodium salts and that it "tastes both salty and bitter (this bitterness is one reason it is often not fully successful in replacing the sensory effects of salt)." Institute of Medicine at 71. For example, Institute of Medicine discloses "products with sodium-reduced, potassium- and magnesium-enriched mineral salts" such as the "Better Choice" salt product that was put in use by the Finnish Heart Association in 2000. Institute of Medicine at 360 (citing He and MacGregor, 2009; Karppanen and Mervaala, 2006).

**(25) MacGregor**

MacGregor reports on studies aimed to reduce sodium intake and of "the long-term effects of salt reduction on CVD," and states that "[a]n increase in potassium intake through the use of reduced-sodium, potassium- and magnesium-enriched salt … played a part in the fall in CVD." MacGregor at 369. In another study that MacGregor describes, patients "switch[ed] from the usual salt to potassium-enriched salt (49% sodium chloride, 49% potassium chloride, 2% other additives) with a subsequent reduction of 17% in salt intake and an increase of 76% in potassium intake [which] resulted in a 40% decrease in CVD mortality." MacGregor at 370.

**(26) Bighley**

Bighley teaches that "[s]alt formation is one of the simplest chemical reactions." Bighley at 453. Bighley discloses that "[s]alt formation is frequently performed on weak acidic or basic drugs because it is a relatively simple chemical manipulation which may alter the physicochemical, formulation, biopharmaceutical, and therapeutic properties of a drug without modifying the basic chemical structure." Bighley at 453. Also, "[t]he ideal characteristics of a salt are that it is chemically stable, not hygroscopic, presents no processing problems, dissolves quickly from solid dosage forms (unless it is formed with the intent to delay dissolution), and exhibits good bioavailability." *Id.* at 453. Bighley identifies 11 metallic cations in pharmaceutical salt forms in use at the time of publication. *See id.* at 456, Table 2. Of these 11 metallic cations, the four most commonly used are calcium, magnesium, sodium, and potassium. *Id*.

Bighley discloses that "sodium is the most predominate cation" used in pharmaceutical salt formations because of "physiological reasons and simple availability." *Id*. at 453.

Bighley discloses

> The solubility also of organic carboxylic acids is also affected by salt formation, in some cases adversely. For example, *N-[* 4-(1,4-benzodioxan-6-yl)-2-thiazolyl] organic acid was less soluble in the presence of sodium, potassium, and calcium ions. However, these ions increased the distribution coefficients significantly between water and 1-octanol, even at low concentrations. The lower solubility was attributed to the formation of less soluble salts, whereas the increase in distribution coefficients was explained by ion-pairing and/or complexation." *Id*. at 461 (citing Pandit, N.K., Strykowski, J.M., and Shtohryn, L., *Int. J. Pharm.,* 50:7'-13 (1989).).

Bighly at 462.

Similarly, Bighley discloses solubility studies for "three organic carboxylic acids (naproxen; 7-methylsulfinyl-2-xanthonecarboxylic acid; and 7-methythio-2-xanthonecarboxylic acid) and their sodium, potassium, calcium, and magnesium salts." *Id*. at 462. Bighley teaches that "Oral toxicity of magnesium salts is rare." *Id*. at 478.

Bighley specifically teaches to create the sodium, potassium, calcium, and magnesium salt forms of an acidic compound.




**FIG. 1.** Decision tree for salt selection.

*Id*. at 481, Fig. 1 (annotated). Bighley teaches that the sodium salt should be used "if the patient does not have a restriction on sodium intake," but teaches that "[i]f the sodium salt process to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium, or zinc." *Id*. at 482-83.

Bighley also cautions that "metal salts can cause taste problems" which should be taken into consideration. *Id*. at 483.

**(27) Pandit**

Pandit teaches the effect of salt concentration, including sodium, potassium, and calcium salts, on the solubility of a drug compound. *See* Pandit at abstract. Pandit discloses the stoichiometric ratio of an acidic drug compound to a metal cation—sodium and potassium both have 1:1 ratios, and calcium has a 2:1 ratio. *See* Pandit at Table 1.

**(28) Chowhan**

Chowan discloses a study of "[t]he solubilities of [three organic carboxylic acids] and their sodium, potassium, calcium, and magnesium salts." *Id*. at abstract. Chowan also discloses methods of preparing sodium, potassium, calcium, and magnesium salts. *Id*. at 1258.

**(29) Kothare**

Kothare discloses that because "[t]hree grams of sodium oxybate contains 0.5 g of sodium, while the 9 g dose contains 1.6 g of sodium," that [p]atients with congestive heart failure, hypertension, or renal insufficiency will need to have their daily sodium intake assessed." Kothare at 49 (citing Lemon MD, Strain JD, Farver DK. Sodium Oxybate for cataplexy. *Ann Pharmacother*. 2006;40:433–40).

Kothare also states that patients reported that Na.GHB had a "bad taste" and that "issues reovle[d] around [its] "salty taste." Kothare at abstract, Table 2.

**(30) Krahn**

Krahn discloses the use of sodium oyxbate "to reduce daytime sleepiness and cataplexy by improving nighttime sleep in patients with narcolepsy." Krhan at 1. Krahn teaches that sodium oxybate "is high in sodium (0.5 grams in a 3-gram dose)" and warns to "[u]se caution when considering the agent for patients with hypertension or on low-sodium diets." Krahn at 4. Krahn also discloses that sodium oxybate "has a salty taste." Krahn at 4.

**(31) Remington's 2000**

Remington's 2000 describes preformulation activities that "range[] from supporting discovery's identification of new active agents to characterizing physical properties necessary for the design of dosage forms." Remington's 2000 at 700. Remington's 2000 explains that "[t]he un-ionized (free) form of weak acids and bases [] may not be the ideal molecular form for development." *Id.* at 704. As Remington's 2000 explains, salts are prepared to explore whether one of them would make a more suitable API, by reacting the free form with an appropriate counter-acid or counter-base. *Id.* Further, Remington's 2000 teaches that "[s]alts generally dissolve faster in water than their free forms because dissolution is enhanced by the rapid hydration of the ionized salt species with water." *Id.* Thus, salts often improve oral absorption by increasing the dissolution rate.

**(32) Rowe 2006**

Rowe 2006 discloses the typical properties as well as applications of excipients in oral formulations, including buffering agents, sweetening agents, flavoring agents, coloring agents, and pharmaceutically acceptable carriers. Rowe 2006 (in passim); see, e.g., Rowe 2006 at 192, 742.

**(33) EFSA 2006**

EFSA 2006 "present[s] comprehensive evaluations of possible adverse health effects of individual micronutrients at intakes in excess of dietary requirements and, where possible, establish Tolerable Upper Intake Levels (UL). EFSA 2006 at 3.

EFSA 2006 states that "oral Mg supply has to be considerably increased to increase plasma Mg" and discloses "[o]ptimal concentration" values of plasma Mg, such as 0.80 – 1.10 mmol/L. EFSA 2006 at 111. EFSA 2006 states that calcium intake is "very important" because it "helps to maintain a constant concentration of blood calcium" at about "2.5 mmol/L (10 mg/dL) (between 2.25 and 2.75 mmol/L)." EFSA 2006 at 215. EFSA 2006 discloses that potassium intake

"is important for regulating … nerve and muscle function, blood pressure regulation, etc.," and states that "[t]he concentration of potassium in plasma is … about 3.5 to 5 mmol/L." EFSA 2006 at 411-412.

**(34) Davis**

Davis discloses that "[v]arious reports have considered the gastric emptying of markers … several methods are available to measure small intestine transit times." Davis at 886-887. Further, Davis states that "non-digestible solid particles" are used to measure "intestinal transit" time. Davis at 891.

**iii. The Asserted Claims are Invalid as Anticipated**

References discussed above anticipate the limitations of asserted claims of the '922 patent. Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references would have readily gleaned that each and every limitation is found either expressly or inherently in a single prior art reference." *See King Pharm., Inc. v. Eon Labs., Inc*., 616 F.3d 1267, 1274 (Fed. Cir. 2010) (internal citation and quotation marks omitted). Further, a POSA would have realized that although the anticipating "prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citation omitted); *see also Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958 (Fed. Cir. 2014). Thus, additional references or evidence can be used to show that a POSA would recognize the inherent characteristic of the thing taught by the primary reference discussed below. *E.g.*, *Teleflex, Inc.*, 299 F.3d at 1335 (recognizing that courts permit "the use of additional references to confirm the contents of the allegedly anticipating reference"); *Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).

As explained below, asserted claims would have been anticipated in view of several prior art references. By way of example, the following references render asserted claims anticipated:

- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family)
- The ’632 patent
- The ‘027 application
- The ’030 patent

Lupin reserves the right to rely on other prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

In addition, Lupin’s invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

**(1) Independent Claim 1**

Claim 1 recites “[a] pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca.(GHB)_2$); and optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier.”[2] In other words, claim 1 is directed

[2] Claim optionally allows for additional inactive ingredients in a pharmaceutically acceptable carrier. As an optional limitation, Lupin does not have to show that this additional optional element would have been anticipated. As explained below, however, this additional limitation is anticipated.

to a composition of Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$. Claim 1 should be found invalid as anticipated in view of the prior art for the reasons discussed below.

Cook Application anticipates Claim 1. Cook Application teaches that "[i]n certain embodiments, the composition may contain one or more salts" and that "salts" "includ[es] salts of GHB" that can "be derived from … sodium, potassium … calcium, [and] magnesium." Cook Application at ¶ 22. Cook Application further discloses that "[i]n certain embodiments, excipients may be added" such as "xylitol, mannitol, lactose, starch, magnesium stearate, sodium saccharine, cellulose, cellulose derivatives, magnesium carbonate and the like." Cook Application at ¶ 22.

The '632 patent anticipates Claim 1. The '632 patent states that "Suitable gamma-hydroxy butyric acid salts include the sodium salt, potassium salt, calcium salt and magnesium salt. In addition to GHB salts, the composition of the present invention can contain one or more non-toxic pharmaceutically acceptable excipients." '632 patent at 7:32-36; *see also* claims 2, 7, and 9. The '632 patent further states that "[t]he composition containing a GHB salt and suitable pharmaceutically acceptable excipients can be formed using various gamma-hydroxy butyric acid salts and excipients." *Id*. at 7:26-31.

The '027 application anticipates Claim 1. The '027 application discloses an oral dosage form of GHB comprising "at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate." '027 application at claim 4. Similarly, the '027 application teaches that "one or more of a GHB drug" can be formulated into an oral dosage form. '027 application ¶ 39.

The '030 patent anticipates Claim 1. The '030 patent claims "pharmaceutical compositions … wherein the salts of gamma-hydroxy-butyric acid are selected from the group consisting of sodium, lithium, potassium, magnesium and calcium salts." '030 patent at claim 6

Thus, Claim 1 is anticipated by any of the Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family), the ’632 patent, the ‘027 application, or the ’030 patent.

**(2) Dependent Claim 2**

Claim 2 depends on claim 1 and further requires that “the pharmaceutically acceptable carrier comprises [one or] more of a solvent, dispersion medium, coating, antibacterial agent, antifungal agent, isotonic agent, or absorption delaying agent.” Claim 2 should be found invalid as anticipated in view of the prior art for the reasons discussed below.

Cook Application anticipates Claim 2. Cook Application teaches that the compositions may comprise a “pharmaceutically acceptable carrier,” which “includes any and all solvents, dispersion media, coatings, antibacterial and antifungal agents, isotonic and absorption delaying agents and the like.” Cook Application at ¶ 53.

The ’027 application anticipates Claim 2. The ’027 application teaches that “formulations described herein include a combination of GHB, lubricant, and binder, as described herein, and in certain such embodiments, the immediate release formulations are substantially free of other excipients or adjuvants. In yet other embodiments, the immediate release formulations described herein include a combination of GHB, lubricant, and surfactant, as described herein, and in certain such embodiments, the immediate release formulations are substantially free of other excipients or adjuvants. In still further embodiments, the formulations described herein include a combination of GHB, lubricant, binder, and surfactant, as described herein, and in certain such embodiments, the immediate release formulations are substantially free of other excipients or adjuvants. Though the immediate release formulations described herein may be formulated using a combination of drug and one or more of a lubricant, binder and surfactant, in certain embodiments, the compositions described herein may include one or more additional excipients selected from, for

example, fillers, compression aids, diluents, disintegrants, colorants, buffering agents, coatings, glidants, or other suitable excipients." '027 application at ¶ 30.

Thus, Claim 1 is anticipated by any of the Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family) or the '027 application.

**iv. The Asserted Claims are Invalid as Obvious**

At least the references discussed above disclose, either alone or in combination, the limitations of the asserted claims of the '922 patent.[3] Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references together with the knowledge he or she would have possessed, would have readily gleaned the information necessary to develop the claimed formulations; would have had a motivation to develop such formulations; and would have had a reasonable expectation of success in doing so. *See, e.g.*, *KSR*, 550 U.S.at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

As explained below, the asserted claims would have been obvious in view of a host of prior art references. Consequently, there are numerous different combinations of these prior art references and many exemplary references that disclose the claimed method. *See, e.g.*, *Rothman v. Target Corp.*, 556 F.3d 1310, 1320-21 (Fed. Cir. 2009) (when the "entire body of prior art"—

[3] To the extent that any specific limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

or an "evidentiary cornucopia"—renders a patent claim obvious, a trier of fact can fairly rely on "any combination of these references in reaching its obviousness verdict.").

By way of example, the following combinations render the asserted claims obvious:

- One or more of the Xyrem Label, Cook Application or Cook Patent, Ferris, '632 patent, '804 patent, '236 patent, GB '029, '027 application, '030 patent; in view of
- One or more of Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Kesteloot, Dietary Guidelines 2010, Institute of Medicine, EFSA 2006; in further view of
- One or more of Mervaala I, Mervaala II, '878 patent, Sarkkinen, Institute of Medicine, MacGregor, Bighley, Pandit; in further view of
- Smith, Kothare, Krahn; and optionally in combination with
- Either Rowe 2006 and/or Remington's 2000.

More specifically, at least the following combinations of prior art references are exemplary of the combinations of prior art references that render the asserted claims of the '922 patent obvious:

By way of example, the following combinations render the asserted claims obvious:

- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family) alone or in combination with the '878 patent;
- The '632 patent alone or in combination with the '878 patent;
- The '027 application alone or in combination with the '878 patent;
- The '030 patent alone or in combination with the '878 patent;
- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family) alone or in combination with the '878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- The '632 patent alone or in combination with the '878 patent, Sarkkinen, Mervaala I and II, and Karppanen;

- The '027 application alone or in combination with the '878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- The '030 patent alone or in combination with the '878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- Cook Application or Cook Patent, '632 patent, '027 application, '030 patent, Sarkkinen, Mervaala I and II, Karppanen, and Kothare;
- Xyrem Label, Cook Application or Cook Patent, in combination with the '878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- Xyrem Label, Cook Application or Cook Patent, '632 patent, '027 application, '030 patent, Sarkkinen, Mervaala I and II, Karppanen, and Kothare;
- Xyrem Label, Cook Application or Cook Patent, '632 patent, '027 application, '030 patent, Ubeda, Intersalt, Quanhe, and Van Leer;
- Xyrem Label, Cook Application or Cook Patent, in combination with the '878 patent, Sarkkinen, Mervaala I and II, and Karppanen and Smith
- Xyrem Label, Smith, Ferris in combination with the '878 patent;
- Xyrem Label, '804 patent, Smith, the '236 patent, and GB '029, in combination with the '878 patent;
- Xyrem Label, Cook Application or Cook Patent, '632 patent, '027 application, '030 patent, Sarkkinen, Mervaala I and II, Karppanen, Kothare, Smith, in combination with the '878 patent, '804 patent, the '236 patent, GB '029, Houston, Kesteloot, Dietary Guidelines 2010, MacGregor, Bighley, and EFSA 2006
- Xyrem Label, Ferris, EFSA 2006, Mervaala I / II, Kothare, and Rowe 2006
- Xyrem Label, the '632 patent, '027 application, '030 patent, Intersalt, Kesteloot, Mervaala I / II, '878 patent, Sarkkinen, Institute of Medicine, and MacGregor in combination with Smith, Kothare, Krahn, and Rowe 2006;
- Xyrem Label, Cook Application or Cook Patent, Ferris, '632 patent, Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Mervaala I, Mervaala II, '878 patent, Sarkkinen, Smith, Kothare, and Krahn;
- Xyrem Label, '804 patent, '236 patent, GB '029, '027 application, '030 patent, Kesteloot, Dietary Guidelines 2010, Institute of Medicine, EFSA 2006, Institute of Medicine, MacGregor, Bighley, Pandit, Smith, Kothare, and Krahn;

- Xyrem Label, Cook Application or Cook Patent, Ferris, ’632 patent, Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Institute of Medicine, EFSA 2006, Institute of Medicine, MacGregor, Bighley, Pandit, Smith, Kothare, and Krahn

- Xyrem Label, ’804 patent, ’236 patent, GB ’029, ’027 application, ’030 patent, Kesteloot, Dietary Guidelines 2010, Mervaala I, Mervaala II, ’878 patent, Sarkkinen, Smith, Kothare, and Krahn;

Lupin reserves the right to rely on other combinations of prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

As further explained below, a POSA would have been motivated to combine the teachings of these references with a reasonable expectation of success in light of the problem to be solved, the disclosures of the references, and the common subject matter of the references as explained throughout. In addition, Lupin’s invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

As explained more fully below, a POSA would have been motivated to combine the teachings of the prior art discussed above to arrive at the claimed capsule. As an initial matter, a POSA would have been motivated to develop a lower-sodium salt GHB alternative given the well-known health concerns related to sodium intake. Moreover, a POSA would have been motivated to use calcium, magnesium and/or potassium salts in formulating a lower sodium salt GHB product.

Finally, a POSA would have reasonably expected to be able to develop the claimed formulations given the teaching of alternative salt forms, including alternative salt forms of GHB disclosed in the prior art as explained below. Thus, a POSA would have been motivated to

formulate a reduced sodium GHB formulation, and would have reasonably expected it to work as a replacement for the existing sodium GHB formulation.

**(1) Independent Claim 1**

Claim 1 recites "[a] pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca.(GHB)_2$); and optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier."[4] In other words, claim 1 is directed to a composition of Na.GHB, K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$. Claim 1 should be found invalid as obvious to a POSA in view of the prior art for the reasons discussed below.

**a) A POSA would have known that salts of GHB were used for therapeutic purposes**

As of the priority date, salts of GHB were known as therapeutic agents for several different therapeutic purposes. For example, the prior art taught that sodium oxybate ("Na.GHB") (chemically known as sodium γ-hydroxybutyrate; commercially-sold as Xyrem) was known as "a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy." Xyrem Label at 1.

Likewise, the potassium (K.GHB), magnesium ($Mg.(GHB)_2$), and calcium ($Ca.(GHB)_2$) salts of GHB were also well-known alternatives to Na.GHB. For instance, Cook Application discloses a pharmaceutical composition of multiple salts of gamma-hydroxybutyrate in an aqueous

[4] Claim optionally allows for additional inactive ingredients in a pharmaceutically acceptable carrier. As an optional limitation, Lupin does not have to show that this additional optional element would have been obvious. As explained below, however, this additional limitation would have been obvious.

medium for the treatment of sleep disorders, including narcolepsy, as well as alcohol and opiate withdrawal, reduced levels of growth hormone, increased intracranial pressure, and physical pain in a patient. Cook Application at abstract.

Ferris teaches method of making salts of GHB and states that "[s]odium, potassium, magnesium and calcium salts of gamma-hydroxybutyrate have been synthesized from gamma-butyrolactone and the corresponding group 1 or 2 hydroxide." Ferris at abstract.

The '632 patent teaches that salts of GHB are useful for treatment of various conditions and also discloses preparing aqueous pharmaceutical compositions comprising GHB salts, including "the sodium, potassium, calcium or magnesium salt." '632 patent at 7:47-50; *see also* claims 2, 7, and 9. Further, the '632 patent teaches that pharmaceutical compositions "can be formed using various gamma-hydroxy butyric acid salts." *Id*. at 7:26-31.

EP '804 discloses that salts of GHB "possess[] anxiolytic activity and [are] suitable for the treatment of states of depression." EP '804 at abstract. EP '804 further teaches that "[p]referred pharmaceutically acceptable salts of gamma-hydroxybutyric acid for use in the present compositions are lithium-, sodium-, potassium-, calcium-, and magnesium salts." (EP '804 at 2:37-39).

The '236 patent teaches that "there is a large desire for these [salts of GHB] especially as sleeping agent and as a tranquilizer, since virtually all the known sleeping agents and tranquilizers such as barbiturates, amides, but also diazepams are associated with large side effects upon continuous application, but also directly associated with undesired aftereffects." '236 patent at 1:48-54. The '236 patent also claims "[a] method for the production of magnesium and[] calcium salts of 4-hydroxybutyric acid comprising … reacting … 4-hydroxybutyric acid, … magnesium hydroxide, … [and] calcium hydroxide … in an aqueous solution." '236 at claims 6 and 14.

GB '029 discloses that the "pharmacological properties" of salts of GHB "promote[] … deep sleep." GB '029 at 3:36-49. Further, GB '029 teaches using salts of GHB and "especially the alkaline-earth metal salts," including "the sodium salt" and "the calcium salt." GB '029 at 2:53-75.

The '027 application discloses that salts of GHB "induce[] sleep that closely resembles normal, physiologic sleep" and can be used for treatments including "cataplexy and excessive daytime sleepiness associated with narcolepsy." '027 application at ¶¶ 2, 43; claim 42. The '027 application also teaches an oral dosage form of GHB comprising "at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate." '027 application at claim 4. Similarly, the '027 application teaches that "one or more of a GHB drug" can be formulated into an oral dosage form. '027 application ¶ 39.

Thus, as of the priority date, a POSA would have known that sodium, potassium, calcium, and magnesium salts of GHB could be formulated into pharmaceutical compositions for therapeutic purposes.

**b) A POSA would have been aware of the drawbacks associated with Na.GHB and its administration to patients**

While a POSA would have known that Na.GHB had been used for therapeutic purposes, a POSA would have also known of the drawbacks associated with Na.GHB and its administration.

**c) Na.GHB and its administration was associated with excessive sodium intake**

A primary concern with administration of Na.GHB was the excessive amount of sodium intake associated with its administration. The recommended starting dose for Xyrem (Na.GHB) is 4.5 g/night, which can be increased (recommended in 1.5 g increments) to a maximum of 9 g/night. Xyrem Label at 22–23. Thus, patients taking sodium oxybate will have an additional

daily intake of sodium that ranges from 0.82 g (for a 4.5 g/day dose) to 1.6 g (for a 9 g/day dose). Karpannen discloses that the "Dietary Reference Intakes (DRIs)" "for sodium is 1500 mg a day." Thus, a single 9 g/day dose of Na.GHB exceeds the DRI for sodium.

Because of this excessive intake of sodium, the prior art warned against administering Na.GHB to certain patient populations. For instance, Kothare discloses that because "[t]hree grams of sodium oxybate contains 0.5 g of sodium, while the 9 g dose contains 1.6 g of sodium," that [p]atients with congestive heart failure, hypertension, or renal insufficiency will need to have their daily sodium intake assessed." Kothare at 49 (citing Lemon MD, Strain JD, Farver DK. Sodium Oxybate for cataplexy. Ann Pharmacother. 2006;40:433–40). Krahn also teaches that sodium oxybate "is high in sodium (0.5 grams in a 3-gram dose)" and warns to "[u]se caution when considering the agent for patients with hypertension or on low-sodium diets." Krahn at 4.

Further, the prior art warned that administering Na.GHB is not right for "patients with heart failure, hypertension or compromised renal function" due to the "daily sodium intake" in taking Na.GHB. *See, e.g.*, Xyrem Label at 11. For instance, under the section on "Precautions" Xyrem Label warns that "[d]aily sodium intake in patients taking sodium oxybate … should be considered in patients with heart failure, hypertension or compromised renal function." Xyrem Label at 11. Xyrem Label further reports "hypertenson" as a "[f]requent" "[v]ascular disorder[]." Xyrem Label at 20. Xyrem Label also warns patients to tell their doctor if they "are on a salt-restricted diet, have high blood pressure, heart failure, or kidney problems" because "Xyrem contains a lot of sodium (salt) and may not be right for [them]." Xyrem Label Medication Guide at 2.

It was also well-known "that higher sodium intake is associated with increased total mortality in the general US population." Quanhe at 1183. For instance, Intersalt studied the relationship between "electrolyte excretion and blood pressure" and showed that "sodium was

significantly related to the slope of blood pressure" and concluded that increasing long-term intake of dietary sodium was shown to increase blood pressure across all study populations and age ranges. Intersalt at abstract. Institute of Medicine states that "excess sodium intake is strongly associated with elevated blood pressure, a serious public health concern related to increased risk of heart disease, stroke, congestive heart failure, and renal disease." Institute of Medicine at Preface. Further, "[i]ncreased dietary sodium [] intake produced a marked rise in blood pressure" as well as other negative side effects. Mervaala I at abstract. The Mervaala II study teaches that "[sodium] produced a marked rise in blood pressure and induced cardiac hypertrophy and significant mortality, while the salt alternative neither increased blood pressure nor caused any mortality and produced less cardiac hypertrophy than salt." Mervaala II at Abstract. Quanhe teaches that "a higher sodium-potassium ratio is associated with significantly increased risk of [cardiovascular diseases] and all-cause mortality, and that higher sodium intake is associated with increased total mortality in the general US population." Quanhe at 1183. Ubeda discloses a study aimed at "[r]aised blood pressure associated with the sodium … content" of an orally administered drug. Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension. Sarkkinen at abstract. Karppanen discloses that "[t]he present average sodium intakes, approximately 3000–4500 mg/day in various industrialised populations, are very high, that is, 2–3-fold in comparison with the current Dietary Reference Intake (DRI) of 1500 mg." Karppanen at abstact.

Thus, a POSA would have known that administration of Na.GHB causes an excessive intake of sodium that could contribute to negative health effects.

**d) Na.GHB had an undesirable flavor**

A POSA also would have known that oral administration of Na.GHB had an unpleasant taste. For instance, Smith discloses sodium oxybate "has an unpleasant, salty taste that is often described as soapy." Smith at 1074. Similarly, Kothare also states that patients reported that

Na.GHB had a "bad taste" and that "issues reovle[d] around [its] "salty taste." Kothare at abstract, Table 2. Krahn also discloses that sodium oxybate "has a salty taste." Krahn at 4. Thus, a POSA would have known that Na.GHB causes an unpleasant taste when administered to patients.

**e) Other problems were associated with Na.GHB**

Additionally, Na.GHB was associated with other problems such as preparation, manufacture, and formulation issues. For instance, it was known that "[t]he sodium salts of the 4-hydroxybutyric acid are hygroscopic," may not be "suitable for crystallization" and cause "difficulties of production and handling" that "are also very expensive." '236 patent at 1:14-47. Thus, a POSA would have known that there were issues associated with the production and formulation of Na.GHB, which would have motivated a POSA to explore other compositions and formulations for administering GHB.

**f) To address drawbacks associated with Na.GHB, a POSA would have been motivated to prepare a mixture of salts of GHB**

To avoid the drawbacks associated with Na.GHB and its administration, a POSA would have been motivated to prepare a composition of mixed salts of GHB, including sodium, calcium, magnesium, and potassium GHB salts.

**g) A POSA would have been motivated to use calcium, magnesium, and potassium salts of GHB to lower the intake of sodium**

A POSA would have sought to prepare a composition that reduces the intake of sodium associated with administration of Na.GHB. For instance, Institute of Medicine stated that it was a goal of "health initiatives to address the high levels of sodium" and also disclosed that "sources of dietary sodium" includes drugs which "can contribute to sodium intake." Institute of Medicine at Preface; 122. A POSA would have known that decreasing the intake of sodium would have had a

beneficial effect. For instance, Mervaala II teaches that "reduction in the intake of sodium chloride has an antihypertensive effect." Mervaala II at 1189. Quanhe further discloses that a reduced sodium intake could lead to greater health benefits. Quanhe at 1183. Karppanen taught that "[d]ecreased intakes of sodium alone … decrease elevated blood pressure." Karppanen at abstract. Indeed, it was well-known that that "reduction in the intake of sodium [] has an antihypertensive effect," as well as other beneficial effects. *See, e.g.,* Mervaala II at 1189.

In particular, a POSA would have known that reducing sodium intake could be achieved by reducing the sodium content of a drug. For instance, Ubeda discloses a study aimed at "[r]aised blood pressure associated with the sodium … content" of an orally administered drug. Ubeda at abstract. Ubeda observed patients that were administered paracetamol with sodium content and followed by administration of paracetamol with "no sodium content." Ubeda at abstract. Ubeda observed that "[s]witching to paracetamol tablets (no sodium content) was associated with both lowered systolic pressure of 13.1 mmHg (95%CI: 11.9–14.3, $p < 0.0001$) and a moderate reduction of diastolic pressure of 2.5 mmHg (95%CI: 2.1–2.9, $p < 0.0001$)." Ubeda at abstract. Ubeda concluded that "[a] relationship of causality between the intake of high sodium excipients and high blood pressure in elderly hypertensive individuals, without chloride ions, was found" and warned that "[c]linicians should be aware of possible raised blood pressure" when these high sodium drugs "are prescribed to hypertensive patients." Ubeda at abstract. Thus, Ubeda shows that switching from a drug formulation high in sodium to a drug formulation with lower sodium content can have beneficial health effects.

The prior art also taught strategies for how to reduce sodium content in a composition. For instance, the '878 patent teaches "a low sodium salt composition and the methods used to make it." '878 patent at abstract. Because "[e]xceeding the recommended daily intake of sodium is a

significant risk factor in developing high blood pressure and a cause or contributing factor in the rising incidence of heart disease," the '878 patent teaches that "medical professionals and governmental authorities recommend a reduction in per capita salt consumption." '878 patent at 1:29-35. Thus, the '878 patent sought to provide methods to prepare low sodium salt compositions. The '878 patent teaches that "there are a variety of salt substitutes in the market" and "[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios." '878 patent at 1:43-46. The '878 patent teaches that suitable low sodium compositions "preferably" include salts of "potassium, magnesium, calcium, ammonium, and combinations thereof." '878 patent at 2:63-67; *see also* claims 7, 28, 48 ("potassium, magnesium, calcium, ammonium, and a mixture thereof"). Thus, the "low sodium salt composition of the invention has lower sodium content." '878 patent at 3:61-67. The '878 patent also discloses several example formulations of low sodium compositions. '878 patent at Examples 1-3. A POSA would have known that this same strategy could be employed with GHB—i.e., a "low sodium" GHB salt composition could be prepared by combining the sodium, potassium, magnesium, and calcium salts of GHB.

Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl). Mervaala I at abstract; *see also* Mervaala II at abstract. The "salt alternative ha[d] the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%. Therefore, the sodium chloride concentration was 43% lower in the salt alternative." Mervaala I at 640-641. Mervaala I concluded that "replacement of common salt by a potassium-, and magnesium-enriched salt … produces beneficial cardiovascular effects." Mervaala I at abstract. A POSA would have known that this same strategy could be employed with GHB—i.e., a GHB salt composition could be "sodium-

reduced" by using a combination of sodium, potassium, and magnesium salts. Mervaala I at abstract; *see also* Mervaala II at abstract.

Likewise, Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension whereas a restriction of dietary [sodium chloride] lowers blood pressure (BP)" and that "[s]ubstituting potassium and/or magnesium salts for sodium chloride (NaCl) may enhance the feasibility of [sodium chloride] restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. Thus Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Sarkkinen concluded that "that potassium and magnesium could potentiate the effect of sodium restriction on reducing [blood pressure]" and that "[t]his effect is in line with earlier clinical trials with mineral salts." Sarkkinen at 6. A POSA would have known that this same strategy could be employed with GHB—i.e., a GHB salt composition could be "sodium-reduced" by using substituted salts. Sarkkinen at abstract.

Further, Karppanen discloses that "[t]he present average sodium intakes, approximately 3000–4500 mg/day in various industrialized populations, are very high, that is, 2–3-fold in comparison with the current Dietary Reference Intake (DRI) of 1500 mg." Karppanen at abstract. "By contrast, the present average potassium, calcium, and magnesium intakes are remarkably lower than the recommended intake levels (DRI). In USA, for example, the average intake of these mineral nutrients is only 35–50% of the recommended intakes." Karppanen at abstract. Karppanen further states that "[d]ecreased intakes of sodium alone, and increased intakes of potassium, calcium, and magnesium each alone decrease elevated blood pressure. A combination of all these factors, that is, decrease of sodium, and increase of potassium, calcium, and magnesium intakes,

which are characteristic of the so-called Dietary Approaches to Stop Hypertension diets, has an excellent blood pressure lowering effect." Karppanen at abstract. A POSA would have found it obvious to use the teachings of Karppanen—to decrease sodium content and increase potassium, calcium, and magnesium content—to prepare a combination of sodium, potassium, and magnesium salts of GHB.

Likewise, MacGregor reports on studies aimed to reduce sodium intake and of "the long-term effects of salt reduction on CVD," and states that "[a]n increase in potassium intake through the use of reduced-sodium, potassium- and magnesium-enriched salt … played a part in the fall in CVD." MacGregor at 369. In another study that MacGregor describes, patients "switch[ed] from the usual salt to potassium-enriched salt (49% sodium chloride, 49% potassium chloride, 2% other additives) with a subsequent reduction of 17% in salt intake and an increase of 76% in potassium intake [which] resulted in a 40% decrease in CVD mortality." MacGregor at 370.

Similarly, Institute of Medicine teaches "[p]artially replacing [sodium] salt with other compounds, such as potassium chloride and calcium chloride" to reduce sodium intake. Institute of Medicine at 97; see also Table 4-4; Table D-1 ("Mixtures of NaCl substitutes … consist of a number of ingredients such as non-sodium salts."). Houston describes the "DASH study" and states that a diet "rich in calcium, magnesium, and [potassium]" contributed to a reduction in blood pressure. Houston at 4. Kesteloot concludes that "[a] higher sodium intake increases blood pressure, whereas a higher intake of calcium and magnesium, whenever significant, decreases blood pressure" and that a "negative relationship between urinary 24-hour potassium excretion and blood pressure have been found." Kesteloot at 598 Dietary Guidelines 2010 also reports on how "typical American diets compare to recommended intake levels" and states that Americans

should "eat more" potassium and calcium and "eat less" sodium." Dietary Guidelines 2010 at 46, Figure 5-1.

Bighley teaches that when pharmaceutical salts for oral dosage forms, the sodium salt should be used "if the patient does not have a restriction on sodium intake," but teaches that "[i]f the sodium salt process to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium, or zinc." *Id.* at 482-83. Thus, a POSA would have known that Na.GHB was undesirable due to patients having a restriction on sodium intake and would have therefore been motivated to prepare a composition containing the potassium, calcium, and magnesium salts of GHB.

The prior art taught how to prepare sodium, magnesium, calcium, and potassium salts of acidic drug compounds, including the stoichiometric ratio of the metal cation to drug compound. *See, e.g.,* Pandit at Table 1.

Thus, a POSA would have been motivated to produce a low sodium content composition by using mixed salts including sodium, magnesium, calcium, and potassium salts of GHB.

**h) A POSA would have been motivated to use magnesium, calcium, and potassium salts due to the benefits associated with increased intake of those minerals**

In addition to the motivation to reduce sodium content, a POSA would have been motivated to use magnesium, calcium, and potassium salts of GHB due to the benefits associated with increased intake of magnesium, calcium, and potassium.

For example, it was well known that increasing intake of magnesium, calcium, and potassium had beneficial effects. Karppanen states that in contrast to the high levels of sodium intake, "the present average potassium, calcium, and magnesium intakes are remarkably lower than the recommended intake levels (DRI). In USA, for example, the average intake of these

mineral nutrients is only 35–50% of the recommended intakes." Karppanen at abstract. Karpannen further teaches that "[t]here is convincing evidence, which indicates that this imbalance, that is, the high intake of sodium on one hand and the low intakes of potassium, calcium, and magnesium on the other hand, produce and maintain elevated blood pressure in a big proportion of the population." Karppanen at abstract. Further, "[d]ecreased intakes of sodium alone, and increased intakes of potassium, calcium, and magnesium each alone decrease elevated blood pressure. A combination of all these factors, that is, decrease of sodium, and increase of potassium, calcium, and magnesium intakes, which are characteristic of the so-called Dietary Approaches to Stop Hypertension diets, has an excellent blood pressure lowering effect." Karppanen at abstract.

Mervaala I discloses the importance of intake of magnesium, calcium, and potassium. For example, Mervaala I teaches that "[i]ncreased intake of potassium and/or magnesium … from the salt alternative is involved in the beneficial effects" because it "produces beneficial cardiovascular effects and improves the antihypertensive efficacy." Mervaala I at Abstract. Mervaala I also taught that "increased calcium intake dose dependently augmented urinary excretion of sodium and reduced the arterial wall sodium/potassium ratio suggesting an important interaction between these two electrolytes in the regulation of blood pressure and vascular responses (Wuorela et al., 1992)." Mervalla I at 647.

Similarly, Mervaala II teaches that a "sodium-reduced, potassium- and magnesium-enriched salt alternative was virtually devoid of the hypertensive and cardiac hypertrophy producing effects, typical of NaCl" and that "[t]his effect was due to increased intake of potassium and/or magnesium." Mervaala II at 1196.

Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension whereas a restriction of dietary salt lowers blood pressure (BP)" and that "[s]ubstituting potassium and/or

magnesium salts for sodium chloride (NaCl) may enhance the feasibility of salt restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. Sarkkinen further teaches that "[t]he supplementation of potassium and magnesium to a low-sodium diet may enhance the antihypertensive effect of a low-sodium diet, and thus be useful in treating hypertension. Potassium has a natriuretic effect, promoting the excretion of sodium salts in the urine. Intake of magnesium may also support BP lowering by reducing vascular resistance." Sarkkinen at 1-2. Sarkkinen concluded that "that potassium and magnesium could potentiate the effect of sodium restriction on reducing [blood pressure]" and that "[t]his effect is in line with earlier clinical trials with mineral salts." Sarkkinen at 6.

Other references have similar teachings about the benefits associated with increased intake of magnesium, calcium, and potassium. Quanhe concludes that "[p]ublic health recommendations should emphasize simultaneous reduction in sodium intake and increase in potassium intake." Quanhe at 1189. Quanhe teaches that "[s]odium-potassium ratios can be improved by lowering sodium intake, by raising potassium intake, or both." Quanhe at 1191. Van Leer studied the "relation between blood pressure and dietary calcium, potassium and magnesium and the combined effect of these minerals on blood pressure" and concluded that "diets rich in calcium, potassium and magnesium are associated with lower blood pressure." Van Leer at Abstract. Intersalt studied the relationship between "electrolyte excretion and blood pressure" and showed that "[p]otassium excretion was negatively correlated with blood pressure in individual subjects after adjustment for confounding variables." Intersalt at abstract. Institute of Medicine teaches that "one strategy to reduce [sodium] intake would be to encourage increased calcium consumption." Institute of Medicine at 77.

Thus, a POSA would have been motivated to increase the content of magnesium, calcium, and potassium salts of GHB relative to the content of Na.GHB in order to provide for increased intake of magnesium, calcium, and potassium.

**i) A POSA would have been motivated to use alternative salts to make a better tasting composition**

Due to the relatively high dosage range for administering GHB, (e.g., up to 9 g/night of Na.GHB), a POSA would have known that GHB salt form will affect the taste of the composition. Xyrem Label at 22–23. Further, as explained above, a POSA would have known that the unpleasant salty taste associated with Na.GHB was due to the high level of sodium associated with its administration. Thus, a POSA would have been motivated to use alternative salt forms of GHB to make a better tasting composition.

For instance, the prior art generally teaches the use of magnesium, potassium, and calcium salts to improve the taste of a composition of pharmaceutical salts. For instance, Bighley teaches that "[t]aste acceptability is a primary consideration in the formulation of a liquid" and provides "examples [of] approaches to make drugs organoleptically acceptable." Bighley at 465 (citing Roy, G .M., *Pharm . Technol. ,* 18:84,86,88 ,90,92,94,96-99 (1994) (April)). Bighley explains that one of those approaches is that "[t]he taste of a drug may be improved by formation of a soluble salt." Bighley at 466-467. Bighley also teaches that "[i]f the sodium salt proves to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium, or zinc," but cautions that "metal salts can cause taste problems" which should be taken into consideration. *Id*. at 483. Bighley explains that "[f]or example, potassium salts frequently have an unpleasant taste and leave a metallic aftertaste … but that "potassium salts showed … varying degrees of palatability at therapeutic potassium concentrations." Bighley at 466-467. Thus, a POSA would have been

motivated to vary the concentration of the salts, such as the potassium salt, in order to achieve a palatable taste profile of the composition of GHB salts.

Further, Bighley taught that varying concentration levels of potassium salts can results in "varying degrees of palatability," and a POSA would have known that varying the relative concentrations of the sodium, magnesium, potassium, and calcium salts of GHB could result in varying degrees of palatability. For instance, a POSA would have reasonably expected that a composition comprising 100% of a magnesium, potassium, or calcium salt would have likely "cause[d] taste problems" because these are "metal salts." Bighley at 483. But a POSA would have reasonably expected that any taste issues associated with any one salt could be reduced by reducing the concentration of that salt and correspondingly increasing the concentration of other GHB salts. Thus, a POSA would have reasonably expected that by varying concentration levels of the sodium, magnesium, potassium, and calcium salts of GHB could result in a composition with a palatable taste profile.

Similarly, the '878 patent teaches that to lower the sodium content of a salt composition, a low sodium salt composition comprising "potassium, magnesium, calcium, ammonium, and combinations thereof" should be utilized. '878 patent at abstract; claims 7, 28, 28. The'878 patent teaches to perform "[s]ensory tests … to analyze the taste characteristics" of those low-sodium content salt compositions. For instance, the '878 patent teaches that "salt substitutes containing potassium" can be associated with a "generally metallic/bitter taste" than can be "reduce[d]" or "mask[ed]" with certain additives. '878 patent at 1:48-53. The examples of low sodium salt compositions disclosed in the '878 patent had favorable taste profiles. *See* '878 patent at Tables 2-5.

Like the ’878 patent, Sarkkinen teaches that “[s]ubstituting potassium and/or magnesium salts for sodium [salts] may enhance the feasibility of [sodium] restriction and lower blood pressure beyond the sodium reduction alone.” Sarkkinen at abstract. Sarkkinen noted that “[t]he taste profile of test products was good” for the low-sodium content composition comprising sodium, potassium, and magnesium salts. Sarkkinen at 7-8.

Further, Institute of Medicine teaches that “potassium” is “often used in lowered-sodium formulations” as an alternative to sodium salts and that it “tastes both salty and bitter (this bitterness is one reason it is often not fully successful in replacing the sensory effects of salt).” Institute of Medicine at 71.

Thus, a POSA would have been motivated to produce a low sodium content composition by using mixed salts including sodium, magnesium, calcium, and potassium salts of GHB and to vary the concentration of the salts in order to achieve a palatable taste profile.

**j) Additional reasons would have motivated a POSA to use alternative salts of GHB**

In addition to the reasons discussed above, a POSA would have considered other factors when deciding to use a composition comprising sodium, magnesium, calcium, and potassium salts of GHB. For instance, it was known that “[t]he sodium salts of the 4-hydroxybutyric acid are hygroscopic,” may not be “suitable for crystallization” and cause “difficulties of production and handling” that “are also very expensive.” ’236 patent at 1:14-47. The ‘236 patent discloses that the “calcium and magnesium salts . . . from 4-hydroxybutyric acid are solid, nonhygroscopic and storable and they can be recrystallized. . . . They dissolve in water to a clear solution and they can be dispensed as injection solutions, but also as drops, or in drinks or as suppositories while maintaining a *stable situation*.” (*Id.* at col. 4, ll. 39-47 (emphasis added)). Thus, a POSA would

have been further motivated to prepare a composition comprising sodium, magnesium, calcium, and potassium salts of GHB.

**k) A POSA would have found it obvious to optionally include a buffering agent, sweetening agent, flavoring agent and/or coloring agent, in a pharmaceutically acceptable carrier**

To the extent Claim 1 of the '922 patent "optionally" *does not* include "a buffering agent, sweetening agent, flavoring agent and/or coloring agent, in a pharmaceutically acceptable carrier," then claim 1 would have been obvious for the reasons discussed above. To the extent Claim 1 of the '922 patent "optionally" *does* include "a buffering agent, sweetening agent, flavoring agent and/or coloring agent, in a pharmaceutically acceptable carrier," claim 1 is further obvious for the reasons discussed below.

A POSA would have been motivated to include "a buffering agent" because it was known that "GHB degrades into gamma-butyrolactone (GBL) and possibly other degradants in solution depending upon the pH." Cook Application at ¶ 10. Because the pH affects the degradation of GHB, a POSA would have been motivated to control the pH of a composition comprising GHB by including a buffering agent. Indeed the prior art taught the use of buffering agents in composition of GHB salts. For instance, Cook Application teaches that "the pharmaceutical composition may comprise a pH adjusting or buffering agent." Cook Application at ¶ 21. Cook Application further discloses that "pH adjusting agents such as acids, bases and buffering agents, … may be combined with the compositions of the present invention, or may be used to prepare the compositions of the present invention, are well known in the art, (see for example, 'Remington's Pharmaceutical Sciences' 8th and 15th Editions, and Nema et al., 1997, incorporated herein in their entirety), and are encompassed by the invention." Cook Application at ¶ 27. Cook Application also teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about

6 to about 7.5 but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Similarly, The ’027 application teaches that compositions of salts of GHB “may include … buffering agents.” ’027 application at ¶ 31. Further, the ’804 patent teaches that pharmaceutical compositions of salts of GHB “may also be buffered.” ’804 patent at claim 4. Rowe 2006 discloses applications of excipients in oral formulations, including buffering agents. Rowe 2006 (in passim); see, e.g., Rowe 2006 at 192, 742. Thus, a POSA would have been motivated to include “a buffering agent” to control the pH in a composition comprising salts of GHB.

A POSA would have also been motivated to include a “sweetening agent, flavoring agent and/or coloring agent” in a composition comprising salts of GHB. As explained above, taste would have been a primary concern when formulating a composition comprising GHB. Thus, the use of sweetening and flavoring agents would have been obvious to produce a composition with a palatable taste profile. For instance, Cook Application discloses that “flavoring agents, and other agents that may be combined with the compositions of the present invention, or may be used to prepare the compositions of the present invention, are well known in the art, (see for example, ‘Remington's Pharmaceutical Sciences’ 8th and 15th Editions, and Nema et al., 1997, incorporated herein in their entirety), and are encompassed by the invention.” Cook Application at ¶ 27. The ’804 patent discloses examples of compositions of GHB salts containing flavorings, e.g., “sour cherry flavour.” ’804 patent at Formulation 2. GB ‘029 discloses example oral liquid formulations of salts of GHB containing flavoring agents such as “sugar (glucose, levulose or sorbitol).” GB ’029 at 5:22-30.

Similarly, Rowe 2006 discloses applications of excipients in oral formulations, including sweetening agents, flavoring agents, and coloring agents. Rowe 2006 (in passim); see, e.g., Rowe 2006 at 192, 742.

Further, as discussed above, because "metal salts can cause taste problems" (Bighley at 483), a POSA would have been motivated to, and reasonably expected that varying concentration levels of the sodium, magnesium, potassium, and calcium salts of GHB could result in a composition with a palatable taste profile. To the extent any "taste problems" remained after optimizing the salt concentrations for taste, a POSA would have been motivated to use sweetening agents or flavoring agents as disclosed in the prior art references discussed above in order to obtain a more palatable taste profile.

A POSA would have also been motivated to formulate a composition comprising GHB salts "in a pharmaceutically acceptable carrier" in order to administer the composition to a patient. Cook Application states that "[i]t is understood that the compositions of the present invention, including those in a set, may be dispersed in a pharmaceutically acceptable carrier" and provides specific examples of acceptable carriers. Cook Application at ¶ 35. Further, Rowe 2006 discloses applications of excipients in oral formulations, including pharmaceutically acceptable carriers. Rowe 2006 (in passim); see, e.g., Rowe 2006 at 192, 742.

Thus, a POSA would have been motivated to optionally include a buffering agent, sweetening agent, flavoring agent and/or coloring agent, in a pharmaceutically acceptable carrier. Therefore, Claim 1 is invalid as obvious at least for the reasons discussed above.

**(2) Dependent claim 2**

Claim 2 depends on claim 1 and further requires that "the pharmaceutically acceptable carrier comprises [one or] more of a solvent, dispersion medium, coating, antibacterial agent, antifungal agent, isotonic agent, or absorption delaying agent." A POSA would have found it obvious to include one or more of the claimed excipients in the claimed compositions. For example, Cook Application teaches that the composition of various salts of GHB "may be dissolved or dispersed in a pharmaceutically acceptable carrier and/or an aqueous medium" which

"includes any and all solvents, dispersion media, coatings, antibacterial and antifungal agents, isotonic and absorption delaying agents and the like. The use of such media and agents for pharmaceutical active substances is well known in the art. Insofar as any conventional media or agent is incompatible with the active ingredient, its use in the therapeutic compositions is not appropriate." Cook Application at ¶¶ 52-53. Rowe 2006 discloses applications of excipients in oral formulations, including pharmaceutically acceptable carriers. Rowe 2006 (in passim); see, e.g., Rowe 2006 at 192, 742. Thus, a POSA would have found it obvious to use a pharmaceutically acceptable carrier that includes "a solvent, dispersion medium, coating, antibacterial agent, antifungal agent, isotonic agent, or absorption delaying agent."

**(3) Dependent claim 3**

Claim 3 depends on claim 2 and further requires that "the Na.GHB salt is present in a wt/wt % of 5% to 10%, 10% to 15%, 15% to 20%, 20% to 25%, 25% to 30%, 30% to 35%, or 35% to 40%." Claim 3 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to reduce to Na.GHB salt present to a range between 5% and 40% wt/wt % in order to reduce the sodium intake associated with administering GHB and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and renders obvious the use of low sodium salt compositions. For instance, the '878 patent teaches that a "low sodium salt composition may comprise "about 10-90%, lower sodium" and "[m]ore preferably, the composition contains about 25%, 30%, 35%, 45%, 50%, 55% or 75% lower sodium," and "[m]ore preferably, the composition contains about 50% less sodium." '878 patent at 3:61-67. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced"

composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%. Therefore, the sodium chloride concentration was 43% lower in the salt alternative." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB.[5]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB where "the Na.GHB salt is present in a wt/wt % of 5% to 10%, 10% to 15%, 15% to 20%, 20% to 25%, 25% to 30%, 30% to 35%, or 35% to 40%."

**(4) Dependent Claim 4**

Claim 4 depends on claim 2 "wherein the K.GHB salt is present in a wt/wt % of 5% to 10%, 10% to 15%, 15% to 20%, 20% to 25%, 25% to 30%, 30% to 35%, or 35% to 40%." Claim

[5] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitation would have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

4 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to use K.GHB in a range of 5% to 40% wt/wt % in order to to reduce Na.GHB salt present, to increase the intake of potassium due to its associated health benefits, and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and render obvious the use of composition of mixed salts of GHB where the K.GHB salt is present in a wt/wt % of 5%-40%. For instance, the ‘878 patent teaches that a “low sodium salt composition may comprise a “modified chloride salt” “consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof” that “may include from about 2.5% to about 80% by weight of the “modified chloride salt” and “[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt.” ’878 patent at 3:1-6; claims 7, 28, 48. The ’878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. ’878 patent at Table 1. Similarly, Mervaala I discloses a “sodium-reduced” composition as an alternative to sodium chloride (NaCl) comprising “the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%.” Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of “NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt).” Sarkkinen at abstract. Further, Cook Application discloses that “[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained.” Cook

Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB. [6]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the K.GHB salt is present in a wt/wt % of 5% to 10%, 10% to 15%, 15% to 20%, 20% to 25%, 25% to 30%, 30% to 35%, or 35% to 40%."

**(5) Dependent Claim 5**

Claim 5 depends on claim 2 "wherein the Mg.$(GHB)_2$ salt is present in a wt/wt % of 5% to 10%, 10% to 15%, 15% to 20%, 20% to 25%, 25% to 30%." Claim 5 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to use Mg.$(GHB)_2$ in a range of 5% to 30% wt/wt % in order to reduce Na.GHB salt present, to increase the intake of magnesium due to its associated health benefits, and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and render obvious the use of compositions of mixed salts of GHB where the Mg.$(GHB)_2$ salt is present in a wt/wt % of 5%-30%. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride

[6] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB. [7]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the Mg.$(GHB)_2$ salt is present in a wt/wt % of 5% to 10%, 10% to 15%, 15% to 20%, 20% to 25%, 25% to 30%."

---

[7] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

**(6) Dependent Claim 6**

Claim 3 depends on claim 2 "wherein the $Ca.(GHB)_2$ salt is present in a wt/wt % of 20% to 25%, 25% to 30%, 30% to 35%, 35% to 40%, 40% to 45%, 45% to 50%, 50% to 55%, 55% to 60%, 60% to 65%, 65% to 70%, 70% to about 75%, or 75% to 80%." Claim 6 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to use $Ca.(GHB)_2$ in a range of 20% to 80% wt/wt % in order to reduce Na.GHB salt present, to increase the intake of calcium due to its associated health benefits, and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and render obvious the use composition of mixed salts of GHB where the $Ca.(GHB)_2$ salt is present in a wt/wt % of 20%-80%. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and

preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB. [8]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the $Ca.(GHB)_2$ salt is present in a wt/wt % of 20% to 25%, 25% to 30%, 30% to 35%, 35% to 40%, 40% to 45%, 45% to 50%, 50% to 55%, 55% to 60%, 60% to 65%, 65% to 70%, 70% to about 75%, or 75% to 80%."

**(7) Dependent Claims 7-11**

Claim 7-11 depend on claim 2 and further recite claimed wt/wt% values and ranges for the salts of GHB recited in claim 1. As explained above, the prior art discloses all of these values and ranges. For example, the Cook Application teaches that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied to achieve a suitable

[8] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

dosage. Further, it would have been within the knowledge and skill of a POSA to arrive at the weight percent of a salt of GHB. [9] Therefore, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB according to the claimed wt/wt% values and ranges.

**(8) Dependent Claim 12, 14, and 16**

Claim 12, 14, and 16 depend on claim 2 and further recite claimed wt/wt% ratios for the salts of GHB recited in claim 1. As explained above, the prior art taught and renders obvious these claimed wt/wt% ratios. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he

[9] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds and the weight percent of each active compound can be varied.

Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB to obtain the claimed wt/wt% ratios. For instance, a POSA could have varied the weight percent of the salts of GHB to account for daily recommended doses of sodium, potassium, magnesium, and calcium. For instance, Karpannen discloses that the "Dietary Reference Intakes (DRIs)" "for sodium is 1500 mg a day, while 2500 mg has been given as the maximum level of daily intake that is likely to pose no risk of adverse effects;" "potassium for adolescents and adults is 4700 mg/day. Recommended intake of potassium for children 1–3 years of age is 3000 mg/day, for 4–8 years of age it is 3800 mg/day, and for 9–13 years of age it is 4500 mg/day;" "for calcium are 1000–1300 mg per day. Therefore, the usual USA intakes are only 35–40% of the DRIs;" and "magnesium intake recommendation is 420 mg for adult men" and that "the usual USA intake of 180 mg is only approximately 50% of the recommended level." Karpannen at S12. As described above, Dietary Guidelines 2010 reports recommended daily allowances for calcium, magnesium, potassium, and sodium that are similar to Karpannen. Dietary Guidelines 2010 at Appendix 5. Further, Kesteloot describes a study of the relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure and reports that men and women exceed these recommended intake levels for sodium, but fall short of the recommended intake levels for potassium, calcium, and magnesium. Kesteloot at Table 2.

Likewise, a POSA would have known of the optimal and/or recommended blood concentration levels of these minerals and their importance. For example, EFSA 2006 states that "oral Mg supply has to be considerably increased to increase plasma Mg" and discloses "[o]ptimal concentration" values of plasma Mg, such as 0.80 – 1.10 mmol/L. EFSA 2006 at 111. EFSA 2006 states that calcium intake is "very important" because it "helps to maintain a constant concentration of blood calcium" at about "2.5 mmol/L (10 mg/dL) (between 2.25 and 2.75 mmol/L)." EFSA 2006 at 215. EFSA 2006 discloses that potassium intake "is important for regulating … nerve and muscle function, blood pressure regulation, etc.," and states that "[t]he concentration of potassium in plasma is … about 3.5 to 5 mmol/L." EFSA 2006 at 411-412. Further, as discussed above, a POSA would have known that certain "population[s] could most benefit from increased potassium, magnesium, and calcium." Houston at 9-10; see also Karppanen at S14 ("Although the diets in different populations may differ considerably … the essential features are similar in all industrialised populations … the sodium level is very high while the levels of potassium and magnesium are very low. In most populations, the level of calcium is also low." A POSA would have known that the deficient intake of potassium, magnesium, and calcium could impact the blood concentration levels of these minerals.

Because of this imbalance—that patients consume too much sodium and not enough potassium, calcium, and magnesium—a POSA would have been motivated to formulate a composition of sodium, potassium, calcium, and magnesium salts of GHB in order to compensate for this imbalance. In particular, a POSA would have been motivated to vary the ratio of the sodium, potassium, calcium, and magnesium salts of GHB so that patients' intake of sodium is decreased closer to the daily recommended levels and patients' intake of potassium, calcium, and magnesium is increased closer to the daily recommended levels. Similarly, a POSA would have

been motivated to vary the ratio of the sodium, potassium, calcium, and magnesium salts of GHB so that patients' blood concentration levels of these minerals trend closer to their optimal and/or recommended levels.

To optimize this formulation for daily recommended levels, a POSA could perform routine experimentation. For instance, intake of sodium, potassium, calcium, and magnesium can be indirectly measured by measuring the levels excreted from the body. A POSA could conduct routine experimentation to administer compositions with various levels of the sodium, potassium, calcium, and magnesium salts of GHB and then measure the corresponding levels excreted from the body. In this manner, a POSA could optimize for a composition to target daily recommended levels of sodium, potassium, calcium, and magnesium. Such optimization would have been obvious and routine to a POSA. Moreover, the '878 patent teaches that "there are a variety of salt substitutes in the market" and "[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios." '878 patent at 1:43-46.

Thus, a POSA would have found it obvious to adjust the ratios of the salts of GHB to account for daily recommended doses of sodium, potassium, magnesium, and calcium while also factoring in that patients generally exceed the daily recommended dose for sodium but do not meet the recommended levels for potassium, magnesium, and calcium. Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB comprising the claimed wt/wt% ratios according to claims 12, 14, and 16.

**(9) Dependent Claim 15**

Claim 15 depends on claim 2 "wherein the solvent comprises one or more of water, ethanol, polyol, or vegetable oil." Cook Application teaches that the "carrier can also be a solvent or dispersion medium containing, for example, water, ethanol, polyol (for example, glycerol,

propylene glycol, and liquid polyethylene glycol, or the like), suitable mixtures thereof, and vegetable oils." Cook Application at ¶ 58. Further, Rowe 2006 discloses applications of excipients in oral formulations, including water, ethanol, polyol, or vegetable oil. Rowe 2006 (in passim); see, e.g., Rowe 2006 at 192, 742. Thus, a POSA would have found it obvious to use a pharmaceutically acceptable carrier wherein the solvent comprises one or more of water, ethanol, polyol, or vegetable oil.

**(10) Dependent Claim 21**

Claim 21 depends on claim 1 and further requires that the composition "compris[es] an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives." The prior art discloses these limitations of claim 21. For instance, Cook Application discloses that the gamma-hydroxybutyrate is at a final concentration of about 150 mg/ml to 750 mg/ml. Cook Application at ¶ 18. Cook Application also teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about 6 to about 7.5 but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Further, Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63; *see also* Xyrem Label at 2. Further, the '632 patent discloses compositions of GHB salts that are "free of preservatives. *Id.* at 8:57-59. Thus, a POSA would have found it obvious to not include a preservative. Therefore, a POSA would have found it obvious to prepare a composition with an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about

9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.

**(11) Dependent Claim 22-24**

Claims 22-24 depend on claim 21 and further require that "the composition has a pH of about 7.3 to about 8.5," "the composition additionally comprises a pH adjusting or buffering agent," and "wherein the pH adjusting or buffering agent is an acid," respectively. These claims are rendered obvious for the same reasons as described above in connection with claims 1 and 21. Also, Xyrem Label discloses an oral solution of Na.GHB "neutralized to pH 7.5 with malic acid." Xyrem Label at 2. Further, Cook Application teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about 6 to about 7.5 but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Cook Application discloses that the composition of GHB salts may comprise "pH adjusting agents such as acids, bases and buffering agents." Cook Application at ¶ 12. Cook Application teaches that the composition may comprise malic acid, citric acid, acetic acid, boric acid, lactic acid, hydrochloric acid, phosphoric acid, sulfuric acid, sulfonic acid, and nitric acid. Cook Application at claim 35. Therefore, a POSA would have found it obvious to prepare compositions according to claims 22-24.

**(12) Dependent Claim 27-29**

Claims 27-29 depend on claim 1 and further require that "the composition is formulated as a liquid formulation," "the formulation is chemically stable and resistant to microbial growth, and wherein the formulation is free of preservatives," and that the formulation "is suitable for oral administration," respectively. Cook Application teaches liquid form preparations of the composition of GHB salts, e.g. syrups, aromatic powders, honey, and various elixirs that are suitable for oral administration. Cook Application at ¶¶ 23, 26. Further, Xyrem is a composition of a GHB salt formulated as a liquid. Xyrem Label. Further, Cook Application discloses a

pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63. Further, the '632 patent discloses compositions of GHB salts that are "free of preservatives. *Id.* at 8:57-59. Thus, a POSA would have found it obvious to not include a preservative. Therefore, a POSA would have found it obvious to prepare compositions according to claims 27-29.

**(13) No Objective Indicia**

Lupin is unaware of any evidence of secondary considerations that would render the particular combination of claim elements found in the '922 patent non-obvious, as described below and incorporated herein by reference. For example:

- *Long-Felt Need:* Lupin is not aware of any evidence to support a claim that the '922 patent resolved a long-felt need.
- *Failure of Others:* Lupin is not aware of any evidence of failure of others that reflects any non-obviousness of the subject matter of the '922 patent.
- *Skepticism of Those of Skill in the Art:* Lupin is not aware of any skepticism of those skilled in the art with respect to the subject matter of the '922 patent.
- *Licensing:* Lupin is not aware of any licensing of the '922 patent that may be reflective of non-obviousness of the subject matter of that patent.
- *Commercial Success:* Lupin is not aware of any evidence linking any product sales made to the '922 patent, as opposed to marketing, endorsements, other patents or marketing exclusivities, or other factors unrelated to the alleged invention of the '922 patent. *See Merck*, 395 F.3d at 1376-77. Further, nothing submitted during prosecution of the '922 patent establishes commercial success. On at least these bases, Lupin is aware of no commercial success that could support a claim of non-obviousness.
- *Recognition in the Industry:* Lupin is not aware of any recognition in the industry for the '922 patent.
- *Acquiescence:* Lupin is not aware of any evidence of acquiescence to the validity of the '922 patent.

- *Copying:* Lupin is not aware of any copying that could support a claim of non-obviousness of the subject matter of the '922 patent. *See, e.g.*, *Bayer Healthcare*, 713 F.3d at 1377; *Purdue*, 377 F. App'x at 983; *Santarus*, 2010 WL 1506017, at *26; *Aventis*, 2006 WL 2008962, at *45.

- *Unexpected Results:* Lupin is not aware of any evidence of unexpected results with respect to the '922 patent. Rather, as explained above a person of ordinary skill in the art would have reasonably expected to be able to successfully formulate a composition of mixed salts of GHB.

- *Teaching away:* Lupin is not aware of any prior art teaching away from formulating a composition of mixed salts of GHB. To the contrary, as explained above, the prior art taught a person of ordinary skill in the art to reduce the sodium content by using alternative salts including magnesium, potassium, and calcium.

Additionally, as noted above, the patentee must prove the required nexus before relying on <u>*any*</u> secondary considerations of alleged non-obviousness. *Muniauction*, 532 F.3d at 1327-28. Lupin is not aware of any evidence that would establish the required nexus for the claims of the '922 patent.

Thus, for at least these reasons, claims 1-12, 14-16, 21-24, and 27-29 of the '922 patent are invalid for obviousness.

**b. Lack of Enablement**

Alternatively, to the extent the claims are not rendered obvious as discussed above, the claims of the '922 patent are invalid for lack of enablement. For example, independent claim 1 of the '922 patent broadly claims pharmaceutical compositions of gamma-hydroxybutyrate (GHB) containing a "mixture" of four salts of GHB. with no specific ratio of the respective GHB salts. Accordingly, claim 1 covers *any* ratio of the four salts. Claims 2-11, 15-16, 21-24, and 27-29 similarly allow for a wide range of ratios of the various GHB salts. The specification, however, only describes a limited number of examples of exemplary syntheses of mixtures of oxybate salts. To the extent that the claimed mixtures of GHB salts in the claimed ratios would not have been obvious, the specification fails to enable a person of ordinary skill in the art to practice the full

scope of the claimed invention without undue experimentation. *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1309 (Fed. Cir. 2015) (citing *In re Wands*, 858 F.2d 731, 736–37 (Fed.Cir.1988)). Thus, to the extent that claims 1, 2-11, 15-16, 18-19, 21-24, and 27-33 are not invalid as obvious, they are invalid as not enabled to the full scope of the claims.

**c. Indefiniteness**

The claims of the '922 patent that require a "wt/wt %" are invalid as indefinite because when "read in light of the specification delineating the patent, and the prosecution history," "wt/wt %" "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). The patent explains that "[t]he term 'wt/wt %,' are used herein, refers to the normalized weight percent of a particular salt in a salt mixture. A sample calculation of wt/wt % is provided in Example 1 of the present disclosure." '922 patent at 7:25-34. The sample calculation provided in Example 1, however, fails to "provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1371 (Fed. Cir. 2014).

The calculation described in Table 1 states that "[f]or Mixture A, 34.38 g of 99.9% GBL were charged, which is (34.38×0.999/68.089×1000)=399.0 mMol. The total base equivalents charged were 404.40 mEq. Hence, the excess base was ((404.40−399.0)/(399.0×100%))=1.35%." '922 patent at 25:13-18. However, the "wt/wt %" does not factor in the "1.35%" excess base into the calculation to determine the relative wt/wt % of each salt of GHB. For instance, Table 1 shows that the total "Oxybate or GHB equivalents value" is 404.40 mEQ, which is inconsistent with the disclosure that only 399.0 mMol of GBL was charged. Thus, the calculation shown in Table 1 does not reflect the actual relative "wt/wt %" of the GHB salts formed. Further, the actual relative "wt/wt %" of the GHB salts formed depends on other factors such as the amount of excess base(s)

added, the pKa values of the bases, and the effects of the concentration of counterions. *See, e.g.,* Serajuddin at 605-606.

Said another way, a POSA could either calculate "wt/wt %" like the example shown in the specification or a POSA could use a known alternative calculation that accounts for factors such as excess base(s) and concentration of counterions. These varying calculations have the potential to produce inconsistent results. Therefore, the term "wt/wt %" "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." N*autilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). Thus, claims 3-14, 16-17, and 19-20 that recite "wt/wt %" are invalid as indefinite.

**B. The '173 Patent**

U.S. Patent No. 8,901,173 B2 ("the '173 patent"), entitled "Gamma-hydroxybutyrate compositions and their use for the treatment of disorders," issued on or about December 2, 2014. Clark P. Allphin and Michael Desjardin are identified as the purported inventors on the face of the '173 patent. According to the records of the Patent Office, the '173 patent is purportedly assigned to Jazz Pharmaceuticals Ireland Limited. The '173 patent issued from U.S. Patent Application Serial No. 14/172,751 ("the '751 application"), filed on January 11, 2013, and also purports to claim the benefit of priority of U.S. Provisional Patent Application Serial No. 61/737,695 ("the '695 provisional application"), filed on December 14, 2012.

Plaintiff has the burden to establish that the asserted claims of the '173 patent are entitled to the priority date of any earlier-filed application. *See Dynamic Drinkware, LLC v. National Graphics, Inc.* 800 F.3d 1375, 1380 (Fed. Cir. 2015). Absent specific evidence of entitlement to an earlier priority date, the '173 patent must be assigned its actual filing date of January 11, 2013. *Id.* To establish an earlier priority date, each earlier application in the chain must fully disclose the claimed invention by meeting all requirements of 35 U.S.C. §112. *In re NTP, Inc.,* 654 F.3d

1268, 1277 (Fed. Cir. 2011). Lupin does not concede that the '173 patent has made a proper claim of priority to an earlier- filed application, and reserves the right to (i) challenge the '173 patent's entitlement to claim priority to any previous application, (ii) challenge any alleged date of conception or reduction to practice; and (iii) identify additional prior art thereto.

**1. The '173 Patent Specification**

The specification of the '173 patent is substantially similar to the specification of the '922 patent discussed above said discussion is incorporated herein by reference.

**2. Asserted Claims of the '173 Patent**

Plaintiff asserts claims 1-12, 14-16, 18-19, 21-24, and 27-33 of the '173 patent, of which claim 1 is independent. These claims are reproduced below:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture comprises three or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca.(GHB)_2$).
>
> 2. The pharmaceutical composition of claim 1, wherein the mixture comprises Na.GHB, K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$.
>
> 3. The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%.
>
> 4. The pharmaceutical composition of claim 2, wherein the K.GHB salt is present in a wt/wt % of about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%.
>
> 5. The pharmaceutical composition of claim 2, wherein the $Mg.(GHB)_2$ salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, or about 25% to about 30%.

6. The pharmaceutical composition of claim 2, wherein the $Ca.(GHB)_2$ salt is present in a wt/wt % of about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, about 35% to about 40%, about 40% to about 45%, about 45% to about 50%, about 50% to about 55%, about 55% to about 60%, about 60% to about 65%, about 65% to about 70%, about 70% to about 75%, or about 75% to about 80%.

7. The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%.

8. The pharmaceutical composition of claim 2, wherein the K.GHB salt is present in a wt/wt % of about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%.

9. The pharmaceutical composition of claim 2, wherein the $Mg.(GHB)_2$ salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, or about 30%.

10. The pharmaceutical composition of claim 2, wherein the $Ca.(GHB)_2$ salt is present in a wt/wt % of about 20%, about 25%, about 30%, about 35%, about 40%, about 45%, about 50%, about 55%, about 60%, about 65%, about 70%, about 75%, or about 80%.

11. The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of about 5% to about 40%, the K.GHB salt is present in a wt/wt % of about 10% to about 40%, the $Mg.(GHB)_2$ salt is present in a wt/wt % of about 5% to about 30%, and the $Ca.(GHB)_2$ salt is present in a wt/wt % of about 20% to about 80%.

12. The pharmaceutical composition of claim 2, wherein the Na.GHB, K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$ salts are present in a wt/wt % ratio of about 8%:32%:20%:40%, respectively.

* * *

14. The pharmaceutical composition of claim 2, wherein the Na.GHB, K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$ salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively.

15. The pharmaceutical composition of claim 1, wherein the mixture comprises Na.GHB, K.GHB, and $Ca.(GHB)_2$.

16. The pharmaceutical composition of claim 15, wherein the Na.GHB salt is present in a wt/wt % of about 5% to about 40%, the K.GHB salt is present in a wt/wt % of about 10% to about 40%, and

the $Ca.(GHB)_2$ salt is present in a wt/wt % of about 20% to about 80%.

* * *

18. The pharmaceutical composition of claim 1, wherein the mixture comprises K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$.

19. The pharmaceutical composition of claim 18, wherein the K.GHB salt is present in a wt/wt % of about 10% to about 50%, the $Mg.(GHB)_2$ salt is present in a wt/wt % of about 20% to about 60%, and the $Ca.(GHB)_2$ salt is present in a wt/wt % of about 10% to about 40%.

* * *

21. The pharmaceutical composition of claim 1, comprising an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.

22. The pharmaceutical composition of claim 21, wherein the composition has a pH of about 7.3 to about 8.5.

23. The pharmaceutical composition of claim 21, wherein the composition additionally comprises a pH adjusting or buffering agent.

24. The pharmaceutical composition of claim 23, wherein the pH adjusting or buffering agent is an acid.

* * *

27. The pharmaceutical composition of claim 1, wherein the composition is formulated as a liquid formulation.

28. The formulation of claim 27, wherein the formulation is chemically stable and resistant to microbial growth, and wherein the formulation is free of preservatives.

29. The formulation of claim 27, which is suitable for oral administration.

30. A pharmaceutical composition in accordance with claim 27 wherein the concentration of the GHB is between 300 mg/ml to 750 mg/ml.

> 31. A pharmaceutical composition in accordance with claim 27 wherein the concentration of the GHB is between 400 mg/ml to 600 mg/ml.
>
> 32. The pharmaceutical composition of claim 1, further comprising one or more of the following: a pharmaceutically acceptable carrier or excipient; a pH-mediating, adjusting or buffering compound or agent; a coloring or flavoring agent; a solvent; glycerol; glycol; oil; an antibacterial or antifungal agent; antibiotics; antihistamines; or sweetening agents.
>
> 33. The pharmaceutical composition of claim 1, wherein the molecular weight per oxybate equivalent of the mixture of GHB salts is about the same as a formulation of sodium oxybate.

**3. Invalidity of the '173 Patent**

The Asserted Claims of the '173 patent are invalid at least under 35 U.S.C. § 102 for being anticipated by the prior art and/or § 103 for being obvious over the prior art. Further, to the extent Plaintiff argues that the asserted claims of the '173 patent are not anticipated/obvious over the prior art, then they are invalid under 35 U.S.C. § 112 for lack of enablement.

**a. Anticipation/Obviousness**

In addition to the prior art references found on the face of the '173 patent, which Lupin identifies and incorporates fully herein, Lupin identifies the following items of prior art which, separately or in any reasonable combination, anticipate or render obvious one or more of the asserted claims of the '173 patent under 35 U.S.C. §§ 102 or 103 (Pre-AIA). In addition, Lupin reserves the right to rely on all prior art, evidence of the relevant state of the art, and evidence of prior sales, produced by Plaintiff during fact discovery and all prior art identified in the '173 patent or its prosecution history. Lupin further incorporates by reference, in full, all references cited in the following prior art references and their prosecution histories, where applicable.

The citations provided are representative of the references and are not exhaustive. To the extent that similar claim limitations occur in one or more claims, the disclosures below should be

read to apply to all similar claim limitations. Moreover, many of the references discussed herein are representative of additional prior art references in the relevant field. It should be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of the other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information, including other publications and general scientific, medical or engineering knowledge. Lupin therefore reserves the right to rely upon other unidentified portions of the prior art references and on other publications and expert testimony to provide context and to aid understanding and interpretation of any identified portions. Lupin also reserves the right to rely upon other portions of the prior art references, other publications, and the testimony of experts to establish that the alleged inventions were expressly or inherently disclosed in the prior art and/or would have been obvious to a person of ordinary skill in the art, including on the basis of modifying or combining certain cited references. It should also be recognized that the various concepts may be discussed in numerous references and that citation to one particular reference does not exclude later citation to other references discussing the same concept. Lupin also reserves the right to rely upon any admissions relating to prior art or the state of the art in the '173 patent or its prosecution history, as well as any admissions relating to prior art or the statement of the art in foreign counterparts and their prosecution histories. Lupin further reserves the right to modify these Invalidity Contentions to add additional prior art references in light of the information gained through fact discovery, expert discovery, arguments or positions advanced by Plaintiff, or the Court's claim construction rulings.

Lupin reserves the right to rely upon any related patents and patent applications, foreign patent counterparts and foreign patent applications of U.S. patents or applications identified in

these Invalidity Contentions, U.S. counterparts of foreign patents or foreign patent applications identified in these Invalidity Contentions, or U.S. and foreign patents or applications corresponding to articles and publications identified in these Invalidity Contentions. For prior art patents and publications identified in these Invalidity Contentions, Lupin reserves the right to rely on inherency, public use, offer for sale, and/or sale of the products described in those prior art patents or publications once Lupin has had an opportunity to take discovery on these subjects.

**i. Identification of the Prior Art**

Subject to the above, at least the following prior art is relevant to the invalidity of the asserted claims of the ’173 patent:

- Xyrem® (sodium oxybate) oral solution, CIII, FDA Approval 2002 (Rev. November 2005) (“Xyrem Label”);
- Eero M.A. Mervaala et al., Improvement of cardiovascular effects of metoprolol by replacement of common salt with a potassium- and magnesium-enriched salt alternative, Br. J. Pharmacol. (1994), 112, 640-648 (“Mervaala I”);
- Eero M.A. Mervaala et al., Replacement of salt by a novel potassium- and magnesium-enriched salt alternative improves the cardiovascular effects of ramipril, Br. J. Pharmacol. (1994), 111, 1189-1197 (“Mervaala II”)
- Quanhe Yang, PhD et al., Sodium and Potassium Intake and Mortality Among US Adults, Arch Intern Med. 2011;171(13):1183-1191 (“Quanhe”)
- U.S. Patent Application No. 2003/0125385 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (published July 3, 2003) (“Cook Application”)
- U.S. Patent No. 6,780,889 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (issued Aug. 24, 2004) (“Cook Patent”)
- Van Leer EM, Seidell JC, Kromhout D., Dietary calcium, potassium, magnesium and blood pressure in the Netherlands. Int J Epidemiol. 1995;24(6):1117-1123 (“Van Leer”)
- Smith KM, et al., Club drugs: methylenedioxymethamphetamine, flunitrazepam, ketamine hydrochloride, and γ-hydroxybutyrate, Am J Health-Syst Pharm—Vol 59 Jun 1, 2002 (“Smith”)

- Ferris and Went, 2012, Forensic Science International 216: 158-162 (“Ferris”)
- U.S. Patent No. 4,983,632, Use of gamma-hydroxybutyric acid salts for preparing pharmaceutical compositions for use in the treatment of alcoholism, and the compositions obtained, to Gian Luigi Gessa, Fabio Fadda, and Chiara Mormile di Campochiaro (“the ’632 patent”)
- European Patent No. EP0616804, Gamma-hydroxybutyric acid salts possessing anxiolytic activity and suitable for the treatment of states of depression, to Giuseppe Tessitore and Roberto Cacciaglia (“the ’804 patent”)
- U.S. Patent No. 4,393,236, Production of nonhygroscopic salts of 4-hydroxybutyric acid, to Joseph Klosa (“the ’236 patent”)
- Great Britain Patent No. 922,029, Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy, to Colette Goderstad, Martha Hamilton, Harry N. Cook, Dayton T. Reardan, and Douglas Danielson (“GB ‘029”)
- U.S. Patent Application No. 2011/0111027, Immediate release formulations and dosage forms of gamma-hydroxybutyrate, to Andrea Marie Rourke, Maura Patricia Murphy, James Frederick Pfeiffer, Clark Patrick Allphin, and Alya Khan Mcginlay (“the ’027 application”)
- U.S. Patent No. 8,197,878, Method for producing a low sodium salt composition, to Sambasiva Rao Chigurupati (“the ’878 patent”)
- U.S. Patent No. 5,594,030, Controlled release pharmaceutical compositions based on one or more pharmaceutically acceptable salts of gamma hydroxy-butyric acid, to Ubaldo Conte, Aldo La Manna, and Giuseppe Tessitore (“the ’030 patent”)
- Amalia Ubeda et al., Blood pressure reduction in hypertensive patients after withdrawal of effervescent medication, J of PDS, Vol 18, Issue 5 (May 2009) Pages 417-419 (“Ubeda”)
- Intersalt Cooperative Research Group, ‘Intersalt: an international study of electrolyte excretion and blood pressure. Results for 24 hour urinary sodium and potassium excretion’, BMJ, Vol. 297, 1988, p. 319-328 (“Intersalt”)
- Sarkkinen, E.S., Kastarinen, M.J., Niskanen, T.H. et al. Feasibility and antihypertensive effect of replacing regular salt with mineral salt -rich in magnesium and potassium- in subjects with mildly elevated blood pressure. Nutr J 10, 88 (2011). https://doi.org/10.1186/1475-2891-10-88 (“Sarkkinen”)
- Karppanen, H., Karppanen, P. & Mervaala, E. Why and how to implement sodium, potassium, calcium, and magnesium changes in food items and diets?. J Hum Hypertens 19, S10–S19 (2005). https://doi.org/10.1038/sj.jhh.1001955 (“Karppanen”)

- Houston, M.C. and Harper, K.J. (2008), Potassium, Magnesium, and Calcium: Their Role in Both the Cause and Treatment of Hypertension. The Journal of Clinical Hypertension, 10: 3-11 ("Houston")

- H Kesteloot and J V Joossens Relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure, Hypertension. 1988;12:594–599 ("Kesteloot")

- U.S. Department of Agriculture, Dietary Guidelines for Americans, 2010, https://health.gov/sites/default/files/2020-01/DietaryGuidelines2010.pdf ("Dietary Guidelines 2010")

- Institute of Medicine. 2010. Strategies to Reduce Sodium Intake in the United States. Washington, DC: The National Academies Press. https://doi.org/10.17226/12818 ("Institute of Medicine")

- He, F. J., and G. A. MacGregor. 2009. A comprehensive review on salt and health and current experience of worldwide salt reduction programmes. Journal of Human Hypertension 23(6):363-384 ("MacGregor")

- Lyle D. Bighley et al., Salt Forms of Drugs and Absorption, in 13 Encyclopedia of Pharmaceutical Technology 453 (James Swarbrick & James C. Boylan eds., 1995) ("Bighley")

- Pandit, N.K., Strykowski, J.M., and Shtohryn, L., The effect of salts on the distribution and solubility of an acidic drug. Int. J. Pharm. 1989, 50, 7–13 ("Pandit")

- Chowhan, Z.T. , J. Pharm. Sci. , pH–Solubility Profiles of Organic Carboxylic Acids and Their Salts 67 :1257-1260 (1978) ("Chowhan")

- Sanjeev Kothare et al., Pharmacotherapy of Narcolepsy: Focus on Sodium Oxybate, Clinical Medicine Insights: Therapeutics 2010:2 37–52 ("Kothare")

- Lois E. Krahn, MD, Sodium oxybate: A new way to treat narcolepsy, Current Psychiatry 2003 August;2(8):65-69 ("Krahn")

- Remington: the Science and Practice of Pharmacy (Alfonso R. Gennaro et al. eds., 20th ed. 2000) ("Remington's 2000")

- Rowe et al., Handbook of Pharmaceutical Excipients, Fifth Edition, Amer Pharmacists Assn. ("Rowe 2006")

- Scientific Panel on Dietetic Products, Nutrition and Allergies, Tolerable Upper Intake Levels For Vitamins and Minerals, European Food Safety Authority (February 2006). ("EFSA 2006")

Lupin expressly reserves the right to modify and/or supplement the prior art discussed herein. Each of the above is prior art to the ’173 patent. To the extent that the patentee and/or inventors attempt to swear behind or otherwise remove as prior art any of the art identified herein, Lupin specifically reserves its right to, *inter alia*, add additional prior art to the list. Furthermore, to the extent that the patentee argues that any of the cited references are not prior art under 35 U.S.C. § 102, many of the referenced patents and/or patent applications have foreign or U.S. equivalents which also qualify as prior art. Such foreign and U.S. equivalents are incorporated herein, and Lupin reserves the right to rely upon them. Additionally, as previously noted, Lupin reserves its right to, *inter alia*, supplement or amend its list of prior art references based upon, among other things, Plaintiff's disclosure of its alleged infringement proofs; disclosure of the Plaintiff's proposed construction of the claims of the ’173 patent; issuance of a claim construction ruling by a court,should the court be able to construe the claims of the ’173 patent; Plaintiff's response to any of Lupin's defenses, including, but not limited to, Plaintiff's interpretation of the prior art; the discovery (fact or expert) during litigation; and/or further investigation. Moreover, Lupin does not admit, or otherwise concede, that the claims of the ’173 patent are entitled to an effective filing date earlier than the patent's filing date, and therefore reserves the right to, *inter alia*, challenge the effective filing date of the patent and to assert additional prior art references and/or products based on any such challenge. Nevertheless, as discussed herein, each claim of the patent is invalid even if the ’173 patent is entitled to claim priority to an earlier-filed application.

**ii. Description and Content of the Prior Art**

The teachings of the prior art identified above are described in detail in the section related to the invalidity of the ’922 patent, said discussion incorporated herein by reference.

### iii. The Asserted Claims are Invalid as Anticipated

References discussed above anticipate the limitations of asserted claims of the '173 patent. Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references would have readily gleaned that each and every limitation is found either expressly or inherently in a single prior art reference." *See King Pharm., Inc. v. Eon Labs., Inc*., 616 F.3d 1267, 1274 (Fed. Cir. 2010) (internal citation and quotation marks omitted). Further, a POSA would have realized that although the anticipating "prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citation omitted); *see also Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958 (Fed. Cir. 2014). Thus, additional references or evidence can be used to show that a POSA would recognize the inherent characteristic of the thing taught by the primary reference discussed below. *E.g.*, *Teleflex, Inc.*, 299 F.3d at 1335 (recognizing that courts permit "the use of additional references to confirm the contents of the allegedly anticipating reference"); *Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).

As explained below, asserted claims would have been anticipated in view of several prior art references. By way of example, the following references render asserted claims anticipated:

- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family)
- The '632 patent
- The '027 application
- The '030 patent

Lupin reserves the right to rely on other prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

In addition, Lupin's invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

**(1) Independent Claim 1**

Claim 1 recites "[a] pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture comprises three or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.$(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate (Ca.$(GHB)_2$)." In other words, claim 1 is directed to a composition of three or more of Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$. Claim 1 should be found invalid as anticipated in view of the prior art for the reasons discussed below.

Cook Application anticipates Claim 1. Cook Application teaches that "[i]n certain embodiments, the composition may contain one or more salts" and that "salts" "includ[es] salts of GHB" that can "be derived from … sodium, potassium … calcium, [and] magnesium." Cook Application at ¶ 22. Cook Application further discloses that "[i]n certain embodiments, excipients may be added" such as "xylitol, mannitol, lactose, starch, magnesium stearate, sodium saccharine, cellulose, cellulose derivatives, magnesium carbonate and the like." Cook Application at ¶ 22.

The '632 patent anticipates Claim 1. The '632 patent states that "Suitable gamma-hydroxy butyric acid salts include the sodium salt, potassium salt, calcium salt and magnesium salt. In addition to GHB salts, the composition of the present invention can contain one or more non-toxic

pharmaceutically acceptable excipients." '632 patent at 7:32-36; *see also* claims 2, 7, and 9. The '632 patent further states that "[t]he composition containing a GHB salt and suitable pharmaceutically acceptable excipients can be formed using various gamma-hydroxy butyric acid salts and excipients." *Id*. at 7:26-31.

The '027 application anticipates Claim 1. The '027 application discloses an oral dosage form of GHB comprising "at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate." '027 application at claim 4. Similarly, the '027 application teaches that "one or more of a GHB drug" can be formulated into an oral dosage form. '027 application ¶ 39.

The '030 patent anticipates Claim 1. The '030 patent claims "pharmaceutical compositions … wherein the salts of gamma-hydroxy-butyric acid are selected from the group consisting of sodium, lithium, potassium, magnesium and calcium salts." '030 patent at claim 6

Thus, Claim 1 is anticipated by any of the Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family), the '632 patent, the '027 application, or the '030 patent.

**(2) Dependent Claims 2, 15, and 18**

Claim 2 depends on claim 1 and further recites "wherein the mixture comprises Na.GHB, K.GHB, M.$(GHB)_2$, and Ca.$(GHB)_2$." In other words, claim 2 is directed to a composition of Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$. Claim 2 should be found invalid as anticipated in view of the prior art for the same reasons as discussed above in connection with Claim 1.

Claim 15 depends on claim 1 and further recites "wherein the mixture comprises Na.GHB, K.GHB, and Ca.$(GHB)_2$." In other words, claim 15 is directed to a composition of Na.GHB, K.GHB, and Ca.$(GHB)_2$. Claim 15 should be found invalid as anticipated in view of the prior art for the same reasons as discussed above in connection with Claim 1.

Claim 15 depends on claim 1 and further recites "wherein the mixture comprises K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$." In other words, claim 15 is directed to a composition of K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$. Claim 18 should be found invalid as anticipated in view of the prior art for the same reasons as discussed above in connection with Claim 1.

**(3) Dependent Claims 27-32**

Claims 27-33 depend on claim 1 and further require "the composition is formulated as a liquid formulation," "wherein the formulation is chemically stable and resistant to microbial growth, and wherein the formulation is free of preservatives," "which is suitable for oral administration," "wherein the concentration of the GHB is between 300 mg/ml to 750 mg/ml," "wherein the concentration of the GHB is between 400 mg/ml to 600 mg/ml," and "comprising one or more of the following: a pharmaceutically acceptable carrier or excipient; a pH-mediating, adjusting or buffering compound or agent; a coloring or flavoring agent; a solvent; glycerol; glycol; oil; an antibacterial or antifungal agent; antibiotics; antihistamines; or sweetening agents."

These limitations are all expressly disclosed in Cook Application. Cook Application teaches liquid form preparations of the composition of GHB salts, e.g. syrups, aromatic powders, honey, and various elixirs. Cook Application at ¶ 23. Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63. Cook Application discloses that the composition of multiple GHB salts may be formulated for oral consumption. Cook Application at ¶ 26. Cook Application discloses that the gamma-hydroxybutyrate is at a final concentration of about 400 mg/ml to about 600 mg/ml. Cook Application at ¶ 18. Cook Application discloses that "any excipient, salt, acid, pH-mediating, adjusting or buffering compound or agent, flavoring, solution, solvent, dispersion, glycerol, glycol, oil, antibacterial and antifungal agents, antibiotics

and antihistamines, binders, disintegrating agents, lubricants, sweetening agents, or any other additive or ingredient from those enumerated above or in the examples, or in any pharmaceutically acceptable composition or carrier described herein, or as would be known by one of skill in the art, is contemplated for use in aqueous mediums or solid forms of the GHB compositions." Cook Application at ¶ 68.

Thus, Claims 27-32 are anticipated by Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family).

**iv. The Asserted Claims are Invalid as Obvious**

At least the references discussed above disclose, either alone or in combination, the limitations of the asserted claims of the '173 patent.[10] Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references together with the knowledge he or she would have possessed, would have readily gleaned the information necessary to develop the claimed formulations; would have had a motivation to develop such formulations; and would have had a reasonable expectation of success in doing so. *See, e.g.*, *KSR*, 550 U.S.at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

As explained below, the asserted claims would have been obvious in view of a host of prior art references. Consequently, there are numerous different combinations of these prior art references and many exemplary references that disclose the claimed method. *See, e.g.*, *Rothman*

[10] To the extent that any specific limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

*v. Target Corp.*, 556 F.3d 1310, 1320-21 (Fed. Cir. 2009) (when the "entire body of prior art"—or an "evidentiary cornucopia"—renders a patent claim obvious, a trier of fact can fairly rely on "any combination of these references in reaching its obviousness verdict.").

By way of example, the following combinations render the asserted claims obvious:

- One or more of the Xyrem Label, Cook Application or Cook Patent, Ferris, '632 patent, '804 patent, '236 patent, GB '029, '027 application, '030 patent; in view of
- One or more of Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Kesteloot, Dietary Guidelines 2010, Institute of Medicine, EFSA 2006; in further view of
- One or more of Mervaala I, Mervaala II, '878 patent, Sarkkinen, Institute of Medicine, MacGregor, Bighley, Pandit; in further view of
- Smith, Kothare, Krahn; and optionally in combination with
- Either Rowe 2006 and/or Remington's 2000.

More specifically, at least the following combinations of prior art references are exemplary of the combinations of prior art references that render the asserted claims of the '173 patent obvious:

By way of example, the following combinations render the asserted claims obvious:

- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family) alone or in combination with the '878 patent;
- The '632 patent alone or in combination with the '878 patent;
- The '027 application alone or in combination with the '878 patent;
- The '030 patent alone or in combination with the '878 patent;
- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family) alone or in combination with the '878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- The '632 patent alone or in combination with the '878 patent, Sarkkinen, Mervaala I and II, and Karppanen;

- The ‘027 application alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;

- The ’030 patent alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;

- Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Sarkkinen, Mervaala I and II, Karppanen, and Kothare;

- Xyrem Label, Cook Application or Cook Patent, in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;

- Xyrem Label, Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Sarkkinen, Mervaala I and II, Karppanen, and Kothare;

- Xyrem Label, Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Ubeda, Intersalt, Quanhe, and Van Leer;

- Xyrem Label, Cook Application or Cook Patent, in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen and Smith

- Xyrem Label, Smith, Ferris in combination with the ’878 patent;

- Xyrem Label, ’804 patent, Smith, the ’236 patent, and GB ’029, in combination with the ’878 patent;

- Xyrem Label, Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Sarkkinen, Mervaala I and II, Karppanen, Kothare, Smith, in combination with the ’878 patent, ’804 patent, the ’236 patent, GB ’029, Houston, Kesteloot, Dietary Guidelines 2010, MacGregor, Bighley, and EFSA 2006

- Xyrem Label, Ferris, EFSA 2006, Mervaala I / II, Kothare, and Rowe 2006

- Xyrem Label, the ’632 patent, ‘027 application, ’030 patent, Intersalt, Kesteloot, Mervaala I / II, ‘878 patent, Sarkkinen, Institute of Medicine, and MacGregor in combination with Smith, Kothare, Krahn, and Rowe 2006;

- Xyrem Label, Cook Application or Cook Patent, Ferris, ’632 patent, Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Mervaala I, Mervaala II, ’878 patent, Sarkkinen, Smith, Kothare, and Krahn;

- Xyrem Label, ’804 patent, ’236 patent, GB ’029, ’027 application, ’030 patent, Kesteloot, Dietary Guidelines 2010, Institute of Medicine, EFSA 2006, Institute of Medicine, MacGregor, Bighley, Pandit, Smith, Kothare, and Krahn;

- Xyrem Label, Cook Application or Cook Patent, Ferris, '632 patent, Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Institute of Medicine, EFSA 2006, Institute of Medicine, MacGregor, Bighley, Pandit, Smith, Kothare, and Krahn

- Xyrem Label, '804 patent, '236 patent, GB '029, '027 application, '030 patent, Kesteloot, Dietary Guidelines 2010, Mervaala I, Mervaala II, '878 patent, Sarkkinen, Smith, Kothare, and Krahn;

Lupin reserves the right to rely on other combinations of prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

As further explained below, a POSA would have been motivated to combine the teachings of these references with a reasonable expectation of success in light of the problem to be solved, the disclosures of the references, and the common subject matter of the references as explained throughout. In addition, Lupin's invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

As explained more fully below, a POSA would have been motivated to combine the teachings of the prior art discussed above to arrive at the claimed capsule. As an initial matter, a POSA would have been motivated to develop a lower-sodium salt GHB alternative given the well-known health concerns related to sodium intake. Moreover, a POSA would have been motivated to use calcium, magnesium and/or potassium salts in formulating a lower sodium salt GHB product.

Finally, a POSA would have reasonably expected to be able to develop the claimed formulations given the teaching of alternative salt forms, including alternative salt forms of GHB disclosed in the prior art as explained below. Thus, a POSA would have been motivated to

formulate a reduced sodium GHB formulation, and would have reasonably expected it to work as a replacement for the existing sodium GHB formulation.

**(1) Independent Claim 1**

Claim 1 recites "[a] pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture comprises three or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca.(GHB)_2$)." In other words, claim 1 is directed to a composition of three or more of Na.GHB, K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$. Claim 1 should be found invalid as obvious to a POSA in view of the prior art for the reasons discussed below.

**a) A POSA would have known that salts of GHB were used for therapeutic purposes**

As of the priority date, salts of GHB were known as therapeutic agents for several different therapeutic purposes. For example, the prior art taught that sodium oxybate ("Na.GHB") (chemically known as sodium γ-hydroxybutyrate; commercially-sold as Xyrem) was known as "a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy." Xyrem Label at 1.

Likewise, the potassium (K.GHB), magnesium ($Mg.(GHB)_2$), and calcium ($Ca.(GHB)_2$) salts of GHB were also well-known alternatives to Na.GHB. For instance, Cook Application discloses a pharmaceutical composition of multiple salts of gamma-hydroxybutyrate in an aqueous medium for the treatment of sleep disorders, including narcolepsy, as well as alcohol and opiate withdrawal, reduced levels of growth hormone, increased intracranial pressure, and physical pain in a patient. Cook Application at abstract.

Ferris teaches method of making salts of GHB and states that "[s]odium, potassium, magnesium and calcium salts of gamma-hydroxybutyrate have been synthesized from gamma-butyrolactone and the corresponding group 1 or 2 hydroxide." Ferris at abstract.

The '632 patent teaches that salts of GHB are useful for treatment of various conditions and also discloses preparing aqueous pharmaceutical compositions comprising GHB salts, including "the sodium, potassium, calcium or magnesium salt." '632 patent at 7:47-50; *see also* claims 2, 7, and 9. Further, the '632 patent teaches that pharmaceutical compositions "can be formed using various gamma-hydroxy butyric acid salts." *Id*. at 7:26-31.

EP '804 discloses that salts of GHB "possess[] anxiolytic activity and [are] suitable for the treatment of states of depression." EP '804 at abstract. EP '804 further teaches that "[p]referred pharmaceutically acceptable salts of gamma-hydroxybutyric acid for use in the present compositions are lithium-, sodium-, potassium-, calcium-, and magnesium salts." (EP '804 at 2:37-39).

The '236 patent teaches that "there is a large desire for these [salts of GHB] especially as sleeping agent and as a tranquilizer, since virtually all the known sleeping agents and tranquilizers such as barbiturates, amides, but also diazepams are associated with large side effects upon continuous application, but also directly associated with undesired aftereffects." '236 patent at 1:48-54. The '236 patent also claims "[a] method for the production of magnesium and[] calcium salts of 4-hydroxybutyric acid comprising … reacting … 4-hydroxybutyric acid, … magnesium hydroxide, … [and] calcium hydroxide … in an aqueous solution." '236 at claims 6 and 14.

GB '029 discloses that the "pharmacological properties" of salts of GHB "promote[] … deep sleep." GB '029 at 3:36-49. Further, GB '029 teaches using salts of GHB and "especially

the alkaline-earth metal salts," including "the sodium salt" and "the calcium salt." GB '029 at 2:53-75.

The '027 application discloses that salts of GHB "induce[] sleep that closely resembles normal, physiologic sleep" and can be used for treatments including "cataplexy and excessive daytime sleepiness associated with narcolepsy." '027 application at ¶¶ 2, 43; claim 42. The '027 application also teaches an oral dosage form of GHB comprising "at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate." '027 application at claim 4. Similarly, the '027 application teaches that "one or more of a GHB drug" can be formulated into an oral dosage form. '027 application ¶ 39.

Thus, as of the priority date, a POSA would have known that sodium, potassium, calcium, and magnesium salts of GHB could be formulated into pharmaceutical compositions for therapeutic purposes.

**b) A POSA would have been aware of the drawbacks associated with Na.GHB and its administration to patients**

While a POSA would have known that Na.GHB had been used for therapeutic purposes, a POSA would have also known of the drawbacks associated with Na.GHB and its administration.

**c) Na.GHB and its administration was associated with excessive sodium intake**

A primary concern with administration of Na.GHB was the excessive amount of sodium intake associated with its administration. The recommended starting dose for Xyrem (Na.GHB) is 4.5 g/night, which can be increased (recommended in 1.5 g increments) to a maximum of 9 g/night. Xyrem Label at 22–23. Thus, patients taking sodium oxybate will have an additional daily intake of sodium that ranges from 0.82 g (for a 4.5 g/day dose) to 1.6 g (for a 9 g/day dose).

Karpannen discloses that the "Dietary Reference Intakes (DRIs)" "for sodium is 1500 mg a day." Thus, a single 9 g/day dose of Na.GHB exceeds the DRI for sodium.

Because of this excessive intake of sodium, the prior art warned against administering Na.GHB to certain patient populations. For instance, Kothare discloses that because "[t]hree grams of sodium oxybate contains 0.5 g of sodium, while the 9 g dose contains 1.6 g of sodium," that [p]atients with congestive heart failure, hypertension, or renal insufficiency will need to have their daily sodium intake assessed." Kothare at 49 (citing Lemon MD, Strain JD, Farver DK. Sodium Oxybate for cataplexy. Ann Pharmacother. 2006;40:433–40). Krahn also teaches that sodium oxybate "is high in sodium (0.5 grams in a 3-gram dose)" and warns to "[u]se caution when considering the agent for patients with hypertension or on low-sodium diets." Krahn at 4.

Further, the prior art warned that administering Na.GHB is not right for "patients with heart failure, hypertension or compromised renal function" due to the "daily sodium intake" in taking Na.GHB. *See, e.g.*, Xyrem Label at 11. For instance, under the section on "Precautions" Xyrem Label warns that "[d]aily sodium intake in patients taking sodium oxybate … should be considered in patients with heart failure, hypertension or compromised renal function." Xyrem Label at 11. Xyrem Label further reports "hypertenson" as a "[f]requent" "[v]ascular disorder[]." Xyrem Label at 20. Xyrem Label also warns patients to tell their doctor if they "are on a salt-restricted diet, have high blood pressure, heart failure, or kidney problems" because "Xyrem contains a lot of sodium (salt) and may not be right for [them]." Xyrem Label Medication Guide at 2.

It was also well-known "that higher sodium intake is associated with increased total mortality in the general US population." Quanhe at 1183. For instance, Intersalt studied the relationship between "electrolyte excretion and blood pressure" and showed that "sodium was significantly related to the slope of blood pressure" and concluded that increasing long-term intake

of dietary sodium was shown to increase blood pressure across all study populations and age ranges. Intersalt at abstract. Institute of Medicine states that "excess sodium intake is strongly associated with elevated blood pressure, a serious public health concern related to increased risk of heart disease, stroke, congestive heart failure, and renal disease." Institute of Medicine at Preface. Further, "[i]ncreased dietary sodium [] intake produced a marked rise in blood pressure" as well as other negative side effects. Mervaala I at abstract. The Mervaala II study teaches that "[sodium] produced a marked rise in blood pressure and induced cardiac hypertrophy and significant mortality, while the salt alternative neither increased blood pressure nor caused any mortality and produced less cardiac hypertrophy than salt." Mervaala II at Abstract. Quanhe teaches that "a higher sodium-potassium ratio is associated with significantly increased risk of [cardiovascular diseases] and all-cause mortality, and that higher sodium intake is associated with increased total mortality in the general US population." Quanhe at 1183. Ubeda discloses a study aimed at "[r]aised blood pressure associated with the sodium … content" of an orally administered drug. Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension. Sarkkinen at abstract. Karppanen discloses that "[t]he present average sodium intakes, approximately 3000–4500 mg/day in various industrialised populations, are very high, that is, 2–3-fold in comparison with the current Dietary Reference Intake (DRI) of 1500 mg." Karppanen at abstact.

Thus, a POSA would have known that administration of Na.GHB causes an excessive intake of sodium that could contribute to negative health effects.

**d) Na.GHB had an undesirable flavor**

A POSA also would have known that oral administration of Na.GHB had an unpleasant taste. For instance, Smith discloses sodium oxybate "has an unpleasant, salty taste that is often described as soapy." Smith at 1074. Similarly, Kothare also states that patients reported that Na.GHB had a "bad taste" and that "issues reovle[d] around [its] "salty taste." Kothare at abstract,

Table 2. Krahn also discloses that sodium oxybate "has a salty taste." Krahn at 4. Thus, a POSA would have known that Na.GHB causes an unpleasant taste when administered to patients.

**e) Other problems were associated with Na.GHB**

Additionally, Na.GHB was associated with other problems such as preparation, manufacture, and formulation issues. For instance, it was known that "[t]he sodium salts of the 4-hydroxybutyric acid are hygroscopic," may not be "suitable for crystallization" and cause "difficulties of production and handling" that "are also very expensive." '236 patent at 1:14-47. Thus, a POSA would have known that there were issues associated with the production and formulation of Na.GHB, which would have motivated a POSA to explore other compositions and formulations for administering GHB.

**f) To address drawbacks associated with Na.GHB, a POSA would have been motivated to prepare a mixture of salts of GHB**

To avoid the drawbacks associated with Na.GHB and its administration, a POSA would have been motivated to prepare a composition of mixed salts of GHB, including sodium, calcium, magnesium, and potassium GHB salts.

**g) A POSA would have been motivated to use calcium, magnesium, and potassium salts of GHB to lower the intake of sodium**

A POSA would have sought to prepare a composition that reduces the intake of sodium associated with administration of Na.GHB. For instance, Institute of Medicine stated that it was a goal of "health initiatives to address the high levels of sodium" and also disclosed that "sources of dietary sodium" includes drugs which "can contribute to sodium intake." Institute of Medicine at Preface; 122. A POSA would have known that decreasing the intake of sodium would have had a beneficial effect. For instance, Mervaala II teaches that "reduction in the intake of sodium chloride

has an antihypertensive effect." Mervaala II at 1189. Quanhe further discloses that a reduced sodium intake could lead to greater health benefits. Quanhe at 1183. Karppanen taught that "[d]ecreased intakes of sodium alone … decrease elevated blood pressure." Karppanen at abstract. Indeed, it was well-known that that "reduction in the intake of sodium [] has an antihypertensive effect," as well as other beneficial effects. *See, e.g.,* Mervaala II at 1189.

In particular, a POSA would have known that reducing sodium intake could be achieved by reducing the sodium content of a drug. For instance, Ubeda discloses a study aimed at "[r]aised blood pressure associated with the sodium … content" of an orally administered drug. Ubeda at abstract. Ubeda observed patients that were administered paracetamol with sodium content and followed by administration of paracetamol with "no sodium content." Ubeda at abstract. Ubeda observed that "[s]witching to paracetamol tablets (no sodium content) was associated with both lowered systolic pressure of 13.1 mmHg (95%CI: 11.9–14.3, $p < 0.0001$) and a moderate reduction of diastolic pressure of 2.5 mmHg (95%CI: 2.1–2.9, $p < 0.0001$)." Ubeda at abstract. Ubeda concluded that "[a] relationship of causality between the intake of high sodium excipients and high blood pressure in elderly hypertensive individuals, without chloride ions, was found" and warned that "[c]linicians should be aware of possible raised blood pressure" when these high sodium drugs "are prescribed to hypertensive patients." Ubeda at abstract. Thus, Ubeda shows that switching from a drug formulation high in sodium to a drug formulation with lower sodium content can have beneficial health effects.

The prior art also taught strategies for how to reduce sodium content in a composition. For instance, the '878 patent teaches "a low sodium salt composition and the methods used to make it." '878 patent at abstract. Because "[e]xceeding the recommended daily intake of sodium is a significant risk factor in developing high blood pressure and a cause or contributing factor in the

rising incidence of heart disease," the '878 patent teaches that "medical professionals and governmental authorities recommend a reduction in per capita salt consumption." '878 patent at 1:29-35. Thus, the '878 patent sought to provide methods to prepare low sodium salt compositions. The '878 patent teaches that "there are a variety of salt substitutes in the market" and "[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios." '878 patent at 1:43-46. The '878 patent teaches that suitable low sodium compositions "preferably" include salts of "potassium, magnesium, calcium, ammonium, and combinations thereof." '878 patent at 2:63-67; *see also* claims 7, 28, 48 ("potassium, magnesium, calcium, ammonium, and a mixture thereof"). Thus, the "low sodium salt composition of the invention has lower sodium content." '878 patent at 3:61-67. The '878 patent also discloses several example formulations of low sodium compositions. '878 patent at Examples 1-3. A POSA would have known that this same strategy could be employed with GHB—i.e., a "low sodium" GHB salt composition could be prepared by combining the sodium, potassium, magnesium, and calcium salts of GHB.

Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl). Mervaala I at abstract; *see also* Mervaala II at abstract. The "salt alternative ha[d] the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%. Therefore, the sodium chloride concentration was 43% lower in the salt alternative." Mervaala I at 640-641. Mervaala I concluded that "replacement of common salt by a potassium-, and magnesium-enriched salt … produces beneficial cardiovascular effects." Mervaala I at abstract. A POSA would have known that this same strategy could be employed with GHB—i.e., a GHB salt composition could be "sodium-

reduced" by using a combination of sodium, potassium, and magnesium salts. Mervaala I at abstract; *see also* Mervaala II at abstract.

Likewise, Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension whereas a restriction of dietary [sodium chloride] lowers blood pressure (BP)" and that "[s]ubstituting potassium and/or magnesium salts for sodium chloride (NaCl) may enhance the feasibility of [sodium chloride] restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. Thus Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Sarkkinen concluded that "that potassium and magnesium could potentiate the effect of sodium restriction on reducing [blood pressure]" and that "[t]his effect is in line with earlier clinical trials with mineral salts." Sarkkinen at 6. A POSA would have known that this same strategy could be employed with GHB—i.e., a GHB salt composition could be "sodium-reduced" by using substituted salts. Sarkkinen at abstract.

Further, Karppanen discloses that "[t]he present average sodium intakes, approximately 3000–4500 mg/day in various industrialized populations, are very high, that is, 2–3-fold in comparison with the current Dietary Reference Intake (DRI) of 1500 mg." Karppanen at abstract. "By contrast, the present average potassium, calcium, and magnesium intakes are remarkably lower than the recommended intake levels (DRI). In USA, for example, the average intake of these mineral nutrients is only 35–50% of the recommended intakes." Karppanen at abstract. Karppanen further states that "[d]ecreased intakes of sodium alone, and increased intakes of potassium, calcium, and magnesium each alone decrease elevated blood pressure. A combination of all these factors, that is, decrease of sodium, and increase of potassium, calcium, and magnesium intakes,

which are characteristic of the so-called Dietary Approaches to Stop Hypertension diets, has an excellent blood pressure lowering effect." Karppanen at abstract. A POSA would have found it obvious to use the teachings of Karppanen—to decrease sodium content and increase potassium, calcium, and magnesium content—to prepare a combination of sodium, potassium, and magnesium salts of GHB.

Likewise, MacGregor reports on studies aimed to reduce sodium intake and of "the long-term effects of salt reduction on CVD," and states that "[a]n increase in potassium intake through the use of reduced-sodium, potassium- and magnesium-enriched salt … played a part in the fall in CVD." MacGregor at 369. In another study that MacGregor describes, patients "switch[ed] from the usual salt to potassium-enriched salt (49% sodium chloride, 49% potassium chloride, 2% other additives) with a subsequent reduction of 17% in salt intake and an increase of 76% in potassium intake [which] resulted in a 40% decrease in CVD mortality." MacGregor at 370.

Similarly, Institute of Medicine teaches "[p]artially replacing [sodium] salt with other compounds, such as potassium chloride and calcium chloride" to reduce sodium intake. Institute of Medicine at 97; see also Table 4-4; Table D-1 ("Mixtures of NaCl substitutes … consist of a number of ingredients such as non-sodium salts."). Houston describes the "DASH study" and states that a diet "rich in calcium, magnesium, and [potassium]" contributed to a reduction in blood pressure. Houston at 4. Kesteloot concludes that "[a] higher sodium intake increases blood pressure, whereas a higher intake of calcium and magnesium, whenever significant, decreases blood pressure" and that a "negative relationship between urinary 24-hour potassium excretion and blood pressure have been found." Kesteloot at 598 Dietary Guidelines 2010 also reports on how "typical American diets compare to recommended intake levels" and states that Americans

should "eat more" potassium and calcium and "eat less" sodium." Dietary Guidelines 2010 at 46, Figure 5-1.

Bighley teaches that when pharmaceutical salts for oral dosage forms, the sodium salt should be used "if the patient does not have a restriction on sodium intake," but teaches that "[i]f the sodium salt process to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium, or zinc." *Id.* at 482-83. Thus, a POSA would have known that Na.GHB was undesirable due to patients having a restriction on sodium intake and would have therefore been motivated to prepare a composition containing the potassium, calcium, and magnesium salts of GHB.

The prior art teaches how to prepare sodium, magnesium, calcium, and potassium salts of acidic drug compounds, including the stoichiometric ratio of the metal cation to drug compound. *See, e.g.,* Pandit at Table 1.

Thus, a POSA would have been motivated to produce a low sodium content composition by using mixed salts including sodium, magnesium, calcium, and potassium salts of GHB.

#### h) A POSA would have been motivated to use magnesium, calcium, and potassium salts due to the benefits associated with increased intake of those minerals

In addition to the motivation to reduce sodium content, a POSA would have been motivated to use magnesium, calcium, and potassium salts of GHB due to the benefits associated with increased intake of magnesium, calcium, and potassium.

For example, it was well known that increasing intake of magnesium, calcium, and potassium had beneficial effects. Karppanen states that in contrast to the high levels of sodium intake, "the present average potassium, calcium, and magnesium intakes are remarkably lower than the recommended intake levels (DRI). In USA, for example, the average intake of these

mineral nutrients is only 35–50% of the recommended intakes." Karppanen at abstract. Karpannen further teaches that "[t]here is convincing evidence, which indicates that this imbalance, that is, the high intake of sodium on one hand and the low intakes of potassium, calcium, and magnesium on the other hand, produce and maintain elevated blood pressure in a big proportion of the population." Karppanen at abstract. Further, "[d]ecreased intakes of sodium alone, and increased intakes of potassium, calcium, and magnesium each alone decrease elevated blood pressure. A combination of all these factors, that is, decrease of sodium, and increase of potassium, calcium, and magnesium intakes, which are characteristic of the so-called Dietary Approaches to Stop Hypertension diets, has an excellent blood pressure lowering effect." Karppanen at abstract.

Mervaala I discloses the importance of intake of magnesium, calcium, and potassium. For example, Mervaala I teaches that "[i]ncreased intake of potassium and/or magnesium … from the salt alternative is involved in the beneficial effects" because it "produces beneficial cardiovascular effects and improves the antihypertensive efficacy." Mervaala I at Abstract. Mervaala I also taught that "increased calcium intake dose dependently augmented urinary excretion of sodium and reduced the arterial wall sodium/potassium ratio suggesting an important interaction between these two electrolytes in the regulation of blood pressure and vascular responses (Wuorela et al., 1992)." Mervalla I at 647.

Similarly, Mervaala II teaches that a "sodium-reduced, potassium- and magnesium-enriched salt alternative was virtually devoid of the hypertensive and cardiac hypertrophy producing effects, typical of NaCl" and that "[t]his effect was due to increased intake of potassium and/or magnesium." Mervaala II at 1196.

Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension whereas a restriction of dietary salt lowers blood pressure (BP)" and that "[s]ubstituting potassium and/or

magnesium salts for sodium chloride (NaCl) may enhance the feasibility of salt restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. Sarkkinen further teaches that "[t]he supplementation of potassium and magnesium to a low-sodium diet may enhance the antihypertensive effect of a low-sodium diet, and thus be useful in treating hypertension. Potassium has a natriuretic effect, promoting the excretion of sodium salts in the urine. Intake of magnesium may also support BP lowering by reducing vascular resistance." Sarkkinen at 1-2. Sarkkinen concluded that "that potassium and magnesium could potentiate the effect of sodium restriction on reducing [blood pressure]" and that "[t]his effect is in line with earlier clinical trials with mineral salts." Sarkkinen at 6.

Other references have similar teachings about the benefits associated with increased intake of magnesium, calcium, and potassium. Quanhe concludes that "[p]ublic health recommendations should emphasize simultaneous reduction in sodium intake and increase in potassium intake." Quanhe at 1189. Quanhe teaches that "[s]odium-potassium ratios can be improved by lowering sodium intake, by raising potassium intake, or both." Quanhe at 1191. Van Leer studied the "relation between blood pressure and dietary calcium, potassium and magnesium and the combined effect of these minerals on blood pressure" and concluded that "diets rich in calcium, potassium and magnesium are associated with lower blood pressure." Van Leer at Abstract. Intersalt studied the relationship between "electrolyte excretion and blood pressure" and showed that "[p]otassium excretion was negatively correlated with blood pressure in individual subjects after adjustment for confounding variables." Intersalt at abstract. Institute of Medicine teaches that "one strategy to reduce [sodium] intake would be to encourage increased calcium consumption." Institute of Medicine at 77.

Thus, a POSA would have been motivated to increase the content of magnesium, calcium, and potassium salts of GHB relative to the content of Na.GHB in order to provide for increased intake of magnesium, calcium, and potassium.

**i) A POSA would have been motivated to use alternative salts to make a better tasting composition**

Due to the relatively high dosage range for administering GHB, (e.g., up to 9 g/night of Na.GHB), a POSA would have known that GHB salt form will affect the taste of the composition. Xyrem Label at 22–23. Further, as explained above, a POSA would have known that the unpleasant salty taste associated with Na.GHB was due to the high level of sodium associated with its administration. Thus, a POSA would have been motivated to use alternative salt forms of GHB to make a better tasting composition.

For instance, the prior art generally teaches the use of magnesium, potassium, and calcium salts to improve the taste of a composition of pharmaceutical salts. For instance, Bighley teaches that "[t]aste acceptability is a primary consideration in the formulation of a liquid" and provides "examples [of] approaches to make drugs organoleptically acceptable." Bighley at 465 (citing Roy, G .M., *Pharm . Technol. ,* 18:84,86,88 ,90,92,94,96-99 (1994) (April)). Bighley explains that one of those approaches is that "[t]he taste of a drug may be improved by formation of a soluble salt." Bighley at 466-467. Bighley also teaches that "[i]f the sodium salt proves to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium, or zinc," but cautions that "metal salts can cause taste problems" which should be taken into consideration. *Id*. at 483. Bighley explains that "[f]or example, potassium salts frequently have an unpleasant taste and leave a metallic aftertaste … but that "potassium salts showed … varying degrees of palatability at therapeutic potassium concentrations." Bighley at 466-467. Thus, a POSA would have been

motivated to vary the concentration of the salts, such as the potassium salt, in order to achieve a palatable taste profile of the composition of GHB salts.

Further, Bighley taught that varying concentration levels of potassium salts can results in "varying degrees of palatability," and a POSA would have known that varying the relative concentrations of the sodium, magnesium, potassium, and calcium salts of GHB could result in varying degrees of palatability. For instance, a POSA would have reasonably expected that a composition comprising 100% of a magnesium, potassium, or calcium salt would have likely "cause[d] taste problems" because these are "metal salts." Bighley at 483. But a POSA would have reasonably expected that any taste issues associated with any one salt could be reduced by reducing the concentration of that salt and correspondingly increasing the concentration of other GHB salts. Thus, a POSA would have reasonably expected that by varying concentration levels of the sodium, magnesium, potassium, and calcium salts of GHB could result in a composition with a palatable taste profile.

Similarly, the '878 patent teaches that to lower the sodium content of a salt composition, a low sodium salt composition comprising "potassium, magnesium, calcium, ammonium, and combinations thereof" should be utilized. '878 patent at abstract; claims 7, 28, 28. The'878 patent teaches to perform "[s]ensory tests … to analyze the taste characteristics" of those low-sodium content salt compositions. For instance, the '878 patent teaches that "salt substitutes containing potassium" can be associated with a "generally metallic/bitter taste" than can be "reduce[d]" or "mask[ed]" with certain additives. '878 patent at 1:48-53. The examples of low sodium salt compositions disclosed in the '878 patent had favorable taste profiles. *See* '878 patent at Tables 2-5.

Like the ’878 patent, Sarkkinen teaches that “[s]ubstituting potassium and/or magnesium salts for sodium [salts] may enhance the feasibility of [sodium] restriction and lower blood pressure beyond the sodium reduction alone.” Sarkkinen at abstract. Sarkkinen noted that “[t]he taste profile of test products was good” for the low-sodium content composition comprising sodium, potassium, and magnesium salts. Sarkkinen at 7-8.

Further, Institute of Medicine teaches that “potassium” is “often used in lowered-sodium formulations” as an alternative to sodium salts and that it “tastes both salty and bitter (this bitterness is one reason it is often not fully successful in replacing the sensory effects of salt).” Institute of Medicine at 71.

Thus, a POSA would have been motivated to produce a low sodium content composition by using mixed salts including sodium, magnesium, calcium, and potassium salts of GHB and to vary the concentration of the salts in order to achieve a palatable taste profile.

**j) Additional reasons would have motivated a POSA to use alternative salts of GHB**

In addition to the reasons discussed above, a POSA would have considered other factors when deciding to use a composition comprising sodium, magnesium, calcium, and potassium salts of GHB. For instance, it was known that “[t]he sodium salts of the 4-hydroxybutyric acid are hygroscopic,” may not be “suitable for crystallization” and cause “difficulties of production and handling” that “are also very expensive.” ’236 patent at 1:14-47. The ‘236 patent discloses that the “calcium and magnesium salts . . . from 4-hydroxybutyric acid are solid, nonhygroscopic and storable and they can be recrystallized. . . . They dissolve in water to a clear solution and they can be dispensed as injection solutions, but also as drops, or in drinks or as suppositories while maintaining a *stable situation*.” (*Id.* at col. 4, ll. 39-47 (emphasis added)). Thus, a POSA would

have been further motivated to prepare a composition of three or more of Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$.

**(2) Dependent Claims 2, 15, and 18**

Claim 2 depends on claim 1 and further recites "wherein the mixture comprises Na.GHB, K.GHB, M.$(GHB)_2$, and Ca.$(GHB)_2$." In other words, claim 2 is directed to a composition of Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$. Claim 2 should be found invalid as obvious in view of the prior art for the same reasons as discussed above in connection with Claim 1.

Claim 15 depends on claim 1 and further recites "wherein the mixture comprises Na.GHB, K.GHB, and Ca.$(GHB)_2$." In other words, claim 15 is directed to a composition of Na.GHB, K.GHB, and Ca.$(GHB)_2$. Claim 15 should be found invalid as obvious in view of the prior art for the same reasons as discussed above in connection with Claim 1.

Claim 15 depends on claim 1 and further recites "wherein the mixture comprises K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$." In other words, claim 15 is directed to a composition of K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$. Claim 18 should be found invalid as obvious in view of the prior art for the same reasons as discussed above in connection with Claim 1.

**(3) Dependent claim 3**

Claim 3 depends on claim 2 and further requires "wherein the Na.GHB salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%." Claim 3 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to reduce to Na.GHB salt present to a range between 5% and 40% wt/wt % in order to reduce the sodium intake associated with administering GHB and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and renders obvious the use of low sodium salt compositions. For instance, the ‘878 patent teaches that a “low sodium salt composition may comprise “about 10-90%, lower sodium” and “[m]ore preferably, the composition contains about 25%, 30%, 35%, 45%, 50%, 55% or 75% lower sodium,” and “[m]ore preferably, the composition contains about 50% less sodium.” ’878 patent at 3:61-67. The ’878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. ’878 patent at Table 1. Similarly, Mervaala I discloses a “sodium-reduced” composition as an alternative to sodium chloride (NaCl) comprising “the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%. Therefore, the sodium chloride concentration was 43% lower in the salt alternative.” Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of “NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt).” Sarkkinen at abstract. Further, Cook Application discloses that “[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained.” Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB.[11]

[11] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the “discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the Na.GHB salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%."

**(4) Dependent Claim 4**

Claim 4 depends on claim 2 "wherein the K.GHB salt is present in a wt/wt % of about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%." Claim 4 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to use K.GHB in a range of 5% to 40% wt/wt % in order to to reduce Na.GHB salt present, to increase the intake of potassium due to its associated health benefits, and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and render obvious the use of composition of mixed salts of GHB where the K.GHB salt is present in a wt/wt % of 5%-40%. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg

---

the art." *Id.* For at least this additional reason, any such limitation would have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB. [12]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the K.GHB salt is present in a wt/wt % of about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%."

**(5) Dependent Claim 5**

[12] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

Claim 5 depends on claim 2 "wherein the Mg.$(GHB)_2$ salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, or about 25% to about 30%." Claim 5 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to use Mg.$(GHB)_2$ in a range of 5% to 30% wt/wt % in order to reduce Na.GHB salt present, to increase the intake of magnesium due to its associated health benefits, and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and render obvious the use of compositions of mixed salts of GHB where the Mg.$(GHB)_2$ salt is present in a wt/wt % of 5%-30%. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and

preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB. [13]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the Mg.$(GHB)_2$ salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, or about 25% to about 30%."

**(6) Dependent Claim 6**

Claim 3 depends on claim 2 "wherein the Ca.$(GHB)_2$ salt is present in a wt/wt % of about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, about 35% to about 40%, about 40% to about 45%, about 45% to about 50%, about 50% to about 55%, about 55% to about 60%, about 60% to about 65%, about 65% to about 70%, about 70% to about 75%, or about 75% to about 80%." Claim 6 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to use Ca.$(GHB)_2$ in a range of 20% to

[13] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

80% wt/wt % in order to reduce Na.GHB salt present, to increase the intake of calcium due to its associated health benefits, and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and render obvious the use composition of mixed salts of GHB where the $Ca.(GHB)_2$ salt is present in a wt/wt % of 20%-80%. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active

compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB. [14]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the $Ca.(GHB)_2$ salt is present in a wt/wt % of about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, about 35% to about 40%, about 40% to about 45%, about 45% to about 50%, about 50% to about 55%, about 55% to about 60%, about 60% to about 65%, about 65% to about 70%, about 70% to about 75%, or about 75% to about 80%."

**(7) Dependent Claims 7-11, 16, 19**

Claim 7-11 depend on claim 2 and further recite claimed wt/wt% values and ranges for the salts of GHB recited in claim 1. As explained above, the prior art discloses all of these values and ranges. For example, the Cook Application teaches that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied to achieve a suitable dosage. Further, it would have been within the knowledge and skill of a POSA to arrive at the

[14] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

weight percent of a salt of GHB. [15] Therefore, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB according to the claimed wt/wt% values and ranges.

**(8) Dependent Claim 12 and 14**

Claim 12 and 14 depend on claim 2 and further recite claimed wt/wt% ratios for the salts of GHB recited in claim 1. As explained above, the prior art taught and renders obvious these claimed wt/wt% ratios. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently

[15] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds and the weight percent of each active compound can be varied.

Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB to obtain the claimed wt/wt% ratios. For instance, a POSA could have varied the weight percent of the salts of GHB to account for daily recommended doses of sodium, potassium, magnesium, and calcium. For instance, Karpannen discloses that the "Dietary Reference Intakes (DRIs)" "for sodium is 1500 mg a day, while 2500 mg has been given as the maximum level of daily intake that is likely to pose no risk of adverse effects;" "potassium for adolescents and adults is 4700 mg/day. Recommended intake of potassium for children 1–3 years of age is 3000 mg/day, for 4–8 years of age it is 3800 mg/day, and for 9–13 years of age it is 4500 mg/day;" "for calcium are 1000–1300 mg per day. Therefore, the usual USA intakes are only 35–40% of the DRIs;" and "magnesium intake recommendation is 420 mg for adult men" and that "the usual USA intake of 180 mg is only approximately 50% of the recommended level." Karpannen at S12. As described above, Dietary Guidelines 2010 reports recommended daily allowances for calcium, magnesium, potassium, and sodium that are similar to Karpannen. Dietary Guidelines 2010 at Appendix 5. Further, Kesteloot describes a study of the relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure and reports that men and women exceed these recommended intake levels for sodium, but fall short of the recommended intake levels for potassium, calcium, and magnesium. Kesteloot at Table 2.

Likewise, a POSA would have known of the optimal and/or recommended blood concentration levels of these minerals and their importance. For example, EFSA 2006 states that "oral Mg supply has to be considerably increased to increase plasma Mg" and discloses "[o]ptimal concentration" values of plasma Mg, such as 0.80 – 1.10 mmol/L. EFSA 2006 at 111. EFSA 2006 states that calcium intake is "very important" because it "helps to maintain a constant concentration of blood calcium" at about "2.5 mmol/L (10 mg/dL) (between 2.25 and 2.75 mmol/L)." EFSA 2006 at 215. EFSA 2006 discloses that potassium intake "is important for regulating … nerve and muscle function, blood pressure regulation, etc.," and states that "[t]he concentration of potassium in plasma is … about 3.5 to 5 mmol/L." EFSA 2006 at 411-412. Further, as discussed above, a POSA would have known that certain "population[s] could most benefit from increased potassium, magnesium, and calcium." Houston at 9-10; see also Karppanen at S14 ("Although the diets in different populations may differ considerably … the essential features are similar in all industrialised populations … the sodium level is very high while the levels of potassium and magnesium are very low. In most populations, the level of calcium is also low." A POSA would have known that the deficient intake of potassium, magnesium, and calcium could impact the blood concentration levels of these minerals.

Because of this imbalance—that patients consume too much sodium and not enough potassium, calcium, and magnesium—a POSA would have been motivated to formulate a composition of sodium, potassium, calcium, and magnesium salts of GHB in order to compensate for this imbalance. In particular, a POSA would have been motivated to vary the ratio of the sodium, potassium, calcium, and magnesium salts of GHB so that patients' intake of sodium is decreased closer to the daily recommended levels and patients' intake of potassium, calcium, and magnesium is increased closer to the daily recommended levels. Similarly, a POSA would have

been motivated to vary the ratio of the sodium, potassium, calcium, and magnesium salts of GHB so that patients' blood concentration levels of these minerals trend closer to their optimal and/or recommended levels.

To optimize this formulation for daily recommended levels, a POSA could perform routine experimentation. For instance, intake of sodium, potassium, calcium, and magnesium can be indirectly measured by measuring the levels excreted from the body. A POSA could conduct routine experimentation to administer compositions with various levels of the sodium, potassium, calcium, and magnesium salts of GHB and then measure the corresponding levels excreted from the body. In this manner, a POSA could optimize for a composition to target daily recommended levels of sodium, potassium, calcium, and magnesium. Such optimization would have been obvious and routine to a POSA. Moreover, the '878 patent teaches that "there are a variety of salt substitutes in the market" and "[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios." '878 patent at 1:43-46.

Thus, a POSA would have found it obvious to adjust the ratios of the salts of GHB to account for daily recommended doses of sodium, potassium, magnesium, and calcium while also factoring in that patients generally exceed the daily recommended dose for sodium but do not meet the recommended levels for potassium, magnesium, and calcium. Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB comprising the claimed wt/wt% ratios according to claims 12 and 14.

**(9) Dependent Claim 21**

Claim 21 depends on claim 1 and further requires that the composition "compris[es] an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable

and resistant to microbial growth, and wherein the composition is free of preservatives." The prior art discloses these limitations of claim 21. For instance, Cook Application discloses that the gamma-hydroxybutyrate is at a final concentration of about 150 mg/ml to 750 mg/ml. Cook Application at ¶ 18. Cook Application also teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about 6 to about 7.5 but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Further, Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63; *see also* Xyrem Label at 2. Further, the '632 patent discloses compositions of GHB salts that are "free of preservatives. *Id.* at 8:57-59. Thus, a POSA would have found it obvious to not include a preservative. Therefore, a POSA would have found it obvious to prepare a composition with an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.

**(10) Dependent Claim 22-24**

Claims 22-24 depend on claim 21 and further require that "the composition has a pH of about 7.3 to about 8.5," "the composition additionally comprises a pH adjusting or buffering agent," and "wherein the pH adjusting or buffering agent is an acid," respectively. These claims are rendered obvious for the same reasons as described above in connection with claims 1 and 21. Also, Xyrem Label discloses an oral solution of Na.GHB "neutralized to pH 7.5 with malic acid." Xyrem Label at 2. Further, Cook Application teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about 6 to about 7.5 but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Cook Application discloses that the composition of GHB salts may

comprise "pH adjusting agents such as acids, bases and buffering agents." Cook Application at ¶ 12. Cook Application teaches that the composition may comprise malic acid, citric acid, acetic acid, boric acid, lactic acid, hydrochloric acid, phosphoric acid, sulfuric acid, sulfonic acid, and nitric acid. Cook Application at claim 35. Therefore, a POSA would have found it obvious to prepare compositions according to claims 22-24.

**(11) Dependent Claim 27-33**

Claims 27-33 depend on claim 1 and further require that "the composition is formulated as a liquid formulation," "the formulation is chemically stable and resistant to microbial growth, and wherein the formulation is free of preservatives," and that the formulation "is suitable for oral administration," "wherein the concentration of the GHB is between 300 mg/ml to 750 mg/ml," "wherein the concentration of the GHB is between 400 mg/ml to 600 mg/ml," "comprising one or more of the following: a pharmaceutically acceptable carrier or excipient; a pH-mediating, adjusting or buffering compound or agent; a coloring or flavoring agent; a solvent; glycerol; glycol; oil; an antibacterial or antifungal agent; antibiotics; antihistamines; or sweetening agents," and "wherein the molecular weight per oxybate equivalent of the mixture of GHB salts is about the same as a formulation of sodium oxybate," respectively.

Cook Application teaches liquid form preparations of the composition of GHB salts, e.g. syrups, aromatic powders, honey, and various elixirs. Cook Application at ¶ 23. Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63. Cook Application discloses that the composition of multiple GHB salts may be formulated for oral consumption. Cook Application at ¶ 26. Cook Application discloses that the gamma-hydroxybutyrate is at a final concentration of about 400 mg/ml to about 600 mg/ml. Cook

Application at ¶ 18. Cook Application discloses that "any excipient, salt, acid, pH-mediating, adjusting or buffering compound or agent, flavoring, solution, solvent, dispersion, glycerol, glycol, oil, antibacterial and antifungal agents, antibiotics and antihistamines, binders, disintegrating agents, lubricants, sweetening agents, or any other additive or ingredient from those enumerated above or in the examples, or in any pharmaceutically acceptable composition or carrier described herein, or as would be known by one of skill in the art, is contemplated for use in aqueous mediums or solid forms of the GHB compositions." Cook Application at ¶ 68. GB '029 discloses example oral liquid formulations of salts of GHB containing flavoring agents such as "sugar (glucose, levulose or sorbitol)." GB '029 at 5:22-30.

Further, Xyrem is a composition of a GHB salt formulated as a liquid. Xyrem Label. Further, Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63. Further, the '632 patent discloses compositions of GHB salts that are "free of preservatives. *Id.* at 8:57-59. Thus, a POSA would have found it obvious to not include a preservative. Therefore, a POSA would have found it obvious to prepare compositions according to claims 27-33.

Cook Application also discloses a calcium oxybate formulation where the molecular weight per oxybate equivalent of the mixture of GHB salts is about the same as a formulation of sodium oxybate, Cook Application at Table 17. Further, it would have been obvious to formulate a mixed oxybate salt composition where the molecular weight per oxybate equivalent of the mixture of GHB salts is about the same as a formulation of sodium oxybate to achieve the same

or similar therapeutic effect in a patent with the mixed salt composition as for the sodium oxybate composition.

**(12) No Objective Indicia**

Lupin is unaware of any evidence of secondary considerations that would render the particular combination of claim elements found in the '173 patent non-obvious, as described below and incorporated herein by reference. For example:

- *Long-Felt Need:* Lupin is not aware of any evidence to support a claim that the '173 patent resolved a long-felt need.

- *Failure of Others:* Lupin is not aware of any evidence of failure of others that reflects any non-obviousness of the subject matter of the '173 patent.

- *Skepticism of Those of Skill in the Art:* Lupin is not aware of any skepticism of those skilled in the art with respect to the subject matter of the '173 patent.

- *Licensing:* Lupin is not aware of any licensing of the '173 patent that may be reflective of non-obviousness of the subject matter of that patent.

- *Commercial Success:* Lupin is not aware of any evidence linking any product sales made to the '173 patent, as opposed to marketing, endorsements, other patents or marketing exclusivities, or other factors unrelated to the alleged invention of the '173 patent. *See Merck*, 395 F.3d at 1376-77. Further, nothing submitted during prosecution of the '173 patent establishes commercial success. On at least these bases, Lupin is aware of no commercial success that could support a claim of non-obviousness.

- *Recognition in the Industry:* Lupin is not aware of any recognition in the industry for the '173 patent.

- *Acquiescence:* Lupin is not aware of any evidence of acquiescence to the validity of the '173 patent.

- *Copying:* Lupin is not aware of any copying that could support a claim of non-obviousness of the subject matter of the '173 patent. *See, e.g.*, *Bayer Healthcare*, 713 F.3d at 1377; *Purdue*, 377 F. App'x at 983; *Santarus*, 2010 WL 1506017, at *26; *Aventis*, 2006 WL 2008962, at *45.

- *Unexpected Results:* Lupin is not aware of any evidence of unexpected results with respect to the '173 patent. Rather, as explained above a person of ordinary skill in the art would have reasonably expected to be able to successfully formulate a composition of mixed salts of GHB.

- *Teaching away:* Lupin is not aware of any prior art teaching away from formulating a composition of mixed salts of GHB. To the contrary, as explained above, the prior art taught a person of ordinary skill in the art to reduce the sodium content by using alternative salts including magnesium, potassium, and calcium.

Additionally, as noted above, the patentee must prove the required nexus before relying on *any* secondary considerations of alleged non-obviousness. *Muniauction*, 532 F.3d at 1327-28. Lupin is not aware of any evidence that would establish the required nexus for the claims of the '173 patent.

Thus, for at least these reasons, claims 1-12, 14-16, 18-19, 21-24, and 27-33 of the '173 patent are invalid for obviousness.

**b. Lack of Enablement**

Alternatively, to the extent the claims are not rendered obvious as discussed above, the claims of the '173 patent are invalid for lack of enablement. For example, independent claim 1 of the '173 patent broadly claims pharmaceutical compositions of gamma-hydroxybutyrate (GHB) containing a "mixture" of "three or more" salts of GHB. with no specific ratio of the respective GHB salts. Accordingly, claim 1 covers *any* ratio of the four salts. Claims 2-11, 15-16, 18-19, 21-24, and 27-33 similarly allow for a wide range of ratios of the various GHB salts. The specification, however, only describes a limited number of examples of exemplary syntheses of mixtures of oxybate salts, and does not exemplify any three salt combinations with Na/K/Mg or Na/Ca/Mg. To the extent that the claimed mixtures of GHB salts in the claimed ratios would not have been obvious, the specification fails to enable a person of ordinary skill in the art to practice the full scope of the claimed invention without undue experimentation. *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1309 (Fed. Cir. 2015) (citing *In re Wands*, 858 F.2d 731, 736–37 (Fed.Cir.1988)). Thus, to the extent that claims 1, 2-11, 15-16, 18-19, 21-24, and 27-33 are not invalid as obvious, they are invalid as not enabled to the full scope of the claims.

### c. Indefiniteness

The claims of the ’173 patent that require a “wt/wt %” are invalid as indefinite because when “read in light of the specification delineating the patent, and the prosecution history,” “wt/wt %” “fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.” *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). The patent explains that “[t]he term ‘wt/wt %,’ are used herein, refers to the normalized weight percent of a particular salt in a salt mixture. A sample calculation of wt/wt % is provided in Example 1 of the present disclosure.” ’922 patent at 7:25-34. The sample calculation provided in Example 1, however, fails to “provide objective boundaries for those of skill in the art.” *Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1371 (Fed. Cir. 2014).

The calculation described in Table 1 states that “[f]or Mixture A, 34.38 g of 99.9% GBL were charged, which is (34.38×0.999/68.089×1000)=399.0 mMol. The total base equivalents charged were 404.40 mEq. Hence, the excess base was ((404.40−399.0)/(399.0×100%))=1.35%.” ’922 patent at 25:13-18. However, the “wt/wt %” does not factor in the “1.35%” excess base into the calculation to determine the relative wt/wt % of each salt of GHB. For instance, Table 1 shows that the total “Oxybate or GHB equivalents value” is 404.40 mEQ, which is inconsistent with the disclosure that only 399.0 mMol of GBL was charged. Thus, the calculation shown in Table 1 does not reflect the actual relative “wt/wt %” of the GHB salts formed. Further, the actual relative “wt/wt %” of the GHB salts formed depends on other factors such as the amount of excess base(s) added, the pKa values of the bases, and the effects of the concentration of counterions. *See, e.g.,* Serajuddin at 605-606.

Said another way, a POSA could either calculate “wt/wt %” like the example shown in the specification or a POSA could use a known alternative calculation that accounts for factors such as excess base(s) and concentration of counterions. These varying calculations have the potential

to produce inconsistent results. Therefore, the term "wt/wt %" "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." N*autilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). Thus, claims 3-14, 16-17, and 19-20 that recite "wt/wt %" are invalid as indefinite.

**C. The '107 Patent**

U.S. Patent No. 9,132,107 B2 ("the '107 patent"), entitled "Gamma-hydroxybutyrate compositions and their use for the treatment of disorders," issued on or about September 15, 2015. Clark P. Allphin and Michael Desjardin are identified as the purported inventors on the face of the '107 patent. According to the records of the Patent Office, the '107 patent is purportedly assigned to Jazz Pharmaceuticals Ireland Limited. The '107 patent issued from U.S. Patent Application Serial No. 14/045,673 ("the '673 application"), filed on October 3, 2013, and also purports to claim the benefit of priority of U.S. Provisional Patent Application Serial No. 61/737,695 ("the '695 provisional application"), filed on December 14, 2012.

Plaintiff has the burden to establish that the asserted claims of the '107 patent are entitled to the priority date of any earlier-filed application. *See Dynamic Drinkware, LLC v. National Graphics, Inc.* 800 F.3d 1375, 1380 (Fed. Cir. 2015). Absent specific evidence of entitlement to an earlier priority date, the '107 patent must be assigned its actual filing date of January 11, 2013. *Id*. To establish an earlier priority date, each earlier application in the chain must fully disclose the claimed invention by meeting all requirements of 35 U.S.C. §112. *In re NTP, Inc.,* 654 F.3d 1268, 1277 (Fed. Cir. 2011). Lupin does not concede that the '107 patent has made a proper claim of priority to an earlier- filed application, and reserves the right to (i) challenge the '107 patent's entitlement to claim priority to any previous application, (ii) challenge any alleged date of conception or reduction to practice; and (iii) identify additional prior art thereto.

### 1. The ’107 Patent Specification

The specification of the ’107 patent is substantially similar to the specification of the ’922 patent discussed above said discussion is incorporated herein by reference.

### 2. Asserted Claims of the ’107 Patent

Plaintiff asserts claims 1-12, 14-18, 20-23, and 26-29 of the ’107 patent, of which claim 1 is independent. These claims are reproduced below:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of at least three salts of GHB, wherein the mixture comprises a calcium salt of gamma-hydroxybutyrate (Ca•(GHB)$_2$), a magnesium salt of gamma-hydroxybutyrate (Mg•(GHB)$_2$), and one or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na•GHB) and a potassium salt of gamma-hydroxybutyrate (K•GHB).
>
> 2. The pharmaceutical composition of claim 1, wherein the mixture comprises Na•GHB, K•GHB, Mg•(GHB)$_2$, and Ca•(GHB)$_2$, and wherein the amount of Na•GHB is present at a wt/wt % of about 5% to about 40%.
>
> 3. The pharmaceutical composition of claim 1, wherein a Na•GHB salt is present in a wt/wt % of about 5% to about 10%.
>
> 4. The pharmaceutical composition of claim 1, wherein a K•GHB salt is present in a wt/wt % of about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%.
>
> 5. The pharmaceutical composition of claim 1, wherein the Mg•(GHB)$_2$ salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, or about 25% to about 30%.
>
> 6. The pharmaceutical composition of claim 1, wherein the Ca•(GHB)$_2$ salt is present in a wt/wt % of about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, about 35% to about 40%, about 40% to about 45%, about 45% to about 50%, or about 50% to about 55%.
>
> 7. The pharmaceutical composition of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 10%.

8. The pharmaceutical composition of claim 2, wherein the K•GHB salt is present in a wt/wt % of about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%.

9. The pharmaceutical composition of claim 2, wherein the Mg•$(GHB)_2$ salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, or about 30%.

10. The pharmaceutical composition of claim 2, wherein the Ca•$(GHB)_2$ salt is present in a wt/wt % of about 20%, about 25%, about 30%, about 35%, about 40%, about 45%, about 50%, or about 55%.

11. The pharmaceutical composition of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 40%, the K•GHB salt is present in a wt/wt % of about 10% to about 40%, the Mg•$(GHB)_2$ salt is present in a wt/wt % of about 5% to about 30%, and the Ca•$(GHB)_2$ salt is present in a wt/wt % of about 20% to about 80%.

12. The pharmaceutical composition of claim 2, wherein the Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$ salts are present in a wt/wt % ratio of about 8%:32%:20%:40%, respectively.

* * *

14. The pharmaceutical composition of claim 2, wherein the Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$ salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively.

15. The pharmaceutical composition of claim 1, wherein the mixture comprises Mg•$(GHB)_2$, Na•GHB, and Ca•$(GHB)_2$.

16. The pharmaceutical composition of claim 15, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 10%, the Mg•$GHB_2$ salt is present in a wt/wt % of about 20% to about 25%, and the Ca•$(GHB)_2$ salt is present in a wt/wt % of about 40% to about 50%.

17. The pharmaceutical composition of claim 1, wherein the mixture comprises K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$.

18. The pharmaceutical composition of claim 17, wherein the K•GHB salt is present in a wt/wt % of about 10% to about 40%, the Mg•$(GHB)_2$ salt is present in a wt/wt % of about 20% to about 30%, and the Ca•$(GHB)_2$ salt is present in a wt/wt % of about 40% to about 55%.

* * *

> 20. The pharmaceutical composition of claim 1, comprising an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.
>
> 21. The pharmaceutical composition of claim 20, wherein the composition has a pH of about 7.3 to about 8.5.
>
> 22. The pharmaceutical composition of claim 20, wherein the composition additionally comprises a pH adjusting or buffering agent.
>
> 23. The pharmaceutical composition of claim 22, wherein the pH adjusting or buffering agent is an acid.

* * *

> 26. The pharmaceutical composition of claim 1, wherein the composition is formulated as a liquid formulation.
>
> 27. The formulation of claim 26, wherein the formulation is chemically stable and resistant to microbial growth, and wherein the formulation is free of preservatives.
>
> 28. The formulation of claim 26, which is suitable for oral administration.
>
> 29. The formulation of claim 26, wherein the formulation is chemically stable and resistant to microbial growth, and wherein the formulation contains at least one preservative.

**3. Invalidity of the ’107 Patent**

The Asserted Claims of the ’107 patent are invalid at least under 35 U.S.C. § 102 for being anticipated by the prior art and/or § 103 for being obvious over the prior art. Further, to the extent Plaintiff argues that the asserted claims of the ’107 patent are not anticipated/obvious over the prior art, then they are invalid under 35 U.S.C. § 112 for lack of enablement.

**a. Anticipation/Obviousness**

In addition to the prior art references found on the face of the ’107 patent, which Lupin identifies and incorporates fully herein, Lupin identifies the following items of prior art which, separately or in any reasonable combination, anticipate or render obvious one or more of the asserted claims of the ’107 patent under 35 U.S.C. §§ 102 or 103 (Pre-AIA). In addition, Lupin reserves the right to rely on all prior art, evidence of the relevant state of the art, and evidence of prior sales, produced by Plaintiff during fact discovery and all prior art identified in the ’107 patent or its prosecution history. Lupin further incorporates by reference, in full, all references cited in the following prior art references and their prosecution histories, where applicable.

The citations provided are representative of the references and are not exhaustive. To the extent that similar claim limitations occur in one or more claims, the disclosures below should be read to apply to all similar claim limitations. Moreover, many of the references discussed herein are representative of additional prior art references in the relevant field. It should be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of the other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information, including other publications and general scientific, medical or engineering knowledge. Lupin therefore reserves the right to rely upon other unidentified portions of the prior art references and on other publications and expert testimony to provide context and to aid understanding and interpretation of any identified portions. Lupin also reserves the right to rely upon other portions of the prior art references, other publications, and the testimony of experts to establish that the alleged inventions were expressly or inherently disclosed in the prior art and/or would have been obvious to a person of ordinary skill in the art, including on the basis of modifying or combining certain cited references. It should also be recognized that

the various concepts may be discussed in numerous references and that citation to one particular reference does not exclude later citation to other references discussing the same concept. Lupin also reserves the right to rely upon any admissions relating to prior art or the state of the art in the '107 patent or its prosecution history, as well as any admissions relating to prior art or the statement of the art in foreign counterparts and their prosecution histories. Lupin further reserves the right to modify these Invalidity Contentions to add additional prior art references in light of the information gained through fact discovery, expert discovery, arguments or positions advanced by Plaintiff, or the Court's claim construction rulings.

Lupin reserves the right to rely upon any related patents and patent applications, foreign patent counterparts and foreign patent applications of U.S. patents or applications identified in these Invalidity Contentions, U.S. counterparts of foreign patents or foreign patent applications identified in these Invalidity Contentions, or U.S. and foreign patents or applications corresponding to articles and publications identified in these Invalidity Contentions. For prior art patents and publications identified in these Invalidity Contentions, Lupin reserves the right to rely on inherency, public use, offer for sale, and/or sale of the products described in those prior art patents or publications once Lupin has had an opportunity to take discovery on these subjects.

**i. Identification of the Prior Art**

Subject to the above, at least the following prior art is relevant to the invalidity of the asserted claims of the '107 patent:

- Xyrem® (sodium oxybate) oral solution, CIII, FDA Approval 2002 (Rev. November 2005) ("Xyrem Label");
- Eero M.A. Mervaala et al., Improvement of cardiovascular effects of metoprolol by replacement of common salt with a potassium- and magnesium-enriched salt alternative, Br. J. Pharmacol. (1994), 112, 640-648 ("Mervaala I");

- Eero M.A. Mervaala et al., Replacement of salt by a novel potassium- and magnesium-enriched salt alternative improves the cardiovascular effects of ramipril, Br. J. Pharmacol. (1994), 111, 1189-1197 ("Mervaala II")

- Quanhe Yang, PhD et al., Sodium and Potassium Intake and Mortality Among US Adults, Arch Intern Med. 2011;171(13):1183-1191 ("Quanhe")

- U.S. Patent Application No. 2003/0125385 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (published July 3, 2003) ("Cook Application")

- U.S. Patent No. 6,780,889 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (issued Aug. 24, 2004) ("Cook Patent")

- Van Leer EM, Seidell JC, Kromhout D., Dietary calcium, potassium, magnesium and blood pressure in the Netherlands. Int J Epidemiol. 1995;24(6):1117-1123 ("Van Leer")

- Smith KM, et al., Club drugs: methylenedioxymethamphetamine, flunitrazepam, ketamine hydrochloride, and γ-hydroxybutyrate, Am J Health-Syst Pharm—Vol 59 Jun 1, 2002 ("Smith")

- Ferris and Went, 2012, Forensic Science International 216: 158-162 ("Ferris")

- U.S. Patent No. 4,983,632, Use of gamma-hydroxybutyric acid salts for preparing pharmaceutical compositions for use in the treatment of alcoholism, and the compositions obtained, to Gian Luigi Gessa, Fabio Fadda, and Chiara Mormile di Campochiaro ("the '632 patent")

- European Patent No. EP0616804, Gamma-hydroxybutyric acid salts possessing anxiolytic activity and suitable for the treatment of states of depression, to Giuseppe Tessitore and Roberto Cacciaglia ("the '804 patent")

- U.S. Patent No. 4,393,236, Production of nonhygroscopic salts of 4-hydroxybutyric acid, to Joseph Klosa ("the '236 patent")

- Great Britain Patent No. 922,029, Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy, to Colette Goderstad, Martha Hamilton, Harry N. Cook, Dayton T. Reardan, and Douglas Danielson ("GB '029")

- U.S. Patent Application No. 2011/0111027, Immediate release formulations and dosage forms of gamma-hydroxybutyrate, to Andrea Marie Rourke, Maura Patricia Murphy, James Frederick Pfeiffer, Clark Patrick Allphin, and Alya Khan Mcginlay ("the '027 application")

- U.S. Patent No. 8,197,878, Method for producing a low sodium salt composition, to Sambasiva Rao Chigurupati ("the '878 patent")

- U.S. Patent No. 5,594,030, Controlled release pharmaceutical compositions based on one or more pharmaceutically acceptable salts of gamma hydroxy-butyric acid, to Ubaldo Conte, Aldo La Manna, and Giuseppe Tessitore ("the '030 patent")

- Amalia Ubeda et al., Blood pressure reduction in hypertensive patients after withdrawal of effervescent medication, J of PDS, Vol 18, Issue 5 (May 2009) Pages 417-419 ("Ubeda")

- Intersalt Cooperative Research Group, 'Intersalt: an international study of electrolyte excretion and blood pressure. Results for 24 hour urinary sodium and potassium excretion', BMJ, Vol. 297, 1988, p. 319-328 ("Intersalt")

- Sarkkinen, E.S., Kastarinen, M.J., Niskanen, T.H. et al. Feasibility and antihypertensive effect of replacing regular salt with mineral salt -rich in magnesium and potassium- in subjects with mildly elevated blood pressure. Nutr J 10, 88 (2011). https://doi.org/10.1186/1475-2891-10-88 ("Sarkkinen")

- Karppanen, H., Karppanen, P. & Mervaala, E. Why and how to implement sodium, potassium, calcium, and magnesium changes in food items and diets?. J Hum Hypertens 19, S10–S19 (2005). https://doi.org/10.1038/sj.jhh.1001955 ("Karppanen")

- Houston, M.C. and Harper, K.J. (2008), Potassium, Magnesium, and Calcium: Their Role in Both the Cause and Treatment of Hypertension. The Journal of Clinical Hypertension, 10: 3-11 ("Houston")

- H Kesteloot and J V Joossens Relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure, Hypertension. 1988;12:594–599 ("Kesteloot")

- U.S. Department of Agriculture, Dietary Guidelines for Americans, 2010, https://health.gov/sites/default/files/2020-01/DietaryGuidelines2010.pdf ("Dietary Guidelines 2010")

- Institute of Medicine. 2010. Strategies to Reduce Sodium Intake in the United States. Washington, DC: The National Academies Press. https://doi.org/10.17226/12818 ("Institute of Medicine")

- He, F. J., and G. A. MacGregor. 2009. A comprehensive review on salt and health and current experience of worldwide salt reduction programmes. Journal of Human Hypertension 23(6):363-384 ("MacGregor")

- Lyle D. Bighley et al., Salt Forms of Drugs and Absorption, in 13 Encyclopedia of Pharmaceutical Technology 453 (James Swarbrick & James C. Boylan eds., 1995) ("Bighley")

- Pandit, N.K., Strykowski, J.M., and Shtohryn, L., The effect of salts on the distribution and solubility of an acidic drug. Int. J. Pharm. 1989, 50, 7–13 ("Pandit")
- Chowhan, Z.T. , J. Pharm. Sci. , pH–Solubility Profiles of Organic Carboxylic Acids and Their Salts 67 :1257-1260 (1978) ("Chowhan")
- Sanjeev Kothare et al., Pharmacotherapy of Narcolepsy: Focus on Sodium Oxybate, Clinical Medicine Insights: Therapeutics 2010:2 37–52 ("Kothare")
- Lois E. Krahn, MD, Sodium oxybate: A new way to treat narcolepsy, Current Psychiatry 2003 August;2(8):65-69 ("Krahn")
- Remington: the Science and Practice of Pharmacy (Alfonso R. Gennaro et al. eds., 20th ed. 2000) ("Remington's 2000")
- Rowe et al., Handbook of Pharmaceutical Excipients, Fifth Edition, Amer Pharmacists Assn. ("Rowe 2006")
- Scientific Panel on Dietetic Products, Nutrition and Allergies, Tolerable Upper Intake Levels For Vitamins and Minerals, European Food Safety Authority (February 2006). ("EFSA 2006")

Lupin expressly reserves the right to modify and/or supplement the prior art discussed herein. Each of the above is prior art to the '107 patent. To the extent that the patentee and/or inventors attempt to swear behind or otherwise remove as prior art any of the art identified herein, Lupin specifically reserves its right to, *inter alia*, add additional prior art to the list. Furthermore, to the extent that the patentee argues that any of the cited references are not prior art under 35 U.S.C. § 102, many of the referenced patents and/or patent applications have foreign or U.S. equivalents which also qualify as prior art. Such foreign and U.S. equivalents are incorporated herein, and Lupin reserves the right to rely upon them. Additionally, as previously noted, Lupin reserves its right to, *inter alia*, supplement or amend its list of prior art references based upon, among other things, Plaintiff's disclosure of its alleged infringement proofs; disclosure of the Plaintiff's proposed construction of the claims of the '107 patent; issuance of a claim construction ruling by a court,should the court be able to construe the claims of the '107 patent; Plaintiff's response to any of Lupin's defenses, including, but not limited to, Plaintiff's interpretation of the

prior art; the discovery (fact or expert) during litigation; and/or further investigation. Moreover, Lupin does not admit, or otherwise concede, that the claims of the ’107 patent are entitled to an effective filing date earlier than the patent’s filing date, and therefore reserves the right to, *inter alia*, challenge the effective filing date of the patent and to assert additional prior art references and/or products based on any such challenge. Nevertheless, as discussed herein, each claim of the patent is invalid even if the ’107 patent is entitled to claim priority to an earlier-filed application.

**ii. Description and Content of the Prior Art**

The teachings of the prior art identified above are described in detail in the section related to the invalidity of the ’922 patent, said discussion incorporated herein by reference.

**iii. The Asserted Claims are Invalid as Anticipated**

References discussed above anticipate the limitations of asserted claims of the ’107 patent. Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references would have readily gleaned that each and every limitation is found either expressly or inherently in a single prior art reference.” *See King Pharm., Inc. v. Eon Labs., Inc.*, 616 F.3d 1267, 1274 (Fed. Cir. 2010) (internal citation and quotation marks omitted). Further, a POSA would have realized that although the anticipating “prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference.” *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citation omitted); *see also Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958 (Fed. Cir. 2014). Thus, additional references or evidence can be used to show that a POSA would recognize the inherent characteristic of the thing taught by the primary reference discussed below. *E.g.*, *Teleflex, Inc.*, 299 F.3d at 1335 (recognizing that courts permit “the use of additional references to confirm the contents of the allegedly anticipating reference”); *Cont’l Can Co. USA*

*v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).

As explained below, asserted claims would have been anticipated in view of several prior art references. By way of example, the following references render asserted claims anticipated:

- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family)
- The ’632 patent
- The ‘027 application
- The ’030 patent

Lupin reserves the right to rely on other prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

In addition, Lupin’s invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

**(1) Independent Claim 1**

Claim 1 recites “[a] pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of at least three salts of GHB, wherein the mixture comprises a calcium salt of gamma-hydroxybutyrate (Ca•$(GHB)_2$), a magnesium salt of gamma-hydroxybutyrate (Mg•$(GHB)_2$), and one or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na•GHB) and a potassium salt of gamma-hydroxybutyrate (K•GHB).” In other words, claim 1 is directed to a composition comprising Ca•$(GHB)_2$, Mg•$(GHB)_2$, and either Na•GHB and/or K•GHB. Claim 1 should be found invalid as anticipated in view of the prior art for the reasons discussed below.

Cook Application anticipates Claim 1. Cook Application teaches that "[i]n certain embodiments, the composition may contain one or more salts" and that "salts" "includ[es] salts of GHB" that can "be derived from … sodium, potassium … calcium, [and] magnesium." Cook Application at ¶ 22. Cook Application further discloses that "[i]n certain embodiments, excipients may be added" such as "xylitol, mannitol, lactose, starch, magnesium stearate, sodium saccharine, cellulose, cellulose derivatives, magnesium carbonate and the like." Cook Application at ¶ 22.

The '632 patent anticipates Claim 1. The '632 patent states that "Suitable gamma-hydroxy butyric acid salts include the sodium salt, potassium salt, calcium salt and magnesium salt. In addition to GHB salts, the composition of the present invention can contain one or more non-toxic pharmaceutically acceptable excipients." '632 patent at 7:32-36; *see also* claims 2, 7, and 9. The '632 patent further states that "[t]he composition containing a GHB salt and suitable pharmaceutically acceptable excipients can be formed using various gamma-hydroxy butyric acid salts and excipients." *Id*. at 7:26-31.

The '027 application anticipates Claim 1. The '027 application discloses an oral dosage form of GHB comprising "at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate." '027 application at claim 4. Similarly, the '027 application teaches that "one or more of a GHB drug" can be formulated into an oral dosage form. '027 application ¶ 39.

The '030 patent anticipates Claim 1. The '030 patent claims "pharmaceutical compositions … wherein the salts of gamma-hydroxy-butyric acid are selected from the group consisting of sodium, lithium, potassium, magnesium and calcium salts." '030 patent at claim 6

Thus, Claim 1 is anticipated by any of the Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family), the ’632 patent, the ‘027 application, or the ’030 patent.

**(2) Dependent Claims 15 and 17**

Claim 15 depends on claim 1 and further recites “wherein the mixture comprises Mg•$GHB_2$, Na•GHB, and Ca•$(GHB)_2$.” In other words, claim 15 is directed to a composition of Mg•$GHB_2$, Na•GHB, and Ca•$(GHB)_2$. Claim 15 should be found invalid as anticipated in view of the prior art for the same reasons as discussed above in connection with Claim 1.

Claim 17 depends on claim 1 and further recites “wherein the mixture comprises K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$.” In other words, claim 15 is directed to a composition of K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$. Claim 17 should be found invalid as anticipated in view of the prior art for the same reasons as discussed above in connection with Claim 1.

**(3) Dependent Claims 20-23 and 26-29**

Claims 20-23 and 26-29 depend on claim 1 and further require “comprising an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives,” “wherein the composition has a pH of about 7.3 to about 8.5,” “ wherein the composition additionally comprises a pH adjusting or buffering agent,” “wherein the pH adjusting or buffering agent is an acid,” “wherein the composition is formulated as a liquid formulation,” “wherein the formulation is chemically stable and resistant to microbial growth, and wherein the formulation is free of preservatives,” “which is suitable for oral administration,” and “wherein the formulation is chemically stable and resistant to microbial growth, and wherein the formulation contains at least one preservative.”

These limitations are all expressly disclosed in Cook Application. Cook Application teaches liquid form preparations of the composition of GHB salts, e.g. syrups, aromatic powders, honey, and various elixirs. Cook Application at ¶ 23. Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63. Cook Application discloses that the composition of multiple GHB salts may be formulated for oral consumption. Cook Application at ¶ 26. Cook Application discloses that the gamma-hydroxybutyrate is at a final concentration of about 400 mg/ml to about 600 mg/ml. Cook Application at ¶ 18. Cook Application also teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about 6 to about 7.5l but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Cook Application discloses that "any excipient, salt, acid, pH-mediating, adjusting or buffering compound or agent, flavoring, solution, solvent, dispersion, glycerol, glycol, oil, antibacterial and antifungal agents, antibiotics and antihistamines, binders, disintegrating agents, lubricants, sweetening agents, or any other additive or ingredient from those enumerated above or in the examples, or in any pharmaceutically acceptable composition or carrier described herein, or as would be known by one of skill in the art, is contemplated for use in aqueous mediums or solid forms of the GHB compositions." Cook Application at ¶ 68. Further, Cook Application discloses that "the presence of a preservative may allow the amount of GLIB contained in the compositions of the present invention to be increased and still maintain resistance to chemical degradation and/or microbial growth." Cook Application at ¶ 13, Claim 20.

Thus, Claims 20-23 and 26-29 are anticipated by Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family).

### iv. The Asserted Claims are Invalid as Obvious

At least the references discussed above disclose, either alone or in combination, the limitations of the asserted claims of the '107 patent.[16] Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references together with the knowledge he or she would have possessed, would have readily gleaned the information necessary to develop the claimed formulations; would have had a motivation to develop such formulations; and would have had a reasonable expectation of success in doing so. *See, e.g.*, *KSR*, 550 U.S.at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

As explained below, the asserted claims would have been obvious in view of a host of prior art references. Consequently, there are numerous different combinations of these prior art references and many exemplary references that disclose the claimed method. *See, e.g.*, *Rothman v. Target Corp.*, 556 F.3d 1310, 1320-21 (Fed. Cir. 2009) (when the "entire body of prior art"—or an "evidentiary cornucopia"—renders a patent claim obvious, a trier of fact can fairly rely on "any combination of these references in reaching its obviousness verdict.").

By way of example, the following combinations render the asserted claims obvious:

- One or more of the Xyrem Label, Cook Application or Cook Patent, Ferris, '632 patent, '804 patent, '236 patent, GB '029, '027 application, '030 patent; in view of
- One or more of Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Kesteloot, Dietary Guidelines 2010, Institute of Medicine, EFSA 2006; in further view of

[16] To the extent that any specific limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

- One or more of Mervaala I, Mervaala II, ’878 patent, Sarkkinen, Institute of Medicine, MacGregor, Bighley, Pandit; in further view of
- Smith, Kothare, Krahn; and optionally in combination with
- Either Rowe 2006 and/or Remington’s 2000.

More specifically, at least the following combinations of prior art references are exemplary of the combinations of prior art references that render the asserted claims of the ’107 patent obvious:

By way of example, the following combinations render the asserted claims obvious:

- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family) alone or in combination with the ’878 patent;
- The ’632 patent alone or in combination with the ’878 patent;
- The ‘027 application alone or in combination with the ’878 patent;
- The ’030 patent alone or in combination with the ’878 patent;
- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family) alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- The ’632 patent alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- The ‘027 application alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- The ’030 patent alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Sarkkinen, Mervaala I and II, Karppanen, and Kothare;
- Xyrem Label, Cook Application or Cook Patent, in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- Xyrem Label, Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Sarkkinen, Mervaala I and II, Karppanen, and Kothare;

- Xyrem Label, Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Ubeda, Intersalt, Quanhe, and Van Leer;

- Xyrem Label, Cook Application or Cook Patent, in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen and Smith

- Xyrem Label, Smith, Ferris in combination with the ’878 patent;

- Xyrem Label, ’804 patent, Smith, the ’236 patent, and GB ’029, in combination with the ’878 patent;

- Xyrem Label, Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Sarkkinen, Mervaala I and II, Karppanen, Kothare, Smith, in combination with the ’878 patent, ’804 patent, the ’236 patent, GB ’029, Houston, Kesteloot, Dietary Guidelines 2010, MacGregor, Bighley, and EFSA 2006

- Xyrem Label, Ferris, EFSA 2006, Mervaala I / II, Kothare, and Rowe 2006

- Xyrem Label, the ’632 patent, ‘027 application, ’030 patent, Intersalt, Kesteloot, Mervaala I / II, ‘878 patent, Sarkkinen, Institute of Medicine, and MacGregor in combination with Smith, Kothare, Krahn, and Rowe 2006;

- Xyrem Label, Cook Application or Cook Patent, Ferris, ’632 patent, Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Mervaala I, Mervaala II, ’878 patent, Sarkkinen, Smith, Kothare, and Krahn;

- Xyrem Label, ’804 patent, ’236 patent, GB ’029, ’027 application, ’030 patent, Kesteloot, Dietary Guidelines 2010, Institute of Medicine, EFSA 2006, Institute of Medicine, MacGregor, Bighley, Pandit, Smith, Kothare, and Krahn;

- Xyrem Label, Cook Application or Cook Patent, Ferris, ’632 patent, Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Institute of Medicine, EFSA 2006, Institute of Medicine, MacGregor, Bighley, Pandit, Smith, Kothare, and Krahn

- Xyrem Label, ’804 patent, ’236 patent, GB ’029, ’027 application, ’030 patent, Kesteloot, Dietary Guidelines 2010, Mervaala I, Mervaala II, ’878 patent, Sarkkinen, Smith, Kothare, and Krahn;

Lupin reserves the right to rely on other combinations of prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

As further explained below, a POSA would have been motivated to combine the teachings of these references with a reasonable expectation of success in light of the problem to be solved, the disclosures of the references, and the common subject matter of the references as explained throughout. In addition, Lupin's invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

As explained more fully below, a POSA would have been motivated to combine the teachings of the prior art discussed above to arrive at the claimed capsule. As an initial matter, a POSA would have been motivated to develop a lower-sodium salt GHB alternative given the well-known health concerns related to sodium intake. Moreover, a POSA would have been motivated to use calcium, magnesium and/or potassium salts in formulating a lower sodium salt GHB product.

Finally, a POSA would have reasonably expected to be able to develop the claimed formulations given the teaching of alternative salt forms, including alternative salt forms of GHB disclosed in the prior art as explained below. Thus, a POSA would have been motivated to formulate a reduced sodium GHB formulation, and would have reasonably expected it to work as a replacement for the existing sodium GHB formulation.

**(1) Independent Claim 1**

Claim 1 recites "[a] pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of at least three salts of GHB, wherein the mixture comprises a calcium salt of gamma-hydroxybutyrate ($Ca\bullet(GHB)_2$), a magnesium salt of gamma-hydroxybutyrate ($Mg\bullet(GHB)_2$), and one or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na•GHB) and a potassium salt of gamma-hydroxybutyrate (K•GHB)." In other words, claim 1 is directed to a composition comprising $Ca\bullet(GHB)_2$, $Mg\bullet(GHB)_2$, and either

Na•GHB and/or K•GHB. Claim 1 should be found invalid as obvious to a POSA in view of the prior art for the reasons discussed below.

**a) A POSA would have known that salts of GHB were used for therapeutic purposes**

As of the priority date, salts of GHB were known as therapeutic agents for several different therapeutic purposes. For example, the prior art taught that sodium oxybate ("Na.GHB") (chemically known as sodium γ-hydroxybutyrate; commercially-sold as Xyrem) was known as "a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy." Xyrem Label at 1.

Likewise, the potassium (K.GHB), magnesium ($Mg.(GHB)_2$), and calcium ($Ca.(GHB)_2$) salts of GHB were also well-known alternatives to Na.GHB. For instance, Cook Application discloses a pharmaceutical composition of multiple salts of gamma-hydroxybutyrate in an aqueous medium for the treatment of sleep disorders, including narcolepsy, as well as alcohol and opiate withdrawal, reduced levels of growth hormone, increased intracranial pressure, and physical pain in a patient. Cook Application at abstract.

Ferris teaches method of making salts of GHB and states that "[s]odium, potassium, magnesium and calcium salts of gamma-hydroxybutyrate have been synthesized from gamma-butyrolactone and the corresponding group 1 or 2 hydroxide." Ferris at abstract.

The '632 patent teaches that salts of GHB are useful for treatment of various conditions and also discloses preparing aqueous pharmaceutical compositions comprising GHB salts, including "the sodium, potassium, calcium or magnesium salt." '632 patent at 7:47-50; *see also* claims 2, 7, and 9. Further, the '632 patent teaches that pharmaceutical compositions "can be formed using various gamma-hydroxy butyric acid salts." *Id*. at 7:26-31.

EP ‘804 discloses that salts of GHB “possess[] anxiolytic activity and [are] suitable for the treatment of states of depression.” EP ‘804 at abstract. EP ‘804 further teaches that “[p]referred pharmaceutically acceptable salts of gamma-hydroxybutyric acid for use in the present compositions are lithium-, sodium-, potassium-, calcium-, and magnesium salts.” (EP ‘804 at 2:37-39).

The ’236 patent teaches that “there is a large desire for these [salts of GHB] especially as sleeping agent and as a tranquilizer, since virtually all the known sleeping agents and tranquilizers such as barbiturates, amides, but also diazepams are associated with large side effects upon continuous application, but also directly associated with undesired aftereffects.” ’236 patent at 1:48-54. The ’236 patent also claims “[a] method for the production of magnesium and[] calcium salts of 4-hydroxybutyric acid comprising … reacting … 4-hydroxybutyric acid, … magnesium hydroxide, … [and] calcium hydroxide … in an aqueous solution.” ’236 at claims 6 and 14.

GB ‘029 discloses that the “pharmacological properties” of salts of GHB “promote[] … deep sleep.” GB ’029 at 3:36-49. Further, GB ‘029 teaches using salts of GHB and “especially the alkaline-earth metal salts,” including “the sodium salt” and “the calcium salt.” GB ’029 at 2:53-75.

The ’027 application discloses that salts of GHB “induce[] sleep that closely resembles normal, physiologic sleep” and can be used for treatments including “cataplexy and excessive daytime sleepiness associated with narcolepsy.” ’027 application at ¶¶ 2, 43; claim 42. The ’027 application also teaches an oral dosage form of GHB comprising “at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate.” ’027 application at claim 4. Similarly, the ’027 application teaches that “one or more of a GHB drug” can be formulated into an oral dosage form. ’027 application ¶ 39.

Thus, as of the priority date, a POSA would have known that sodium, potassium, calcium, and magnesium salts of GHB could be formulated into pharmaceutical compositions for therapeutic purposes.

**b) A POSA would have been aware of the drawbacks associated with Na.GHB and its administration to patients**

While a POSA would have known that Na.GHB had been used for therapeutic purposes, a POSA would have also known of the drawbacks associated with Na.GHB and its administration.

**c) Na.GHB and its administration was associated with excessive sodium intake**

A primary concern with administration of Na.GHB was the excessive amount of sodium intake associated with its administration. The recommended starting dose for Xyrem (Na.GHB) is 4.5 g/night, which can be increased (recommended in 1.5 g increments) to a maximum of 9 g/night. Xyrem Label at 22–23. Thus, patients taking sodium oxybate will have an additional daily intake of sodium that ranges from 0.82 g (for a 4.5 g/day dose) to 1.6 g (for a 9 g/day dose). Karpannen discloses that the "Dietary Reference Intakes (DRIs)" "for sodium is 1500 mg a day." Thus, a single 9 g/day dose of Na.GHB exceeds the DRI for sodium.

Because of this excessive intake of sodium, the prior art warned against administering Na.GHB to certain patient populations. For instance, Kothare discloses that because "[t]hree grams of sodium oxybate contains 0.5 g of sodium, while the 9 g dose contains 1.6 g of sodium," that [p]atients with congestive heart failure, hypertension, or renal insufficiency will need to have their daily sodium intake assessed." Kothare at 49 (citing Lemon MD, Strain JD, Farver DK. Sodium Oxybate for cataplexy. Ann Pharmacother. 2006;40:433–40). Krahn also teaches that sodium oxybate "is high in sodium (0.5 grams in a 3-gram dose)" and warns to "[u]se caution when considering the agent for patients with hypertension or on low-sodium diets." Krahn at 4.

Further, the prior art warned that administering Na.GHB is not right for "patients with heart failure, hypertension or compromised renal function" due to the "daily sodium intake" in taking Na.GHB. *See, e.g.*, Xyrem Label at 11. For instance, under the section on "Precautions" Xyrem Label warns that "[d]aily sodium intake in patients taking sodium oxybate … should be considered in patients with heart failure, hypertension or compromised renal function." Xyrem Label at 11. Xyrem Label further reports "hypertenson" as a "[f]requent" "[v]ascular disorder[]." Xyrem Label at 20. Xyrem Label also warns patients to tell their doctor if they "are on a salt-restricted diet, have high blood pressure, heart failure, or kidney problems" because "Xyrem contains a lot of sodium (salt) and may not be right for [them]." Xyrem Label Medication Guide at 2.

It was also well-known "that higher sodium intake is associated with increased total mortality in the general US population." Quanhe at 1183. For instance, Intersalt studied the relationship between "electrolyte excretion and blood pressure" and showed that "sodium was significantly related to the slope of blood pressure" and concluded that increasing long-term intake of dietary sodium was shown to increase blood pressure across all study populations and age ranges. Intersalt at abstract. Institute of Medicine states that "excess sodium intake is strongly associated with elevated blood pressure, a serious public health concern related to increased risk of heart disease, stroke, congestive heart failure, and renal disease." Institute of Medicine at Preface. Further, "[i]ncreased dietary sodium [] intake produced a marked rise in blood pressure" as well as other negative side effects. Mervaala I at abstract. The Mervaala II study teaches that "[sodium] produced a marked rise in blood pressure and induced cardiac hypertrophy and significant mortality, while the salt alternative neither increased blood pressure nor caused any mortality and produced less cardiac hypertrophy than salt." Mervaala II at Abstract. Quanhe teaches that "a higher sodium-potassium ratio is associated with significantly increased risk of

[cardiovascular diseases] and all-cause mortality, and that higher sodium intake is associated with increased total mortality in the general US population." Quanhe at 1183. Ubeda discloses a study aimed at "[r]aised blood pressure associated with the sodium … content" of an orally administered drug. Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension. Sarkkinen at abstract. Karppanen discloses that "[t]he present average sodium intakes, approximately 3000–4500 mg/day in various industrialised populations, are very high, that is, 2–3-fold in comparison with the current Dietary Reference Intake (DRI) of 1500 mg." Karppanen at abstact.

Thus, a POSA would have known that administration of Na.GHB causes an excessive intake of sodium that could contribute to negative health effects.

**d) Na.GHB had an undesirable flavor**

A POSA also would have known that oral administration of Na.GHB had an unpleasant taste. For instance, Smith discloses sodium oxybate "has an unpleasant, salty taste that is often described as soapy." Smith at 1074. Similarly, Kothare also states that patients reported that Na.GHB had a "bad taste" and that "issues reovle[d] around [its] "salty taste." Kothare at abstract, Table 2. Krahn also discloses that sodium oxybate "has a salty taste." Krahn at 4. Thus, a POSA would have known that Na.GHB causes an unpleasant taste when administered to patients.

**e) Other problems were associated with Na.GHB**

Additionally, Na.GHB was associated with other problems such as preparation, manufacture, and formulation issues. For instance, it was known that "[t]he sodium salts of the 4-hydroxybutyric acid are hygroscopic," may not be "suitable for crystallization" and cause "difficulties of production and handling" that "are also very expensive." '236 patent at 1:14-47. Thus, a POSA would have known that there were issues associated with the production and

formulation of Na.GHB, which would have motivated a POSA to explore other compositions and formulations for administering GHB.

#### f) To address drawbacks associated with Na.GHB, a POSA would have been motivated to prepare a mixture of salts of GHB

To avoid the drawbacks associated with Na.GHB and its administration, a POSA would have been motivated to prepare a composition of mixed salts of GHB, including sodium, calcium, magnesium, and potassium GHB salts.

#### g) A POSA would have been motivated to use calcium, magnesium, and potassium salts of GHB to lower the intake of sodium

A POSA would have sought to prepare a composition that reduces the intake of sodium associated with administration of Na.GHB. For instance, Institute of Medicine stated that it was a goal of "health initiatives to address the high levels of sodium" and also disclosed that "sources of dietary sodium" includes drugs which "can contribute to sodium intake." Institute of Medicine at Preface; 122. A POSA would have known that decreasing the intake of sodium would have had a beneficial effect. For instance, Mervaala II teaches that "reduction in the intake of sodium chloride has an antihypertensive effect." Mervaala II at 1189. Quanhe further discloses that a reduced sodium intake could lead to greater health benefits. Quanhe at 1183. Karppanen taught that "[d]ecreased intakes of sodium alone … decrease elevated blood pressure." Karppanen at abstract. Indeed, it was well-known that that "reduction in the intake of sodium [] has an antihypertensive effect," as well as other beneficial effects. *See, e.g.,* Mervaala II at 1189.

In particular, a POSA would have known that reducing sodium intake could be achieved by reducing the sodium content of a drug. For instance, Ubeda discloses a study aimed at "[r]aised blood pressure associated with the sodium … content" of an orally administered drug. Ubeda at

abstract. Ubeda observed patients that were administered paracetamol with sodium content and followed by administration of paracetamol with "no sodium content." Ubeda at abstract. Ubeda observed that "[s]witching to paracetamol tablets (no sodium content) was associated with both lowered systolic pressure of 13.1 mmHg (95%CI: 11.9–14.3, $p < 0.0001$) and a moderate reduction of diastolic pressure of 2.5 mmHg (95%CI: 2.1–2.9, $p < 0.0001$)." Ubeda at abstract. Ubeda concluded that "[a] relationship of causality between the intake of high sodium excipients and high blood pressure in elderly hypertensive individuals, without chloride ions, was found" and warned that "[c]linicians should be aware of possible raised blood pressure" when these high sodium drugs "are prescribed to hypertensive patients." Ubeda at abstract. Thus, Ubeda shows that switching from a drug formulation high in sodium to a drug formulation with lower sodium content can have beneficial health effects.

The prior art also taught strategies for how to reduce sodium content in a composition. For instance, the '878 patent teaches "a low sodium salt composition and the methods used to make it." '878 patent at abstract. Because "[e]xceeding the recommended daily intake of sodium is a significant risk factor in developing high blood pressure and a cause or contributing factor in the rising incidence of heart disease," the '878 patent teaches that "medical professionals and governmental authorities recommend a reduction in per capita salt consumption." '878 patent at 1:29-35. Thus, the '878 patent sought to provide methods to prepare low sodium salt compositions. The '878 patent teaches that "there are a variety of salt substitutes in the market" and "[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios." '878 patent at 1:43-46. The '878 patent teaches that suitable low sodium compositions "preferably" include salts of "potassium, magnesium, calcium, ammonium, and combinations thereof." '878 patent at 2:63-

67; *see also* claims 7, 28, 48 ("potassium, magnesium, calcium, ammonium, and a mixture thereof"). Thus, the "low sodium salt composition of the invention has lower sodium content." '878 patent at 3:61-67. The '878 patent also discloses several example formulations of low sodium compositions. '878 patent at Examples 1-3. A POSA would have known that this same strategy could be employed with GHB—i.e., a "low sodium" GHB salt composition could be prepared by combining the sodium, potassium, magnesium, and calcium salts of GHB.

Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl). Mervaala I at abstract; *see also* Mervaala II at abstract. The "salt alternative ha[d] the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%. Therefore, the sodium chloride concentration was 43% lower in the salt alternative." Mervaala I at 640-641. Mervaala I concluded that "replacement of common salt by a potassium-, and magnesium-enriched salt … produces beneficial cardiovascular effects." Mervaala I at abstract. A POSA would have known that this same strategy could be employed with GHB—i.e., a GHB salt composition could be "sodium-reduced" by using a combination of sodium, potassium, and magnesium salts. Mervaala I at abstract; *see also* Mervaala II at abstract.

Likewise, Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension whereas a restriction of dietary [sodium chloride] lowers blood pressure (BP)" and that "[s]ubstituting potassium and/or magnesium salts for sodium chloride (NaCl) may enhance the feasibility of [sodium chloride] restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. Thus Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Sarkkinen

concluded that "that potassium and magnesium could potentiate the effect of sodium restriction on reducing [blood pressure]" and that "[t]his effect is in line with earlier clinical trials with mineral salts." Sarkkinen at 6. A POSA would have known that this same strategy could be employed with GHB—i.e., a GHB salt composition could be "sodium-reduced" by using substituted salts. Sarkkinen at abstract.

Further, Karppanen discloses that "[t]he present average sodium intakes, approximately 3000–4500 mg/day in various industrialized populations, are very high, that is, 2–3-fold in comparison with the current Dietary Reference Intake (DRI) of 1500 mg." Karppanen at abstract. "By contrast, the present average potassium, calcium, and magnesium intakes are remarkably lower than the recommended intake levels (DRI). In USA, for example, the average intake of these mineral nutrients is only 35–50% of the recommended intakes." Karppanen at abstract. Karppanen further states that "[d]ecreased intakes of sodium alone, and increased intakes of potassium, calcium, and magnesium each alone decrease elevated blood pressure. A combination of all these factors, that is, decrease of sodium, and increase of potassium, calcium, and magnesium intakes, which are characteristic of the so-called Dietary Approaches to Stop Hypertension diets, has an excellent blood pressure lowering effect." Karppanen at abstract. A POSA would have found it obvious to use the teachings of Karppanen—to decrease sodium content and increase potassium, calcium, and magnesium content—to prepare a combination of sodium, potassium, and magnesium salts of GHB.

Likewise, MacGregor reports on studies aimed to reduce sodium intake and of "the long-term effects of salt reduction on CVD," and states that "[a]n increase in potassium intake through the use of reduced-sodium, potassium- and magnesium-enriched salt … played a part in the fall in CVD." MacGregor at 369. In another study that MacGregor describes, patients "switch[ed] from

the usual salt to potassium-enriched salt (49% sodium chloride, 49% potassium chloride, 2% other additives) with a subsequent reduction of 17% in salt intake and an increase of 76% in potassium intake [which] resulted in a 40% decrease in CVD mortality." MacGregor at 370.

Similarly, Institute of Medicine teaches "[p]artially replacing [sodium] salt with other compounds, such as potassium chloride and calcium chloride" to reduce sodium intake. Institute of Medicine at 97; see also Table 4-4; Table D-1 ("Mixtures of NaCl substitutes … consist of a number of ingredients such as non-sodium salts."). Houston describes the "DASH study" and states that a diet "rich in calcium, magnesium, and [potassium]" contributed to a reduction in blood pressure. Houston at 4. Kesteloot concludes that "[a] higher sodium intake increases blood pressure, whereas a higher intake of calcium and magnesium, whenever significant, decreases blood pressure" and that a "negative relationship between urinary 24-hour potassium excretion and blood pressure have been found." Kesteloot at 598 Dietary Guidelines 2010 also reports on how "typical American diets compare to recommended intake levels" and states that Americans should "eat more" potassium and calcium and "eat less" sodium." Dietary Guidelines 2010 at 46, Figure 5-1.

Bighley teaches that when pharmaceutical salts for oral dosage forms, the sodium salt should be used "if the patient does not have a restriction on sodium intake," but teaches that "[i]f the sodium salt process to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium, or zinc." *Id*. at 482-83. Thus, a POSA would have known that Na.GHB was undesirable due to patients having a restriction on sodium intake and would have therefore been motivated to prepare a composition containing the potassium, calcium, and magnesium salts of GHB.

The prior art teaches how to prepare sodium, magnesium, calcium, and potassium salts of acidic drug compounds, including the stoichiometric ratio of the metal cation to drug compound. *See* Pandit at Table 1.

Thus, a POSA would have been motivated to produce a low sodium content composition by using mixed salts including sodium, magnesium, calcium, and potassium salts of GHB.

**h) A POSA would have been motivated to use magnesium, calcium, and potassium salts due to the benefits associated with increased intake of those minerals**

In addition to the motivation to reduce sodium content, a POSA would have been motivated to use magnesium, calcium, and potassium salts of GHB due to the benefits associated with increased intake of magnesium, calcium, and potassium.

For example, it was well known that increasing intake of magnesium, calcium, and potassium had beneficial effects. Karppanen states that in contrast to the high levels of sodium intake, "the present average potassium, calcium, and magnesium intakes are remarkably lower than the recommended intake levels (DRI). In USA, for example, the average intake of these mineral nutrients is only 35–50% of the recommended intakes." Karppanen at abstract. Karpannen further teaches that "[t]here is convincing evidence, which indicates that this imbalance, that is, the high intake of sodium on one hand and the low intakes of potassium, calcium, and magnesium on the other hand, produce and maintain elevated blood pressure in a big proportion of the population." Karppanen at abstract. Further, "[d]ecreased intakes of sodium alone, and increased intakes of potassium, calcium, and magnesium each alone decrease elevated blood pressure. A combination of all these factors, that is, decrease of sodium, and increase of potassium, calcium, and magnesium intakes, which are characteristic of the so-called Dietary Approaches to Stop Hypertension diets, has an excellent blood pressure lowering effect." Karppanen at abstract.

Mervaala I discloses the importance of intake of magnesium, calcium, and potassium. For example, Mervaala I teaches that "[i]ncreased intake of potassium and/or magnesium … from the salt alternative is involved in the beneficial effects" because it "produces beneficial cardiovascular effects and improves the antihypertensive efficacy." Mervaala I at Abstract. Mervaala I also taught that "increased calcium intake dose dependently augmented urinary excretion of sodium and reduced the arterial wall sodium/potassium ratio suggesting an important interaction between these two electrolytes in the regulation of blood pressure and vascular responses (Wuorela et al., 1992)." Mervalla I at 647.

Similarly, Mervaala II teaches that a "sodium-reduced, potassium- and magnesium-enriched salt alternative was virtually devoid of the hypertensive and cardiac hypertrophy producing effects, typical of NaCl" and that "[t]his effect was due to increased intake of potassium and/or magnesium." Mervaala II at 1196.

Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension whereas a restriction of dietary salt lowers blood pressure (BP)" and that "[s]ubstituting potassium and/or magnesium salts for sodium chloride (NaCl) may enhance the feasibility of salt restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. Sarkkinen further teaches that "[t]he supplementation of potassium and magnesium to a low-sodium diet may enhance the antihypertensive effect of a low-sodium diet, and thus be useful in treating hypertension. Potassium has a natriuretic effect, promoting the excretion of sodium salts in the urine. Intake of magnesium may also support BP lowering by reducing vascular resistance." Sarkkinen at 1-2. Sarkkinen concluded that "that potassium and magnesium could potentiate the effect of sodium restriction on reducing [blood pressure]" and that "[t]his effect is in line with earlier clinical trials with mineral salts." Sarkkinen at 6.

Other references have similar teachings about the benefits associated with increased intake of magnesium, calcium, and potassium. Quanhe concludes that "[p]ublic health recommendations should emphasize simultaneous reduction in sodium intake and increase in potassium intake." Quanhe at 1189. Quanhe teaches that "[s]odium-potassium ratios can be improved by lowering sodium intake, by raising potassium intake, or both." Quanhe at 1191. Van Leer studied the "relation between blood pressure and dietary calcium, potassium and magnesium and the combined effect of these minerals on blood pressure" and concluded that "diets rich in calcium, potassium and magnesium are associated with lower blood pressure." Van Leer at Abstract. Intersalt studied the relationship between "electrolyte excretion and blood pressure" and showed that "[p]otassium excretion was negatively correlated with blood pressure in individual subjects after adjustment for confounding variables." Intersalt at abstract. Institute of Medicine teaches that "one strategy to reduce [sodium] intake would be to encourage increased calcium consumption." Institute of Medicine at 77.

Thus, a POSA would have been motivated to increase the content of magnesium, calcium, and potassium salts of GHB relative to the content of Na.GHB in order to provide for increased intake of magnesium, calcium, and potassium.

**i) A POSA would have been motivated to use alternative salts to make a better tasting composition**

Due to the relatively high dosage range for administering GHB, (e.g., up to 9 g/night of Na.GHB), a POSA would have known that GHB salt form will affect the taste of the composition. Xyrem Label at 22–23. Further, as explained above, a POSA would have known that the unpleasant salty taste associated with Na.GHB was due to the high level of sodium associated with its administration. Thus, a POSA would have been motivated to use alternative salt forms of GHB to make a better tasting composition.

For instance, the prior art generally teaches the use of magnesium, potassium, and calcium salts to improve the taste of a composition of pharmaceutical salts. For instance, Bighley teaches that "[t]aste acceptability is a primary consideration in the formulation of a liquid" and provides "examples [of] approaches to make drugs organoleptically acceptable." Bighley at 465 (citing Roy, G .M., *Pharm . Technol. ,* 18:84,86,88 ,90,92,94,96-99 (1994) (April)). Bighley explains that one of those approaches is that "[t]he taste of a drug may be improved by formation of a soluble salt." Bighley at 466-467. Bighley also teaches that "[i]f the sodium salt proves to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium, or zinc," but cautions that "metal salts can cause taste problems" which should be taken into consideration. *Id*. at 483. Bighley explains that "[f]or example, potassium salts frequently have an unpleasant taste and leave a metallic aftertaste … but that "potassium salts showed … varying degrees of palatability at therapeutic potassium concentrations." Bighley at 466-467. Thus, a POSA would have been motivated to vary the concentration of the salts, such as the potassium salt, in order to achieve a palatable taste profile of the composition of GHB salts.

Further, Bighley taught that varying concentration levels of potassium salts can results in "varying degrees of palatability," and a POSA would have known that varying the relative concentrations of the sodium, magnesium, potassium, and calcium salts of GHB could result in varying degrees of palatability. For instance, a POSA would have reasonably expected that a composition comprising 100% of a magnesium, potassium, or calcium salt would have likely "cause[d] taste problems" because these are "metal salts." Bighley at 483. But a POSA would have reasonably expected that any taste issues associated with any one salt could be reduced by reducing the concentration of that salt and correspondingly increasing the concentration of other GHB salts. Thus, a POSA would have reasonably expected that by varying concentration levels of the sodium,

magnesium, potassium, and calcium salts of GHB could result in a composition with a palatable taste profile.

Similarly, the ’878 patent teaches that to lower the sodium content of a salt composition, a low sodium salt composition comprising “potassium, magnesium, calcium, ammonium, and combinations thereof” should be utilized. ’878 patent at abstract; claims 7, 28, 28. The’878 patent teaches to perform “[s]ensory tests … to analyze the taste characteristics” of those low-sodium content salt compositions. For instance, the ’878 patent teaches that “salt substitutes containing potassium” can be associated with a “generally metallic/bitter taste” than can be “reduce[d]” or “mask[ed]” with certain additives. ’878 patent at 1:48-53. The examples of low sodium salt compositions disclosed in the ’878 patent had favorable taste profiles. *See* ’878 patent at Tables 2-5.

Like the ’878 patent, Sarkkinen teaches that “[s]ubstituting potassium and/or magnesium salts for sodium [salts] may enhance the feasibility of [sodium] restriction and lower blood pressure beyond the sodium reduction alone.” Sarkkinen at abstract. Sarkkinen noted that “[t]he taste profile of test products was good” for the low-sodium content composition comprising sodium, potassium, and magnesium salts. Sarkkinen at 7-8.

Further, Institute of Medicine teaches that “potassium” is “often used in lowered-sodium formulations” as an alternative to sodium salts and that it “tastes both salty and bitter (this bitterness is one reason it is often not fully successful in replacing the sensory effects of salt).” Institute of Medicine at 71.

Thus, a POSA would have been motivated to produce a low sodium content composition by using mixed salts including sodium, magnesium, calcium, and potassium salts of GHB and to vary the concentration of the salts in order to achieve a palatable taste profile.

#### j) Additional reasons would have motivated a POSA to use alternative salts of GHB

In addition to the reasons discussed above, a POSA would have considered other factors when deciding to use a composition comprising sodium, magnesium, calcium, and potassium salts of GHB. For instance, it was known that "[t]he sodium salts of the 4-hydroxybutyric acid are hygroscopic," may not be "suitable for crystallization" and cause "difficulties of production and handling" that "are also very expensive." '236 patent at 1:14-47. The '236 patent discloses that the "calcium and magnesium salts . . . from 4-hydroxybutyric acid are solid, nonhygroscopic and storable and they can be recrystallized. . . . They dissolve in water to a clear solution and they can be dispensed as injection solutions, but also as drops, or in drinks or as suppositories while maintaining a *stable situation*." (*Id.* at col. 4, ll. 39-47 (emphasis added)). Thus, a POSA would have been further motivated to prepare a composition comprising Ca•$(GHB)_2$, Mg•$(GHB)_2$, and either Na•GHB and/or K•GHB.

#### (2) Dependent claim 2

Claim 2 depends on claim 1 and further requires "wherein the mixture comprises Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$, and wherein the amount of Na•GHB is present at a wt/wt % of about 5% to about 40%." Claim 2 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to reduce to Na.GHB salt present to a range between 5% and 40% wt/wt % in order to reduce the sodium intake associated with administering GHB and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and renders obvious the use of low sodium salt compositions. For instance, the '878 patent teaches that a "low sodium salt composition may comprise "about 10-90%, lower sodium" and "[m]ore preferably, the composition contains about

25%, 30%, 35%, 45%, 50%, 55% or 75% lower sodium," and "[m]ore preferably, the composition contains about 50% less sodium." '878 patent at 3:61-67. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%. Therefore, the sodium chloride concentration was 43% lower in the salt alternative." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB.[17]

[17] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitation would have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the mixture comprises Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$, and wherein the amount of Na•GHB is present at a wt/wt % of about 5% to about 40%."

**(1) Dependent claim 3**

Claim 3 depends on claim 1 and further requires "wherein a Na•GHB salt is present in a wt/wt % of about 5% to about 10%." Claim 3 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to reduce to Na.GHB salt present to a range between 5% and 10% wt/wt % in order to reduce the sodium intake associated with administering GHB and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and renders obvious the use of low sodium salt compositions. For instance, the '878 patent teaches that a "low sodium salt composition may comprise "about 10-90%, lower sodium" and "[m]ore preferably, the composition contains about 25%, 30%, 35%, 45%, 50%, 55% or 75% lower sodium," and "[m]ore preferably, the composition contains about 50% less sodium." '878 patent at 3:61-67. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%. Therefore, the sodium chloride concentration was 43% lower in the salt alternative." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at

abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB.[18]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein a Na•GHB salt is present in a wt/wt % of about 5% to about 10%."

**(2) Dependent Claim 4**

Claim 4 depends on claim 1 "wherein the K.GHB salt is present in a wt/wt % of about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%." Claim 4 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to use K.GHB in a range of 5% to 40% wt/wt % in order to to reduce Na.GHB salt present, to increase the intake of potassium due to its associated health benefits, and also to produce a composition with a palatable taste profile.

[18] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitation would have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

Further, prior art references disclose and render obvious the use of composition of mixed salts of GHB where the K.GHB salt is present in a wt/wt % of 5%-40%. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB. [19]

---

[19] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the K.GHB salt is present in a wt/wt % of about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%."

**(3) Dependent Claim 5**

Claim 5 depends on claim 1 "wherein the Mg.$(GHB)_2$ salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, or about 25% to about 30%." Claim 5 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to use Mg.$(GHB)_2$ in a range of 5% to 30% wt/wt % in order to reduce Na.GHB salt present, to increase the intake of magnesium due to its associated health benefits, and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and render obvious the use of compositions of mixed salts of GHB where the Mg.$(GHB)_2$ salt is present in a wt/wt % of 5%-30%. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg

an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB. [20]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the Mg.$(GHB)_2$ salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, or about 25% to about 30%."

**(4) Dependent Claim 6**

[20] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

Claim 3 depends on claim 2 "wherein the Ca•$(GHB)_2$ salt is present in a wt/wt % of about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, about 35% to about 40%, about 40% to about 45%, about 45% to about 50%, or about 50% to about 55%." Claim 6 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to use Ca.$(GHB)_2$ in a range of 20% to 55% wt/wt % in order to reduce Na.GHB salt present, to increase the intake of calcium due to its associated health benefits, and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and render obvious the use composition of mixed salts of GHB where the Ca.$(GHB)_2$ salt is present in a wt/wt % of 20%-55%. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and

preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB. [21]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the $Ca\bullet(GHB)_2$ salt is present in a wt/wt % of about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, about 35% to about 40%, about 40% to about 45%, about 45% to about 50%, or about 50% to about 55%."

**(5) Dependent Claims 7-11, 16, and 18**

Claims 7-11, 16, and 18 depend on claim 1 and further recite claimed wt/wt% values and ranges for the salts of GHB recited in claim 1. As explained above, the prior art discloses all of these values and ranges. For example, the Cook Application teaches that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied to

[21] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

achieve a suitable dosage. Further, it would have been within the knowledge and skill of a POSA to arrive at the weight percent of a salt of GHB.[22] Therefore, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB according to the claimed wt/wt% values and ranges.

**(6) Dependent Claims 12 and 14**

Claim 12 and 14 depend on claim 2 and further recite claimed wt/wt% ratios for the salts of GHB recited in claim 1. As explained above, the prior art taught and renders obvious these claimed wt/wt% ratios. For instance, the ‘878 patent teaches that a “low sodium salt composition may comprise a “modified chloride salt” “consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof” that “may include from about 2.5% to about 80% by weight of the “modified chloride salt” and “[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt.” ’878 patent at 3:1-6; claims 7, 28, 48. The ’878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. ’878 patent at Table 1. Similarly, Mervaala I discloses a “sodium-reduced” composition as an alternative to sodium chloride (NaCl) comprising “the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%.” Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of “NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate

[22] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the “discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art.” *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

(25%)] (Smart Salt).” Sarkkinen at abstract. Further, Cook Application discloses that “[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained.” Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds and the weight percent of each active compound can be varied.

Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB to obtain the claimed wt/wt% ratios. For instance, a POSA could have varied the weight percent of the salts of GHB to account for daily recommended doses of sodium, potassium, magnesium, and calcium. For instance, Karpannen discloses that the “Dietary Reference Intakes (DRIs)” “for sodium is 1500 mg a day, while 2500 mg has been given as the maximum level of daily intake that is likely to pose no risk of adverse effects;” “potassium for adolescents and adults is 4700 mg/day. Recommended intake of potassium for children 1–3 years of age is 3000 mg/day, for 4–8 years of age it is 3800 mg/day, and for 9–13 years of age it is 4500 mg/day;” “for calcium are 1000–1300 mg per day. Therefore, the usual USA intakes are only 35–40% of the DRIs;” and “magnesium intake recommendation is 420 mg for adult men” and that “the usual USA intake of 180 mg is only approximately 50% of the recommended level.” Karpannen at S12. As described above, Dietary Guidelines 2010 reports recommended daily allowances for calcium, magnesium, potassium, and sodium that are similar to Karpannen. Dietary Guidelines 2010 at Appendix 5. Further, Kesteloot describes a study of the relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure and reports that men and women

exceed these recommended intake levels for sodium, but fall short of the recommended intake levels for potassium, calcium, and magnesium. Kesteloot at Table 2.

Likewise, a POSA would have known of the optimal and/or recommended blood concentration levels of these minerals and their importance. For example, EFSA 2006 states that "oral Mg supply has to be considerably increased to increase plasma Mg" and discloses "[o]ptimal concentration" values of plasma Mg, such as 0.80 – 1.10 mmol/L. EFSA 2006 at 111. EFSA 2006 states that calcium intake is "very important" because it "helps to maintain a constant concentration of blood calcium" at about "2.5 mmol/L (10 mg/dL) (between 2.25 and 2.75 mmol/L)." EFSA 2006 at 215. EFSA 2006 discloses that potassium intake "is important for regulating … nerve and muscle function, blood pressure regulation, etc.," and states that "[t]he concentration of potassium in plasma is … about 3.5 to 5 mmol/L." EFSA 2006 at 411-412. Further, as discussed above, a POSA would have known that certain "population[s] could most benefit from increased potassium, magnesium, and calcium." Houston at 9-10; see also Karppanen at S14 ("Although the diets in different populations may differ considerably … the essential features are similar in all industrialised populations … the sodium level is very high while the levels of potassium and magnesium are very low. In most populations, the level of calcium is also low." A POSA would have known that the deficient intake of potassium, magnesium, and calcium could impact the blood concentration levels of these minerals.

Because of this imbalance—that patients consume too much sodium and not enough potassium, calcium, and magnesium—a POSA would have been motivated to formulate a composition of sodium, potassium, calcium, and magnesium salts of GHB in order to compensate for this imbalance. In particular, a POSA would have been motivated to vary the ratio of the sodium, potassium, calcium, and magnesium salts of GHB so that patients' intake of sodium is

decreased closer to the daily recommended levels and patients' intake of potassium, calcium, and magnesium is increased closer to the daily recommended levels. Similarly, a POSA would have been motivated to vary the ratio of the sodium, potassium, calcium, and magnesium salts of GHB so that patients' blood concentration levels of these minerals trend closer to their optimal and/or recommended levels.

To optimize this formulation for daily recommended levels, a POSA could perform routine experimentation. For instance, intake of sodium, potassium, calcium, and magnesium can be indirectly measured by measuring the levels excreted from the body. A POSA could conduct routine experimentation to administer compositions with various levels of the sodium, potassium, calcium, and magnesium salts of GHB and then measure the corresponding levels excreted from the body. In this manner, a POSA could optimize for a composition to target daily recommended levels of sodium, potassium, calcium, and magnesium. Such optimization would have been obvious and routine to a POSA. Moreover, the '878 patent teaches that "there are a variety of salt substitutes in the market" and "[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios." '878 patent at 1:43-46.

Thus, a POSA would have found it obvious to adjust the ratios of the salts of GHB to account for daily recommended doses of sodium, potassium, magnesium, and calcium while also factoring in that patients generally exceed the daily recommended dose for sodium but do not meet the recommended levels for potassium, magnesium, and calcium. Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB comprising the claimed wt/wt% ratios according to claims 12 and 14.

**(1) Dependent Claims 15 and 17**

Claim 15 depends on claim 1 and further recites "wherein the mixture comprises Mg•$GHB_2$, Na•GHB, and Ca•$(GHB)_2$." In other words, claim 15 is directed to a composition of Mg•$GHB_2$, Na•GHB, and Ca•$(GHB)_2$. Claim 15 should be found invalid as obvious in view of the prior art for the same reasons as discussed above in connection with Claim 1.

Claim 17 depends on claim 1 and further recites "wherein the mixture comprises K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$." In other words, claim 15 is directed to a composition of K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$. Claim 17 should be found invalid as obvious in view of the prior art for the same reasons as discussed above in connection with Claim 1.

**(2) Dependent Claim 20**

Claim 20 depends on claim 1 and further requires that the composition "compris[es] an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives." The prior art discloses these limitations of claim 20. For instance, Cook Application discloses that the gamma-hydroxybutyrate is at a final concentration of about 150 mg/ml to 750 mg/ml. Cook Application at ¶ 18. Cook Application also teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about 6 to about 7.5 but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Further, Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63; *see also* Xyrem Label at 2. Further, the '632 patent discloses compositions of GHB salts that are "free of preservatives. *Id.* at 8:57-59. Thus, a POSA would have found it obvious to not include a preservative. Therefore, a POSA would have found it obvious to prepare a composition with an aqueous solution of about 250 mg/mL to about 750

mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.

**(3) Dependent Claims 21-23**

Claims 21-23 depend on claim 20 and further require that "the composition has a pH of about 7.3 to about 8.5," "the composition additionally comprises a pH adjusting or buffering agent," and "wherein the pH adjusting or buffering agent is an acid," respectively. These claims are rendered obvious for the same reasons as described above in connection with claims 1 and 20. Also, Xyrem Label discloses an oral solution of Na.GHB "neutralized to pH 7.5 with malic acid." Xyrem Label at 2. Further, Cook Application teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about 6 to about 7.5 but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Cook Application discloses that the composition of GHB salts may comprise "pH adjusting agents such as acids, bases and buffering agents." Cook Application at ¶ 12. Cook Application teaches that the composition may comprise malic acid, citric acid, acetic acid, boric acid, lactic acid, hydrochloric acid, phosphoric acid, sulfuric acid, sulfonic acid, and nitric acid. Cook Application at claim 35. Therefore, a POSA would have found it obvious to prepare compositions according to claims 21-23.

**(4) Dependent Claims 26-29**

Claims 26-29 depend on claim 1 and further require that "the composition is formulated as a liquid formulation," "the formulation is chemically stable and resistant to microbial growth, and wherein the formulation is free of preservatives," that the formulation "is suitable for oral administration," and that the formulation "is chemically stable and resistant to microbial growth, and wherein the formulation contains at least one preservative," respectively.

Cook Application teaches liquid form preparations of the composition of GHB salts, e.g. syrups, aromatic powders, honey, and various elixirs. Cook Application at ¶ 23. Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63. Cook Application discloses that the composition of multiple GHB salts may be formulated for oral consumption. Cook Application at ¶ 26. Cook Application discloses that the gamma-hydroxybutyrate is at a final concentration of about 400 mg/ml to about 600 mg/ml. Cook Application at ¶ 18. Cook Application discloses that "any excipient, salt, acid, pH-mediating, adjusting or buffering compound or agent, flavoring, solution, solvent, dispersion, glycerol, glycol, oil, antibacterial and antifungal agents, antibiotics and antihistamines, binders, disintegrating agents, lubricants, sweetening agents, or any other additive or ingredient from those enumerated above or in the examples, or in any pharmaceutically acceptable composition or carrier described herein, or as would be known by one of skill in the art, is contemplated for use in aqueous mediums or solid forms of the GHB compositions." Cook Application at ¶ 68. GB '029 discloses example oral liquid formulations of salts of GHB containing flavoring agents such as "sugar (glucose, levulose or sorbitol)." GB '029 at 5:22-30.

Further, Xyrem is a composition of a GHB salt formulated as a liquid. Xyrem Label. Further, Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63. Further, the '632 patent discloses compositions of GHB salts that are "free

of preservatives. *Id.* at 8:57-59. Thus, a POSA would have found it obvious to not include a preservative.

Further, Cook Application discloses that "the presence of a preservative may allow the amount of GLIB contained in the compositions of the present invention to be increased and still maintain resistance to chemical degradation and/or microbial growth." Cook Application at ¶ 13, Claim 20. Thus, a POSA would have also found it obvious to include a preservative to formulate a composition that is chemically stable and resistant to microbial growth.

Therefore, a POSA would have found it obvious to prepare compositions according to claims 26-29.

**(5) No Objective Indicia**

Lupin is unaware of any evidence of secondary considerations that would render the particular combination of claim elements found in the '107 patent non-obvious, as described below and incorporated herein by reference. For example:

- *Long-Felt Need:* Lupin is not aware of any evidence to support a claim that the '107 patent resolved a long-felt need.
- *Failure of Others:* Lupin is not aware of any evidence of failure of others that reflects any non-obviousness of the subject matter of the '107 patent.
- *Skepticism of Those of Skill in the Art:* Lupin is not aware of any skepticism of those skilled in the art with respect to the subject matter of the '107 patent.
- *Licensing:* Lupin is not aware of any licensing of the '107 patent that may be reflective of non-obviousness of the subject matter of that patent.
- *Commercial Success:* Lupin is not aware of any evidence linking any product sales made to the '107 patent, as opposed to marketing, endorsements, other patents or marketing exclusivities, or other factors unrelated to the alleged invention of the '107 patent. *See Merck*, 395 F.3d at 1376-77. Further, nothing submitted during prosecution of the '107 patent establishes commercial success. On at least these bases, Lupin is aware of no commercial success that could support a claim of non-obviousness.

- *Recognition in the Industry:* Lupin is not aware of any recognition in the industry for the '107 patent.

- *Acquiescence:* Lupin is not aware of any evidence of acquiescence to the validity of the '107 patent.

- *Copying:* Lupin is not aware of any copying that could support a claim of non-obviousness of the subject matter of the '107 patent. *See, e.g.*, *Bayer Healthcare*, 713 F.3d at 1377; *Purdue*, 377 F. App'x at 983; *Santarus*, 2010 WL 1506017, at *26; *Aventis*, 2006 WL 2008962, at *45.

- *Unexpected Results:* Lupin is not aware of any evidence of unexpected results with respect to the '107 patent. Rather, as explained above a person of ordinary skill in the art would have reasonably expected to be able to successfully formulate a composition of mixed salts of GHB.

- *Teaching away:* Lupin is not aware of any prior art teaching away from formulating a composition of mixed salts of GHB. To the contrary, as explained above, the prior art taught a person of ordinary skill in the art to reduce the sodium content by using alternative salts including magnesium, potassium, and calcium.

Additionally, as noted above, the patentee must prove the required nexus before relying on *any* secondary considerations of alleged non-obviousness. *Muniauction*, 532 F.3d at 1327-28. Lupin is not aware of any evidence that would establish the required nexus for the claims of the '107 patent.

Thus, for at least these reasons, claims 1-12, 14-18, 20-23, and 26-29 of the '107 patent are invalid for obviousness.

**b. Lack of Enablement**

Alternatively, to the extent the claims are not rendered obvious as discussed above, the claims of the '107 patent are invalid for lack of enablement. For example, independent claim 1 of the '107 patent broadly claims pharmaceutical compositions of gamma-hydroxybutyrate (GHB) containing a "mixture" comprising $Ca•(GHB)_2$, $Mg•(GHB)_2$, and either Na•GHB and/or K•GHB with no specific ratio of the respective GHB salts. Accordingly, claim 1 covers *any* ratio of the three or four salts and claim 15 covers any ratio of three salts. Claims 2-11, 16-18, 20-23, and 26-

29 similarly allow for a wide range of ratios of the various GHB salts. The specification, however, only describes a limited number of examples of exemplary syntheses of mixtures of oxybate salts, and does not exemplify any three salt combinations with Na/Ca/Mg. To the extent that the claimed mixtures of GHB salts in the claimed ratios would not have been obvious, the specification fails to enable a person of ordinary skill in the art to practice the full scope of the claimed invention without undue experimentation. *Allergan, Inc. v. Sandoz Inc*., 796 F.3d 1293, 1309 (Fed. Cir. 2015) (citing *In re Wands*, 858 F.2d 731, 736–37 (Fed.Cir.1988)). Thus, to the extent that claims 1, 2-11, 15-16, 18-19, 21-24, and 27-33 are not invalid as obvious, they are invalid as not enabled to the full scope of the claims.

**c. Indefiniteness**

The claims of the '107 patent that require a "wt/wt %" are invalid as indefinite because when "read in light of the specification delineating the patent, and the prosecution history," "wt/wt %" "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc*., 134 S. Ct. 2120, 2124 (2014). The patent explains that "[t]he term 'wt/wt %,' are used herein, refers to the normalized weight percent of a particular salt in a salt mixture. A sample calculation of wt/wt % is provided in Example 1 of the present disclosure." '922 patent at 7:25-34. The sample calculation provided in Example 1, however, fails to "provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1371 (Fed. Cir. 2014).

The calculation described in Table 1 states that "[f]or Mixture A, 34.38 g of 99.9% GBL were charged, which is (34.38×0.999/68.089×1000)=399.0 mMol. The total base equivalents charged were 404.40 mEq. Hence, the excess base was ((404.40−399.0)/(399.0×100%))=1.35%." '922 patent at 25:13-18. However, the "wt/wt %" does not factor in the "1.35%" excess base into the calculation to determine the relative wt/wt % of each salt of GHB. For instance, Table 1 shows

that the total "Oxybate or GHB equivalents value" is 404.40 mEQ, which is inconsistent with the disclosure that only 399.0 mMol of GBL was charged. Thus, the calculation shown in Table 1 does not reflect the actual relative "wt/wt %" of the GHB salts formed. Further, the actual relative "wt/wt %" of the GHB salts formed depends on other factors such as the amount of excess base(s) added, the pKa values of the bases, and the effects of the concentration of counterions. *See, e.g.,* Serajuddin at 605-606.

Said another way, a POSA could either calculate "wt/wt %" like the example shown in the specification or a POSA could use a known alternative calculation that accounts for factors such as excess base(s) and concentration of counterions. These varying calculations have the potential to produce inconsistent results. Therefore, the term "wt/wt %" "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." N*autilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). Thus, claims 2-14, 16, and 18-19 that recite "wt/wt %" are invalid as indefinite.

### D. The '168 Patent

U.S. Patent No. 10,195,168 B2 ("the '168 patent"), entitled "Gamma-hydroxybutyrate compositions and their use for the treatment of disorders," issued on or about February 5, 2019. Clark P. Allphin and Michael Desjardin are identified as the purported inventors on the face of the '168 patent. According to the records of the Patent Office, the '168 patent is purportedly assigned to Jazz Pharmaceuticals Ireland Limited. The '168 patent issued from U.S. Patent Application Serial No. 15/385,447 ("the '447 application"), filed on December 20, 2016, and also purports to claim the benefit of priority of U.S. Provisional Patent Application Serial No. 61/737,695 ("the '695 provisional application"), filed on December 14, 2012.

Plaintiff has the burden to establish that the asserted claims of the ’168 patent are entitled to the priority date of any earlier-filed application. *See Dynamic Drinkware, LLC v. National Graphics, Inc.* 800 F.3d 1375, 1380 (Fed. Cir. 2015). Absent specific evidence of entitlement to an earlier priority date, the ’168 patent must be assigned its actual filing date of January 11, 2013. *Id*. To establish an earlier priority date, each earlier application in the chain must fully disclose the claimed invention by meeting all requirements of 35 U.S.C. §112. *In re NTP, Inc.,* 654 F.3d 1268, 1277 (Fed. Cir. 2011). Lupin does not concede that the ’168 patent has made a proper claim of priority to an earlier- filed application, and reserves the right to (i) challenge the ’168 patent’s entitlement to claim priority to any previous application, (ii) challenge any alleged date of conception or reduction to practice; and (iii) identify additional prior art thereto.

**1. The ’168 Patent Specification**

The specification of the ’168 patent is substantially similar to the specification of the ’922 patent discussed above said discussion is incorporated herein by reference.

**2. Asserted Claims of the ’168 Patent**

Plaintiff asserts claims 1-4 of the ’168 patent, of which claim 1 is independent. These claims are reproduced below:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na·GHB), a potassium salt of gamma-hydroxybutyrate (K·GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg\cdot(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca\cdot(GHB)_2$), wherein the Na·GHB, K·GHB, $Mg\cdot(GHB)_2$, and $Ca\cdot(GHB)_2$ salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively, wherein the composition is formulated as a liquid formulation, and wherein the liquid formulation has a total concentration of GHB salts of about 350 mg/mL to about 650 mg/mL.
>
> 2. The pharmaceutical composition of claim 1, wherein the total concentration of GHB salts is about 500 mg/mL.
>
> 3. The pharmaceutical composition of claim 1, wherein the composition has a pH of about 7.0 to about 9.0.

4. The pharmaceutical composition of claim 1, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.

### 3. Invalidity of the ’168 Patent

The Asserted Claims of the ’168 patent are invalid at least under § 103 for being obvious over the prior art.

#### a. Anticipation/Obviousness

In addition to the prior art references found on the face of the ’168 patent, which Lupin identifies and incorporates fully herein, Lupin identifies the following items of prior art which, separately or in any reasonable combination, anticipate or render obvious one or more of the asserted claims of the ’168 patent under 35 U.S.C. §§ 102 or 103 (Pre-AIA). In addition, Lupin reserves the right to rely on all prior art, evidence of the relevant state of the art, and evidence of prior sales, produced by Plaintiff during fact discovery and all prior art identified in the ’168 patent or its prosecution history. Lupin further incorporates by reference, in full, all references cited in the following prior art references and their prosecution histories, where applicable.

The citations provided are representative of the references and are not exhaustive. To the extent that similar claim limitations occur in one or more claims, the disclosures below should be read to apply to all similar claim limitations. Moreover, many of the references discussed herein are representative of additional prior art references in the relevant field. It should be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of the other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information, including other publications and general scientific, medical or engineering knowledge. Lupin therefore reserves the right to rely upon other unidentified portions of the prior art references and on other publications and expert testimony to

provide context and to aid understanding and interpretation of any identified portions. Lupin also reserves the right to rely upon other portions of the prior art references, other publications, and the testimony of experts to establish that the alleged inventions were expressly or inherently disclosed in the prior art and/or would have been obvious to a person of ordinary skill in the art, including on the basis of modifying or combining certain cited references. It should also be recognized that the various concepts may be discussed in numerous references and that citation to one particular reference does not exclude later citation to other references discussing the same concept. Lupin also reserves the right to rely upon any admissions relating to prior art or the state of the art in the ’168 patent or its prosecution history, as well as any admissions relating to prior art or the statement of the art in foreign counterparts and their prosecution histories. Lupin further reserves the right to modify these Invalidity Contentions to add additional prior art references in light of the information gained through fact discovery, expert discovery, arguments or positions advanced by Plaintiff, or the Court’s claim construction rulings.

Lupin reserves the right to rely upon any related patents and patent applications, foreign patent counterparts and foreign patent applications of U.S. patents or applications identified in these Invalidity Contentions, U.S. counterparts of foreign patents or foreign patent applications identified in these Invalidity Contentions, or U.S. and foreign patents or applications corresponding to articles and publications identified in these Invalidity Contentions. For prior art patents and publications identified in these Invalidity Contentions, Lupin reserves the right to rely on inherency, public use, offer for sale, and/or sale of the products described in those prior art patents or publications once Lupin has had an opportunity to take discovery on these subjects.

**i. Identification of the Prior Art**

Subject to the above, at least the following prior art is relevant to the invalidity of the asserted claims of the ’168 patent:

- Xyrem® (sodium oxybate) oral solution, CIII, FDA Approval 2002 (Rev. November 2005) ("Xyrem Label");

- Eero M.A. Mervaala et al., Improvement of cardiovascular effects of metoprolol by replacement of common salt with a potassium- and magnesium-enriched salt alternative, Br. J. Pharmacol. (1994), 112, 640-648 ("Mervaala I");

- Eero M.A. Mervaala et al., Replacement of salt by a novel potassium- and magnesium-enriched salt alternative improves the cardiovascular effects of ramipril, Br. J. Pharmacol. (1994), 111, 1189-1197 ("Mervaala II")

- Quanhe Yang, PhD et al., Sodium and Potassium Intake and Mortality Among US Adults, Arch Intern Med. 2011;171(13):1183-1191 ("Quanhe")

- U.S. Patent Application No. 2003/0125385 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (published July 3, 2003) ("Cook Application")

- U.S. Patent No. 6,780,889 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (issued Aug. 24, 2004) ("Cook Patent")

- Van Leer EM, Seidell JC, Kromhout D., Dietary calcium, potassium, magnesium and blood pressure in the Netherlands. Int J Epidemiol. 1995;24(6):1117-1123 ("Van Leer")

- Smith KM, et al., Club drugs: methylenedioxymethamphetamine, flunitrazepam, ketamine hydrochloride, and γ-hydroxybutyrate, Am J Health-Syst Pharm—Vol 59 Jun 1, 2002 ("Smith")

- Ferris and Went, 2012, Forensic Science International 216: 158-162 ("Ferris")

- U.S. Patent No. 4,983,632, Use of gamma-hydroxybutyric acid salts for preparing pharmaceutical compositions for use in the treatment of alcoholism, and the compositions obtained, to Gian Luigi Gessa, Fabio Fadda, and Chiara Mormile di Campochiaro ("the '632 patent")

- European Patent No. EP0616804, Gamma-hydroxybutyric acid salts possessing anxiolytic activity and suitable for the treatment of states of depression, to Giuseppe Tessitore and Roberto Cacciaglia ("the '804 patent")

- U.S. Patent No. 4,393,236, Production of nonhygroscopic salts of 4-hydroxybutyric acid, to Joseph Klosa ("the '236 patent")

- Great Britain Patent No. 922,029, Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy, to Colette Goderstad,

Martha Hamilton, Harry N. Cook, Dayton T. Reardan, and Douglas Danielson ("GB '029")

- U.S. Patent Application No. 2011/0111027, Immediate release formulations and dosage forms of gamma-hydroxybutyrate, to Andrea Marie Rourke, Maura Patricia Murphy, James Frederick Pfeiffer, Clark Patrick Allphin, and Alya Khan Mcginlay ("the '027 application")

- U.S. Patent No. 8,197,878, Method for producing a low sodium salt composition, to Sambasiva Rao Chigurupati ("the '878 patent")

- U.S. Patent No. 5,594,030, Controlled release pharmaceutical compositions based on one or more pharmaceutically acceptable salts of gamma hydroxy-butyric acid, to Ubaldo Conte, Aldo La Manna, and Giuseppe Tessitore ("the '030 patent")

- Amalia Ubeda et al., Blood pressure reduction in hypertensive patients after withdrawal of effervescent medication, J of PDS, Vol 18, Issue 5 (May 2009) Pages 417-419 ("Ubeda")

- Intersalt Cooperative Research Group, 'Intersalt: an international study of electrolyte excretion and blood pressure. Results for 24 hour urinary sodium and potassium excretion', BMJ, Vol. 297, 1988, p. 319-328 ("Intersalt")

- Sarkkinen, E.S., Kastarinen, M.J., Niskanen, T.H. et al. Feasibility and antihypertensive effect of replacing regular salt with mineral salt -rich in magnesium and potassium- in subjects with mildly elevated blood pressure. Nutr J 10, 88 (2011). https://doi.org/10.1186/1475-2891-10-88 ("Sarkkinen")

- Karppanen, H., Karppanen, P. & Mervaala, E. Why and how to implement sodium, potassium, calcium, and magnesium changes in food items and diets?. J Hum Hypertens 19, S10–S19 (2005). https://doi.org/10.1038/sj.jhh.1001955 ("Karppanen")

- Houston, M.C. and Harper, K.J. (2008), Potassium, Magnesium, and Calcium: Their Role in Both the Cause and Treatment of Hypertension. The Journal of Clinical Hypertension, 10: 3-11 ("Houston")

- H Kesteloot and J V Joossens Relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure, Hypertension. 1988;12:594–599 ("Kesteloot")

- U.S. Department of Agriculture, Dietary Guidelines for Americans, 2010, https://health.gov/sites/default/files/2020-01/DietaryGuidelines2010.pdf ("Dietary Guidelines 2010")

- Institute of Medicine. 2010. Strategies to Reduce Sodium Intake in the United States. Washington, DC: The National Academies Press. https://doi.org/10.17226/12818 ("Institute of Medicine")

- He, F. J., and G. A. MacGregor. 2009. A comprehensive review on salt and health and current experience of worldwide salt reduction programmes. Journal of Human Hypertension 23(6):363-384 ("MacGregor")

- Lyle D. Bighley et al., Salt Forms of Drugs and Absorption, in 13 Encyclopedia of Pharmaceutical Technology 453 (James Swarbrick & James C. Boylan eds., 1995) ("Bighley")

- Pandit, N.K., Strykowski, J.M., and Shtohryn, L., The effect of salts on the distribution and solubility of an acidic drug. Int. J. Pharm. 1989, 50, 7–13 ("Pandit")

- Chowhan, Z.T. , J. Pharm. Sci. , pH–Solubility Profiles of Organic Carboxylic Acids and Their Salts 67 :1257-1260 (1978) ("Chowhan")

- Sanjeev Kothare et al., Pharmacotherapy of Narcolepsy: Focus on Sodium Oxybate, Clinical Medicine Insights: Therapeutics 2010:2 37–52 ("Kothare")

- Lois E. Krahn, MD, Sodium oxybate: A new way to treat narcolepsy, Current Psychiatry 2003 August;2(8):65-69 ("Krahn")

- Remington: the Science and Practice of Pharmacy (Alfonso R. Gennaro et al. eds., 20th ed. 2000) ("Remington's 2000")

- Rowe et al., Handbook of Pharmaceutical Excipients, Fifth Edition, Amer Pharmacists Assn. ("Rowe 2006")

- Scientific Panel on Dietetic Products, Nutrition and Allergies, Tolerable Upper Intake Levels For Vitamins and Minerals, European Food Safety Authority (February 2006). ("EFSA 2006")

Lupin expressly reserves the right to modify and/or supplement the prior art discussed herein. Each of the above is prior art to the '168 patent. To the extent that the patentee and/or inventors attempt to swear behind or otherwise remove as prior art any of the art identified herein, Lupin specifically reserves its right to, *inter alia*, add additional prior art to the list. Furthermore, to the extent that the patentee argues that any of the cited references are not prior art under 35 U.S.C. § 102, many of the referenced patents and/or patent applications have foreign or U.S. equivalents which also qualify as prior art. Such foreign and U.S. equivalents are incorporated herein, and Lupin reserves the right to rely upon them. Additionally, as previously noted, Lupin reserves its right to, *inter alia*, supplement or amend its list of prior art references based upon,

among other things, Plaintiff's disclosure of its alleged infringement proofs; disclosure of the Plaintiff's proposed construction of the claims of the '168 patent; issuance of a claim construction ruling by a court,should the court be able to construe the claims of the '168 patent; Plaintiff's response to any of Lupin's defenses, including, but not limited to, Plaintiff's interpretation of the prior art; the discovery (fact or expert) during litigation; and/or further investigation. Moreover, Lupin does not admit, or otherwise concede, that the claims of the '168 patent are entitled to an effective filing date earlier than the patent's filing date, and therefore reserves the right to, *inter alia*, challenge the effective filing date of the patent and to assert additional prior art references and/or products based on any such challenge. Nevertheless, as discussed herein, each claim of the patent is invalid even if the '168 patent is entitled to claim priority to an earlier-filed application.

**ii. Description and Content of the Prior Art**

The teachings of the prior art identified above are described in detail in the section related to the invalidity of the '922 patent, said discussion incorporated herein by reference.

**iii. The Asserted Claims are Invalid as Obvious**

At least the references discussed above disclose, either alone or in combination, the limitations of the asserted claims of the '168 patent.[23] Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references together with the knowledge he or she would have possessed, would have readily gleaned the information necessary to develop the claimed formulations; would have had a motivation to develop such formulations; and would have

[23] To the extent that any specific limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

had a reasonable expectation of success in doing so. *See, e.g.*, *KSR*, 550 U.S.at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

As explained below, the asserted claims would have been obvious in view of a host of prior art references. Consequently, there are numerous different combinations of these prior art references and many exemplary references that disclose the claimed method. *See, e.g.*, *Rothman v. Target Corp.*, 556 F.3d 1310, 1320-21 (Fed. Cir. 2009) (when the "entire body of prior art"—or an "evidentiary cornucopia"—renders a patent claim obvious, a trier of fact can fairly rely on "any combination of these references in reaching its obviousness verdict.").

By way of example, the following combinations render the asserted claims obvious:

- One or more of the Xyrem Label, Cook Application or Cook Patent, Ferris, '632 patent, '804 patent, '236 patent, GB '029, '027 application, '030 patent; in view of
- One or more of Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Kesteloot, Dietary Guidelines 2010, Institute of Medicine, EFSA 2006; in further view of
- One or more of Mervaala I, Mervaala II, '878 patent, Sarkkinen, Institute of Medicine, MacGregor, Bighley, Pandit; in further view of
- Smith, Kothare, Krahn; and optionally in combination with
- Either Rowe 2006 and/or Remington's 2000.

More specifically, at least the following combinations of prior art references are exemplary of the combinations of prior art references that render the asserted claims of the '168 patent obvious:

By way of example, the following combinations render the asserted claims obvious:

- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family) alone or in combination with the '878 patent;
- The '632 patent alone or in combination with the '878 patent;

- The ‘027 application alone or in combination with the ’878 patent;
- The ’030 patent alone or in combination with the ’878 patent;
- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family) alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- The ’632 patent alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- The ‘027 application alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- The ’030 patent alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Sarkkinen, Mervaala I and II, Karppanen, and Kothare;
- Xyrem Label, Cook Application or Cook Patent, in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen;
- Xyrem Label, Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Sarkkinen, Mervaala I and II, Karppanen, and Kothare;
- Xyrem Label, Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Ubeda, Intersalt, Quanhe, and Van Leer;
- Xyrem Label, Cook Application or Cook Patent, in combination with the ’878 patent, Sarkkinen, Mervaala I and II, and Karppanen and Smith
- Xyrem Label, Smith, Ferris in combination with the ’878 patent;
- Xyrem Label, ’804 patent, Smith, the ’236 patent, and GB ’029, in combination with the ’878 patent;
- Xyrem Label, Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Sarkkinen, Mervaala I and II, Karppanen, Kothare, Smith, in combination with the ’878 patent, ’804 patent, the ’236 patent, GB ’029, Houston, Kesteloot, Dietary Guidelines 2010, MacGregor, Bighley, and EFSA 2006
- Xyrem Label, Ferris, EFSA 2006, Mervaala I / II, Kothare, and Rowe 2006

- Xyrem Label, the '632 patent, '027 application, '030 patent, Intersalt, Kesteloot, Mervaala I / II, '878 patent, Sarkkinen, Institute of Medicine, and MacGregor in combination with Smith, Kothare, Krahn, and Rowe 2006;

- Xyrem Label, Cook Application or Cook Patent, Ferris, '632 patent, Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Mervaala I, Mervaala II, '878 patent, Sarkkinen, Smith, Kothare, and Krahn;

- Xyrem Label, '804 patent, '236 patent, GB '029, '027 application, '030 patent, Kesteloot, Dietary Guidelines 2010, Institute of Medicine, EFSA 2006, Institute of Medicine, MacGregor, Bighley, Pandit, Smith, Kothare, and Krahn;

- Xyrem Label, Cook Application or Cook Patent, Ferris, '632 patent, Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Institute of Medicine, EFSA 2006, Institute of Medicine, MacGregor, Bighley, Pandit, Smith, Kothare, and Krahn

- Xyrem Label, '804 patent, '236 patent, GB '029, '027 application, '030 patent, Kesteloot, Dietary Guidelines 2010, Mervaala I, Mervaala II, '878 patent, Sarkkinen, Smith, Kothare, and Krahn;

Lupin reserves the right to rely on other combinations of prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

As further explained below, a POSA would have been motivated to combine the teachings of these references with a reasonable expectation of success in light of the problem to be solved, the disclosures of the references, and the common subject matter of the references as explained throughout. In addition, Lupin's invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

As explained more fully below, a POSA would have been motivated to combine the teachings of the prior art discussed above to arrive at the claimed capsule. As an initial matter, a POSA would have been motivated to develop a lower-sodium salt GHB alternative given the well-known health concerns related to sodium intake. Moreover, a POSA would have been motivated

to use calcium, magnesium and/or potassium salts in formulating a lower sodium salt GHB product.

Finally, a POSA would have reasonably expected to be able to develop the claimed formulations given the teaching of alternative salt forms, including alternative salt forms of GHB disclosed in the prior art as explained below. Thus, a POSA would have been motivated to formulate a reduced sodium GHB formulation, and would have reasonably expected it to work as a replacement for the existing sodium GHB formulation.

**(1) Independent Claim 1**

Claim 1 recites "[a] pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na·GHB), a potassium salt of gamma-hydroxybutyrate (K·GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg\cdot(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca\cdot(GHB)_2$), wherein the Na·GHB, K·GHB, $Mg\cdot(GHB)_2$, and $Ca\cdot(GHB)_2$ salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively, wherein the composition is formulated as a liquid formulation, and wherein the liquid formulation has a total concentration of GHB salts of about 350 mg/mL to about 650 mg/mL."

In other words, claim 1 is directed to a composition comprising Na.GHB, K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$ present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively, formulated as a liquid with a total concentration of GHB salts of about 350 mg/mL to about 650 mg/mL. Claim 1 should be found invalid as obvious to a POSA in view of the prior art for the reasons discussed below.

**a) A POSA would have known that salts of GHB were used for therapeutic purposes**

As of the priority date, salts of GHB were known as therapeutic agents for several different therapeutic purposes. For example, the prior art taught that sodium oxybate ("Na.GHB") (chemically known as sodium γ-hydroxybutyrate; commercially-sold as Xyrem) was known as "a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy." Xyrem Label at 1.

Likewise, the potassium (K.GHB), magnesium ($Mg.(GHB)_2$), and calcium ($Ca.(GHB)_2$) salts of GHB were also well-known alternatives to Na.GHB. For instance, Cook Application discloses a pharmaceutical composition of multiple salts of gamma-hydroxybutyrate in an aqueous medium for the treatment of sleep disorders, including narcolepsy, as well as alcohol and opiate withdrawal, reduced levels of growth hormone, increased intracranial pressure, and physical pain in a patient. Cook Application at abstract.

Ferris teaches method of making salts of GHB and states that "[s]odium, potassium, magnesium and calcium salts of gamma-hydroxybutyrate have been synthesized from gamma-butyrolactone and the corresponding group 1 or 2 hydroxide." Ferris at abstract.

The '632 patent teaches that salts of GHB are useful for treatment of various conditions and also discloses preparing aqueous pharmaceutical compositions comprising GHB salts, including "the sodium, potassium, calcium or magnesium salt." '632 patent at 7:47-50; *see also* claims 2, 7, and 9. Further, the '632 patent teaches that pharmaceutical compositions "can be formed using various gamma-hydroxy butyric acid salts." *Id*. at 7:26-31.

EP '804 discloses that salts of GHB "possess[] anxiolytic activity and [are] suitable for the treatment of states of depression." EP '804 at abstract. EP '804 further teaches that "[p]referred pharmaceutically acceptable salts of gamma-hydroxybutyric acid for use in the present

compositions are lithium-, sodium-, potassium-, calcium-, and magnesium salts." (EP '804 at 2:37-39).

The '236 patent teaches that "there is a large desire for these [salts of GHB] especially as sleeping agent and as a tranquilizer, since virtually all the known sleeping agents and tranquilizers such as barbiturates, amides, but also diazepams are associated with large side effects upon continuous application, but also directly associated with undesired aftereffects." '236 patent at 1:48-54. The '236 patent also claims "[a] method for the production of magnesium and[] calcium salts of 4-hydroxybutyric acid comprising … reacting … 4-hydroxybutyric acid, … magnesium hydroxide, … [and] calcium hydroxide … in an aqueous solution." '236 at claims 6 and 14.

GB '029 discloses that the "pharmacological properties" of salts of GHB "promote[] … deep sleep." GB '029 at 3:36-49. Further, GB '029 teaches using salts of GHB and "especially the alkaline-earth metal salts," including "the sodium salt" and "the calcium salt." GB '029 at 2:53-75.

The '027 application discloses that salts of GHB "induce[] sleep that closely resembles normal, physiologic sleep" and can be used for treatments including "cataplexy and excessive daytime sleepiness associated with narcolepsy." '027 application at ¶¶ 2, 43; claim 42. The '027 application also teaches an oral dosage form of GHB comprising "at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate." '027 application at claim 4. Similarly, the '027 application teaches that "one or more of a GHB drug" can be formulated into an oral dosage form. '027 application ¶ 39.

Thus, as of the priority date, a POSA would have known that sodium, potassium, calcium, and magnesium salts of GHB could be formulated into pharmaceutical compositions for therapeutic purposes.

**b) A POSA would have been aware of the drawbacks associated with Na.GHB and its administration to patients**

While a POSA would have known that Na.GHB had been used for therapeutic purposes, a POSA would have also known of the drawbacks associated with Na.GHB and its administration.

**c) Na.GHB and its administration was associated with excessive sodium intake**

A primary concern with administration of Na.GHB was the excessive amount of sodium intake associated with its administration. The recommended starting dose for Xyrem (Na.GHB) is 4.5 g/night, which can be increased (recommended in 1.5 g increments) to a maximum of 9 g/night. Xyrem Label at 22–23. Thus, patients taking sodium oxybate will have an additional daily intake of sodium that ranges from 0.82 g (for a 4.5 g/day dose) to 1.6 g (for a 9 g/day dose). Karpannen discloses that the "Dietary Reference Intakes (DRIs)" "for sodium is 1500 mg a day." Thus, a single 9 g/day dose of Na.GHB exceeds the DRI for sodium.

Because of this excessive intake of sodium, the prior art warned against administering Na.GHB to certain patient populations. For instance, Kothare discloses that because "[t]hree grams of sodium oxybate contains 0.5 g of sodium, while the 9 g dose contains 1.6 g of sodium," that [p]atients with congestive heart failure, hypertension, or renal insufficiency will need to have their daily sodium intake assessed." Kothare at 49 (citing Lemon MD, Strain JD, Farver DK. Sodium Oxybate for cataplexy. Ann Pharmacother. 2006;40:433–40). Krahn also teaches that sodium oxybate "is high in sodium (0.5 grams in a 3-gram dose)" and warns to "[u]se caution when considering the agent for patients with hypertension or on low-sodium diets." Krahn at 4.

Further, the prior art warned that administering Na.GHB is not right for "patients with heart failure, hypertension or compromised renal function" due to the "daily sodium intake" in taking Na.GHB. *See, e.g.*, Xyrem Label at 11. For instance, under the section on "Precautions"

Xyrem Label warns that “[d]aily sodium intake in patients taking sodium oxybate … should be considered in patients with heart failure, hypertension or compromised renal function.” Xyrem Label at 11. Xyrem Label further reports “hypertenson” as a “[f]requent” “[v]ascular disorder[].” Xyrem Label at 20. Xyrem Label also warns patients to tell their doctor if they “are on a salt-restricted diet, have high blood pressure, heart failure, or kidney problems” because “Xyrem contains a lot of sodium (salt) and may not be right for [them].” Xyrem Label Medication Guide at 2.

It was also well-known “that higher sodium intake is associated with increased total mortality in the general US population.” Quanhe at 1183. For instance, Intersalt studied the relationship between “electrolyte excretion and blood pressure” and showed that “sodium was significantly related to the slope of blood pressure” and concluded that increasing long-term intake of dietary sodium was shown to increase blood pressure across all study populations and age ranges. Intersalt at abstract. Institute of Medicine states that “excess sodium intake is strongly associated with elevated blood pressure, a serious public health concern related to increased risk of heart disease, stroke, congestive heart failure, and renal disease.” Institute of Medicine at Preface. Further, “[i]ncreased dietary sodium [] intake produced a marked rise in blood pressure” as well as other negative side effects. Mervaala I at abstract. The Mervaala II study teaches that “[sodium] produced a marked rise in blood pressure and induced cardiac hypertrophy and significant mortality, while the salt alternative neither increased blood pressure nor caused any mortality and produced less cardiac hypertrophy than salt.” Mervaala II at Abstract. Quanhe teaches that “a higher sodium-potassium ratio is associated with significantly increased risk of [cardiovascular diseases] and all-cause mortality, and that higher sodium intake is associated with increased total mortality in the general US population.” Quanhe at 1183.

Ubeda discloses a study aimed at "[r]aised blood pressure associated with the sodium … content" of an orally administered drug. Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension. Sarkkinen at abstract. Karppanen discloses that "[t]he present average sodium intakes, approximately 3000–4500 mg/day in various industrialised populations, are very high, that is, 2–3-fold in comparison with the current Dietary Reference Intake (DRI) of 1500 mg." Karppanen at abstact.

Thus, a POSA would have known that administration of Na.GHB causes an excessive intake of sodium that could contribute to negative health effects.

**d) Na.GHB had an undesirable flavor**

A POSA also would have known that oral administration of Na.GHB had an unpleasant taste. For instance, Smith discloses sodium oxybate "has an unpleasant, salty taste that is often described as soapy." Smith at 1074. Similarly, Kothare also states that patients reported that Na.GHB had a "bad taste" and that "issues reovle[d] around [its] "salty taste." Kothare at abstract, Table 2. Krahn also discloses that sodium oxybate "has a salty taste." Krahn at 4. Thus, a POSA would have known that Na.GHB causes an unpleasant taste when administered to patients.

**e) Other problems were associated with Na.GHB**

Additionally, Na.GHB was associated with other problems such as preparation, manufacture, and formulation issues. For instance, it was known that "[t]he sodium salts of the 4-hydroxybutyric acid are hygroscopic," may not be "suitable for crystallization" and cause "difficulties of production and handling" that "are also very expensive." '236 patent at 1:14-47. Thus, a POSA would have known that there were issues associated with the production and

formulation of Na.GHB, which would have motivated a POSA to explore other compositions and formulations for administering GHB.

#### f) To address drawbacks associated with Na.GHB, a POSA would have been motivated to prepare a mixture of salts of GHB

To avoid the drawbacks associated with Na.GHB and its administration, a POSA would have been motivated to prepare a composition of mixed salts of GHB, including sodium, calcium, magnesium, and potassium GHB salts.

#### g) A POSA would have been motivated to use calcium, magnesium, and potassium salts of GHB to lower the intake of sodium

A POSA would have sought to prepare a composition that reduces the intake of sodium associated with administration of Na.GHB. For instance, Institute of Medicine stated that it was a goal of "health initiatives to address the high levels of sodium" and also disclosed that "sources of dietary sodium" includes drugs which "can contribute to sodium intake." Institute of Medicine at Preface; 122. A POSA would have known that decreasing the intake of sodium would have had a beneficial effect. For instance, Mervaala II teaches that "reduction in the intake of sodium chloride has an antihypertensive effect." Mervaala II at 1189. Quanhe further discloses that a reduced sodium intake could lead to greater health benefits. Quanhe at 1183. Karppanen taught that "[d]ecreased intakes of sodium alone … decrease elevated blood pressure." Karppanen at abstract. Indeed, it was well-known that that "reduction in the intake of sodium [] has an antihypertensive effect," as well as other beneficial effects. *See, e.g.,* Mervaala II at 1189.

In particular, a POSA would have known that reducing sodium intake could be achieved by reducing the sodium content of a drug. For instance, Ubeda discloses a study aimed at "[r]aised blood pressure associated with the sodium … content" of an orally administered drug. Ubeda at

abstract. Ubeda observed patients that were administered paracetamol with sodium content and followed by administration of paracetamol with "no sodium content." Ubeda at abstract. Ubeda observed that "[s]witching to paracetamol tablets (no sodium content) was associated with both lowered systolic pressure of 13.1 mmHg (95%CI: 11.9–14.3, $p < 0.0001$) and a moderate reduction of diastolic pressure of 2.5 mmHg (95%CI: 2.1–2.9, $p < 0.0001$)." Ubeda at abstract. Ubeda concluded that "[a] relationship of causality between the intake of high sodium excipients and high blood pressure in elderly hypertensive individuals, without chloride ions, was found" and warned that "[c]linicians should be aware of possible raised blood pressure" when these high sodium drugs "are prescribed to hypertensive patients." Ubeda at abstract. Thus, Ubeda shows that switching from a drug formulation high in sodium to a drug formulation with lower sodium content can have beneficial health effects.

The prior art also taught strategies for how to reduce sodium content in a composition. For instance, the '878 patent teaches "a low sodium salt composition and the methods used to make it." '878 patent at abstract. Because "[e]xceeding the recommended daily intake of sodium is a significant risk factor in developing high blood pressure and a cause or contributing factor in the rising incidence of heart disease," the '878 patent teaches that "medical professionals and governmental authorities recommend a reduction in per capita salt consumption." '878 patent at 1:29-35. Thus, the '878 patent sought to provide methods to prepare low sodium salt compositions. The '878 patent teaches that "there are a variety of salt substitutes in the market" and "[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios." '878 patent at 1:43-46. The '878 patent teaches that suitable low sodium compositions "preferably" include salts of "potassium, magnesium, calcium, ammonium, and combinations thereof." '878 patent at 2:63-

67; *see also* claims 7, 28, 48 ("potassium, magnesium, calcium, ammonium, and a mixture thereof"). Thus, the "low sodium salt composition of the invention has lower sodium content." '878 patent at 3:61-67. The '878 patent also discloses several example formulations of low sodium compositions. '878 patent at Examples 1-3. A POSA would have known that this same strategy could be employed with GHB—i.e., a "low sodium" GHB salt composition could be prepared by combining the sodium, potassium, magnesium, and calcium salts of GHB.

Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl). Mervaala I at abstract; *see also* Mervaala II at abstract. The "salt alternative ha[d] the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%. Therefore, the sodium chloride concentration was 43% lower in the salt alternative." Mervaala I at 640-641. Mervaala I concluded that "replacement of common salt by a potassium-, and magnesium-enriched salt … produces beneficial cardiovascular effects." Mervaala I at abstract. A POSA would have known that this same strategy could be employed with GHB—i.e., a GHB salt composition could be "sodium-reduced" by using a combination of sodium, potassium, and magnesium salts. Mervaala I at abstract; *see also* Mervaala II at abstract.

Likewise, Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension whereas a restriction of dietary [sodium chloride] lowers blood pressure (BP)" and that "[s]ubstituting potassium and/or magnesium salts for sodium chloride (NaCl) may enhance the feasibility of [sodium chloride] restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. Thus Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Sarkkinen

concluded that "that potassium and magnesium could potentiate the effect of sodium restriction on reducing [blood pressure]" and that "[t]his effect is in line with earlier clinical trials with mineral salts." Sarkkinen at 6. A POSA would have known that this same strategy could be employed with GHB—i.e., a GHB salt composition could be "sodium-reduced" by using substituted salts. Sarkkinen at abstract.

Further, Karppanen discloses that "[t]he present average sodium intakes, approximately 3000–4500 mg/day in various industrialized populations, are very high, that is, 2–3-fold in comparison with the current Dietary Reference Intake (DRI) of 1500 mg." Karppanen at abstract. "By contrast, the present average potassium, calcium, and magnesium intakes are remarkably lower than the recommended intake levels (DRI). In USA, for example, the average intake of these mineral nutrients is only 35–50% of the recommended intakes." Karppanen at abstract. Karppanen further states that "[d]ecreased intakes of sodium alone, and increased intakes of potassium, calcium, and magnesium each alone decrease elevated blood pressure. A combination of all these factors, that is, decrease of sodium, and increase of potassium, calcium, and magnesium intakes, which are characteristic of the so-called Dietary Approaches to Stop Hypertension diets, has an excellent blood pressure lowering effect." Karppanen at abstract. A POSA would have found it obvious to use the teachings of Karppanen—to decrease sodium content and increase potassium, calcium, and magnesium content—to prepare a combination of sodium, potassium, and magnesium salts of GHB.

Likewise, MacGregor reports on studies aimed to reduce sodium intake and of "the long-term effects of salt reduction on CVD," and states that "[a]n increase in potassium intake through the use of reduced-sodium, potassium- and magnesium-enriched salt … played a part in the fall in CVD." MacGregor at 369. In another study that MacGregor describes, patients "switch[ed] from

the usual salt to potassium-enriched salt (49% sodium chloride, 49% potassium chloride, 2% other additives) with a subsequent reduction of 17% in salt intake and an increase of 76% in potassium intake [which] resulted in a 40% decrease in CVD mortality." MacGregor at 370.

Similarly, Institute of Medicine teaches "[p]artially replacing [sodium] salt with other compounds, such as potassium chloride and calcium chloride" to reduce sodium intake. Institute of Medicine at 97; see also Table 4-4; Table D-1 ("Mixtures of NaCl substitutes … consist of a number of ingredients such as non-sodium salts."). Houston describes the "DASH study" and states that a diet "rich in calcium, magnesium, and [potassium]" contributed to a reduction in blood pressure. Houston at 4. Kesteloot concludes that "[a] higher sodium intake increases blood pressure, whereas a higher intake of calcium and magnesium, whenever significant, decreases blood pressure" and that a "negative relationship between urinary 24-hour potassium excretion and blood pressure have been found." Kesteloot at 598 Dietary Guidelines 2010 also reports on how "typical American diets compare to recommended intake levels" and states that Americans should "eat more" potassium and calcium and "eat less" sodium." Dietary Guidelines 2010 at 46, Figure 5-1.

Bighley teaches that when pharmaceutical salts for oral dosage forms, the sodium salt should be used "if the patient does not have a restriction on sodium intake," but teaches that "[i]f the sodium salt process to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium, or zinc." *Id*. at 482-83. Thus, a POSA would have known that Na.GHB was undesirable due to patients having a restriction on sodium intake and would have therefore been motivated to prepare a composition containing the potassium, calcium, and magnesium salts of GHB.

The prior art teaches how to prepare sodium, magnesium, calcium, and potassium salts of acidic drug compounds, including the stoichiometric ratio of the metal cation to drug compound. *See, e.g.,* Pandit at Table 1.

Thus, a POSA would have been motivated to produce a low sodium content composition by using mixed salts including sodium, magnesium, calcium, and potassium salts of GHB.

#### h) A POSA would have been motivated to use magnesium, calcium, and potassium salts due to the benefits associated with increased intake of those minerals

In addition to the motivation to reduce sodium content, a POSA would have been motivated to use magnesium, calcium, and potassium salts of GHB due to the benefits associated with increased intake of magnesium, calcium, and potassium.

For example, it was well known that increasing intake of magnesium, calcium, and potassium had beneficial effects. Karppanen states that in contrast to the high levels of sodium intake, "the present average potassium, calcium, and magnesium intakes are remarkably lower than the recommended intake levels (DRI). In USA, for example, the average intake of these mineral nutrients is only 35–50% of the recommended intakes." Karppanen at abstract. Karpannen further teaches that "[t]here is convincing evidence, which indicates that this imbalance, that is, the high intake of sodium on one hand and the low intakes of potassium, calcium, and magnesium on the other hand, produce and maintain elevated blood pressure in a big proportion of the population." Karppanen at abstract. Further, "[d]ecreased intakes of sodium alone, and increased intakes of potassium, calcium, and magnesium each alone decrease elevated blood pressure. A combination of all these factors, that is, decrease of sodium, and increase of potassium, calcium, and magnesium intakes, which are characteristic of the so-called Dietary Approaches to Stop Hypertension diets, has an excellent blood pressure lowering effect." Karppanen at abstract.

Mervaala I discloses the importance of intake of magnesium, calcium, and potassium. For example, Mervaala I teaches that "[i]ncreased intake of potassium and/or magnesium … from the salt alternative is involved in the beneficial effects" because it "produces beneficial cardiovascular effects and improves the antihypertensive efficacy." Mervaala I at Abstract. Mervaala I also taught that "increased calcium intake dose dependently augmented urinary excretion of sodium and reduced the arterial wall sodium/potassium ratio suggesting an important interaction between these two electrolytes in the regulation of blood pressure and vascular responses (Wuorela et al., 1992)." Mervalla I at 647.

Similarly, Mervaala II teaches that a "sodium-reduced, potassium- and magnesium-enriched salt alternative was virtually devoid of the hypertensive and cardiac hypertrophy producing effects, typical of NaCl" and that "[t]his effect was due to increased intake of potassium and/or magnesium." Mervaala II at 1196.

Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension whereas a restriction of dietary salt lowers blood pressure (BP)" and that "[s]ubstituting potassium and/or magnesium salts for sodium chloride (NaCl) may enhance the feasibility of salt restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. Sarkkinen further teaches that "[t]he supplementation of potassium and magnesium to a low-sodium diet may enhance the antihypertensive effect of a low-sodium diet, and thus be useful in treating hypertension. Potassium has a natriuretic effect, promoting the excretion of sodium salts in the urine. Intake of magnesium may also support BP lowering by reducing vascular resistance." Sarkkinen at 1-2. Sarkkinen concluded that "that potassium and magnesium could potentiate the effect of sodium restriction on reducing [blood pressure]" and that "[t]his effect is in line with earlier clinical trials with mineral salts." Sarkkinen at 6.

Other references have similar teachings about the benefits associated with increased intake of magnesium, calcium, and potassium. Quanhe concludes that "[p]ublic health recommendations should emphasize simultaneous reduction in sodium intake and increase in potassium intake." Quanhe at 1189. Quanhe teaches that "[s]odium-potassium ratios can be improved by lowering sodium intake, by raising potassium intake, or both." Quanhe at 1191. Van Leer studied the "relation between blood pressure and dietary calcium, potassium and magnesium and the combined effect of these minerals on blood pressure" and concluded that "diets rich in calcium, potassium and magnesium are associated with lower blood pressure." Van Leer at Abstract. Intersalt studied the relationship between "electrolyte excretion and blood pressure" and showed that "[p]otassium excretion was negatively correlated with blood pressure in individual subjects after adjustment for confounding variables." Intersalt at abstract. Institute of Medicine teaches that "one strategy to reduce [sodium] intake would be to encourage increased calcium consumption." Institute of Medicine at 77.

Thus, a POSA would have been motivated to increase the content of magnesium, calcium, and potassium salts of GHB relative to the content of Na.GHB in order to provide for increased intake of magnesium, calcium, and potassium.

**i) A POSA would have been motivated to use alternative salts to make a better tasting composition**

Due to the relatively high dosage range for administering GHB, (e.g., up to 9 g/night of Na.GHB), a POSA would have known that GHB salt form will affect the taste of the composition. Xyrem Label at 22–23. Further, as explained above, a POSA would have known that the unpleasant salty taste associated with Na.GHB was due to the high level of sodium associated with its administration. Thus, a POSA would have been motivated to use alternative salt forms of GHB to make a better tasting composition.

For instance, the prior art generally teaches the use of magnesium, potassium, and calcium salts to improve the taste of a composition of pharmaceutical salts. For instance, Bighley teaches that "[t]aste acceptability is a primary consideration in the formulation of a liquid" and provides "examples [of] approaches to make drugs organoleptically acceptable." Bighley at 465 (citing Roy, G .M., *Pharm . Technol. ,* 18:84,86,88 ,90,92,94,96-99 (1994) (April)). Bighley explains that one of those approaches is that "[t]he taste of a drug may be improved by formation of a soluble salt." Bighley at 466-467. Bighley also teaches that "[i]f the sodium salt proves to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium, or zinc," but cautions that "metal salts can cause taste problems" which should be taken into consideration. *Id*. at 483. Bighley explains that "[f]or example, potassium salts frequently have an unpleasant taste and leave a metallic aftertaste … but that "potassium salts showed … varying degrees of palatability at therapeutic potassium concentrations." Bighley at 466-467. Thus, a POSA would have been motivated to vary the concentration of the salts, such as the potassium salt, in order to achieve a palatable taste profile of the composition of GHB salts.

Further, Bighley taught that varying concentration levels of potassium salts can results in "varying degrees of palatability," and a POSA would have known that varying the relative concentrations of the sodium, magnesium, potassium, and calcium salts of GHB could result in varying degrees of palatability. For instance, a POSA would have reasonably expected that a composition comprising 100% of a magnesium, potassium, or calcium salt would have likely "cause[d] taste problems" because these are "metal salts." Bighley at 483. But a POSA would have reasonably expected that any taste issues associated with any one salt could be reduced by reducing the concentration of that salt and correspondingly increasing the concentration of other GHB salts. Thus, a POSA would have reasonably expected that by varying concentration levels of the sodium,

magnesium, potassium, and calcium salts of GHB could result in a composition with a palatable taste profile.

Similarly, the ’878 patent teaches that to lower the sodium content of a salt composition, a low sodium salt composition comprising “potassium, magnesium, calcium, ammonium, and combinations thereof” should be utilized. ’878 patent at abstract; claims 7, 28, 28. The’878 patent teaches to perform “[s]ensory tests … to analyze the taste characteristics” of those low-sodium content salt compositions. For instance, the ’878 patent teaches that “salt substitutes containing potassium” can be associated with a “generally metallic/bitter taste” than can be “reduce[d]” or “mask[ed]” with certain additives. ’878 patent at 1:48-53. The examples of low sodium salt compositions disclosed in the ’878 patent had favorable taste profiles. *See* ’878 patent at Tables 2-5.

Like the ’878 patent, Sarkkinen teaches that “[s]ubstituting potassium and/or magnesium salts for sodium [salts] may enhance the feasibility of [sodium] restriction and lower blood pressure beyond the sodium reduction alone.” Sarkkinen at abstract. Sarkkinen noted that “[t]he taste profile of test products was good” for the low-sodium content composition comprising sodium, potassium, and magnesium salts. Sarkkinen at 7-8.

Further, Institute of Medicine teaches that “potassium” is “often used in lowered-sodium formulations” as an alternative to sodium salts and that it “tastes both salty and bitter (this bitterness is one reason it is often not fully successful in replacing the sensory effects of salt).” Institute of Medicine at 71.

Thus, a POSA would have been motivated to produce a low sodium content composition by using mixed salts including sodium, magnesium, calcium, and potassium salts of GHB and to vary the concentration of the salts in order to achieve a palatable taste profile.

#### j) Additional reasons would have motivated a POSA to use alternative salts of GHB

In addition to the reasons discussed above, a POSA would have considered other factors when deciding to use a composition comprising sodium, magnesium, calcium, and potassium salts of GHB. For instance, it was known that "[t]he sodium salts of the 4-hydroxybutyric acid are hygroscopic," may not be "suitable for crystallization" and cause "difficulties of production and handling" that "are also very expensive." '236 patent at 1:14-47. The '236 patent discloses that the "calcium and magnesium salts . . . from 4-hydroxybutyric acid are solid, nonhygroscopic and storable and they can be recrystallized. . . . They dissolve in water to a clear solution and they can be dispensed as injection solutions, but also as drops, or in drinks or as suppositories while maintaining a *stable situation*." (*Id.* at col. 4, ll. 39-47 (emphasis added)). Thus, a POSA would have been further motivated to prepare a composition comprising Ca•$(GHB)_2$, Mg•$(GHB)_2$, and either Na•GHB and/or K•GHB.

#### k) A POSA would have been motivated and found it obvious to optimize the ratio of GHB salts with a reasonable expectation of success

Claim 1 further requires the Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$ salts be present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively. As explained above, the prior art taught and renders obvious this claimed wt/wt% ratio. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878

patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds and the weight percent of each active compound can be varied.

Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB to obtain the claimed wt/wt% ratios. For instance, a POSA could have varied the weight percent of the salts of GHB to account for daily recommended doses of sodium, potassium, magnesium, and calcium. For instance, Karpannen discloses that the "Dietary Reference Intakes (DRIs)" "for sodium is 1500 mg a day, while 2500 mg has been given as the maximum level of daily intake that is likely to pose no risk of adverse effects;" "potassium for adolescents and adults is 4700 mg/day. Recommended intake of potassium for children 1–3 years of age is 3000 mg/day, for 4–8 years of age it is 3800 mg/day, and for 9–13 years of age it is 4500 mg/day;" "for calcium are 1000–1300 mg per day. Therefore, the usual USA intakes are only 35–40% of the DRIs;" and "magnesium intake recommendation is 420 mg for adult men" and that "the usual USA intake of 180 mg is only approximately 50% of the recommended level."

Karpannen at S12. As described above, Dietary Guidelines 2010 reports recommended daily allowances for calcium, magnesium, potassium, and sodium that are similar to Karpannen. Dietary Guidelines 2010 at Appendix 5. Further, Kesteloot describes a study of the relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure and reports that men and women exceed these recommended intake levels for sodium, but fall short of the recommended intake levels for potassium, calcium, and magnesium. Kesteloot at Table 2.

Likewise, a POSA would have known of the optimal and/or recommended blood concentration levels of these minerals and their importance. For example, EFSA 2006 states that "oral Mg supply has to be considerably increased to increase plasma Mg" and discloses "[o]ptimal concentration" values of plasma Mg, such as 0.80 – 1.10 mmol/L. EFSA 2006 at 111. EFSA 2006 states that calcium intake is "very important" because it "helps to maintain a constant concentration of blood calcium" at about "2.5 mmol/L (10 mg/dL) (between 2.25 and 2.75 mmol/L)." EFSA 2006 at 215. EFSA 2006 discloses that potassium intake "is important for regulating … nerve and muscle function, blood pressure regulation, etc.," and states that "[t]he concentration of potassium in plasma is … about 3.5 to 5 mmol/L." EFSA 2006 at 411-412. Further, as discussed above, a POSA would have known that certain "population[s] could most benefit from increased potassium, magnesium, and calcium." Houston at 9-10; see also Karppanen at S14 ("Although the diets in different populations may differ considerably … the essential features are similar in all industrialised populations … the sodium level is very high while the levels of potassium and magnesium are very low. In most populations, the level of calcium is also low." A POSA would have known that the deficient intake of potassium, magnesium, and calcium could impact the blood concentration levels of these minerals.

Because of this imbalance—that patients consume too much sodium and not enough potassium, calcium, and magnesium—a POSA would have been motivated to formulate a composition of sodium, potassium, calcium, and magnesium salts of GHB in order to compensate for this imbalance. In particular, a POSA would have been motivated to vary the ratio of the sodium, potassium, calcium, and magnesium salts of GHB so that patients' intake of sodium is decreased closer to the daily recommended levels and patients' intake of potassium, calcium, and magnesium is increased closer to the daily recommended levels. Similarly, a POSA would have been motivated to vary the ratio of the sodium, potassium, calcium, and magnesium salts of GHB so that patients' blood concentration levels of these minerals trend closer to their optimal and/or recommended levels.

To optimize this formulation for daily recommended levels, a POSA could perform routine experimentation. For instance, intake of sodium, potassium, calcium, and magnesium can be indirectly measured by measuring the levels excreted from the body. A POSA could conduct routine experimentation to administer compositions with various levels of the sodium, potassium, calcium, and magnesium salts of GHB and then measure the corresponding levels excreted from the body. In this manner, a POSA could optimize for a composition to target daily recommended levels of sodium, potassium, calcium, and magnesium. Such optimization would have been obvious and routine to a POSA. Moreover, the '878 patent teaches that "there are a variety of salt substitutes in the market" and "[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios." '878 patent at 1:43-46.

Thus, a POSA would have found it obvious to adjust the ratios of the salts of GHB to account for daily recommended doses of sodium, potassium, magnesium, and calcium while also

factoring in that patients generally exceed the daily recommended dose for sodium but do not meet the recommended levels for potassium, magnesium, and calcium. Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB comprising the claimed wt/wt% ratios according to claims 12 and 14.

**l) A POSA would have been motivated and found it obvious to formulate a liquid formulation with a reasonable expectation of success**

Claim 1 further requires the claimed composition is formulated as a liquid formulation, and wherein the liquid formulation has a total concentration of GHB salts of about 350 mg/mL to about 650 mg/mL. This limitation is obvious for at least the reasons described above to form a composition of salts of GHB that reduces the content of sodium.

Further, Cook Application discloses liquid formulations of GHB having a total concentration of GHB of about 350 mg/mL to about 650 mg/mL. Cook Application at Table 16; *see also* Xyrem Label at 2 (disclosing liquid formulation of about 500 mg/mL).

**(2) Dependent claim 2**

Claim 2 depends on claim 1 and further requires "wherein the total concentration of GHB salts is about 500 mg/mL." Claim 2 is obvious for at least the reasons described above in connection with claim 1. Further, Cook Application discloses liquid formulations of GHB having a total concentration of GHB of about 500 mg/mL. Cook Application at Table 16; *see also* Xyrem Label at 2 (disclosing liquid formulation of about 500 mg/mL).

**(3) Dependent claim 3**

Claim 3 depends on claim 1 and further requires "wherein the composition has a pH of about 7.0 to about 9.0." Claim 3 is obvious for at least the reasons described above in connection with claim 1. Further, Cook Application discloses that "the pH may be of about 4.75 to about

10.3" and further discloses that "the pH may be from about … 7.0 ... [to] about 9.0." Cook Application at 14.

**(4) Dependent Claim 4**

Claim 4 depends on claim 1 "wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives." Claim 4 is obvious for at least the reasons described above in connection with claim 1. Further, Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63; *see also* Xyrem Label at 2. Further, the '632 patent discloses compositions of GHB salts that are "free of preservatives. *Id.* at 8:57-59. Thus, a POSA would have found it obvious to not include a preservative.

**(5) No Objective Indicia**

Lupin is unaware of any evidence of secondary considerations that would render the particular combination of claim elements found in the '168 patent non-obvious, as described below and incorporated herein by reference. For example:

- *Long-Felt Need:* Lupin is not aware of any evidence to support a claim that the '168 patent resolved a long-felt need.
- *Failure of Others:* Lupin is not aware of any evidence of failure of others that reflects any non-obviousness of the subject matter of the '168 patent.
- *Skepticism of Those of Skill in the Art:* Lupin is not aware of any skepticism of those skilled in the art with respect to the subject matter of the '168 patent.
- *Licensing:* Lupin is not aware of any licensing of the '168 patent that may be reflective of non-obviousness of the subject matter of that patent.
- *Commercial Success:* Lupin is not aware of any evidence linking any product sales made to the '168 patent, as opposed to marketing, endorsements, other patents or marketing exclusivities, or other factors unrelated to the alleged invention of the '168 patent. *See Merck*, 395 F.3d at 1376-77. Further, nothing submitted during prosecution of the '168 patent establishes

commercial success. On at least these bases, Lupin is aware of no commercial success that could support a claim of non-obviousness.

- *Recognition in the Industry:* Lupin is not aware of any recognition in the industry for the '168 patent.

- *Acquiescence:* Lupin is not aware of any evidence of acquiescence to the validity of the '168 patent.

- *Copying:* Lupin is not aware of any copying that could support a claim of non-obviousness of the subject matter of the '168 patent. *See, e.g.*, *Bayer Healthcare*, 713 F.3d at 1377; *Purdue*, 377 F. App'x at 983; *Santarus*, 2010 WL 1506017, at *26; *Aventis*, 2006 WL 2008962, at *45.

- *Unexpected Results:* Lupin is not aware of any evidence of unexpected results with respect to the '168 patent. Rather, as explained above a person of ordinary skill in the art would have reasonably expected to be able to successfully formulate a composition of mixed salts of GHB.

- *Teaching away:* Lupin is not aware of any prior art teaching away from formulating a composition of mixed salts of GHB. To the contrary, as explained above, the prior art taught a person of ordinary skill in the art to reduce the sodium content by using alternative salts including magnesium, potassium, and calcium.

Additionally, as noted above, the patentee must prove the required nexus before relying on *any* secondary considerations of alleged non-obviousness. *Muniauction*, 532 F.3d at 1327-28. Lupin is not aware of any evidence that would establish the required nexus for the claims of the '168 patent.

Thus, for at least these reasons, claims 1-4 of the '168 patent are invalid for obviousness.

#### b. Indefiniteness

The claims of the '168 patent that require a "wt/wt %" are invalid as indefinite because when "read in light of the specification delineating the patent, and the prosecution history," "wt/wt %" "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). The patent explains that "[t]he term 'wt/wt %,' are used herein, refers to the normalized weight percent of a

particular salt in a salt mixture. A sample calculation of wt/wt % is provided in Example 1 of the present disclosure." '922 patent at 7:25-34. The sample calculation provided in Example 1, however, fails to "provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1371 (Fed. Cir. 2014).

The calculation described in Table 1 states that "[f]or Mixture A, 34.38 g of 99.9% GBL were charged, which is (34.38×0.999/68.089×1000)=399.0 mMol. The total base equivalents charged were 404.40 mEq. Hence, the excess base was ((404.40−399.0)/(399.0×100%))=1.35%." '922 patent at 25:13-18. However, the "wt/wt %" does not factor in the "1.35%" excess base into the calculation to determine the relative wt/wt % of each salt of GHB. For instance, Table 1 shows that the total "Oxybate or GHB equivalents value" is 404.40 mEQ, which is inconsistent with the disclosure that only 399.0 mMol of GBL was charged. Thus, the calculation shown in Table 1 does not reflect the actual relative "wt/wt %" of the GHB salts formed. Further, the actual relative "wt/wt %" of the GHB salts formed depends on other factors such as the amount of excess base(s) added, the pKa values of the bases, and the effects of the concentration of counterions. *See, e.g.,* Serajuddin at 605-606.

Said another way, a POSA could either calculate "wt/wt %" like the example shown in the specification or a POSA could use a known alternative calculation that accounts for factors such as excess base(s) and concentration of counterions. These varying calculations have the potential to produce inconsistent results. Therefore, the term "wt/wt %" "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." N*autilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). Thus, claim 1 that recites "wt/wt %" is invalid as indefinite.

### E. The ’258 Patent

U.S. Patent No. 10,675,258 B2 (“the ’258 patent”), entitled “Gamma-hydroxybutyrate compositions and their use for the treatment of disorders,” issued on or about June 9, 2020. Clark P. Allphin and Michael Desjardin are identified as the purported inventors on the face of the ’258 patent. According to the records of the Patent Office, the ’258 patent is purportedly assigned to Jazz Pharmaceuticals Ireland Limited. The ’258 patent issued from U.S. Patent Application Serial No. 16/230,460 (“the ’460 application”), filed on December 21, 2018, and also purports to claim the benefit of priority of U.S. Provisional Patent Application Serial No. 61/737,695 (“the ’695 provisional application”), filed on December 14, 2012.

Plaintiff has the burden to establish that the asserted claims of the ’258 patent are entitled to the priority date of any earlier-filed application. *See Dynamic Drinkware, LLC v. National Graphics, Inc.* 800 F.3d 1375, 1380 (Fed. Cir. 2015). Absent specific evidence of entitlement to an earlier priority date, the ’258 patent must be assigned its actual filing date of January 11, 2013. *Id*. To establish an earlier priority date, each earlier application in the chain must fully disclose the claimed invention by meeting all requirements of 35 U.S.C. §112. *In re NTP, Inc.,* 654 F.3d 1268, 1277 (Fed. Cir. 2011). Lupin does not concede that the ’258 patent has made a proper claim of priority to an earlier- filed application, and reserves the right to (i) challenge the ’258 patent’s entitlement to claim priority to any previous application, (ii) challenge any alleged date of conception or reduction to practice; and (iii) identify additional prior art thereto.

#### 1. The ’258 Patent Specification

The specification of the ’258 patent is substantially similar to the specification of the ’922 patent discussed above said discussion is incorporated herein by reference.

### 2. Asserted Claims of the ’258 Patent

Plaintiff asserts claims 1-12, 14-20, 22-30, and 32-33 of the ’258 patent, of which claim 1 is independent. These claims are reproduced below:

> 1. A method of treating cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy comprising administering orally a pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture comprises three or four salts of GHB selected from the group consisting of a sodium salt of GHB (Na•GHB), a potassium salt of GHB (K•GHB), a magnesium salt of GHB (Mg•$(GHB)_2$), and a calcium salt GHB (Ca•$(GHB)_2$).
>
> 2. The method of claim 1, wherein the mixture comprises Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$.
>
> 3. The method of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%.
>
> 4. The method of claim 2, wherein the K•GHB salt is present in a wt/wt % of about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%.
>
> 5. The method of claim 2, wherein the Mg•$(GHB)_2$ salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, or about 25% to about 30%.
>
> 6. The method of claim 2, wherein the Ca•$(GHB)_2$ salt is present in a wt/wt % of about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, about 35% to about 40%, about 40% to about 45%, about 45% to about 50%, about 50% to about 55%, about 55% to about 60%, about 60% to about 65%, about 65% to about 70%, about 70% to about 75%, or about 75% to about 80%.
>
> 7. The method of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%.
>
> 8. The method of claim 2, wherein the K•GHB salt is present in a wt/wt % of about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%.

9. The method of claim 2, wherein the $Mg{\bullet}(GHB)_2$ salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, or about 30%.

10. The method of claim 2, wherein the $Ca{\bullet}(GHB)_2$ salt is present in a wt/wt % of about 20%, about 25%, about 30%, about 35%, about 40%, about 45%, about 50%, about 55%, about 60%, about 65%, about 70%, about 75%, or about 80%.

11. The method of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 40%, the K•GHB salt is present in a wt/wt % of about 10% to about 40%, the $Mg{\bullet}(GHB)_2$ salt is present in a wt/wt % of about 5% to about 30%, and the $Ca{\bullet}(GHB)_2$ salt is present in a wt/wt % of about 20% to about 80%.

12. The method of claim 2, wherein the Na•GHB, K•GHB, $Mg{\bullet}(GHB)_2$, and $Ca{\bullet}(GHB)_2$ salts are present in a wt/wt % ratio of about 8%:32%:20%:40%, respectively.

* * *

14. The method of claim 2, wherein the Na•GHB, K•GHB, $Mg{\bullet}(GHB)_2$, and $Ca{\bullet}(GHB)_2$ salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively.

15. The method of claim 1, wherein the pharmaceutical composition of GHB comprises an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.

16. The method of claim 15, wherein the composition has a pH of about 7.3 to about 8.5.

17. The method of claim 15, wherein the total concentration of the GHB is between 300 mg/ml to 750 mg/ml.

18. The method of claim 15, wherein the total concentration of the GHB is between 400 mg/ml to 600 mg/ml.

19. The method of claim 1, wherein the total concentration of the mixture of salts of GHB in the solution is about 500 mg/mL.

20. The method of claim 1, wherein the pharmaceutical composition of GHB is formulated as a liquid formulation.

* * *

22. The method of claim 1, wherein the mixture of salts of GHB provides a mean GastroIntestinal transit rate of about 35%.

23. The method of claim 22, wherein the mean GastroIntestinal transit rate is measured as compared to a non-absorbable marker reference.

24. A method of treating cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy comprising administering orally a pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of four salts of GHB, wherein the mixture comprises a sodium salt of GHB (Na•GHB), a potassium salt of GHB (K•GHB), a magnesium salt of GHB (Mg•$(GHB)_2$), and a calcium salt GHB (Ca•$(GHB)_2$), and wherein the Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$ salts are present in a % molar equivalents ratio of about 8%:23%:21%:48%, respectively.

25. The method of claim 24, wherein the pharmaceutical composition of GHB comprises an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.

26. The method of claim 25, wherein the composition has a pH of about 7.3 to about 8.5.

27. The method of claim 25, wherein the total concentration of the GHB is between 300 mg/ml to 750 mg/ml.

28. The method of claim 25, wherein the total concentration of the GHB is between 400 mg/ml to 600 mg/ml.

29. The method of claim 25, wherein the total concentration of the mixture of salts of GHB in the solution is about 500 mg/mL.

30. The method of claim 24, wherein the pharmaceutical composition of GHB is formulated as a liquid formulation.

* * *

32. The method of claim 24, wherein the mixture of salts of GHB provides a mean GastroIntestinal transit rate of about 35%.

33. The method of claim 32, wherein the mean GastroIntestinal transit rate is measured as compared to a non-absorbable marker reference.

### 3. Invalidity of the '258 Patent

The Asserted Claims of the '258 patent are invalid at least under 35 U.S.C. § 102 for being anticipated by the prior art and/or § 103 for being obvious over the prior art. Further, to the extent Plaintiff argues that the asserted claims of the '258 patent are not anticipated/obvious over the prior art, then they are invalid under 35 U.S.C. § 112 for lack of enablement.

#### a. Anticipation/Obviousness

In addition to the prior art references found on the face of the '258 patent, which Lupin identifies and incorporates fully herein, Lupin identifies the following items of prior art which, separately or in any reasonable combination, anticipate or render obvious one or more of the asserted claims of the '258 patent under 35 U.S.C. §§ 102 or 103 (Pre-AIA). In addition, Lupin reserves the right to rely on all prior art, evidence of the relevant state of the art, and evidence of prior sales, produced by Plaintiff during fact discovery and all prior art identified in the '258 patent or its prosecution history. Lupin further incorporates by reference, in full, all references cited in the following prior art references and their prosecution histories, where applicable.

The citations provided are representative of the references and are not exhaustive. To the extent that similar claim limitations occur in one or more claims, the disclosures below should be read to apply to all similar claim limitations. Moreover, many of the references discussed herein are representative of additional prior art references in the relevant field. It should be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of the other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information, including other publications and general scientific, medical or engineering knowledge. Lupin therefore reserves the right to rely upon other unidentified portions of the prior art references and on other publications and expert testimony to

provide context and to aid understanding and interpretation of any identified portions. Lupin also reserves the right to rely upon other portions of the prior art references, other publications, and the testimony of experts to establish that the alleged inventions were expressly or inherently disclosed in the prior art and/or would have been obvious to a person of ordinary skill in the art, including on the basis of modifying or combining certain cited references. It should also be recognized that the various concepts may be discussed in numerous references and that citation to one particular reference does not exclude later citation to other references discussing the same concept. Lupin also reserves the right to rely upon any admissions relating to prior art or the state of the art in the ’258 patent or its prosecution history, as well as any admissions relating to prior art or the statement of the art in foreign counterparts and their prosecution histories. Lupin further reserves the right to modify these Invalidity Contentions to add additional prior art references in light of the information gained through fact discovery, expert discovery, arguments or positions advanced by Plaintiff, or the Court’s claim construction rulings.

Lupin reserves the right to rely upon any related patents and patent applications, foreign patent counterparts and foreign patent applications of U.S. patents or applications identified in these Invalidity Contentions, U.S. counterparts of foreign patents or foreign patent applications identified in these Invalidity Contentions, or U.S. and foreign patents or applications corresponding to articles and publications identified in these Invalidity Contentions. For prior art patents and publications identified in these Invalidity Contentions, Lupin reserves the right to rely on inherency, public use, offer for sale, and/or sale of the products described in those prior art patents or publications once Lupin has had an opportunity to take discovery on these subjects.

**i. Identification of the Prior Art**

Subject to the above, at least the following prior art is relevant to the invalidity of the asserted claims of the ’258 patent:

- Xyrem® (sodium oxybate) oral solution, CIII, FDA Approval 2002 (Rev. November 2005) (“Xyrem Label”);

- Eero M.A. Mervaala et al., Improvement of cardiovascular effects of metoprolol by replacement of common salt with a potassium- and magnesium-enriched salt alternative, Br. J. Pharmacol. (1994), 112, 640-648 (“Mervaala I”);

- Eero M.A. Mervaala et al., Replacement of salt by a novel potassium- and magnesium-enriched salt alternative improves the cardiovascular effects of ramipril, Br. J. Pharmacol. (1994), 111, 1189-1197 (“Mervaala II”)

- Quanhe Yang, PhD et al., Sodium and Potassium Intake and Mortality Among US Adults, Arch Intern Med. 2011;171(13):1183-1191 (“Quanhe”)

- U.S. Patent Application No. 2003/0125385 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (published July 3, 2003) (“Cook Application”)

- U.S. Patent No. 6,780,889 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (issued Aug. 24, 2004) (“Cook Patent”)

- Van Leer EM, Seidell JC, Kromhout D., Dietary calcium, potassium, magnesium and blood pressure in the Netherlands. Int J Epidemiol. 1995;24(6):1117-1123 (“Van Leer”)

- Smith KM, et al., Club drugs: methylenedioxymethamphetamine, flunitrazepam, ketamine hydrochloride, and γ-hydroxybutyrate, Am J Health-Syst Pharm—Vol 59 Jun 1, 2002 (“Smith”)

- Ferris and Went, 2012, Forensic Science International 216: 158-162 (“Ferris”)

- U.S. Patent No. 4,983,632, Use of gamma-hydroxybutyric acid salts for preparing pharmaceutical compositions for use in the treatment of alcoholism, and the compositions obtained, to Gian Luigi Gessa, Fabio Fadda, and Chiara Mormile di Campochiaro (“the ’632 patent”)

- European Patent No. EP0616804, Gamma-hydroxybutyric acid salts possessing anxiolytic activity and suitable for the treatment of states of depression, to Giuseppe Tessitore and Roberto Cacciaglia (“the ’804 patent”)

- U.S. Patent No. 4,393,236, Production of nonhygroscopic salts of 4-hydroxybutyric acid, to Joseph Klosa (“the ’236 patent”)

- Great Britain Patent No. 922,029, Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy, to Colette Goderstad,

Martha Hamilton, Harry N. Cook, Dayton T. Reardan, and Douglas Danielson ("GB '029")

- U.S. Patent Application No. 2011/0111027, Immediate release formulations and dosage forms of gamma-hydroxybutyrate, to Andrea Marie Rourke, Maura Patricia Murphy, James Frederick Pfeiffer, Clark Patrick Allphin, and Alya Khan Mcginlay ("the '027 application")

- U.S. Patent No. 8,197,878, Method for producing a low sodium salt composition, to Sambasiva Rao Chigurupati ("the '878 patent")

- U.S. Patent No. 5,594,030, Controlled release pharmaceutical compositions based on one or more pharmaceutically acceptable salts of gamma hydroxy-butyric acid, to Ubaldo Conte, Aldo La Manna, and Giuseppe Tessitore ("the '030 patent")

- Amalia Ubeda et al., Blood pressure reduction in hypertensive patients after withdrawal of effervescent medication, J of PDS, Vol 18, Issue 5 (May 2009) Pages 417-419 ("Ubeda")

- Intersalt Cooperative Research Group, 'Intersalt: an international study of electrolyte excretion and blood pressure. Results for 24 hour urinary sodium and potassium excretion', BMJ, Vol. 297, 1988, p. 319-328 ("Intersalt")

- Sarkkinen, E.S., Kastarinen, M.J., Niskanen, T.H. et al. Feasibility and antihypertensive effect of replacing regular salt with mineral salt -rich in magnesium and potassium- in subjects with mildly elevated blood pressure. Nutr J 10, 88 (2011). https://doi.org/10.1186/1475-2891-10-88 ("Sarkkinen")

- Karppanen, H., Karppanen, P. & Mervaala, E. Why and how to implement sodium, potassium, calcium, and magnesium changes in food items and diets?. J Hum Hypertens 19, S10–S19 (2005). https://doi.org/10.1038/sj.jhh.1001955 ("Karppanen")

- Houston, M.C. and Harper, K.J. (2008), Potassium, Magnesium, and Calcium: Their Role in Both the Cause and Treatment of Hypertension. The Journal of Clinical Hypertension, 10: 3-11 ("Houston")

- H Kesteloot and J V Joossens Relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure, Hypertension. 1988;12:594–599 ("Kesteloot")

- U.S. Department of Agriculture, Dietary Guidelines for Americans, 2010, https://health.gov/sites/default/files/2020-01/DietaryGuidelines2010.pdf ("Dietary Guidelines 2010")

- Institute of Medicine. 2010. Strategies to Reduce Sodium Intake in the United States. Washington, DC: The National Academies Press. https://doi.org/10.17226/12818 ("Institute of Medicine")

- He, F. J., and G. A. MacGregor. 2009. A comprehensive review on salt and health and current experience of worldwide salt reduction programmes. Journal of Human Hypertension 23(6):363-384 ("MacGregor")

- Lyle D. Bighley et al., Salt Forms of Drugs and Absorption, in 13 Encyclopedia of Pharmaceutical Technology 453 (James Swarbrick & James C. Boylan eds., 1995) ("Bighley")

- Pandit, N.K., Strykowski, J.M., and Shtohryn, L., The effect of salts on the distribution and solubility of an acidic drug. Int. J. Pharm. 1989, 50, 7–13 ("Pandit")

- Chowhan, Z.T. , J. Pharm. Sci. , pH–Solubility Profiles of Organic Carboxylic Acids and Their Salts 67 :1257-1260 (1978) ("Chowhan")

- Sanjeev Kothare et al., Pharmacotherapy of Narcolepsy: Focus on Sodium Oxybate, Clinical Medicine Insights: Therapeutics 2010:2 37–52 ("Kothare")

- Lois E. Krahn, MD, Sodium oxybate: A new way to treat narcolepsy, Current Psychiatry 2003 August;2(8):65-69 ("Krahn")

- Remington: the Science and Practice of Pharmacy (Alfonso R. Gennaro et al. eds., 20th ed. 2000) ("Remington's 2000")

- Rowe et al., Handbook of Pharmaceutical Excipients, Fifth Edition, Amer Pharmacists Assn. ("Rowe 2006")

- Scientific Panel on Dietetic Products, Nutrition and Allergies, Tolerable Upper Intake Levels For Vitamins and Minerals, European Food Safety Authority (February 2006). ("EFSA 2006")

- S. Davis et al., Transit of pharmaceutical dosage forms through the small intestine, Gut, 1986, 27, 886-892 ("Davis")

Lupin expressly reserves the right to modify and/or supplement the prior art discussed herein. Each of the above is prior art to the '107 patent. To the extent that the patentee and/or inventors attempt to swear behind or otherwise remove as prior art any of the art identified herein, Lupin specifically reserves its right to, *inter alia*, add additional prior art to the list. Furthermore, to the extent that the patentee argues that any of the cited references are not prior art under 35 U.S.C. § 102, many of the referenced patents and/or patent applications have foreign or U.S. equivalents which also qualify as prior art. Such foreign and U.S. equivalents are incorporated

herein, and Lupin reserves the right to rely upon them. Additionally, as previously noted, Lupin reserves its right to, *inter alia*, supplement or amend its list of prior art references based upon, among other things, Plaintiff's disclosure of its alleged infringement proofs; disclosure of the Plaintiff's proposed construction of the claims of the '107 patent; issuance of a claim construction ruling by a court,should the court be able to construe the claims of the '107 patent; Plaintiff's response to any of Lupin's defenses, including, but not limited to, Plaintiff's interpretation of the prior art; the discovery (fact or expert) during litigation; and/or further investigation. Moreover, Lupin does not admit, or otherwise concede, that the claims of the '107 patent are entitled to an effective filing date earlier than the patent's filing date, and therefore reserves the right to, *inter alia*, challenge the effective filing date of the patent and to assert additional prior art references and/or products based on any such challenge. Nevertheless, as discussed herein, each claim of the patent is invalid even if the '107 patent is entitled to claim priority to an earlier-filed application.

**ii. Description and Content of the Prior Art**

The teachings of the prior art identified above are described in detail in the section related to the invalidity of the '922 patent, said discussion incorporated herein by reference.

**iii. The Asserted Claims are Invalid as Anticipated**

References discussed above anticipate the limitations of asserted claims of the '107 patent. Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references would have readily gleaned that each and every limitation is found either expressly or inherently in a single prior art reference." *See King Pharm., Inc. v. Eon Labs., Inc.*, 616 F.3d 1267, 1274 (Fed. Cir. 2010) (internal citation and quotation marks omitted). Further, a POSA would have realized that although the anticipating "prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in

the single anticipating reference." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citation omitted); *see also Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958 (Fed. Cir. 2014). Thus, additional references or evidence can be used to show that a POSA would recognize the inherent characteristic of the thing taught by the primary reference discussed below. *E.g.*, *Teleflex, Inc.*, 299 F.3d at 1335 (recognizing that courts permit "the use of additional references to confirm the contents of the allegedly anticipating reference"); *Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).

As explained below, asserted claims would have been anticipated in view of several prior art references. By way of example, the following references render asserted claims anticipated:

- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family)
- The '027 application

Lupin reserves the right to rely on other prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

In addition, Lupin's invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

**(1) Independent Claim 1**

Claim 1 recites "[a] method of treating cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy comprising administering orally a pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture comprises three or four salts of GHB selected from the group consisting of a sodium

salt of GHB (Na•GHB), a potassium salt of GHB (K•GHB), a magnesium salt of GHB (Mg•$(GHB)_2$), and a calcium salt GHB (Ca•$(GHB)_2$)." In other words, claim 1 is directed to a method of treating cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy by administering a composition of Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$. Claim 1 should be found invalid as anticipated in view of the prior art for the reasons discussed below.

Cook Application anticipates Claim 1. Cook Application teaches that "[i]n certain embodiments, the composition may contain one or more salts" and that "salts" "includ[es] salts of GHB" that can "be derived from … sodium, potassium … calcium, [and] magnesium." Cook Application at ¶ 22. Cook Application further discloses that "[i]n certain embodiments, excipients may be added" such as "xylitol, mannitol, lactose, starch, magnesium stearate, sodium saccharine, cellulose, cellulose derivatives, magnesium carbonate and the like." Cook Application at ¶ 22. Further, Cook Application discloses that this composition can "be used in treatments, such as, sleeping disorders, such as, e.g., narcolepsy (particularly cataplexy)." Cook Application at ¶ 3.

The '027 application anticipates Claim 1. The '027 application discloses an oral dosage form of GHB comprising "at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate." '027 application at claim 4. Similarly, the '027 application teaches that "one or more of a GHB drug" can be formulated into an oral dosage form. '027 application ¶ 39. Further, the '027 application teaches that "the present dosage forms can be administered to treat a human afflicted with narcolepsy to reduce cataplexy and/or daytime sleepiness." '027 application ¶ 43.

Thus, Claim 1 is anticipated by any of the Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family) and the ’027 application.

**(2) Dependent Claims 2**

Claim 2 depends on claim 1 and further recites “wherein the mixture comprises Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$.” In other words, claim 2 is directed to a composition of Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$. Claim 2 should be found invalid as anticipated in view of the prior art for the same reasons as discussed above in connection with Claim 1.

**(3) Dependent Claims 15-20**

Claims 15-20 depend on claim 1 and further require “wherein the pharmaceutical composition of GHB comprises an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives,” “wherein the composition has a pH of about 7.3 to about 8.5,” “ wherein the total concentration of the GHB is between 300 mg/ml to 750 mg/ml,” “wherein the total concentration of the GHB is between 400 mg/ml to 600 mg/ml,” “wherein the total concentration of the mixture of salts of GHB in the solution is about 500 mg/mL,” and “wherein the pharmaceutical composition of GHB is formulated as a liquid formulation.”

These limitations are all expressly disclosed in Cook Application. Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63. Cook Application discloses that the composition of multiple GHB salts may be formulated for oral consumption. Cook Application at ¶ 26. Cook Application discloses that the gamma-

hydroxybutyrate is at a final concentration of about 400 mg/ml to about 600 mg/ml. Cook Application at ¶ 18. Cook Application discloses liquid formulations of GHB having a total concentration of GHB of about 350 mg/mL to about 650 mg/mL. Cook Application at Table 16; see also Xyrem Label at 2 (disclosing liquid formulation of about 500 mg/mL). Cook Application also teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about 6 to about 7.5l but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Cook Application discloses that "any excipient, salt, acid, pH-mediating, adjusting or buffering compound or agent, flavoring, solution, solvent, dispersion, glycerol, glycol, oil, antibacterial and antifungal agents, antibiotics and antihistamines, binders, disintegrating agents, lubricants, sweetening agents, or any other additive or ingredient from those enumerated above or in the examples, or in any pharmaceutically acceptable composition or carrier described herein, or as would be known by one of skill in the art, is contemplated for use in aqueous mediums or solid forms of the GHB compositions." Cook Application at ¶ 68.

Thus, Claims 15-20 are anticipated by Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family).

**iv. The Asserted Claims are Invalid as Obvious**

At least the references discussed above disclose, either alone or in combination, the limitations of the asserted claims of the '258 patent.[24] Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references together with the knowledge he or she

[24] To the extent that any specific limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

would have possessed, would have readily gleaned the information necessary to develop the claimed formulations; would have had a motivation to develop such formulations; and would have had a reasonable expectation of success in doing so. *See, e.g.*, *KSR*, 550 U.S.at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

As explained below, the asserted claims would have been obvious in view of a host of prior art references. Consequently, there are numerous different combinations of these prior art references and many exemplary references that disclose the claimed method. *See, e.g.*, *Rothman v. Target Corp.*, 556 F.3d 1310, 1320-21 (Fed. Cir. 2009) (when the "entire body of prior art"—or an "evidentiary cornucopia"—renders a patent claim obvious, a trier of fact can fairly rely on "any combination of these references in reaching its obviousness verdict.").

By way of example, the following combinations render the asserted claims obvious:

- One or more of the Xyrem Label, Cook Application or Cook Patent, Ferris, '632 patent, '804 patent, '236 patent, GB '029, '027 application, '030 patent; in view of
- One or more of Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Kesteloot, Dietary Guidelines 2010, Institute of Medicine, EFSA 2006; in further view of
- One or more of Mervaala I, Mervaala II, '878 patent, Sarkkinen, Institute of Medicine, MacGregor, Bighley, Pandit; Davis in further view of
- Smith, Kothare, Krahn; and optionally in combination with
- Either Rowe 2006 and/or Remington's 2000.

More specifically, at least the following combinations of prior art references are exemplary of the combinations of prior art references that render the asserted claims of the '258 patent obvious:

By way of example, the following combinations render the asserted claims obvious:

- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family) alone or in combination with the ’878 patent;

- The ’632 patent alone or in combination with the ’878 patent;

- The ‘027 application alone or in combination with the ’878 patent;

- The ’030 patent alone or in combination with the ’878 patent;

- Cook Application (or alternatively, related patents including the Cook Patent and patent applications of the Cook Patent Family) alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, Karppanen and Davis;

- The ’632 patent alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, Karppanen and Davis;

- The ‘027 application alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, Karppanen and Davis;

- The ’030 patent alone or in combination with the ’878 patent, Sarkkinen, Mervaala I and II, Davis, and Karppanen;

- Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Sarkkinen, Mervaala I and II, Karppanen, Davis, and Kothare;

- Xyrem Label, Cook Application or Cook Patent, in combination with the ’878 patent, Sarkkinen, Mervaala I and II, Davis, and Karppanen;

- Xyrem Label, Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Sarkkinen, Mervaala I and II, Karppanen, Davis, and Kothare;

- Xyrem Label, Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Ubeda, Intersalt, Quanhe, Davis, and Van Leer;

- Xyrem Label, Cook Application or Cook Patent, in combination with the ’878 patent, Sarkkinen, Mervaala I and II, Davis, Karppanen, and Smith

- Xyrem Label, Smith, Davis, Ferris in combination with the ’878 patent;

- Xyrem Label, ’804 patent, Smith, the ’236 patent, and GB ’029, in combination with the ’878 patent and Davis;

- Xyrem Label, Cook Application or Cook Patent, ’632 patent, ‘027 application, ’030 patent, Sarkkinen, Mervaala I and II, Karppanen, Kothare, Smith, in

combination with the ’878 patent, ’804 patent, the ’236 patent, GB ’029, Houston, Kesteloot, Dietary Guidelines 2010, MacGregor, Bighley, Davis, and EFSA 2006

- Xyrem Label, Ferris, EFSA 2006, Mervaala I / II, Kothare, Davis, and Rowe 2006
- Xyrem Label, the ’632 patent, ‘027 application, ’030 patent, Intersalt, Kesteloot, Mervaala I / II, ‘878 patent, Sarkkinen, Institute of Medicine, and MacGregor in combination with Smith, Kothare, Krahn, Davis, and Rowe 2006;
- Xyrem Label, Cook Application or Cook Patent, Ferris, ’632 patent, Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Mervaala I, Mervaala II, ’878 patent, Sarkkinen, Smith, Kothare, Davis, and Krahn;
- Xyrem Label, ’804 patent, ’236 patent, GB ’029, ’027 application, ’030 patent, Kesteloot, Dietary Guidelines 2010, Institute of Medicine, EFSA 2006, Institute of Medicine, MacGregor, Bighley, Pandit, Smith, Kothare, Davis, and Krahn;
- Xyrem Label, Cook Application or Cook Patent, Ferris, ’632 patent, Quanhe, Van Leer, Ubeda, Intersalt, Karppanen, Houston, Institute of Medicine, EFSA 2006, Institute of Medicine, MacGregor, Bighley, Pandit, Smith, Kothare, Davis, and Krahn
- Xyrem Label, ’804 patent, ’236 patent, GB ’029, ’027 application, ’030 patent, Kesteloot, Dietary Guidelines 2010, Mervaala I, Mervaala II, ’878 patent, Sarkkinen, Smith, Kothare, Davis, and Krahn;

Lupin reserves the right to rely on other combinations of prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

As further explained below, a POSA would have been motivated to combine the teachings of these references with a reasonable expectation of success in light of the problem to be solved, the disclosures of the references, and the common subject matter of the references as explained throughout. In addition, Lupin’s invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

As explained more fully below, a POSA would have been motivated to combine the teachings of the prior art discussed above to arrive at the claimed capsule. As an initial matter, a POSA would have been motivated to develop a lower-sodium salt GHB alternative given the well-known health concerns related to sodium intake. Moreover, a POSA would have been motivated to use calcium, magnesium and/or potassium salts in formulating a lower sodium salt GHB product.

Finally, a POSA would have reasonably expected to be able to develop the claimed formulations given the teaching of alternative salt forms, including alternative salt forms of GHB disclosed in the prior art as explained below. Thus, a POSA would have been motivated to formulate a reduced sodium GHB formulation, and would have reasonably expected it to work as a replacement for the existing sodium GHB formulation.

**(1) Independent Claim 1**

Claim 1 recites "[a] method of treating cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy comprising administering orally a pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture comprises three or four salts of GHB selected from the group consisting of a sodium salt of GHB (Na•GHB), a potassium salt of GHB (K•GHB), a magnesium salt of GHB ($Mg•(GHB)_2$), and a calcium salt GHB ($Ca•(GHB)_2$)." In other words, claim 1 is directed to a method of treating cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy by administering a composition of Na.GHB, K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$. Claim 1 should be found invalid as obvious to a POSA in view of the prior art for the reasons discussed below.

**a) A POSA would have known that salts of GHB were used for the treatment of**

**cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy**

As of the priority date, salts of GHB were known as therapeutic agents for several different therapeutic purposes, including the treatment of cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy. For example, the prior art taught that sodium oxybate ("Na.GHB") (chemically known as sodium γ-hydroxybutyrate; commercially-sold as Xyrem) was known as "a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy." Xyrem Label at 1.

Likewise, the potassium (K.GHB), magnesium ($Mg.(GHB)_2$), and calcium ($Ca.(GHB)_2$) salts of GHB were also well-known alternatives to Na.GHB. For instance, Cook Application teaches that "[i]n certain embodiments, the composition may contain one or more salts" and that "salts" "includ[es] salts of GHB" that can "be derived from … sodium, potassium … calcium, [and] magnesium." Cook Application at ¶ 22. Cook Application further discloses that "[i]n certain embodiments, excipients may be added" such as "xylitol, mannitol, lactose, starch, magnesium stearate, sodium saccharine, cellulose, cellulose derivatives, magnesium carbonate and the like." Cook Application at ¶ 22. Further, Cook Application discloses that this composition can "be used in treatments, such as, sleeping disorders, such as, e.g., narcolepsy (particularly cataplexy)." Cook Application at ¶ 3.

The '027 application discloses an oral dosage form of GHB comprising "at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate." '027 application at claim 4. Similarly, the '027 application teaches that "one or more of a GHB drug" can be formulated into an oral dosage form. '027 application ¶ 39. Further, the '027 application teaches that "the present dosage forms can be administered to treat a human afflicted with narcolepsy to reduce cataplexy and/or daytime sleepiness." '027 application ¶ 43.

Ferris teaches method of making salts of GHB and states that "[s]odium, potassium, magnesium and calcium salts of gamma-hydroxybutyrate have been synthesized from gamma-butyrolactone and the corresponding group 1 or 2 hydroxide." Ferris at abstract.

The '632 patent teaches that salts of GHB are useful for treatment of various conditions and also discloses preparing aqueous pharmaceutical compositions comprising GHB salts, including "the sodium, potassium, calcium or magnesium salt." '632 patent at 7:47-50; *see also* claims 2, 7, and 9. Further, the '632 patent teaches that pharmaceutical compositions "can be formed using various gamma-hydroxy butyric acid salts." *Id*. at 7:26-31.

EP '804 discloses that salts of GHB "possess[] anxiolytic activity and [are] suitable for the treatment of states of depression." EP '804 at abstract. EP '804 further teaches that "[p]referred pharmaceutically acceptable salts of gamma-hydroxybutyric acid for use in the present compositions are lithium-, sodium-, potassium-, calcium-, and magnesium salts." (EP '804 at 2:37-39).

The '236 patent teaches that "there is a large desire for these [salts of GHB] especially as sleeping agent and as a tranquilizer, since virtually all the known sleeping agents and tranquilizers such as barbiturates, amides, but also diazepams are associated with large side effects upon continuous application, but also directly associated with undesired aftereffects." '236 patent at 1:48-54. The '236 patent also claims "[a] method for the production of magnesium and[] calcium salts of 4-hydroxybutyric acid comprising … reacting … 4-hydroxybutyric acid, … magnesium hydroxide, … [and] calcium hydroxide … in an aqueous solution." '236 at claims 6 and 14.

GB '029 discloses that the "pharmacological properties" of salts of GHB "promote[] … deep sleep." GB '029 at 3:36-49. Further, GB '029 teaches using salts of GHB and "especially

the alkaline-earth metal salts," including "the sodium salt" and "the calcium salt." GB '029 at 2:53-75.

Thus, as of the priority date, a POSA would have known that sodium, potassium, calcium, and magnesium salts of GHB could be formulated into pharmaceutical compositions for the therapeutic purpose of treating cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy.

**b) A POSA would have been aware of the drawbacks associated with Na.GHB and its administration to patients**

While a POSA would have known that Na.GHB had been used for therapeutic purposes, a POSA would have also known of the drawbacks associated with Na.GHB and its administration.

**c) Na.GHB and its administration was associated with excessive sodium intake**

A primary concern with administration of Na.GHB was the excessive amount of sodium intake associated with its administration. The recommended starting dose for Xyrem (Na.GHB) is 4.5 g/night, which can be increased (recommended in 1.5 g increments) to a maximum of 9 g/night. Xyrem Label at 22–23. Thus, patients taking sodium oxybate will have an additional daily intake of sodium that ranges from 0.82 g (for a 4.5 g/day dose) to 1.6 g (for a 9 g/day dose). Karpannen discloses that the "Dietary Reference Intakes (DRIs)" "for sodium is 1500 mg a day." Thus, a single 9 g/day dose of Na.GHB exceeds the DRI for sodium.

Because of this excessive intake of sodium, the prior art warned against administering Na.GHB to certain patient populations. For instance, Kothare discloses that because "[t]hree grams of sodium oxybate contains 0.5 g of sodium, while the 9 g dose contains 1.6 g of sodium," that [p]atients with congestive heart failure, hypertension, or renal insufficiency will need to have their daily sodium intake assessed." Kothare at 49 (citing Lemon MD, Strain JD, Farver DK.

Sodium Oxybate for cataplexy. Ann Pharmacother. 2006;40:433–40). Krahn also teaches that sodium oxybate "is high in sodium (0.5 grams in a 3-gram dose)" and warns to "[u]se caution when considering the agent for patients with hypertension or on low-sodium diets." Krahn at 4.

Further, the prior art warned that administering Na.GHB is not right for "patients with heart failure, hypertension or compromised renal function" due to the "daily sodium intake" in taking Na.GHB. *See, e.g.*, Xyrem Label at 11. For instance, under the section on "Precautions" Xyrem Label warns that "[d]aily sodium intake in patients taking sodium oxybate … should be considered in patients with heart failure, hypertension or compromised renal function." Xyrem Label at 11. Xyrem Label further reports "hypertenson" as a "[f]requent" "[v]ascular disorder[]." Xyrem Label at 20. Xyrem Label also warns patients to tell their doctor if they "are on a salt-restricted diet, have high blood pressure, heart failure, or kidney problems" because "Xyrem contains a lot of sodium (salt) and may not be right for [them]." Xyrem Label Medication Guide at 2.

It was also well-known "that higher sodium intake is associated with increased total mortality in the general US population." Quanhe at 1183. For instance, Intersalt studied the relationship between "electrolyte excretion and blood pressure" and showed that "sodium was significantly related to the slope of blood pressure" and concluded that increasing long-term intake of dietary sodium was shown to increase blood pressure across all study populations and age ranges. Intersalt at abstract. Institute of Medicine states that "excess sodium intake is strongly associated with elevated blood pressure, a serious public health concern related to increased risk of heart disease, stroke, congestive heart failure, and renal disease." Institute of Medicine at Preface. Further, "[i]ncreased dietary sodium [] intake produced a marked rise in blood pressure" as well as other negative side effects. Mervaala I at abstract. The Mervaala II

study teaches that "[sodium] produced a marked rise in blood pressure and induced cardiac hypertrophy and significant mortality, while the salt alternative neither increased blood pressure nor caused any mortality and produced less cardiac hypertrophy than salt." Mervaala II at Abstract. Quanhe teaches that "a higher sodium-potassium ratio is associated with significantly increased risk of [cardiovascular diseases] and all-cause mortality, and that higher sodium intake is associated with increased total mortality in the general US population." Quanhe at 1183. Ubeda discloses a study aimed at "[r]aised blood pressure associated with the sodium … content" of an orally administered drug. Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension. Sarkkinen at abstract. Karppanen discloses that "[t]he present average sodium intakes, approximately 3000–4500 mg/day in various industrialised populations, are very high, that is, 2–3-fold in comparison with the current Dietary Reference Intake (DRI) of 1500 mg." Karppanen at abstact.

Thus, a POSA would have known that administration of Na.GHB causes an excessive intake of sodium that could contribute to negative health effects.

**d) Na.GHB had an undesirable flavor**

A POSA also would have known that oral administration of Na.GHB had an unpleasant taste. For instance, Smith discloses sodium oxybate "has an unpleasant, salty taste that is often described as soapy." Smith at 1074. Similarly, Kothare also states that patients reported that Na.GHB had a "bad taste" and that "issues reovle[d] around [its] "salty taste." Kothare at abstract, Table 2. Krahn also discloses that sodium oxybate "has a salty taste." Krahn at 4. Thus, a POSA would have known that Na.GHB causes an unpleasant taste when administered to patients.

**e) Other problems were associated with Na.GHB**

Additionally, Na.GHB was associated with other problems such as preparation, manufacture, and formulation issues. For instance, it was known that "[t]he sodium salts of the 4-hydroxybutyric acid are hygroscopic," may not be "suitable for crystallization" and cause "difficulties of production and handling" that "are also very expensive." '236 patent at 1:14-47. Thus, a POSA would have known that there were issues associated with the production and formulation of Na.GHB, which would have motivated a POSA to explore other compositions and formulations for administering GHB.

**f) To address drawbacks associated with Na.GHB, a POSA would have been motivated to prepare a mixture of salts of GHB**

To avoid the drawbacks associated with Na.GHB and its administration, a POSA would have been motivated to prepare a composition of mixed salts of GHB, including sodium, calcium, magnesium, and potassium GHB salts.

**g) A POSA would have been motivated to use calcium, magnesium, and potassium salts of GHB to lower the intake of sodium**

A POSA would have sought to prepare a composition that reduces the intake of sodium associated with administration of Na.GHB. For instance, Institute of Medicine stated that it was a goal of "health initiatives to address the high levels of sodium" and also disclosed that "sources of dietary sodium" includes drugs which "can contribute to sodium intake." Institute of Medicine at Preface; 122. A POSA would have known that decreasing the intake of sodium would have had a beneficial effect. For instance, Mervaala II teaches that "reduction in the intake of sodium chloride has an antihypertensive effect." Mervaala II at 1189. Quanhe further discloses that a reduced sodium intake could lead to greater health benefits. Quanhe at 1183. Karppanen taught that "[d]ecreased intakes of sodium alone … decrease elevated blood pressure." Karppanen at abstract.

Indeed, it was well-known that that "reduction in the intake of sodium [] has an antihypertensive effect," as well as other beneficial effects. *See, e.g.,* Mervaala II at 1189.

In particular, a POSA would have known that reducing sodium intake could be achieved by reducing the sodium content of a drug. For instance, Ubeda discloses a study aimed at "[r]aised blood pressure associated with the sodium … content" of an orally administered drug. Ubeda at abstract. Ubeda observed patients that were administered paracetamol with sodium content and followed by administration of paracetamol with "no sodium content." Ubeda at abstract. Ubeda observed that "[s]witching to paracetamol tablets (no sodium content) was associated with both lowered systolic pressure of 13.1 mmHg (95%CI: 11.9–14.3, $p < 0.0001$) and a moderate reduction of diastolic pressure of 2.5 mmHg (95%CI: 2.1–2.9, $p < 0.0001$)." Ubeda at abstract. Ubeda concluded that "[a] relationship of causality between the intake of high sodium excipients and high blood pressure in elderly hypertensive individuals, without chloride ions, was found" and warned that "[c]linicians should be aware of possible raised blood pressure" when these high sodium drugs "are prescribed to hypertensive patients." Ubeda at abstract. Thus, Ubeda shows that switching from a drug formulation high in sodium to a drug formulation with lower sodium content can have beneficial health effects.

The prior art also taught strategies for how to reduce sodium content in a composition. For instance, the '878 patent teaches "a low sodium salt composition and the methods used to make it." '878 patent at abstract. Because "[e]xceeding the recommended daily intake of sodium is a significant risk factor in developing high blood pressure and a cause or contributing factor in the rising incidence of heart disease," the '878 patent teaches that "medical professionals and governmental authorities recommend a reduction in per capita salt consumption." '878 patent at 1:29-35. Thus, the '878 patent sought to provide methods to prepare

low sodium salt compositions. The '878 patent teaches that "there are a variety of salt substitutes in the market" and "[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios." '878 patent at 1:43-46. The '878 patent teaches that suitable low sodium compositions "preferably" include salts of "potassium, magnesium, calcium, ammonium, and combinations thereof." '878 patent at 2:63-67; *see also* claims 7, 28, 48 ("potassium, magnesium, calcium, ammonium, and a mixture thereof"). Thus, the "low sodium salt composition of the invention has lower sodium content." '878 patent at 3:61-67. The '878 patent also discloses several example formulations of low sodium compositions. '878 patent at Examples 1-3. A POSA would have known that this same strategy could be employed with GHB—i.e., a "low sodium" GHB salt composition could be prepared by combining the sodium, potassium, magnesium, and calcium salts of GHB.

Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl). Mervaala I at abstract; *see also* Mervaala II at abstract. The "salt alternative ha[d] the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%. Therefore, the sodium chloride concentration was 43% lower in the salt alternative." Mervaala I at 640-641. Mervaala I concluded that "replacement of common salt by a potassium-, and magnesium-enriched salt … produces beneficial cardiovascular effects." Mervaala I at abstract. A POSA would have known that this same strategy could be employed with GHB—i.e., a GHB salt composition could be "sodium-reduced" by using a combination of sodium, potassium, and magnesium salts. Mervaala I at abstract; *see also* Mervaala II at abstract.

Likewise, Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension whereas a restriction of dietary [sodium chloride] lowers blood pressure (BP)" and that

"[s]ubstituting potassium and/or magnesium salts for sodium chloride (NaCl) may enhance the feasibility of [sodium chloride] restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. Thus Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Sarkkinen concluded that "that potassium and magnesium could potentiate the effect of sodium restriction on reducing [blood pressure]" and that "[t]his effect is in line with earlier clinical trials with mineral salts." Sarkkinen at 6. A POSA would have known that this same strategy could be employed with GHB—i.e., a GHB salt composition could be "sodium-reduced" by using substituted salts. Sarkkinen at abstract.

Further, Karppanen discloses that "[t]he present average sodium intakes, approximately 3000–4500 mg/day in various industrialized populations, are very high, that is, 2–3-fold in comparison with the current Dietary Reference Intake (DRI) of 1500 mg." Karppanen at abstract. "By contrast, the present average potassium, calcium, and magnesium intakes are remarkably lower than the recommended intake levels (DRI). In USA, for example, the average intake of these mineral nutrients is only 35–50% of the recommended intakes." Karppanen at abstract. Karppanen further states that "[d]ecreased intakes of sodium alone, and increased intakes of potassium, calcium, and magnesium each alone decrease elevated blood pressure. A combination of all these factors, that is, decrease of sodium, and increase of potassium, calcium, and magnesium intakes, which are characteristic of the so-called Dietary Approaches to Stop Hypertension diets, has an excellent blood pressure lowering effect." Karppanen at abstract. A POSA would have found it obvious to use the teachings of Karppanen—to decrease sodium content and increase potassium,

calcium, and magnesium content—to prepare a combination of sodium, potassium, and magnesium salts of GHB.

Likewise, MacGregor reports on studies aimed to reduce sodium intake and of "the long-term effects of salt reduction on CVD," and states that "[a]n increase in potassium intake through the use of reduced-sodium, potassium- and magnesium-enriched salt … played a part in the fall in CVD." MacGregor at 369. In another study that MacGregor describes, patients "switch[ed] from the usual salt to potassium-enriched salt (49% sodium chloride, 49% potassium chloride, 2% other additives) with a subsequent reduction of 17% in salt intake and an increase of 76% in potassium intake [which] resulted in a 40% decrease in CVD mortality." MacGregor at 370.

Similarly, Institute of Medicine teaches "[p]artially replacing [sodium] salt with other compounds, such as potassium chloride and calcium chloride" to reduce sodium intake. Institute of Medicine at 97; see also Table 4-4; Table D-1 ("Mixtures of NaCl substitutes … consist of a number of ingredients such as non-sodium salts."). Houston describes the "DASH study" and states that a diet "rich in calcium, magnesium, and [potassium]" contributed to a reduction in blood pressure. Houston at 4. Kesteloot concludes that "[a] higher sodium intake increases blood pressure, whereas a higher intake of calcium and magnesium, whenever significant, decreases blood pressure" and that a "negative relationship between urinary 24-hour potassium excretion and blood pressure have been found." Kesteloot at 598 Dietary Guidelines 2010 also reports on how "typical American diets compare to recommended intake levels" and states that Americans should "eat more" potassium and calcium and "eat less" sodium." Dietary Guidelines 2010 at 46, Figure 5-1.

Bighley teaches that when pharmaceutical salts for oral dosage forms, the sodium salt should be used "if the patient does not have a restriction on sodium intake," but teaches that "[i]f

the sodium salt process to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium, or zinc." *Id*. at 482-83. Thus, a POSA would have known that Na.GHB was undesirable due to patients having a restriction on sodium intake and would have therefore been motivated to prepare a composition containing the potassium, calcium, and magnesium salts of GHB.

The prior art teaches how to prepare sodium, magnesium, calcium, and potassium salts of acidic drug compounds, including the stoichiometric ratio of the metal cation to drug compound. *See, e.g.,* Pandit at Table 1.

Thus, a POSA would have been motivated to produce a low sodium content composition by using mixed salts including sodium, magnesium, calcium, and potassium salts of GHB.

**h) A POSA would have been motivated to use magnesium, calcium, and potassium salts due to the benefits associated with increased intake of those minerals**

In addition to the motivation to reduce sodium content, a POSA would have been motivated to use magnesium, calcium, and potassium salts of GHB due to the benefits associated with increased intake of magnesium, calcium, and potassium.

For example, it was well known that increasing intake of magnesium, calcium, and potassium had beneficial effects. Karppanen states that in contrast to the high levels of sodium intake, "the present average potassium, calcium, and magnesium intakes are remarkably lower than the recommended intake levels (DRI). In USA, for example, the average intake of these mineral nutrients is only 35–50% of the recommended intakes." Karppanen at abstract. Karpannen further teaches that "[t]here is convincing evidence, which indicates that this imbalance, that is, the high intake of sodium on one hand and the low intakes of potassium, calcium, and magnesium on the other hand, produce and maintain elevated blood pressure in a big proportion of the

population." Karppanen at abstract. Further, "[d]ecreased intakes of sodium alone, and increased intakes of potassium, calcium, and magnesium each alone decrease elevated blood pressure. A combination of all these factors, that is, decrease of sodium, and increase of potassium, calcium, and magnesium intakes, which are characteristic of the so-called Dietary Approaches to Stop Hypertension diets, has an excellent blood pressure lowering effect." Karppanen at abstract.

Mervaala I discloses the importance of intake of magnesium, calcium, and potassium. For example, Mervaala I teaches that "[i]ncreased intake of potassium and/or magnesium … from the salt alternative is involved in the beneficial effects" because it "produces beneficial cardiovascular effects and improves the antihypertensive efficacy." Mervaala I at Abstract. Mervaala I also taught that "increased calcium intake dose dependently augmented urinary excretion of sodium and reduced the arterial wall sodium/potassium ratio suggesting an important interaction between these two electrolytes in the regulation of blood pressure and vascular responses (Wuorela et al., 1992)." Mervalla I at 647.

Similarly, Mervaala II teaches that a "sodium-reduced, potassium- and magnesium-enriched salt alternative was virtually devoid of the hypertensive and cardiac hypertrophy producing effects, typical of NaCl" and that "[t]his effect was due to increased intake of potassium and/or magnesium." Mervaala II at 1196.

Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension whereas a restriction of dietary salt lowers blood pressure (BP)" and that "[s]ubstituting potassium and/or magnesium salts for sodium chloride (NaCl) may enhance the feasibility of salt restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. Sarkkinen further teaches that "[t]he supplementation of potassium and magnesium to a low-sodium diet may enhance the antihypertensive effect of a low-sodium diet, and thus be useful in treating

hypertension. Potassium has a natriuretic effect, promoting the excretion of sodium salts in the urine. Intake of magnesium may also support BP lowering by reducing vascular resistance." Sarkkinen at 1-2. Sarkkinen concluded that "that potassium and magnesium could potentiate the effect of sodium restriction on reducing [blood pressure]" and that "[t]his effect is in line with earlier clinical trials with mineral salts." Sarkkinen at 6.

Other references have similar teachings about the benefits associated with increased intake of magnesium, calcium, and potassium. Quanhe concludes that "[p]ublic health recommendations should emphasize simultaneous reduction in sodium intake and increase in potassium intake." Quanhe at 1189. Quanhe teaches that "[s]odium-potassium ratios can be improved by lowering sodium intake, by raising potassium intake, or both." Quanhe at 1191. Van Leer studied the "relation between blood pressure and dietary calcium, potassium and magnesium and the combined effect of these minerals on blood pressure" and concluded that "diets rich in calcium, potassium and magnesium are associated with lower blood pressure." Van Leer at Abstract. Intersalt studied the relationship between "electrolyte excretion and blood pressure" and showed that "[p]otassium excretion was negatively correlated with blood pressure in individual subjects after adjustment for confounding variables." Intersalt at abstract. Institute of Medicine teaches that "one strategy to reduce [sodium] intake would be to encourage increased calcium consumption." Institute of Medicine at 77.

Thus, a POSA would have been motivated to increase the content of magnesium, calcium, and potassium salts of GHB relative to the content of Na.GHB in order to provide for increased intake of magnesium, calcium, and potassium.

**i) A POSA would have been motivated to use alternative salts to make a better tasting composition**

Due to the relatively high dosage range for administering GHB, (e.g., up to 9 g/night of Na.GHB), a POSA would have known that GHB salt form will affect the taste of the composition. Xyrem Label at 22–23. Further, as explained above, a POSA would have known that the unpleasant salty taste associated with Na.GHB was due to the high level of sodium associated with its administration. Thus, a POSA would have been motivated to use alternative salt forms of GHB to make a better tasting composition.

For instance, the prior art generally teaches the use of magnesium, potassium, and calcium salts to improve the taste of a composition of pharmaceutical salts. For instance, Bighley teaches that "[t]aste acceptability is a primary consideration in the formulation of a liquid" and provides "examples [of] approaches to make drugs organoleptically acceptable." Bighley at 465 (citing Roy, G .M., *Pharm . Technol. ,* 18:84,86,88 ,90,92,94,96-99 (1994) (April)). Bighley explains that one of those approaches is that "[t]he taste of a drug may be improved by formation of a soluble salt." Bighley at 466-467. Bighley also teaches that "[i]f the sodium salt proves to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium, or zinc," but cautions that "metal salts can cause taste problems" which should be taken into consideration. *Id*. at 483. Bighley explains that "[f]or example, potassium salts frequently have an unpleasant taste and leave a metallic aftertaste … but that "potassium salts showed … varying degrees of palatability at therapeutic potassium concentrations." Bighley at 466-467. Thus, a POSA would have been motivated to vary the concentration of the salts, such as the potassium salt, in order to achieve a palatable taste profile of the composition of GHB salts.

Further, Bighley taught that varying concentration levels of potassium salts can results in "varying degrees of palatability," and a POSA would have known that varying the relative concentrations of the sodium, magnesium, potassium, and calcium salts of GHB could result in

varying degrees of palatability. For instance, a POSA would have reasonably expected that a composition comprising 100% of a magnesium, potassium, or calcium salt would have likely "cause[d] taste problems" because these are "metal salts." Bighley at 483. But a POSA would have reasonably expected that any taste issues associated with any one salt could be reduced by reducing the concentration of that salt and correspondingly increasing the concentration of other GHB salts. Thus, a POSA would have reasonably expected that by varying concentration levels of the sodium, magnesium, potassium, and calcium salts of GHB could result in a composition with a palatable taste profile.

Similarly, the '878 patent teaches that to lower the sodium content of a salt composition, a low sodium salt composition comprising "potassium, magnesium, calcium, ammonium, and combinations thereof" should be utilized. '878 patent at abstract; claims 7, 28, 28. The'878 patent teaches to perform "[s]ensory tests … to analyze the taste characteristics" of those low-sodium content salt compositions. For instance, the '878 patent teaches that "salt substitutes containing potassium" can be associated with a "generally metallic/bitter taste" than can be "reduce[d]" or "mask[ed]" with certain additives. '878 patent at 1:48-53. The examples of low sodium salt compositions disclosed in the '878 patent had favorable taste profiles. *See* '878 patent at Tables 2-5.

Like the '878 patent, Sarkkinen teaches that "[s]ubstituting potassium and/or magnesium salts for sodium [salts] may enhance the feasibility of [sodium] restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. Sarkkinen noted that "[t]he taste profile of test products was good" for the low-sodium content composition comprising sodium, potassium, and magnesium salts. Sarkkinen at 7-8.

Further, Institute of Medicine teaches that "potassium" is "often used in lowered-sodium formulations" as an alternative to sodium salts and that it "tastes both salty and bitter (this bitterness is one reason it is often not fully successful in replacing the sensory effects of salt)." Institute of Medicine at 71.

Thus, a POSA would have been motivated to produce a low sodium content composition by using mixed salts including sodium, magnesium, calcium, and potassium salts of GHB and to vary the concentration of the salts in order to achieve a palatable taste profile.

**j) Additional reasons would have motivated a POSA to use alternative salts of GHB**

In addition to the reasons discussed above, a POSA would have considered other factors when deciding to use a composition comprising sodium, magnesium, calcium, and potassium salts of GHB. For instance, it was known that "[t]he sodium salts of the 4-hydroxybutyric acid are hygroscopic," may not be "suitable for crystallization" and cause "difficulties of production and handling" that "are also very expensive." '236 patent at 1:14-47. The '236 patent discloses that the "calcium and magnesium salts . . . from 4-hydroxybutyric acid are solid, nonhygroscopic and storable and they can be recrystallized. . . . They dissolve in water to a clear solution and they can be dispensed as injection solutions, but also as drops, or in drinks or as suppositories while maintaining a *stable situation*." (*Id.* at col. 4, ll. 39-47 (emphasis added)). Thus, a POSA would have been further motivated to prepare a composition comprising Ca•$(GHB)_2$, Mg•$(GHB)_2$, and either Na•GHB and/or K•GHB.

**(2) Dependent claim 2**

Claim 2 depends on claim 1 and further recites "wherein the mixture comprises Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$." In other words, claim 2 is directed to a composition of

Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$. Claim 2 is obvious for at least the reasons described above in connection with claim 1.

**(3) Dependent claims 3 and 7**

Claim 3 depends on claim 2 and further requires "wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%." Claim 7 depends on claim 2 and further recites "wherein the Na•GHB salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%." Claims 3 and 7 are obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to reduce to Na.GHB salt present to a range between 5% and 40% wt/wt % in order to reduce the sodium intake associated with administering GHB and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and render obvious the use of low sodium salt compositions. For instance, the '878 patent teaches that a "low sodium salt composition may comprise "about 10-90%, lower sodium" and "[m]ore preferably, the composition contains about 25%, 30%, 35%, 45%, 50%, 55% or 75% lower sodium," and "[m]ore preferably, the composition contains about 50% less sodium." '878 patent at 3:61-67. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%. Therefore, the sodium chloride concentration was 43% lower in the salt alternative." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl

(Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB.[25]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%" and/or "wherein the Na•GHB salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%."

**(4) Dependent claim 4**

Claim 4 depends on claim 2 "wherein the K•GHB salt is present in a wt/wt % of about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%." Claim 4 is obvious for at least the reasons

[25] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitation would have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to use K.GHB in a range of 5% to 40% wt/wt % in order to to reduce Na.GHB salt present, to increase the intake of potassium due to its associated health benefits, and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and render obvious the use of composition of mixed salts of GHB where the K.GHB salt is present in a wt/wt % of 5%-40%. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook

Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB. [26]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the K.GHB salt is present in a wt/wt % of about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%."

**(5) Dependent Claim 5**

Claim 5 depends on claim 2 "wherein the $Mg.(GHB)_2$ salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, or about 25% to about 30%." Claim 5 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to use $Mg.(GHB)_2$ in a range of 5% to 30% wt/wt % in order to reduce Na.GHB salt present, to increase the intake of magnesium due to its associated health benefits, and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and render obvious the use of compositions of mixed salts of GHB where the $Mg.(GHB)_2$ salt is present in a wt/wt % of 5%-30%. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt"

[26] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

"consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB. [27]

[27] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the Mg.$(GHB)_2$ salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, or about 25% to about 30%."

**(6) Dependent Claim 6**

Claim 3 depends on claim 2 "wherein the Ca•$(GHB)_2$ salt is present in a wt/wt % of about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, about 35% to about 40%, about 40% to about 45%, about 45% to about 50%, about 50% to about 55%, about 55% to about 60%, about 60% to about 65%, about 65% to about 70%, about 70% to about 75%, or about 75% to about 80%." Claim 6 is obvious for at least the reasons described above in connection with claim 1 to form a composition of salts of GHB that reduces the content of sodium. For instance, as explained above, a POSA would have been motivated to use Ca.$(GHB)_2$ in a range of 20% to 80% wt/wt % in order to reduce Na.GHB salt present, to increase the intake of calcium due to its associated health benefits, and also to produce a composition with a palatable taste profile.

Further, prior art references disclose and render obvious the use composition of mixed salts of GHB where the Ca.$(GHB)_2$ salt is present in a wt/wt % of 20%-80%. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly, Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition:

NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied. Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB. [28]

Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB "wherein the $Ca\bullet(GHB)_2$ salt is present in a wt/wt % of about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, about 35% to about 40%, about 40% to about 45%, about 45% to about 50%, about 50% to about 55%, about 55% to about 60%, about 60% to about 65%, about 65% to about 70%, about 70% to about 75%, or about 75% to about 80%."

**(7) Dependent Claims 8-11**

Claims 8-11 depend on claim 2 and further recite claimed wt/wt% values and ranges for the salts of GHB recited in claim 2. As explained above, the prior art discloses all of these values

[28] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

and ranges. For example, the Cook Application teaches that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds, and the weight percent of each active compound can be varied to achieve a suitable dosage. Further, it would have been within the knowledge and skill of a POSA to arrive at the weight percent of a salt of GHB.[29] Therefore, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB according to the claimed wt/wt% values and ranges.

**(8) Dependent Claims 12 and 14**

Claim 12 and 14 depend on claim 2 and further recite claimed wt/wt% ratios for the salts of GHB recited in claim 1. As explained above, the prior art taught and renders obvious these claimed wt/wt% ratios. For instance, the '878 patent teaches that a "low sodium salt composition may comprise a "modified chloride salt" "consisting of a chloride of potassium, magnesium, calcium, ammonium, and combinations thereof" that "may include from about 2.5% to about 80% by weight of the "modified chloride salt" and "[m]ore preferably, the modified chloride salt includes from about 15% to about 30% by weight chloride salt." '878 patent at 3:1-6; claims 7, 28, 48. The '878 patent also discloses examples of low sodium content compositions containing 200 mg per 100 g of sodium and 65 mg per 100 g of potassium. '878 patent at Table 1. Similarly,

[29] To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%." Mervaala I at 640-641. Likewise, Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Further, Cook Application discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66. Thus, Cook Application explicitly teaches that both the amount of active compounds and the weight percent of each active compound can be varied.

Further, it would have been within the knowledge and skill of a POSA to vary the weight percent of a salt of GHB to obtain the claimed wt/wt% ratios. For instance, a POSA could have varied the weight percent of the salts of GHB to account for daily recommended doses of sodium, potassium, magnesium, and calcium. For instance, Karpannen discloses that the "Dietary Reference Intakes (DRIs)" "for sodium is 1500 mg a day, while 2500 mg has been given as the maximum level of daily intake that is likely to pose no risk of adverse effects;" "potassium for adolescents and adults is 4700 mg/day. Recommended intake of potassium for children 1–3 years of age is 3000 mg/day, for 4–8 years of age it is 3800 mg/day, and for 9–13 years of age it is 4500 mg/day;" "for calcium are 1000–1300 mg per day. Therefore, the usual USA intakes are only 35–40% of the DRIs;" and "magnesium intake recommendation is 420 mg for adult men" and that "the usual USA intake of 180 mg is only approximately 50% of the recommended level."

Karpannen at S12. As described above, Dietary Guidelines 2010 reports recommended daily allowances for calcium, magnesium, potassium, and sodium that are similar to Karpannen. Dietary Guidelines 2010 at Appendix 5. Further, Kesteloot describes a study of the relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure and reports that men and women exceed these recommended intake levels for sodium, but fall short of the recommended intake levels for potassium, calcium, and magnesium. Kesteloot at Table 2.

Likewise, a POSA would have known of the optimal and/or recommended blood concentration levels of these minerals and their importance. For example, EFSA 2006 states that "oral Mg supply has to be considerably increased to increase plasma Mg" and discloses "[o]ptimal concentration" values of plasma Mg, such as 0.80 – 1.10 mmol/L. EFSA 2006 at 111. EFSA 2006 states that calcium intake is "very important" because it "helps to maintain a constant concentration of blood calcium" at about "2.5 mmol/L (10 mg/dL) (between 2.25 and 2.75 mmol/L)." EFSA 2006 at 215. EFSA 2006 discloses that potassium intake "is important for regulating … nerve and muscle function, blood pressure regulation, etc.," and states that "[t]he concentration of potassium in plasma is … about 3.5 to 5 mmol/L." EFSA 2006 at 411-412. Further, as discussed above, a POSA would have known that certain "population[s] could most benefit from increased potassium, magnesium, and calcium." Houston at 9-10; see also Karppanen at S14 ("Although the diets in different populations may differ considerably … the essential features are similar in all industrialised populations … the sodium level is very high while the levels of potassium and magnesium are very low. In most populations, the level of calcium is also low." A POSA would have known that the deficient intake of potassium, magnesium, and calcium could impact the blood concentration levels of these minerals.

Because of this imbalance—that patients consume too much sodium and not enough potassium, calcium, and magnesium—a POSA would have been motivated to formulate a composition of sodium, potassium, calcium, and magnesium salts of GHB in order to compensate for this imbalance. In particular, a POSA would have been motivated to vary the ratio of the sodium, potassium, calcium, and magnesium salts of GHB so that patients' intake of sodium is decreased closer to the daily recommended levels and patients' intake of potassium, calcium, and magnesium is increased closer to the daily recommended levels. Similarly, a POSA would have been motivated to vary the ratio of the sodium, potassium, calcium, and magnesium salts of GHB so that patients' blood concentration levels of these minerals trend closer to their optimal and/or recommended levels.

To optimize this formulation for daily recommended levels, a POSA could perform routine experimentation. For instance, intake of sodium, potassium, calcium, and magnesium can be indirectly measured by measuring the levels excreted from the body. A POSA could conduct routine experimentation to administer compositions with various levels of the sodium, potassium, calcium, and magnesium salts of GHB and then measure the corresponding levels excreted from the body. In this manner, a POSA could optimize for a composition to target daily recommended levels of sodium, potassium, calcium, and magnesium. Such optimization would have been obvious and routine to a POSA. Moreover, the '878 patent teaches that "there are a variety of salt substitutes in the market" and "[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios." '878 patent at 1:43-46.

Thus, a POSA would have found it obvious to adjust the ratios of the salts of GHB to account for daily recommended doses of sodium, potassium, magnesium, and calcium while also

factoring in that patients generally exceed the daily recommended dose for sodium but do not meet the recommended levels for potassium, magnesium, and calcium. Thus, a POSA would have been motivated and found it obvious to prepare a mixture of salts of GHB comprising the claimed wt/wt% ratios according to claims 12 and 14.

**(9) Dependent Claims 15-20**

Claims 15-20 depend on claim 1 and further require "wherein the pharmaceutical composition of GHB comprises an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives," "wherein the composition has a pH of about 7.3 to about 8.5," " wherein the total concentration of the GHB is between 300 mg/ml to 750 mg/ml," "wherein the total concentration of the GHB is between 400 mg/ml to 600 mg/ml," "wherein the total concentration of the mixture of salts of GHB in the solution is about 500 mg/mL," and "wherein the pharmaceutical composition of GHB is formulated as a liquid formulation." Claims 15-20 should be found invalid as obvious in view of the prior art for the same reasons as discussed above in connection with Claim 1.

Further, these limitations are all expressly disclosed in Cook Application. Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63. Cook Application discloses that the composition of multiple GHB salts may be formulated for oral consumption. Cook Application at ¶ 26. Cook Application discloses that the gamma-hydroxybutyrate is at a final concentration of about 400 mg/ml to about 600 mg/ml. Cook Application at ¶ 18. Cook Application discloses liquid formulations of GHB having a total

concentration of GHB of about 350 mg/mL to about 650 mg/mL. Cook Application at Table 16; see also Xyrem Label at 2 (disclosing liquid formulation of about 500 mg/mL). Cook Application also teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about 6 to about 7.5l but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Cook Application discloses that "any excipient, salt, acid, pH-mediating, adjusting or buffering compound or agent, flavoring, solution, solvent, dispersion, glycerol, glycol, oil, antibacterial and antifungal agents, antibiotics and antihistamines, binders, disintegrating agents, lubricants, sweetening agents, or any other additive or ingredient from those enumerated above or in the examples, or in any pharmaceutically acceptable composition or carrier described herein, or as would be known by one of skill in the art, is contemplated for use in aqueous mediums or solid forms of the GHB compositions." Cook Application at ¶ 68. GB '029 discloses example oral liquid formulations of salts of GHB containing flavoring agents such as "sugar (glucose, levulose or sorbitol)." GB '029 at 5:22-30.

Thus, Claims 15-20 are obvious in view of the prior art.

#### (10) Dependent Claims 22-23 and 32-33

Claims 22-23 depend on claim 1 and claims 32-33 depend on Claim 24 and further require "wherein the mixture of salts of GHB provides a mean GastroIntestinal transit rate of about 35%" and " wherein the mean GastroIntestinal transit rate is measured as compared to a non-absorbable marker reference," respectively. These claims are rendered obvious for the same reasons as described above in connection with claim 1 and described below in connection with Claim 24.

Further, a POSA would have understood that gastrointestinal transit rate is an inherent property of a formulated pharmaceutical composition. A POSA would have been motivated to formulate a mixture of GHB salts to achieve the claimed rate in order to promote efficient absorption of the active ingredients into the bloodstream. Further, it would have been obvious to a

POSA that a mean gastrointestinal transit rate is measured through comparison to a non-absorbable marker reference. *See, e.g.*, Davis at 886-887 ("Various reports have considered the gastric emptying of markers … several methods are available to measure small intestine transit times."); *see also Davis* at 891 ("non-digestible solid particles" used to measure "intestinal transit" time). Thus, Claims 22-23 are obvious in view of the prior art.

**(11) Independent Claim 24**

Claim 24 recites "[a] method of treating cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy comprising administering orally a pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of four salts of GHB, wherein the mixture comprises a sodium salt of GHB (Na•GHB), a potassium salt of GHB (K•GHB), a magnesium salt of GHB (Mg•$(GHB)_2$), and a calcium salt GHB (Ca•$(GHB)_2$), and wherein the Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$ salts are present in a % molar equivalents ratio of about 8%:23%:21%:48%, respectively." Claim 15 should be found invalid as obvious in view of the prior art for the same reasons as discussed above in connection with Claims 1 and 14.

**(12) Dependent Claim 25**

Claim 25 depends on claim 24 and further requires that the composition "compris[es] an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives." The prior art discloses these limitations of claim 25. For instance, Cook Application discloses that the gamma-hydroxybutyrate is at a final concentration of about 150 mg/ml to 750 mg/ml. Cook Application at ¶ 18. Cook Application also teaches that the preferred pH of an aqueous medium

for the composition of GHB salts is about 6 to about 7.5 but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Further, Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63; *see also* Xyrem Label at 2. Further, the '632 patent discloses compositions of GHB salts that are "free of preservatives. *Id.* at 8:57-59. Thus, a POSA would have found it obvious to not include a preservative. Therefore, a POSA would have found it obvious to prepare a composition with an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.

**(13) Dependent Claims 26-30**

Claims 26-30 depend on claim 25 and further require that "the composition has a pH of about 7.3 to about 8.5," "wherein the total concentration of the GHB is between 300 mg/ml to 750 mg/ml," "wherein the total concentration of the GHB is between 400 mg/ml to 600 mg/ml," "wherein the total concentration of the mixture of salts of GHB in the solution is about 500 mg/mL," "wherein the pharmaceutical composition of GHB is formulated as a liquid formulation," These claims are rendered obvious for the same reasons as described above in connection with claims 24 and 25. Also, Xyrem Label discloses an oral solution of Na.GHB "neutralized to pH 7.5 with malic acid." Xyrem Label at 2. Further, Cook Application teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about 6 to about 7.5 but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Cook Application discloses that the composition of GHB salts may comprise "pH adjusting agents such as acids, bases and buffering agents." Cook Application at ¶ 12. Cook Application teaches that the composition may comprise malic acid, citric

acid, acetic acid, boric acid, lactic acid, hydrochloric acid, phosphoric acid, sulfuric acid, sulfonic acid, and nitric acid. Cook Application at claim 35. Further, Cook Application discloses liquid formulations of GHB having a total concentration of GHB of about 350 mg/mL to about 650 mg/mL. Cook Application at Table 16; *see also* Xyrem Label at 2 (disclosing liquid formulation of about 500 mg/mL). Therefore, a POSA would have found it obvious to prepare compositions according to claims 26-30.

**(14) No Objective Indicia**

Lupin is unaware of any evidence of secondary considerations that would render the particular combination of claim elements found in the ’258 patent non-obvious, as described below and incorporated herein by reference. For example:

- *Long-Felt Need:* Lupin is not aware of any evidence to support a claim that the ’258 patent resolved a long-felt need.
- *Failure of Others:* Lupin is not aware of any evidence of failure of others that reflects any non-obviousness of the subject matter of the ’258 patent.
- *Skepticism of Those of Skill in the Art:* Lupin is not aware of any skepticism of those skilled in the art with respect to the subject matter of the ’258 patent.
- *Licensing:* Lupin is not aware of any licensing of the ’258 patent that may be reflective of non-obviousness of the subject matter of that patent.
- *Commercial Success:* Lupin is not aware of any evidence linking any product sales made to the ’258 patent, as opposed to marketing, endorsements, other patents or marketing exclusivities, or other factors unrelated to the alleged invention of the ’258 patent. *See Merck*, 395 F.3d at 1376-77. Further, nothing submitted during prosecution of the ’258 patent establishes commercial success. On at least these bases, Lupin is aware of no commercial success that could support a claim of non-obviousness.
- *Recognition in the Industry:* Lupin is not aware of any recognition in the industry for the ’258 patent.
- *Acquiescence:* Lupin is not aware of any evidence of acquiescence to the validity of the ’258 patent.

- *Copying:* Lupin is not aware of any copying that could support a claim of non-obviousness of the subject matter of the '258 patent. *See, e.g.*, *Bayer Healthcare*, 713 F.3d at 1377; *Purdue*, 377 F. App'x at 983; *Santarus*, 2010 WL 1506017, at *26; *Aventis*, 2006 WL 2008962, at *45.

- *Unexpected Results:* Lupin is not aware of any evidence of unexpected results with respect to the '258 patent. Rather, as explained above a person of ordinary skill in the art would have reasonably expected to be able to successfully formulate a composition of mixed salts of GHB.

- *Teaching away:* Lupin is not aware of any prior art teaching away from formulating a composition of mixed salts of GHB. To the contrary, as explained above, the prior art taught a person of ordinary skill in the art to reduce the sodium content by using alternative salts including magnesium, potassium, and calcium.

Additionally, as noted above, the patentee must prove the required nexus before relying on <u>*any*</u> secondary considerations of alleged non-obviousness. *Muniauction*, 532 F.3d at 1327-28. Lupin is not aware of any evidence that would establish the required nexus for the claims of the '258 patent.

Thus, for at least these reasons, claims 1-12, 14-20, 22-30, and 32-33 of the '258 patent are invalid for obviousness.

**b. Lack of Enablement**

Alternatively, to the extent the claims are not rendered obvious as discussed above, the claims of the '258 patent are invalid for lack of enablement. For example, independent claim 1 of the '258 patent broadly claims a method administering pharmaceutical compositions of gamma-hydroxybutyrate (GHB) containing a "mixture" comprising "three or four" of Na•GHB, K•GHB, Ca•$(GHB)_2$, and/or Mg•$(GHB)_2$, with no specific ratio of the respective GHB salts. Accordingly, claim 1 covers *any* ratio of the three or four salts. Claims 2-11, 15-20, and 22-23 similarly allow for a wide range of ratios of the various GHB salts. The specification, however, only describes a limited number of examples of exemplary syntheses of mixtures of oxybate salts, and does not exemplify any three salt combinations with Na/K/Mg or Na/Ca/Mg. To the extent that the claimed

mixtures of GHB salts in the claimed ratios would not have been obvious, the specification fails to enable a person of ordinary skill in the art to practice the full scope of the claimed invention without undue experimentation. *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1309 (Fed. Cir. 2015) (citing *In re Wands*, 858 F.2d 731, 736–37 (Fed.Cir.1988)). Thus, to the extent that claims 1, 2-11, 15-16, 18-19, 21-24, and 27-33 are not invalid as obvious, they are invalid as not enabled to the full scope of the claims.

Further, to the extent the claimed method of treating cataplexy or excessive daytime sleepiness is not rendered obvious as discussed above, the claims of the '258 patent are invalid for lack of enablement. As discussed above, the scope of the claims is broad, for instance, claim 1 covers *any* ratio of the three or four salts. The specification provides no human clinical data showing whether the use of mixed salt formulations of GHB are effective for the treatment of cataplexy or excessive daytime sleepiness. The only disclosed *in vivo* data merely shows that two mixtures (Mixtures A and G), which each contain four salts of GHB, displayed transit rates similar to those of Xyrem®. '258 patent at 33:54-57. Thus, to the extent that Plaintiffs contend that it would not have been obvious to treat cataplexy or excessive daytime sleepiness with a mixed salt formulation, the specification fails to enable the full scope of the claims. *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1285 (Fed. Cir. 2007); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1378-79 (Fed. Cir. 2007).

**c. Indefiniteness**

The claims of the '258 patent that require a "wt/wt %" are invalid as indefinite because when "read in light of the specification delineating the patent, and the prosecution history," "wt/wt %" "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). The patent explains that "[t]he term 'wt/wt %,' are used herein, refers to the normalized weight percent of a

particular salt in a salt mixture. A sample calculation of wt/wt % is provided in Example 1 of the present disclosure." '922 patent at 7:25-34. The sample calculation provided in Example 1, however, fails to "provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1371 (Fed. Cir. 2014).

The calculation described in Table 1 states that "[f]or Mixture A, 34.38 g of 99.9% GBL were charged, which is (34.38×0.999/68.089×1000)=399.0 mMol. The total base equivalents charged were 404.40 mEq. Hence, the excess base was ((404.40−399.0)/(399.0×100%))=1.35%." '922 patent at 25:13-18. However, the "wt/wt %" does not factor in the "1.35%" excess base into the calculation to determine the relative wt/wt % of each salt of GHB. For instance, Table 1 shows that the total "Oxybate or GHB equivalents value" is 404.40 mEQ, which is inconsistent with the disclosure that only 399.0 mMol of GBL was charged. Thus, the calculation shown in Table 1 does not reflect the actual relative "wt/wt %" of the GHB salts formed. Further, the actual relative "wt/wt %" of the GHB salts formed depends on other factors such as the amount of excess base(s) added, the pKa values of the bases, and the effects of the concentration of counterions. *See, e.g.,* Serajuddin at 605-606.

Said another way, a POSA could either calculate "wt/wt %" like the example shown in the specification or a POSA could use a known alternative calculation that accounts for factors such as excess base(s) and concentration of counterions. These varying calculations have the potential to produce inconsistent results. Therefore, the term "wt/wt %" "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." N*autilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). Thus, claims 3-14, and 24 that recite "wt/wt %" are invalid as indefinite.

## IV. INVALIDITY OF THE DRUG-DRUG INTERACTION PATENTS

U.S. Patent Nos. 8,772,306 ("the 306 patent"); 9,050,302 ("the '302 patent"); 9,486,426 ("the '462 patent"); 10,213,400 ("the '400 patent"); and 10,864,181 ("the '181 patent") (collectively the "Drug-Drug Interaction Patents") are invalid for at least the reasons discussed below.

### A. The '306 Patent

U.S. Patent No. 8,772,306 B1 ("the '306 patent"), entitled "Method of Administration of Gamma Hydroxybutyrate with Monocarboxylate Transporters," issued on or about July 8, 2014. Mark Eller is identified as the inventor on the face of the '306 patent. According to the records of the Patent Office, the '306 patent is assigned to Jazz Pharmaceuticals Ireland Limited. The '306 patent issued from U.S. Patent Application Serial No. 13/872,997 ("the '997 application"), filed on April 29, 2013, as a continuation of U.S. Patent Application Serial No. 13/837,714 ("the'714 application"), filed on March 15, 2013. The '306 patent also purports to claim the benefit ofpriority of U.S. Provisional Patent Application Serial Nos. 61/771,557 ("the '557 provisional application") and 61/777,873 ("the '873 provisional application"), filed on March 1, 2013, and March 12, 2013, respectively.

Plaintiff has the burden to establish that the asserted claims of the '306 patent are entitled to the priority date of any earlier-filed application. *See Dynamic Drinkware, LLC v. National Graphics, Inc*. 800 F.3d 1375, 1380 (Fed. Cir. 2015). Absent specific evidence of entitlement to an earlier priority date, the '306 patent must be assigned its actual filing date of April 29, 2013. *Id*. To establish an earlier priority date, each earlier application in the chain must fully disclose the claimed invention by meeting all requirements of 35 U.S.C. §112. *In re NTP, Inc*., 654 F.3d 1268, 1277 (Fed. Cir. 2011). Lupin does not concede that the '306 patent has made a proper claim of priority to an earlier-filed application, and reserves the right to (i) challenge the '306 patent's

entitlement to claim priority to any previous application, (ii) challenge any alleged date of conception or reduction to practice; and (iii) identify additional prior art thereto.

### 1. The '306 Patent Specification

The specification of the '306 patent states that "[o]ne embodiment of the present invention, without being limited by theory, is the discovery of drug interactions that change either, or both, the efficacy or safety profile of GHB. …. To achieve the above benefits, GHB of the present invention can be administered in a reduced amount when a second compound, such as valproate, is concomitantly administered with GHB. . . . The compounds can also be avoided or discontinued to prevent unsafe concomitant administration." *See* '306 patent at 10:47-57. Similarly, the '306 patent asserts that "one embodiment of present invention" is the alleged "unexpected discovery that drugs change the PD profile of GHB to alter its effects and its safety profile. Example drugs are [mis] include valproate and diclofenac." *See* '306 patent at 13:10-13; *see also id.* at 13:48-55. The '306 patent also states that "[i]t has been discovered that the concomitant administration of ... valproate ... will affect GHB administration." *Id*. at Abstract. Also, according to the '306 patent, it was "discovered that valproate increases the effect of GHB on the body, thereby potentially causing an unsafe condition." *Id*. As explained in these Invalidity Contentions, the assertion that the inventors of the '306 patent "discovered that valproate increases the effect of GHB on the body thereby potentially causing an unsafe condition" (*id*.) is incorrect. As explained below, the prior art disclosed that valproate had potentiating effects on GHB, such that a person of ordinary skill in the art would have carefully considered administering the two compounds together, and if so, would have been motivated to reduce the dose of GHB to account for the increased potency of GHB when administered with valproate.

The '306 patent specification further states that "GHB (also called oxysorbate or oxybate) is approved in the United States (US) for the treatment of excessive daytime sleepiness (EDS) and

for the treatment of cataplexy, both in patients with narcolepsy. GHB is commercially sold as Xyrem®) sodium oxybate by Jazz Pharmaceuticals. Sodium oxybate is the sodium salt of the endogenous neurotransmitter gamma hydroxybutyrate (GHB), which is found in many tissues of the body." *See* '306 patent at 11:22-29. The specification of the '306 patent states that "the normal dose ranges of GHB" (i.e., in patients not taking valproate or other interacting drugs) is disclosed in the product insert for Xyrem. *See id*. at 2:52-54.

The '306 patent specification further states that "GHB treatment substantially reduces the signs and symptoms of narcolepsy, i.e. excessive daytime sleepiness, cataplexy, sleep paralysis, apnea, narcolepsy, sleep time disturbances, hypnagogic hallucinations, sleep arousal, insomnia, and nocturnal myoclonus. In addition, GHB increases total sleep time and REM sleep, and it decreases REM latency (Mamelak et al., 1973; Yamada et al., 1967: Bedard et al., 1989), reduces sleep apnea (Scrima et al., 1987), and improves general anesthesia (Hasenbos and Gielen, 1985)." *See* '306 patent at 11:46-54. According to the '306 patent specification, "[a] good safety profile for GHB consumption, when used long term for treatment of narcolepsy has been reported." *See* '306 patent at 12:1-2.

The '306 patent further states that "GHB is a central nervous system (CNS) depressant," and lists a number of other CNS depressants that may interact with GHB. *See* '306 patent at 13:56-63. The '306 patent then states "[i]f use of these CNS depressants in combination with GHB is required, dose reduction or discontinuation of one or more CNS depressants (including GHB) should be considered." *Id.* at 13:63-66.

According to the '306 patent, "[v]alproic acid (VPA, also called valproate or divalproex), an acidic chemical compound, has found clinical use as an anticonvulsant and mood-stabilizing drug, primarily in the treatment of epilepsy, bipolar disorder, and, less commonly, major

depression. *See* G. Rosenberg, Cell. Mol. Life. Sci. 64 (2007) 2090-2103. It is also used to treat migraine headaches and schizophrenia." *See* '306 patent at 15:20-26.

The '306 patent further states that the concomitant administration of GHB with MCT inhibitors, such as valproate, can "effect GHB levels or activity and alter the GHB safety and efficacy profile to create an unsafe condition." *See* '306 patent at 17:45–49. Specifically, the '306 patent states that valproate "can increase or prolong GHB effects." *Id.* at 17:49–50.

### 2. Asserted Claims of the '306 Patent

Plaintiff asserts claims 1-5, 7-16, 18-26, and 28-34 of the '306 patent, of which claims 1, 11, 19, 30, and 33 are independent. These claims are reproduced below:

> 1. A method for treating a patient who is suffering from excessive daytime sleepiness, cataplexy, sleep paralysis, apnea, narcolepsy, sleep time disturbances, hypnagogic hallucinations, sleep arousal, insomnia, or nocturnal myoclonus with gamma-hydroxybutyrate (GHB) or a salt thereof, said method comprising:
>
> > orally administering to the patient in need of treatment at least 5% decrease in an effective dosage amount of the GHB or salt thereof when the patient is receiving a concomitant administration of valproate, an acid, salt, or mixture thereof.
>
> 2. The method in accordance with claim 1, wherein there is at least about a 15% reduction in the effective dosage amount of the GHB or salt thereof given to the patient and wherein the valproate, acid, salt or mixture thereof is divalproex sodium.
>
> 3. The method in accordance with claim 2, wherein the dose of the GHB or salt thereof given to the patient without concomitant administration of valproate, an acid, salt or mixture thereof is from 4.5 to 9 grams per day.
>
> 4. The method in accordance with claim 1, wherein the effective dosage amount is a reduction of about 5% to 10%, about 10% to 15%, about 15% to 20%, about 20% to 25%, about 25% to 30%, about 30% to 35%, about 35% to 40%, about 40% to 45%, or about 45% to 50%, relative to the dose of the GHB or salt thereof normally given to the patient.
>
> 5. The method in accordance with claim 1, wherein the patient is suffering from narcolepsy.

* * *

7. The method in accordance with claim 1, wherein the effective dosage amount of the GHB or a salt thereof is reduced from a range of 4.5 to 9 grams per day.

8. The method in accordance with claim 1, wherein the dose of the GHB or salt thereof without concomitant administration of valproate, an acid, salt or mixture thereof is from 4.5 to 9 grams per day.

9. The method in accordance with claim 1, wherein the effective dosage amount of the GHB or salt thereof is between 3 grams and 7 grams per day.

10. The method in accordance with claim 1, wherein the effective dosage amount of the GHB or salt thereof is between 3.5 grams and 4 grams per day.

11. A method of safely administering GHB or a salt thereof for excessive daytime sleepiness, cataplexy, sleep paralysis, apnea, narcolepsy, sleep time disturbances, hypnagogic hallucinations, sleep arousal, insomnia, or nocturnal myoclonusin a human patient who is being administered GHB, said method comprising:

> determining if the patient has taken, or will take, a concomitant dose of valproate, an acid, salt or mixture thereof; and
>
> orally administering a reduced amount of the GHB or salt thereof to the patient wherein the reduction is at least 5% compared to a dose without concomitant administration of valproate, an acid, salt or mixture thereof.

12. The method in accordance with claim 11, wherein the amount of GHB or salt thereof is reduced at least 10% to 30%.

13. The method in accordance with claim 11, wherein the amount of GHB or salt thereof is reduced at least 15% [] and wherein the valproate, acid, salt, or mixture thereof is divalproex sodium.

14. The method in accordance with claim 11, wherein the valproate, acid, salt or mixture thereof is administered within two weeks of administration of the GHB or salt thereof.

15. The method in accordance with claim 11, wherein the valproate, acid, salt or mixture thereof is administered within three days of administration of the GHB or salt thereof.

16. The method in accordance with claim 11, wherein the patient is

suffering from narcolepsy.

* * *

18. The method in accordance with claim 11, further comprising recommending to decrease the dose of GHB or salt thereof by 20% [] and wherein the valproate, acid, salt, or mixture thereof is divalproex sodium.

19. A method for treating a patient who is suffering from narcolepsy, said method comprising:

> administering a therapeutically effective amount of a formulation containing a GHB salt to a patient starting at a concentration of between 350 and 750 mg/ml with a pH of between 6 and 10;
>
> determining if the patient is also being administered valproate, an acid, salt or mixture thereof;
>
> warning of a potential drug/drug interaction due to the combination of valproate, an acid, salt or mixture thereof and the GHB salt; and
>
> recommending reducing the dose of the GHB salt at least 15%.

20. The method in accordance with claim 19, wherein the valproate, acid, salt or mixture thereof is administered within two weeks of administration of the GHB salt.

21. The method in accordance with claim 19, wherein the valproate, acid, salt or mixture thereof is administered within three days of administration of the GHB salt.

22. The method in accordance with claim 19, wherein the GHB salt is administered starting at a concentration of between 450 to 550 mg/ml.

23. The method in accordance with claim 22, further comprising adding water to the GHB salt formulation.

24. The method in accordance with claim 19, wherein the GHB salt formulation has a pH between 6.5 and 8.

25. The method in accordance with claim 19, further comprising administering the reduced dose of the GHB salt to the patient.

26. The method in accordance with claim 19, wherein the GHB salt comprises a single salt or a mixture of salts of GHB selected from the group consisting of a sodium salt of hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$), and a calcium salt of gamma-

hydroxybutyrate ($Ca.(GHB)_2$).

* * *

28. The method in accordance with claim 19, comprisingrecommending reducing a dose of GHB or salt thereof at least 20% [] and wherein the valproate, acid, salt, or mixture thereof is divalproex sodium.

29. The method in accordance with claim 19, further comprising adding water to the GHB salt formulation.

30. A method for treating a patient who is suffering from narcolepsy, said method comprising:

administering a therapeutically effective amount of a formulation containing a GHB salt to a patient;

determining if the patient is also being administered valproate, an acid, salt or mixture thereof;

recommending a 20% decrease in the starting dose of the GHB salt such that a patient starts taking the GHB salt at an adjusted dosage amount between 3.5 grams and 4 grams the GHB salt per night administered orally.

31. The method in accordance with claim 30, wherein the starting adjusted dosage amount of the GHB salt is about 3.6 grams.

32. The method in accordance with claim 30, further comprising optionally diluting the GHB salt formulation from a starting concentration of between 350 and 750 mg/ml with a pH of between 6 and 10.

33. A method for treating a patient who is suffering from narcolepsy, said method comprising:

orally administering a therapeutically effective amount of a formulation containing a GHB salt;

determining if the patient is also being administered valproate, an acid, salt or mixture thereof;

recommending a 20% decrease in the starting dose of the GHB salt such that the amount that the patient is administered is reduced to about 3.6 grams GHB per day.

34. The method in accordance with claim 33, further comprising optionally diluting the GHB salt formulation from a starting concentration of between 350 and 750 mg/ml with a pH of between 6 and 10.

### 3. Invalidity of the ’306 Patent

Claims 1-5, 7-16, 18-26, and 28-34 of the ’306 patent are invalid at least under 35 U.S.C. § 103 for being obvious over the prior art, and under 35 U.S.C. § 101 for claiming unpatentable subject matter. Further, to the extent Plaintiff argues that the asserted claims of the ’306 patent are not obvious over the prior art, then they are invalid under 35 U.S.C. § 101 for lack of utility, and under 35 U.S.C. § 112 for lack of enablement and written description support.

#### a. Obviousness

In addition to the prior art references found on the face of the ’306 patent, which Lupin identifies and incorporates fully herein, Lupin identifies the following items of prior art which, separately or in any reasonable combination, render obvious one or more of the asserted claims of the ’306 patent under 35 U.S.C. § 103. In addition, Lupin reserves the right to rely on all prior art, evidence of the relevant state of the art, and evidence of prior sales, produced by Plaintiff during fact discovery and all prior art identified in the ’306 patent or its prosecution history. Lupin further incorporates by reference, in full, all references cited in the following prior art references and their prosecution histories, where applicable.

The citations provided are representative of the references and are not exhaustive. To the extent that similar claim limitations occur in one or more claims, the disclosures below should be read to apply to all similar claim limitations. Moreover, many of the references discussed herein are representative of additional prior art references in the relevant field. It should be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of the other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information, including other publications and general scientific, medical or engineering knowledge. Lupin therefore reserves the right to rely upon other

unidentified portions of the prior art references and on other publications and expert testimony to provide context and to aid understanding and interpretation of any identified portions. Lupin also reserves the right to rely upon other portions of the prior art references, other publications, and the testimony of experts to establish that the alleged inventions were expressly or inherently disclosed in the prior art and/or would have been obvious to a person of ordinary skill in the art, including on the basis of modifying or combining certain cited references. It should also be recognized that the various concepts may be discussed in numerous references and that citation to one particular reference does not exclude later citation to other references discussing the same concept. Lupin also reserves the right to rely upon any admissions relating to prior art or the state of the art in the '306 patent or its prosecution history, as well as any admissions relating to prior art or the statement of the art in foreign counterparts and their prosecution histories. Lupin further reserves the right to modify these Invalidity Contentions to add additional prior art references in light of the information gained through fact discovery, expert discovery, arguments or positions advanced by Plaintiff, or the Court's claim construction rulings.

Lupin reserves the right to rely upon any related patents and patent applications, foreign patent counterparts and foreign patent applications of U.S. patents or applications identified in these Invalidity Contentions, U.S. counterparts of foreign patents or foreign patent applications identified in these Invalidity Contentions, or U.S. and foreign patents or applications corresponding to articles and publications identified in these Invalidity Contentions. For prior art patents and publications identified in these Invalidity Contentions, Lupin reserves the right to rely on inherency, public use, offer for sale, and/or sale of the products described in those prior art patents or publications once Lupin has had an opportunity to take discovery on these subjects.

**i. Identification of the Prior Art**

Subject to the above, at least the following prior art is relevant to the invalidity of the asserted claims of the ’306 patent:

- U.S. Patent No. 6,780,889 B2 (“the Cook Patent”);[30]
- R. Bernasconi, et al., *Experimental Absence Seizures: Potential Role of γ-Hydroxybutyratic Acid and GABAB Receptors*, J. Neural. Transm. 35:155-177 (1992) (“Bernasconi”);
- Bhattacharya, I. et al., *GHB (γ-Hydroxybutyrate) Carrier-Mediated Transport across the Blood-Brain Barrier*, 311(1) J. Pharmacol. Exp. Ther. 92–98 (2004) (“Bhattacharya 2004”);
- Bhattacharya, I. et al., *Potential γ-Hydroxybutyric Acid (GHB) Interactions Through Blood–Brain Barrier Transport Inhibition: A Pharmacokinetic Simulation-Based Evaluation*, 33(5) J. Pharmacokinetics & Pharmacodynamics 657–81 (2006) (“Bhattacharya 2006”);
- Lowell A. Borgen, et al., *The Influence of Gender and Food on the Pharmacokinetics of Sodium Oxybate Oral Solution in Healthy Subjects*, 43 J. Clin. Pharmacol. 59-65 (2003) (“Borgen”);
- R. Broughton & M. Mamelak, *The Treatment of Narcolepsy-Cataplexy with Nocturnal Gamma-Hydroxybutyrate*, Can. J. Neurol Sci, Vol. 6, No.1 (1979) (“Broughton 1979”);
- R. Broughton & M. Mamelak, *Effects of nocturnal Gamma-Hydroxybutyrate on Sleep/Waking Patterns in Narcolepsy-Cataplexy*, Can. J. Neurol. Sci. Vol. 7, No.1 (1980) (“Broughton 1980”);
- Annachiara Cagnin et al., *γ-Hydroxybutyric Acid-Induced Psychosis andSeizures*, 21 Epilepsy & Behavior 203 (2011) (“Cagnin”);
- C.D. Cash, Gamma hydroxybutyrate: *An Overview of the Pros and Cons for it Being a Neurotransmitter And/Or a Useful Therapeutic Agent*, Neurosci.

[30] The Cook Patent, and U.S. Patent Nos. 7,262,219 B2 (“the ’219 patent”) and 7,851,506 B2 (“the ’506 patent”), as well as their application publications, including U.S. Patent Application No. 2003/0125385 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (published July 3, 2003) (“Cook Application”), are each prior art to the ’306 patent. Since the specifications of each of the ’889, ’219, and ’506 patents, and the corresponding application publications, are substantially the same, for the purposes of these Invalidity Contentions, Lupin will limit its discussion to the teachings of the Cook Patent in this section. Any citations herein with respect to the Cook Patent are also made with respect to the same or similar disclosures in the Cook Application, the ’219 patent, the ’506 patent, as well as their application publications.

Biobehavioral Rev., Vol. 18(2), 291-304 (1994) ("Cash");

- Sébastien Chateauvieux et al., *Molecular and Therapeutic Potential and Toxicity of Valproic Acid*, 2010 J. Biomed. & Biotech. 1 (online version) (2010) ("Chateauvieux");

- Depakote (Divalproex Sodium) Tablets for Oral Use: FDA Approved Labeling Text, (2011) ("Depakote Label");

- P. Divry et al., *A New Patient with 4-Hydroxybutyric Aciduria, a Possible Defect of 4-Aminobutyrate Metabolism*, 129 Clinica Chimica Acta 303-309 (1983) ("Divry");

- Food and Drug Administration, Center for Drug Evaluation and Research, Clinical Pharmacology Division, Guidance for Industry: Drug Interaction Studies – Study Design, Data Analysis, Implications for Dosing and Labeling (February 2012) ("FDA Guidance");

- Neil T. Feldman, et al., Sleep Architecture Effects of Sodium Oxybate Treatment in Subjects with Sleep-Disordered Breathing, 20 Chest 130 (2006) ("Feldman 2006");

- Neil T. Feldman, Clinical perspective: Monitoring Sodium Oxybate-Treated Narcolepsy Patients for the Development of Sleep-Disordered Breathing, 14 SLEEP BREATH 77-79 (2010) ("Feldman 2010");

- S.J. Frucht, et al., A Pilot Tolerability and Efficacy Trial of Sodium-Oxybate in Ethanol-Responsive Movement Disorders, 20 Movement Disorders 1330-1337 (2011) ("Frucht");

- Philip D. Hansten & John R. Horn, Drug Interactions Analysis and Management, Wolters Kluwer Health, PM1-36 (2011) ("Hansten");

- Harvey, P. et al., *The Inhibitory Effect of Sodium* n-*Dipropyl Acetate on the Degradative Enzymes of the GABA Shunt*, 52(2) FEBS Lett. 251–54 (1975) ("Harvey");

- Viviane Hechler et al., *γ-Hydroxybutyrate Conversion into GABA Induces Displacement of $GABA_B$ Binding That Is Blocked by Valproate and Ethosuximide*, 281 J. Pharmacology & Experimental Therapeutics 753 (1997) ("Hechler");

- Elaine E. Kaufman & Thomas Nelson, *Evidence for the Participation of a Cytosolic $NADP^+$-Dependent Oxidoreductase in the Catabolism of γ-Hydroxybutyrate In Vivo*, 48 J. Neurochemistry 1935 (1987) ("Kaufman 1987");

- Kaufman, E. et al., *Oxidation of γ-Hydroxybutyrate to Succinic Semialdehyde by a Mitochondrial Pyridine Nucleotide-Independent Enzyme*, 51(4) J.

Neurochemistry 1079–84 (1988) ("Kaufman 1988");

- Kaufman, E. et al., *An Overview of γ-Hydroxybutyrate Catabolism: The Role of the Cytosolic NADP+-Dependent Oxidoreductase EC 1.1.1.19 and of a Mitochondrial Hydroxyacid-Oxoacid Transhydrogenase in the Initial, Rate-Limiting Step in This Pathway*, 16(9) Neurochem. Res. 965–74 (1991) ("Kaufman 1991");

- I. Knerr, et al., *Therapeutic concepts in succinate semialdehyde dehydrogenase (SSADH; ALDH5a1) deficiency (γ-hydroxybutyric aciduria). Hypotheses evolved from 25 years of patient evaluation, studies in Aldh5a1$^{-/-}$ mice and characterization of γ-hydroxybutyric acid pharmacology*, J. Inherit. Metab. Dis., Vol. 30, pp. 279-294 (2007) ("Knerr");

- van der Laan, J.W. et al., *Di-n-Propylacetate and GABA Degradation: Preferential Inhibition of Succinic Semialdehyde Dehydrogenase and Indirect Inhibition of GABA-Transaminase*, 32(4) J. Neurochem. 1769–80 (1979) ("Laan");

- Löscher, *Valproate: A Reappraisal of Its Pharmacodynamic Properties and Mechanisms of Action*, Progress in Neurobiol., Vol. 58, pp. 31-59 (1999) ("Löscher 1999");

- Löscher, W., *Basic Pharmacology of Valproate: A Review after 35 Years of Clinical Use for the Treatment of Epilepsy*, 16(10) CNS Drugs 669–94 (2002) ("Löscher 2002");

- Maitre, M, *The γ-Hydroxybutyrate Signalling System in Brain Organization and Functional Implications*, 51 Progress in Neurobiology 337 (1997) ("Maitre");

- Pascal Mathivet, et al., *Binding Characteristics of γ-Hydroxybutyric Acid as a Weak but Select $GABA_B$ Receptor Agonist*, 321 European J. Pharmacology 67-75 (1997) ("Mathivet");

- Morris, Monocarboxylate Transporter Inhibition with Osmotic Diuresis Increases γ-Hydroxybutyrate Renal Elimination in Humans: A Proof-of-Concept Study, *J. Clin. Tox.*, 1(2), 1000105, pp. 1-4 (2011) ("Morris 2011");

- Mortimer Mamelak et al., *Treatment of Narcolepsy with γ-Hydroxybutyrate. A Review of Clinical And Sleep Laboratory Findings*, Sleep, 9(1):285-289 (1986) ("Mamelak 1986");

- Mortimer Mamelak, *Gamma hydroxybutyrate: An Endogenous Regulatorof Energy Metabolism*, 13 Neurosci. & Biobehavorial Revs. 187(1989) ("Mamelak 1989");

- Okun, M., *GHB: An Important Pharmacologic and Clinical Update*, 4 J. Pharmaceut. Sci. 167 (2001) ("Okun");

- A Priori, et al., *γ-Hydroxybutyric Acid for Alcohol-Sensitive Myoclonus with Dystonia*, 54 NEUROLOGY 1706 (2000) ("Priori");

- J.F. Rumigny et al., *Specific and Non-Specific Succinic Semialdehyde Reductases from Rat Brain: Isolation and Properties*, 117 FEBS Letters 111 (1980) ("Rumigny");

- Martin B. Scharf, et al., *The Effects and Effectiveness of γ-Hydroxybutyrate in Patients with Narcolepsy*, J. Clin. Psychiatry, 46:222-225 (1985) ("Scharf 1985");

- Martin B. Scharf, *Pharmacokinetics of Gamma hydroxybutyrate (GHB) in Narcoleptic Patients*, *Sleep*, Vol. 21(5), pp. 507-514 (1998) ("Scharf 1988");

- Schep, L. et al., *The Clinical Toxicology of Gamma-Hydroxybutyrate, Gamma-Butyrolactone and 1,4-Butanediol*, 50(6) Clin. Toxicol. (Phila). 458–70 (2012) ("Schep");

- Lawrence Scrima, et al., *The Effects of γ-Hydroxybutyrate on the Sleep of Narcolepsy Patients: A Double-Blind Study*, 13(6) Sleep 479-90 (1990) ("Scrima");

- T. Shinka et al., *Effect of Valproic Acid on the Urinary MetabolicProfile of a Patient with Succinic Semialdehyde Dehydrogenase Deficiency*, 792 J. Chromatography 99-106 (2003) ("Shinka");

- O.C. Snead et al., *Effect of Acute and Chronic Anticonvulsant Administration on Endogenous γ-Hydroxybutyrate in Rat Brain*, 19 Neuropharmacology 47-52 (1980) ("Snead 1980");

- O.C. Snead & K. Michael Gibson, *γ-Hydroxybutyric Acid*, 352 New England J. Med. 2721-32 (2005) ("Snead 2005");

- Vayer, P. et al., *3′-5′ Cyclic-Guanosine Monophosphate Increase in Rat Brain Hippocampus after Gamma- Hydroxybutyrate Administration: Prevention by Valproate and Naloxone*, 41(5) Life Sci. 605–10 (1987) ("Vayer 1987");

- Vayer, P. et al., *Is the Anticonvulsant Mechanism of Valproate Linked to Its Interaction with the Cerebral γ-Hydroxybutyrate System?*, 9(4) Trends Pharmacol. Sci. 127–29 (1988) ("Vayer 1988");

- Anna Waszkielewicz & Jacek Bojarski, *γ-Hydroxybutyric Acid (GHB) and Its Chemical Modifications: A Review of the GHBergic System*, 56 Polish J. Pharmacology 43 (2004) ("Waszkielewicz");

- Gregory P. Wedin et al., *The Clinical Development of γ-Hydroxybutyrate (GHB)*, 1 Current Drug Safety 99 (2006) ("Wedin");

- Weiss, T. et al., *Gamma-Hydroxybutyrate (GHB) and Topiramate—Clinically Relevant Drug Interaction Suggested by a Case of Coma and Increased Plasma GHB Concentration*, 69 Eur. J. Clin. Pharmacol. 1193 (2013) ("Weiss");
- Xyrem® Prescribing Information (2012) ("Xyrem 2012 PI");
- Xyrem® Prescribing Information (2005) ("Xyrem 2005 PI");
- FDA Approval Letter for Xyrem® (Nov. 18, 2005) ("Xyrem 2005 FDA Approval Letter");
- FDA Approval Letter for Xyrem® (Jul. 17, 2002) ("Xyrem 2002 FDA Approval Letter");
- Physician's Desk Reference Edition 61, pp. 1688-1692, (2007) ("Xyrem Physician's Desk Reference"); and
- Xyrem® Titration Schedule published in 2008 ("the Xyrem Titration Schedule").

Lupin expressly reserves the right to modify and/or supplement the prior art discussed herein. Each of the above is prior art to the '306 patent. To the extent that the patentee and/or inventors attempt to swear behind or otherwise remove as prior art any of the art identified herein, Lupin specifically reserves its right to, *inter alia*, add additional prior art to the list. Furthermore, to the extent that the patentee argues that any of the cited references are not prior art under 35 U.S.C. § 102, many of the referenced patents and/or patent applications have foreign or U.S. equivalents which also qualify as prior art. Such foreign and U.S. equivalents are incorporated herein, and Lupin reserves the right to rely upon them. Additionally, as previously noted, Lupin reserves its right to, *inter alia*, supplement or amend its list of prior art references based upon, among other things, Plaintiff's disclosure of its alleged infringement proofs; disclosure of the Plaintiff's proposed construction of the claims of the '306 patent; issuance of a claim construction ruling by a court,should the court be able to construe the claims of the '306 patent;  Plaintiff's response to any of Lupin's defenses, including, but not limited to, Plaintiff's interpretation of the prior art; the discovery (fact or expert) during litigation; and/or further investigation. Moreover,

Lupin does not admit, or otherwise concede, that the claims of the ’306 patent are entitled to an effective filing date earlier than the patent’s filing date, and therefore reserves the right to, *inter alia*, challenge the effective filing date of the patent and to assert additional prior art references and/or products based on any such challenge. Nevertheless, as discussed herein, each claim of the patent is invalid even if the ’306 patent is entitled to claim priority to an earlier-filed application.

Claims 1-5, 7-16, 18-26, and 28-34 of the ’306 patent are rendered obvious for at least the reasons set forth below. (*See also* Section V.F).

**ii. The Scope and Content of the Prior Art**

**(1) The Cook Patent**

The Cook Patent discloses compositions comprising “gamma-hydroxybutyrate (GHB), also known as 4-hydroxybutyrate, and the sodium salt of GHB (sodium oxybate) and other salts such as magnesium, ammonium and calcium,” as well as their use in treating sleep disorders such as narcolepsy. The Cook Patent at 1:16-31. The Cook Patent also discusses preferred concentration and pH ranges for compositions comprising GHB, stating:

> At a concentration or content of about 450 mg/ml GHB, the pH may be of about 3.9 to about 10.3. At a concentration or content of about 500 mg/ml GHB, the pH may be of about 4.75 to about 10.3. At a concentration or content of about 600 mg/ml GHB, the pH may be of about 6.1 to about 10.3. At a concentration or content of about 750 mg/ml GHB, the pH may be of about 7.0 to about 10.3. Of course, all pH and concentration or content values in between each of the listed pH and concentration or content values are encompassed by the invention.

*Id.* at 4:30-40. The Cook Patent discloses that liquid formulations of GHB were used in clinical trials and states:

> The initial dose for all patients in the GHB open-label trial was 6 grams of GHB nightly in divided doses. Dosage adjustments were permitted in the first two weeks of the trial as indicated for intolerance or lack of efficacy. The investigator was permitted to decrease the dose of GHB to 3 grams or 4.5 grams, or increase the dose to 7.5 grams or 9 grams nightly. After two weeks, further dosage adjustments were made if clinically indicated.

*Id.* at 18: 2-10. The Cook Patent further incorporates by reference the teachings of a number of prior art references, at least one of which, Mamelak 1989, teaches that valproate increases brain tissue levels of GHB. *Id.* at 61: 19-23; *id.* at 62:50-53; Mamelak 1989 at 189.

**(2) Bernasconi**

Bernasconi teaches that concomitant administration of GHB and valproate results in increased GHB levels in plasma and brain. Bernasconi investigated, among other things, the increase in GHB, or its precursor ɣ-butyrolactone (GBL), induced by valproate in two strains of rats. Bernasconi at 157. Bernasconi teaches that "in cortex and striatum" "valproate induced a rapid and strong increase of GHB and GBL levels (about 180%) for 30 minutes; then the content of the two GABA metabolites decreased slightly until a plateau was reached (Fig. 3)." *See id.* at 164, Fig. 3. Bernasconi teaches that the "rapid accumulation of GHB" was due to "enzymatic inhibition of its metabolization." *Id.*

**(3) Bhattacharya 2004**

Bhattacharya 2004 teaches that "the Food and Drug Administration granted orphan drug status to GHB (sodium oxybate; Xyrem) as a controlled substance with restricted distribution for the treatment of narcolepsy with cataplexy." Bhattacharya 2004 at 92. Bhattacharya 2004 teaches that "[a]dverse events associated with GHB overdose include seizures, respiratory depression, and impaired consciousness leading to coma and death." *Id.* Bhattacharya 2004 reported that GHB undergoes both carrier-mediated transport and passive diffusion and that the carrier-mediated processes are pharmacologically inhibited by known inhibitors of MCT, the monocarboxylate transporter. *Id.* at 93.

**(4) Bhattacharya 2006**

Bhattacharya 2006 noted that "MCT substrates (salicylic acid, valproic acid, and probenecid) significantly inhibited GHB brain influx, suggesting that MCT substrates may be

potential transport inhibitor candidates for GHB toxicity." Bhattacharya 2006 at 658. However, Bhattacharya 2006 performed pharmacokinetic simulations using another GHB dehydrogenase/MCT inhibitor, salicylic acid, and found that, accounting for both MCT inhibition and GHB dehydrogenase inhibition, GHB brain concentrations were significantly elevated. *Id.* at 672–74. Bhattacharya 2006 concluded that

> Given the modest predicted decreases in GHB brain exposure, the narrow window of treatment following GHB ingestion, and the significant *in vivo* (rats) interaction, this study further suggests that salicylic acid is more likely to cause an undesirable drug interaction with therapeutic use of GHB (for narcolepsy with cataplexy) rather than as an antidote to GHB overdose.

*Id*. at 678.

**(5) Borgen**

Borgen teaches that renal elimination of GHB is only about 3% of total body clearance. Borgen at 62. Table II of Borgen shows that the CL/F (apparent systemic clearance) and CLr (renal clearance) are compared using the same measure (mL/hr), and the total clearance is about 34-fold greater than renal clearance. *Id.* Thus, renal clearance is about 3% of total body clearance. Further, Borgen demonstrated that urinary excretion of GHB was a minor elimination pathway, and average urinary recovery of GHB was about 3% following dosing. *Id.* Borgen also acknowledges that metabolism to GHB to carbon dioxide (via the Krebs Cycle) is the major mechanism of GHB clearance, which is consistent with Borgen's findings that urinary recovery of GHB was less than 4%. *Id.* at 64.

**(6) Broughton 1979**

Broughton 1979 discloses the use of GHB to treat narcolepsy. Broughton 1979 discloses that sixteen patients with narcolepsy and cataplexy were treated with GHB "given at night and tailored to achieve as continuous a night's sleep as possible. The dosage usually consisted of 1.5-2.25 gm orally at bedtime and then one or two further1.0-1.5 gm doses with awakening during the

night and totaled about 50 mg/kg." Broughton 1979 at Summary. Broughton 1979 explains that "[t]he ameliorating effects of GHB on the major daytime symptoms of narcolepsy appeared gradually. By comparison, the subjective quality of night-time sleep improved very rapidly." *Id.* at 3.

**(7) Broughton 1980**

Broughton 1980 discloses the use of GHB to treat narcolepsy. Broughton 1980 teaches that "GHB improved the quality of night sleep by increasing the amount of slow wave sleep, reducing stage 1, increasing sleep efficiency (percentage of time in bed spent asleep), and reducing the number of periods of short sleep under 15 minutes," and that patients "experienced reduction or loss of daytime attacks of irresistible sleep, cataplectic attacks, and other auxiliary symptoms." Broughton 1980 at Summary.

**(8) Cagnin**

Cagnin discusses a case report of a patient who suffered epileptic seizures when treated with both GHB and valproate. Cagnin at 203-04. After six days, GHB was discontinued with immediate remission of seizures. *Id.* at 205. Cagnin suggests that an interaction between valproate and GHB may have triggered the seizures. *Id.* According to Cagnin:

> [A]n interaction between valproate and GHB might have induced an imbalance in GABAergic neurotransmission and triggered the seizures. It is well recognized that GABAergic and glutamatergic transmission may be implicated in the antiepileptic and mood-stabilizing actions of valproate. On the other hand, it is less well known that valproate is a potent in vitro inhibitor of succinic semialdehyde dehydrogenase (SSADH), which catalyzes the production of succinate from succinic semialdehyde, an intermediate product in the metabolic pathway transforming GHB into GABA and vice versa. An inherited deficiency of SSADH activity leads to accumulation of succinic semialdehyde and, consequently, a 30-fold increase in GHB level and 2- to 4-fold increase in GABA in the brains of affected rats.

*Id.* at 205.

**(9) Cash**

Cash discloses the use of GHB to treat narcolepsy, and that concomitant administration of GHB and valproate results in increased GHB levels in plasma and brain. Cash teaches that valproate "is the most well-known agent that acutely increases cerebral GHB levels." Cash at 294. Cash teaches that "[t]he mechanism of this increase might be due to inhibition of the mitochondrial enzyme, succinic semialdehyde dehydrogenase (SSADH)." *Id.* As Cash explains, "[i]n the rat brain, valproate is a competitive inhibitor of SSADH vis a vis SSA [succinic semialdehyde] with a $K_m$ value of about 0.8 μM," and that "[c]ompetitive inhibition of SSADH might be expected to increase the SSA level to a point where reduction of this catabolite to GHB is favoured, because the specific SSA reductase, which is not inhibited by valproate, (150) appears at least, in vitro, to be responsible for SSA reduction to GHB." *Id.*

**(10) Chateauvieux**

Chateauvieux reviews the therapeutic use and toxicity of valproic acid, including clinical trials involving valproic acid and its side effects encountered during treatment. Chateauvieux at 1. According to Chateauvieux "[t]he therapeutic action on central nervous system and respiratory of sodium oxybate (gamma-Hydroxybutyrate, GHB) can be potentially increased by other CNS-depressants which includes" valproic acid. *Id.* at 9.

**(11) Depakote Label**

Depakote Label teaches that Depakote (i.e., sodium valproate) when co-administered with aspirin increased valproate free fraction by 4-fold, compared to the administration of valproate alone. Depakote Label at 24. Depakote Label suggests using caution when administering valproate and aspirin together. *Id.* Depakote was also known to produce CNS depression in some patients, particularly when combined with another CNS depressant. *Id.* at 1, 48.

**(12) Divry**

Divry teaches that, in addition to inhibition of GHB dehydrogenase, valproate inhibits

SSADH, which results in accumulation of SSA, which is then converted to GHB, leading to increased levels of GHB. Divry at 308, Table I.

**(13) The FDA Guidance**

The FDA Guidance discloses that "[d]rug interactions can result when one drug alters the pharmacokinetics of another drug or its metabolites," and recommends that drug-drug interactions be studied during drug development. FDA Guidance at 1. The FDA Guidance provides draft guidance for industry on drug interaction studies – study design, data analysis, implications, and labeling recommendations. *See generally id*. The FDA Guidance states that if potential drug-drug interactions are identified based on *in vitro* and/or *in vivo* studies, drug sponsors or manufacturers should design further studies or collect information to determine whether dosage adjustments or other prescribing modifications (e.g., additionalsafety monitoring or contraindications) are needed based on the identified interaction(s) to avoid undesired consequences. *Id.* at 15. The FDA Guidance further discloses that the overall objective of interaction studies for a new drug is to determine (1) whether any interactions are sufficiently large to necessitate a dosage adjustment of the drug itself or of the drugs withwhich it might be used; (2) whether any interactions call for additional therapeutic monitoring; and (3) whether there should be a contraindication to concomitant use when lesser measures cannot mitigate risk. *Id*. at 6–7.

**(14) Feldman 2006**

Feldman 2006 teaches that GHB is effective for the treatment of myoclonus and sleep apnea. Feldman 2006 at 130S. Feldman 2006 reports the results of a safety trial to determine the effect of sodium oxybate on the apnea hypopnea index, including a significant increase in total sleep time and stage 3/4 sleep, reduction in REM, and improvement in excessive daytime sleepiness. *Id.*

**(15) Feldman 2010**

Feldman 2010 teaches that sodium oxybate is recognized as an effective treatment of cataplexy, daytime sleepiness, and disrupted sleep due to narcolepsy, and notes that sodium oxybate is a central nervous system and respiratory depressant, and these safety issues are described in the product labeling. Feldman 2010 at 77.

**(16) Frucht**

Frucht teaches that sodium oxybate (marketed as Xyrem) was approved in 2002 for the treatment of cataplexy in patients with narcolepsy. Frucht at 1330. Frucht also teaches that "all persons in the United States who are prescribed Xyrem must be entered into a central registry, the Xyrem Success Program, and close follow-up is required. The drug is administered in divided doses, the first given at bedtime, followed several hours later during the night by the second dose." *Id.* Frucht reports the results of an open-label study of five patients that showed "sodium oxybate produced dose-dependent improvements in blinded ratings of ethanol-responsive myoclonus and tremor. The drug was tolerated at doses that produced clinical benefit." *Id.* at 1334.

**(17) Hansten**

Hansten teaches that drug interactions may lead to change in response to a drug. A drug interaction occurs when a substance (typically another drug) affects the activity of a drug when both are administered concomitantly. The drug that is affected is known as the object drug; the drug causing the change is the precipitant drug. A drug interaction that affects the object drug may lead to a change in response to the drug, most commonly loss of efficacy or increased risk of drug toxicity. Hansten at 1-2.

**(18) Harvey**

Harvey teaches that sodium n-dipropyl acetate (sodium valproate) inhibits succinic semialdehyde dehydrogenase (SSADH) from rat brain and from guinea pig kidney. Harvey at 251, 253.

### (19) Hechler

Hechler states that "GHB could be converted into GABA *in vitro* by the sequential action of GHB dehydrogenase, which oxidizes GHB to SSA, and then a GABA-T activity transaminating SSA to GABA." Hechler at 757. According to Hechler, "GHB degradation into GABA was prevented by GHB dehydrogenase inhibition with either valproate or ethosuximide." *Id.* at 754. Hechler discloses that this inhibition "induce[d] GHB accumulation in brain after administration *in vivo*." *Id.* at 759.

### (20) Kaufman 1987

Kaufman 1987 studied the effect of the *in vivo* inhibition of GHB dehydrogenase (which catalyzes the oxidation of GHB to succinic semialdehyde) on tissue levels of GHB and on the half-life of GHB in plasma. Kaufman 1987 at 1935-36. Of the compounds studied, sodium valproate was noted to be an "excellent" inhibitor of GHB dehydrogenase. *Id.* at 1937. According to Kaufman 1987, the administration of sodium valproate to rats "produced a 1.4-fold increase in the GHB level in brain." *Id.* Kaufman 1987 further discloses that "both the increase in tissue levels of GHB following administration of inhibitors of GHB dehydrogenase and the change in the $t_{½}$ for the plasma disappearance curve after infusion of either an inhibitor or a compound that stimulates the reaction are findings that are consistent with a role for GHB dehydrogenase in the overall degradation of GHB in vivo." *Id.* at 1940.

### (21) Kaufman 1988

Kaufman 1988 teaches that GHB enters its "major degradative pathway," "the citric acid cycle as succinate." Kaufman 1988 at 1079. Kaufman 1988 teaches that sodium valproate is "a potent inhibitor of GHB dehydrogenase." *Id.* at Abstract. According to Kaufman 1988, the $NADP^+$-dependent oxidation of GHB catalyzed by brain cytosol "can be inhibited almost completely" by sodium valproate. *Id.* at 1083.

**(22) Kaufman 1991**

Kaufman 1991 teaches that administration of valproate, an inhibitor of GHB dehydrogenase, "significantly increased the concentration of GHB in brain." Kaufman 1991 at Abstract; *see also id.* at 1937 ("Sodium valproate produced a 1.4-fold increase in the GHB level in brain and a small but insignificant decrease in the kidney."). Kaufman 1991 teaches that "at a tissue concentration of 0.3 mM sodium valproate, GHB dehydrogenase would be 85% inhibited, a very marked inhibition compared to the 5% inhibition of SSA dehydrogenase which would occur at a 0.3 mM tissue concentration of the drug. Even at a tissue concentration of 0.05 mM sodium valproate, a tissue concentration at which there would be essentially no inhibition of SSA dehydrogenase, GHB dehydrogenase still would be 48% inhibited." *Id.* at 1940.

**(23) Knerr**

Knerr teaches that sodium valproate (di-n-propyl acetate) is employed for treatment of generalized and partial seizures in humans, and that it can inhibit cytosolic GHB dehydrogenase, thereby preventing GHB conversion to GABA. Knerr at 285-286.

**(24) Laan**

Laan teaches that DPA (valproate) increases brain concentrations of GABA through two mechanisms: inhibition of succinate-semialdehyde NAD(P)+ oxidoreductase (SSADH) resulting in succinate-semialdehyde (SSA) accumulating and preventing degradation of GABA by 4-aminobutyrate 2-oxo-glutarate aminotransferase (GAB-T) and conversion of SSA into GABA by the GABA-T reverse reaction. Laan at 1779.

**(25) Löscher 1999**

Löscher 1999 teaches that valproate was one of the major antiepileptic drugs with efficacy for the treatment of both generalized and partial seizures in adults and children, and was increasingly used for therapy of bipolar and schizoaffective disorders, neuropathic pain and for

prophylactic treatment of migraine. Löscher 1999 at Abstract. Löscher 1999 teaches that administration of valproate to rats has been shown to increase the brain level of GHB in vivo, in a time- and dose-dependent manner. *Id.* at 45, 48.

**(26) Löscher 2002**

Löscher 2002 teaches that GABA is the major inhibitory neurotransmitter in the brain, and alterations to the function of GABA are significantly involved in the pathophysiology of several brain diseases, including epilepsy. Löscher 2002 at 681. Impairment of GABA-ergic inhibitory neurotransmission can result in convulsions, and potentiation of GABAergic transmission can lead to anticonvulsant effects. *Id.* Löscher 2002 also teaches that GHB can be metabolized to SSA by nonspecific succinic semialdehyde reductase (nonspecific SSR), and that valproate is a potent inhibitor of nonspecific SSR, leading to accumulation of GHB. *Id.* at 681, 686. Löscher 2002 also teaches that the increase in brain GHB levels due to concomitant administration of valproate has been shown to be time-dependent and dose-dependent. *Id.* at 686.

**(27) Maitre**

Maitre discloses GHB as "γ-hydroxybutyrate," "[g]amma-hydroxybutyrate," and "GHB." *See* Maitre at Abstract. Maitre discloses the administration of GHB to subjects suffering from narcolepsy. *See, e.g., id.* at 352. Maitre also teaches that valproate increases levels of GHB in the brain. *Id.* at 340-41. Specifically, Maitre discloses that valproate increases levels of GHB in the brain by inhibiting GHB dehydrogenase, which catalyzes the degradation of GHB. *Id.* at 340, 343, 351.

**(28) Mathivet**

Mathivet teaches that valproate inhibits GHB dehydrogenase. *See* Mathivet at 71 (teaching that valproate (3 mM) completely blocked the nonspecific semialdehyde reductase, also known as GHB dehydrogenase).

**(29) Morris 2011**

Morris 2011 teaches that any potential for valproate to decrease GHB levels through its function as a MCT inhibitor would have been minimal. Morris 2011 investigated the impact of MCT inhibition with L-lactate combined with osmotic diuresis on renal clearance of GHB (50 mg/kg, 4.5 g maximum dose) in human subjects. Morris 2011 at Abstract. Morris 2011 discloses that "[n]o effect on total clearance was observed in this study due to the negligible contribution of renal clearance to total clearance at this low GHB dose." *Id.; see also id.* at 3. Morris 2011 teaches

> At low, therapeutic GHB doses, such as that studied currently, the primary route of elimination is metabolism by GHB dehydrogenase to form succinic semialdehyde, which is then metabolized by succinic semialdehyde dehydrogenase to succinic acid, which enters the Krebs cycle at is excreted as carbon dioxide. Renal excretion represents a minor route of elimination at low doses, as illustrated in this study with only approximately 2% of the total dose excreted into the urine.

*Id.* at 3.

**(30) Mamelak 1986**

Mamelak 1986 discloses a review of previous studies that examined the effects of GHB in patients with narcolepsy. Mamelak 1986 at Abstract. Mamelak 1986 reports the results of one study in which "low doses (~30 mg/kg) of GHB promote a normal sequence of NREM and REM sleep lasting ~2 to 3 h." *Id.* at 285. Another study involving patients with narcolepsy administered "~2.25-3 g of GBH two or three times during the night. In all, they received 5-7 g of GHB every night. . . . GHB must be used in repeated doses during the night, and symptoms usually recur the following day when treatment is stopped or when only one dose is used." *Id.* at 286. Mamelak 1986 discloses the results of another study in which participants were administered a dose of "GHB about 30 mg/kg or 2.25-3 g twice each night. . . . The use of GHB in this patient series ranges from 4.5 to 9 g/night." *Id.* at 287.

**(31) Mamelak 1989**

Mamelak 1989 teaches that GHB "promote[s] both NREM and REM sleep," a feature which "has been exploited therapeutically to consolidate the night sleep of narcoleptics, and in this way, improve their alertness during the day." Mamelak 1989 at 188. According to Mamelak 1989, oral and intravenous dosages ranging from 20-30 mg/kg promote NREM and REM sleep when administered at bedtime to normal subjects. *Id.*

**(32) Okun**

Okun teaches that GHB, marketed as Xyrem®, is used to treat narcolepsy, including cataplexy in narcolepsy, (*id.* at 169) and is taken orally. *See id.* at 170. Okun also teaches that valproate inhibits GHB dehydrogenase. *See, e.g., id.*

**(33) Priori**

Priori discloses a patient with alcohol-sensitive myoclonus and dystonia whose symptoms improved significantly when treated with GHB at a dose of 6.125 g/day.

**(34) Rumigny**

Rumigny teaches "[a]s valproate is an inhibitor of rat brain SSADH, its administration might raise the endogenous level of SSA. If this is the case, it could explain the recent finding that administration of valproate to rats brings about some increase in cerebral GHB levels since we have shown that one of the enzymes capable of reducing SSA to GHB is not significantly inhibited by this drug." Rumigny at 115.

**(35) Scharf 1985**

Scharf 1985 teaches treatment of narcolepsy in 30 patients with GHB, with results showing significant improvements in symptoms including cataplexy, sleep paralysis, hypnogogic hallucinations, daily naps, and sleep attacks, and control of daytime sleepiness. Scharf 1985 at Abstract.

**(36) Scharf 1988**

Scharf 1988 discloses results of studying the pharmacokinetics of GHB given twice in one night to six narcoleptic patients who had been chronically taking GHB nightly on a similar basis. Scharf 1988 at Abstract. Scharf 1988 teaches "[m]aximum concentrations were reached in 40±6.2 and 35.7±7 minutes after the first and second dose respectively," and "[m]ean GHB $T_{1/2}$ was 53±19 minutes. GHB elimination appears to be capacity-limited in some patients when administered at a fixed dose of 3 g twice nightly at a 4-hour interval." *Id.*

**(37) Schep**

Schep teaches "GHB is primarily metabolized hepatically to succinic semialdehyde by means of $NAD(P)^+$-linked oxidation by GHB dehydrogenase (Fig. 2)." Schep at 462. Schep also teaches that "GHB is predominantly eliminated following the biotransformation pathway, as outlined in Fig. 2, to form GABA and ultimately enter the Krebs cycle; less than 2% of the parent drug is eliminated unchanged in the urine." *Id.*

**(38) Scrima**

Scrima teaches treatment of cataplexy in patients with narcolepsy using GHB (25 mg/kg h.s. and 3 h later) in a double-blind, counterbalanced crossover design. Scrima at Summary. Scrima teaches that GHB improves sleep depth and continuity, confirming the results of two previous open trials. *Id.* at 486.

**(39) Shinka**

Shinka disclosed that therapeutic levels of valproate inhibit the metabolic pathway of GHB by inhibiting SSADH, resulting in increased concentrations of GHB in the brain. Shinka at 99-100, 106. Shinka further disclosed that valproate affects additional aspects of the GHB metabolic pathway, including inhibiting nonspecific SSR, which also results in the accumulation of GHB. *Id.* at 99-100, 103-104, 106. In addition, Shinka disclosed that valproate does not affect specific succinic semialdehyde reductase, which further results in increased GHB levels. *Id.*

**(40) Snead 1980**

Snead 1980 investigated the effects of acute and chronic administration of sodium valproate on the brain concentration of GHB. Snead 1980 at Summary. Snead 1980 teaches that acute administration of sodium valproate increased the whole brain GHB levels, which coincided with the onset of anticonvulsant effect. *Id.*

**(41) Snead 2005**

Snead 2005 teaches that the primary metabolic pathway for GHB involves conversion of GHB to succinic semialdehyde ("SSA") by GHB dehydrogenase. Snead 2005 at 2721.

**(42) Vayer 1987**

Vayer 1987 teaches that valproate "increases GHB levels possibly by inhibition of its catabolism." Vayer 1987 at 609.

**(43) Vayer 1988**

Vayer 1988 teaches that GHB can be metabolized to SSA by non-specific succinic semialdehyde reductase. Vayer 1988 at 128. The metabolism of GHB to SSA by GHB dehydrogenase is inhibited by some anti-epileptics, such as valproate, ethosuximide, and barbiturates. *Id.* Further, valproate has the effect of inhibiting the GHB dehydrogenase, nonspecific SSR, and SSADH to prevent GHB metabolism, which results in increased GHB levels in the brain. *Id.; see also id.* at Figures 2, 3. The increase in brain GHB levels due to concomitant administration of valproate has been shown to be time-dependent and dose-dependent. *Id.* at 128.

**(44) Waszkielewicz**

Waszkielewicz is a review of the mechanisms of GHB action. Waszkielewicz at 43. Waszkielewicz provides the following tables, summarizing the relationship between GHB dose and effect in patients and the relationship between blood concentrations of GHB and state of consciousness, respectively:

*Table 1.* The relationship between the dose and the effect of GHB in patients [6]

| Dose (g) | Effect |
|---|---|
| below 0.7 | euphoria, sociability |
| 0.7–1.4 | short amnesia |
| 1.5–2.1 | weariness and sleep |
| 2.1–3.5 | intensification of the above effects |
| 3.5–4.9 | hypnosis, hypotonia, weak analgesia |

*Table 2.* The relationship between the GHB concentration in blood and the state of consciousness in patients [12]

| GHB concentration in blood (mg/l) | State of consciousness |
|---|---|
| over 260 | patients in coma and did not react to pain stimuli |
| 156-260 | patients asleep and did react to pain stimuli |
| 52-156 | patients showed spontaneous movements and occasionally opened their eyes |
| below 52 | patients woke up |

*Id.* at 47. Waszkielewicz states that valproic acid is a GHB dehydrogenase inhibitor which "intensif[ies] all the effects observed after administration of GHB. The effect is observed due to inhibited GHB metabolism." *Id.* at 48.

**(45) Wedin**

Wedin discusses the clinical development of GHB, and notes that GHB "was developed for the treatment of narcolepsy." Wedin at 99. Wedin also discusses the metabolism of GHB *in vivo* by oxidative conversion to succinic semialdehyde. *Id.* Wedin also notes that a deficiency in succinic semialdehyde dehydrogenase (SSADH) (which catalyzes the oxidation of succinic semialdehyde to succinic acid), (*see* Cagnin at 205), "causes an accumulation of endogenous GHB, GABA and products of their β-oxidation, leading to motor problems including ataxia, hyporeflexia, seizures, mental retardation, hyperkinesis, psychosis and numerous other neurologic manifestations." Wedin at 99. According to Wedin, valproic acid "inhibit[s] the conversion of GHB to succinic semialdehyde by blocking the NADP-dependent GHB dehydrogenase, which may lead to potentiation of the effects of GHB." *Id.* at 102.

**(46) Weiss**

Weiss reports a case of a patient who was co-administered GHB (9 g/night, 4.5 g twice nightly) with the antiepileptic topiramate (25 mg), who developed confusion, intermittent myoclonic jerks, and rapid onset of coma. Weiss at 1193. The authors noted that, in plasma samples drawn from the patient, the GHB concentration was 2.8-fold higher when the patient was administered topiramate versus without topiramate, and 1.8-fold higher than the peak plasma concentration of 142 mg/L that would be expected 0.5–2 hours after the second daily dose of GHB. *Id*. The authors stated that metabolism via GHB dehydrogenase is GHB's main route of elimination, and that *in vitro* studies have demonstrated that it is inhibited by antiepileptic drugs such as valproate and ethosuximide. *Id.* The authors concluded that, "in light of the increasing therapeutic . . . use of GHB . . . , possible interactions should be evaluated in formal pharmacokinetic studies. In the mean time, we suggest using such combinations only with great care." *Id.*

**(47) Xyrem 2012 PI**

The Xyrem 2012 PI teaches that Xyrem is a central nervous system depressant indicated for the treatment of cataplexy in narcolepsy and excessive daytime sleepiness (EDS) in narcolepsy. Xyrem 2012 PI at 1. Under the warnings and precautions section, the Xyrem 2012 PI states: "[u]se caution when considering the concurrent use of Xyrem with other CNS depressants." *Id.* The Xyrem 2012 PI teaches that the "recommended starting dose is 4.5 grams (g) per night administered orally in two equal, divided doses: 2.25 g at bedtime and 2.25 g taken 2.5 to 4 hours later (see Table 1). Increase the dose by 1.5 g per night at weekly intervals (additional 0.75 g at bedtime and 0.75 g taken 2.5 to 4 hours later)" up to "9 g per night orally." *Id.* at 2. The Xyrem 2012 PI states

The concurrent use of Xyrem with other CNS depressants, including but not limited

> to opioid analgesics, benzodiazepines, sedating antidepressants or antipsychotics, general anesthetics, muscle relaxants, and/or illicit CNS depressants, may increase the risk of respiratory depression, hypotension, profound sedation, syncope, and death. If use of these CNS depressants in combination with Xyrem is required, dose reduction or discontinuation of one or more CNS depressants (including Xyrem) should be considered. In addition, if short-term use of an opioid (e.g., post- or perioperative) is required, interruption of treatment with Xyrem should be considered.

*Id.* at 3. The Xyrem 2012 PI states, under the Drug Interactions section, that "[u]se of other CNS depressants may potentiate the CNS-depressant effects of Xyrem." *Id.* at 8.

**(48) Xyrem 2005 PI**

The Xyrem 2005 PI discloses a method of treating excessive daytime sleepiness and cataplexy in patients suffering from narcolepsy with a sodium gamma-hydroxybutyrate salt (sodium oxybate). Xyrem 2005 PI at 1, 7. The Xyrem 2005 PI teaches that sodium oxybate (chemically known as sodium γ-hydroxybutyrate) "is a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy." *Id.* at 1. The recommended starting dose for Xyrem is 4.5 g/night, which can be increased (recommended in 1.5 g increments) to a maximum of 9 g/night. *Id.* at 22-23. In patients with liver dysfunction, the Xyrem 2005 PI teaches that "[i]t is prudent to reduce the starting dose of sodium oxybate by one-half." *Id.* at 4. According to the Xyrem 2005 PI, the pharmacokineticsof sodium oxybate "are nonlinear with blood levels increasing 3.7-fold as dose is doubled from 4.5 to 9 grams (g)." *Id.* at 2. The Xyrem 2005 PI also discloses that "[s]odium oxybate is contraindicated in patients with succinic semialdehyde dehydrogenase deficiency." *Id.* at 8.

**(49) Xyrem 2005 FDA Approval Letter**

The Xyrem 2005 FDA Approval Letter states that Xyrem ® (sodium oxybate) oral solution was approved "for the treatment of excessive daytime sleepiness in patients with narcolepsy" as of November 18, 2005. Xyrem 2005 FDA Approval Letter at 1, 4.

**(50) Xyrem 2002 FDA Approval Letter**

The Xyrem 2002 FDA Approval Letter states that Xyrem® Oral Solution received approval for the treatment of cataplexy associated with narcolepsy as of July 17, 2002. Xyrem 2002 FDA Approval Letter at 1, 5. The Xyrem 2002 FDA Approval Letter states that Xyrem was "approved with a Risk Management Program that must include each of the following components:

> 1) Implementation of a restricted distribution program for Xyrem.
>
> 2) Implementation of a program to educate physicians and patients about the risks and benefits of Xyrem, including critical information necessary for the safe use and handling of the drug.
>
> 3) Filling of the initial prescription only after the prescriber and patient have received and read the educational materials.
>
> 4) Maintenance of a registry of all patients and a record of all prescribers."

*Id.* at 2.

**(51) Xyrem Physician's Desk Reference**

The Xyrem Physician's Desk Reference teaches that GHB was marketed as sodium oxybate under the trade name Xyrem® at least as early as 2002, that GHB was known to be useful for treating narcolepsy in patients (e.g., to improve sleep patterns), and that GHB could be administered orally, as an aqueous solution. Xyrem Physician's Desk Reference at 1688. According to the Xyrem Physician's Desk Reference

> Animal studies indicate that metabolism is the major elimination pathway for sodium oxybate, producing carbon dioxide and water via the tricarboxylic acid (Krebs) cycle and secondarily by beta-oxidation. The primary pathway involves a cytosolic $NADP^+$-linked enzyme, GHB dehydrogenase, that catalyses the conversion of sodium oxybate to succinic semialdehyde, which is then bio transformed to succinic acid by the enzyme succinic semialdehyde dehydrogenase. Succinic acid enters the Krebs cycle where it is metabolized to carbon dioxide and water.

*Id.* As the Xyrem Physician's Desk Reference explains, the clearance of sodium oxybate "is almost entirely by biotransformation to carbo dioxide, which eliminated by expiration. On average, less

than 5% of unchanged drug appears in human urine within 6 to 8 hours after dosing." *Id.*

The Xyrem Physician's Desk Reference teaches that the starting dose of GHB should be 4.5 grams per night, and that the GHB dose is thereafter increased in 1.5 g increments until achieving the desired effect. *Id.* at 1692. The Xyrem Physician's Desk Reference teaches that administration of increasing doses of GHB leads to increased plasma levels of GHB, which may result in adverse effects, including coma or death. *Id.* at 1688-1689. Moreover, these effects were known to be dose dependent (*id.* at 1692,) and were known to be exacerbated when GHB was administered along with alcohol or certain other drugs. *Id.* at 1688. The Xyrem Physician's Desk Reference also teaches that that a GHB doses should be decreased when treating a patient with compromised metabolic function. *Id.* at 1692.

**(52) Xyrem Titration Schedule**

The Xyrem Titration Schedule teaches that the "[r]ecommended starting dose is 4.5 g/night" and that "[d]osage should be titrated to effect in increments of 1.5 g/night . . . to a maximum dose of 9 g/night." Xyrem Titration Schedule at 1.

**iii. The Asserted Claims Are Invalid as Obvious**

At least the references discussed above disclose, either alone or in combination, the limitations of claims 1-5, 7-16, 18-26, and 28-34 of the '306 patent.[31] Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references together with the knowledge he or she would have possessed, would have readily gleaned the information necessary to develop

[31] To the extent that any specific limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

the methods of treatment (to the extent such methods were not already known or in use) within claims 1-5, 7-16, 18-26, and 28-34 of the ’306 patent; would have had a motivation to use such a method; and would have had a reasonable expectation of success in doing so. *See, e.g.*, *KSR*, 550 U.S.at 416 (“The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.”).

As explained below, the asserted claims would have been obvious in view of a host of prior art references. Consequently, there are numerous different combinations of these prior art references and many exemplary references that disclose the claimed method. *See, e.g.*, *Rothman v. Target Corp.*, 556 F.3d 1310, 1320-21 (Fed. Cir. 2009) (when the “entire body of prior art”—or an “evidentiary cornucopia”—renders a patent claim obvious, a trier of fact can fairly rely on “any combination of these references in reaching its obviousness verdict.”).

By way of example, the following combinations render the asserted claims obvious:

- One or more of the Cook Patent, Bhattacharya 2004, Broughton 1979, Broughton 1980, Feldman 2006, Feldman 2010, Frucht, Mamelak 1986, Mamelak 1989, Okun, Priori, Scharf 1985, Scharf 1988, Scrima, Xyrem 2005 PI, Xyrem 2012 PI, Xyrem Physician’s Desk Reference, Xyrem 2002 FDA Approval Letter, Xyrem 2005 FDA Approval Letter, Xyrem Titration Schedule; in view of

- One or more of Bernasconi, Bhattacharya 2006, Borgen, Cash, Chateauvieux, Depakote Label, Divry, Harvey, Hechler, Kaufman 1987, Kaufman 1988, Kaufman 1991, Knerr, Laan, Löscher 1999, Löscher 2002, Maitre, Mathivet, Morris 2011, Rumigny, Schep, Shinka, Snead 2005, Snead 1980, Vayer 1987, Vayer 1988, Waszkielewicz, Wedin; in further view of

- One or both of Cagnin, Weiss; optionally in combination with

- One or both of the FDA Guidance, Hansten.

More specifically, at least the following combinations of prior art references are exemplary of the combinations of prior art references that render the asserted claims of the ’306 patent obvious:

- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance

Lupin reserves the right to rely on other combinations of prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

As further explained below, a person of ordinary skill in the art would have been motivated to combine the teachings of these references with a reasonable expectation of success in light of the problem to be solved, the disclosures of the references, and the common subject matter of the references as explained throughout. In addition, Lupin's invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

A person of ordinary skill in the art would have been motivated to combine the teachings of the prior art discussed above to arrive at the claimed method of treatment. As an initial matter, a person of ordinary skill in the art would have been motivated to use GHB to treat sleep disorders based on the extensive prior art disclosing its use for such purposes. *See, e.g.*, Cook Patentat 1:16-31; Wedin at 99; Okun at 169-170, Xyrem 2005 PI, Xyrem 2012 PI, Xyrem Physician's Desk Reference at 1688; Xyrem 2002 FDA Approval Letter at 1; Xyrem 2005 FDA Approval Letter at 1; Bhattacharya 2004 at 92; Broughton 1979 at Summary; Broughton 1980 at Summary; Feldman 2006 at 130S; Feldman 2010 at 77; Frucht at 1330; Maitre at Abstract, 352; Mamelak 1986 at Abstract, 288; Mamelak 1989 at 188; Priori; Scharf 1985 at Abstract; Scharf 1988; Scrima at Summary, 486. Moreover, given the extensive teaching in the art about the potential interaction between GHB and valproate, a person of ordinary skill in the art would have been motivated to reduce the dose of GHB if it were to be given concomitantly with valproate.

Finally, a person of ordinary skill in the art would have reasonably expected to be able to treat the claimed sleep disorders by giving a reduced GHB dose, when administered concomitantly with valproate, because the prior art taught that GHB was effective at a number of doses, including reduced doses, and a person of ordinary skill in the art would have reasonably expected that a reduced dose of GHB would have increased potency when co-administered with valproate, such that the increased potency would offset any reduction in GHB dose. Thus, a person of ordinary skill in the art would have been motivated to reduce the dose of GHB if it was to be co-administered with valproate, and would have reasonably expected to be able to successfully treat the claimed conditions.

**(1) Independent Claim 1**

Independent claim 1 of the '306 patent recites "A method for treating a patient who is suffering from excessive daytime sleepiness, cataplexy, sleep paralysis, apnea, narcolepsy, sleep time disturbances, hypnagogic hallucinations, sleep arousal, insomnia, or nocturnal myoclonus with gamma-hydroxybutyrate (GHB) or a salt thereof, said method comprising: orally administering to the patient in need of treatment at least 5% decrease in an effective dosage amount of the GHB or salt thereof when the patient is receiving a concomitant administration of valproate, an acid, salt, or mixture thereof."

Claim 1 of the '306 patent would have been obvious to a person of ordinary skill in the art for at least the reasons set forth below.

**a) "A method for treating a patient who is suffering from excessive daytime sleepiness, cataplexy, sleep paralysis, apnea, narcolepsy, sleep time disturbances, hypnagogic hallucinations, sleep arousal, insomnia, or nocturnal myoclonus with gamma-hydroxybutyrate (GHB) or a salt thereof"**

The prior art disclosed methods for treating a patient who is suffering from excessive daytime sleepiness,cataplexy, sleep paralysis, apnea, narcolepsy, and/or nocturnal myoclonus with oral administration of GHB or a salt thereof. For example, the Cook Patent discloses compositions comprising "gamma-hydroxybutyrate (GHB), also known as 4-hydroxybutyrate, and the sodium salt of GHB (sodium oxybate) and other salts such as magnesium, ammonium andcalcium" as well as their use in treating sleep disorders such as narcolepsy. The Cook Patentat 1:16-31. Wedin discusses the clinical development of GHB, and notes that GHB "was developed for the treatment of narcolepsy." Wedin at 99. Okun teaches that GHB, marketed as "Xyrem®," is used to treat narcolepsy, including cataplexy in narcolepsy, (Okun at 169) and is taken orally. *See id.* at 170. Xyrem 2005 PI teaches that sodium oxybate (chemically known as sodium γ-hydroxybutyrate) "is a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy." Xyrem 2005 PI at 1; *see also* Xyrem 2012 PI at 1; Xyrem Physician's Desk Reference at 1688; Xyrem 2002 FDA Approval Letter at 1; Xyrem 2005 FDA Approval Letter at 1; Bhattacharya 2004 at 92; Broughton 1979 at Summary; Broughton 1980 at Summary; Feldman 2006 at 130S; Feldman 2010 at 77; Frucht at 1330; Maitre at Abstract, 352; Mamelak 1986 at Abstract, 288; Mamelak 1989 at 188; Priori; Scharf 1985 at Abstract; Scharf 1988; Scrima at Summary, 486.

**b) "orally administering to the patient in need of treatment at least 5% decrease in an effective dosage amount of the GHB or salt thereof when the patient is receiving a concomitant administration of valproate, an acid, salt, or mixture thereof"**

The prior art rendered obvious "orally administering to the patient in need of treatment at least 5% decrease in an effective dosage amount of the GHB or salt thereof when the patient is receiving a concomitant administration of valproate, an acid, salt, ormixture thereof." For example,

the FDA Guidance discloses that "[d]rug interactions can result when one drug alters the pharmacokinetics of another drug or its metabolites," and recommends that drug-drug interactions be studied during drug development. FDA Guidance at 1; *see also* Hansten at 1-2. A person of ordinary skill in the art would have known that GHB is a CNS depressant. Xyrem 2005 PI at 1, 7. The Xyrem 2012 PI discloses that caution should be used "when considering the concurrent use of Xyrem with other CNS depressants. Xyrem 2012 PI at 1; *see also id.* at 3 ("If use of [] CNS depressants in combination with Xyrem is required, dose reduction or discontinuation of one or more CNS depressants (including Xyrem) should be considered."). The Xyrem Physician's Desk Reference teaches that administration of increasing doses of GHB leads to increased plasma levels of GHB, which may result in adverse effects, including coma or death. Xyrem Physician's Desk Reference at 1688-1689. Moreover, these effects were known to be dose dependent (*id.* at 1692,) and were known to be exacerbated when GHB was administered along with alcohol or certain other drugs. *Id.* at 1688. The Xyrem Physician's Desk Reference also teaches that GHB doses should be decreased when treating a patient with compromised metabolic function. *Id.* at 1692.

A person of ordinary skill in the art would have also known that valproate can have CNS depressant effects, especially in combination with other CNS depressants. Depakote Label at 1, 48. Chateauvieux reviews the therapeutic use and toxicity of valproic acid, including clinical trials involving valproic acid and its side effects encountered during treatment. Chateauvieux at 1. According to Chateauvieux "[t]he therapeutic action on central nervous system and respiratory of sodium oxybate (gamma-Hydroxybutyrate, GHB) can be potentially increased by other CNS-depressants which includes" valproic acid. *Id.* at 9. Thus, a person of ordinary skill in the art would have recognized that there may exist a potential pharmacodynamic interaction between the two drugs, and that using two CNS depressants in combination could potentially create adverse

consequences if the dose of either was too high.

Further, the prior art teaches that valproate causes an increase in GHB levels. This would have further motivated a person of ordinary skill in the art to administer at least 5% decrease in an effective dosage amount of GHB when the patient is receiving concomitant administration of valproate, to avoid complications associated with increased GHB levels. For example, the Cook Patent incorporates by reference the teachings of a number of prior art references, at least one of which, Mamelak 1989, teaches that valproate increases brain tissue levels of GHB. The Cook Patent at 61:19-23; *id.* at 62:50-53; Mamelak 1989 at 189. As another example, Löscher 1999 teaches that administration of valproate to rats has been shown to increase the brain level of GHB *in vivo*, in a time- and dose-dependent manner. Löscher 1999 at 45, 48; *see also* Löscher 2002 at 686.

The prior art teaches that valproate inhibits the catabolic metabolism of GHB, for example, by inhibiting an enzyme called GHB dehydrogenase (which catalyzes the oxidation of GHB to succinic semialdehyde). For example, Wedin discusses the metabolism of GHB *in vivo* by oxidative conversion to succinic semialdehyde. Wedin at 99; *see also* Snead 2005 at 2721. According to Wedin, valproic acid "inhibit[s] the conversion of GHB to succinic semialdehyde by blocking the NADP-dependent GHB dehydrogenase, which may lead to potentiation of the effects of GHB." Wedin at 102; *see also* Vayer 1987 at 609. Okun also teaches that valproate inhibits GHB dehydrogenase. Okun at 170.

Similarly, Waszkielewicz states that valproic acid is a GHB dehydrogenase inhibitor which "intensif[ies] all the effects observed after administration of GHB. The effect is observed due to inhibited GHB metabolism." Waszkielewicz at 48.

Additional prior art disclosed similar teachings. Snead 1980 investigated the effects of acute and chronic administration of sodium valproate on the brain concentration of GHB. Snead 1980 at Summary. Snead 1980 teaches that acute administration of sodium valproate increased the whole brain GHB levels, which coincided with the onset of anticonvulsant effect. *Id.*

Maitre teaches that valproate increases levels of GHB in the brain. *Id.* at 340. Specifically, Maitre discloses that valproate increases levels of GHB in the brain by inhibiting GHB dehydrogenase, which catalyzes the degradation of GHB. *Id.* at 340, 343, 351.

Cash discloses the use of GHB to treat narcolepsy, and that concomitant administration of GHB and valproate results in increased GHB levels in plasma and brain. Cash teaches that valproate "is the most well-known agent that acutely increases cerebral GHB levels." Cash at 294. Cash taught that this increase was due to inhibition of succinic semialdehyde dehydrogenase (SSADH). *Id.*

Shinka disclosed that therapeutic levels of valproate inhibit the metabolic pathway of GHB by inhibiting SSADH, resulting in increased concentrations of GHB in the brain. Shinka at 99-100, 106. Shinka further disclosed that valproate affects additional aspects of the GHB metabolic pathway, including inhibiting nonspecific SSR, which also results in the accumulation of GHB. *Id.* at99-100, 103-104, 106. In addition, Shinka disclosed that valproate does not affect specific succinic semialdehyde reductase, which further results in increased GHB levels. *Id.*

Bernasconi teaches concomitant administration of GHB and valproate results in increased GHB levels in plasma and brain. Bernasconi investigated, among other things, the increase in GHB, or its precursor ɣ-butyrolactone (GBL), induced by valproate in two strains of rats. Bernasconi at 157. Bernasconi teaches that "in cortex and striatum" "valproate induced a rapid and strong increase of GHB and GBL levels (about 180%) for 30 minutes; then the content of the two

GABA metabolites decreased slightly until a plateau was reached (Fig. 3)." *See id.* at 164, Fig. 3. Bernasconi teaches that the "rapid accumulation of GHB" was due to "enzymatic inhibition of its metabolization." *Id.*

Kaufman 1987 studied the effect of the *in vivo* inhibition of GHB dehydrogenase on tissue levels of GHB and on the half-life of GHB in plasma. Kaufman 1987 at 1935-36. Sodium valproate was noted to be an "excellent" inhibitor of GHB dehydrogenase. *Id.* at 1937; *see also* Kaufman 1988 at Abstract (teaching that sodium valproate is "a potent inhibitor of GHB dehydrogenase."). According to Kaufman 1987, the administration of sodium valproate to rats "produced a 1.4-fold increase in the GHB level in brain." *Id.; see also* Kaufman 1991 at 1937. Kaufman 1991 teaches that "at a tissue concentration of 0.3 mM sodium valproate, GHB dehydrogenase would be 85% inhibited, a very marked inhibition compared to the 5% inhibition of SSA dehydrogenase which would occur at a 0.3 mM tissue concentration of the drug. Even at a tissue concentration of 0.05 mM sodium valproate, a tissue concentration at which there would be essentially no inhibition of SSA dehydrogenase, GHB dehydrogenase still would be 48% inhibited." Kaufman 1991 at 1940.

Similarly, Hechler teaches that "GHB degradation into GABA was prevented by GHB dehydrogenase inhibition with either valproate or ethosuximide." Hechler at 754; *see also* Laan at 1779. Hechler discloses that this inhibition "induce[d] GHB accumulation in brain after administration *in vivo*." Hechler at 759; *see also* Knerr at 285-286 (teaching that sodium valproate (di-n-propyl acetate) can inhibit cytosolic GHB dehydrogenase, thereby preventing GHB conversion to GABA); Mathivet at 71 (teaching that valproate (3 mM) completely blocked the nonspecific semialdehyde reductase, also known as GHB dehydrogenase).

Löscher 2002 teaches that GHB can be metabolized to SSA by nonspecific succinic semialdehyde reductase (nonspecific SSR), and that valproate is a potent inhibitor of nonspecific

SSR, leading to accumulation of GHB. *Id.* at 681, 686; *see also* Vayer 1988 at 128 (teaching that valproate has the effect of inhibiting the GHB dehydrogenase, nonspecific SSR, and SSADH to prevent GHB metabolism, which results in increased GHB levels in the brain, and that the increase in brain GHB levels due to concomitant administration of valproate has been shown to be time-dependent and dose-dependent). Similarly, Divry teaches that, in addition to inhibition of GHB dehydrogenase, valproate inhibits SSADH, which results in accumulation of SSA, which is then converted to GHB, leading to increased levels of GHB. Divry at 308, Table I; *see also* Harvey at 251, 253; Rumigny at 115.

Further, the prior art teaches that any potential for valproate to decrease GHB levels through its function as an MCT inhibitor would have been minimal. For example, a person of ordinary skill in the art would have also known that pharmacokinetic simulations using another GHB dehydrogenase/MCT inhibitor, salicylic acid, showed that, accounting for both MCT inhibition and GHB dehydrogenase inhibition, GHB brain concentrations were significantly elevated. *See* Bhattacharya 2006 at 672–74. This would have led a person of ordinary skill in the art to conclude that the effect of MCT inhibition would likely not be significant in comparison to the effect of GHB dehydrogenase inhibition, and that valproate would thus, most likely, increase brain GHB concentrations.

Similarly, Morris 2011 investigated the impact of MCT inhibition with L-lactate combined with osmotic diuresis on renal clearance of GHB (50 mg/kg, 4.5 g maximum dose) in human subjects. Morris 2011 at Abstract. Morris 2011 discloses that "[n]o effect on total clearance was observed in this study due to the negligible contribution of renal clearance to total clearance at this low GHB dose." *Id.; see also id.* at 3. Morris 2011 teaches "[a]t low, therapeutic GHB doses, such as that studied currently, the primary route of elimination is metabolism by GHB dehydrogenase

to form succinic semialdehyde, which is then metabolized by succinic semialdehyde dehydrogenase to succinic acid, which enters the Krebs cycle at is excreted as carbon dioxide. Renal excretion represents a minor route of elimination at low doses, as illustrated in this study with only approximately 2% of the total dose excreted into the urine." *Id.* at 3.

Borgen's teachings are similar to those disclosed in Bhattacharya 2006 and Morris 2011. Borgen teaches that renal elimination of GHB is only about 3% of total body clearance. Borgen at 62; Table II. Borgen also acknowledges that metabolism to GHB to carbon dioxide (via the Krebs Cycle) is the major mechanism of GHB clearance, which is consistent with Borgen's findings that urinary recovery of GHB was less than 4%. *Id.* at 64*; see also* Xyrem Physician's Desk Reference at 1688.

Similarly, Schep teaches "GHB is primarily metabolized hepatically to succinic semialdehyde by means of NAD(P)+-linked oxidation by GHB dehydrogenase (Fig. 2)." Schep at 462. Schep also teaches that "GHB is predominantly eliminated following the biotransformation pathway, as outlined in Fig. 2, to form GABA and ultimately enter the Krebs cycle; less than 2% of the parent drug is eliminated unchanged in the urine." *Id.* Therefore, a person of ordinary skill in the art would have understood based these teachings that renal elimination of GHB due to MCT was a minor pathway, and that MCT inhibition would not have had a significant impact on overall GHB levels *in vivo*.

The case studies disclosed in the prior art would have further motivated a person of ordinary skill in the art to reduce the GHB dose administered when the patient is also being treated with valproate. Cagnin discusses a case report of a patient who suffered epileptic seizures when treated with both GHB and valproate. Cagnin at 203. According to Cagnin: [a]n interaction between valproate and GHB might have induced an imbalance in GABAergic neurotransmission

and triggered the seizures. It is well recognized that GABAergic and glutamatergic transmission may be implicated in theantiepileptic and mood-stabilizing actions of valproate. On the other hand, it is less well known that valproate is a potent in vitro inhibitor of succinic semialdehyde dehydrogenase (SSADH), which catalyzes the production of succinate from succinic semialdehyde, an intermediate product in the metabolic pathway transforming GHB into GABA and vice versa. An inherited deficiencyof SSADH activity leads to accumulation of succinic semialdehyde and, consequently, a 30-fold increase in GHB level and 2- to 4-fold increase in GABA in the brains of affected rats. *Id.* at 205.

Weiss reports a case of a patient who was co-administered GHB (9 g/night, 4.5 g twice nightly) with the antiepileptic topiramate (25 mg), who developed confusion, intermittent myoclonic jerks, and rapid onset of coma. Weiss at 1193. The authors noted that, in plasma samples drawn from the patient, the GHB concentration was 2.8- fold higher when the patient was administered topiramate versus without topiramate, and 1.8-fold higher thanthe peak plasma concentration of 142 mg/Lthat would be expected 0.5–2 hours after the second daily dose of GHB. *Id*. The authors stated that metabolism via GHB dehydrogenase is GHB's main route of elimination, and that in vitro studies have demonstrated that it is inhibited byantiepileptic drugs such as valproate and ethosuximide. *Id.* The authors concluded that,"in light of the increasing therapeutic . . . use of GHB . . . , possible interactions should be evaluated in formal pharmacokinetic studies. Inthe mean time, we suggest using such combinations only with great care." *Id.*

Thus, a person of ordinary skill in the art would have found it obvious to reduce the dose of GHB to mitigate the effects of any drug interactions in a patient taking concomitant valproate. Reducing the GHB dose would have been considered one way to mitigate any potential interaction.

A person of ordinary skill in the art would have reduced the dose by at least 5%. The 5% reduction in GHB dose recited in claim 1 is a very small reduction in dose. For instance, a 5% reduction of the maximum 9 g/night dose would be a dose reduction of less than half a gram per night. For instance, a person of ordinary skill in the art could have reduced the dose by 1.5 g/night. This would have been a reasonable choice, as the Xyrem 2005 PI suggests titrating the dose upwards in 1.5 g/night increments. *See also* Xyrem 2012 PI at 2. Depending on the starting dose, this would likely be somewhere between a 33% reduction (if the dose in the absence of concomitant valproate was 4.5 g/night, as recommended by the Xyrem 2005 PI) or a 16.7% reduction (if the dose in the absence of concomitant valproate was 9 g/night, the maximum dose disclosed in the Xyrem 2005 PI.) *See* Xyrem 2005 PI at 23.

A person of ordinary skill in the art would have further understood that routine pharmacokinetic studies could be conducted to identify the specific dosage adjustment needed to safely co-administer GHB and valproate. As a person of ordinary skill in the art would have found it obvious to decrease the dose of GHB by "at least 5%" based on the prior art, a person of ordinary skill in the art would have found it obvious to try to reduce the dose of GHB by "at least 5%" in routine pharmacokinetic studies with a reasonable expectation of success.

**(2) Independent Claim 11**

Independent claim 11 recites "A method of safely administering GHB or a salt thereof for excessive daytime sleepiness, cataplexy, sleep paralysis, apnea, narcolepsy, sleep time disturbances, hypnagogic hallucinations, sleep arousal, insomnia, or nocturnal myoclonus in a human patient who is being administered GHB, said method comprising: determining if the patient has taken, or will take, a concomitant dose of valproate, an acid, salt or mixture thereof;and orally administering a reduced amount of the GHB or salt thereof to the patient wherein the reduction is at least 5% compared to a dose without concomitant administration of valproate, an acid, salt or

mixture thereof."

Claim 11 is similar to claim 1, but claim 11 is directed to "[a] method of safely administering GHB or a salt thereof" in contrast to "a method for treating" as in claim 1. Claim 11 is further directed to determining if the patient has taken, or will take a dose of valproate with concomitantly GHB. Claim 11 is also directed to "orally administering a reduced amount of the GHB or salt thereof to the patient wherein the reduction is at least 5% compared to a dose without concomitant administration of valproate, an acid, salt or mixture thereof."

Claim 11 of the '306 patent would have been obvious to a person of ordinary skill in the art for at least the reasons set forth below.

First, Claim 11 is directed to "[a] method of safely administering GHB or a salt thereof" to treat narcolepsy as well as symptoms associated with narcolepsy, such as cataplexy, sleep paralysis, sleep time disturbances, hypnagogic hallucinations, and insomnia. As discussed for claim 1, a person of ordinary skill in the art would have found it obvious to treat a patient with narcolepsy and its related symptoms such as cataplexy with GHB, or a salt thereof. Similarly, a person of ordinary skill in the art would have found it obvious to safely administer a dose of GHB to a patient.

Second, claim 11 includes the additional step of "determining if the patient has taken, or will take, a concomitant dose of valproate, an acid, salt, or mixture thereof." Determining what concomitant medications a patient is taking, however, is both routine practice, and required by the standard of care for a person of ordinary skill in the art when prescribing any new medication or before initiating any new treatment. Generally, in taking a patient's medical history before treatment, a person of ordinary skill in the art will obtain a complete list of other medications that the patient is taking, in order to facilitate the identification of any potential drug interactions with

any new therapies the physician may add, and in order for the physician to take steps to mitigate the effects of, or avoid, such interactions. Indeed, the practice of assessing drug-drug interactions is so commonplace that it has become automated: the same system that tracks prescriptions, also flags potential drug-drug interactions when a new prescription is entered in a patient profile. As such, this step would have been obvious to a person of ordinary skill in the art.

Further, based on the teachings of the prior art discussed above with respect to claim 1 of the ’306 patent it would have been obvious to determine whether a patient had taken or was taking valproate prior to administering GHB in order to mitigate any potential pharmacodynamic and pharmacokinetic interactions, for the reasons stated above with regard to claim 1.

Third, claim 11 also recites “orally administering a reduced amount of the GHB or salt thereof to the patient wherein the reduction is at least 5% compared to a dose without concomitant administration of valproate, an acid, salt or mixture thereof.” For the same reasons stated for claim 1, a person of ordinary skill in the art would have found it obvious to administer a reduced amount of GHB of at least 5% compared a dose without concomitant administration of valproate, an acid, salt or mixture thereof.

**(3) Independent Claim 19**

Independent claim 19 recites “A method for treating a patient who is suffering from narcolepsy, said method comprising: administering a therapeutically effective amount of a formulation containing a GHB salt to a patient starting at a concentration of between 350 and 750 mg/ml with a pH of between 6 and 10; determining if the patient is also being administered valproate, an acid, salt or mixture thereof; warning of a potential drug/drug interaction due to the combination of valproate, an acid, salt or mixture thereof and the GHB salt; and recommending reducing the dose of the GHB salt at least 15%.”

Claim 19 of the ’306 patent would have been obvious to a person of ordinary skill in the art for at least the reasons set forth below.

As discussed above with respect to claims 1 and 11, it would have been obvious to a person of ordinary skill in the art to treat a patient suffering from narcolepsy by administering a therapeutically effective dose of a GHB salt.

Moreover, the prior art taught preferred concentration and pH ranges for compositions comprising GHB. For example, the Cook Patent discloses: “At a concentration or content of about 450 mg/ml GHB, the pH may be of about 3.9 to about 10.3. At a concentration or content of about 500 mg/ml GHB, the pH may be of about 4.75 to about 10.3. At a concentration or content of about 600 mg/ml GHB, the pH may be of about 6.1 to about 10.3. At a concentration or content of about 750 mg/ml GHB, the pH may be of about 7.0 to about 10.3. Of course, all pH and concentration or content values in between each of the listed pH and concentration or content values are encompassed by the invention.” The Cook Patent at 4:30-40; *see also* Xyrem 2005 PI at Description (“Xyrem oral solution contains 500 mg of sodium oxybate per milliliter of USP Purified Water, neutralized to pH 7.5 with malic acid); *id.* at 22-23; Xyrem 2012 PI at 2; *see id.* (“Oral Solution, 0.5 g per mL.”); *id*. at Description (“Each mL of Xyrem contains 0.5 g of sodium oxybate in USP Purified Water, neutralized to pH 7.5 with malic acid.”)

Also, for the reasons discussed above with respect to claims 1 and 11, it would have been obvious to a person of ordinary skill in the art to determine if a patient is being administered valproate and to recommend reducing the dose by at least 15% when the patient is receiving a concomitant administration of valproate, to avoid complications associated with increased GHB levels. While claims 1 and 11 recite a 5% reduction, the at least 15% reduction would likewise have been obvious. For example, reducing the recommended starting dose of 4.5 grams by 1.5

grams (the titration level taught by the Xyrem titration schedule) would result in over a 30% reduction in dose.

Additionally, the Cook Patent discloses that liquid formulations of GHB were used in clinical trials and states "[t]he initial dose for all patients in the GHB open-label trial was 6 grams of GHB nightly in divided doses. Dosage adjustments were permitted in the first two weeks of the trial as indicated for intolerance or lack of efficacy. The investigator was permitted to decrease the dose of GHB to 3 grams or 4.5 grams (a 50% and 25% reduction, respectively), or increase the dose to 7.5 grams or 9 grams nightly. After two weeks, further dosage adjustments were made if clinicallyindicated." the Cook Patent at 18:2-10.

The Xyrem 2005 PI states that the recommended starting dose for Xyrem is 4.5 g/night, which can be increased (recommended in 1.5 g increments) to a maximum of 9 g/night. Xyrem 2005 PI at 22-23. In patients with liver dysfunction, the Xyrem PI teaches that "[i]t is prudent to reduce the starting dose of sodium oxybate by one-half." *Id.* at 4. According to the Xyrem 2005 PI, the pharmacokinetics of sodium oxybate "are nonlinear with blood levels increasing 3.7-fold as dose is doubled from 4.5 to 9 grams (g)." *Id.* at 2; *see also* Xyrem 2012 PI at 2.

Finally, the step of "warning the patient" is entitled no patentable weight, as it recites mere "printed matter" unrelated to the underlying method. *See, e.g., In re Ngai*, 367 F.3d 1336, 1339 (Fed. Cir. 2004); *see also, King Pharmaceuticals, Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1279 (Fed. Cir. 2010). Even if this step is considered, "warning of a potential drug/drug interaction due to the combination of valproate, an acid, salt or mixture thereof and the GHB salt" would have been obvious as well. For all the reasons discussed above with respect to claim 1, it would have been obvious for a person of ordinary skill in the art to provide a warning of a potential drug/drug interaction due to the combination of valproate, an acid, salt, or mixture thereof, and the GHB salt.

Indeed, drug manufacturers are required to warn of potential drug/drug interactions in drug product labeling. A person of ordinary skill in the art would reasonably expect that a doctor prescribing combined use of valproate with GHB would warn a patient of the potential for drug-drug interaction, would prescribe a reduced dose of GHB to account for any interaction, and would carefully monitor the patient for any adverse effects.

**(4) Independent Claims 30 and 33**

Independent claim 30 recites "A method for treating a patient who is suffering from narcolepsy, said method comprising: administering a therapeutically effective amount of a formulation containing a GHB salt to a patient; determining if the patient is also being administered valproate, an acid, salt or mixture thereof; recommending a 20% decrease in the starting dose of the GHB salt such that a patient starts taking the GHB salt at an adjusted dosage amount between 3.5 grams and 4 grams the GHB salt per night administered orally."

Independent claim 33 recites "A method for treating a patient who is suffering from narcolepsy, said method comprising: orally administering a therapeutically effective amount of a formulation containing a GHB salt; determining if the patient is also being administered valproate, an acid, salt or mixture thereof; recommending a 20% decrease in the starting dose of the GHB salt such that the amount that the patient is administered is reduced to about 3.6 grams GHB per day."

Claims 30 and 33 would have been obvious for the same reasons as discussed for claims 1, 11, and 19 above. For example, as discussed above, the prior art teaches that valproate causes an increase in GHB levels. Accordingly, it would have been obvious for a person of ordinary skill in the art to recommend reducing the dose of GHB by at least 20%, in order to avoid complications associated with increased GHB levels.

Additionally, the Cook Patent discloses that liquid formulations of GHB were used in clinical trials and states "[t]he initial dose for all patients in the GHB open-label trial was 6 grams of GHB nightly in divided doses. Dosage adjustments were permitted in the first two weeks of the trial as indicated for intolerance or lack of efficacy. The investigator was permitted to decrease the dose of GHB to 3 grams or 4.5 grams (a 50% and 25% reduction, respectively), or increase the dose to 7.5 grams or 9 grams nightly. After two weeks, further dosage adjustments were made if clinically indicated." the Cook Patent at 18:2-10.

The Xyrem 2005 PI states that the recommended starting dose for Xyrem is 4.5 g/night, which can be increased (recommended in 1.5 g increments) to a maximum of 9 g/night. Xyrem 2005 PI at 22-23. In patients with liver dysfunction, the Xyrem PI teaches that "[i]t is prudent to reduce the starting dose of sodium oxybate by one-half." *Id.* at 4. According to the Xyrem 2005 PI, the pharmacokinetics of sodium oxybate "are nonlinear with blood levels increasing 3.7-fold as dose is doubled from 4.5 to 9 grams (g)." *Id.* at 2; *see also* Xyrem 2012 PI at 2.

**(5) Claims 2, 4, 12, 13, 18 and 28**

Dependent claims 2, 4, 12, 13, 18, and 28 further recite percent reductions in the dosage amount of GHB or a salt thereof.

Claim 2 depends from claim 1, and further recites "wherein there is at least about a 15% reduction in the effective dosage amount of the GHB or salt thereof given to the patient and wherein the valproate, acid, salt or mixture thereof is divalproex sodium." Claim 4 depends from claim 1, and is further directed to "wherein the effective dosage amount is a reduction of about 5% to 10%, about 10% to 15%, about 15% to 20%, about 20% to 25%, about 25% to 30%, about 30% to 35%, about 35% to 40%, about 40% to 45%, or about 45% to 50%, relative to the dose of the GHB or salt thereof normally given to the patient."

Claim 12 depends from claim 11, and is further directed to "wherein the amount of GHB or salt thereof is reduced at least 10% to 30%." Claim 13 depends from claim 11, and is further directed to "wherein the amount of GHB or salt thereof is reduced at least 15% patient and wherein the valproate, acid, salt, or mixture thereof is divalproex sodium." Claim 18 depends from claim 11, and is further directed to "recommending to decrease the dose of GHB or salt thereof by 20% patient and wherein the valproate, acid, salt, or mixture thereof is divalproex sodium."

Claim 28 depends from claim 19, and further recites "recommending reducing a dose of GHB or salt thereof at least 20% patient and wherein the valproate, acid, salt, or mixture thereof is divalproex sodium."

Claims 2, 13, 18, and 28 also each require "wherein the valproate, acid, salt, or mixture thereof is divalproex sodium." The Depakote Label discloses that Depakote contains divalproex sodium, a valproate salt. *See* Depakote Label at 1, 33, 48, 55. Specifically, the Depakote Label states that Depakote is a co-ordination compound that is comprised of sodium valproate and valproate in a 1:1 molar ratio. *Id.* at 33-34.

For the same reasons discussed above with respect to claim 1, the prior art disclosed or rendered obvious the reductions in GHB doses recited in claims 2, 4, 12, 13, 18, and 28. For example, optimizing the dose of GHB would have been obvious to one of ordinary skill in the art. As discussed above, the prior art teaches that valproate causes an increase in GHB levels. Accordingly, it would have been obvious for a person of ordinary skill in the art to reduce effective dosage amount of GHB when the patient is receiving a concomitant administration of valproate, in order to avoid complications associated with increased GHB levels. Further, a person of ordinary skill in the art would have found it obvious to decrease the dose of GHB based on the titration instructions in the Xyrem 2005 PI. Per the titration instructions in the Xyrem 2005 PI, a

person of ordinary skill in the art could reduce the dose of GHB by 1.5 grams per night. If the starting dose of GHB is 4.5 grams per night based on the per label instructions, a 1.5 gram decrease would be a 33.3 % reduction. If the dose of GHB is 7.5 grams, a 1.5 gram decrease would be a 20 % reduction. Similarly, if the dose of GHB is the maximum per label dose of 9 grams per night, a decrease of 1.5 grams would be a 16.7 % reduction. Further, a person of ordinary skill in the art would have reasonably been motivated to reduce the GHB dose by 50 %, as the Xyrem 2005 PI discloses that "it is prudent to reduce the starting dose of sodium oxybate by one- half in patients with liver dysfunction." Xyrem 2005 PI at 4; *see also* Xyrem Titration Schedule; Xyrem 2012 PI. Additionally, the Cook Patent discloses that liquid formulations of GHB were used in clinical trials and states "[t]he initial dose for all patients in the GHB open-label trial was 6 grams of GHB nightly in divided doses. Dosage adjustments were permitted in the first two weeks of the trial as indicated for intolerance or lack of efficacy. The investigator was permitted to decrease the dose of GHB to 3 grams or 4.5 grams (a 50% and 25% reduction, respectively), or increase the dose to 7.5 grams or 9 grams nightly. After two weeks, further dosage adjustments were made if clinically indicated." the Cook Patent at 18:2-10.

Further, a person of ordinary skill in the art would have further understood that routine pharmacokinetic studies could be conducted to identify the specific dosage adjustment needed to safely co-administer GHB and valproate. As a person of ordinary skill in the art would have found it obvious to reduce the dose of GHB by the amounts recited in claims 2, 4, 12, 13, 18, and 28 based on the prior art, a person of ordinary skill in the art would have found it obvious to try to reduce the dose of GHB by the amounts recited in claims 2, 4, 12, 13, 18, and 28 in routine pharmacokinetic studies with a reasonable expectation of success.

**(6) Claims 3, 7, 8, 9, 10 and 31**

Claim 3 is dependent on claim 2 and requires "the dose of the GHB or salt thereof given to the patient without concomitant administration of valproate, an acid, salt or mixture thereof is from 4.5 to 9 grams per day." Claims 7 and 8 are dependent on claim 1 and recite that the dose of GHB is "reduced from a range of 4.5 to 9 grams per day" or that "the dose of the GHB or salt thereof without concomitant administration of valproate, an acid, salt or mixture thereof is from 4.5 to 9 grams per day," respectively. Claim 9 is dependent on claim 1 and requires that the "effective dosage amount of the GHB or salt thereof is between 3 grams and 7 grams per day." Claim 10 is dependent on claim 1 and requires that the "effective dosage amount of the GHB or salt thereof is between 3.5 grams and 4 grams per day." Claim 31 is dependent on claim 30 and requires a starting GHB dose of 3.6 grams. The additional limitations of claims 3, 7, 8, 9, 10 and 31 do not distinguish the claims from the prior art.

The Cook Patent discloses that liquid formulations of GHB were used in clinical trials and states "[t]he initial dose for all patients in the GHB open-label trial was 6 grams of GHB nightly in divided doses. Dosage adjustments were permitted in the first two weeks of the trial as indicated for intolerance or lack of efficacy. The investigator was permitted to decrease the dose of GHB to 3 grams or 4.5 grams, or increase the dose to 7.5 grams or 9 grams nightly. After two weeks, further dosage adjustments were made if clinically indicated." Cook Patent at 18:2-10.

Xyrem 2005 PI states that the recommended starting dose for Xyrem is 4.5 g/night, which can be increased (recommended in 1.5 g increments) to a maximum of 9 g/night. Xyrem 2005 PI at 22-23; *see also* Xyrem 2012 PI. In patients with liver dysfunction, Xyrem 2005 PI teaches that "[i]t is prudent to reduce the starting dose of sodium oxybate by one-half." Xyrem 2005 PI at 4; *see also* Xyrem 2012 PI. According to Xyrem 2005 PI, the pharmacokinetics of

sodium oxybate "are nonlinear with blood levels increasing 3.7-fold as dose is doubled from 4.5 to 9 grams (g)." Xyrem 2005 PI at 2; *see also* Xyrem 2012 PI.

The Xyrem Titration Schedule, like the Xyrem 2005 PI, teaches that the "[r]ecommended starting dose is 4.5 g/night" and that "[d]osage should be titrated to effect in increments of 1.5 g/night . . . to a maximum dose of 9 g/night." Xyrem Titration Schedule at 1.

**(7) Claims 5 and 16**

Claims 5 and 16 are dependent on claims 1 and 11, respectively. The additional limitation of claims 5 and 16, wherein the patient is suffering from narcolepsy, does not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claim 1 of the '306 patent, said discussion incorporated here by reference.

**(8) Claims 14, 15, 20 and 21**

Claims 14 and 15 are dependent on claim 11, and claims 20 and 21 are dependent on claim 19. The additional limitation of claims 14 and 20, wherein the valproate, acid, salt or mixture thereof is administered within two weeks of administration of the GHB or salt thereof, does not distinguish the claim from the prior art. Similarly, the additional limitation of claims 15 and 21, wherein the valproate, acid, salt or mixture thereof is administered within three days of administration of the GHB or salt thereof does not distinguish the claim from the prior art. As discussed above, a person of ordinary skill in the art would have known that valproate increases levels of GHB in the brain. Accordingly, a person of ordinary skill in the art would have decreased the GHB dose in patients who are taking both valproate and GHB. Moreover, a person of ordinary skill in the art would have understood that concomitant administration would have necessarily included coadministration, as well as administration of the two drugs close in time, such as "within two weeks" or "within three days" of each other.

**(9) Claims 22 and 24**

Claims 22 and 24 are dependent on claim 19. The additional limitation of claim 22, wherein the GHB salt is administered starting at a concentration of between 450 to 550 mg/ml, does not distinguish the claim from the prior art. Similarly, The additional limitation of claim 24 wherein the GHB salt formulation has a pH between 6.5 and 8, does not distinguish the claim from the prior art. For example, the Cook Patent discusses preferred concentration and pH ranges for compositions comprising GHB, stating: "[a]t a concentration or content of about 450 mg/ml GHB, the pH may be of about 3.9 to about 10.3. At a concentration or content of about 500 mg/ml GHB, the pH may be of about 4.75 to about 10.3. At a concentration or content of about 600 mg/ml GHB, the pH may be of about 6.1 to about 10.3. At a concentration or content of about 750 mg/ml GHB, the pH may be of about 7.0 to about 10.3. Of course, all pH and concentration or content values in between each of the listed pH and concentration or content values are encompassed by the invention." *See* Cook Patent at 4:30-40; *see also* Xyrem 2005 PI ("Xyrem oral solution contains 500 mg of sodium oxybate per milliliter of USP Purified Water, neutralized to pH 7.5 with malic acid."); Xyrem 2012 PI ("Xyrem is a clear to slightly opalescent oral solution, in a concentration of 0.5 g per mL").

**(10) Claims 23, 29, 32 and 34**

Claims 23 and 29 are dependent on claims 22 and 19, respectively, and further require adding water to the GHB salt formulation. Claims 32 and 34 are dependent on claim 30 and 33, respectively, and further require "optionally diluting the GHB salt formulation from a starting concentration of between 350 and 750 mg/ml with a pH of between 6 and 10." The additional limitations of claims 23, 29, 32 and 34 do not distinguish the claims from the prior art. For example, the Xyrem 2005 PI teaches diluting each dose of Xyrem "with two ounces (60 mL, ¼ cup, or 4 tablespoons) of water in the child-resistant dosing cups provided prior to ingestion." *See* Xyrem 2005 PI at 23; *see also* Xyrem 2012 PI at 2. Xyrem 2005 PI also teaches that "Xyrem oral solution

contains 500 mg of sodium oxybate per milliliter of USP Purified Water, neutralized to pH 7.5 with malic acid." *See also* Xyrem 2012 PI ("Xyrem is a clear to slightly opalescent oral solution, in a concentration of 0.5 g per mL").

In addition, the Cook Patent discusses preferred concentration and pH ranges for compositions comprising GHB, stating: "[a]t a concentration or content of about 450 mg/ml GHB, the pH may be of about 3.9 to about 10.3. At a concentration or content of about 500 mg/ml GHB, the pH may be of about 4.75 to about 10.3. At a concentration or content of about 600 mg/ml GHB, the pH may be of about 6.1 to about 10.3. At a concentration or content of about 750 mg/ml GHB, the pH may be of about 7.0 to about 10.3. Of course, all pH and concentration or content values in between each of the listed pH and concentration or content values are encompassed by the invention." The Cook Patent at 4:30-40.

**(11) Claim 25**

Claim 25 is dependent on claim 19. The additional limitation of claim 25, further comprising administering the reduced dose of the GHB salt to the patient, does not distinguish the claim from the prior art. As discussed above with respect to claim 1, administration of GHB is well known in the prior art.

**(12) Claim 26**

Claim 26 is dependent on claim 19. The additional limitation of claim 26, wherein the GHB salt comprises a single salt or a mixture of salts of GHB selected from the group consisting of a sodium salt of hydroxybutyrate (Na.GHB), a potassium salt of gamma- hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca.(GHB)_2$), does not distinguish the claim from the prior art. For example, the Xyrem 2005 PI states that Xyrem is sodium oxybate, the chemical name of which is "sodium 4-hydroxyburyrate," or the sodium salt of GHB. *See also* Xyrem 2012 PI; Xyrem Titration Schedule;

Cook Patent at 1:16-31 (disclosing compositions comprising "gamma-hydroxybutyrate (GHB), also known as 4-hydroxybutyrate, and the sodium salt of GHB (sodium oxybate) and other salts such as magnesium, ammonium and calcium").

**(13) No Objective Indicia**

Lupin is unaware of any evidence of secondary considerations that would render the particular combination of claim elements found in the '306 patent non-obvious, as described below and incorporated herein by reference. For example:

- *Long-Felt Need:* Lupin is not aware of any evidence to support a claim that the '306 patent resolved a long-felt need.
- *Failure of Others:* Lupin is not aware of any evidence of failure of others that reflects any non-obviousness of the subject matter of the '306 patent.
- *Skepticism of Those of Skill in the Art:* Lupin is not aware of any skepticism of those skilled in the art with respect to the subject matter of the '306 patent.
- *Licensing:* Lupin is not aware of any licensing of the '306 patent that may be reflective of non-obviousness of the subject matter of that patent.
- *Commercial Success:* Lupin is not aware of any evidence linking anyproduct sales made to the '306 patent, as opposed to marketing, endorsements, other patents or marketing exclusivities, or other factors unrelated to the alleged invention of the '306 patent. *See Merck*, 395 F.3d at 1376-77. Further, nothing submitted during prosecution of the '306 patent establishes commercial success. On at least these bases, Lupin is aware of no commercial success that could support a claim of non-obviousness.
- *Recognition in the Industry:* Lupin is not aware of any recognition in the industry for the '306 patent.
- *Acquiescence:* Lupin is not aware of any evidence of acquiescence to the validity of the '306 patent.
- *Copying:* Lupin is not aware of any copying that could support a claim of non-obviousness of the subject matter of the '306 patent. *See, e.g.*, *Bayer Healthcare*, 713 F.3d at 1377; *Purdue*, 377 F. App'x at 983; *Santarus*, 2010 WL 1506017, at *26; *Aventis*, 2006 WL 2008962, at *45.
- *Unexpected Results:* Lupin is not aware of any evidence of unexpected results

with respect to the ’306 patent. Rather, as explained above a person of ordinary skill in the art would have reasonably expected to be able to successfully administer a reduced dose of GHB if given concomitantly with valproate.

- *Teaching away:* Lupin is not aware of any prior art teaching away from reducing the dose of GHB when the patient is receiving a concomitant administration of valproate. To the contrary, as explained above, the prior art taught a person of ordinary skill in the art to reduce the GHB dose when the patient is receiving a concomitant administration of valproate.

Additionally, as noted above, the patentee must prove the required nexus before relying on *any* secondary considerations of alleged non-obviousness. *Muniauction*, 532 F.3d at 1327-28. Lupin is not aware of any evidence that would establish the required nexus for the claims ofthe ’306 patent.

Thus, for at least these reasons, claims 1-5, 7-16, 18-26, and 28-34 of the ’306 patent are invalid for obviousness.

**b. Unpatentable Subject Matter**

Claims 1-5, 7-16, 18-26, and 28-34 of the ’306 patent are invalid under 35 U.S.C. § 101 for claiming unpatentable subject matter.

Natural phenomena, laws of nature, and abstract ideas are not patentable subject matter. *Mayo*, 132 S. Ct. at 1293. “[A] process that focuses upon the use of a natural law [must] also contain other elements or a combination of elements, sometimes referred to as an ‘inventive concept,’ sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself.” *Id.* at 1294.

Claims 1-5, 7-16, 18-26, and 28-34 of the ’306 patent are method of treatment claims that require adjusting the dosage of GHB when a patient is concomitantly receiving valproate. The interaction between GHB and valproate is a natural phenomenon, and the reduction in the GHB dosage is not a sufficient “inventive concept” to render the claims patentable. *See Mayo*, 132 S.

Ct. at 1294. Accordingly, claims 1-5, 7-16, 18-26, and 28-34 of the '306 patent are invalid under 35 U.S.C. § 101 for claiming unpatentable subject matter.

**c. Lack of Utility**

To the extent that Plaintiff argues that the prior art would not have motivated a person of ordinary skill in the art to administer a reduced dose of GHB to a patient receiving a concomitant administration of valproate, that the prior art taught away from administering GHB concomitantly with valproate, that a person of ordinary skill in the art would not have reasonably expected to be able to successfully treat a patient in co-administering GHB and valproate, and/or that no patient with a sleep disorder was receiving co-administered GHB and valproate in the prior art, then claim 1-5, 7-16, 18-26, and 28-34 of the '306 patent are invalid under 35 U.S.C. § 101 for lack of credible utility.

**d. Lack of Enablement and Written Description Support**

To the extent that Plaintiff argues claim 1-5, 7-16, 18-26, and 28-34 of the '306 patent are not invalid as obvious over the prior art, these claims are invalid for failing to satisfy the written description and enablement requirements of 35 U.S.C. § 112.

The written description inquiry focuses on whether the disclosure of the original application is sufficient to convey possession of the invention. *See Eiselstein v. Frank*, 52 F.3d 1035, 1039 (Fed. Cir. 1995). "Put another way, one skilled in the art, reading the original disclosure, must immediately discern the limitation at issue in the claims." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326 (Fed. Cir. 2000).

In order for claims to be enabled under 35 U.S.C. § 112, the specification must describe "the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." *Magsil Corp. v. Hitachi Global Storage Techs.*, 687 F.3d

1377, 1380 (Fed. Cir. 2012). The specification must enable a person of ordinary skill in the art to practice the claimed invention without undue experimentation. *In re Wands*, 858 F.2d at 737 (Fed. Cir. 1988). The following factors (*Wands* factors) are considered by a court when determining whether a patent specification would require undue experimentation: (1) the breadth of the claims, (2) the nature of the invention, (3) the state of the prior art, (4) the relative skill of those in the art, (5) the predictability or unpredictability of the art, (6) the amount of direction or guidance presented, (7) the presence or absence of working examples, and (8) the quantity of experimentation necessary.

As explained above, claim 1-5, 7-16, 18-26, and 28-34 of the '306 patent are generally directed to methods of treating a patient who is suffering from excessive daytime sleepiness, cataplexy, sleep paralysis, apnea, narcolepsy, sleep time disturbances, hypnagogic hallucinations, sleep arousal, insomnia, or nocturnal myoclonus, by administering, or safely administering, a reduced amount of GHB or a salt thereof, to a patient who is receiving a concomitant administration of valproate, an acid, salt, or mixture thereof.

The specification of the '306 patent does not describe the extent to which the GHB dose should be reduced based on various pharmacokinetic or pharmacodynamic parameters, or how to otherwise determine the extent to which the GHB dose should be reduced, when the patient is receiving a concomitant administration of valproate, an acid, salt, or mixture thereof. For example, the specification does not provide any information to correlate various pharmacokinetic or pharmacodynamic parameters with a GHB dose reduction claimed in claim 1-5, 7-16, 18-26, and 28-34 of the '306 patent. Therefore, to the extent that Plaintiff contends that a person of ordinary skill in the art would not view these claims as obvious for the reasons stated above, then a person of ordinary skill in the art would understand that the named inventors were not in possession of

the claimed invention as of the earliest claimed filing date of the ’306 patent. Therefore, claim 1-5, 7-16, 18-26, and 28-34 of the ’306 patent would be invalid for lacking written description support.

Further, if Plaintiff contends that a person of ordinary skill in the art would not view these claims as obvious for the reasons stated above, then the ’306 patent specification fails to enable a person of ordinary skill in the art to practice the full scope of claims 1-5, 7-16, 18-26, and 28-34 without undue experimentation. In particular, no direction or guidance or working examples are presented in the specification the extent to which the GHB dose should be reduced based on various pharmacokinetic or pharmacodynamic parameters, or how to otherwise determine the extent to which the GHB dose should be reduced, when the patient is receiving a concomitant administration of valproate, an acid, salt, or mixture thereof.

**B. The ’302 Patent**

U.S. Patent No. 9,050,302 B2 (“the ’302 patent”), entitled “Method of Administration of Gamma Hydroxybutyrate with Monocarboxylate Transporters,” issued on or about June 9, 2015. Mark Eller is identified as the inventor on the face of the ’302 patent. According to the records of the Patent Office, the ’302 patent is assigned to Jazz Pharmaceuticals Ireland Limited. The ’302 patent issued from U.S. Patent Application Serial No. 13/837,714 (“the’714 application”), filed on March 15, 2013. The ’302 patent also purports to claim the benefit ofpriority of U.S. Provisional Patent Application Serial Nos. 61/771,557 (“the ’557 provisional application”) and 61/777,873 (“the ’873 provisional application”), filed on March 1, 2013, and March 12, 2013, respectively. Plaintiff has the burden to establish that the asserted claims of the ’302 patent are entitled to the priority date of any earlier-filed application. *See Dynamic Drinkware, LLC v. National Graphics, Inc*. 800 F.3d 1375, 1380 (Fed. Cir. 2015). Absent specific evidence of entitlement to an earlier priority date, the ’302 patent must be assigned its actual filing date of March 15, 2013. *Id*. To

establish an earlier priority date, each earlier application in the chain must fully disclose the claimed invention by meeting all requirements of 35 U.S.C. §112. *In re NTP, Inc*., 654 F.3d 1268, 1277 (Fed. Cir. 2011). Lupin does not concede that the ’302 patent has made a proper claim of priority to an earlier-filed application, and reserves the right to (i) challenge the ’302 patent’s entitlement to claim priority to any previous application, (ii) challenge any alleged date of conception or reduction to practice; and (iii) identify additional prior art thereto.

**1. The ’302 Patent Specification**

The specification of the ’302 patent is substantially similar to the specification of the ’306 patent discussed above said discussion is incorporated herein by reference.

**2. Asserted Claims of the ’302 Patent**

Plaintiff asserts claims 1-31 of the ’302 patent, of which claims 1, 8, 13, 20, 27 and 31 are independent. These claims are reproduced below:

> 1. A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking gamma-hydroxybutyrate (GHB) or a salt thereof comprising:
>
>> administering to the patient a dose of divalproex sodium concomitant to a dose of GHB or salt thereof; and
>>
>> reducing the daily dosage amount of GHB or salt thereof administered to the patient by at least 20% wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g.
>
> 2. The method of claim 1 further comprising monitoring, patient response and adjusting the GHB dose to maintain the effect of the GHB.
>
> 3. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g.
>
> 4. The method of claim 3 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced to lower than 3.6 g.

5. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 6 g.

6. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 7.5 g.

7. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 9 g.

8. A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking gamma-hydroxybutyrate (GHB) or a salt thereof comprising:

> reducing the daily dosage amount of GHB or salt thereof administered to the patient by at least 20% during concomitant administration of divalproex sodium, compared to the daily dosage amount of between 4.5 and 9 g of GHB or salt thereof currently used in the absence of concomitant administration of divalproex sodium.

9. The method of claim 8, wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by at least 20% compared to the manufacturer's, recommended daily dosage amount of GHB or salt thereof.

10. The method of claim 8 further comprising monitoring patient response and adjusting the GHB dose to maintain the effect of the GHB.

11. The method of claim 8 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g.

12. The method of claim 11 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced to lower than 3.6 g.

13. A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising:

> administering to the patient a starting daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is 20% lower than a manufacturer's recommended starting daily dosage amount of between

4.5 and 9 g in the absence of concomitant administration of divalproex sodium.

14. The method of claim 13 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient is lower than 4.5 g.

15. The method of claim 14 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient is divided in two equal doses.

16. The method of claim 15 wherein the first dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g.

17. The method of claim 15 wherein the second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g.

18. The method of claim 13 further comprising monitoring patient response and adjusting the GHB dose to treat the patient.

19. The method of claim 13 wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g.

20. A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising:

administering to the patient a starting daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is 20% lower than the starting daily dosage amount of between 4.5 to 9 g GHB that would otherwise have been recommended to the patient if the patient was not currently taking divalproex sodium.

21. The method of claim 20 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient who is currently taking divalproex sodium is lower than 4.5 g.

22. The method of claim 21 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient who is currently taking divalproex sodium is divided in two equal doses.

23. The method of claim 22 wherein the first dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g.

24. The method of claim 23 wherein the second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g.

25. The method of claim 20 further comprising monitoring patient response and adjusting the GHB dose to treat the patient.

26. The method of claim 20 wherein the starting daily dosage amount of GHB or salt thereof that would otherwise have been recommended to the patient if the patient was not currently taking divalproex sodium is 4.5 g.

27. A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising the steps of:

> administering to the patient a daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is lower than 4.5 g.

28. The method of claim 27 wherein the daily dosage amount of GHB or salt thereof administered to the patient is divided in two equal doses.

29. The method of claim 28 wherein the first dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g.

30. The method of claim 28 wherein the second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g.

31. A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising the steps of:

> administering to the patient a dose of gamma-hydroxybutyrate (GHB) or a salt thereof that is lower than 2.25 g; and
>
> administering to the patient a second dose of GHB or salt thereof that is lower than 2.25 g.

**3. Invalidity of the ’302 Patent**

Claims 1-31 of the ’302 patent are invalid at least under 35 U.S.C. § 103 for being obvious over the prior art, and under 35 U.S.C. § 101 for claiming unpatentable subject matter. Further, to the extent Plaintiff argues that the asserted claims of the ’302 patent are not obvious over the prior

art, then they are invalid under 35 U.S.C. § 101 for lack of utility, and under 35 U.S.C. § 112 for lack of enablement and written description support.

**a. Obviousness**

In addition to the prior art references found on the face of the '302 patent, which Lupin identifies and incorporates fully herein, Lupin identifies the following items of prior art which, separately or in any reasonable combination, render obvious one or more of the asserted claims of the '302 patent under 35 U.S.C. § 103. In addition, Lupin reserves the right to rely on all prior art, evidence of the relevant state of the art, and evidence of prior sales, produced by Plaintiff during fact discovery and all prior art identified in the '302 patent or its prosecution history. Lupin further incorporates by reference, in full, all references cited in the following prior art references and their prosecution histories, where applicable.

The citations provided are representative of the references and are not exhaustive. To the extent that similar claim limitations occur in one or more claims, the disclosures below should be read to apply to all similar claim limitations. Moreover, many of the references discussed herein are representative of additional prior art references in the relevant field. It should be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of the other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information, including other publications and general scientific, medical or engineering knowledge. Lupin therefore reserves the right to rely upon other unidentified portions of the prior art references and on other publications and expert testimony to provide context and to aid understanding and interpretation of any identified portions. Lupin also reserves the right to rely upon other portions of the prior art references, other publications, and the testimony of experts to establish that the alleged inventions were expressly or inherently disclosed

in the prior art and/or would have been obvious to a person of ordinary skill in the art, including on the basis of modifying or combining certain cited references. It should also be recognized that the various concepts may be discussed in numerous references and that citation to one particular reference does not exclude later citation to other references discussing the same concept. Lupin also reserves the right to rely upon any admissions relating to prior art or the state of the art in the '302 patent or its prosecution history, as well as any admissions relating to prior art or the statement of the art in foreign counterparts and their prosecution histories. Lupin further reserves the right to modify these Invalidity Contentions to add additional prior art references in light of the information gained through fact discovery, expert discovery, arguments or positions advanced by Plaintiff, or the Court's claim construction rulings.

Lupin reserves the right to rely upon any related patents and patent applications, foreign patent counterparts and foreign patent applications of U.S. patents or applications identified in these Invalidity Contentions, U.S. counterparts of foreign patents or foreign patent applications identified in these Invalidity Contentions, or U.S. and foreign patents or applications corresponding to articles and publications identified in these Invalidity Contentions. For prior art patents and publications identified in these Invalidity Contentions, Lupin reserves the right to rely on inherency, public use, offer for sale, and/or sale of the products described in those prior art patents or publications once Lupin has had an opportunity to take discovery on these subjects.

**i. Identification of the Prior Art**

Subject to the above, at least the following prior art is relevant to the invalidity of the asserted claims of the '302 patent:

- U.S. Patent No. 6,780,889 B2 ("the Cook Patent");[32]

[32] The Cook Patent, and U.S. Patent Nos. 7,262,219 B2 ("the '219 patent") and 7,851,506 B2 ("the '506 patent"), as well as their application publications, including U.S. Patent Application No.

- R. Bernasconi, et al., *Experimental Absence Seizures: Potential Role of γ-Hydroxybutyratic Acid and GABAB Receptors*, J. Neural. Transm. 35:155-177 (1992) ("Bernasconi");

- Bhattacharya, I. et al., *GHB (γ-Hydroxybutyrate) Carrier-Mediated Transport across the Blood-Brain Barrier*, 311(1) J. Pharmacol. Exp. Ther. 92–98 (2004) ("Bhattacharya 2004");

- Bhattacharya, I. et al., *Potential γ-Hydroxybutyric Acid (GHB) Interactions Through Blood–Brain Barrier Transport Inhibition: A Pharmacokinetic Simulation-Based Evaluation*, 33(5) J. Pharmacokinetics & Pharmacodynamics 657–81 (2006) ("Bhattacharya 2006");

- Lowell A. Borgen, et al., *The Influence of Gender and Food on the Pharmacokinetics of Sodium Oxybate Oral Solution in Healthy Subjects*, 43 J. Clin. Pharmacol. 59-65 (2003) ("Borgen");

- R. Broughton & M. Mamelak, *The Treatment of Narcolepsy-Cataplexy with Nocturnal Gamma-Hydroxybutyrate*, Can. J. Neurol Sci, Vol. 6, No.1 (1979) ("Broughton 1979");

- R. Broughton & M. Mamelak, *Effects of nocturnal Gamma-Hydroxybutyrate on Sleep/Waking Patterns in Narcolepsy-Cataplexy*, Can. J. Neurol. Sci. Vol. 7, No.1 (1980) ("Broughton 1980");

- Annachiara Cagnin et al., *γ-Hydroxybutyric Acid-Induced Psychosis andSeizures*, 21 Epilepsy & Behavior 203 (2011) ("Cagnin");

- C.D. Cash, Gamma hydroxybutyrate: *An Overview of the Pros and Cons for it Being a Neurotransmitter And/Or a Useful Therapeutic Agent*, Neurosci. Biobehavioral Rev., Vol. 18(2), 291-304 (1994) ("Cash");

- Sébastien Chateauvieux et al., *Molecular and Therapeutic Potential and Toxicity of Valproic Acid*, 2010 J. Biomed. & Biotech. 1 (online version) (2010) ("Chateauvieux");

- Depakote (Divalproex Sodium) Tablets for Oral Use: FDA Approved Labeling

---

2003/0125385 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (published July 3, 2003) ("Cook Application"), are each prior art to the '306 patent. Since the specifications of each of the '889, '219, and '506 patents, and the corresponding application publications, are substantially the same, for the purposes of these Invalidity Contentions, Lupin will limit its discussion to the teachings of the Cook Patent in this section. Any citations herein with respect to the Cook Patent are also made with respect to the same or similar disclosures in the Cook Application, the '219 patent, the '506 patent, as well as their application publications.

Text, (2011) (“Depakote Label”);

- P. Divry et al., *A New Patient with 4-Hydroxybutyric Aciduria, a Possible Defect of 4-Aminobutyrate Metabolism*, 129 Clinica Chimica Acta 303-309 (1983) (“Divry”);

- Food and Drug Administration, Center for Drug Evaluation and Research, Clinical Pharmacology Division, Guidance for Industry: Drug Interaction Studies – Study Design, Data Analysis, Implications for Dosing and Labeling (February 2012) (“FDA Guidance”);

- Neil T. Feldman, et al., Sleep Architecture Effects of Sodium Oxybate Treatment in Subjects with Sleep-Disordered Breathing, 20 Chest 130 (2006) (“Feldman 2006”);

- Neil T. Feldman, Clinical perspective: Monitoring Sodium Oxybate-Treated Narcolepsy Patients for the Development of Sleep-Disordered Breathing, 14 SLEEP BREATH 77-79 (2010) (“Feldman 2010”);

- S.J. Frucht, et al., A Pilot Tolerability and Efficacy Trial of Sodium-Oxybate in Ethanol-Responsive Movement Disorders, 20 Movement Disorders 1330-1337 (2011) (“Frucht”);

- Philip D. Hansten & John R. Horn, Drug Interactions Analysis and Management, Wolters Kluwer Health, PM1-36 (2011) (“Hansten”);

- Harvey, P. et al., *The Inhibitory Effect of Sodium* n-*Dipropyl Acetate on the Degradative Enzymes of the GABA Shunt*, 52(2) FEBS Lett. 251–54 (1975) (“Harvey”);

- Viviane Hechler et al., *γ-Hydroxybutyrate Conversion into GABA Induces Displacement of $GABA_B$ Binding That Is Blocked by Valproate and Ethosuximide*, 281 J. Pharmacology & Experimental Therapeutics 753 (1997) (“Hechler”);

- Elaine E. Kaufman & Thomas Nelson, *Evidence for the Participation of a Cytosolic $NADP^+$-Dependent Oxidoreductase in the Catabolism of γ-Hydroxybutyrate In Vivo*, 48 J. Neurochemistry 1935 (1987) (“Kaufman 1987”);

- Kaufman, E. et al., *Oxidation of γ-Hydroxybutyrate to Succinic Semialdehyde by a Mitochondrial Pyridine Nucleotide-Independent Enzyme*, 51(4) J. Neurochemistry 1079–84 (1988) (“Kaufman 1988”);

- Kaufman, E. et al., *An Overview of γ-Hydroxybutyrate Catabolism: The Role of the Cytosolic NADP+-Dependent Oxidoreductase EC 1.1.1.19 and of a Mitochondrial Hydroxyacid-Oxoacid Transhydrogenase in the Initial, Rate-Limiting Step in This Pathway*, 16(9) Neurochem. Res. 965–74 (1991) (“Kaufman 1991”);

- I. Knerr, et al., *Therapeutic concepts in succinate semialdehyde dehydrogenase (SSADH; ALDH5a1) deficiency (γ-hydroxybutyric aciduria). Hypotheses evolved from 25 years of patient evaluation, studies in Aldh5a1$^{-/-}$ mice and characterization of γ-hydroxybutyric acid pharmacology*, J. Inherit. Metab. Dis., Vol. 30, pp. 279-294 (2007) ("Knerr");

- van der Laan, J.W. et al., *Di-n-Propylacetate and GABA Degradation: Preferential Inhibition of Succinic Semialdehyde Dehydrogenase and Indirect Inhibition of GABA-Transaminase*, 32(4) J. Neurochem. 1769–80 (1979) ("Laan");

- Löscher, *Valproate: A Reappraisal of Its Pharmacodynamic Properties and Mechanisms of Action*, Progress in Neurobiol., Vol. 58, pp. 31-59 (1999) ("Löscher 1999");

- Löscher, W., *Basic Pharmacology of Valproate: A Review after 35 Years of Clinical Use for the Treatment of Epilepsy*, 16(10) CNS Drugs 669–94 (2002) ("Löscher 2002");

- Maitre, M, *The γ-Hydroxybutyrate Signalling System in Brain Organization and Functional Implications*, 51 Progress in Neurobiology 337 (1997) ("Maitre");

- Pascal Mathivet, et al., *Binding Characteristics of γ-Hydroxybutyric Acid as a Weak but Select $GABA_B$ Receptor Agonist*, 321 European J. Pharmacology 67-75 (1997) ("Mathivet");

- Morris, Monocarboxylate Transporter Inhibition with Osmotic Diuresis Increases γ-Hydroxybutyrate Renal Elimination in Humans: A Proof-of-Concept Study, *J. Clin. Tox.*, 1(2), 1000105, pp. 1-4 (2011) ("Morris 2011");

- Mortimer Mamelak et al., *Treatment of Narcolepsy with γ-Hydroxybutyrate. A Review of Clinical And Sleep Laboratory Findings*, Sleep, 9(1):285-289 (1986) ("Mamelak 1986");

- Mortimer Mamelak, *Gamma hydroxybutyrate: An Endogenous Regulatorof Energy Metabolism*, 13 Neurosci. & Biobehavorial Revs. 187(1989) ("Mamelak 1989");

- Okun, M., *GHB: An Important Pharmacologic and Clinical Update*, 4 J. Pharmaceut. Sci. 167 (2001) ("Okun");

- A Priori, et al., *γ-Hydroxybutyric Acid for Alcohol-Sensitive Myoclonus with Dystonia*, 54 NEUROLOGY 1706 (2000) ("Priori");

- J.F. Rumigny et al., *Specific and Non-Specific Succinic Semialdehyde Reductases from Rat Brain: Isolation and Properties*, 117 FEBS Letters 111 (1980) ("Rumigny");

- Martin B. Scharf, et al., *The Effects and Effectiveness of γ-Hydroxybutyrate in Patients with Narcolepsy*, J. Clin. Psychiatry, 46:222-225 (1985) ("Scharf 1985");

- Martin B. Scharf, *Pharmacokinetics of Gamma hydroxybutyrate (GHB) in Narcoleptic Patients*, *Sleep*, Vol. 21(5), pp. 507-514 (1998) ("Scharf 1988");

- Schep, L. et al., *The Clinical Toxicology of Gamma-Hydroxybutyrate, Gamma-Butyrolactone and 1,4-Butanediol*, 50(6) Clin. Toxicol. (Phila). 458–70 (2012) ("Schep");

- Lawrence Scrima, et al., *The Effects of γ-Hydroxybutyrate on the Sleep of Narcolepsy Patients: A Double-Blind Study*, 13(6) Sleep 479-90 (1990) ("Scrima");

- T. Shinka et al., *Effect of Valproic Acid on the Urinary MetabolicProfile of a Patient with Succinic Semialdehyde Dehydrogenase Deficiency*, 792 J. Chromatography 99-106 (2003) ("Shinka");

- O.C. Snead et al., *Effect of Acute and Chronic Anticonvulsant Administration on Endogenous γ-Hydroxybutyrate in Rat Brain*, 19 Neuropharmacology 47-52 (1980) ("Snead 1980");

- O.C. Snead & K. Michael Gibson, *γ-Hydroxybutyric Acid*, 352 New England J. Med. 2721-32 (2005) ("Snead 2005");

- Vayer, P. et al., *3′-5′ Cyclic-Guanosine Monophosphate Increase in Rat Brain Hippocampus after Gamma- Hydroxybutyrate Administration: Prevention by Valproate and Naloxone*, 41(5) Life Sci. 605–10 (1987) ("Vayer 1987");

- Vayer, P. et al., *Is the Anticonvulsant Mechanism of Valproate Linked to Its Interaction with the Cerebral γ-Hydroxybutyrate System?*, 9(4) Trends Pharmacol. Sci. 127–29 (1988) ("Vayer 1988");

- Anna Waszkielewicz & Jacek Bojarski, *γ-Hydroxybutyric Acid (GHB) and Its Chemical Modifications: A Review of the GHBergic System*, 56 Polish J. Pharmacology 43 (2004) ("Waszkielewicz");

- Gregory P. Wedin et al., *The Clinical Development of γ-Hydroxybutyrate (GHB)*, 1 Current Drug Safety 99 (2006) ("Wedin");

- Weiss, T. et al., *Gamma-Hydroxybutyrate (GHB) and Topiramate—Clinically Relevant Drug Interaction Suggested by a Case of Coma and Increased Plasma GHB Concentration*, 69 Eur. J. Clin. Pharmacol. 1193 (2013) ("Weiss");

- Xyrem® Prescribing Information (2012) ("Xyrem 2012 PI");

- Xyrem® Prescribing Information (2005) ("Xyrem 2005 PI");

- FDA Approval Letter for Xyrem® (Nov. 18, 2005) ("Xyrem 2005 FDA Approval Letter");
- FDA Approval Letter for Xyrem® (Jul. 17, 2002) ("Xyrem 2002 FDA Approval Letter");
- Physician's Desk Reference Edition 61, pp. 1688-1692, (2007) ("Xyrem Physician's Desk Reference"); and
- Xyrem® Titration Schedule published in 2008 ("the Xyrem Titration Schedule").

Lupin expressly reserves the right to modify and/or supplement the prior art discussed herein. Each of the above is prior art to the '302 patent. To the extent that the patentee and/or inventors attempt to swear behind or otherwise remove as prior art any of the art identified herein, Lupin specifically reserves its right to, *inter alia*, add additional prior art to the list. Furthermore, to the extent that the patentee argues that any of the cited references are not prior art under 35 U.S.C. § 102, many of the referenced patents and/or patent applications have foreign or U.S. equivalents which also qualify as prior art. Such foreign and U.S. equivalents are incorporated herein, and Lupin reserves the right to rely upon them. Additionally, as previously noted, Lupin reserves its right to, *inter alia*, supplement or amend its list of prior art references based upon, among other things, Plaintiff's disclosure of its alleged infringement proofs; disclosure of the Plaintiff's proposed construction of the claims of the '302 patent; issuance of a claim construction ruling by a court,should the court be able to construe the claims of the '302 patent; Plaintiff's response to any of Lupin's defenses, including, but not limited to, Plaintiff's interpretation of the prior art; the discovery (fact or expert) during litigation; and/or further investigation. Moreover, Lupin does not admit, or otherwise concede, that the claims of the '302 patent are entitled to an effective filing date earlier than the patent's filing date, and therefore reserves the right to, *inter alia*, challenge the effective filing date of the patent and to assert additional prior art references and/or products based on any such challenge. Nevertheless, as discussed herein, each claim of the

patent is invalid even if the '302 patent is entitled to claim priority to an earlier-filed application.

Claims 1-31 of the '302 patent are rendered obvious for at least the reasons set forth below. (*See also* Section V.G).

**ii. The Scope and Content of the Prior Art**

The teachings of the prior art identified above are described in detail in the section related to the invalidity of the '306 patent, said discussion incorporated herein by reference.

**iii. The Asserted Claims Are Invalid as Obvious**

At least the references discussed above disclose, either alone or in combination, the limitations of claims 1-31 of the '302 patent.[33] Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references together with the knowledgehe or she would have possessed, would have readily gleaned the information necessary to develop the methods of treatment (to the extent such methods were not already known or in use) within claims 1-31 of the '302 patent; would have had a motivation to use such a method; and would have had a reasonable expectation of success in doing so. *See, e.g.*, *KSR*, 550 U.S.at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

As explained below, the asserted claims would have been obvious in view of a host of prior art references. Consequently, there are numerous different combinations of these prior art references and many exemplary references that disclose the claimed method. *See, e.g.*, *Rothman*

[33] To the extent that any specific limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

*v. Target Corp.*, 556 F.3d 1310, 1320-21 (Fed. Cir. 2009) (when the "entire body of prior art"—or an "evidentiary cornucopia"—renders a patent claim obvious, a trier of fact can fairly rely on "any combination of these references in reaching its obviousness verdict.").

By way of example, the following combinations render the asserted claims obvious:

- One or more of the Cook Patent, Bhattacharya 2004, Broughton 1979, Broughton 1980, Feldman 2006, Feldman 2010, Frucht, Mamelak 1986, Mamelak 1989, Okun, Priori, Scharf 1985, Scharf 1988, Scrima, Xyrem 2005 PI, Xyrem 2012 PI, Xyrem Physician's Desk Reference, Xyrem 2002 FDA Approval Letter, Xyrem 2005 FDA Approval Letter, Xyrem Titration Schedule; in view of

- One or more of Bernasconi, Bhattacharya 2006, Borgen, Cash, Chateauvieux, Depakote Label, Divry, Harvey, Hechler, Kaufman 1987, Kaufman 1988, Kaufman 1991, Knerr, Laan, Löscher 1999, Löscher 2002, Maitre, Mathivet, Morris 2011, Rumigny, Schep, Shinka, Snead 2005, Snead 1980, Vayer 1987, Vayer 1988, Waszkielewicz, Wedin; in further view of

- One or both of Cagnin, Weiss; optionally in combination with

- One or both of the FDA Guidance, Hansten.

More specifically, at least the following combinations of prior art references are exemplary of the combinations of prior art references that render the asserted claims of the '302 patent obvious:

- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance

Lupin reserves the right to rely on other combinations of prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

As further explained below, a person of ordinary skill in the art would have been motivated to combine the teachings of these references with a reasonable expectation of success in light of

the problem to be solved, the disclosures of the references, and the common subject matter of the references as explained throughout. In addition, Lupin's invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

A person of ordinary skill in the art would have been motivated to combine the teachings of the prior art discussed above to arrive at the claimed method of treatment. As an initial matter, a person of ordinary skill in the art would have been motivated to use GHB to treat sleep disorders based on the extensive prior art disclosing its use for such purposes. *See, e.g.*, Cook Patentat 1:16-31; Wedin at 99; Okun at 169-170, Xyrem 2005 PI, Xyrem 2012 PI, Xyrem Physician's Desk Reference at 1688; Xyrem 2002 FDA Approval Letter at 1; Xyrem 2005 FDA Approval Letter at 1; Bhattacharya 2004 at 92; Broughton 1979 at Summary; Broughton 1980 at Summary; Feldman 2006 at 130S; Feldman 2010 at 77; Frucht at 1330; Maitre at Abstract, 352; Mamelak 1986 at Abstract, 288; Mamelak 1989 at 188; Priori; Scharf 1985 at Abstract; Scharf 1988; Scrima at Summary, 486. Moreover, given the extensive teaching in the art about the potential interaction between GHB and valproate, a POSA would have been motivated to reduce the dose of GHB if it were to be given concomitantly with valproate.

Finally, a POSA would have reasonably expected to be able to treat the claimed sleep disorders by giving a reduced GHB dose, when administered concomitantly with valproate, because the prior art taught that GHB was effective at a number of doses, including reduced doses, and a POSA would have reasonably expected that a reduced dose of GHB would have increased potency when co-administered with valproate, such that the increased potency would offset any reduction in GHB dose. Thus, a POSA would have been motivated to reduce the dose of GHB if it was to be co-administered with valproate, and would have reasonably expected to be able to successfully treat the claimed conditions.

**(1) Independent Claims**

Independent claim 1 of the '302 patent recites "[a] method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking gamma-hydroxybutyrate (GHB) or a salt thereof comprising: administering to the patient a dose of divalproex sodium concomitant to a dose of GHB or salt thereof; and reducing the daily dosage amount of GHB or salt thereof administered to the patient by at least 20% wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g." Claim 1 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

Independent claim 8 recites "[a] method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking gamma-hydroxybutyrate (GHB) or a salt thereof comprising: reducing the daily dosage amount of GHB or salt thereof administered to the patient by at least 20% during concomitant administration of divalproex sodium, compared to the daily dosage amount of between 4.5 and 9 g of GHB or salt thereof currently used in the absence of concomitant administration of divalproex sodium." Claim 8 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

Independent claim 13 recites "[a] method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising: administering to the patient a starting daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is 20% lower than a manufacturer's recommended starting daily dosage amount of between 4.5 and 9 g in the absence of concomitant administration

of divalproex sodium." Claim 13 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

Independent claim 20 recites "[a] method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising: administering to the patient a starting daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is 20% lower than the starting daily dosage amount of between 4.5 to 9 g GHB that would otherwise have been recommended to thepatient if the patient was not currently taking divalproex sodium." Claim 20 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

Independent claim 27 recites "[a] method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising the steps of: administering to the patient a daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is lower than 4.5 g." Claim 27 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

Independent claim 31 recites "[a] method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising the steps of: administering to the patient a dose of gamma-hydroxybutyrate (GHB) or a salt thereof that is lower than 2.25 g; and administering to the patient a second dose of GHB or salt thereof that is lower than 2.25 g." Claim 31 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent,

said discussion incorporated herein by reference. Additionally, with respect to administering two doses of GHB to the patient, Xyrem 2005 PI recommends dividing the nightly dose into two equal doses. Xyrem 2005 PI at 22-23; *see also* Xyrem 2012 PI at 2 ("The recommended starting dose is 4.5 grams (g) per night administered orally in two equal, divided doses: 2.25 g at bedtime and 2.25 g taken 2.5 to 4 hours later (see Table 1)."); Xyrem Titration Schedule.

**(2) Dependent Claims**

Claims 2, 10, 18 and 25 are dependent on claims 1, 8, 13 and 20, respectively, and require "monitoring patient response and adjusting the GHB dose to treat the patient." The additional limitation of claims 2, 10, 18 and 25 does not distinguish the claim from the prior art. For example, the Cook Patent discloses a clinical trial where GHB dosage was adjusted when clinically indicated (e.g., intolerance or lack of efficacy). The Cook Patent at 17:40–18:10. The Xyrem 2005 PI discloses that the dosage for GHB may be increased. Specifically, the Xyrem 2005 PI states that "[t]he starting dosage can then be increased to a maximum of 9 g/night in increments of 1.5 g/night (0.75 g per dose). One to two weeks are recommended between dosage increases to evaluate clinical response and minimize adverse effects." Xyrem 2005 PI at 23; *see also* Xyrem 2012 at 2; Xyrem Titration Schedule. Further, a person of ordinary skill in the art would have known that a dose of a medication could be titrated upwards or downwards based on clinical response.

Claims 3, 5-7, 11, 19 and 26 are dependent claims and each require that the daily dosage of GHB, in the absence of concomitant administration of valproate, is 4.5 g (claims 3, 11, 19 and 26); 6 g (claim 5); 7.5 g (claim 6); and 9 g (claim 7). The additional limitations of claims 3, 5-7, 11, 19 and 26 do not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claims 1, 4, and 7-10 of the '306 patent, said discussion incorporated herein by reference.

Claim 9 is dependent on claim 8 and further requires that "the daily dosage amount of GHB or salt thereof administered to the patient is reduced by at least 20% compared to the manufacturer's, recommended daily dosage amount of GHB or salt thereof." The additional limitation of claim 9 does not distinguish the claim from the prior art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

Claims 4 and 12 are dependent on claims 1 and 8, respectively and require lowering the daily dosage of GHB to lower than 3.6 grams. The additional limitation of claims 4 and 12 does not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claims 1, 4, 7-10 of the '306 patent, said discussion incorporated hereinby reference.

Claims 14 and 21 are dependent on claims 13 and 20, respectively, and require lowering the daily dosage of GHB to lower than 4.5 grams. The additional limitation of claims 14 and 21 does not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claims 1, 4, 7-10 of the '306 patent, said discussion incorporated herein by reference.

Claims 15, 22 and 28 are dependent on claims 14, 21 and 27, respectively, and require that the daily dosage amount of GHB or salt thereof administered to the patient is divided in two equal doses. The additional limitation of claims 15, 22 and 28 does not distinguish the claims from the prior art. For example, the Xyrem 2005 PI recommends dividing the nightly dose into two equal doses. Xyrem 2005 PI at 22-23; *see also* Xyrem 2012 PI at 2; Xyrem Titration Schedule.

Claims 16, 23 and 29 are dependent on claims 15, 22 and 28, respectively, and require that the first dose of the two equal doses of GHB or salt thereof administered to the patient is lower

than 2.25 g. The additional limitation of claims 16, 23 and 29 does not distinguish the claims from the prior art for at least the same reasons discussed above and also with respect to claims 1, 4, 7-10 of the ’306 patent, said discussion incorporated herein by reference.

Claims 17, 24 and 30 are dependent on claims 15, 22 and 28, respectively, and require that the second dose of the two equal doses of GHB or salt thereof administered to the patientis lower than 2.25 g. The additional limitation of claims 17, 24 and 30 does not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claim claims 1, 4, 7-10 of the ’306 patent, said discussion incorporated herein by reference.

**(3) No Objective Indicia**

Lupin is unaware of any evidence of secondary considerations that would render the particular combination of claim elements found in the ’302 patent non-obvious, as described below and incorporated herein by reference. For example:

- *Long-Felt Need:* Lupin is not aware of any evidence to support a claim that the ’302 patent resolved a long-felt need.
- *Failure of Others:* Lupin is not aware of any evidence of failure of others that reflects any non-obviousness of the subject matter of the ’302 patent. *Skepticism of Those of Skill in the Art:* Lupin is not aware of any skepticism of those skilled in the art with respect to the subject matter of the ’302 patent.
- *Licensing:* Lupin is not aware of any licensing of the ’302 patent that may be reflective of non-obviousness of the subject matter of that patent.
- *Commercial Success:* Lupin is not aware of any evidence linking anyproduct sales made to the ’302 patent, as opposed to marketing, endorsements, other patents or marketing exclusivities, or other factors unrelated to the alleged invention of the ’302 patent. *See Merck*, 395 F.3d at 1376-77. Further, nothing submitted during prosecution of the ’302 patent establishes commercial success. On at least these bases, Lupin is aware of no commercial success that could support a claim of non-obviousness.
- *Recognition in the Industry:* Lupin is not aware of any recognition in the industry for the ’302 patent.

- *Acquiescence:* Lupin is not aware of any evidence of acquiescence to the validity of the '302 patent.
- *Copying:* Lupin is not aware of any copying that could support a claim of non-obviousness of the subject matter of the '302 patent. *See, e.g.*, *Bayer Healthcare*, 713 F.3d at 1377; *Purdue*, 377 F. App'x at 983; *Santarus*, 2010 WL 1506017, at *26; *Aventis*, 2006 WL 2008962, at *45.
- *Unexpected Results:* Lupin is not aware of any evidence of unexpected results with respect to the '302 patent.
- *Teaching away:* Lupin is not aware of any prior art teaching away from reducing the dose of GHB when the patient is receiving a concomitant administration of valproate. To the contrary, as explained above, the prior art taught a person of ordinary skill in the art to reduce the GHB dose when the patient is receiving a concomitant administration of valproate.

Additionally, as noted above, the patentee must prove the required nexus before relying on *any* secondary considerations of alleged non-obviousness. *Muniauction*, 532 F.3d at 1327-28. Lupin is not aware of any evidence that would establish the required nexus for the claims ofthe '302 patent.

Thus, for at least these reasons, claims 1-31 of the '302 patent are invalid for obviousness.

**b. Unpatentable Subject Matter**

Claims 1-31 of the '302 patent are invalid under 35 U.S.C. § 101 for claiming unpatentable subject matter.

Natural phenomena, laws of nature, and abstract ideas are not patentable subject matter. *Mayo*, 132 S. Ct. at 1293. "[A] process that focuses upon the use of a natural law [must] also contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself." *Id.* at 1294.

Claims 1-31 of the '302 patent are method of treatment claims that require adjusting the dosage of GHB when a patient is concomitantly receiving valproate. The interaction between GHB

and valproate is a natural phenomenon, and the reduction in the GHB dosage is not a sufficient "inventive concept" to render the claims patentable. *See Mayo*, 132 S. Ct. at 1294. Accordingly, claims 1-31 of the '302 patent are invalid under 35 U.S.C. § 101 for claiming unpatentable subject matter.

**c. Lack of Utility**

To the extent that Plaintiff argues that the prior art would not have motivated a person of ordinary skill in the art to administer a reduced dose of GHB to a patient receiving a concomitant administration of valproate, that the prior art taught away from administering GHB concomitantly with valproate, that a POSA would not have reasonably expected to be able to successfully treat a patient in co-administering GHB and valproate, and/or that no patient with a sleep disorder was receiving co-administered GHB and valproate in the prior art, then claims 1-31 of the '302 patent are invalid under 35 U.S.C. § 101 for lack of credible utility.

**d. Lack of Enablement and Written Description Support**

To the extent that Plaintiff argues claim 1-31 of the '302 patent are not invalid as obvious over the prior art, these claims are invalid for failing to satisfy the written description and enablement requirements of 35 U.S.C. § 112.

The written description inquiry focuses on whether the disclosure of the original application is sufficient to convey possession of the invention. *See Eiselstein v. Frank*, 52 F.3d 1035, 1039 (Fed. Cir. 1995). "Put another way, one skilled in the art, reading the original disclosure, must immediately discern the limitation at issue in the claims." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326 (Fed. Cir. 2000).

In order for claims to be enabled under 35 U.S.C. § 112, the specification must describe "the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly

connected, to make and use the same." *Magsil Corp. v. Hitachi Global Storage Techs.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012). The specification must enable a person of ordinary skill in the art to practice the claimed invention without undue experimentation. *In re Wands*, 858 F.2d at 737 (Fed. Cir. 1988). The following factors (*Wands* factors) are considered by a court when determining whether a patent specification would require undue experimentation: (1) the breadth of the claims, (2) the nature of the invention, (3) the state of the prior art, (4) the relative skill of those in the art, (5) the predictability or unpredictability of the art, (6) the amount of direction or guidance presented, (7) the presence or absence of working examples, and (8) the quantity of experimentation necessary.

As explained above, claim 1-31 of the '302 patent are generally directed to methods of treating cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is taking GHB and divalproex sodium, by reducing the daily dose of GHB to lower than 4.5 g, or by reducing the GHB daily dose by at least 20% of the starting daily dose of between 4.5 to 9 g GHB.

The specification of the '302 patent does not describe the extent to which the GHB dose should be reduced when the patient is receiving a concomitant administration of divalproex sodium based on various pharmacokinetic or pharmacodynamic parameters, or how to otherwise determine the extent to which the GHB dose should be reduced, or whether reducing the daily dose of GHB to lower than 4.5 g, or reducing the GHB daily dose by at least 20% of the starting daily dose of between 4.5 to 9 g GHB, would achieve the claimed results. For example, the specification does not provide any information to correlate various pharmacokinetic or pharmacodynamic parameters with the GHB dose reduction claimed in claim 1-31 of the '302 patent. Therefore, to the extent that Plaintiff contends that a person of ordinary skill in the art would not view these claims as obvious for the reasons stated above, then a person of ordinary skill in the art would

understand that the named inventors were not in possession of the claimed invention as of the earliest claimed filing date of the ’302 patent. Therefore, claim 1-31 of the ’302 patent would be invalid for lacking written description support.

Further, if Plaintiff contends that a person of ordinary skill in the art would not view these claims as obvious for the reasons stated above, then the ’302 patent specification fails to enable a person of ordinary skill in the art to practice the full scope of claims 1-31 without undue experimentation. In particular, no direction or guidance or working examples are presented in the specification regarding the extent to which the GHB dose should be reduced when the patient is receiving a concomitant administration of divalproex sodium based on various pharmacokinetic or pharmacodynamic parameters, or how to otherwise determine the extent to which the GHB dose should be reduced, or whether reducing the daily dose of GHB to lower than 4.5 g, or reducing the GHB daily dose by at least 20% of the starting daily dose of between 4.5 to 9 g GHB would achieve the claimed results.

**C. The ’426 Patent**

U.S. Patent No. 9,486,426 B2 (“the ’426 patent”), entitled “Method of Administration of Gamma Hydroxybutyrate with Monocarboxylate Transporters,” issued on or about November 8, 2016. Mark Eller is identified as the inventor on the face of the ’426 patent. According to the records of the Patent Office, the ’426 patent is assigned to Jazz Pharmaceuticals Ireland Limited. The ’426 patent issued from U.S. Patent Application Serial No. 14/707,914 (“the ’914 application”), filed on May 8, 2015, as a continuation of U.S. Patent Application Serial No. 13/837,714 (“the’714 application”), filed on March 15, 2013. The ’426 patent also purports to claim the benefit ofpriority of U.S. Provisional Patent Application Serial Nos. 61/771,557 (“the ’557 provisional application”) and 61/777,873 (“the ’873 provisional application”), filed on March 1, 2013, and March 12, 2013, respectively.

Plaintiff has the burden to establish that the asserted claims of the '426 patent are entitled to the priority date of any earlier-filed application. *See Dynamic Drinkware, LLC v. National Graphics, Inc*. 800 F.3d 1375, 1380 (Fed. Cir. 2015). Absent specific evidence of entitlement to an earlier priority date, the '426 patent must be assigned its actual filing date of May 8, 2015. *Id*. To establish an earlier priority date, each earlier application in the chain must fully disclose the claimed invention by meeting all requirements of 35 U.S.C. §112. *In re NTP, Inc*., 654 F.3d 1268, 1277 (Fed. Cir. 2011). Lupin does not concede that the '426 patent has made a proper claim of priority to an earlier-filed application, and reserves the right to (i) challenge the '426 patent's entitlement to claim priority to any previous application, (ii) challenge any alleged date of conception or reduction to practice; and (iii) identify additional prior art thereto.

### 1. The '426 Patent Specification

The specification of the '426 patent is substantially similar to the specification of the '306 patent discussed above said discussion is incorporated herein by reference.

### 2. Asserted Claims of the '426 Patent

Plaintiff asserts claims 1-31 of the '426 patent, of which claims 1, 9, 15, 22 and 28 are independent. These claims are reproduced below:

> 1. A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking gamma-hydroxybutyrate (GHB) or a salt thereof comprising: administering to the patient a dose of divalproex sodium concomitant to a dose of GHB or salt thereof; and reducing the daily dosage amount of GHB or salt thereof administered to the patient between about 5% and about 50% wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g.
>
> 2. The method of claim 1 further comprising monitoring patient response and adjusting the GHB dose to maintain the effect of the GHB.

3. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g.

4. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 6 g.

5. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 7.5 g.

6. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 9 g.

7. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced between about 15% and about 50%.

8. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by between about 20% and about 50%.

9. A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking gamma-hydroxybutyrate (GHB) or a salt thereof comprising: reducing the daily dosage amount of GHB or salt thereof administered to the patient between about 5% and about 50% during concomitant administration of divalproex sodium, compared to the daily dosage amount of between 4.5 g and 9 g of GHB or salt thereof currently used in the absence of concomitant administration of divalproex sodium.

10. The method of claim 9, wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by between about 15% and about 50% compared to the manufacturer's recommended daily dosage amount of GHB or salt thereof.

11. The method of claim 9 further comprising monitoring patient response and adjusting the GHB dose to maintain the effect of the GHB.

12. The method of claim 9 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g.

13. The method of claim 12 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by between about 15% and about 50%.

14. The method of claim 13 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced at least 20%.

15. A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising: administering to the patient a starting daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is between about 15% and about 25% lower than a manufacturer's recommended starting daily dosage amount of between 4.5 g and 9 g in the absence of concomitant administration of divalproex sodium.

16. The method of claim 15 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient is lower than 4.5 g.

17. The method of claim 16 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient is divided into two equal doses.

18. The method of claim 17 wherein the first or second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g.

19. The method of claim 15 wherein the starting daily dosage amount of GHB or a salt thereof is reduced by between about 20% and about 25%.

20. The method of claim 15 further comprising monitoring patient response and adjusting the GHB dose to treat the patient.

21. The method of claim 15 wherein the manufacturer’s recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g.

22. A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising: administering to the patient a starting daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is between about 15% and about 30% lower than the starting daily dosage amount of between 4.5 g and 9 g GHB that would otherwise have been recommended to the patient if the patient was not currently taking divalproex sodium.

23. The method of claim 22 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient who is currently taking divalproex sodium is lower than 4.5 g.

24. The method of claim 23 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient who is currently taking divalproex sodium is divided into two equal doses.

25. The method of claim 24 wherein the first or second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g.

26. The method of claim 22 further comprising monitoring patient response and adjusting the GHB dose to treat the patient.

27. The method of claim 22 wherein the starting daily dosage amount of GHB or a salt thereof is reduced by between about 20% and about 30%.

28. A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising the steps of: administering to the patient a daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is between about 15% and about 30% lower than 4.5 g.

29. The method of claim 28 wherein the daily dosage amount of GHB or salt thereof administered to the patient is divided into two equal doses.

30. The method of claim 29 wherein the first dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g.

31. The method of claim 29 wherein the second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g.

### 3. Invalidity of the ’426 Patent

Claims 1-31 of the ’426 patent are invalid at least under 35 U.S.C. § 103 for being obvious over the prior art, and under 35 U.S.C. § 101 for claiming unpatentable subject matter. Further, to the extent Plaintiff argues that the asserted claims of the ’426 patent are not obvious over the prior art, then they are invalid under 35 U.S.C. § 101 for lack of utility, and under 35 U.S.C. § 112 for lack of enablement and written description support.

**a. Obviousness**

In addition to the prior art references found on the face of the '426 patent, which Lupin identifies and incorporates fully herein, Lupin identifies the following items of prior art which, separately or in any reasonable combination, render obvious one or more of the asserted claims of the '426 patent under 35 U.S.C. § 103. In addition, Lupin reserves the right to rely on all prior art, evidence of the relevant state of the art, and evidence of prior sales, produced by Plaintiff during fact discovery and all prior art identified in the '426 patent or its prosecution history. Lupin further incorporates by reference, in full, all references cited in the following prior art references and their prosecution histories, where applicable.

The citations provided are representative of the references and are not exhaustive. To the extent that similar claim limitations occur in one or more claims, the disclosures below should be read to apply to all similar claim limitations. Moreover, many of the references discussed herein are representative of additional prior art references in the relevant field. It should be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of the other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information, including other publications and general scientific, medical or engineering knowledge. Lupin therefore reserves the right to rely upon other unidentified portions of the prior art references and on other publications and expert testimony to provide context and to aid understanding and interpretation of any identified portions. Lupin also reserves the right to rely upon other portions of the prior art references, other publications, and the testimony of experts to establish that the alleged inventions were expressly or inherently disclosed in the prior art and/or would have been obvious to a person of ordinary skill in the art, including on the basis of modifying or combining certain cited references. It should also be recognized that

the various concepts may be discussed in numerous references and that citation to one particular reference does not exclude later citation to other references discussing the same concept. Lupin also reserves the right to rely upon any admissions relating to prior art or the state of the art in the '426 patent or its prosecution history, as well as any admissions relating to prior art or the statement of the art in foreign counterparts and their prosecution histories. Lupin further reserves the right to modify these Invalidity Contentions to add additional prior art references in light of the information gained through fact discovery, expert discovery, arguments or positions advanced by Plaintiff, or the Court's claim construction rulings.

Lupin reserves the right to rely upon any related patents and patent applications, foreign patent counterparts and foreign patent applications of U.S. patents or applications identified in these Invalidity Contentions, U.S. counterparts of foreign patents or foreign patent applications identified in these Invalidity Contentions, or U.S. and foreign patents or applications corresponding to articles and publications identified in these Invalidity Contentions. For prior art patents and publications identified in these Invalidity Contentions, Lupin reserves the right to rely on inherency, public use, offer for sale, and/or sale of the products described in those prior art patents or publications once Lupin has had an opportunity to take discovery on these subjects.

**i. Identification of the Prior Art**

Subject to the above, at least the following prior art is relevant to the invalidity of the asserted claims of the '426 patent:

- U.S. Patent No. 6,780,889 B2 ("the Cook Patent"); [34]

[34] The Cook Patent, and U.S. Patent Nos. 7,262,219 B2 ("the '219 patent") and 7,851,506 B2 ("the '506 patent"), as well as their application publications, including U.S. Patent Application No. 2003/0125385 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (published July 3, 2003) ("Cook Application"), are each prior art to the '306 patent. Since the specifications of each of the '889, '219, and '506 patents, and the corresponding application publications, are substantially the same,

- R. Bernasconi, et al., *Experimental Absence Seizures: Potential Role of γ-Hydroxy butyratic Acid and GABAB Receptors*, J. Neural. Transm. 35:155-177 (1992) ("Bernasconi");

- Bhattacharya, I. et al., *GHB (γ-Hydroxybutyrate) Carrier-Mediated Transport across the Blood-Brain Barrier*, 311(1) J. Pharmacol. Exp. Ther. 92–98 (2004) ("Bhattacharya 2004");

- Bhattacharya, I. et al., *Potential γ-Hydroxybutyric Acid (GHB) Interactions Through Blood–Brain Barrier Transport Inhibition: A Pharmacokinetic Simulation-Based Evaluation*, 33(5) J. Pharmacokinetics & Pharmacodynamics 657–81 (2006) ("Bhattacharya 2006");

- Lowell A. Borgen, et al., *The Influence of Gender and Food on the Pharmacokinetics of Sodium Oxybate Oral Solution in Healthy Subjects*, 43 J. Clin. Pharmacol. 59-65 (2003) ("Borgen");

- R. Broughton & M. Mamelak, *The Treatment of Narcolepsy-Cataplexy with Nocturnal Gamma-Hydroxybutyrate*, Can. J. Neurol Sci, Vol. 6, No.1 (1979) ("Broughton 1979");

- R. Broughton & M. Mamelak, *Effects of nocturnal Gamma-Hydroxybutyrate on Sleep/Waking Patterns in Narcolepsy-Cataplexy*, Can. J. Neurol. Sci. Vol. 7, No.1 (1980) ("Broughton 1980");

- Annachiara Cagnin et al., *γ-Hydroxybutyric Acid-Induced Psychosis andSeizures*, 21 Epilepsy & Behavior 203 (2011) ("Cagnin");

- C.D. Cash, Gamma hydroxybutyrate: *An Overview of the Pros and Cons for it Being a Neurotransmitter And/Or a Useful Therapeutic Agent*, Neurosci. Biobehavioral Rev., Vol. 18(2), 291-304 (1994) ("Cash");

- Sébastien Chateauvieux et al., *Molecular and Therapeutic Potential and Toxicity of Valproic Acid*, 2010 J. Biomed. & Biotech. 1 (online version) (2010) ("Chateauvieux");

- Depakote (Divalproex Sodium) Tablets for Oral Use: FDA Approved Labeling Text, (2011) ("Depakote Label");

- P. Divry et al., *A New Patient with 4-Hydroxybutyric Aciduria, a Possible Defect of 4-Aminobutyrate Metabolism*, 129 Clinica Chimica Acta 303-309 (1983)

---

for the purposes of these Invalidity Contentions, Lupin will limit its discussion to the teachings of the Cook Patent in this section. Any citations herein with respect to the Cook Patent are also made with respect to the same or similar disclosures in the Cook Application, the '219 patent, the '506 patent, as well as their application publications.

("Divry");

- Food and Drug Administration, Center for Drug Evaluation and Research, Clinical Pharmacology Division, Guidance for Industry: Drug Interaction Studies – Study Design, Data Analysis, Implications for Dosing and Labeling (February 2012) ("FDA Guidance");

- Neil T. Feldman, et al., Sleep Architecture Effects of Sodium Oxybate Treatment in Subjects with Sleep-Disordered Breathing, 20 Chest 130 (2006) ("Feldman 2006");

- Neil T. Feldman, Clinical perspective: Monitoring Sodium Oxybate-Treated Narcolepsy Patients for the Development of Sleep-Disordered Breathing, 14 SLEEP BREATH 77-79 (2010) ("Feldman 2010");

- S.J. Frucht, et al., A Pilot Tolerability and Efficacy Trial of Sodium-Oxybate in Ethanol-Responsive Movement Disorders, 20 Movement Disorders 1330-1337 (2011) ("Frucht");

- Philip D. Hansten & John R. Horn, Drug Interactions Analysis and Management, Wolters Kluwer Health, PM1-36 (2011) ("Hansten");

- Harvey, P. et al., *The Inhibitory Effect of Sodium* n-*Dipropyl Acetate on the Degradative Enzymes of the GABA Shunt*, 52(2) FEBS Lett. 251–54 (1975) ("Harvey");

- Viviane Hechler et al., *γ-Hydroxybutyrate Conversion into GABA Induces Displacement of $GABA_B$ Binding That Is Blocked by Valproate and Ethosuximide*, 281 J. Pharmacology & Experimental Therapeutics 753 (1997) ("Hechler");

- Elaine E. Kaufman & Thomas Nelson, *Evidence for the Participation of a Cytosolic $NADP^+$-Dependent Oxidoreductase in the Catabolism of γ-Hydroxybutyrate In Vivo*, 48 J. Neurochemistry 1935 (1987) ("Kaufman 1987");

- Kaufman, E. et al., *Oxidation of γ-Hydroxybutyrate to Succinic Semialdehyde by a Mitochondrial Pyridine Nucleotide-Independent Enzyme*, 51(4) J. Neurochemistry 1079–84 (1988) ("Kaufman 1988");

- Kaufman, E. et al., *An Overview of γ-Hydroxybutyrate Catabolism: The Role of the Cytosolic NADP+-Dependent Oxidoreductase EC 1.1.1.19 and of a Mitochondrial Hydroxyacid-Oxoacid Transhydrogenase in the Initial, Rate-Limiting Step in This Pathway*, 16(9) Neurochem. Res. 965–74 (1991) ("Kaufman 1991");

- I. Knerr, et al., *Therapeutic concepts in succinate semialdehyde dehydrogenase (SSADH; ALDH5a1) deficiency (γ-hydroxybutyric aciduria). Hypotheses evolved from 25 years of patient evaluation, studies in $Aldh5a1^{-/-}$ mice and*

*characterization of γ-hydroxybutyric acid pharmacology*, J. Inherit. Metab. Dis., Vol. 30, pp. 279-294 (2007) ("Knerr");

- van der Laan, J.W. et al., *Di-n-Propylacetate and GABA Degradation: Preferential Inhibition of Succinic Semialdehyde Dehydrogenase and Indirect Inhibition of GABA-Transaminase*, 32(4) J. Neurochem. 1769–80 (1979) ("Laan");

- Löscher, *Valproate: A Reappraisal of Its Pharmacodynamic Properties and Mechanisms of Action*, Progress in Neurobiol., Vol. 58, pp. 31-59 (1999) ("Löscher 1999");

- Löscher, W., *Basic Pharmacology of Valproate: A Review after 35 Years of Clinical Use for the Treatment of Epilepsy*, 16(10) CNS Drugs 669–94 (2002) ("Löscher 2002");

- Maitre, M, *The γ-Hydroxybutyrate Signalling System in Brain Organization and Functional Implications*, 51 Progress in Neurobiology 337 (1997) ("Maitre");

- Pascal Mathivet, et al., *Binding Characteristics of γ-Hydroxybutyric Acid as a Weak but Select $GABA_B$ Receptor Agonist*, 321 European J. Pharmacology 67-75 (1997) ("Mathivet");

- Morris, Monocarboxylate Transporter Inhibition with Osmotic Diuresis Increases γ-Hydroxybutyrate Renal Elimination in Humans: A Proof-of-Concept Study, *J. Clin. Tox.*, 1(2), 1000105, pp. 1-4 (2011) ("Morris 2011");

- Mortimer Mamelak et al., *Treatment of Narcolepsy with γ-Hydroxybutyrate. A Review of Clinical And Sleep Laboratory Findings*, Sleep, 9(1):285-289 (1986) ("Mamelak 1986");

- Mortimer Mamelak, *Gamma hydroxybutyrate: An Endogenous Regulatorof Energy Metabolism*, 13 Neurosci. & Biobehavorial Revs. 187(1989) ("Mamelak 1989");

- Okun, M., *GHB: An Important Pharmacologic and Clinical Update*, 4 J. Pharmaceut. Sci. 167 (2001) ("Okun");

- A Priori, et al., *γ-Hydroxybutyric Acid for Alcohol-Sensitive Myoclonus with Dystonia*, 54 NEUROLOGY 1706 (2000) ("Priori");

- J.F. Rumigny et al., *Specific and Non-Specific Succinic Semialdehyde Reductases from Rat Brain: Isolation and Properties*, 117 FEBS Letters 111 (1980) ("Rumigny");

- Martin B. Scharf, et al., *The Effects and Effectiveness of γ-Hydroxybutyrate in Patients with Narcolepsy*, J. Clin. Psychiatry, 46:222-225 (1985) ("Scharf 1985");

- Martin B. Scharf, *Pharmacokinetics of Gamma hydroxybutyrate (GHB) in Narcoleptic Patients*, *Sleep*, Vol. 21(5), pp. 507-514 (1998) ("Scharf 1988");

- Schep, L. et al., *The Clinical Toxicology of Gamma-Hydroxybutyrate, Gamma-Butyrolactone and 1,4-Butanediol*, 50(6) Clin. Toxicol. (Phila). 458–70 (2012) ("Schep");

- Lawrence Scrima, et al., *The Effects of γ-Hydroxybutyrate on the Sleep of Narcolepsy Patients: A Double-Blind Study*, 13(6) Sleep 479-90 (1990) ("Scrima");

- T. Shinka et al., *Effect of Valproic Acid on the Urinary MetabolicProfile of a Patient with Succinic Semialdehyde Dehydrogenase Deficiency*, 792 J. Chromatography 99-106 (2003) ("Shinka");

- O.C. Snead et al., *Effect of Acute and Chronic Anticonvulsant Administration on Endogenous γ-Hydroxybutyrate in Rat Brain*, 19 Neuropharmacology 47-52 (1980) ("Snead 1980");

- O.C. Snead & K. Michael Gibson, *γ-Hydroxybutyric Acid*, 352 New England J. Med. 2721-32 (2005) ("Snead 2005");

- Vayer, P. et al., *3′-5′ Cyclic-Guanosine Monophosphate Increase in Rat Brain Hippocampus after Gamma- Hydroxybutyrate Administration: Prevention by Valproate and Naloxone*, 41(5) Life Sci. 605–10 (1987) ("Vayer 1987");

- Vayer, P. et al., *Is the Anticonvulsant Mechanism of Valproate Linked to Its Interaction with the Cerebral γ-Hydroxybutyrate System?*, 9(4) Trends Pharmacol. Sci. 127–29 (1988) ("Vayer 1988");

- Anna Waszkielewicz & Jacek Bojarski, *γ-Hydroxybutyric Acid (GHB) and Its Chemical Modifications: A Review of the GHBergic System*, 56 Polish J. Pharmacology 43 (2004) ("Waszkielewicz");

- Gregory P. Wedin et al., *The Clinical Development of γ-Hydroxybutyrate (GHB)*, 1 Current Drug Safety 99 (2006) ("Wedin");

- Weiss, T. et al., *Gamma-Hydroxybutyrate (GHB) and Topiramate—Clinically Relevant Drug Interaction Suggested by a Case of Coma and Increased Plasma GHB Concentration*, 69 Eur. J. Clin. Pharmacol. 1193 (2013) ("Weiss");

- Xyrem® Prescribing Information (2012) ("Xyrem 2012 PI");

- Xyrem® Prescribing Information (2005) ("Xyrem 2005 PI");

- FDA Approval Letter for Xyrem® (Nov. 18, 2005) ("Xyrem 2005 FDA Approval Letter");

- FDA Approval Letter for Xyrem® (Jul. 17, 2002) ("Xyrem 2002 FDA Approval Letter");
- Physician's Desk Reference Edition 61, pp. 1688-1692, (2007) ("Xyrem Physician's Desk Reference"); and
- Xyrem® Titration Schedule published in 2008 ("the Xyrem Titration Schedule").

Lupin expressly reserves the right to modify and/or supplement the prior art discussed herein. Each of the above is prior art to the '426 patent. To the extent that the patentee and/or inventors attempt to swear behind or otherwise remove as prior art any of the art identified herein, Lupin specifically reserves its right to, *inter alia*, add additional prior art to the list. Furthermore, to the extent that the patentee argues that any of the cited references are not prior art under 35 U.S.C. § 102, many of the referenced patents and/or patent applications have foreign or U.S. equivalents which also qualify as prior art. Such foreign and U.S. equivalents are incorporated herein, and Lupin reserves the right to rely upon them. Additionally, as previously noted, Lupin reserves its right to, *inter alia*, supplement or amend its list of prior art references based upon, among other things, the patentee's disclosure of the asserted claims; thepatentee's disclosure of its alleged infringement proofs; disclosure of the patentee's proposed construction of the claims of the '426 patent; issuance of a claim construction ruling by a court,should the court be able to construe the claims of the '426 patent; the patentee's response to any of Lupin's defenses, including, but not limited to, the patentee's interpretation of the prior art; the discovery (fact or expert) during litigation; and/or further investigation. Moreover, Lupin does not admit, or otherwise concede, that the claims of the '426 patent are entitled to aneffective filing date earlier than the patent's filing date, and therefore reserves the right to, *interalia*, challenge the effective filing date of the patent and to assert additional prior art referencesand/or products based on any such challenge. Nevertheless, as discussed herein, each claim of the patent is invalid even if the '426 patent had made (it has not) a proper claim of priority toan earlier-filed application.

Claims 1-31 of the '426 patent are rendered obvious for at least the reasons set forth below. (*See also* Section V.G).

**ii. The Scope and Content of the Prior Art**

The teachings of the prior art identified above are described in detail in the section related to the invalidity of the '306 patent, said discussion incorporated herein by reference.

**iii. The Asserted Claims Are Invalid as Obvious**

At least the references discussed above disclose, either alone or in combination, the limitations of claims 1-31 of the '426 patent.[35] Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references together with the knowledgehe or she would have possessed, would have readily gleaned the information necessary to develop the methods of treatment (to the extent such methods were not already known or in use) within claims 1-31 of the '426 patent; would have had a motivation to use such a method; and would have had a reasonable expectation of success in doing so. *See, e.g.*, *KSR*, 550 U.S.at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

As explained below, the asserted claims would have been obvious in view of a host of prior art references. Consequently, there are numerous different combinations of these prior art references and many exemplary references that disclose the claimed method. *See, e.g.*, *Rothman v. Target Corp.*, 556 F.3d 1310, 1320-21 (Fed. Cir. 2009) (when the "entire body of prior art"—

[35] To the extent that any specific limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

or an "evidentiary cornucopia"—renders a patent claim obvious, a trier of fact can fairly rely on "any combination of these references in reaching its obviousness verdict.").

By way of example, the following combinations render the asserted claims obvious:

- One or more of the Cook Patent, Bhattacharya 2004, Broughton 1979, Broughton 1980, Feldman 2006, Feldman 2010, Frucht, Mamelak 1986, Mamelak 1989, Okun, Priori, Scharf 1985, Scharf 1988, Scrima, Xyrem 2005 PI, Xyrem 2012 PI, Xyrem Physician's Desk Reference, Xyrem 2002 FDA Approval Letter, Xyrem 2005 FDA Approval Letter, Xyrem Titration Schedule; in view of

- One or more of Bernasconi, Bhattacharya 2006, Borgen, Cash, Chateauvieux, Depakote Label, Divry, Harvey, Hechler, Kaufman 1987, Kaufman 1988, Kaufman 1991, Knerr, Laan, Löscher 1999, Löscher 2002, Maitre, Mathivet, Morris 2011, Rumigny, Schep, Shinka, Snead 2005, Snead 1980, Vayer 1987, Vayer 1988, Waszkielewicz, Wedin; in further view of

- One or both of Cagnin, Weiss; optionally in combination with

- One or both of the FDA Guidance, Hansten.

More specifically, at least the following combinations of prior art references are exemplary of the combinations of prior art references that render the asserted claims of the '426 patent obvious:

- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance

Lupin reserves the right to rely on other combinations of prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

As further explained below, a person of ordinary skill in the art would have been motivated to combine the teachings of these references with a reasonable expectation of success in light of the problem to be solved, the disclosures of the references, and the common subject matter of the

references as explained throughout. In addition, Lupin's invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

A person of ordinary skill in the art would have been motivated to combine the teachings of the prior art discussed above to arrive at the claimed method of treatment. As an initial matter, a person of ordinary skill in the art would have been motivated to use GHB to treat sleep disorders based on the extensive prior art disclosing its use for such purposes. *See, e.g.*, Cook Patentat 1:16-31; Wedin at 99; Okun at 169-170, Xyrem 2005 PI, Xyrem 2012 PI, Xyrem Physician's Desk Reference at 1688; Xyrem 2002 FDA Approval Letter at 1; Xyrem 2005 FDA Approval Letter at 1; Bhattacharya 2004 at 92; Broughton 1979 at Summary; Broughton 1980 at Summary; Feldman 2006 at 130S; Feldman 2010 at 77; Frucht at 1330; Maitre at Abstract, 352; Mamelak 1986 at Abstract, 288; Mamelak 1989 at 188; Priori; Scharf 1985 at Abstract; Scharf 1988; Scrima at Summary, 486. Moreover, given the extensive teaching in the art about the potential interaction between GHB and valproate, a person of ordinary skill in the art would have been motivated to reduce the dose of GHB if it were to be given concomitantly with valproate.

Finally, a person of ordinary skill in the art would have reasonably expected to be able to treat the claimed sleep disorders by giving a reduced GHB dose, when administered concomitantly with valproate, because the prior art taught that GHB was effective at a number of doses, including reduced doses, and a person of ordinary skill in the art would have reasonably expected that a reduced dose of GHB would have increased potency when co-administered with valproate, such that the increased potency would offset any reduction in GHB dose. Thus, a person of ordinary skill in the art would have been motivated to reduce the dose of GHB if it was to be co-administered with valproate, and would have reasonably expected to be able to successfully treat the claimed conditions.

### (1) Independent Claims

Independent claim 1 of the ’426 patent recites “[a] method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking gamma-hydroxybutyrate (GHB) or a salt thereof comprising: administering to the patient a dose of divalproex sodium concomitant to a dose of GHB or salt thereof; and reducing the daily dosage amount of GHB or salt thereof administered to the patient between about 5% and about 50% wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g.” Claim 1 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the ’306 patent, said discussion incorporated herein by reference.

Independent claim 9 recites “[a] method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking gamma-hydroxybutyrate (GHB) or a salt thereof comprising: reducing the daily dosage amount of GHB or salt thereof administered to the patient between about 5% and about 50% during concomitant administration of divalproex sodium, compared to the daily dosage amount of between 4.5 g and 9 g of GHB or salt thereof currently used in the absence of concomitant administration of divalproex sodium.” Claim 9 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the ’306 patent, said discussion incorporated herein by reference.

Independent claim 15 recites “[a] method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising: administering to the patient a starting daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is between about 15% and about 25% lower than a manufacturer's recommended starting daily dosage amount of between 4.5 g and 9 g in the absence of concomitant

administration of divalproex sodium." Claim 15 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

Independent claim 22 recites "[a] method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising: administering to the patient a starting daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is between about 15% and about 30% lower than the starting daily dosage amount of between 4.5 g and 9 g GHB that would otherwise have been recommended to the patient if the patient was not currently taking divalproex sodium." Claim 22 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

Independent claim 28 recites "[a] method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising the steps of: administering to the patient a daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is between about 15% and about 30% lower than 4.5 g." Claim 28 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

**(2) Dependent Claims**

Claims 2, 11, 20 and 26 are dependent on claims 1, 9, 15 and 22, respectively, and require "monitoring patient response and adjusting the GHB dose to maintain the effect of the GHB" (claims 2 and 11) or "monitoring patient response and adjusting the GHB dose to treat the patient" (claims 20 and 26). The additional limitation of claims 2, 11, 20 and 26 does not distinguish the claim from the prior art. For example, the Cook Patent discloses a clinical trial where GHB dosage

was adjusted when clinically indicated (e.g., intolerance or lack of efficacy). The Cook Patent at 17:40–18:10. The Xyrem 2005 PI discloses that the dosage for GHB may be increased. Specifically, the Xyrem 2005 PI states that "[t]he starting dosage can then be increased to a maximum of 9 g/night in increments of 1.5 g/night (0.75 g per dose). One to two weeks are recommended between dosage increases to evaluate clinical response and minimize adverse effects." Xyrem 2005 PI at 23; *see also* Xyrem 2012 at 2; Xyrem Titration Schedule. Further, a person of ordinary skill in the art would have known that a dose of a medication could be titrated upwards or downwards based on clinical response.

Claims 3-6, 12 and 21 are dependent claims and each require that the daily dosage off GHB or salt thereof, in the absence of concomitant administration of divalproex sodium, is 4.5 g (claims 3, 12 and 21); 6 g (claim 4); 7.5 g (claim 5); and 9 g (claim 6). The additional limitations of claims 3-6, 12 and 21 do not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claims 1, 4, and 7-10 of the '306 patent, said discussion incorporated herein by reference.

Claims 7, 8, 10, 13, 14, 19 and 27 are dependent claims and require that the daily dosage of GHB or salt thereof is reduced by between about 15% and about 50% (claims 7, 10 and 13); between about 20% and about 50% (claim 8); at least 20% (claim 14); between about 20% and about 25% (claim 19); or between about 20% and about 30% (claim 27). The additional limitations of claims 7, 8, 10, 13, 14, 19 and 27 do not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claims 1, 4, 12 and 18 of the '306 patent, said discussion incorporated herein by reference.

Claims 16 and 23 are dependent on claims 15 and 22, respectively, and require lowering the daily dosage of GHB to lower than 4.5 grams. The additional limitation of claims 16 and 23

does not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claims 1, 4, 7-10 of the ’306 patent, said discussion incorporated herein by reference.

Claims 17, 24 and 29 are dependent on claims 16, 23 and 28, respectively, and require that the daily dosage amount of GHB or salt thereof administered to the patient is divided in two equal doses. The additional limitation of claims 17, 24 and 29 does not distinguish the claims from the prior art. For example, the Xyrem 2005 PI recommends dividing the nightly dose into two equal doses. Xyrem 2005 PI at 22-23; *see also* Xyrem 2012 PI at 2; Xyrem Titration Schedule.

Claims 18, 25 are dependent on claims 17, 24, and claims 30 and 31 are dependent on claim 29, and require that the first dose or the second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. The additional limitations of claims 18, 25, 30 and 31 do not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claims 1, 4, 7-10 of the ’306 patent, said discussion incorporated herein by reference.

**(3) No Objective Indicia**

Lupin is unaware of any evidence of secondary considerations that would render the particular combination of claim elements found in the ’426 patent non-obvious, as described below and incorporated herein by reference. For example:

- *Long-Felt Need:* Lupin is not aware of any evidence to support a claim that the ’426 patent resolved a long-felt need.
- *Failure of Others:* Lupin is not aware of any evidence of failure of others that reflects any non-obviousness of the subject matter of the ’426 patent. *Skepticism of Those of Skill in the Art:* Lupin is not aware of any skepticism of those skilled in the art with respect to the subject matter of the ’426 patent.
- *Licensing:* Lupin is not aware of any licensing of the ’426 patent that may be reflective of non-obviousness of the subject matter of that patent.

- *Commercial Success:* Lupin is not aware of any evidence linking anyproduct sales made to the '426 patent, as opposed to marketing, endorsements, other patents or marketing exclusivities, or other factors unrelated to the alleged invention of the '426 patent. *See Merck*, 395 F.3d at 1376-77. Further, nothing submitted during prosecution of the '426 patent establishes commercial success. On at least these bases, Lupin is aware of no commercial success that could support a claim of non-obviousness.

- *Recognition in the Industry:* Lupin is not aware of any recognition in the industry for the '426 patent.

- *Acquiescence:* Lupin is not aware of any evidence of acquiescence to the validity of the '426 patent.

- *Copying:* Lupin is not aware of any copying that could support a claim of non-obviousness of the subject matter of the '426 patent. *See, e.g.*, *Bayer Healthcare*, 713 F.3d at 1377; *Purdue*, 377 F. App'x at 983; *Santarus*, 2010 WL 1506017, at *26; *Aventis*, 2006 WL 2008962, at *45.

- *Unexpected Results:* Lupin is not aware of any evidence of unexpected results with respect to the '426 patent.

- *Teaching away:* Lupin is not aware of any prior art teaching away from reducing the dose of GHB when the patient is receiving a concomitant administration of valproate. To the contrary, as explained above, the prior art taught a person of ordinary skill in the art to reduce the GHB dose when the patient is receiving a concomitant administration of valproate.

Additionally, as noted above, the patentee must prove the required nexus before relyingon <u>*any*</u> secondary considerations of alleged non-obviousness. *Muniauction*, 532 F.3d at 1327-28. Lupin is not aware of any evidence that would establish the required nexus for the claims ofthe '426 patent.

Thus, for at least these reasons, claims 1-31 of the '426 patent are invalid for obviousness.

**b. Unpatentable Subject Matter**

Claims 1-31 of the '426 patent are invalid under 35 U.S.C. § 101 for claiming unpatentable subject matter.

Natural phenomena, laws of nature, and abstract ideas are not patentable subject matter. *Mayo*, 132 S. Ct. at 1293. "[A] process that focuses upon the use of a natural law [must] also

contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself." *Id.* at 1294.

Claims 1-31 of the '426 patent are method of treatment claims that require adjusting the dosage of GHB when a patient is concomitantly receiving valproate. The interaction between GHB and valproate is a natural phenomenon, and the reduction in the GHB dosage is not a sufficient "inventive concept" to render the claims patentable. *See Mayo*, 132 S. Ct. at 1294. Accordingly, claims 1-31 of the '426 patent are invalid under 35 U.S.C. § 101 for claiming unpatentable subject matter.

**c. Lack of Utility**

To the extent that Plaintiff argues that the prior art discussed above would not have motivated a person of ordinary skill in the art to administer a reduced dose of GHB to a patient receiving a concomitant administration of valproate, that the prior art taught away from administering GHB concomitantly with valproate, that a person of ordinary skill in the art would not have reasonably expected to be able to successfully treat a patient in co-administering GHB and valproate, and/or that no patient with a sleep disorder was receiving co-administered GHB and valproate in the prior art, then claims 1-31 of the '426 patent are invalid under 35 U.S.C. § 101 for lack of credible utility.

**d. Lack of Enablement and Written Description Support**

To the extent that Plaintiff argues claim 1-31 of the '426 patent are not invalid as obvious over the prior art, these claims are invalid for failing to satisfy the written description and enablement requirements of 35 U.S.C. § 112.

The written description inquiry focuses on whether the disclosure of the original application is sufficient to convey possession of the invention. *See Eiselstein v. Frank*, 52 F.3d 1035, 1039 (Fed. Cir. 1995). "Put another way, one skilled in the art, reading the original disclosure, must immediately discern the limitation at issue in the claims." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326 (Fed. Cir. 2000).

In order for claims to be enabled under 35 U.S.C. § 112, the specification must describe "the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." *Magsil Corp. v. Hitachi Global Storage Techs.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012). The specification must enable a person of ordinary skill in the art to practice the claimed invention without undue experimentation. *In re Wands*, 858 F.2d at 737 (Fed. Cir. 1988). The following factors (*Wands* factors) are considered by a court when determining whether a patent specification would require undue experimentation: (1) the breadth of the claims, (2) the nature of the invention, (3) the state of the prior art, (4) the relative skill of those in the art, (5) the predictability or unpredictability of the art, (6) the amount of direction or guidance presented, (7) the presence or absence of working examples, and (8) the quantity of experimentation necessary.

As explained above, claim 1-31 of the '426 patent are generally directed to methods of treating cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is concomitantly taking GHB and divalproex sodium by reducing the daily dosage of GHB.

The specification of the '426 patent does not describe the extent to which the GHB dose should be reduced based on various pharmacokinetic or pharmacodynamic parameters, or how to otherwise determine the extent to which the GHB dose should be reduced, when the patient is

receiving a concomitant administration of divalproex sodium. For example, the specification does not provide any information to correlate various pharmacokinetic or pharmacodynamic parameters with a GHB dose reduction claimed in claim 1-31 of the '426 patent. Therefore, to the extent that Plaintiff contends that a person of ordinary skill in the art would not view these claims as obvious for the reasons stated above, then a person of ordinary skill in the art would understand that the named inventors were not in possession of the claimed invention as of the earliest claimed filing date of the '426 patent. Therefore, claim 1-31 of the '426 patent would be invalid for lacking written description support.

Further, if Plaintiff contends that a person of ordinary skill in the art would not view these claims as obvious for the reasons stated above, then the '426 patent specification fails to enable a person of ordinary skill in the art to practice the full scope of claims 1-31 without undue experimentation. In particular, no direction or guidance or working examples are presented in the specification regarding the extent to which the GHB dose should be reduced based on various pharmacokinetic or pharmacodynamic parameters, or how to otherwise determine the extent to which the GHB dose should be reduced, when the patient is receiving a concomitant administration of valproate, an acid, salt, or mixture thereof.

**D. The '400 Patent**

U.S. Patent No. 10,213,400 B2 ("the '400 patent"), entitled "Method of Administration of Gamma Hydroxybutyrate with Monocarboxylate Transporters," issued on or about February 26, 2019. Mark Eller is identified as the inventor on the face of the '400 patent. According to the records of the Patent Office, the '400 patent is assigned to Jazz Pharmaceuticals Ireland Limited. The '400 patent issued from U.S. Patent Application Serial No. 15/869,792 ("the '792 application"), filed on January 12, 2018, as a continuation of U.S. Patent Application Serial No. 15/343,806, filed on November 4, 2016, which is a continuation of U.S. Patent Application Serial

No. 14/707,914, filed on May 8, 2015, which is a continuation of U.S. Patent Application Serial No. 13/837,714, filed on March 15, 2013. the ’400 patent also purports to claim the benefit of priority of U.S. Provisional Patent Application Serial Nos. 61/771,557 (“the ’557 provisional application”) and 61/777,873 (“the ’873 provisional application”), filed on March 1, 2013, and March 12, 2013, respectively.

Plaintiff has the burden to establish that the asserted claims of the ’400 patent are entitled to the priority date of any earlier-filed application. *See Dynamic Drinkware, LLC v. National Graphics, Inc*. 800 F.3d 1375, 1380 (Fed. Cir. 2015). Absent specific evidence of entitlement to an earlier priority date, the ’400 patent must be assigned its actual filing date of January 12, 2018. *Id*. To establish an earlier priority date, each earlier application in the chain must fully disclose the claimed invention by meeting all requirements of 35 U.S.C. §112. *In re NTP, Inc*., 654 F.3d 1268, 1277 (Fed. Cir. 2011). Lupin does not concede that the ’400 patent has made a proper claim of priority to an earlier-filed application, and reserves the right to (i) challenge the ’400 patent’s entitlement to claim priority to any previous application, (ii) challenge any alleged date of conception or reduction to practice; and (iii) identify additional prior art thereto.

**1. The ’400 Patent Specification**

The specification of the ’400 patent is substantially similar to the specification of the ’306 patent discussed above said discussion is incorporated herein by reference.

**2. Asserted Claims of the ’400 Patent**

Plaintiff asserts claims 1-20 of the ’400 patent, of which claims 1, 8, and 15 are independent. These claims are reproduced below:

> 1. A method for reducing adverse effects caused by a combination of gamma-hydroxybutyrate (GHB) or a salt thereof and divalproex sodium in a patient comprising:

administering a reduced daily dosage amount of GHB or a salt thereof to the patient of between about 5% to about 35%, compared to a daily dosage amount of GHB or salt thereof administered to the patient in the absence of concomitant administration of divalproex sodium;

wherein the patient is concomitantly administered divalproex sodium;

wherein the patient is a patient suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy and currently taking GHB or salt thereof;

wherein the daily dosage amount of GHB or salt thereof administered to the patient in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g.

2. The method of claim 1 further comprising monitoring the patient's response and adjusting the dose of GHB or salt thereof.

3. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g.

4. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 6 g.

5. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 7.5 g.

6. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 9 g.

7. The method of claim 1 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by between about 20% and about 35%.

8. A method for reducing adverse effects caused by combination of gamma-hydroxybutyrate (GHB) or salt thereof and divalproex sodium in a patient comprising:

administering a reduced daily dosage amount of GHB or salt thereof to the patient of between about 5% to and about 35%, compared to a manufacturer's recommended starting daily dosage amount of GHB or

salt thereof in the absence of concomitant administration of divalproex sodium;

wherein the patient is concomitantly administered divalproex sodium;

wherein the patient is a patient suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy and currently taking GHB or salt thereof;

wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g.

9. The method of claim 8 further comprising monitoring the patient's response and adjusting the dose of GHB or salt thereof.

10. The method of claim 8 wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g.

11. The method of claim 8 wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is divided into two equal doses.

12. The method of claim 11 wherein a first or second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g.

13. The method of claim 8 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by between about 20% and about 35%, compared to manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium.

14. The method of claim 13 wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g.

15. A method for reducing adverse effects caused by combination of gamma-hydroxybutyrate (GHB) or salt thereof and divalproex sodium in a patient comprising:

administering to the patient a daily dosage amount of GHB or a salt thereof that is between about 5% and about 35% lower than a starting

dosage amount of GHB or a salt thereof that would otherwise have been recommended to the patient if the patient was not currently taking divalproex sodium;

wherein the patient is concomitantly administered divalproex sodium;

wherein the patient is a patient suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy and currently taking GHB or salt thereof;

wherein the starting daily dosage amount of GHB or salt hereof is between 4.5 g and 9 g.

16. The method of claim 15 further comprising monitoring the patient's response and adjusting the dose of GHB or salt thereof.

17. The method of claim 15 wherein the daily dosage amount of GHB or a salt thereof administered to the patient who is currently taking divalproex sodium is lower than 4.5 g.

18. The method of claim 15 wherein the daily dosage amount of GHB or a salt thereof administered to the patient who is currently taking divalproex sodium is divided into two equal doses.

19. The method of claim 18 wherein a first or second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g.

20. The method of claim 15 wherein the starting daily dosage amount of GHB or a salt thereof is reduced by between about 20% and about 35%.

**3. Invalidity of the '400 Patent**

Claims 1-20 of the '400 patent are invalid at least under 35 U.S.C. § 103 for being obvious over the prior art, and under 35 U.S.C. § 101 for claiming unpatentable subject matter. Further, to the extent Plaintiff argues that the asserted claims of the '400 patent are not obvious over the prior art, then they are invalid under 35 U.S.C. § 101 for lack of utility, and under 35 U.S.C. § 112 for lack of enablement and written description support.

**a. Obviousness**

In addition to the prior art references found on the face of the ’426 patent, which Lupin identifies and incorporates fully herein, Lupin identifies the following items of prior art which, separately or in any reasonable combination, render obvious one or more of the asserted claims of the ’426 patent under 35 U.S.C. §§ 102 or 103. In addition, Lupin reserves the right to rely on all prior art, evidence of the relevant state of the art, and evidence of prior sales, produced by Plaintiff during fact discovery and all prior art identified in the ’426 patent or its prosecution history. Lupin further incorporates by reference, in full, all references cited in the following prior art references and their prosecution histories, where applicable.

The citations provided are 399epresenttative of the references and are not exhaustive. To the extent that similar claim limitations occur in one or more claims, the disclosures below should be read to apply to all similar claim limitations. Moreover, many of the references discussed herein are representative of additional prior art references in the relevant field. It should be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of the other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information, including other publications and general scientific, medical or engineering knowledge. Lupin therefore reserves the right to rely upon other unidentified portions of the prior art references and on other publications and expert testimony to provide context and to aid understanding and interpretation of any identified portions. Lupin also reserves the right to rely upon other portions of the prior art references, other publications, and the testimony of experts to establish that the alleged inventions were expressly or inherently disclosed in the prior art and/or would have been obvious to a person of ordinary skill in the art, including on the basis of modifying or combining certain cited references. It should also be recognized that

the various concepts may be discussed in numerous references and that citation to one particular reference does not exclude later citation to other references discussing the same concept. Lupin also reserves the right to rely upon any admissions relating to prior art or the state of the art in the '400 patent or its prosecution history, as well as any admissions relating to prior art or the statement of the art in foreign counterparts and their prosecution histories. Lupin further reserves the right to modify these Invalidity Contentions to add additional prior art references in light of the information gained through fact discovery, expert discovery, arguments or positions advanced by Plaintiff, or the Court's claim construction rulings.

Lupin reserves the right to rely upon any related patents and patent applications, foreign patent counterparts and foreign patent applications of U.S. patents or applications identified in these Invalidity Contentions, U.S. counterparts of foreign patents or foreign patent applications identified in these Invalidity Contentions, or U.S. and foreign patents or applications corresponding to articles and publications identified in these Invalidity Contentions. For prior art patents and publications identified in these Invalidity Contentions, Lupin reserves the right to rely on inherency, public use, offer for sale, and/or sale of the products described in those prior art patents or publications once Lupin has had an opportunity to take discovery on these subjects.

**i. Identification of the Prior Art**

Subject to the above, at least the following prior art is relevant to the invalidity of the asserted claims of the '400 patent:

- U.S. Patent No. 6,780,889 B2 ("the Cook Patent"); [36]

[36] The Cook Patent, and U.S. Patent Nos. 7,262,219 B2 ("the '219 patent") and 7,851,506 B2 ("the '506 patent"), as well as their application publications, including U.S. Patent Application No. 2003/0125385 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (published July 3, 2003) ("Cook Application"), are each prior art to the '306 patent. Since the specifications of each of the '889, '219, and '506 patents, and the corresponding application publications, are substantially the same,

- R. Bernasconi, et al., *Experimental Absence Seizures: Potential Role of γ-Hydroxybutyratic Acid and GABAB Receptors*, J. Neural. Transm. 35:155-177 (1992) ("Bernasconi");

- Bhattacharya, I. et al., *GHB (γ-Hydroxybutyrate) Carrier-Mediated Transport across the Blood-Brain Barrier*, 311(1) J. Pharmacol. Exp. Ther. 92–98 (2004) ("Bhattacharya 2004");

- Bhattacharya, I. et al., *Potential γ-Hydroxybutyric Acid (GHB) Interactions Through Blood–Brain Barrier Transport Inhibition: A Pharmacokinetic Simulation-Based Evaluation*, 33(5) J. Pharmacokinetics & Pharmacodynamics 657–81 (2006) ("Bhattacharya 2006");

- Lowell A. Borgen, et al., *The Influence of Gender and Food on the Pharmacokinetics of Sodium Oxybate Oral Solution in Healthy Subjects*, 43 J. Clin. Pharmacol. 59-65 (2003) ("Borgen");

- R. Broughton & M. Mamelak, *The Treatment of Narcolepsy-Cataplexy with Nocturnal Gamma-Hydroxybutyrate*, Can. J. Neurol Sci, Vol. 6, No.1 (1979) ("Broughton 1979");

- R. Broughton & M. Mamelak, *Effects of nocturnal Gamma-Hydroxybutyrate on Sleep/Waking Patterns in Narcolepsy-Cataplexy*, Can. J. Neurol. Sci. Vol. 7, No.1 (1980) ("Broughton 1980");

- Annachiara Cagnin et al., *γ-Hydroxybutyric Acid-Induced Psychosis andSeizures*, 21 Epilepsy & Behavior 203 (2011) ("Cagnin");

- C.D. Cash, Gamma hydroxybutyrate: *An Overview of the Pros and Cons for it Being a Neurotransmitter And/Or a Useful Therapeutic Agent*, Neurosci. Biobehavioral Rev., Vol. 18(2), 291-304 (1994) ("Cash");

- Sébastien Chateauvieux et al., *Molecular and Therapeutic Potential and Toxicity of Valproic Acid*, 2010 J. Biomed. & Biotech. 1 (online version) (2010) ("Chateauvieux");

- Depakote (Divalproex Sodium) Tablets for Oral Use: FDA Approved Labeling Text, (2011) ("Depakote Label");

- P. Divry et al., *A New Patient with 4-Hydroxybutyric Aciduria, a Possible Defect of 4-Aminobutyrate Metabolism*, 129 Clinica Chimica Acta 303-309 (1983)

---

for the purposes of these Invalidity Contentions, Lupin will limit its discussion to the teachings of the Cook Patent in this section. Any citations herein with respect to the Cook Patent are also made with respect to the same or similar disclosures in the Cook Application, the '219 patent, the '506 patent, as well as their application publications.

("Divry");

- Food and Drug Administration, Center for Drug Evaluation and Research, Clinical Pharmacology Division, Guidance for Industry: Drug Interaction Studies – Study Design, Data Analysis, Implications for Dosing and Labeling (February 2012) ("FDA Guidance");

- Neil T. Feldman, et al., Sleep Architecture Effects of Sodium Oxybate Treatment in Subjects with Sleep-Disordered Breathing, 20 Chest 130 (2006) ("Feldman 2006");

- Neil T. Feldman, Clinical perspective: Monitoring Sodium Oxybate-Treated Narcolepsy Patients for the Development of Sleep-Disordered Breathing, 14 SLEEP BREATH 77-79 (2010) ("Feldman 2010");

- S.J. Frucht, et al., A Pilot Tolerability and Efficacy Trial of Sodium-Oxybate in Ethanol-Responsive Movement Disorders, 20 Movement Disorders 1330-1337 (2011) ("Frucht");

- Philip D. Hansten & John R. Horn, Drug Interactions Analysis and Management, Wolters Kluwer Health, PM1-36 (2011) ("Hansten");

- Harvey, P. et al., *The Inhibitory Effect of Sodium* n-*Dipropyl Acetate on the Degradative Enzymes of the GABA Shunt*, 52(2) FEBS Lett. 251–54 (1975) ("Harvey");

- Viviane Hechler et al., *γ-Hydroxybutyrate Conversion into GABA Induces Displacement of $GABA_B$ Binding That Is Blocked by Valproate and Ethosuximide*, 281 J. Pharmacology & Experimental Therapeutics 753 (1997) ("Hechler");

- Elaine E. Kaufman & Thomas Nelson, *Evidence for the Participation of a Cytosolic $NADP^+$-Dependent Oxidoreductase in the Catabolism of γ-Hydroxybutyrate In Vivo*, 48 J. Neurochemistry 1935 (1987) ("Kaufman 1987");

- Kaufman, E. et al., *Oxidation of γ-Hydroxybutyrate to Succinic Semialdehyde by a Mitochondrial Pyridine Nucleotide-Independent Enzyme*, 51(4) J. Neurochemistry 1079–84 (1988) ("Kaufman 1988");

- Kaufman, E. et al., *An Overview of γ-Hydroxybutyrate Catabolism: The Role of the Cytosolic NADP+-Dependent Oxidoreductase EC 1.1.1.19 and of a Mitochondrial Hydroxyacid-Oxoacid Transhydrogenase in the Initial, Rate-Limiting Step in This Pathway*, 16(9) Neurochem. Res. 965–74 (1991) ("Kaufman 1991");

- I. Knerr, et al., *Therapeutic concepts in succinate semialdehyde dehydrogenase (SSADH; ALDH5a1) deficiency (γ-hydroxybutyric aciduria). Hypotheses evolved from 25 years of patient evaluation, studies in $Aldh5a1^{-/-}$ mice and*

*characterization of γ-hydroxybutyric acid pharmacology*, J. Inherit. Metab. Dis., Vol. 30, pp. 279-294 (2007) ("Knerr");

- van der Laan, J.W. et al., *Di-n-Propylacetate and GABA Degradation: Preferential Inhibition of Succinic Semialdehyde Dehydrogenase and Indirect Inhibition of GABA-Transaminase*, 32(4) J. Neurochem. 1769–80 (1979) ("Laan");
- Löscher, *Valproate: A Reappraisal of Its Pharmacodynamic Properties and Mechanisms of Action*, Progress in Neurobiol., Vol. 58, pp. 31-59 (1999) ("Löscher 1999");
- Löscher, W., *Basic Pharmacology of Valproate: A Review after 35 Years of Clinical Use for the Treatment of Epilepsy*, 16(10) CNS Drugs 669–94 (2002) ("Löscher 2002");
- Maitre, M, *The γ-Hydroxybutyrate Signalling System in Brain Organization and Functional Implications*, 51 Progress in Neurobiology 337 (1997) ("Maitre");
- Pascal Mathivet, et al., *Binding Characteristics of γ-Hydroxybutyric Acid as a Weak but Select $GABA_B$ Receptor Agonist*, 321 European J. Pharmacology 67-75 (1997) ("Mathivet");
- Morris, Monocarboxylate Transporter Inhibition with Osmotic Diuresis Increases γ-Hydroxybutyrate Renal Elimination in Humans: A Proof-of-Concept Study, *J. Clin. Tox.*, 1(2), 1000105, pp. 1-4 (2011) ("Morris 2011");
- Mortimer Mamelak et al., *Treatment of Narcolepsy with γ-Hydroxybutyrate. A Review of Clinical And Sleep Laboratory Findings*, Sleep, 9(1):285-289 (1986) ("Mamelak 1986");
- Mortimer Mamelak, *Gamma hydroxybutyrate: An Endogenous Regulatorof Energy Metabolism*, 13 Neurosci. & Biobehavorial Revs. 187(1989) ("Mamelak 1989");
- Okun, M., *GHB: An Important Pharmacologic and Clinical Update*, 4 J. Pharmaceut. Sci. 167 (2001) ("Okun");
- A Priori, et al., *γ-Hydroxybutyric Acid for Alcohol-Sensitive Myoclonus with Dystonia*, 54 NEUROLOGY 1706 (2000) ("Priori");
- J.F. Rumigny et al., *Specific and Non-Specific Succinic Semialdehyde Reductases from Rat Brain: Isolation and Properties*, 117 FEBS Letters 111 (1980) ("Rumigny");
- Martin B. Scharf, et al., *The Effects and Effectiveness of γ-Hydroxybutyrate in Patients with Narcolepsy*, J. Clin. Psychiatry, 46:222-225 (1985) ("Scharf 1985");

- Martin B. Scharf, *Pharmacokinetics of Gamma hydroxybutyrate (GHB) in Narcoleptic Patients*, *Sleep*, Vol. 21(5), pp. 507-514 (1998) ("Scharf 1988");

- Schep, L. et al., *The Clinical Toxicology of Gamma-Hydroxybutyrate, Gamma-Butyrolactone and 1,4-Butanediol*, 50(6) Clin. Toxicol. (Phila). 458–70 (2012) ("Schep");

- Lawrence Scrima, et al., *The Effects of γ-Hydroxybutyrate on the Sleep of Narcolepsy Patients: A Double-Blind Study*, 13(6) Sleep 479-90 (1990) ("Scrima");

- T. Shinka et al., *Effect of Valproic Acid on the Urinary MetabolicProfile of a Patient with Succinic Semialdehyde Dehydrogenase Deficiency*, 792 J. Chromatography 99-106 (2003) ("Shinka");

- O.C. Snead et al., *Effect of Acute and Chronic Anticonvulsant Administration on Endogenous γ-Hydroxybutyrate in Rat Brain*, 19 Neuropharmacology 47-52 (1980) ("Snead 1980");

- O.C. Snead & K. Michael Gibson, *γ-Hydroxybutyric Acid*, 352 New England J. Med. 2721-32 (2005) ("Snead 2005");

- Vayer, P. et al., *3'-5' Cyclic-Guanosine Monophosphate Increase in Rat Brain Hippocampus after Gamma- Hydroxybutyrate Administration: Prevention by Valproate and Naloxone*, 41(5) Life Sci. 605–10 (1987) ("Vayer 1987");

- Vayer, P. et al., *Is the Anticonvulsant Mechanism of Valproate Linked to Its Interaction with the Cerebral γ-Hydroxybutyrate System?*, 9(4) Trends Pharmacol. Sci. 127–29 (1988) ("Vayer 1988");

- Anna Waszkielewicz & Jacek Bojarski, *γ-Hydroxybutyric Acid (GHB) and Its Chemical Modifications: A Review of the GHBergic System*, 56 Polish J. Pharmacology 43 (2004) ("Waszkielewicz");

- Gregory P. Wedin et al., *The Clinical Development of γ-Hydroxybutyrate (GHB)*, 1 Current Drug Safety 99 (2006) ("Wedin");

- Weiss, T. et al., *Gamma-Hydroxybutyrate (GHB) and Topiramate—Clinically Relevant Drug Interaction Suggested by a Case of Coma and Increased Plasma GHB Concentration*, 69 Eur. J. Clin. Pharmacol. 1193 (2013) ("Weiss");

- Xyrem® Prescribing Information (2012) ("Xyrem 2012 PI");

- Xyrem® Prescribing Information (2005) ("Xyrem 2005 PI");

- FDA Approval Letter for Xyrem® (Nov. 18, 2005) ("Xyrem 2005 FDA Approval Letter");

- FDA Approval Letter for Xyrem® (Jul. 17, 2002) ("Xyrem 2002 FDA Approval Letter");
- Physician's Desk Reference Edition 61, pp. 1688-1692, (2007) ("Xyrem Physician's Desk Reference"); and
- Xyrem® Titration Schedule published in 2008 ("the Xyrem Titration Schedule").

Lupin expressly reserves the right to modify and/or supplement the prior art discussed herein. Each of the above is prior art to the '400 patent. To the extent that the patentee and/or inventors attempt to swear behind or otherwise remove as prior art any of the art identified herein, Lupin specifically reserves its right to, *inter alia*, add additional prior art to the list. Furthermore, to the extent that the patentee argues that any of the cited references are not prior art under 35 U.S.C. § 102, many of the referenced patents and/or patent applications have foreign or U.S. equivalents which also qualify as prior art. Such foreign and U.S. equivalents are incorporated herein, and Lupin reserves the right to rely upon them. Additionally, as previously noted, Lupin reserves its right to, *inter alia*, supplement or amend its list of prior art references based upon, among other things, Plaintiff's disclosure of its alleged infringement proofs; disclosure of Plaintiff's proposed construction of the claims of the '400 patent; issuance of a claim construction ruling by a court,should the court be able to construe the claims of the '400 patent; Plaintiff's response to any of Lupin's defenses, including, but not limited to, Plaintiff's interpretation of the prior art; the discovery (fact or expert) during litigation; and/or further investigation. Moreover, Lupin does not admit, or otherwise concede, that the claims of the '400 patent are entitled to an effective filing date earlier than the patent's filing date, and therefore reserves the right to, *inter alia*, challenge the effective filing date of the patent and to assert additional prior art references and/or products based on any such challenge. Nevertheless, as discussed herein, each claim of the patent is invalid even if the '400 patent is entitled to claim priority to an earlier-filed application.

Claims 1-20 of the ’400 patent are rendered obvious for at least the reasons set forth below. (*See also* Section V.I).

**ii. The Scope and Content of the Prior Art**

The teachings of the prior art identified above are described in detail in the section related to the invalidity of the ’306 patent, said discussion incorporated herein by reference.

**iii. The Asserted Claims are Invalid as Obvious**

At least the references discussed above disclose, either alone or in combination, the limitations of claims 1-20 of the ’400 patent.[37] Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references together with the knowledgehe or she would have possessed, would have readily gleaned the information necessary to develop the methods of treatment (to the extent such methods were not already known or in use) within claims 1-20 of the ’400 patent; would have had a motivation to use such a method; and would have had a reasonable expectation of success in doing so. *See, e.g.*, *KSR*, 550 U.S.at 416 (“The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.”).

As explained below, the asserted claims would have been obvious in view of a host of prior art references. Consequently, there are numerous different combinations of these prior art references and many exemplary references that disclose the claimed method. *See, e.g.*, *Rothman v. Target Corp.*, 556 F.3d 1310, 1320-21 (Fed. Cir. 2009) (when the “entire body of prior art”—

[37] To the extent that any specific limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the “discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art.” *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

or an "evidentiary cornucopia"—renders a patent claim obvious, a trier of fact can fairly rely on "any combination of these references in reaching its obviousness verdict.").

By way of example, the following combinations render the asserted claims obvious:

- One or more of the Cook Patent, Bhattacharya 2004, Broughton 1979, Broughton 1980, Feldman 2006, Feldman 2010, Frucht, Mamelak 1986, Mamelak 1989, Okun, Priori, Scharf 1985, Scharf 1988, Scrima, Xyrem 2005 PI, Xyrem 2012 PI, Xyrem Physician's Desk Reference, Xyrem 2002 FDA Approval Letter, Xyrem 2005 FDA Approval Letter, Xyrem Titration Schedule; in view of

- One or more of Bernasconi, Bhattacharya 2006, Borgen, Cash, Chateauvieux, Depakote Label, Divry, Harvey, Hechler, Kaufman 1987, Kaufman 1988, Kaufman 1991, Knerr, Laan, Löscher 1999, Löscher 2002, Maitre, Mathivet, Morris 2011, Rumigny, Schep, Shinka, Snead 2005, Snead 1980, Vayer 1987, Vayer 1988, Waszkielewicz, Wedin; in further view of

- One or both of Cagnin, Weiss; optionally in combination with

- One or both of the FDA Guidance, Hansten.

More specifically, at least the following combinations of prior art references are exemplary of the combinations of prior art references that render the asserted claims of the '400 patent obvious:

- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Borgen, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Schep, Hechler, Vayer 1988, Shinka, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Borgen, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Schep, Bernasconi, Waszkielewicz, Wedin, and/or Cagnin, optionally in view of the FDA Guidance

Lupin reserves the right to rely on other combinations of prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

As further explained below, a person of ordinary skill in the art would have been motivated to combine the teachings of these references with a reasonable expectation of success in light of the problem to be solved, the disclosures of the references, and the common subject matter of the

references as explained throughout. In addition, Lupin's invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

A person of ordinary skill in the art would have been motivated to combine the teachings of the prior art discussed above to arrive at the claimed method. As an initial matter, a person of ordinary skill in the art would have been motivated to use GHB to treat sleep disorders based on the extensive prior art disclosing its use for such purposes. *See, e.g.*, Cook Patentat 1:16-31; Wedin at 99; Okun at 169-170, Xyrem 2005 PI, Xyrem 2012 PI, Xyrem Physician's Desk Reference at 1688; Xyrem 2002 FDA Approval Letter at 1; Xyrem 2005 FDA Approval Letter at 1; Bhattacharya 2004 at 92; Broughton 1979 at Summary; Broughton 1980 at Summary; Feldman 2006 at 130S; Feldman 2010 at 77; Frucht at 1330; Maitre at Abstract, 352; Mamelak 1986 at Abstract, 288; Mamelak 1989 at 188; Priori; Scharf 1985 at Abstract; Scharf 1988; Scrima at Summary, 486. Moreover, given the extensive teaching in the art about the potential interaction between GHB and valproate, a person of ordinary skill in the art would have been motivated to reduce the dose of GHB if it were to be given concomitantly with valproate in order to reduce the adverse effects of concomitant administration of GHB and valproate.

Finally, a person of ordinary skill in the art would have reasonably expected to be able to treat the claimed sleep disorders by giving a reduced GHB dose, when administered concomitantly with valproate, because the prior art taught that GHB was effective at a number of doses, including reduced doses, and a person of ordinary skill in the art would have reasonably expected that a reduced dose of GHB would have increased potency when co-administered with valproate, such that the increased potency would offset any reduction in GHB dose. Thus, a person of ordinary skill in the art would have been motivated to reduce the dose of GHB if it was to be co-administered

with valproate, and would have reasonably expected to be able to successfully treat the claimed conditions.

**(1) Independent Claims**

Independent claim 1 of the '400 patent recites "[a] method for reducing adverse effects caused by a combination of gamma-hydroxybutyrate (GHB) or a salt thereof and divalproex sodium in a patient comprising: administering a reduced daily dosage amount of GHB or a salt thereof to the patient of between about 5% to about 35%, compared to a daily dosage amount of GHB or salt thereof administered to the patient in the absence of concomitant administration of divalproex sodium; wherein the patient is concomitantly administered divalproex sodium; wherein the patient is a patient suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy and currently taking GHB or salt thereof; wherein the daily dosage amount of GHB or salt thereof administered to the patient in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g." Claim 1 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

Independent claim 8 recites "[a] method for reducing adverse effects caused by combination of gamma-hydroxybutyrate (GHB) or salt thereof and divalproex sodium in a patient comprising: administering a reduced daily dosage amount of GHB or salt thereof to the patient of between about 5% to and about 35%, compared to a manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium; wherein the patient is concomitantly administered divalproex sodium; wherein the patient is a patient suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy and currently taking GHB or salt thereof; wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex

sodium is between 4.5 g to 9 g." Claim 8 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

Independent claim 15 recites "[a] method for reducing adverse effects caused by combination of gamma-hydroxybutyrate (GHB) or salt thereof and divalproex sodium in a patient comprising: administering to the patient a daily dosage amount of GHB or a salt thereof that is between about 5% and about 35% lower than a starting dosage amount of GHB or a salt thereof that would otherwise have been recommended to the patient if the patient was not currently taking divalproex sodium; wherein the patient is concomitantly administered divalproex sodium; wherein the patient is a patient suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy and currently taking GHB or salt thereof; wherein the starting daily dosage amount of GHB or salt hereof is between 4.5 g and 9 g." Claim 15 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

**(2) Dependent Claims**

Claims 2, 9 and 16 are dependent on claims 1, 8 and 15, respectively, and require "monitoring patient response and adjusting the dose of GHB or salt thereof." The additional limitation of claims 2, 9 and 16 does not distinguish the claim from the prior art. For example, the Cook Patent discloses a clinical trial where GHB dosage was adjusted when clinically indicated (e.g., intolerance or lack of efficacy). The Cook Patent at 17:40–18:10. The Xyrem 2005 PI discloses that the dosage for GHB may be increased. Specifically, the Xyrem 2005 PI states that "[t]he starting dosage can then be increased to a maximum of 9 g/night in increments of 1.5 g/night (0.75 g per dose). One to two weeks are recommended between dosage increases to evaluate clinical response and minimize adverse effects." Xyrem 2005 PI at 23; *see also* Xyrem

2012 at 2; Xyrem Titration Schedule. Further, a person of ordinary skill in the art would have known that a dose of a medication could be titrated upwards or downwards based on clinical response.

Claims 3-6, 10 and 14 are dependent claims and each require that the daily dosage of GHB or salt thereof, in the absence of concomitant administration of divalproex sodium, is 4.5 g (claims 3, 10 and 14); 6 g (claim 4); 7.5 g (claim 5); and 9 g (claim 6). The additional limitations of claims 3-6, 10 and 14 do not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claims 1, 4, and 7-10 of the '306 patent, said discussion incorporated herein by reference.

Claims 7, 13 and 20 are dependent on claims 1, 8 and 15, respectively, and require that the daily dosage amount of GHB or salt thereof is reduced by between about 20% and about 35%. The additional limitation of claims 7, 13 and 20 does not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claims 1, 4 and 12 of the '306 patent, said discussion incorporated herein by reference.

Claim 17 is dependent on claim 15 and requires lowering the daily dosage of GHB to lower than 4.5 grams. The additional limitation of claim 17 does not distinguish the claim from the prior art for at least the same reasons discussed above with respect to claims 1, 4, 7-10 of the '306 patent, said discussion incorporated herein by reference.

Claims 11 and 18 are dependent on claims 8 and 15, respectively, and require that the daily dosage amount of GHB or salt thereof administered to the patient is divided in two equal doses. The additional limitation of claims 11 and 18 does not distinguish the claims from the prior art. For example, the Xyrem 2005 PI recommends dividing the nightly dose into two equal doses. Xyrem 2005 PI at 22-23; *see also* Xyrem 2012 PI at 2; Xyrem Titration Schedule.

Claims 12 and 19 are dependent on claims 8 and 15, and require that the first dose or the second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. The additional limitations of claims 12 and 19 do not distinguish the claims from the prior art for at least the same reasons discussed above and also with respect to claims 1, 4, 7-10 of the '306 patent, said discussion incorporated herein by reference.

**(3) No Objective Indicia**

Lupin is unaware of any evidence of secondary considerations that would render the particular combination of claim elements found in the '400 patent non-obvious, as described below and incorporated herein by reference. For example:

- *Long-Felt Need:* Lupin is not aware of any evidence to support a claim that the '400 patent resolved a long-felt need.
- *Failure of Others:* Lupin is not aware of any evidence of failure of others that reflects any non-obviousness of the subject matter of the '400 patent. *Skepticism of Those of Skill in the Art:* Lupin is not aware of any skepticism of those skilled in the art with respect to the subject matter of the '400 patent.
- *Licensing:* Lupin is not aware of any licensing of the '400 patent that may be reflective of non-obviousness of the subject matter of that patent.
- *Commercial Success:* Lupin is not aware of any evidence linking anyproduct sales made to the '400 patent, as opposed to marketing, endorsements, other patents or marketing exclusivities, or other factors unrelated to the alleged invention of the '400 patent. *See Merck*, 395 F.3d at 1376-77. Further, nothing submitted during prosecution of the '400 patent establishes commercial success. On at least these bases, Lupin is aware of no commercial success that could support a claim of non-obviousness.
- *Recognition in the Industry:* Lupin is not aware of any recognition in the industry for the '400 patent.
- *Acquiescence:* Lupin is not aware of any evidence of acquiescence to the validity of the '400 patent.
- *Copying:* Lupin is not aware of any copying that could support a claim of non-obviousness of the subject matter of the '400 patent. *See, e.g.*, *Bayer*

*Healthcare*, 713 F.3d at 1377; *Purdue*, 377 F. App'x at 983; *Santarus*, 2010 WL 1506017, at *26; *Aventis*, 2006 WL 2008962, at *45.

- *Unexpected Results:* Lupin is not aware of any evidence of unexpected results with respect to the '400 patent.
- *Teaching away:* Lupin is not aware of any prior art teaching away from reducing the dose of GHB when the patient is receiving a concomitant administration of valproate. To the contrary, as explained above, the prior art taught a person of ordinary skill in the art to reduce the GHB dose when the patient is receiving a concomitant administration of valproate.

Additionally, as noted above, the patentee must prove the required nexus before relyingon *any* secondary considerations of alleged non-obviousness. *Muniauction*, 532 F.3d at 1327-28. Lupin is not aware of any evidence that would establish the required nexus for the claims ofthe '400 patent.

Thus, for at least these reasons, claims 1-20 of the '400 patent are invalid for obviousness.

**b. Unpatentable Subject Matter**

Claims 1-20 of the '400 patent are invalid under 35 U.S.C. § 101 for claiming unpatentable subject matter.

Natural phenomena, laws of nature, and abstract ideas are not patentable subject matter. *Mayo*, 132 S. Ct. at 1293. "[A] process that focuses upon the use of a natural law [must] also contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself." *Id.* at 1294.

Claims 1-20 of the '400 patent are method of reducing adverse effect claims that require adjusting the dosage of GHB when a patient is concomitantly receiving valproate. The interaction between GHB and valproate is a natural phenomenon, and the reduction in the GHB dosage is not a sufficient "inventive concept" to render the claims patentable. *See Mayo*, 132 S. Ct. at 1294.

Accordingly, claims 1-20 of the '400 patent are invalid under 35 U.S.C. § 101 for claiming unpatentable subject matter.

**c. Lack of Utility**

To the extent that Plaintiff argues that the prior art discussed above would not have motivated a person of ordinary skill in the art to administer a reduced dose of GHB to a patient receiving a concomitant administration of valproate, that the prior art taught away from administering GHB concomitantly with valproate, that a person of ordinary skill in the art would not have reasonably expected to be able to successfully treat a patient in co-administering GHB and valproate, and/or that no patient with a sleep disorder was receiving co-administered GHB and valproate in the prior art, then claims 1-20 of the '400 patent are invalid under 35 U.S.C. § 101 for lack of credible utility.

**d. Lack of Enablement and Written Description Support**

To the extent that Plaintiff argues claim 1-20 of the '400 patent are not invalid as obvious over the prior art, these claims are invalid for failing to satisfy the written description and enablement requirements of 35 U.S.C. § 112.

The written description inquiry focuses on whether the disclosure of the original application is sufficient to convey possession of the invention. *See Eiselstein v. Frank*, 52 F.3d 1035, 1039 (Fed. Cir. 1995). "Put another way, one skilled in the art, reading the original disclosure, must immediately discern the limitation at issue in the claims." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326 (Fed. Cir. 2000).

In order for claims to be enabled under 35 U.S.C. § 112, the specification must describe "the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." *Magsil Corp. v. Hitachi Global Storage Techs.*, 687 F.3d

1377, 1380 (Fed. Cir. 2012). The specification must enable a person of ordinary skill in the art to practice the claimed invention without undue experimentation. *In re Wands*, 858 F.2d at 737 (Fed. Cir. 1988). The following factors (*Wands* factors) are considered by a court when determining whether a patent specification would require undue experimentation: (1) the breadth of the claims, (2) the nature of the invention, (3) the state of the prior art, (4) the relative skill of those in the art, (5) the predictability or unpredictability of the art, (6) the amount of direction or guidance presented, (7) the presence or absence of working examples, and (8) the quantity of experimentation necessary.

As explained above, claim 1-20 of the ’400 patent are generally directed to methods of reducing adverse effects caused by concomitant administration of GHB and divalproex sodium in a patient suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy by administering a reduced daily dosage amount of GHB.

The specification of the ’400 patent does not describe the extent to which the GHB dose should be reduced based on various pharmacokinetic or pharmacodynamic parameters, or how to otherwise determine the extent to which the GHB dose should be reduced, to reduce adverse effects caused by concomitant administration of GHB and divalproex sodium. For example, the specification does not provide any information to correlate various pharmacokinetic or pharmacodynamic parameters with a GHB dose reduction claimed in claim 1-20 of the ’400 patent. Therefore, to the extent that Plaintiff contends that a person of ordinary skill in the art would not view these claims as obvious for the reasons stated above, then a person of ordinary skill in the art would understand that the named inventors were not in possession of the claimed invention as of the earliest claimed filing date of the ’400 patent. Therefore, claim 1-20 of the ’400 patent would be invalid for lacking written description support.

Further, if Plaintiff contends that a person of ordinary skill in the art would not view these claims as obvious for the reasons stated above, then the ’400 patent specification fails to enable a person of ordinary skill in the art to practice the full scope of claims 1-20 without undue experimentation. In particular, no direction or guidance or working examples are presented in the specification regarding the extent to which the GHB dose should be reduced based on various pharmacokinetic or pharmacodynamic parameters, or how to otherwise determine the extent to which the GHB dose should be reduced, to reduce adverse effects caused by concomitant administration of GHB and divalproex sodium.

**E. The ’181 Patent**

U.S. Patent No. 10,864,181 B2 (“the ’181 patent”), entitled “Method of Administration of Gamma Hydroxybutyrate with Monocarboxylate Transporters,” issued on or about December 15, 2020. Mark Eller is identified as the inventor on the face of the ’181 patent. According to the records of the Patent Office, the ’181 patent is assigned to Jazz Pharmaceuticals Ireland Limited. The ’181 patent issued from U.S. Patent Application Serial No. 16/245,067 (“the ’067 application”), filed on January 10, 2019, which is a continuation application of U.S. Patent Application Serial No. 15/869,792, filed on January 12, 2018, as a continuation of U.S. Patent Application Serial No. 15/343,806, filed on November 4, 2016, which is a continuation of U.S. Patent Application Serial No. 14/707,914, filed on May 8, 2015, which is a continuation of U.S. Patent Application Serial No. 13/837,714, filed on March 15, 2013. The ’181 patent also purports to claim the benefit ofpriority of U.S. Provisional Patent Application Serial Nos. 61/771,557 (“the ’557 provisional application”) and 61/777,873 (“the ’873 provisional application”), filed on March 1, 2013, and March 12, 2013, respectively.

Plaintiff has the burden to establish that the asserted claims of the ’181 patent are entitled to the priority date of any earlier-filed application. *See Dynamic Drinkware, LLC v. National*

*Graphics, Inc*. 800 F.3d 1375, 1380 (Fed. Cir. 2015). Absent specific evidence of entitlement to an earlier priority date, the '181 patent must be assigned its actual filing date of January 10, 2019. *Id*. To establish an earlier priority date, each earlier application in the chain must fully disclose the claimed invention by meeting all requirements of 35 U.S.C. §112. *In re NTP, Inc*., 654 F.3d 1268, 1277 (Fed. Cir. 2011). Lupin does not concede that the '181 patent has made a proper claim of priority to an earlier-filed application, and reserves the right to (i) challenge the '181 patent's entitlement to claim priority to any previous application, (ii) challenge any alleged date of conception or reduction to practice; and (iii) identify additional prior art thereto.

**1. The '181 Patent Specification**

The specification of the '181 patent is substantially similar to the specification of the '306 patent discussed above said discussion is incorporated herein by reference.

**2. Asserted Claims of the '181 Patent**

Plaintiff asserts claims 1-12 of the '181 patent, of which claim 1 is independent. These claims are reproduced below:

> 1. A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient, the method comprising: administering a reduced daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof to a patient who is concomitantly administered divalproex sodium; wherein the patient is suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy; wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g; and wherein the reduced daily dosage amount of GHB or salt thereof compensates for pharmacokinetic (PK) and/or pharmacodynamic (PD) changes caused by the divalproex sodium.
>
> 2. The method of claim 1, wherein the PD interactions are measured by Cognitive Drug Research (CDR) system tasks or Karolinska Sleepiness Scale (K55).
>
> 3. The method of claim 2, wherein the CDR system tasks are selected from the group consisting of Simple Reaction Time (SRT), Digit Vigilance (DV),

Choice Reaction time (CRT), tracking distance from target, and Numeric Working Memory (NWM).

4. The method of claim 1, wherein the PK changes are measured by one or more parameters selected from the group consisting of plasma concentration, $C_{max}$, $C_n$, $C_{24}$, Tmax, and Area Under the Curve (AUC).

5. The method of claim 4, wherein the PK changes are measured by $C_{max}$ or AUC.

6. The method of claim 1, further comprising monitoring the patient's response and adjusting the dose of GHB or salt thereof.

7. The method of claim 1, wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g.

8. The method of claim 1, wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 6 g.

9. The method of claim 1, wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 7.5 g.

10. The method of claim 1, wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 9 g.

11. The method of claim 1, wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by about 15% to about 30%, compared to manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium.

12. The method of claim 1, wherein the patient is currently taking divalproex sodium.

**3. Invalidity of the '181 Patent**

Claims 1-12 of the '181 patent are invalid at least under 35 U.S.C. § 103 for being obvious over the prior art, and under 35 U.S.C. § 101 for claiming unpatentable subject matter. Further, to the extent Plaintiff argues that the asserted claims of the '181 patent are not obvious over the prior

art, then they are invalid under 35 U.S.C. § 101 for lack of utility, and under 35 U.S.C. § 112 for lack of enablement and written description support.

**a. Obviousness**

In addition to the prior art references found on the face of the ’181 patent, which Lupin identifies and incorporates fully herein, Lupin identifies the following items of prior art which, separately or in any reasonable combination, render obvious one or more of the asserted claims of the ’181 patent under 35 U.S.C. § 103. In addition, Lupin reserves the right to rely on all prior art, evidence of the relevant state of the art, and evidence of prior sales, produced by Plaintiff during fact discovery and all prior art identified in the ’181 patent or its prosecution history. Lupin further incorporates by reference, in full, all references cited in the following prior art references and their prosecution histories, where applicable.

The citations provided are representative of the references and are not exhaustive. To the extent that similar claim limitations occur in one or more claims, the disclosures below should be read to apply to all similar claim limitations. Moreover, many of the references discussed herein are representative of additional prior art references in the relevant field. It should be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of the other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information, including other publications and general scientific, medical or engineering knowledge. Lupin therefore reserves the right to rely upon other unidentified portions of the prior art references and on other publications and expert testimony to provide context and to aid understanding and interpretation of any identified portions. Lupin also reserves the right to rely upon other portions of the prior art references, other publications, and the testimony of experts to establish that the alleged inventions were expressly or inherently disclosed

in the prior art and/or would have been obvious to a person of ordinary skill in the art, including on the basis of modifying or combining certain cited references. It should also be recognized that the various concepts may be discussed in numerous references and that citation to one particular reference does not exclude later citation to other references discussing the same concept. Lupin also reserves the right to rely upon any admissions relating to prior art or the state of the art in the '181 patent or its prosecution history, as well as any admissions relating to prior art or the statement of the art in foreign counterparts and their prosecution histories. Lupin further reserves the right to modify these Invalidity Contentions to add additional prior art references in light of the information gained through fact discovery, expert discovery, arguments or positions advanced by Plaintiff, or the Court's claim construction rulings.

Lupin reserves the right to rely upon any related patents and patent applications, foreign patent counterparts and foreign patent applications of U.S. patents or applications identified in these Invalidity Contentions, U.S. counterparts of foreign patents or foreign patent applications identified in these Invalidity Contentions, or U.S. and foreign patents or applications corresponding to articles and publications identified in these Invalidity Contentions. For prior art patents and publications identified in these Invalidity Contentions, Lupin reserves the right to rely on inherency, public use, offer for sale, and/or sale of the products described in those prior art patents or publications once Lupin has had an opportunity to take discovery on these subjects.

**i. Identification of the Prior Art**

Subject to the above, at least the following prior art is relevant to the invalidity of the asserted claims of the '181 patent:

- U.S. Patent No. 6,780,889 B2 ("the Cook Patent"); [38]

[38] The Cook Patent, and U.S. Patent Nos. 7,262,219 B2 ("the '219 patent") and 7,851,506 B2 ("the '506 patent"), as well as their application publications, including U.S. Patent Application No.

- R. Bernasconi, et al., *Experimental Absence Seizures: Potential Role of γ-Hydroxybutyratic Acid and GABAB Receptors*, J. Neural. Transm. 35:155-177 (1992) ("Bernasconi");

- Bhattacharya, I. et al., *GHB (γ-Hydroxybutyrate) Carrier-Mediated Transport across the Blood-Brain Barrier*, 311(1) J. Pharmacol. Exp. Ther. 92–98 (2004) ("Bhattacharya 2004");

- Bhattacharya, I. et al., *Potential γ-Hydroxybutyric Acid (GHB) Interactions Through Blood–Brain Barrier Transport Inhibition: A Pharmacokinetic Simulation-Based Evaluation*, 33(5) J. Pharmacokinetics & Pharmacodynamics 657–81 (2006) ("Bhattacharya 2006");

- Lowell A. Borgen, et al., *The Influence of Gender and Food on the Pharmacokinetics of Sodium Oxybate Oral Solution in Healthy Subjects*, 43 J. Clin. Pharmacol. 59-65 (2003) ("Borgen");

- R. Broughton & M. Mamelak, *The Treatment of Narcolepsy-Cataplexy with Nocturnal Gamma-Hydroxybutyrate*, Can. J. Neurol Sci, Vol. 6, No.1 (1979) ("Broughton 1979");

- R. Broughton & M. Mamelak, *Effects of nocturnal Gamma-Hydroxybutyrate on Sleep/Waking Patterns in Narcolepsy-Cataplexy*, Can. J. Neurol. Sci. Vol. 7, No.1 (1980) ("Broughton 1980");

- Annachiara Cagnin et al., *γ-Hydroxybutyric Acid-Induced Psychosis andSeizures*, 21 Epilepsy & Behavior 203 (2011) ("Cagnin");

- C.D. Cash, Gamma hydroxybutyrate: *An Overview of the Pros and Cons for it Being a Neurotransmitter And/Or a Useful Therapeutic Agent*, Neurosci. Biobehavioral Rev., Vol. 18(2), 291-304 (1994) ("Cash");

- Sébastien Chateauvieux et al., *Molecular and Therapeutic Potential and Toxicity of Valproic Acid*, 2010 J. Biomed. & Biotech. 1 (online version) (2010) ("Chateauvieux");

- Depakote (Divalproex Sodium) Tablets for Oral Use: FDA Approved Labeling

---

2003/0125385 to Harry Cook et al., Microbiologically sound and stable solutions of gamma-hydroxybutyrate salt for the treatment of narcolepsy (published July 3, 2003) ("Cook Application"), are each prior art to the '306 patent. Since the specifications of each of the '889, '219, and '506 patents, and the corresponding application publications, are substantially the same, for the purposes of these Invalidity Contentions, Lupin will limit its discussion to the teachings of the Cook Patent in this section. Any citations herein with respect to the Cook Patent are also made with respect to the same or similar disclosures in the Cook Application, the '219 patent, the '506 patent, as well as their application publications.

Text, (2011) ("Depakote Label");

- P. Divry et al., *A New Patient with 4-Hydroxybutyric Aciduria, a Possible Defect of 4-Aminobutyrate Metabolism*, 129 Clinica Chimica Acta 303-309 (1983) ("Divry");

- Food and Drug Administration, Center for Drug Evaluation and Research, Clinical Pharmacology Division, Guidance for Industry: Drug Interaction Studies – Study Design, Data Analysis, Implications for Dosing and Labeling (February 2012) ("FDA Guidance");

- Neil T. Feldman, et al., Sleep Architecture Effects of Sodium Oxybate Treatment in Subjects with Sleep-Disordered Breathing, 20 Chest 130 (2006) ("Feldman 2006");

- Neil T. Feldman, Clinical perspective: Monitoring Sodium Oxybate-Treated Narcolepsy Patients for the Development of Sleep-Disordered Breathing, 14 SLEEP BREATH 77-79 (2010) ("Feldman 2010");

- S.J. Frucht, et al., A Pilot Tolerability and Efficacy Trial of Sodium-Oxybate in Ethanol-Responsive Movement Disorders, 20 Movement Disorders 1330-1337 (2011) ("Frucht");

- Philip D. Hansten & John R. Horn, Drug Interactions Analysis and Management, Wolters Kluwer Health, PM1-36 (2011) ("Hansten");

- Harvey, P. et al., *The Inhibitory Effect of Sodium* n-*Dipropyl Acetate on the Degradative Enzymes of the GABA Shunt*, 52(2) FEBS Lett. 251–54 (1975) ("Harvey");

- Viviane Hechler et al., *γ-Hydroxybutyrate Conversion into GABA Induces Displacement of $GABA_B$ Binding That Is Blocked by Valproate and Ethosuximide*, 281 J. Pharmacology & Experimental Therapeutics 753 (1997) ("Hechler");

- Elaine E. Kaufman & Thomas Nelson, *Evidence for the Participation of a Cytosolic $NADP^+$-Dependent Oxidoreductase in the Catabolism of γ-Hydroxybutyrate In Vivo*, 48 J. Neurochemistry 1935 (1987) ("Kaufman 1987");

- Kaufman, E. et al., *Oxidation of γ-Hydroxybutyrate to Succinic Semialdehyde by a Mitochondrial Pyridine Nucleotide-Independent Enzyme*, 51(4) J. Neurochemistry 1079–84 (1988) ("Kaufman 1988");

- Kaufman, E. et al., *An Overview of γ-Hydroxybutyrate Catabolism: The Role of the Cytosolic NADP+-Dependent Oxidoreductase EC 1.1.1.19 and of a Mitochondrial Hydroxyacid-Oxoacid Transhydrogenase in the Initial, Rate-Limiting Step in This Pathway*, 16(9) Neurochem. Res. 965–74 (1991) ("Kaufman 1991");

- I. Knerr, et al., *Therapeutic concepts in succinate semialdehyde dehydrogenase (SSADH; ALDH5a1) deficiency (γ-hydroxybutyric aciduria). Hypotheses evolved from 25 years of patient evaluation, studies in Aldh5a1$^{-/-}$ mice and characterization of γ-hydroxybutyric acid pharmacology*, J. Inherit. Metab. Dis., Vol. 30, pp. 279-294 (2007) ("Knerr");

- van der Laan, J.W. et al., *Di-n-Propylacetate and GABA Degradation: Preferential Inhibition of Succinic Semialdehyde Dehydrogenase and Indirect Inhibition of GABA-Transaminase*, 32(4) J. Neurochem. 1769–80 (1979) ("Laan");

- Löscher, *Valproate: A Reappraisal of Its Pharmacodynamic Properties and Mechanisms of Action*, Progress in Neurobiol., Vol. 58, pp. 31-59 (1999) ("Löscher 1999");

- Löscher, W., *Basic Pharmacology of Valproate: A Review after 35 Years of Clinical Use for the Treatment of Epilepsy*, 16(10) CNS Drugs 669–94 (2002) ("Löscher 2002");

- Maitre, M, *The γ-Hydroxybutyrate Signalling System in Brain Organization and Functional Implications*, 51 Progress in Neurobiology 337 (1997) ("Maitre");

- Pascal Mathivet, et al., *Binding Characteristics of γ-Hydroxybutyric Acid as a Weak but Select $GABA_B$ Receptor Agonist*, 321 European J. Pharmacology 67-75 (1997) ("Mathivet");

- Morris, Monocarboxylate Transporter Inhibition with Osmotic Diuresis Increases γ-Hydroxybutyrate Renal Elimination in Humans: A Proof-of-Concept Study, *J. Clin. Tox.*, 1(2), 1000105, pp. 1-4 (2011) ("Morris 2011");

- Mortimer Mamelak et al., *Treatment of Narcolepsy with γ-Hydroxybutyrate. A Review of Clinical And Sleep Laboratory Findings*, Sleep, 9(1):285-289 (1986) ("Mamelak 1986");

- Mortimer Mamelak, *Gamma hydroxybutyrate: An Endogenous Regulatorof Energy Metabolism*, 13 Neurosci. & Biobehavorial Revs. 187(1989) ("Mamelak 1989");

- Okun, M., *GHB: An Important Pharmacologic and Clinical Update*, 4 J. Pharmaceut. Sci. 167 (2001) ("Okun");

- A Priori, et al., *γ-Hydroxybutyric Acid for Alcohol-Sensitive Myoclonus with Dystonia*, 54 NEUROLOGY 1706 (2000) ("Priori");

- J.F. Rumigny et al., *Specific and Non-Specific Succinic Semialdehyde Reductases from Rat Brain: Isolation and Properties*, 117 FEBS Letters 111 (1980) ("Rumigny");

- Martin B. Scharf, et al., *The Effects and Effectiveness of γ-Hydroxybutyrate in Patients with Narcolepsy*, J. Clin. Psychiatry, 46:222-225 (1985) ("Scharf 1985");

- Martin B. Scharf, *Pharmacokinetics of Gamma hydroxybutyrate (GHB) in Narcoleptic Patients*, *Sleep*, Vol. 21(5), pp. 507-514 (1998) ("Scharf 1988");

- Schep, L. et al., *The Clinical Toxicology of Gamma-Hydroxybutyrate, Gamma-Butyrolactone and 1,4-Butanediol*, 50(6) Clin. Toxicol. (Phila). 458–70 (2012) ("Schep");

- Lawrence Scrima, et al., *The Effects of γ-Hydroxybutyrate on the Sleep of Narcolepsy Patients: A Double-Blind Study*, 13(6) Sleep 479-90 (1990) ("Scrima");

- T. Shinka et al., *Effect of Valproic Acid on the Urinary MetabolicProfile of a Patient with Succinic Semialdehyde Dehydrogenase Deficiency*, 792 J. Chromatography 99-106 (2003) ("Shinka");

- O.C. Snead et al., *Effect of Acute and Chronic Anticonvulsant Administration on Endogenous γ-Hydroxybutyrate in Rat Brain*, 19 Neuropharmacology 47-52 (1980) ("Snead 1980");

- O.C. Snead & K. Michael Gibson, *γ-Hydroxybutyric Acid*, 352 New England J. Med. 2721-32 (2005) ("Snead 2005");

- Vayer, P. et al., *3′-5′ Cyclic-Guanosine Monophosphate Increase in Rat Brain Hippocampus after Gamma- Hydroxybutyrate Administration: Prevention by Valproate and Naloxone*, 41(5) Life Sci. 605–10 (1987) ("Vayer 1987");

- Vayer, P. et al., *Is the Anticonvulsant Mechanism of Valproate Linked to Its Interaction with the Cerebral γ-Hydroxybutyrate System?*, 9(4) Trends Pharmacol. Sci. 127–29 (1988) ("Vayer 1988");

- Anna Waszkielewicz & Jacek Bojarski, *γ-Hydroxybutyric Acid (GHB) and Its Chemical Modifications: A Review of the GHBergic System*, 56 Polish J. Pharmacology 43 (2004) ("Waszkielewicz");

- Gregory P. Wedin et al., *The Clinical Development of γ-Hydroxybutyrate (GHB)*, 1 Current Drug Safety 99 (2006) ("Wedin");

- Weiss, T. et al., *Gamma-Hydroxybutyrate (GHB) and Topiramate—Clinically Relevant Drug Interaction Suggested by a Case of Coma and Increased Plasma GHB Concentration*, 69 Eur. J. Clin. Pharmacol. 1193 (2013) ("Weiss");

- Wesnes K. A., *The Value of Assessing Cognitive Function in Drug Development*, Dialogues in Clinical Neuroscience, Vol 2, No. 3, 183-202 (2000) ("Wesnes");

- Xyrem® Prescribing Information (2012) ("Xyrem 2012 PI");
- Xyrem® Prescribing Information (2005) ("Xyrem 2005 PI");
- FDA Approval Letter for Xyrem® (Nov. 18, 2005) ("Xyrem 2005 FDA Approval Letter");
- FDA Approval Letter for Xyrem® (Jul. 17, 2002) ("Xyrem 2002 FDA Approval Letter");
- Physician's Desk Reference Edition 61, pp. 1688-1692, (2007) ("Xyrem Physician's Desk Reference"); and
- Xyrem® Titration Schedule published in 2008 ("the Xyrem Titration Schedule").

Lupin expressly reserves the right to modify and/or supplement the prior art discussed herein. Each of the above is prior art to the '181 patent. To the extent that the patentee and/or inventors attempt to swear behind or otherwise remove as prior art any of the art identified herein, Lupin specifically reserves its right to, *inter alia*, add additional prior art to the list. Furthermore, to the extent that the patentee argues that any of the cited references are not prior art under 35 U.S.C. § 102, many of the referenced patents and/or patent applications have foreign or U.S. equivalents which also qualify as prior art. Such foreign and U.S. equivalents are incorporated herein, and Lupin reserves the right to rely upon them. Additionally, as previously noted, Lupin reserves its right to, *inter alia*, supplement or amend its list of prior art references based upon, among other things, Plaintiff's disclosure of its alleged infringement proofs; disclosure of Plaintiff's proposed construction of the claims of the '181 patent; issuance of a claim construction ruling by a court,should the court be able to construe the claims of the '181 patent; Plaintiff's response to any of Lupin's defenses, including, but not limited to, Plaintiff's interpretation of the prior art; the discovery (fact or expert) during litigation; and/or further investigation. Moreover, Lupin does not admit, or otherwise concede, that the claims of the '181 patent are entitled to an effective filing date earlier than the patent's filing date, and therefore reserves the right to, *inter*

*alia*, challenge the effective filing date of the patent and to assert additional prior art references and/or products based on any such challenge. Nevertheless, as discussed herein, each claim of the patent is invalid even if the '181 patent is entitled to claim priority to an earlier-filed application.

Claims 1-12 of the '181 patent are rendered obvious for at least the reasons set forth below. (*See also* Section V.J).

**ii. The Scope and Content of the Prior Art**

The teachings of Wesnes, one of the prior art identified above are described in detail below. The teachings of the remaining prior art identified above are described in detail in the section related to the invalidity of the '306 patent, said discussion incorporated herein by reference.

Wesnes discusses the value and utility of measuring cognitive function throughout the drug development process using "the most widely used automated cognitive function assessment system in worldwide clinical research, the Cognitive Drug Research (CDR) computerized assessment system." Wesnes at 184. Wesnes describes the core tests of the CDR system in Table 1, including attention, such as "Simple reaction time," "Choice reaction time," "Digit vigilance," as well as executive function and working memory. *Id.* at 185 (Table 1).

**iii. The Asserted Claims are Invalid as Obvious**

At least the references discussed above disclose, either alone or in combination, the limitations of claims 1-12 of the '181 patent.[39] Indeed, a person of ordinary skill in the art, given the disclosures of these prior art references together with the knowledgehe or she would have

[39] To the extent that any specific limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitationwould have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17.

possessed, would have readily gleaned the information necessary to develop the methods of treatment (to the extent such methods were not already known or in use) within claims 1-12 of the ’181 patent; would have had a motivation to use such a method; and would have had a reasonable expectation of success in doing so. *See, e.g.*, *KSR*, 550 U.S.at 416 (“The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.”).

As explained below, the asserted claims would have been obvious in view of a host of prior art references. Consequently, there are numerous different combinations of these prior art references and many exemplary references that disclose the claimed method. *See, e.g.*, *Rothman v. Target Corp.*, 556 F.3d 1310, 1320-21 (Fed. Cir. 2009) (when the “entire body of prior art”—or an “evidentiary cornucopia”—renders a patent claim obvious, a trier of fact can fairly rely on “any combination of these references in reaching its obviousness verdict.”).

By way of example, the following combinations render the asserted claims obvious:

- One or more of the Cook Patent, Bhattacharya 2004, Broughton 1979, Broughton 1980, Feldman 2006, Feldman 2010, Frucht, Mamelak 1986, Mamelak 1989, Okun, Priori, Scharf 1985, Scharf 1988, Scrima, Xyrem 2005 PI, Xyrem 2012 PI, Xyrem Physician’s Desk Reference, Xyrem 2002 FDA Approval Letter, Xyrem 2005 FDA Approval Letter, Xyrem Titration Schedule; in view of

- One or more of Bernasconi, Bhattacharya 2006, Borgen, Cash, Chateauvieux, Depakote Label, Divry, Harvey, Hechler, Kaufman 1987, Kaufman 1988, Kaufman 1991, Knerr, Laan, Löscher 1999, Löscher 2002, Maitre, Mathivet, Morris 2011, Rumigny, Schep, Shinka, Snead 2005, Snead 1980, Vayer 1987, Vayer 1988, Waszkielewicz, Wedin, Wesnes; in further view of

- One or both of Cagnin, Weiss; optionally in combination with

- One or both of the FDA Guidance, Hansten.

More specifically, at least the following combinations of prior art references are exemplary of the combinations of prior art references that render the asserted claims of the ’306 patent obvious:

- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Kaufman 1991, Löscher 2002, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Kaufman 1991, Löscher 2002, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Borgen, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Borgen, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Borgen, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2005 PI, Schep, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Schep, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Morris 2011, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Morris 2011, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Borgen, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Borgen, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Borgen, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Schep, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Schep, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Schep, Hechler, Vayer 1988, Shinka, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Bhattacharya 2006, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Morris 2011, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Morris 2011, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Morris 2011, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Morris 2011, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Borgen, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2012 PI, Borgen, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Physician's Desk Reference, Borgen, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem Titration Schedule, Borgen, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

- the Cook Patent, Xyrem 2005 PI, Schep, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem 2012 PI, Schep, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Physician's Desk Reference, Schep, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance
- the Cook Patent, Xyrem Titration Schedule, Schep, Bernasconi, Waszkielewicz, Wedin, Wesnes and/or Cagnin, optionally in view of the FDA Guidance

Lupin reserves the right to rely on other combinations of prior art references explained throughout these Invalidity Contentions. Lupin further reserves the right to set forth additional such examples as discovery continues and to the extent that Plaintiff challenges the teachings of any of the references identified above.

As further explained below, a person of ordinary skill in the art would have been motivated to combine the teachings of these references with a reasonable expectation of success in light of the problem to be solved, the disclosures of the references, and the common subject matter of the references as explained throughout. In addition, Lupin's invalidity charts set forth where each prior art reference discloses the limitations of the asserted claims.

A person of ordinary skill in the art would have been motivated to combine the teachings of the prior art discussed above to arrive at the claimed method of treatment. As an initial matter, a person of ordinary skill in the art would have been motivated to use GHB to treat sleep disorders based on the extensive prior art disclosing its use for such purposes. *See, e.g.*, Cook Patentat 1:16-31; Wedin at 99; Okun at 169-170, Xyrem 2005 PI, Xyrem 2012 PI, Xyrem Physician's Desk Reference at 1688; Xyrem 2002 FDA Approval Letter at 1; Xyrem 2005 FDA Approval Letter at 1; Bhattacharya 2004 at 92; Broughton 1979 at Summary; Broughton 1980 at Summary; Feldman 2006 at 130S; Feldman 2010 at 77; Frucht at 1330; Maitre at Abstract, 352; Mamelak 1986 at

Abstract, 288; Mamelak 1989 at 188; Priori; Scharf 1985 at Abstract; Scharf 1988; Scrima at Summary, 486. Moreover, given the extensive teaching in the art about the potential interaction between GHB and valproate, a person of ordinary skill in the art would have been motivated to reduce the dose of GHB if it were to be given concomitantly with valproate to compensate for pharmacokinetic and/or pharmacodynamic changes in the GHB levels caused by valproate.

Finally, a person of ordinary skill in the art would have reasonably expected to be able to treat the claimed sleep disorders by giving a reduced GHB dose, when administered concomitantly with valproate, because the prior art taught that GHB was effective at a number of doses, including reduced doses, and a person of ordinary skill in the art would have reasonably expected that a reduced dose of GHB would have increased potency when co-administered with valproate, such that the increased potency would offset any reduction in GHB dose. Thus, a person of ordinary skill in the art would have been motivated to reduce the dose of GHB if it was to be co-administered with valproate, and would have reasonably expected to be able to successfully treat the claimed conditions.

**(1) Claims 1-5**

Independent claim 1 of the '181 patent recites "[a] method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient, the method comprising: administering a reduced daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof to a patient who is concomitantly administered divalproex sodium; wherein the patient is suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy; wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g; and wherein the reduced daily dosage amount of GHB or salt thereof compensates for pharmacokinetic (PK) and/or pharmacodynamic (PD) changes caused by the divalproex sodium."

Claim 1 would have been obvious to one of ordinary skill in the art for at least the same reasons discussed above with respect to claims 1-4 of the ’306 patent, said discussion incorporated herein by reference, and for additional reasons discussed here. First, as discussed above, a person of ordinary skill in the art would have known that concomitant administration of divalproex sodium caused intensified effects of GHB. Thus, a person of ordinary skill in the art would have known to compensate for pharmacokinetic (PK) and/or pharmacodynamic (PD) changes. Further, measuring for pharmacokinetic (PK) and/or pharmacodynamic (PD) changes was well known long before the claimed priority date of the ’181 patent. *See, e.g.,* the Cook Patent at Example 3; *see also* Borgen at 61-62; Xyrem 2012 PI at 5-6; Scharf at Figures 1-6, Tables 1-2; Wesnes at 184-185. Thus, it would have been obvious to a person of ordinary skill in the art to measure these changes when administering a concomitant administration of divalproex sodium, due to the potentially toxic effects that divalproex sodium can cause by intensifying the effects of GHB.

Claim 2 depends from claim 1 and requires that “the PD interactions are measured by Cognitive Drug Research (CDR) system tasks or Karolinska Sleepiness Scale (K55).” Claim 3 depends from claim 2 and requires that “the CDR system tasks are selected from the group consisting of Simple Reaction Time (SRT), Digit Vigilance (DV), Choice Reaction time (CRT), tracking distance from target, and Numeric Working Memory (NWM).” The additional limitations of claims 2 and 3 do not distinguish these claims from prior art. For example, Wesnes discusses the value and utility of measuring cognitive function throughout the drug development process using “the most widely used automated cognitive function assessment system in worldwide clinical research, the Cognitive Drug Research (CDR) computerized assessment system,” including testing attention, such as “Simple reaction time,” “Choice reaction time,” “Digit vigilance,” as well as executive function and working memory. Wesnes at 184-185, Table 1.

Claim 4 is dependent on claim 1 and requires that "the PK changes are measured by one or more parameters selected from the group consisting of plasma concentration, $C_{max}$, $C_n$, $C_{24}$, Tmax, and Area Under the Curve (AUC)." Claim 5 is dependent on claim 4 and requires that "the PK changes are measured by $C_{max}$ or AUC." The additional limitations of claims 4 and 5 do not distinguish these claims from prior art. For example, the Cook Patent, discloses the pharmacokinetics of GHB after oral administration of two consecutive doses of GHB to narcoleptic patients who are maintained on a chronic regimen of GHB. *See* Cook Patent at Example 3. The disclosed study reported measuring plasma concentration, $C_{max}$, Tmax, t ½, the area under the curve (AUC), apparent oral clearance (CL/F), volume of distribution, and mean residence time. *See, e.g., id.* at 29:33-63; *see also* Borgen at 61-62; Xyrem 2012 PI at 5-6; Scharf at Figures 1-6, Tables 1-2.

**(2) Claims 6-10**

Claim 6 depends from claim 1 and requires "monitoring the patient's response and adjusting the dose of GHB or salt thereof." The additional limitation of claim 6 does not distinguish the claim from the prior art. For example, the Cook Patent discloses a clinical trial where GHB dosage was adjusted when clinically indicated (e.g., intolerance or lack of efficacy). The Cook Patent at 17:40–18:10. The Xyrem 2005 PI discloses that the dosage for GHB may be increased. Specifically, the Xyrem 2005 PI states that "[t]he starting dosage can then be increased to a maximum of 9 g/night in increments of 1.5 g/night (0.75 g per dose). One to two weeks are recommended between dosage increases to evaluate clinical response and minimize adverse effects." Xyrem 2005 PI at 23; *see also* Xyrem 2012 at 2. Further, a person of ordinary skill in the art would have known that a dose of a medication could be titrated upwards or downwards based on clinical response.

Claims 7-10 are dependent claims depending from claim 1 and each require that the daily dosage of GHB or salt thereof, in the absence of concomitant administration of divalproex sodium, is 4.5 g (claim 7); 6 g (claim 8); 7.5 g (claim 9); and 9 g (claim 10). The additional limitations of claims 7-10 do not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claims 1, 4, and 7-10 of the '306 patent, said discussion incorporated herein by reference.

Claim 11 depends from claim 1 and requires that "the daily dosage amount of GHB or salt thereof administered to the patient is reduced by about 15% to about 30%, compared to manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium." The additional limitation of claim 11 does not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claims 1, 4, and 7-10 of the '306 patent, said discussion incorporated herein by reference.

Claim 12 depends from claim 1 and requires "the patient is currently taking divalproex sodium." The additional limitation of claim 12 does not distinguish the claims from the prior art for at least the same reasons discussed above with respect to claims 1-4 of the '306 patent, said discussion incorporated herein by reference.

**(3) No Objective Indicia**

Lupin is unaware of any evidence of secondary considerations that would render the particular combination of claim elements found in the '181 patent non-obvious, as described below and incorporated herein by reference. For example:

- *Long-Felt Need:* Lupin is not aware of any evidence to support a claim that the '181 patent resolved a long-felt need.
- *Failure of Others:* Lupin is not aware of any evidence of failure of others that reflects any non-obviousness of the subject matter of the '181 patent. *Skepticism of Those of Skill in the Art:* Lupin is not aware of any skepticism of those skilled in the art with respect to the subject matter of the '181

patent.

- *Licensing:* Lupin is not aware of any licensing of the '181 patent that may be reflective of non-obviousness of the subject matter of that patent.

- *Commercial Success:* Lupin is not aware of any evidence linking anyproduct sales made to the '181 patent, as opposed to marketing, endorsements, other patents or marketing exclusivities, or other factors unrelated to the alleged invention of the '181 patent. *See Merck*, 395 F.3d at 1376-77. Further, nothing submitted during prosecution of the '181 patent establishes commercial success. On at least these bases, Lupin is aware of no commercial success that could support a claim of non-obviousness.

- *Recognition in the Industry:* Lupin is not aware of any recognition in the industry for the '181 patent.

- *Acquiescence:* Lupin is not aware of any evidence of acquiescence to the validity of the '181 patent.

- *Copying:* Lupin is not aware of any copying that could support a claim of non-obviousness of the subject matter of the '181 patent. *See, e.g.*, *Bayer Healthcare*, 713 F.3d at 1377; *Purdue*, 377 F. App'x at 983; *Santarus*, 2010 WL 1506017, at *26; *Aventis*, 2006 WL 2008962, at *45.

- *Unexpected Results:* Lupin is not aware of any evidence of unexpected results with respect to the '181 patent.

- *Teaching away:* Lupin is not aware of any prior art teaching away from reducing the dose of GHB when the patient is receiving a concomitant administration of valproate. To the contrary, as explained above, the prior art taught a person of ordinary skill in the art to reduce the GHB dose when the patient is receiving a concomitant administration of valproate.

Additionally, as noted above, the patentee must prove the required nexus before relyingon *any* secondary considerations of alleged non-obviousness. *Muniauction*, 532 F.3d at 1327-28. Lupin is not aware of any evidence that would establish the required nexus for the claims ofthe '181 patent.

Thus, for at least these reasons, claims 1-12 of the '181 patent are invalid for obviousness.

**b. Unpatentable Subject Matter**

Claims 1-12 of the '426 patent are invalid under 35 U.S.C. § 101 for claiming unpatentable subject matter.

Natural phenomena, laws of nature, and abstract ideas are not patentable subject matter. *Mayo*, 132 S. Ct. at 1293. "[A] process that focuses upon the use of a natural law [must] also contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself." *Id.* at 1294.

Claims 1-12 of the '181 patent are method of treatment claims that require adjusting the dosage of GHB when a patient is concomitantly receiving valproate. The interaction between GHB and valproate is a natural phenomenon, and the reduction in the GHB dosage is not a sufficient "inventive concept" to render the claims patentable. *See Mayo*, 132 S. Ct. at 1294. Accordingly, claims 1-12 of the '181 patent are invalid under 35 U.S.C. § 101 for claiming unpatentable subject matter.

**c. Lack of Utility**

To the extent that Plaintiff argues that the prior art discussed above would not have motivated a person of ordinary skill in the art to administer a reduced dose of GHB to a patient receiving a concomitant administration of valproate, that the prior art taught away from administering GHB concomitantly with valproate, that a person of ordinary skill in the art would not have reasonably expected to be able to successfully treat a patient in co-administering GHB and valproate, and/or that no patient with a sleep disorder was receiving co-administered GHB and valproate in the prior art, then claims 1-12 of the '181 patent are invalid under 35 U.S.C. § 101 for lack of credible utility.

**d. Lack of Enablement and Written Description Support**

To the extent that Plaintiff argues claim 1-12 of the '181 patent are not invalid as obvious over the prior art, these claims are invalid for failing to satisfy the written description and enablement requirements of 35 U.S.C. § 112.

The written description inquiry focuses on whether the disclosure of the original application is sufficient to convey possession of the invention. *See Eiselstein v. Frank*, 52 F.3d 1035, 1039 (Fed. Cir. 1995). "Put another way, one skilled in the art, reading the original disclosure, must immediately discern the limitation at issue in the claims." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326 (Fed. Cir. 2000).

In order for claims to be enabled under 35 U.S.C. § 112, the specification must describe "the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." *Magsil Corp. v. Hitachi Global Storage Techs.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012). The specification must enable a person of ordinary skill in the art to practice the claimed invention without undue experimentation. *In re Wands*, 858 F.2d at 737 (Fed. Cir. 1988). The following factors (*Wands* factors) are considered by a court when determining whether a patent specification would require undue experimentation: (1) the breadth of the claims, (2) the nature of the invention, (3) the state of the prior art, (4) the relative skill of those in the art, (5) the predictability or unpredictability of the art, (6) the amount of direction or guidance presented, (7) the presence or absence of working examples, and (8) the quantity of experimentation necessary.

As explained above, claim 1-12 of the '181 patent are generally directed to methods of treating cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is concomitantly administered divalproex sodium by reducing the daily dosage amount of GHB to

compensate for pharmacokinetic and/or pharmacodynamic changes caused by the divalproex sodium.

The specification of the ’181 patent does not describe the extent to which the GHB dose should be reduced to compensate for pharmacokinetic and/or pharmacodynamic changes caused by the divalproex sodium. For example, the specification does not provide any information to correlate various pharmacokinetic or pharmacodynamic parameters with any GHB dose reduction claimed in claim 1-12 of the ’181 patent. Therefore, to the extent that Plaintiff contends that a person of ordinary skill in the art would not view these claims as obvious for the reasons stated above, then a person of ordinary skill in the art would understand that the named inventors were not in possession of the claimed invention as of the earliest claimed filing date of the ’181 patent. Therefore, claim 1-12 of the ’181 patent would be invalid for lacking written description support.

Further, if Plaintiff contends that a person of ordinary skill in the art would not view these claims as obvious for the reasons stated above, then the ’181 patent specification fails to enable a person of ordinary skill in the art to practice the full scope of claims 1-12 without undue experimentation. In particular, no direction or guidance or working examples are presented in the specification regarding the extent to which the GHB dose should be reduced to compensate for pharmacokinetic and/or pharmacodynamic changes caused by the divalproex sodium.

## V. CLAIM CHARTS

Lupin provides the following invalidity analyses for the asserted claims on a claim-by-claim basis as representative only, and the cited disclosures of each reference are exemplary only. Lupin reserves the right to rely on any disclosure in the cited reference and reserves the right to amend or supplement this information as appropriate and/or necessary. Lupin reserve the right to rely upon any prior art or other evidence produced in discovery in any prior or ongoing litigations involving the asserted claims. Further, Lupin reserves the right to rely on expert testimony. This

disclosure is in addition to the element-by-element discussion provided in Lupin's Invalidity Contentions, which is incorporated fully here.

### A. The '922 Patent

| Patent Claim Elements | Prior Art Disclosures |
| --- | --- |
| **Claim 1** | |
| A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, | This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Xyrem Label teaches that sodium oxybate (chemically known as sodium γ-hydroxybutyrate) "is a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy." Xyrem Label at 1. The recommended starting dose for Xyrem is 4.5 g/night, which can be increased (recommended in 1.5 g increments) to a maximum of 9 g/night. Xyrem Label at 22-23.<br><br>Cook Application discloses a pharmaceutical composition of gamma-hydroxybutyrate in an aqueous medium for the treatment of sleep disorders, including narcolepsy, as well as alcohol and opiate withdrawal, reduced levels of growth hormone, increased intracranial pressure, and physical pain in a patient. Cook Application at abstract. Cook Application teaches that "[i]n certain embodiments, the composition may contain one or more salts" and that "salts" "includ[es] salts of GHB" that can "be derived from … sodium, potassium … calcium, [and] magnesium." Cook Application at ¶ 22. Cook Application further discloses that "[i]n certain embodiments, excipients may be added" such as "xylitol, mannitol, lactose, starch, magnesium stearate, sodium saccharine, cellulose, cellulose derivatives, magnesium carbonate and the like." Cook Application at ¶ 22.<br><br>The '632 patent discloses GHB compositions and states that "Suitable gamma-hydroxy butyric acid salts include the sodium salt, potassium salt, calcium salt and magnesium salt. In addition to GHB salts, the composition of the present invention |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | can contain one or more non-toxic pharmaceutically acceptable excipients." '632 patent at 7:32-36; *see also* claims 2, 7, and 9. The '632 patent further states that "[t]he composition containing a GHB salt and suitable pharmaceutically acceptable excipients can be formed using various gamma-hydroxy butyric acid salts and excipients." *Id*. at 7:26-31.<br><br>The '027 application discloses an oral dosage form of GHB comprising "at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate." '027 application at claim 4. Similarly, the '027 application teaches that "one or more of a GHB drug" can be formulated into an oral dosage form. '027 application ¶ 39.<br><br>The '030 patent claims "pharmaceutical compositions … wherein the salts of gamma-hydroxy-butyric acid are selected from the group consisting of sodium, lithium, potassium, magnesium and calcium salts." '030 patent at claim 6.<br><br>Ferris teaches method of making salts of GHB and states that "[s]odium, potassium, magnesium and calcium salts of gamma-hydroxybutyrate have been synthesised from gamma-butyrolactone and the corresponding group 1 or 2 hydroxide." Ferris at abstract.<br><br>EP '804 discloses "[p]referred pharmaceutically acceptable salts of gamma-hydroxybutyric acid for use in the present compositions are lithium-, sodium-, potassium-, calcium-, and magnesium salts." (EP '804 at 2, ll. 37-39).<br><br>The '236 patent claims "[a] method for the production of magnesium and[] calcium salts of 4-hydroxybutyric acid comprising … reacting … 4-hydroxybutyric acid, … magnesium hydroxide, … [and] calcium hydroxide … in an aqueous solution." '236 at claims 6 and 14. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | GB '029 discloses that the "pharmacological properties" of salts of GHB "promote[] … deep sleep." GB '029 at 3:36-49. Further, GB '029 teaches using salts of GHB and especially the alkaline-earth metal salts," including "the sodium salt" and "the calcium salt." GB '029 at 2:53-75. |
| wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.(GHB)2), and a calcium salt of gamma-hydroxybutyrate (Ca.(GHB)2); | This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Xyrem Label teaches that sodium oxybate (chemically known as sodium γ-hydroxybutyrate) "is a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy." Xyrem Label at 1. The recommended starting dose for Xyrem is 4.5 g/night, which can be increased (recommended in 1.5 g increments) to a maximum of 9 g/night. Xyrem Label at 22-23.<br><br>Cook Application discloses a pharmaceutical composition of gamma-hydroxybutyrate in an aqueous medium for the treatment of sleep disorders, including narcolepsy, as well as alcohol and opiate withdrawal, reduced levels of growth hormone, increased intracranial pressure, and physical pain in a patient. Cook Application at abstract. Cook Application teaches that "[i]n certain embodiments, the composition may contain one or more salts" and that "salts" "includ[es] salts of GHB" that can "be derived from … sodium, potassium … calcium, [and] magnesium." Cook Application at ¶ 22. Cook Application further discloses that "[i]n certain embodiments, excipients may be added" such as "xylitol, mannitol, lactose, starch, magnesium stearate, sodium saccharine, cellulose, cellulose derivatives, magnesium carbonate and the like." Cook Application at ¶ 22.<br><br>The '632 patent discloses GHB compositions and states that "Suitable gamma-hydroxy butyric acid salts include the sodium salt, potassium salt, calcium salt and magnesium salt. In addition to GHB salts, the composition of the present invention |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | can contain one or more non-toxic pharmaceutically acceptable excipients." '632 patent at 7:32-36; *see also* claims 2, 7, and 9. The '632 patent further states that "[t]he composition containing a GHB salt and suitable pharmaceutically acceptable excipients can be formed using various gamma-hydroxy butyric acid salts and excipients." *Id*. at 7:26-31.<br><br>The '027 application discloses an oral dosage form of GHB comprising "at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate." '027 application at claim 4. Similarly, the '027 application teaches that "one or more of a GHB drug" can be formulated into an oral dosage form. '027 application ¶ 39.<br><br>The '030 patent claims "pharmaceutical compositions … wherein the salts of gamma-hydroxy-butyric acid are selected from the group consisting of sodium, lithium, potassium, magnesium and calcium salts." '030 patent at claim 6.<br><br>Ferris teaches method of making salts of GHB and states that "[s]odium, potassium, magnesium and calcium salts of gamma-hydroxybutyrate have been synthesised from gamma-butyrolactone and the corresponding group 1 or 2 hydroxide." Ferris at abstract.<br><br>EP '804 discloses "[p]referred pharmaceutically acceptable salts of gamma-hydroxybutyric acid for use in the present compositions are lithium-, sodium-, potassium-, calcium-, and magnesium salts." (EP '804 at 2, ll. 37-39).<br><br>The '236 patent claims "[a] method for the production of magnesium and[] calcium salts of 4-hydroxybutyric acid comprising … reacting … 4-hydroxybutyric acid, … magnesium hydroxide, … [and] calcium hydroxide … in an aqueous solution." '236 at claims 6 and 14. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | GB '029 discloses that the "pharmacological properties" of salts of GHB "promote[] … deep sleep." GB '029 at 3:36-49. Further, GB '029 teaches using salts of GHB and especially the alkaline-earth metal salts," including "the sodium salt" and "the calcium salt." GB '029 at 2:53-75.<br><br>Mervaala I teaches that "[i]ncreased dietary sodium chloride intake produced a marked rise in blood pressure and induced left ventricular and renal hypertrophy. By contrast, the salt alternative did not increase blood pressure and caused remarkably less cardiac and renal hypertrophy than did sodium chloride." Mervaala at abstract. Further, the findings disclosed by Mervaala "suggest that replacement of common salt by a potassium-, and magnesium-enriched salt alternative in the diet produces beneficial cardiovascular effects and improves the antihypertensive efficacy of metoprolol in stroke-prone spontaneously hypertensive rats. Increased intake of potassium and/or magnesium and L-lysine from the salt alternative is involved in the beneficial effects of the salt alternative. The NaCl-induced myocardial and renal hypertrophies appear to be partially mediated by P-adrenoceptor activation." Mervaala I at abstract.<br><br>Mervaala II discloses that "[s]alt produced a marked rise in blood pressure and induced cardiac hypertrophy and significant mortality, while the salt alternative neither increased blood pressure nor caused any mortality and produced less cardiac hypertrophy than salt." Mervaala II at abstract. Further, Mervaala II teaches that the "vascular relaxation enhancing effect of ramipril was blocked by salt but only slightly attenuated by the salt alternative." Mervaala II at abstract. Mervaala II concluded:<br><br>[T]he present sodium-reduced, potassium- and magnesium-enriched salt alternative was virtually devoid of the hypertensive and cardiac hypertrophy producing effects, typical of NaCl. Replacement of salt in the diet by the salt alternative remarkably |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | improved the cardiovascular effects of ramipril. This effect was due to increased intake of potassium and/or magnesium and L-lysine. The present salt alternative with moderate content of potassium did not produce any tendency to hyperkalaemia, even when combined with ACEI treatment. Mervaala II at 1196.<br><br>Quanhe teaches that a higher sodium-potassium ratio is associated with significantly increased risk of cardiovascular diseases and all-cause mortality, and that higher sodium intake is associated with increased total mortality in the general US population. Quanhe at 1183. Quanhe further discloses that a reduced sodium intake accompanied by increased potassium intake could achieve greater health benefits. Quanhe concludes that "[p]ublic health recommendations should emphasize simultaneous reduction in sodium intake and increase in potassium intake." Quanhe at 1189.<br><br>Ubeda discloses a study aimed at "[r]aised blood pressure associated with the sodium … content" of an orally administered drug. Ubeda at abstract. Ubeda observed patients that were administered paracetamol with sodium content and followed by administration of paracetamol with "no sodium content." Ubeda at abstract. Ubeda observed that "[s]witching to paracetamol tablets (no sodium content) was associated with both lowered systolic pressure of 13.1 mmHg (95%CI: 11.9–14.3, $p < 0.0001$) and a moderate reduction of diastolic pressure of 2.5 mmHg (95%CI: 2.1–2.9, $p < 0.0001$)." Ubeda at abstract. Ubeda concluded that "[a] relationship of causality between the intake of high sodium excipients and high blood pressure in elderly hypertensive individuals, without chloride ions, was found" and warned that "[c]linicians should be aware of possible raised blood pressure" when these high sodium drugs "are prescribed to hypertensive patients." Ubeda at abstract.<br><br>The '878 patent discloses "a low sodium salt composition and the methods used |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | to make it." '878 patent at abstract. Because "[e]xceeding the recommended daily intake of sodium is a significant risk factor in developing high blood pressure and a cause or contributing factor in the rising incidence of heart disease," the '878 patent taught that "medical professionals and governmental authorities recommend a reduction in per capita salt consumption." '878 patent at 1:29-35. Thus, the '878 patent sought to provide methods to prepare low sodium salt compositions. The '878 patent taught that "there are a variety of salt substitutes in the market" and "[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios." '878 patent at 1:43-46. The '878 patent teaches that suitable low sodium compositions "preferably" include salts of "potassium, magnesium, calcium, ammonium, and combinations thereof." '878 patent at 2:63-67; *see also* claims 7, 28, 48 ("potassium, magnesium, calcium, ammonium, and a mixture thereof"). Thus, the "low sodium salt composition of the invention has lower sodium content." '878 patent at 3:61-67. The '878 patent also discloses several example formulations of low sodium compositions. '878 patent at Examples 1-3.<br><br>Sarkkinen teaches that "[h]igh [sodium chloride] intake is linked to hypertension whereas a restriction of dietary [sodium chloride] lowers blood pressure (BP)" and that "[s]ubstituting potassium and/or magnesium salts for sodium chloride (NaCl) may enhance the feasibility of [sodium chloride] restriction and lower blood pressure beyond the sodium reduction alone." Sarkkinen at abstract. Thus Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract. Sarkkinen concluded "that potassium and magnesium could potentiate the effect of sodium restriction on reducing [blood pressure]" and that "[t]his effect is in line with |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | earlier clinical trials with mineral salts." Sarkkinen at 6.<br><br>Karppanen discloses that "[t]he present average sodium intakes, approximately 3000–4500 mg/day in various industrialized populations, are very high, that is, 2–3-fold in comparison with the current Dietary Reference Intake (DRI) of 1500 mg." Karppanen at abstract. "By contrast, the present average potassium, calcium, and magnesium intakes are remarkably lower than the recommended intake levels (DRI). In USA, for example, the average intake of these mineral nutrients is only 35–50% of the recommended intakes." Karppanen at abstract. Karppanen further states that "[d]ecreased intakes of sodium alone, and increased intakes of potassium, calcium, and magnesium each alone decrease elevated blood pressure. A combination of all these factors, that is, decrease of sodium, and increase of potassium, calcium, and magnesium intakes, which are characteristic of the so-called Dietary Approaches to Stop Hypertension diets, has an excellent blood pressure lowering effect." Karppanen at abstract.<br><br>Van Leer discloses that "diets rich in calcium, potassium and magnesium are associated with lower blood pressure." Van Leer at Abstract.<br><br>Intersalt studies the relationship between "electrolyte excretion and blood pressure" and showed that "sodium was significantly related to the slope of blood pressure" but that "[p]otassium excretion was negatively correlated with blood pressure in individual subjects after adjustment for confounding variables." Intersalt at abstract.<br><br>Houston provides a review on the role of potassium, magnesium, and calcium in the cause and treatment of hypertension. Houston describes the "DASH study" and states that a diet "rich in calcium, magnesium, and [potassium]" contributed to a reduction in blood pressure. Houston at 4. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | Kesteloot describes the relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure and confirms that these "dietary cations are related to the regulation of blood pressure." Kesteloot at abstract.<br><br>Dietary Guidelines 2010 also reports on how "typical American diets compare to recommended intake levels" and states that Americans should "eat more" potassium and calcium and "eat less" sodium." Dietary Guidelines 2010 at 46, Figure 5-1.<br><br>Institute of Medicine discloses that "sources of dietary sodium" includes drugs which "can contribute to sodium intake." Institute of Medicine at 122. Institute of Medicine teaches that "potassium" is "often used in lowered-sodium formulations" as an alternative to sodium salts and that it "tastes both salty and bitter (this bitterness is one reason it is often not fully successful in replacing the sensory effects of salt)." Institute of Medicine at 71. For example, Institute of Medicine discloses "products with sodium-reduced, potassium- and magnesium-enriched mineral salts" such as the "Better Choice" salt product that was put in use by the Finnish Heart Association in 2000. Institute of Medicine at 360.<br><br>EFSA 2006 "present[s] comprehensive evaluations of possible adverse health effects of individual micronutrients at intakes in excess of dietary requirements and, where possible, establish Tolerable Upper Intake Levels (UL). EFSA 2006 at 3.<br><br>MacGregor reports on studies aimed to reduce sodium intake and of "the long-term effects of salt reduction on CVD," and states that "[a]n increase in potassium intake through the use of reduced-sodium, potassium- and magnesium-enriched salt … played a part in the fall in CVD." MacGregor at 369. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | Bighley teaches that the sodium salt should be used "if the patient does not have a restriction on sodium intake," but teaches that "[i]f the sodium salt process to be unsuitable, a series of other metal salts may be tried, such as potassium, calcium, magnesium, or zinc." *Id.* at 482-83.<br><br>Smith discloses sodium oxybate "has an unpleasant, salty taste that is often described as soapy." Smith at 1074.<br><br>Kothare discloses that because "[t]hree grams of sodium oxybate contains 0.5 g of sodium, while the 9 g dose contains 1.6 g of sodium," that [p]atients with congestive heart failure, hypertension, or renal insufficiency will need to have their daily sodium intake assessed." Kothare at 49 (citing Lemon MD, Strain JD, Farver DK. Sodium Oxybate for cataplexy. *Ann Pharmacother*. 2006;40:433–40). Kothare also states that patients reported that Na.GHB had a "bad taste" and that "issues reovle[d] around [its] "salty taste." Kothare at abstract, Table 2.<br><br>Krahn discloses the use of sodium oyxbate "to reduce daytime sleepiness and cataplexy by improving nighttime sleep in patients with narcolepsy." Krhan at 1. Krahn teaches that sodium oxybate "is high in sodium (0.5 grams in a 3-gram dose)" and warns to "[u]se caution when considering the agent for patients with hypertension or on low-sodium diets." Krahn at 4. Krahn also discloses that sodium oxybate "has a salty taste." Krahn at 4.<br><br>Pandit teaches how to prepare sodium, magnesium, calcium, and potassium salts of acidic drug compounds, including the stoichiometric ratio of the metal cation to drug compound. *See, e.g.,* Pandit at Table 1. |
| and optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier. | This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | Cook Application discloses that "[s]alts, excipients, pH adjusting agents such as acids, bases and buffering agents, flavoring agents, and other agents that may be combined with the compositions of the present invention, or may be used to prepare the compositions of the present invention, are well known in the art, (see for example, "Remington's Pharmaceutical Sciences" 8th and 15th Editions, and Nema et al., 1997, incorporated herein in their entirety), and are encompassed by the invention." Cook Application at ¶ 12.<br><br>GB '029 discloses example oral liquid formulations of salts of GHB containing flavoring agents such as "sugar (glucose, levulose or sorbitol)." GB '029 at 5:22-30.<br><br>Bighley teaches that "[t]aste acceptability is a primary consideration in the formulation of a liquid" and provides "examples [of] approaches to make drugs organoleptically acceptable." Bighley at 465 (citing Roy, G .M., *Pharm . Technol.* , 18:84,86,88 ,90,92,94,96-99 (1994) (April)).<br><br>Rowe 2006 discloses applications of excipients in oral formulations, including sweetening agents, flavoring agents, and coloring agents. Rowe 2006 (in passim); *see, e.g.*, Rowe 2006 at 192, 742.<br><br>The'878 patent teaches to perform "[s]ensory tests … to analyze the taste characteristics" of low-sodium content salt compositions and teaches that the taste can be "reduce[d]" or "mask[ed]" with certain additives. '878 patent at 1:48-53.<br><br>A POSA would have been motivated and found it obvious to include a coloring agent when formulating a pharmaceutical composition to the extent that the natural color of the formulation was undesirable. |
| **Claim 2** | |
| The pharmaceutical composition of claim 1, wherein the pharmaceutically acceptable | *See* claim 1. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| carrier comprises one or more of a solvent, dispersion medium, coating, antibacterial agent, antifungal agent, isotonic agent, or absorption delaying agent. | This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Cook Application teaches that the composition of various salts of GHB "may be dissolved or dispersed in a pharmaceutically acceptable carrier and/or an aqueous medium" which "includes any and all solvents, dispersion media, coatings, antibacterial and antifungal agents, isotonic and absorption delaying agents and the like. The use of such media and agents for pharmaceutical active substances is well known in the art. Insofar as any conventional media or agent is incompatible with the active ingredient, its use in the therapeutic compositions is not appropriate." Cook Application at ¶¶ 52-53.<br><br>Rowe 2006 discloses applications of excipients in oral formulations, including pharmaceutically acceptable carriers. Rowe 2006 (in passim). |
| **Claim 3** | |
| The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of 5% to 10%, 10% to 15%, 15% to 20%, 20% to 25%, 25% to 30%, 30% to 35%, or 35% to 40%. | *See* claim 1.<br><br>This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Cook Application discloses that the gamma-hydroxybutyrate is at a final concentration of about 150 mg/ml to 750 mg/ml. Cook Application at ¶ 18. Cook Application further teaches that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%. The amount of active compounds in such therapeutically useful compositions is such that a suitable dosage will be obtained." Cook Application at ¶ 66.<br><br>The '878 patent discloses that a "low sodium salt composition may comprise "about 10-90%, lower sodium" and "[m]ore preferably, the composition |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | contains about 25%, 30%, 35%, 45%, 50%, 55% or 75% lower sodium," and "[m]ore preferably, the composition contains about 50% less sodium." '878 patent at 3:61-67.<br><br>Mervaala I discloses a "sodium-reduced" composition as an alternative to sodium chloride (NaCl) comprising "the following composition: NaCl 57%, KCl 28%, MgSO4-7H2O 12%, L-lysine hydrochloride 2% and anticaking agents (MgCO3, SiO2) 1%. Therefore, the sodium chloride concentration was 43% lower in the salt alternative." Mervaala I at 640-641.<br><br>Sarkkinen studied the replacement of "NaCl (Regular salt) with a novel mineral salt [50% sodium chloride and rich in potassium chloride (25%), magnesium ammonium potassium chloride, hydrate (25%)] (Smart Salt)." Sarkkinen at abstract.<br><br>Karpannen discloses that the "Dietary Reference Intakes (DRIs)" "for sodium is 1500 mg a day, while 2500 mg has been given as the maximum level of daily intake that is likely to pose no risk of adverse effects;" "potassium for adolescents and adults is 4700 mg/day. Recommended intake of potassium for children 1–3 years of age is 3000 mg/day, for 4–8 years of age it is 3800 mg/day, and for 9–13 years of age it is 4500 mg/day;" "for calcium are 1000–1300 mg per day. Therefore, the usual USA intakes are only 35–40% of the DRIs;" and "magnesium intake recommendation is 420 mg for adult men" and that "the usual USA intake of 180 mg is only approximately 50% of the recommended level." Karpannen at S12.<br><br>Dietary Guidelines 2010 reports recommended daily allowances for calcium, magnesium, potassium, and sodium that are similar to Karpannen. Dietary Guidelines 2010 at Appendix 5.<br><br>Kesteloot describes a study of the relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure and reports that |

| Patent Claim Elements | Prior Art Disclosures |
| --- | --- |
| | men and women exceed these recommended intake levels for sodium, but fall short of the recommended intake levels for potassium, calcium, and magnesium. Kesteloot at Table 2.<br><br>EFSA 2006 states that "oral Mg supply has to be considerably increased to increase plasma Mg" and discloses "[o]ptimal concentration" values of plasma Mg, such as 0.80 – 1.10 mmol/L. EFSA 2006 at 111. EFSA 2006 states that calcium intake is "very important" because it "helps to maintain a constant concentration of blood calcium" at about "2.5 mmol/L (10 mg/dL) (between 2.25 and 2.75 mmol/L)." EFSA 2006 at 215. EFSA 2006 discloses that potassium intake "is important for regulating … nerve and muscle function, blood pressure regulation, etc.," and states that "[t]he concentration of potassium in plasma is … about 3.5 to 5 mmol/L." EFSA 2006 at 411-412.<br><br>To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitation would have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17. |
| **Claim 4** | |
| The pharmaceutical composition of claim 2, wherein the K.GHB salt is present in a wt/wt % of 5% to 10%, 10% to 15%, 15% to 20%, 20% to 25%, 25% to 30%, 30% to 35%, or 35% to 40%. | *See* claims 1, 2 and 3. |
| **Claim 5** | |
| The pharmaceutical composition of claim 2, wherein the Mg.(GHB)2 salt is present in a wt/wt % of 5% to 10%, 10% to 15%, 15% to 20%, 20% to 25%, 25% to 30%. | *See* claims 1, 2 and 3. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| **Claim 6** | |
| The pharmaceutical composition of claim 2, wherein the Ca.(GHB)2 salt is present in a wt/wt % of 20% to 25%, 25% to 30%, 30% to 35%, 35% to 40%, 40% to 45%, 45% to 50%, 50% to 55%, 55% to 60%, 60% to 65%, 65% to 70%, 70% to about 75%, or 75% to 80%. | *See* claims 1, 2 and 3. |
| **Claim 7** | |
| The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%. | *See* claims 1, 2 and 3. |
| **Claim 8** | |
| The pharmaceutical composition of claim 2, wherein the K.GHB salt is present in a wt/wt % of about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%. | *See* claims 1, 2 and 3. |
| **Claim 9** | |
| The pharmaceutical composition of claim 2, wherein the Mg.(GHB)2 salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, or about 30%. | *See* claims 1, 2 and 3. |
| **Claim 10** | |
| The pharmaceutical composition of claim 2, wherein the Ca.(GHB)2 salt is present in a wt/wt % of about 20%, about 25%, about 30%, about 35%, about 40%, about 45%, about 50%, about 55%, about 60%, about 65%, about 70%, about 75%, or about 80%. | *See* claims 1, 2 and 3. |
| **Claim 11** | |
| The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of 5% to 40%, the K.GHB salt is present in a wt/wt % of 10% to 40%, the Mg(GHB)2 salt is present in a wt/wt % of 5% to 30%, and the Ca.(GHB)2 salt is present in a wt/wt % of 20% to 80%. | *See* claims 1, 2 and 3. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| **Claim 12** | |
| The pharmaceutical composition of claim 2, wherein the Na.GHB, K.GHB, Mg.(GHB)2, and Ca.(GHB)2 salts are present in a wt/wt % ratio of about 8%:32%:20%:40%, respectively. | *See* claims 1, 2 and 3.<br><br>This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Karpannen discloses that the "Dietary Reference Intakes (DRIs)" "for sodium is 1500 mg a day, while 2500 mg has been given as the maximum level of daily intake that is likely to pose no risk of adverse effects;" "potassium for adolescents and adults is 4700 mg/day. Recommended intake of potassium for children 1–3 years of age is 3000 mg/day, for 4–8 years of age it is 3800 mg/day, and for 9–13 years of age it is 4500 mg/day;" "for calcium are 1000–1300 mg per day. Therefore, the usual USA intakes are only 35–40% of the DRIs;" and "magnesium intake recommendation is 420 mg for adult men" and that "the usual USA intake of 180 mg is only approximately 50% of the recommended level." Karpannen at S12.<br><br>Dietary Guidelines 2010 reports recommended daily allowances for calcium, magnesium, potassium, and sodium that are similar to Karpannen. Dietary Guidelines 2010 at Appendix 5.<br><br>Kesteloot describes a study of the relationship of dietary sodium, potassium, calcium, and magnesium with blood pressure and reports that men and women exceed these recommended intake levels for sodium, but fall short of the recommended intake levels for potassium, calcium, and magnesium. Kesteloot at Table 2.<br><br>EFSA 2006 states that "oral Mg supply has to be considerably increased to increase plasma Mg" and discloses "[o]ptimal concentration" values of plasma Mg, such as 0.80 – 1.10 mmol/L. EFSA 2006 at 111. EFSA 2006 states that calcium intake is "very important" because it "helps to maintain a constant concentration of blood calcium" at about |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | "2.5 mmol/L (10 mg/dL) (between 2.25 and 2.75 mmol/L)." EFSA 2006 at 215. EFSA 2006 discloses that potassium intake "is important for regulating … nerve and muscle function, blood pressure regulation, etc.," and states that "[t]he concentration of potassium in plasma is … about 3.5 to 5 mmol/L." EFSA 2006 at 411-412.<br><br>To the extent this limitation is found not to be explicitly or inherently disclosed in the identified prior art, it would have been achieved through routine optimization by one of ordinary skill in the art. *See, e.g.*, *In re Boesch*, 617 F.2d at 276. In *Boesch*, the court noted that the "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Id.* For at least this additional reason, any such limitation would have been rendered obvious as well. *See KSR*, 550 U.S. at 416-17. |
| **Claim 14** | |
| The pharmaceutical composition of claim 2, wherein the Na.GHB, K.GHB, Mg.(GHB)2, and Ca.(GHB)2 salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively. | *See* claims 1, 2 and 12. |
| **Claim 15** | |
| The pharmaceutical composition of claim 2, wherein the solvent comprises one or more of water, ethanol, polyol, or vegetable oil. | *See* claims 1 and 2.<br><br>This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Cook Application teaches that "[t]he carrier can also be a solvent or dispersion medium containing, for example, water, ethanol, polyol (for example, glycerol, propylene glycol, and liquid polyethylene glycol, or the like), suitable mixtures thereof, and vegetable oils." Cook Application at ¶ 58.<br><br>Xyrem Label at 2 (disclosing Xyrem formulation). |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| **Claim 16** | |
| The pharmaceutical composition of claim 15, wherein the Na.GHB salt is present in a wt/wt % of 5% to 40%, the K.GHB salt is present in a wt/wt % of 10% to 40%, and the Ca.(GHB)2 salt is present in a wt/wt % of 20% to 80%. | *See* claims 1, 12 and 15. |
| **Claim 21** | |
| The pharmaceutical composition of claim 1, comprising an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. | *See* claims 1 and 2.<br><br>This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Cook Application discloses that the gamma-hydroxybutyrate is at a final concentration of about 150 mg/ml to 750 mg/ml. Cook Application at ¶ 18. Cook Application also teaches that the preferred pH of an aqueous medium for the composition of GHB salts is about 6 to about 7.5l but may be from about 3.0 to about 10.3. Cook Application at ¶ 14. Further, Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63.<br><br>Xyrem Label at 2 (disclosing Xyrem formulation).<br><br>The ’632 patent discloses compositions of GHB salts that are “free of preservatives. *Id*. at 8:57-59. |
| **Claim 22** | |
| The pharmaceutical composition of claim 21, wherein the composition has a pH of about 7.3 to about 8.5. | *See* claims 1 and 21. |
| **Claim 23** | |
| The pharmaceutical composition of claim 21, wherein the composition additionally comprises a pH adjusting or buffering agent. | *See* claims 1 and 21. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| | This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Cook Application discloses that the composition of GHB salts may comprise “pH adjusting agents such as acids, bases and buffering agents.” Cook Application at ¶ 12. |
| **Claim 24** | |
| The pharmaceutical composition of claim 23, wherein the pH adjusting or buffering agent is an acid. | *See* claims 1 and 21.<br><br>This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Cook Application discloses that “[s]alts, excipients, pH adjusting agents such as acids, bases and buffering agents, flavoring agents, and other agents that may be combined with the compositions of the present invention, or may be used to prepare the compositions of the present invention, are well known in the art, (see for example, “Remington's Pharmaceutical Sciences” 8th and 15th Editions, and Nema et al., 1997, incorporated herein in their entirety), and are encompassed by the invention.” Cook Application at ¶ 12. |
| **Claim 27** | |
| The pharmaceutical composition of claim 1, wherein the composition is formulated as a liquid formulation. | *See* claims 1 and 21.<br><br>This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Cook Application teaches liquid form preparations of the composition of GHB salts, e.g. syrups, aromatic powders, honey, and various elixirs. Cook Application at ¶ 23.<br><br>Xyrem is a composition of a GHB salt formulated as a liquid. Xyrem Label. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| **Claim 28** | |
| The formulation of claim 27, wherein the formulation is chemically stable and resistant to microbial growth, and wherein the formulation is free of preservatives. | *See* claims 1, 21 and 27.<br><br>This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Cook Application discloses a pharmaceutical composition comprising an aqueous solution of sodium gamma-hydroxybutyrate wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. Cook Application at claim 63.<br><br>The '632 patent discloses compositions of GHB salts that are "free of preservatives. *Id.* at 8:57-59. Thus a POSA would have found it obvious to not include a preservative. |
| **Claim 29** | |
| The formulation of claim 27, which is suitable for oral administration. | *See* claims 1, 21 and 27.<br><br>This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Cook Application discloses that the composition of multiple GHB salts may be formulated for oral consumption. Cook Application at ¶ 26. |

### B. The '173 Patent

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| **Claim 1** | |
| A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the | *See* claim 1 of the '922 patent. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| mixture comprises three or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.(GHB)2), and a calcium salt of gamma-hydroxybutyrate (Ca.(GHB)2). | |
| **Claim 2** | |
| The pharmaceutical composition of claim 1, wherein the mixture comprises Na.GHB, K.GHB, Mg.(GHB)2, and Ca.(GHB)2. | *See* claim 1 of the '922 patent. |
| **Claim 3** | |
| The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%. | *See* claims 1 and 3 of the '922 patent. |
| **Claim 4** | |
| The pharmaceutical composition of claim 2, wherein the K.GHB salt is present in a wt/wt % of about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%. | *See* claims 1 and 4 of the '922 patent. |
| **Claim 5** | |
| The pharmaceutical composition of claim 2, wherein the Mg.(GHB)2 salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, or about 25% to about 30%. | *See* claims 1 and 5 of the '922 patent. |
| **Claim 6** | |
| The pharmaceutical composition of claim 2, wherein the Ca.(GHB)2 salt is present in a wt/wt % of about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, about 35% to about 40%, about 40% to about 45%, about 45% to about 50%, about 50% to about 55%, about 55% to about 60%, about 60% to about 65%, about 65% to about 70%, about 70% to about 75%, or about 75% to about 80%. | *See* claims 1 and 6 of the '922 patent. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| **Claim 7** | |
| The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%. | *See* claims 1 and 7 of the '922 patent. |
| **Claim 8** | |
| The pharmaceutical composition of claim 2, wherein the K.GHB salt is present in a wt/wt % of about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%. | *See* claims 1 and 8 of the '922 patent. |
| **Claim 9** | |
| The pharmaceutical composition of claim 2, wherein the Mg.(GHB)2 salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, or about 30%. | *See* claims 1 and 9 of the '922 patent. |
| **Claim 10** | |
| The pharmaceutical composition of claim 2, wherein the Ca.(GHB)2 salt is present in a wt/wt % of about 20%, about 25%, about 30%, about 35%, about 40%, about 45%, about 50%, about 55%, about 60%, about 65%, about 70%, about 75%, or about 80%. | *See* claims 1 and 10 of the '922 patent. |
| **Claim 11** | |
| The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of about 5% to about 40%, the K.GHB salt is present in a wt/wt % of about 10% to about 40%, the Mg.(GHB)2 salt is present in a wt/wt % of about 5% to about 30%, and the Ca.(GHB)2 salt is present in a wt/wt % of about 20% to about 80%. | *See* claims 1 and 11 of the '922 patent. |
| **Claim 12** | |
| The pharmaceutical composition of claim 2, wherein the Na.GHB, K.GHB, Mg.(GHB)2, and Ca.(GHB)2 salts are present in a wt/wt % ratio of about 8%:32%:20%:40%, respectively. | *See* claims 1 and 12 of the '922 patent. |
| **Claim 14** | |
| The pharmaceutical composition of claim 2, wherein the Na.GHB, K.GHB, Mg.(GHB)2, and Ca.(GHB)2 salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively. | *See* claims 1 and 14 of the '922 patent. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| **Claim 15** | |
| The pharmaceutical composition of claim 1, wherein the mixture comprises Na.GHB, K.GHB, and Ca.(GHB)2. | *See* claim 1 of the '922 patent. |
| **Claim 16** | |
| The pharmaceutical composition of claim 15, wherein the Na.GHB salt is present in a wt/wt % of about 5% to about 40%, the K.GHB salt is present in a wt/wt % of about 10% to about 40%, and the Ca.(GHB)2 salt is present in a wt/wt % of about 20% to about 80%. | *See* claims 1 and 16 of the '922 patent. |
| **Claim 18** | |
| The pharmaceutical composition of claim 1, wherein the mixture comprises K.GHB, Mg.(GHB)2, and Ca.(GHB)2. | *See* claim 1 of the '922 patent. |
| **Claim 19** | |
| The pharmaceutical composition of claim 18, wherein the K.GHB salt is present in a wt/wt % of about 10% to about 50%, the Mg.(GHB)2 salt is present in a wt/wt % of about 20% to about 60%, and the Ca.(GHB)2 salt is present in a wt/wt % of about 10% to about 40%. | *See* claims 1 and 19 of the '922 patent. |
| **Claim 21** | |
| The pharmaceutical composition of claim 1, comprising an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. | *See* claims 1 and 21 of the '922 patent. |
| **Claim 22** | |
| The pharmaceutical composition of claim 21, wherein the composition has a pH of about 7.3 to about 8.5. | *See* claims 1 and 22 of the '922 patent. |
| **Claim 23** | |
| The pharmaceutical composition of claim 21, wherein the composition additionally comprises a pH adjusting or buffering agent. | *See* claims 1 and 23 of the '922 patent. |
| **Claim 24** | |
| The pharmaceutical composition of claim 23, wherein the pH adjusting or buffering agent is an acid. | *See* claims 1 and 24 of the '922 patent. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| **Claim 27** | |
| The pharmaceutical composition of claim 1, wherein the composition is formulated as a liquid formulation. | *See* claims 1 and 27 of the ’922 patent. |
| **Claim 28** | |
| The formulation of claim 27, wherein the formulation is chemically stable and resistant to microbial growth, and wherein the formulation is free of preservatives. | *See* claims 1 and 28 of the ’922 patent. |
| **Claim 29** | |
| The formulation of claim 27, which is suitable for oral administration. | *See* claims 1 and 29 of the ’922 patent. |
| **Claim 30** | |
| A pharmaceutical composition in accordance with claim 27 wherein the concentration of the GHB is between 300 mg/ml to 750 mg/ml. | *See* claims 1 and 21 of the ’922 patent. |
| **Claim 31** | |
| A pharmaceutical composition in accordance with claim 27 wherein the concentration of the GHB is between 400 mg/ml to 600 mg/ml. | *See* claims 1 and 21 of the ’922 patent. |
| **Claim 32** | |
| The pharmaceutical composition of claim 1, further comprising one or more of the following: a pharmaceutically acceptable carrier or excipient; a pH-mediating, adjusting or buffering compound or agent; a coloring or flavoring agent; a solvent; glycerol; glycol; oil; an antibacterial or antifungal agent; antibiotics; antihistamines; or sweetening agents. | *See* claims 1 and 2 of the ’922 patent. |
| **Claim 33** | |
| The pharmaceutical composition of claim 1, wherein the molecular weight per oxybate equivalent of the mixture of GHB salts is about the same as a formulation of sodium oxybate. | *See* claims 1 and 2 of the ’922 patent.<br><br>Further, Cook Application discloses a calcium oxybate formulation where the molecular weight per oxybate equivalent of the mixture of GHB salts is about the same as a formulation of sodium oxybate. Cook Application at Table 17. |

### C. The ’107 Patent

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| **Claim 1** | |
| A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of at least three salts of GHB, wherein the mixture comprises a calcium salt of gamma-hydroxybutyrate (Ca•(GHB)2), a magnesium salt of gamma-hydroxybutyrate (Mg•(GHB)2), and one or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na•GHB) and a potassium salt of gamma-hydroxybutyrate (K•GHB). | *See* claim 1 of the '922 patent. |
| **Claim 2** | |
| The pharmaceutical composition of claim 1, wherein the mixture comprises Na•GHB, K•GHB, Mg•(GHB)2, and Ca•(GHB)2, and wherein the amount of Na•GHB is present at a wt/wt % of about 5% to about 40%. | *See* claims 1 and 3 of the '922 patent. |
| **Claim 3** | |
| The pharmaceutical composition of claim 1, wherein a Na•GHB salt is present in a wt/wt % of about 5% to about 10%. | *See* claims 1 and 3 of the '922 patent. |
| **Claim 4** | |
| The pharmaceutical composition of claim 1, wherein a K•GHB salt is present in a wt/wt % of about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%. | *See* claims 1 and 4 of the '922 patent. |
| **Claim 5** | |
| The pharmaceutical composition of claim 1, wherein the Mg•(GHB)2 salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, or about 25% to about 30%. | *See* claims 1 and 5 of the '922 patent. |
| **Claim 6** | |
| The pharmaceutical composition of claim 1, wherein the Ca•(GHB)2 salt is present in a wt/wt % of about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, about 35% to about 40%, about 40% to | *See* claims 1 and 6 of the '922 patent. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| about 45%, about 45% to about 50%, or about 50% to about 55%. | |
| **Claim 7** | |
| The pharmaceutical composition of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 10%. | *See* claims 1 and 7 of the '922 patent. |
| **Claim 8** | |
| The pharmaceutical composition of claim 2, wherein the K•GHB salt is present in a wt/wt % of about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%. | *See* claims 1 and 8 of the '922 patent. |
| **Claim 9** | |
| The pharmaceutical composition of claim 2, wherein the Mg•(GHB)2 salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, or about 30%. | *See* claims 1 and 9 of the '922 patent. |
| **Claim 10** | |
| The pharmaceutical composition of claim 2, wherein the Ca•(GHB)2 salt is present in a wt/wt % of about 20%, about 25%, about 30%, about 35%, about 40%, about 45%, about 50%, or about 55%. | *See* claims 1 and 10 of the '922 patent. |
| **Claim 11** | |
| The pharmaceutical composition of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 40%, the K•GHB salt is present in a wt/wt % of about 10% to about 40%, the Mg•(GHB)2 salt is present in a wt/wt % of about 5% to about 30%, and the Ca•(GHB)2 salt is present in a wt/wt % of about 20% to about 80%. | *See* claims 1 and 11 of the '922 patent. |
| **Claim 12** | |
| The pharmaceutical composition of claim 2, wherein the Na•GHB, K•GHB, Mg•(GHB)2, and Ca•(GHB)2 salts are present in a wt/wt % ratio of about 8%:32%:20%:40%, respectively. | *See* claims 1 and 12 of the '922 patent. |
| **Claim 14** | |
| The pharmaceutical composition of claim 2, wherein the Na•GHB, K•GHB, | *See* claims 1 and 14 of the '922 patent. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| Mg•(GHB)2, and Ca•(GHB)2 salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively. | |
| **Claim 15** | |
| The pharmaceutical composition of claim 1, wherein the mixture comprises Mg•(GHB)2, Na•GHB, and Ca•(GHB)2. | *See* claim 1 of the ’922 patent. |
| **Claim 16** | |
| The pharmaceutical composition of claim 15, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 10%, the Mg•(GHB)2 salt is present in a wt/wt % of about 20% to about 25%, and the Ca•(GHB)2 salt is present in a wt/wt % of about 40% to about 50% | *See* claims 1 and 16 of the ’922 patent. |
| **Claim 17** | |
| The pharmaceutical composition of claim 1, wherein the mixture comprises K•GHB, Mg•(GHB)2, and Ca•(GHB)2. | *See* claim 1 of the ’922 patent. |
| **Claim 18** | |
| The pharmaceutical composition of claim 17, wherein the K•GHB salt is present in a wt/wt % of about 10% to about 40%, the Mg•(GHB)2 salt is present in a wt/wt % of about 20% to about 30%, and the Ca•(GHB)2 salt is present in a wt/wt % of about 40% to about 55%. | *See* claims 1 and 11 of the ’922 patent. |
| **Claim 20** | |
| The pharmaceutical composition of claim 1, comprising an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. | *See* claims 1 and 21 of the ’922 patent. |
| **Claim 21** | |
| The pharmaceutical composition of claim 20, wherein the composition has a pH of about 7.3 to about 8.5. | *See* claims 1 and 22 of the ’922 patent. |

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| **Claim 22** | |
| The pharmaceutical composition of claim 20, wherein the composition additionally comprises a pH adjusting or buffering agent. | *See* claims 1 and 23 of the '922 patent. |
| **Claim 23** | |
| The pharmaceutical composition of claim 22, wherein the pH adjusting or buffering agent is an acid. | *See* claims 1 and 24 of the '922 patent. |
| **Claim 26** | |
| The pharmaceutical composition of claim 1, wherein the composition is formulated as a liquid formulation. | *See* claims 1 and 27 of the '922 patent. |
| **Claim 27** | |
| The formulation of claim 26, wherein the formulation is chemically stable and resistant to microbial growth, and wherein the formulation is free of preservatives. | *See* claims 1 and 28 of the '922 patent. |
| **Claim 28** | |
| The formulation of claim 26, which is suitable for oral administration. | *See* claims 1 and 29 of the '922 patent. |
| **Claim 29** | |
| The formulation of claim 26, wherein the formulation is chemically stable and resistant to microbial growth, and wherein the formulation contains at least one preservative. | *See* claims 1 and 29 of the '922 patent.<br><br>Further, This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Cook Application discloses that "the presence of a preservative may allow the amount of GLIB contained in the compositions of the present invention to be increased and still maintain resistance to chemical degradation and/or microbial growth." Cook Application at ¶ 13, Claim 20. |

### D. The '168 Patent

| Patent Claim Elements | Prior Art Disclosures |
|---|---|
| **Claim 1** | |
| A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na·GHB), a potassium salt of gamma-hydroxybutyrate (K·GHB), a magnesium salt of gamma-hydroxybutyrate (Mg·(GHB)2), and a calcium salt of gamma-hydroxybutyrate (Ca·(GHB)2), | *See* claims 1 and 21 of the ’922 patent. |
| wherein the Na·GHB, K·GHB, Mg·(GHB)2, and Ca·(GHB)2 salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively, | *See* claims 1, 12 and 21 of the ’922 patent. |
| wherein the composition is formulated as a liquid formulation, and | *See* claims 1, 21 and 27 of the ’922 patent. |
| wherein the liquid formulation has a total concentration of GHB salts of about 350 mg/mL to about 650 mg/mL. | *See* claims 1 and 21 of the ’922 patent. |
| **Claim 2** | |
| The pharmaceutical composition of claim 1, wherein the total concentration of GHB salts is about 500 mg/mL. | *See* claims 1 and 21 of the ’922 patent. |
| **Claim 3** | |
| The pharmaceutical composition of claim 1, wherein the composition has a pH of about 7.0 to about 9.0. | *See* claims 1 and 21 of the ’922 patent. |
| **Claim 4** | |
| The pharmaceutical composition of claim 1, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. | *See* claims 1 and 21 of the ’922 patent. |

### E. The ’258 Patent

| ’258 Patent | |
|---|---|
| **Patent Claim Elements** | **Prior Art Disclosures** |
| **Claim 1** | |
| A method of treating cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy comprising | *See* claim 1 of the ’922 patent.<br><br>This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>Cook Application teaches that “[i]n certain embodiments, the composition may contain one or more salts” and that “salts” “includ[es] salts of GHB” that can “be derived from … sodium, potassium … calcium, [and] magnesium.” Cook Application at ¶ 22. Cook Application further discloses that “[i]n certain embodiments, excipients may be added” such as “xylitol, mannitol, lactose, starch, magnesium stearate, sodium saccharine, cellulose, cellulose derivatives, magnesium carbonate and the like.” Cook Application at ¶ 22. Further, Cook Application discloses that this composition can “be used in treatments, such as, sleeping disorders, such as, e.g., narcolepsy (particularly cataplexy).” Cook Application at ¶ 3.<br><br>The ’027 application discloses an oral dosage form of GHB comprising “at least one of sodium oxybate, calcium oxybate, lithium oxybate, potassium oxybate, and magnesium oxybate.” ’027 application at claim 4. Similarly, the ’027 application teaches that “one or more of a GHB drug” can be formulated into an oral dosage form. ’027 application ¶ 39. Further, the ’027 application teaches that “the present dosage forms can be administered to treat a human afflicted with narcolepsy to reduce cataplexy and/or daytime sleepiness.” ’027 application ¶ 43.<br><br>Xyrem Label teaches that sodium oxybate (chemically known as sodium γ-hydroxybutyrate) “is a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy.” Xyrem Label at 1. The recommended starting dose for Xyrem is 4.5 g/night, which can be increased (recommended in |

| ’258 Patent | |
|---|---|
| **Patent Claim Elements** | **Prior Art Disclosures** |
| | 1.5 g increments) to a maximum of 9 g/night. Xyrem Label at 22-23. |
| administering orally a pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture comprises three or four salts of GHB selected from the group consisting of a sodium salt of GHB (Na•GHB), a potassium salt of GHB (K•GHB), a magnesium salt of GHB (Mg•(GHB)2), and a calcium salt GHB (Ca•(GHB)2). | *See* claim 1 of the ’922 patent. |
| **Claim 2** | |
| The method of claim 1, wherein the mixture comprises Na•GHB, K•GHB, Mg•(GHB)2, and Ca•(GHB)2. | *See* claims 1 and 2 of the ’922 patent. |
| **Claim 3** | |
| The method of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%. | *See* claims 1 and 3 of the ’922 patent. |
| **Claim 4** | |
| The method of claim 2, wherein the K•GHB salt is present in a wt/wt % of about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, or about 35% to about 40%. | *See* claims 1 and 4 of the ’922 patent. |
| **Claim 5** | |
| The method of claim 2, wherein the Mg•(GHB)2 salt is present in a wt/wt % of about 5% to about 10%, about 10% to about 15%, about 15% to about 20%, about 20% to about 25%, or about 25% to about 30%. | *See* claims 1 and 5 of the ’922 patent. |
| **Claim 6** | |
| The method of claim 2, wherein the Ca•(GHB)2 salt is present in a wt/wt % of | *See* claims 1 and 6 of the ’922 patent. |

| ’258 Patent | |
|---|---|
| **Patent Claim Elements** | **Prior Art Disclosures** |
| about 20% to about 25%, about 25% to about 30%, about 30% to about 35%, about 35% to about 40%, about 40% to about 45%, about 45% to about 50%, about 50% to about 55%, about 55% to about 60%, about 60% to about 65%, about 65% to about 70%, about 70% to about 75%, or about 75% to about 80%. | |
| **Claim 7** | |
| The method of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%. | *See* claims 1 and 7 of the ’922 patent. |
| **Claim 8** | |
| The method of claim 2, wherein the K•GHB salt is present in a wt/wt % of about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, or about 40%. | *See* claims 1 and 3 of the ’922 patent. |
| **Claim 9** | |
| The method of claim 2, wherein the Mg•(GHB)2 salt is present in a wt/wt % of about 5%, about 10%, about 15%, about 20%, about 25%, or about 30%. | *See* claims 1 and 9 of the ’922 patent. |
| **Claim 10** | |
| The method of claim 2, wherein the Ca•(GHB)2 salt is present in a wt/wt % of about 20%, about 25%, about 30%, about 35%, about 40%, about 45%, about 50%, about 55%, about 60%, about 65%, about 70%, about 75%, or about 80%. | *See* claims 1 and 10 of the ’922 patent. |
| **Claim 11** | |
| The method of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 40%, the K•GHB salt is present in a wt/wt % of about 10% to about 40%, the Mg•(GHB)2 salt is present in a wt/wt % of about 5% to about 30%, and the Ca•(GHB)2 salt is present in a wt/wt % of about 20% to about 80%. | *See* claims 1 and 11 of the ’922 patent. |

| ’258 Patent | |
|---|---|
| **Patent Claim Elements** | **Prior Art Disclosures** |
| **Claim 12** | |
| The method of claim 2, wherein the Na•GHB, K•GHB, Mg•(GHB)2, and Ca•(GHB)2 salts are present in a wt/wt % ratio of about 8%:32%:20%:40%, respectively. | *See* claims 1 and 12 of the ’922 patent. |
| **Claim 14** | |
| The method of claim 2, wherein the Na•GHB, K•GHB, Mg•(GHB)2, and Ca•(GHB)2 salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively. | *See* claims 1 and 14 of the ’922 patent. |
| **Claim 15** | |
| The method of claim 1, wherein the pharmaceutical composition of GHB comprises an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. | *See* claims 1 and 21 of the ’922 patent. |
| **Claim 16** | |
| The method of claim 15, wherein the composition has a pH of about 7.3 to about 8.5. | *See* claims 1 and 22 of the ’922 patent. |
| **Claim 17** | |
| The method of claim 15, wherein the total concentration of the GHB is between 300 mg/ml to 750 mg/ml. | *See* claims 1 and 21 of the ’922 patent. |
| **Claim 18** | |
| The method of claim 15, wherein the total concentration of the GHB is between 400 mg/ml to 600 mg/ml. | *See* claims 1 and 21 of the ’922 patent. |
| **Claim 19** | |
| The method of claim 1, wherein the total concentration of the mixture of salts of GHB in the solution is about 500 mg/mL. | *See* claims 1 and 21 of the ’922 patent.<br><br>*See also* Xyrem Label at 2. |

| ’258 Patent | |
|---|---|
| **Patent Claim Elements** | **Prior Art Disclosures** |
| **Claim 20** | |
| The method of claim 1, wherein the pharmaceutical composition of GHB is formulated as a liquid formulation. | *See* claims 1 and 27 of the ’922 patent. |
| **Claim 22** | |
| The method of claim 1, wherein the mixture of salts of GHB provides a mean GastroIntestinal transit rate of about 35%. | *See* claims 1 and 2 of the ’922 patent.<br><br>Further, a POSA would have understood that gastrointestinal transit rate is an inherent property of a formulated pharmaceutical composition. A POSA would have been motivated to formulate a mixture of GHB salts to achieve the claimed rate in order to promote efficient absorption of the active ingredients into the bloodstream. |
| **Claim 23** | |
| The method of claim 22, wherein the mean GastroIntestinal transit rate is measured as compared to a non-absorbable marker reference. | *See* claims 1 and 2 of the ’922 patent.<br><br>Further, it would have been obvious to a POSA that a mean gastrointestinal transit rate is measured through comparison to a non-absorbable marker reference.<br><br>Davis discloses that “[v]arious reports have considered the gastric emptying of markers … several methods are available to measure small intestine transit times.” Davis at 886-887. Further, Davis states that “non-digestible solid particles” are used to measure “intestinal transit” time. Davis at 891. |
| **Claim 24** | |
| A method of treating cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy comprising administering orally a pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of four salts of GHB, wherein the mixture comprises a sodium salt of GHB (Na•GHB), a potassium salt of GHB (K•GHB), a magnesium salt of GHB (Mg•(GHB)2), and a calcium salt | *See* claim 1 above. *See* also claims 1 and 14 of the ’922 patent. |

| ’258 Patent | |
|---|---|
| **Patent Claim Elements** | **Prior Art Disclosures** |
| GHB (Ca•(GHB)2), and wherein the Na•GHB, K•GHB, Mg•(GHB)2, and Ca•(GHB)2 salts are present in a % molar equivalents ratio of about 8%:23%:21%:48%, respectively. | |
| **Claim 25** | |
| The method of claim 24, wherein the pharmaceutical composition of GHB comprises an aqueous solution of about 250 mg/mL to about 750 mg/mL of the mixture of salts of GHB, wherein the composition has a pH of about 7.0 to about 9.0, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives. | *See* claims 1 and 21 of the ’922 patent. |
| **Claim 26** | |
| The method of claim 25, wherein the composition has a pH of about 7.3 to about 8.5. | *See* claims 1 and 16 above. |
| **Claim 27** | |
| The method of claim 25, wherein the total concentration of the GHB is between 300 mg/ml to 750 mg/ml. | *See* claims 1 and 17 above. |
| **Claim 28** | |
| The method of claim 25, wherein the total concentration of the GHB is between 400 mg/ml to 600 mg/ml. | *See* claims 1 and 18 above. |
| **Claim 29** | |
| The method of claim 25, wherein the total concentration of the mixture of salts of GHB in the solution is about 500 mg/mL. | *See* claims 1 and 19 above. |
| **Claim 30** | |
| The method of claim 24, wherein the pharmaceutical composition of GHB is formulated as a liquid formulation. | *See* claims 1 and 20 above. |
| **Claim 32** | |
| The method of claim 24, wherein the mixture of salts of GHB provides a mean GastroIntestinal transit rate of about 35%. | *See* claims 1 and 22 above. |

| ’258 Patent | |
|---|---|
| **Patent Claim Elements** | **Prior Art Disclosures** |
| **Claim 33** | |
| The method of claim 32, wherein the mean GastroIntestinal transit rate is measured as compared to a non-absorbable marker reference. | *See* claims 1 and 23 above. |

### F. The ’306 Patent

| Claim Elements | Prior Art Teachings |
|---|---|
| **Claim 1** | |
| A method for treating a patient who is suffering from excessive daytime sleepiness, cataplexy, sleep paralysis, apnea, narcolepsy, sleep time disturbances, hypnagogic hallucinations, sleep arousal, insomnia, or nocturnal myoclonus with gamma- hydroxybutyrate (GHB) or a salt thereof, said method comprising: | This element is disclosed in the prior art and would have been obvious to a person of ordinary skill in the art.<br><br>The Cook patent discloses compositions comprising “gamma-hydroxybutyrate (GHB), also known as 4-hydroxybutyrate, and the sodium salt of GHB (sodium oxybate) and other salts such as magnesium, ammonium and calcium” as well as their use in treating sleep disorders such as narcolepsy. The Cook patent at 1:16-31.<br><br>Wedin discusses the clinical development of GHB, and notes that GHB “was developed for the treatment of narcolepsy.” Wedin at 99.<br><br>Okun teaches that GHB, marketed as “Xyrem®,” is used to treat narcolepsy, including cataplexy in narcolepsy, (Okun at 169) and is taken orally. *See id.* at 170.<br><br>Xyrem 2005 PI teaches that sodium oxybate (chemically known as sodium γ-hydroxybutyrate) “is a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy.” Xyrem 2005 PI at 1; *see also* Xyrem 2012 PI at 1; Xyrem Physician’s Desk Reference at 1688; Xyrem 2002 FDA Approval Letter at 1; Xyrem 2005 FDA Approval Letter |

| Claim Elements | Prior Art Teachings |
|---|---|
| | at 1; Bhattacharya 2004 at 92; Broughton 1979 at Summary; Broughton 1980 at Summary; Feldman 2006 at 130S; Feldman 2010 at 77; Frucht at 1330; Maitre at Abstract, 352; Mamelak 1986 at Abstract, 288; Mamelak 1989 at 188; Priori; Scharf 1985 at Abstract; Scharf 1988; Scrima at Summary, 486. |
| orally administering to the patient in need of treatment at least 5% decrease in an effective dosage amount of the GHB or salt thereof when the patient is receiving a concomitant administration of valproate, an acid, salt, or mixture thereof. | This element would have been obvious to a person of ordinary skill in the art.<br><br>For example, the FDA Guidance discloses that "[d]rug interactions can result when one drug alters the pharmacokinetics of another drug or its metabolites," and recommends that drug-drug interactions be studied during drug development. FDA Guidance at 1; *see also* Hansten at 1-2. A person of ordinary skill in the art would have known that GHB is a CNS depressant. Xyrem 2005 PI at 1, 7. The Xyrem 2012 PI discloses that caution should be used "when considering the concurrent use of Xyrem with other CNS depressants. Xyrem 2012 PI at 1; *see also id.* at 3 ("If use of [] CNS depressants in combination with Xyrem is required, dose reduction or discontinuation of one or more CNS depressants (including Xyrem) should be considered."). The Xyrem Physician's Desk Reference teaches that administration of increasing doses of GHB leads to increased plasma levels of GHB, which may result in adverse effects, including coma or death. Xyrem Physician's Desk Reference at 1688-1689. Moreover, these effects were known to be dose dependent (*id.* at 1692,) and were known to be exacerbated when GHB was administered along with alcohol or certain other drugs. *Id.* at 1688. The Xyrem Physician's Desk Reference also teaches that GHB doses should be decreased when treating a patient with compromised metabolic function. *Id.* at 1692.<br><br>A person of ordinary skill in the art would have also known that valproate can have CNS depressant effects, especially in combination |

| Claim Elements | Prior Art Teachings |
| --- | --- |
| | with other CNS depressants. Depakote Label at 1, 48. Chateauvieux reviews the therapeutic use and toxicity of valproic acid, including clinical trials involving valproic acid and its side effects encountered during treatment. Chateauvieux at 1. According to Chateauvieux "[t]he therapeutic action on central nervous system and respiratory of sodium oxybate (gamma-Hydroxybutyrate, GHB) can be potentially increased by other CNS-depressants which includes" valproic acid. *Id.* at 9. Thus, a person of ordinary skill in the art would have recognized that there may exist a potential pharmacodynamic interaction between the two drugs, and that using two CNS depressants in combination could potentially create adverse consequences if the dose of either was too high.<br><br>Further, the prior art teaches that valproate causes an increase in GHB levels. This would have further motivated a person of ordinary skill in the art to administer at least 5% decrease in an effective dosage amount of GHB when the patient is receiving concomitant administration of valproate, to avoid complications associated with increased GHB levels. For example, the Cook patent incorporates by reference the teachings of a number of prior art references, at least one of which, Mamelak 1989, teaches that valproate increases brain tissue levels of GHB. The Cook patent at 61:19-23; *id.* at 62:50-53; Mamelak 1989 at 189. As another example, Löscher 1999 teaches that administration of valproate to rats had been shown to increase the brain level of GHB *in vivo*, in a time- and dose-dependent manner. Löscher 1999 at 45, 48; *see also* Löscher 2002 at 686.<br><br>The prior art teaches that valproate inhibits the catabolic metabolism of GHB, for example, by inhibiting an enzyme called GHB dehydrogenase (which catalyzes the oxidation of GHB to succinic semialdehyde). For example, Wedin discusses the metabolism of |

| Claim Elements | Prior Art Teachings |
|---|---|
| | GHB *in vivo* by oxidative conversion to succinic semialdehyde. Wedin at 99; *see also* Snead 2005 at 2721. According to Wedin, valproic acid "inhibit[s] the conversion of GHB to succinic semialdehyde by blocking the NADP-dependent GHB dehydrogenase, which may lead to potentiation of the effects of GHB." Wedin at 102; *see also* Vayer 1987 at 609. Okun also teaches that valproate inhibits GHB dehydrogenase. Okun at 170.<br><br>Similarly, Waszkielewicz states that valproic acid is a GHB dehydrogenase inhibitor which "intensif[ies] all the effects observed after administration of GHB. The effect is observed due to inhibited GHB metabolism." Waszkielewicz at 48.<br><br>Additional prior art disclosed similar teachings. Snead 1980 investigated the effects of acute and chronic administration of sodium valproate on the brain concentration of GHB. Snead 1980 at Summary. Snead 1980 teaches that acute administration of sodium valproate increased the whole brain GHB levels, which coincided with the onset of anticonvulsant effect. *Id.*<br><br>Maitre teaches that valproate increases levels of GHB in the brain. *Id.* at 340. Specifically, Maitre discloses that valproate increases levels of GHB in the brain by inhibiting GHB dehydrogenase, which catalyzes the degradation of GHB. *Id.* at 340, 343, 351.<br><br>Cash discloses the use of GHB to treat narcolepsy, and that concomitant administration of GHB and valproate results in increased GHB levels in plasma and brain. Cash teaches that valproate "is the most well-known agent that acutely increases cerebral GHB levels." Cash at 294. Cash taught that this increase was due to inhibition of succinic semialdehyde dehydrogenase (SSADH). *Id.* |

| Claim Elements | Prior Art Teachings |
|---|---|
| | Shinka disclosed that therapeutic levels of valproate inhibit the metabolic pathway of GHB by inhibiting SSADH, resulting in increased concentrations of GHB in the brain. Shinka at 99-100, 106. Shinka further disclosed that valproate affects additional aspects of the GHB metabolic pathway, including inhibiting nonspecific SSR, which also results in the accumulation of GHB. *Id.* at99-100, 103-104, 106. In addition, Shinka disclosed that valproate does not affect specific succinic semialdehyde reductase, which further results in increased GHB levels. *Id.*<br><br>Bernasconi teaches concomitant administration of GHB and valproate results in increased GHB levels in plasma and brain. Bernasconi investigated, among other things, the increase in GHB, or its precursor ɣ-butyrolactone (GBL), induced by valproate in two strains of rats. Bernasconi at 157. Bernasconi teaches that "in cortex and striatum" "valproate induced a rapid and strong increase of GHB and GBL levels (about 180%) for 30 minutes; then the content of the two GABA metabolites decreased slightly until a plateau was reached (Fig. 3)." *See id.* at 164, Fig. 3. Bernasconi teaches that the "rapid accumulation of GHB" was due to "enzymatic inhibition of its metabolization." *Id.*<br><br>Kaufman 1987 studied the effect of the *in vivo* inhibition of GHB dehydrogenase on tissue levels of GHB and on the half-life of GHB in plasma. Kaufman 1987 at 1935-36. Sodium valproate was noted to be an "excellent" inhibitor of GHB dehydrogenase. *Id.* at 1937; *see also* Kaufman 1988 at Abstract (teaching that sodium valproate is "a potent inhibitor of GHB dehydrogenase."). According to Kaufman 1987, the administration of sodium valproate to rats "produced a 1.4-fold increase in the GHB level in brain." *Id.; see also* Kaufman 1991 at |

| Claim Elements | Prior Art Teachings |
|---|---|
| | 1937. Kaufman 1991 teaches that "at a tissue concentration of 0.3 mM sodium valproate, GHB dehydrogenase would be 85% inhibited, a very marked inhibition compared to the 5% inhibition of SSA dehydrogenase which would occur at a 0.3 mM tissue concentration of the drug. Even at a tissue concentration of 0.05 mM sodium valproate, a tissue concentration at which there would be essentially no inhibition of SSA dehydrogenase, GHB dehydrogenase still would be 48% inhibited." Kaufman 1991 at 1940.<br><br>Similarly, Hechler teaches that "GHB degradation into GABA was prevented by GHB dehydrogenase inhibition with either valproate or ethosuximide." Hechler at 754; *see also* Laan at 1779. Hechler discloses that this inhibition "induce[d] GHB accumulation in brain after administration *in vivo*." Hechler at 759; *see also* Knerr at 285-286 (teaching that sodium valproate (di-n-propyl acetate) can inhibit cytosolic GHB dehydrogenase, thereby preventing GHB conversion to GABA); Mathivet at 71 (teaching that valproate (3 mM) completely blocked the nonspecific semialdehyde reductase, also known as GHB dehydrogenase).<br><br>Löscher 2002 teaches that GHB can be metabolized to SSA by nonspecific succinic semialdehyde reductase (nonspecific SSR), and that valproate is a potent inhibitor of nonspecific SSR, leading to accumulation of GHB. *Id.* at 681, 686; *see also* Vayer 1988 at 128 (teaching that valproate has the effect of inhibiting the GHB dehydrogenase, nonspecific SSR, and SSADH to prevent GHB metabolism, which results in increased GHB levels in the brain, and that the increase in brain GHB levels due to concomitant administration of valproate has been shown to be time-dependent and dose- |

| Claim Elements | Prior Art Teachings |
|---|---|
| | dependent). Similarly, Divry teaches that, in addition to inhibition of GHB dehydrogenase, valproate inhibits SSADH, which results in accumulation of SSA, which is then converted to GHB, leading to increased levels of GHB. Divry at 308, Table I; *see also* Harvey at 251, 253; Rumigny at 115.<br><br>Further, the prior art teaches that any potential for valproate to decrease GHB levels through its function as an MCT inhibitor would have been minimal. For example, a person of ordinary skill in the art would have also known that pharmacokinetic simulations using another GHB dehydrogenase/MCT inhibitor, salicylic acid, showed that, accounting for both MCT inhibition and GHB dehydrogenase inhibition, GHB brain concentrations were significantly elevated. *See* Bhattacharya 2006 at 672–74. This would have led a person of ordinary skill in the art to conclude that the effect of MCT inhibition would likely not be significant in comparison to the effect of GHB dehydrogenase inhibition, and that valproate would thus, most likely, increase brain GHB concentrations.<br><br>Similarly, Morris 2011 investigated the impact of MCT inhibition with L-lactate combined with osmotic diuresis on renal clearance of GHB (50 mg/kg, 4.5 g maximum dose) in human subjects. Morris 2011 at Abstract. Morris 2011 discloses that "[n]o effect on total clearance was observed in this study due to the negligible contribution of renal clearance to total clearance at this low GHB dose." *Id.; see also id.* at 3. Morris 2011 teaches "[a]t low, therapeutic GHB doses, such as that studied currently, the primary route of elimination is metabolism by GHB dehydrogenase to form succinic semialdehyde, which is then metabolized by succinic semialdehyde dehydrogenase to succinic acid, which enters the Krebs cycle at is excreted as |

| Claim Elements | Prior Art Teachings |
|---|---|
| | carbon dioxide. Renal excretion represents a minor route of elimination at low doses, as illustrated in this study with only approximately 2% of the total dose excreted into the urine." *Id.* at 3.<br><br>Borgen's teachings are similar to those disclosed in Bhattacharya 2006 and Morris 2011. Borgen teaches that renal elimination of GHB is only about 3% of total body clearance. Borgen at 62; Table II. Borgen also acknowledges that metabolism to GHB to carbon dioxide (via the Krebs Cycle) is the major mechanism of GHB clearance, which is consistent with Borgen's findings that urinary recovery of GHB was less than 4%. *Id.* at 64*; see also* Xyrem Physician's Desk Reference at 1688.<br><br>Similarly, Schep teaches "GHB is primarily metabolized hepatically to succinic semialdehyde by means of NAD(P)+-linked oxidation by GHB dehydrogenase (Fig. 2)." Schep at 462. Schep also teaches that "GHB is predominantly eliminated following the biotransformation pathway, as outlined in Fig. 2, to form GABA and ultimately enter the Krebs cycle; less than 2% of the parent drug is eliminated unchanged in the urine." *Id.* Therefore, a person of ordinary skill in the art would have understood based these teachings that renal elimination of GHB due to MCT was a minor pathway, and that MCT inhibition would not have had a significant impact on overall GHB levels *in vivo*.<br><br>The case studies disclosed in the prior art would have further motivated a person of ordinary skill in the art to reduce the GHB dose administered when the patient is also being treated with valproate. Cagnin discusses a case report of a patient who suffered epileptic seizures when treated with both GHB and valproate. Cagnin at |

| Claim Elements | Prior Art Teachings |
|---|---|
| | 203. According to Cagnin: [a]n interaction between valproate and GHB might have induced an imbalance in GABAergic neurotransmission and triggered the seizures. It is well recognized that GABAergic and glutamatergic transmission may be implicated in theantiepileptic and mood-stabilizing actions of valproate. On the other hand, it is less well known that valproate is a potent in vitro inhibitor of succinic semialdehyde dehydrogenase (SSADH), which catalyzes the production of succinate from succinic semialdehyde, an intermediate product in the metabolic pathway transforming GHB into GABA and vice versa. An inherited deficiency of SSADH activity leads to accumulation of succinic semialdehyde and, consequently, a 30-fold increase in GHB level and 2- to 4-fold increase in GABA in the brains of affected rats. *Id.* at 205.<br><br>Weiss reports a case of a patient who was co-administered GHB (9 g/night, 4.5 g twice nightly) with the antiepileptic topiramate (25 mg), who developed confusion, intermittent myoclonic jerks, and rapid onset of coma. Weiss at 1193. The authors noted that, in plasma samples drawn from the patient, the GHB concentration was 2.8- fold higher when the patient was administered topiramate versus without topiramate, and 1.8-fold higher thanthe peak plasma concentration of 142 mg/L that would be expected 0.5–2 hours after the second daily dose of GHB. *Id*. The authors stated that metabolism via GHBdehydrogenase is GHB's main route of elimination, and that in vitro studies have demonstrated that it is inhibited by antiepileptic drugs such as valproate and ethosuximide. *Id.* The authors concluded that, "in light of the increasing therapeutic . . . use of GHB . . . , possible interactions should be evaluated in formal pharmacokinetic studies. In the mean time, we suggest using such combinations only with great care." *Id.* |

| Claim Elements | Prior Art Teachings |
|---|---|
| | Thus, a person of ordinary skill in the art would have found it obvious to reduce the dose of GHB to mitigate the effects of any drug interactions in a patient taking concomitant valproate. Reducing the GHB dose would have been considered one way to mitigate any potential interaction. A person of ordinary skill in the art would have reduced the dose by at least 5%. The 5% reduction in GHB dose recited in claim 1 is a very small reduction in dose. For instance, a 5% reduction of the maximum 9 g/night dose would be a dose reduction of less than half a gram per night. For instance, a person of ordinary skill in the art could have reduced the dose by 1.5 g/night. This would have been a reasonable choice, as the Xyrem 2005 PI suggests titrating the dose upwards in 1.5 g/night increments. *See also* Xyrem 2012 PI at 2. Depending on the starting dose, this would likely be somewhere between a 33% reduction (if the dose in the absence of concomitant valproate was 4.5 g/night, as recommended by the Xyrem 2005 PI) or a 16.7% reduction (if the dose in the absence of concomitant valproate was 9 g/night, the maximum dose disclosed in the Xyrem 2005 PI.) *See* Xyrem 2005 PI at 23. Further, the Xyrem 2005 PI teaches that, in some patients, the starting GHB dose "should be decreased by one-half and dose increments should be titrated to effect while closely monitoring potential adverse events." *Id.*<br><br>A person of ordinary skill in the art would have further understood that routine pharmacokinetic studies could be conducted to identify the specific dosage adjustment needed to safely co-administer GHB and valproate. As a person of ordinary skill in the art would have found it obvious to decrease the dose of GHB by "at least 5%" based on the prior art, a person of ordinary skill in the art would have found it obvious to try |

| Claim Elements | Prior Art Teachings |
|---|---|
| | to reduce the dose of GHB by "at least 5%" in routine pharmacokinetic studies with a reasonable expectation of success. |
| **Claim 2** | |
| The method in accordance with claim 1, wherein there is at least about a 15% reduction in the effective dosage amount of the GHB or salt thereof given to the patient and wherein the valproate, acid, salt or mixture thereof is divalproex sodium. | *See* claim 1.<br><br>Additionally, the Depakote Label discloses that Depakote contains divalproex sodium, a valproate salt. *See* Depakote Label at 1, 33, 48, 55. Specifically, the Depakote Label states that Depakote is a co-ordination compound that is comprised of sodium valproate and valproate in a 1:1 molar ratio. *Id.* at 33-34.<br><br>Further, optimizing the dose of GHB would have been obvious to one of ordinary skill in the art. As discussed above, the prior art teaches that valproate causes an increase in GHB levels. Accordingly, it would have been obvious for a person of ordinary skill in the art to reduce effective dosage amount of GHB when the patient is receiving a concomitant administration of valproate, in order to avoid complications associated with increased GHB levels. Further, a person of ordinary skill in the art would have found it obvious to decrease the dose of GHB based on the titration instructions in the Xyrem 2005 PI. Per the titration instructions in the Xyrem 2005 PI, a person of ordinary skill in the art could reduce the dose of GHB by 1.5 grams per night. If the starting dose of GHB is 4.5 grams per night based on the per label instructions, a 1.5 gram decrease would be a 33.3 % reduction. If the dose of GHB is 7.5 grams, a 1.5 gram decrease would be a 20% reduction. Similarly, if the dose of GHB is the maximum per label dose of 9 grams per night, a decrease of 1.5 grams would be a 16.7% reduction. Further, a person of ordinary skill in the art would have reasonably been motivated to reduce the GHB dose by 50%, as the Xyrem 2005 PI discloses that "it is prudent to reduce the starting dose of sodium oxybate by one- half in patients with liver dysfunction." Xyrem 2005 |

| Claim Elements | Prior Art Teachings |
|---|---|
| | PI at 4; *see also* Xyrem Titration Schedule; Xyrem 2012 PI. Additionally, the Cook patent discloses that liquid formulations of GHB were used in clinical trials and states "[t]he initial dose for all patients in the GHB open-label trial was 6 grams of GHB nightly in divided doses. Dosage adjustments were permitted in the first two weeks of the trial as indicated for intolerance or lack of efficacy. The investigator was permitted to decrease the dose of GHB to 3 grams or 4.5 grams (a 50% and 25% reduction, respectively), or increase the dose to 7.5 grams or 9 grams nightly. After two weeks, further dosage adjustments were made if clinically indicated." the Cook patent at 18:2-10.<br><br>Further, a person of ordinary skill in the art would have further understood that routine pharmacokinetic studies could be conducted to identify the specific dosage adjustment needed to safely co-administer GHB and valproate. As a person of ordinary skill in the art would have found it obvious to reduce the dose of GHB by the amounts recited in claim 2 based on the prior art, a person of ordinary skill in the art would have found it obvious to try to reduce the dose of GHB by the amounts recited in claim 2 in routine pharmacokinetic studies with a reasonable expectation of success. |
| **Claim 3** | |
| The method in accordance with claim 2, wherein the dose of the GHB or salt thereof given to the patient without concomitant administration of valproate, an acid, salt or mixture thereof is from 4.5 to 9 grams per day. | *See* claim 2.<br><br>Further, the Cook patent discloses that liquid formulations of GHB were used in clinical trials and states "[t]he initial dose for all patients in the GHB open-label trial was 6 grams of GHB nightly in divided doses. Dosage adjustments were permitted in the first two weeks of the trial as indicated for intolerance or lack of efficacy. The investigator was permitted to decrease the dose of GHB to 3 grams or 4.5 grams, or increase the dose to 7.5 grams or 9 grams nightly. After two weeks, further dosage |

| Claim Elements | Prior Art Teachings |
|---|---|
| | adjustments were made if clinically indicated." Cook patent at 18:2-10.<br><br>Xyrem 2005 PI states that the recommended starting dose for Xyrem is 4.5 g/night, which can be increased to a maximum of 9 g/night. Xyrem 2005 PI at 22-23; *see also* Xyrem 2012 PI. In patients with liver dysfunction, Xyrem 2005 PI teaches that "[i]t is prudent to reduce the starting dose of sodium oxybate by one-half." Xyrem 2005 PI at 4; *see also* Xyrem 2012 PI. According to Xyrem 2005 PI, the pharmacokinetics of sodium oxybate "are nonlinear with blood levels increasing 3.7-fold as dose is doubled from 4.5 to 9 grams (g)." Xyrem 2005 PI at 2; *see also* Xyrem 2012 PI.<br><br>The Xyrem Titration Schedule, like the Xyrem 2005 PI, teaches that the "[r]ecommended starting dose is 4.5 g/night" and that "[d]osage should be titrated to effect in increments of 1.5 g/night . . . to a maximum dose of 9 g/night." Xyrem Titration Schedule at 1. |
| **Claim 4** | |
| The method in accordance with claim 1, wherein the effective dosage amount is a reduction of about 5% to 10%, about 10% to 15%, about 15% to 20%, about 20% to 25%, about 25% to 30%, about 30% to 35%, about 35% to 40%, about 40% to 45%, or about 45% to 50%, relative to the dose of the GHB or salt thereof normally given to the patient. | *See* claims 1-2. |
| **Claim 5** | |
| The method in accordance with claim 1, wherein the patient is suffering from narcolepsy. | *See* claim 1. |
| **Claim 7** | |
| The method in accordance with claim 1, wherein the effective dosage amount of the GHB or a salt thereof is reduced from a range of 4.5 to 9 grams per day. | *See* claims 1 and 3. |

| Claim Elements | Prior Art Teachings |
|---|---|
| **Claim 8** | |
| The method in accordance with claim 1, wherein the dose of the GHB or salt thereof without concomitant administration of valproate, an acid, salt or mixture thereof is from 4.5 to 9 grams per day. | *See* claims 1 and 3. |
| **Claim 9** | |
| The method in accordance with claim 1, wherein the effective dosage amount of the GHB or salt thereof is between 3 grams and 7 grams per day. | *See* claims 1 and 3. |
| **Claim 10** | |
| The method in accordance with claim 1, wherein the effective dosage amount of the GHB or salt thereof is between 3.5 grams and 4 grams per day. | *See* claims 1 and 3. |
| **Claim 11** | |
| A method of safely administering GHB or a salt thereof for excessive daytime sleepiness, cataplexy, sleep paralysis, apnea, narcolepsy, sleep time disturbances, hypnagogic hallucinations, sleep arousal, insomnia, or nocturnal myoclonusin a human patient who is being administered GHB, said method comprising: | As explained above with respect to claim 1, which is incorporated herein by reference, a person of ordinary skill in the art would have found it obvious to treat a patient with narcolepsy and its related symptoms such as cataplexy with GHB, or a salt thereof. Similarly, a person of ordinary skill in the art would have found it obvious to safely administer a dose of GHB to a patient. |
| determining if the patient has taken, or will take, a concomitant dose of valproate, an acid, salt or mixture thereof; and | Determining what concomitant medications a patient is taking, however, is both routine practice, and required by the standard of care for a person of ordinary skill in the art when prescribing any new medication or before initiating any new treatment. Generally, in taking a patient's medical history before treatment, a person of ordinary skill in the art will obtain a complete list of other medications that the patient is taking, in order to facilitate the identification of any potential drug interactions with any new therapies the physician may add, and in order for the physician to take steps to mitigate the effects of, or avoid, such interactions. Indeed, the practice of assessing drug-drug interactions is so commonplace that it has become automated: the same system that |

| Claim Elements | Prior Art Teachings |
|---|---|
| | tracks prescriptions, also flags potential drug-drug interactions when a new prescription is entered in a patient profile. As such, this step would have been obvious to a person of ordinary skill in the art.<br><br>Further, based on the teachings of the prior art discussed above with respect to claim 1 of the '306 patent, which is incorporated herein by reference, it would have been obvious to determine whether a patient had taken or was taking valproate prior to administering GHB in order to mitigate any potential pharmacodynamic and pharmacokinetic interactions, for the reasons stated above with regard to claim 1. |
| orally administering a reduced amount of the GHB or salt thereof to the patient wherein the reduction is at least 5% compared to a dose without concomitant administration of valproate, an acid, salt or mixture thereof. | For the same reasons stated for claim 1, which is incorporated herein by reference, a person of ordinary skill in the art would have found it obvious to administer a reduced amount of GHB of at least 5% compared a dose without concomitant administration of valproate, an acid, salt or mixture thereof. |
| **Claim 12** | |
| The method in accordance with claim 11, wherein the amount of GHB or salt thereof is reduced at least 10% to 30%. | *See* claims 11 and 2. |
| **Claim 13** | |
| The method in accordance with claim 11, wherein the amount of GHB or salt thereof is reduced at least 15% [] and wherein the valproate, acid, salt, or mixture thereof is divalproex sodium. | *See* claims 11 and 2. |
| **Claim 14** | |
| The method in accordance with claim 11, wherein the valproate, acid, salt or mixture thereof is administered within two weeks of administration of the GHB or salt thereof. | *See* claim 11. Further, as discussed above with respect to claims 1 and 11, which is incorporated herein by reference, a person of ordinary skill in the art would have known that valproate increases levels of GHB in the brain. Accordingly, a person of ordinary skill in the art would have decreased the GHB dose in patients who are taking both valproate and |

| Claim Elements | Prior Art Teachings |
|---|---|
| | GHB. Moreover, a person of ordinary skill in the art would have understood that concomitant administration would have necessarily included coadministration, as well as administration of the two drugs close in time, such as "within two weeks" of each other. |
| **Claim 15** | |
| The method in accordance with claim 11, wherein the valproate, acid, salt or mixture thereof is administered within three days of administration of the GHB or salt thereof. | *See* claim 11. Further, as discussed above with respect to claims 1 and 11, which is incorporated herein by reference, a person of ordinary skill in the art would have known that valproate increases levels of GHB in the brain. Accordingly, a person of ordinary skill in the art would have decreased the GHB dose in patients who are taking both valproate and GHB. Moreover, a person of ordinary skill in the art would have understood that concomitant administration would have necessarily included coadministration, as well as administration of the two drugs close in time, such as "three days" of each other. |
| **Claim 16** | |
| The method in accordance with claim 11, wherein the patient is suffering from narcolepsy. | *See* claim 11. |
| **Claim 18** | |
| The method in accordance with claim 11, further comprising recommending to decrease the dose of GHB or salt thereof by 20% [] and wherein the valproate, acid, salt, or mixture thereof is divalproex sodium. | *See* claims 11 and 2. |
| **Claim 19** | |
| A method for treating a patient who is suffering from narcolepsy, said method comprising: administering a therapeutically effective amount of a formulation containing a GHB salt to a patient starting at a concentration of between 350 and 750 mg/ml with a pH of between 6 and 10; | As discussed above with respect to claims 1 and 11, which is incorporated herein by reference, it would have been obvious to a person of ordinary skill in the art to treat a patient suffering from narcolepsy by administering a therapeutically effective dose of a GHB salt.<br><br>Moreover, the prior art taught preferred concentration and pH ranges for compositions comprising GHB. For example, the Cook patent |

| Claim Elements | Prior Art Teachings |
|---|---|
| | discloses: "At a concentration or content of about 450 mg/ml GHB, the pH may be of about 3.9 to about 10.3. At a concentration or content of about 500 mg/ml GHB, the pH may be of about 4.75 to about 10.3. At a concentration or content of about 600 mg/ml GHB, the pH may be of about 6.1 to about 10.3. At a concentration or content of about 750 mg/ml GHB, the pH may be of about 7.0 to about 10.3. Of course, all pH and concentration or content values in between each of the listed pH and concentration or content values are encompassed by the invention." The Cook patent at 4:30-40; *see also* Xyrem 2005 PI at Description ("Xyrem oral solution contains 500 mg of sodium oxybate per milliliter of USP Purified Water, neutralized to pH 7.5 with malic acid); *id.* at 22-23; Xyrem 2012 PI at 2; *see id.* ("Oral Solution, 0.5 g per mL."); *id*. at Description ("Each mL of Xyrem contains 0.5 g of sodium oxybate in USP Purified Water, neutralized to pH 7.5 with malic acid.") |
| determining if the patient is also being administered valproate, an acid, salt or mixture thereof; | For the reasons discussed above with respect to claim 11, which is incorporated herein by reference, it would have been obvious to a person of ordinary skill in the art to determine if a patient is being administered valproate. |
| warning of a potential drug/drug interaction due to the combination of valproate, an acid, salt or mixture thereof and the GHB salt; and | The step of "warning the patient" is entitled no patentable weight, as it recites mere "printed matter" unrelated to the underlying method. *See, e.g., In re Ngai*, 367 F.3d 1336, 1339 (Fed. Cir. 2004); *see also, King Pharmaceuticals, Inc. v. Eon Labs, Inc*., 616 F.3d 1267, 1279 (Fed. Cir. 2010).<br><br>Even if this step is considered, "warning of a potential drug/drug interaction due to the combination of valproate, an acid, salt or mixture thereof and the GHB salt" would have been obvious as well. For all the reasons discussed above with respect to claim 1, which is incorporated herein by reference, it would have been obvious for a person of ordinary skill in the art to provide a warning of a potential |

| Claim Elements | Prior Art Teachings |
|---|---|
| | drug/drug interaction due to the combination of valproate, an acid, salt, or mixture thereof, and the GHB salt. Indeed, drug manufacturers are required to warn of potential drug/drug interactions in drug product labeling. A person of ordinary skill in the art would reasonably expect that a doctor prescribing combined use of valproate with GHB would warn a patient of the potential for drug-drug interaction, would prescribe a reduced dose of GHB to account for any interaction, and would carefully monitor the patient for any adverse effects. |
| recommending reducing the dose of the GHB salt at least 15%. | For the reasons discussed above with respect to claims 1-2 and 11, which is incorporated herein by reference, it would have been obvious to a person of ordinary skill in the art to recommend reducing the dose by at least 15% when the patient is receiving a concomitant administration of valproate, to avoid complications associated with increased GHB levels. While claims 1 and 11 recite a 5% reduction, at least 15% reduction would likewise have been obvious. For example, reducing the recommended starting dose of 4.5 grams by 1.5 grams (the titration level taught by the Xyrem titration schedule) would result in over a 30% reduction in dose.<br><br>Additionally, the Cook patent discloses that liquid formulations of GHB were used in clinical trials and states "[t]he initial dose for all patients in the GHB open-label trial was 6 grams of GHB nightly in divided doses. Dosage adjustments were permitted in the first two weeks of the trial as indicated for intolerance or lack of efficacy. The investigator was permitted to decrease the dose of GHB to 3 grams or 4.5 grams (a 50% and 25% reduction, respectively), or increase the dose to 7.5 grams or 9 grams nightly. After two weeks, further dosage adjustments were made if clinically indicated." the Cook patent at 18:2-10. The Xyrem 2005 PI states that the recommended starting dose for Xyrem is 4.5 g/night, which can be |

| Claim Elements | Prior Art Teachings |
|---|---|
| | increased to a maximum of 9 g/night. Xyrem 2005 PI at 22-23. In patients with liver dysfunction, the Xyrem PI teaches that "[i]t is prudent to reduce the starting dose of sodium oxybate by one-half." *Id.* at 4. According to the Xyrem 2005 PI, the pharmacokinetics of sodium oxybate "are nonlinear with blood levels increasing 3.7-fold as dose is doubled from 4.5 to 9 grams (g)." *Id.* at 2; *see also* Xyrem 2012 PI at 2. |
| **Claim 20** | |
| The method in accordance with claim 19, wherein the valproate, acid, salt or mixture thereof is administered within two weeks of administration of the GHB salt. | *See* claims 19 and 14. |
| **Claim 21** | |
| The method in accordance with claim 19, wherein the valproate, acid, salt or mixture thereof is administered within three days of administration of the GHB salt. | *See* claims 19 and 15. |
| **Claim 22** | |
| The method in accordance with claim 19, wherein the GHB salt is administered starting at a concentration of between 450 to 550 mg/ml. | *See* claim 19.<br><br>Further, the Cook patent discusses preferred concentration and pH ranges for compositions comprising GHB, stating: "[a]t a concentration or content of about 450 mg/ml GHB, the pH may be of about 3.9 to about 10.3. At a concentration or content of about 500 mg/ml GHB, the pH may be of about 4.75 to about 10.3. At a concentration or content of about 600 mg/ml GHB, the pH may be of about 6.1 to about 10.3. At a concentration or content of about 750 mg/ml GHB, the pH may be of about 7.0 to about 10.3. Of course, all pH and concentration or content values in between each of the listed pH and concentration or content values are encompassed by the invention." *See* Cook patent at 4:30-40; *see also* Xyrem 2005 PI ("Xyrem oral solution contains 500 mg of sodium oxybate per milliliter of USP Purified Water, neutralized to pH 7.5 with malic acid."); Xyrem 2012 PI ("Xyrem is a clear to slightly |

| Claim Elements | Prior Art Teachings |
|---|---|
| | opalescent oral solution, in a concentration of 0.5 g per mL”). |
| **Claim 23** | |
| The method in accordance with claim 22, further comprising adding water to the GHB salt formulation. | *See* claim 22.<br><br>Further, the Xyrem 2005 PI teaches diluting each dose of Xyrem “with two ounces (60 mL, ¼ cup, or 4 tablespoons) of water in the child-resistant dosing cups provided prior to ingestion.” *See* Xyrem 2005 PI at 23; *see also* Xyrem 2012 PI at 2. Xyrem 2005 PI also teaches that “Xyrem oral solution contains 500 mg of sodium oxybate per milliliter of USP Purified Water, neutralized to pH 7.5 with malic acid.” *See also* Xyrem 2012 PI (“Xyrem is a clear to slightly opalescent oral solution, in a concentration of 0.5 g per mL”). In addition, the Cook patent discusses preferred concentration and pH ranges for compositions comprising GHB, stating: “[a]t a concentration or content of about 450 mg/ml GHB, the pH may be of about 3.9 to about 10.3. At a concentration or content of about 500 mg/ml GHB, the pH may be of about 4.75 to about 10.3. At a concentration or content of about 600 mg/ml GHB, the pH may be of about 6.1 to about 10.3. At a concentration or content of about 750 mg/ml GHB, the pH may be of about 7.0 to about 10.3. Of course, all pH and concentration or content values in between each of the listed pH and concentration or content values are encompassed by the invention.” The Cook patent at 4:30-40. |
| **Claim 24** | |
| The method in accordance with claim 19, wherein the GHB salt formulation has a pH between 6.5 and 8. | *See* claims 19 and 22. |
| **Claim 25** | |
| The method in accordance with claim 19, furthercomprising administering the reduced dose of the GHB salt to the patient. | *See* claim 19.<br><br>Further, as discussed above with respect to |

| Claim Elements | Prior Art Teachings |
|---|---|
| | claim 1, which is incorporated herein by reference, administration of GHB is well known in the prior art. |
| **Claim 26** | |
| The method in accordance with claim 19, wherein the GHB salt comprises a single salt or a mixture of salts of GHB selected from the group consisting of a sodium salt of hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca.(GHB)_2$). | *See* claim 19.<br><br>Further, the Xyrem 2005 PI states that Xyrem is sodium oxybate, the chemical name of which is "sodium 4- hydroxyburyrate," or the sodium salt of GHB. *See also* Xyrem 2012 PI; Xyrem Titration Schedule; Cook patent at 1:16-31 (disclosing compositions comprising "gamma-hydroxybutyrate (GHB), also known as 4-hydroxybutyrate, and the sodium salt of GHB (sodium oxybate) and other salts such as magnesium, ammonium and calcium"). |
| **Claim 28** | |
| The method in accordance with claim 19, comprising recommending reducing a dose of GHB or salt thereof at least 20% [] and wherein the valproate, acid, salt, or mixture thereof is divalproex sodium. | *See* claims 19 and 2. |
| **Claim 29** | |
| The method in accordance with claim 19, further comprising adding water to the GHB salt formulation. | *See* claims 19 and 23. |
| **Claim 30** | |
| A method for treating a patient who is suffering from narcolepsy, said method comprising: administering a therapeutically effective amount of a formulation containing a GHB salt to a patient; | *See* claim 1. |
| determining if the patient is also being administered valproate, an acid, salt or mixture thereof; | *See* claim 11. |
| recommending a 20% decrease in the starting dose of the GHB salt such that a patient starts taking the GHB salt at an adjusted dosage amount between 3.5 grams and 4 grams the GHB salt per night administered orally. | *See* claims 1, 3, 11, and 19.<br><br>Additionally, the Cook patent discloses that liquid formulations of GHB were used in clinical trials and states "[t]he initial dose for all patients in the GHB open-label trial was 6 grams |

| Claim Elements | Prior Art Teachings |
|---|---|
| | of GHB nightly in divided doses. Dosage adjustments were permitted in the first two weeks of the trial as indicated for intolerance or lack of efficacy. The investigator was permitted to decrease the dose of GHB to 3 grams or 4.5 grams (a 50% and 25% reduction, respectively), or increase the dose to 7.5 grams or 9 grams nightly. After two weeks, further dosage adjustments were made if clinically indicated." the Cook patent at 18:2-10. The Xyrem 2005 PI states that the recommended starting dose for Xyrem is 4.5 g/night, which can be increased to a maximum of 9 g/. Xyrem 2005 PI at 22-23. In patients with liver dysfunction, the Xyrem PI teaches that "[i]t is prudent to reduce the starting dose of sodium oxybate by one-half." *Id.* at 4. According to the Xyrem 2005 PI, the pharmacokinetics of sodium oxybate "are nonlinear with blood levels increasing 3.7-fold as dose is doubled from 4.5 to 9 grams (g)." *Id.* at 2; *see also* Xyrem 2012 PI at 2. |
| **Claim 31** | |
| The method in accordance with claim 30, wherein the starting adjusted dosage amount of the GHB salt is about 3.6 grams. | *See* claims 30, 2-3. |
| **Claim 32** | |
| The method in accordance with claim 30, further comprising optionally diluting the GHB salt formulation from a starting concentration of between 350 and 750 mg/ml with a pH of between 6 and 10. | *See* claims 30 and 23. |
| **Claim 33** | |
| A method for treating a patient who is suffering from narcolepsy, said method comprising: orally administering a therapeutically effective amount of a formulation containing a GHB salt; | *See* claim 1. |
| determining if the patient is also being administered valproate, an acid, salt or mixture thereof; | *See* claim 11. |

| Claim Elements | Prior Art Teachings |
|---|---|
| recommending a 20% decrease in the starting dose of the GHB salt such that the amount that the patient is administered is reduced to about 3.6 grams GHB per day. | *See* claims 1, 11, and 19.<br><br>Additionally, the Cook patent discloses that liquid formulations of GHB were used in clinical trials and states "[t]he initial dose for all patients in the GHB open-label trial was 6 grams of GHB nightly in divided doses. Dosage adjustments were permitted in the first two weeks of the trial as indicated for intolerance or lack of efficacy. The investigator was permitted to decrease the dose of GHB to 3 grams or 4.5 grams (a 50% and 25% reduction, respectively), or increase the dose to 7.5 grams or 9 grams nightly. After two weeks, further dosage adjustments were made if clinicallyindicated." the Cook patent at 18:2-10. The Xyrem 2005 PI states that the recommended starting dose for Xyrem is 4.5 g/night, which can be increased to a maximum of 9 g/night. Xyrem 2005 PI at 22-23. In patients with liver dysfunction, the Xyrem PI teaches that "[i]t is prudent to reduce the starting dose of sodium oxybate by one-half." *Id.* at 4. According to the Xyrem 2005 PI, the pharmacokinetics of sodium oxybate "are nonlinear with blood levels increasing 3.7-fold as dose is doubled from 4.5 to 9 grams (g)." *Id.* at 2; *see also* Xyrem 2012 PI at 2. |
| **Claim 34** | |
| The method in accordance with claim 33, further comprising optionally diluting the GHB salt formulation from a starting concentration of between 350 and 750 mg/ml with a pH of between 6 and 10. | *See* claims 33 and 23. |

## G. The '302 Patent

| Claim Elements | Prior Art Teachings |
|---|---|
| **Claim 1** | |

| Claim Elements | Prior Art Teachings |
|---|---|
| A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking gamma-hydroxybutyrate (GHB) or a salt thereof comprising: | *See* claim 1 of the '306 patent. |
| administering to the patient a dose of divalproex sodium concomitant to a dose of GHB or salt thereof; and reducing the daily dosage amount of GHB or salt thereof administered to the patient by at least 20% wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g. | *See* claims 1-4 of the '306 patent. |
| **Claim 2** | |
| The method of claim 1 further comprising monitoring, patient response and adjusting the GHB dose to maintain the effect of the GHB. | *See* claim 1 (above). Further, the Cook patent discloses a clinical trial where GHB dosage was adjusted when clinically indicated (e.g., intolerance or lack of efficacy). The Cook patent at 17:40–18:10. The Xyrem 2005 PI discloses that the dosage for GHB may be increased. Specifically, the Xyrem 2005 PI states that "[t]he starting dosage can then be increased to a maximum of 9 g/night in increments of 1.5 g/night (0.75 g per dose). One to two weeks are recommended between dosage increases to evaluate clinical response and minimize adverse effects." Xyrem 2005 PI at 23; *see also* Xyrem 2012 at 2; Xyrem Titration Schedule. Further, a person of ordinary skill in the art would have known that a dose of a medication could be titrated upwards or downwards based on clinical response. |
| **Claim 3** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g. | *See* claim 1 (above) and claim 3 of the '306 patent. |
| **Claim 4** | |
| The method of claim 3 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced to lower than 3.6 g. | *See* claim 3 (above) and claims 2-4 of the '306 patent. |
| **Claim 5** | |

| Claim Elements | Prior Art Teachings |
|---|---|
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 6 g. | *See* claim 1 (above) and claim 3 of the '306 patent. |
| **Claim 6** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 7.5 g. | *See* claim 1 (above) and claim 3 of the '306 patent. |
| **Claim 7** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 9 g. | *See* claim 1 (above) and claim 3 of the '306 patent. |
| **Claim 8** | |
| A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking gamma-hydroxybutyrate (GHB) or a salt thereof comprising: | *See* claim 1 of the '306 patent. |
| reducing the daily dosage amount of GHB or salt thereof administered to the patient by at least 20% during concomitant administration of divalproex sodium, compared to the daily dosage amount of between 4.5 and 9 g of GHB or salt thereof currently used in the absence of concomitant administration of divalproex sodium. | *See* claims 1-4 of the '306 patent. |
| **Claim 9** | |
| The method of claim 8, wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by at least 20% compared to the manufacturer's, recommended daily dosage amount of GHB or salt thereof. | *See* claim 8 (above) and claims 2-4 of the '306 patent. |
| **Claim 10** | |
| The method of claim 8 further comprising monitoring patient response and adjusting the GHB dose to maintain the effect of the GHB. | *See* claims 8 and 2 (above). |
| **Claim 11** | |

| Claim Elements | Prior Art Teachings |
|---|---|
| The method of claim 8 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g. | *See* claim 8 (above) and claim 3 of the '306 patent. |
| **Claim 12** | |
| The method of claim 11 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced to lower than 3.6 g. | *See* claim 12 (above) and claims 2-4 of the '306 patent. |
| **Claim 13** | |
| A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising: | *See* claim 1 of the '306 patent. |
| administering to the patient a starting daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is 20% lower than a manufacturer's recommended starting daily dosage amount of between 4.5 and 9 g in the absence of concomitant administration of divalproex sodium. | *See* claims 1-4 of the '306 patent. |
| **Claim 14** | |
| The method of claim 13 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient is lower than 4.5 g. | *See* claim 13 (above) and claim 3 of the '306 patent. |
| **Claim 15** | |
| The method of claim 14 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient is divided in two equal doses. | *See* claim 13 (above). Further, the Xyrem 2005 PI recommends dividing the nightly dose into two equal doses. Xyrem 2005 PI at 22-23; *see also* Xyrem 2012 PI at 2; Xyrem Titration Schedule. |
| **Claim 16** | |
| The method of claim 15 wherein the first dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. | *See* claim 15 (above) and claims 2-4 of the '306 patent. |
| **Claim 17** | |
| The method of claim 15 wherein the second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. | *See* claim 15 (above) and claims 2-4 of the '306 patent. |

| Claim Elements | Prior Art Teachings |
|---|---|
| | . |
| **Claim 18** | |
| The method of claim 13 further comprising monitoring patient response and adjusting the GHB dose to treat the patient. | *See* claims 13 and 2 (above). |
| **Claim 19** | |
| The method of claim 13 wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g. | *See* claim 13 (above) and claim 3 of the ’306 patent. |
| **Claim 20** | |
| A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising: | *See* claim 1 of the ’306 patent. |
| administering to the patient a starting daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is 20% lower than the starting daily dosage amount of between 4.5 to 9 g GHB that would otherwise have been recommended to the patient if the patient was not currently taking divalproex sodium. | *See* claims 1-4 of the ’306 patent. |
| **Claim 21** | |
| The method of claim 20 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient who is currently taking divalproex sodium is lower than 4.5 g. | *See* claim 21 (above) and claim 3 of the ’306 patent. |
| **Claim 22** | |
| The method of claim 21 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient who is currently taking divalproex sodium is divided in two equal doses. | *See* claims 21 and 15 (above). |
| **Claim 23** | |
| The method of claim 22 wherein the first dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. | *See* claim 22 (above) and claims 2-4 of the ’306 patent. |

| Claim Elements | Prior Art Teachings |
|---|---|
| **Claim 24** | |
| The method of claim 23 wherein the second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. | *See* claim 23 (above) and claims 2-4 of the ’306 patent. |
| **Claim 25** | |
| The method of claim 20 further comprising monitoring patient response and adjusting the GHB dose to treat the patient. | *See* claims 20 and 2 (above).<br>. |
| **Claim 26** | |
| The method of claim 20 wherein the starting daily dosage amount of GHB or salt thereof that would otherwise have been recommended to the patient if the patient was not currently taking divalproex sodium is 4.5 g. | *See* claim 20 (above) and claim 3 of the ’306 patent. |
| **Claim 27** | |
| A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising the steps of: | *See* claim 1 of the ’306 patent. |
| administering to the patient a daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is lower than 4.5 g. | *See* claims 1-4 of the ’306 patent. |
| **Claim 28** | |
| The method of claim 27 wherein the daily dosage amount of GHB or salt thereof administered to the patient is divided in two equal doses. | *See* claims 21 and 15 (above). |
| **Claim 29** | |
| The method of claim 28 wherein the first dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. | *See* claim 28 (above) and claims 2-4 of the ’306 patent. |
| **Claim 30** | |
| The method of claim 28 wherein the second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. | *See* claim 28 (above) and claims 2-4 of the ’306 patent.<br>. |
| **Claim 31** | |

| Claim Elements | Prior Art Teachings |
|---|---|
| A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising the steps of: | administering to the patient a second dose of GHB or salt thereof that is lower than 2.25 g. |
| administering to the patient a dose of gamma-hydroxybutyrate (GHB) or a salt thereof that is lower than 2.25 g; and administering to the patient a second dose of GHB or salt thereof that is lower than 2.25 g. | *See* claims 1-4 of the '306 patent. Additionally, with respect to administering two doses of GHB to the patient, Xyrem 2005 PI recommends dividing the nightly dose into two equal doses. Xyrem 2005 PI at 22-23; *see also* Xyrem 2012 PI at 2 ("The recommended starting dose is 4.5 grams (g) per night administered orally in two equal, divided doses: 2.25 g at bedtime and 2.25 g taken 2.5 to 4 hours later (see Table 1)."); Xyrem Titration Schedule. |

### H. The '426 Patent

| Claim Elements | Prior Art Teachings |
|---|---|
| **Claim 1** | |
| A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking gamma-hydroxybutyrate (GHB) or a salt thereof comprising: | *See* claim 1 of the '306 patent. |
| administering to the patient a dose of divalproex sodium concomitant to a dose of GHB or salt thereof; and reducing the daily dosage amount of GHB or salt thereof administered to the patient by at least 20% wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g. | *See* claims 1-4 of the '306 patent. |
| **Claim 2** | |
| The method of claim 1 further comprising monitoring patient response and adjusting the GHB dose to maintain the effect of the GHB. | *See* claim 1 (above). Further, the Cook patent discloses a clinical trial where GHB dosage was adjusted when clinically indicated (e.g., intolerance or lack of efficacy). The Cook patent at 17:40–18:10. The Xyrem 2005 PI discloses that the dosage for GHB may be increased. Specifically, the Xyrem 2005 PI states that "[t]he starting dosage can then be |

| Claim Elements | Prior Art Teachings |
|---|---|
| | increased to a maximum of 9 g/night in increments of 1.5 g/night (0.75 g per dose). One to two weeks are recommended between dosage increases to evaluate clinical response and minimize adverse effects." Xyrem 2005 PI at 23; *see also* Xyrem 2012 at 2; Xyrem Titration Schedule. Further, a person of ordinary skill in the art would have known that a dose of a medication could be titrated upwards or downwards based on clinical response. |
| **Claim 3** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g. | *See* claim 1 (above) and claim 3 of the '306 patent. |
| **Claim 4** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 6 g. | *See* claim 1 (above) and claim 3 of the '306 patent. |
| **Claim 5** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 7.5 g. | *See* claim 1 (above) and claim 3 of the '306 patent. |
| **Claim 6** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 9 g. | *See* claim 1 (above) and claim 3 of the '306 patent. |
| **Claim 7** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced between about 15% and about 50%. | *See* claim 1 (above) and claims 2 and 4 of the '306 patent. |
| **Claim 8** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by between about 20% and about 50%. | *See* claim 1 (above) and claims 2 and 4 of the '306 patent. |
| **Claim 9** | |

| Claim Elements | Prior Art Teachings |
|---|---|
| A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking gamma-hydroxybutyrate (GHB) or a salt thereof comprising: | *See* claim 1 of the '306 patent. |
| reducing the daily dosage amount of GHB or salt thereof administered to the patient between about 5% and about 50% during concomitant administration of divalproex sodium, compared to the daily dosage amount of between 4.5 g and 9 g of GHB or salt thereof currently used in the absence of concomitant administration of divalproex sodium. | *See* claims 1-4 of the '306 patent. |
| **Claim 10** | |
| The method of claim 9, wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by between about 15% and about 50% compared to the manufacturer's recommended daily dosage amount of GHB or salt thereof. | *See* claim 9 (above) and claims 2-4 of the '306 patent. |
| **Claim 11** | |
| The method of claim 9 further comprising monitoring patient response and adjusting the GHB dose to maintain the effect of the GHB. | *See* claims 9 and 2 (above). |
| **Claim 12** | |
| The method of claim 9 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g. | *See* claim 9 (above) and claim 3 of the '306 patent. |
| **Claim 13** | |
| The method of claim 12 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by between about 15% and about 50%. | *See* claims 12 and 7 (above). |
| **Claim 14** | |
| The method of claim 13 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced at least 20%. | *See* claims 13 and 8 (above). |
| **Claim 15** | |

| Claim Elements | Prior Art Teachings |
|---|---|
| A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising: | *See* claim 1 of the '306 patent. |
| administering to the patient a starting daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is between about 15% and about 25% lower than a manufacturer's recommended starting daily dosage amount of between 4.5 g and 9 g in the absence of concomitant administration of divalproex sodium. | *See* claims 1-4 of the '306 patent. |
| **Claim 16** | |
| The method of claim 15 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient is lower than 4.5 g. | *See* claim 15 (above) and claim 3 of the '306 patent. |
| **Claim 17** | |
| The method of claim 16 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient is divided into two equal doses. | *See* claim 16 (above). Further, the Xyrem 2005 PI recommends dividing the nightly dose into two equal doses. Xyrem 2005 PI at 22-23; *see also* Xyrem 2012 PI at 2; Xyrem Titration Schedule. |
| **Claim 18** | |
| The method of claim 17 wherein the first or second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. | *See* claim 17 (above) and claims 2-4 of the '306 patent. |
| **Claim 19** | |
| The method of claim 15 wherein the starting daily dosage amount of GHB or a salt thereof is reduced by between about 20% and about 25%. | *See* claims 15 and 8 (above).<br>. |
| **Claim 20** | |
| The method of claim 15 further comprising monitoring patient response and adjusting the GHB dose to treat the patient. | *See* claims 15 and 2 (above). |
| **Claim 21** | |
| The method of claim 15 wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of | *See* claim 15 (above) and claim 3 of the '306 patent. |

| Claim Elements | Prior Art Teachings |
|---|---|
| divalproex sodium is 4.5 g. | |
| **Claim 22** | |
| A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising: | *See* claim 1 of the '306 patent. |
| administering to the patient a starting daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is between about 15% and about 30% lower than the starting daily dosage amount of between 4.5 g and 9 g GHB that would otherwise have been recommended to the patient if the patient was not currently taking divalproex sodium. | *See* claims 1-4 of the '306 patent. |
| **Claim 23** | |
| The method of claim 22 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient who is currently taking divalproex sodium is lower than 4.5 g. | *See* claim 22 (above) and claim 3 of the '306 patent. |
| **Claim 24** | |
| The method of claim 23 wherein the starting daily dosage amount of GHB or salt thereof administered to the patient who is currently taking divalproex sodium is divided into two equal doses. | *See* claims 23 and 17 (above). |
| **Claim 25** | |
| The method of claim 24 wherein the first or second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. | *See* claim 24 (above) and claims 2-4 of the '306 patent. |
| **Claim 26** | |
| The method of claim 22 further comprising monitoring patient response and adjusting the GHB dose to treat the patient. | *See* claims 22 and 2 (above). |
| **Claim 27** | |
| The method of claim 22 wherein the starting daily dosage amount of GHB or a salt thereof is reduced by between about 20% and about 30%. | *See* claims 22 and 8 (above). |

| Claim Elements | Prior Art Teachings |
|---|---|
| **Claim 28** | |
| A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient who is currently taking divalproex sodium comprising the steps of: | *See* claim 1 of the '306 patent. |
| administering to the patient a daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof that is between about 15% and about 30% lower than 4.5 g. | *See* claims 1-4 of the '306 patent. |
| **Claim 29** | |
| The method of claim 28 wherein the daily dosage amount of GHB or salt thereof administered to the patient is divided into two equal doses. | *See* claims 28 and 17 (above). |
| **Claim 30** | |
| The method of claim 29 wherein the first dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. | *See* claim 29 (above) and claims 2-4 of the '306 patent. |
| **Claim 31** | |
| The method of claim 29 wherein the second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. | *See* claim 29 (above) and claims 2-4 of the '306 patent. |

## I. The '400 Patent

| Claim Elements | Prior Art Teachings |
|---|---|
| **Claim 1** | |
| A method for reducing adverse effects caused by a combination of gamma-hydroxybutyrate (GHB) or a salt thereof and divalproex sodium in a patient comprising: administering a reduced daily dosage amount of GHB or a salt thereof to the patient of between about 5% to about 35%, compared to a daily dosage amount of GHB or salt thereof administered to the patient in the absence of concomitant administration of divalproex sodium; wherein the patient is concomitantly administered divalproex sodium; | *See* claims 1-4 of the '306 patent. |

| Claim Elements | Prior Art Teachings |
|---|---|
| wherein the patient is a patient suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy and currently taking GHB or salt thereof; | *See* claim 1 of the ’306 patent. |
| wherein the daily dosage amount of GHB or salt thereof administered to the patient in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g. | *See* claim 3 of the ’306 patent. |
| **Claim 2** | |
| The method of claim 1 further comprising monitoring the patient’s response and adjusting the dose of GHB or salt thereof. | *See* claim 1 (above). Further, the Cook patent discloses a clinical trial where GHB dosage was adjusted when clinically indicated (e.g., intolerance or lack of efficacy). The Cook patent at 17:40–18:10. The Xyrem 2005 PI discloses that the dosage for GHB may be increased. Specifically, the Xyrem 2005 PI states that “[t]he starting dosage can then be increased to a maximum of 9 g/night in increments of 1.5 g/night (0.75 g per dose). One to two weeks are recommended between dosage increases to evaluate clinical response and minimize adverse effects.” Xyrem 2005 PI at 23; *see also* Xyrem 2012 at 2; Xyrem Titration Schedule. Further, a person of ordinary skill in the art would have known that a dose of a medication could be titrated upwards or downwards based on clinical response. |
| **Claim 3** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g. | *See* claim 1 (above) and claim 3 of the ’306 patent. |
| **Claim 4** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 6 g. | *See* claim 1 (above) and claim 3 of the ’306 patent. |
| **Claim 5** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 7.5 g. | *See* claim 1 (above) and claim 3 of the ’306 patent. |

| Claim Elements | Prior Art Teachings |
|---|---|
| **Claim 6** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 9 g. | *See* claim 1 (above) and claim 3 of the ’306 patent. |
| **Claim 7** | |
| The method of claim 1 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by between about 20% and about 35%. | *See* claim 1 (above) and claims 2 and 4 of the ’306 patent. |
| **Claim 8** | |
| A method for reducing adverse effects caused by combination of gamma-hydroxybutyrate (GHB) or salt thereof and divalproex sodium in a patient comprising: administering a reduced daily dosage amount of GHB or salt thereof to the patient of between about 5% to and about 35%, compared to a manufacturer’s recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium; | *See* claims 1-4 of the ’306 patent. |
| wherein the patient is a patient suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy and currently taking GHB or salt thereof; | *See* claim 1 of the ’306 patent. |
| wherein the manufacturer’s recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g. | *See* claim 3 of the ’306 patent. |
| **Claim 9** | |
| The method of claim 8 further comprising monitoring the patient’s response and adjusting the dose of GHB or salt thereof. | *See* claims 8 and 2 (above). |
| **Claim 10** | |
| The method of claim 8 wherein the manufacturer’s recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g. | *See* claim 8 (above) and claim 3 of the ’306 patent. |
| **Claim 11** | |

| Claim Elements | Prior Art Teachings |
|---|---|
| The method of claim 8 wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is divided into two equal doses. | *See* claim 8 (above). Further, the Xyrem 2005 PI recommends dividing the nightly dose into two equal doses. Xyrem 2005 PI at 22-23; *see also* Xyrem 2012 PI at 2; Xyrem Titration Schedule. |
| **Claim 12** | |
| The method of claim 11 wherein a first or second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. | *See* claim 11 (above) and claims 2-4 of the '306 patent. |
| **Claim 13** | |
| The method of claim 8 wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by between about 20% and about 35%, compared to manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium. | *See* claim 8 above and claims 2 and 4 of the '306 patent. |
| **Claim 14** | |
| The method of claim 13 wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g. | *See* claim 13 (above) and claim 3 of the '306 patent. |
| **Claim 15** | |
| A method for reducing adverse effects caused by combination of gamma-hydroxybutyrate (GHB) or salt thereof and divalproex sodium in a patient comprising: administering to the patient a daily dosage amount of GHB or a salt thereof that is between about 5% and about 35% lower than a starting dosage amount of GHB or a salt thereof that would otherwise have been recommended to the patient if the patient was not currently taking divalproex sodium; wherein the patient is concomitantly administered divalproex sodium; | *See* claims 1-4 of the '306 patent. |
| wherein the patient is a patient suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy and currently taking GHB or salt thereof; | *See* claim 1 of the '306 patent. |

| Claim Elements | Prior Art Teachings |
|---|---|
| wherein the starting daily dosage amount of GHB or salt hereof is between 4.5 g and 9 g. | *See* claim 3 of the '306 patent. |
| **Claim 16** | |
| The method of claim 15 further comprising monitoring the patient's response and adjusting the dose of GHB or salt thereof. | *See* claims 15 and 2 (above). |
| **Claim 17** | |
| The method of claim 15 wherein the daily dosage amount of GHB or a salt thereof administered to the patient who is currently taking divalproex sodium is lower than 4.5 g. | *See* claim 15 (above) and claims 2 and 4 of the '306 patent. |
| **Claim 18** | |
| The method of claim 15 wherein the daily dosage amount of GHB or a salt thereof administered to the patient who is currently taking divalproex sodium is divided into two equal doses. | *See* claims 15 and 8 (above). |
| **Claim 19** | |
| The method of claim 18 wherein a first or second dose of the two equal doses of GHB or salt thereof administered to the patient is lower than 2.25 g. | *See* claim 18 (above) and claims 2-4 of the '306 patent. |
| **Claim 20** | |
| The method of claim 15 wherein the starting daily dosage amount of GHB or a salt thereof is reduced by between about 20% and about 35%. | *See* claim 15 (above) and claims 2 and 4 of the '306 patent. |

### J. The '181 Patent

| Claim Elements | Prior Art Teachings |
|---|---|
| **Claim 1** | |
| A method for the treatment of cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy in a patient, the method comprising; | *See* claim 1 of the '306 patent. |
| administering a reduced daily dosage amount of gamma-hydroxybutyrate (GHB) or a salt thereof to a patient who is concomitantly administered | *See* claims 1-4 of the '306 patent. |

| Claim Elements | Prior Art Teachings |
|---|---|
| divalproex sodium; wherein the patient is suffering from cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy; wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is between 4.5 g to 9 g; | |
| and wherein the reduced daily dosage amount of GHB or salt thereof compensates for pharmacokinetic (PK) and/or pharmacodynamic (PD) changes caused by the divalproex sodium, | *See* claims 1-4 of the '306 patent. As discussed above, a person of ordinary skill in the art would have known that concomitant administration of divalproex sodium caused intensified effects of GHB. Thus, a person of ordinary skill in the art would have known to compensate for pharmacokinetic (PK) and/or pharmacodynamic (PD) changes. Further, measuring for pharmacokinetic (PK) and/or pharmacodynamic (PD) changes was well known long before the claimed priority date of the '181 patent. *See, e.g.,* the Cook patent at Example 3; *see also* Borgen at 61-62; Xyrem 2012 PI at 5-6; Scharf at Figures 1-6, Tables 1-2; Wesnes at 184-185. Thus, it would have been obvious to a person of ordinary skill in the art to measure these changes when administering a concomitant administration of divalproex sodium, due to the potentially toxic effects that divalproex sodium can cause by intensifying the effects of GHB. |
| **Claim 2** | |
| The method of claim 1, wherein the PD interactions are measured by Cognitive Drug Research (CDR) system tasks or Karolinska Sleepiness Scale (K55). | *See* claim 1 (above). Further, Wesnes discusses the value and utility of measuring cognitive function throughout the drug development process using "the most widely used automated cognitive function assessment system in worldwide clinical research, the Cognitive Drug Research (CDR) computerized assessment system," including testing attention, such as "Simple reaction time," "Choice reaction time," "Digit vigilance," as well as executive function and working memory. Wesnes at 184-185, Table 1. |
| **Claim 3** | |

| Claim Elements | Prior Art Teachings |
|---|---|
| The method of claim 2, wherein the CDR system tasks are selected from the group consisting of Simple Reaction Time (SRT), Digit Vigilance (DV), Choice Reaction time (CRT), tracking distance from target, and Numeric Working Memory (NWM). | *See* claim 2 (above). Further, Wesnes discusses the value and utility of measuring cognitive function throughout the drug development process using "the most widely used automated cognitive function assessment system in worldwide clinical research, the Cognitive Drug Research (CDR) computerized assessment system," including testing attention, such as "Simple reaction time," "Choice reaction time," "Digit vigilance," as well as executive function and working memory. Wesnes at 184-185, Table 1. |
| **Claim 4** | |
| The method of claim 1, wherein the PK changes are measured by one or more parameters selected from the group consisting of plasma concentration, $C_{max}$, $C_n$, $C_{24}$, Tmax, and Area Under the Curve (AUC). | *See* claim 1 (above). Further, the Cook patent, discloses the pharmacokinetics of GHB after oral administration of two consecutive doses of GHB to narcoleptic patients who are maintained on a chronic regimen of GHB. *See* Cook patent at Example 3. The disclosed study reported measuring plasma concentration, $C_{max}$, Tmax, t ½, the area under the curve (AUC), apparent oral clearance (CL/F), volume of distribution, and mean residence time. *See, e.g., id.* at 29:33-63; *see also* Borgen at 61-62; Xyrem 2012 PI at 5-6; Scharf at Figures 1-6, Tables 1-2. |
| **Claim 5** | |
| The method of claim 4, wherein the PK changes are measured by $C_{max}$ or AUC. | *See* claim 4 (above). Further, the Cook patent, discloses the pharmacokinetics of GHB after oral administration of two consecutive doses of GHB to narcoleptic patients who are maintained on a chronic regimen of GHB. *See* Cook patent at Example 3. The disclosed study reported measuring plasma concentration, $C_{max}$, Tmax, t ½, the area under the curve (AUC), apparent oral clearance (CL/F), volume of distribution, and mean residence time. *See, e.g., id.* at 29:33-63; *see also* Borgen at 61-62; Xyrem 2012 PI at 5-6; Scharf at Figures 1-6, Tables 1-2. |
| **Claim 6** | |

| Claim Elements | Prior Art Teachings |
|---|---|
| The method of claim 1, further comprising monitoring the patient's response and adjusting the dose of GHB or salt thereof. | *See* claim 1 (above). Further, the Cook patent discloses a clinical trial where GHB dosage was adjusted when clinically indicated (e.g., intolerance or lack of efficacy). The Cook patent at 17:40–18:10. The Xyrem 2005 PI discloses that the dosage for GHB may be increased. Specifically, the Xyrem 2005 PI states that "[t]he starting dosage can then be increased to a maximum of 9 g/night in increments of 1.5 g/night (0.75 g per dose). One to two weeks are recommended between dosage increases to evaluate clinical response and minimize adverse effects." Xyrem 2005 PI at 23; *see also* Xyrem 2012 at 2. Further, a person of ordinary skill in the art would have known that a dose of a medication could be titrated upwards or downwards based on clinical response. |
| **Claim 7** | |
| The method of claim 1, wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 4.5 g. | *See* claim 1 (above) and claims 2-4 of the '306 patent. |
| **Claim 8** | |
| The method of claim 1, wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 6 g. | *See* claim 1 (above) and claims 2-4 of the '306 patent. |
| **Claim 9** | |
| The method of claim 1, wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 7.5 g. | *See* claim 1 (above) and claims 2-4 of the '306 patent. |
| **Claim 10** | |
| The method of claim 1, wherein the manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium is 9 g. | *See* claim 1 (above) and claims 2-4 of the '306 patent. |
| **Claim 11** | |

| Claim Elements | Prior Art Teachings |
|---|---|
| The method of claim 1, wherein the daily dosage amount of GHB or salt thereof administered to the patient is reduced by about 15% to about 30%, compared to manufacturer's recommended starting daily dosage amount of GHB or salt thereof in the absence of concomitant administration of divalproex sodium. | *See* claim 1 (above) and claims 2-4 of the '306 patent. |
| **Claim 12** | |
| The method of claim 1, wherein the patient is currently taking divalproex sodium. | *See* claim 1 (above) and claim 2 of the '306 patent. |

MIDLIGE RICHTER LLC
*Attorneys for Defendants, Lupin Inc. and Lupin Pharmaceuticals, Inc.*

By: s/ James S. Richter
James S. Richter
jrichter@midlige-richter.com

Dated: July 22, 2022

**OF COUNSEL:**

Michael K. Nutter
Kurt A. Mathas
Kevin J. Boyle
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601

**CERTIFICATION OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing SECOND AMENDED INVALIDITY CONTENTIONS were served by electronic mail upon all counsel of record on July 22, 2022.

*s/ Kevin J. Boyle*
Kevin J. Boyle

Dated: July 22, 2022

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JAZZ PHARMACEUTICALS IRELAND LIMITED.,<br><br>Plaintiff,<br><br>v.<br><br>LUPIN INC., LUPIN LIMITED, and TEVA PHARMACEUTICALS, INC.,<br><br>Defendants. | C.A. No. 2:21-CV-14271-SRC-JSA |

**AMENDED EXPERT REPORT OF MICHAEL CROWLEY, PH.D., ON THE INVALIDITY OF U.S. PATENT NOS. 8,591,922, 8,901,173, 9,132,107, and 11,554,102**

Submitted on May 15, 2025

Michael Crowley

SIGNATURE

Michael Crowley Digitally signed by Michael Crowley Date: 2025.05.15 13:12:22 -05'00'

# Table of Contents

I. INTRODUCTION ........ 1

II. SUMMARY OF OPINIONS ........ 1

III. QUALIFICATIONS ........ 4

IV. COMPENSATION ........ 7

V. MATERIALS CONSIDERED ........ 7

VI. LEGAL PRINCIPLES ........ 8

A. Obviousness ........ 8

B. Person of Ordinary Skill in the Art ........ 9

C. Claim Construction ........ 10

VII. THE ASSERTED PATENTS ........ 10

A. The Asserted Patents ........ 10

B. The Asserted Claims ........ 11

C. The Patent Specification(s) ........ 13

D. The Prosecution History ........ 15

1. The ’922 Patent ........ 15

2. The ’173 Patent ........ 16

3. The ’107 Patent ........ 19

4. The ’102 Patent ........ 20

VIII. LEVEL OF ORDINARY SKILL IN THE ART ........ 21

IX. INVALIDITY OPINIONS ........ 22

A. STATE OF THE PRIOR ART ........ 22

1. GHB was a Well-Known and Extensively Studied Compound ........ 22

2. Xyrem (Sodium-GHB) Was FDA-Approved But Caused High Sodium Consumption 24

3. The Need to Limit Sodium Intake Was Well-Recognized in the Art ..................... 25

4. Partial Replacement of Sodium with Potassium, Magnesium, and Calcium to Reduce Sodium Burden ..................... 28

5. GHB Formulations Using Sodium, Potassium, Magnesium, and Calcium Salts Were Well Known ..................... 32

6. A POSA Would Have Understood How to Optimize Reduced Sodium Mixed-Salt GHB Compositions Through Routine Experimentation ..................... 37

B. The Asserted Claims Are Obvious Over Cook ..................... 43

1. '102 Patent ..................... 44

2. '922 Patent ..................... 60

3. '173 Patent ..................... 64

4. '107 Patent ..................... 65

C. The Asserted Claims are Obvious Over Cook in View of One or More of Conte, Gessa, and/or Karppanen ..................... 67

D. The Asserted Claims are Obvious Over the Xyrem Label in View of One or More of Cook, Conte, Gessa, and/or Karppanen ..................... 71

1. '102 Patent ..................... 73

2. '922 Patent ..................... 89

3. '173 Patent ..................... 92

4. '107 Patent ..................... 93

X. CONCLUSION ..................... 95

# I. INTRODUCTION

1. I have been retained by counsel for Defendants Teva Pharmaceuticals, Inc. ("Teva") and Lupin Inc. and Lupin Pharmaceuticals, Inc. ("Lupin") (collectively, "Defendants") as an expert in this case to consider the validity of U.S. Patent Nos. 8,591,922 ("the '922 Patent"), 9,132,107 ("the '107 Patent"), 8,901,173 ("the '173 Patent"), and 11,554,102 ("the '102 Patent") (collectively, the "Asserted Patents," "'922 Patent Family," or "Reduced Sodium Mixed-Salt Patents"), which I understand have been asserted in this lawsuit by Plaintiff Jazz Pharmaceuticals Ireland Limited ("Plaintiff" or "Jazz").[1]

2. My opinions are based on my professional experience and expertise, as well as information currently available to me. My analysis is ongoing and may include review of additional documents, deposition testimony (including transcripts not yet available), and materials that may be produced in discovery. Accordingly, I expressly reserve the right to amend or supplement my opinions as appropriate in light of new information, developments in the case, or positions taken by Jazz or its experts. I also reserve the right to respond to any rebuttal reports, to rely on demonstrative materials, and to provide rebuttal testimony addressing any arguments or analyses presented in opposition to my report.

# II. SUMMARY OF OPINIONS

3. It is my opinion that the Asserted Claims of the '102, '922, '107, and '173 Patents are invalid as obvious over the prior art.[2]

---

[1] I have been informed by counsel that U.S. Patent Nos. 10,675,258 ("the '258 Patent") and 10,195,168 ("the '168 Patent") were previously asserted but have been dropped.

[2] I have recently been informed that the Plaintiffs are no longer asserting several patent claims from the patent family I refer to as the Reduced Sodium Mixed-Salt Patents, and have narrowed the list of currently asserted claims from this family to only claim 11 of the '922 Patent, claim 11 of the '173 Patent, claims 11 and 16 of the '107 Patent, and claims 1, 6, 7, 8, 9, 10, and 11 of the '102 Patent (collectively, the "Asserted Claims").

4. In particular, as set forth in greater detail in this report, each Asserted Claim would have been obvious in view of, *inter alia*, Cook,[3] which discloses stable, aqueous GHB salt formulations and identifies sodium, potassium, magnesium, and calcium as suitable cations, either alone or in combination. Cook provides detailed guidance on formulation techniques, concentration ranges, acceptable pH values, and the use of pharmaceutically acceptable carriers. A person of ordinary skill in the art ("POSA") would have arrived at the claimed compositions—including the specific salt mixture, total concentration, and pH—through routine optimization using known salts for their expected pharmaceutical functions.

5. To the extent any individual limitation, concentration range, or claimed ratio is not rendered obvious by Cook alone, it would have been obvious in view of Cook in combination with one or more other references including, but not limited to, Conte[4] and/or Gessa,[5] which confirm the suitability and preference for the same four GHB salts (sodium, potassium, magnesium, and calcium), as well as Karppanen,[6] which provides clear motivation to reduce the amount of sodium and incorporate the alternative cations magnesium, potassium, and calcium in oral formulations. These references reflect well-established formulation practices and public health guidance that would have led a POSA to select and incorporate these specific salts in GHB compositions.

---

[3] U.S. Patent Application Publication No. 2003/0125385, *Microbiologically Sound and Stable Solutions of Gamma-Hydroxybutyrate Salt for the Treatment of Narcolepsy* (pub. July 3, 2003) (TEVA_XWAV_00022746-22785) ("Cook").
[4] U.S. Patent No. 5,594,030, *Controlled Release Pharmaceutical Compositions Based on One or More Pharmaceutically Acceptable Salts of Gamma Hydroxy-Butyric Acid* (issued January 14, 1997) (TEVA_XWAV_00022640-22651) ("Conte").
[5] U.S. Patent No. 4,983,632, *Use of Gamma-Hydroxybutyric Acid Salts for Preparing Pharmaceutical Compositions for Use in the Treatment of Alcoholism, and the Compositions Obtained* (issued January 8, 1991) (JPIL0023856-23861) ("Gessa").
[6] H. Karppanen, et. al, *Why and How to Implement Sodium, Potassium, Calcium, and Magnesium Changes in Food Items and Diets?*, 19 Journal of Human Hypertension, S10-S19 (2005) (TEVA_XWAV_00025783-25792) ("Karppanen").

6. In addition, and/or alternatively, the Asserted Claims would have been obvious over the Xyrem Label[7] in view of one or more of Cook, Conte, Gessa, and/or the other references cited above. As indicated in the Xyrem Label (and admitted in the Asserted Patents at *e.g.*, 1:60-2:3[8]), Xyrem was known to contain a high sodium load, which the FDA had identified as a health risk factor, especially for patients with hypertension, heart failure, or renal impairment. The Xyrem product was approved by FDA with explicit warnings relating to its high sodium content. A POSA would have been motivated to reduce the sodium content of Xyrem while maintaining its therapeutic GHB dose and overall concentration, and would have understood that other pharmaceutically acceptable cations could be used in combination with sodium to achieve this goal. The prior art provided sufficient direction to carry out these modifications using known ingredients, routine formulation strategies, and predictable outcomes, all without undue experimentation, and with a reasonable expectation of success.

7. I have found no evidence that the specific salt combinations, concentration ranges, or pH values recited in the Asserted Claims are critical to formulation performance or result in any unexpected properties. To the contrary, based on the teachings of the prior art (*e.g.*, Cook), a POSA would understand that GHB would have been dissociated from its counterion in aqueous media, biological fluids, and at its location of action, and that according to the prior art, the choice of cation would not be expected to meaningfully alter pharmacodynamics or the mechanism of action of the active GHB anion at the site of action. The choice and ratio of cations—sodium, potassium, calcium, and magnesium—would have been dictated by well-known formulation goals, including improving health and safety, taste, reducing sodium content, minimizing side effects, and

[7] Xyrem® (Sodium Oxybate) Oral Solution, CIII, FDA Approved Labeling (approved 2002, rev. Nov. 2005) (TEVA_XWAV_00023318-23376) (“Xyrem Label”).
[8] Unless otherwise noted, citations to the Asserted Patents refer to the ’922 Patent.

maintaining solubility. A POSA could have applied routine optimization techniques, including solubility studies, to develop a composition that achieves GHB dissociation while addressing sodium-related concerns. Accordingly, it is my opinion that the Asserted Claims are obvious and invalid.

## III. QUALIFICATIONS

8. For a detailed list of my experience and publications, see my curriculum vitae attached hereto as Exhibit A.

9. I have 30 years of experience in the field of molecular pharmaceuticals and drug delivery.

10. I received a B.S. in Chemistry, with the distinction of *Summa Cum Laude*, from the University of Missouri, St. Louis, and subsequently received a master's degree, with the distinction of *Cum Laude*, in Organic Chemistry from Washington University in St. Louis, Missouri.

11. After obtaining my master's degree, I worked as a chemist for Warner-Jenkinson Company Inc. ("Warner-Jenkinson"). At Warner-Jenkinson, I worked on a number of projects involving drug formulations including applications for pharmaceutical excipients in film coating, tablets, pellets, solutions, suspensions, topicals, printing inks and medical devices.

12. After working at Warner-Jenkinson, I went to work for Mission Pharmacal Co. ("Mission Pharmacal") where my responsibilities included product and process development for both nutritional supplements and drug products in solid oral and topical dosage forms. My work at Mission Pharmacal included pre-formulation, formulation and product development, analytical and physico-chemical characterization, scale-up, packaging engineering, validation and troubleshooting under GMPs. In addition to generating and evaluating data for regulatory submissions at Mission Pharmacal, I oversaw and managed a group of about two dozen employees.

13. After Mission Pharmacal, I attended the University of Texas at Austin where I obtained a Ph.D. in Molecular Pharmaceutics. During that time, I conducted research in a number of different areas including hot-melt extrusion, wet granulation, extrusion/spheronization, fluidized bed granulating and coating, film coating and tableting. I also gained familiarity with different analytical test methodologies including HPLC, GPC, x-ray diffraction, scanning electron microscopy and differential scanning calorimetry.

14. After graduating from the University of Texas at Austin in 2003, I went to work at PharmaForm, LLC ("PharmaForm") as its Vice President of Drug Delivery Technology & Manufacturing Services. I was subsequently promoted to Vice President of Quality Control & Analytical R&D and then Vice President of Business Development.

15. While at PharmaForm, I gained additional experience in drug development projects from pre-formulation to clinical trials and commercial production. My relevant experience includes studying manufacturing and process technology, scale up studies, and trouble shooting wherever needed. I also studied physical and chemical interactions between raw pharmaceutical excipients and drug substances, the development and validation of stability-indicating analytical methodologies, and development of cleaning methodologies to support clinical and commercial manufacturing. I worked on a number of different formulations during that time, including solid oral dosage forms, transdermal, trans-mucosal, semi-solid and liquids of both small and large compounds.

16. I am currently the President of Theridian Technologies, LLC, which provides technical consulting services for drug product and process development including the application of proprietary and non-proprietary delivery technologies.

17. I am also a co-founder of Oticara, Inc. (formerly Oticus Labs, LLC), which is a specialty pharmaceutical company developing novel treatments for infectious diseases.

18. I have sat on multiple boards of directors including at Texas EnteroSorbents, Inc. ("TxESI"), which makes products and technologies to mitigate and/or remove toxins and inflammatory products from animals and humans, and at Nanopore Therapeutics Inc., which is a startup company developing novel technologies for drug delivery.

19. I am also an Adjunct Professor at the College of Pharmacy at The University of Texas at Austin. In my role as an adjunct professor, I lecture undergraduate and graduate students about Product Development, Advanced Pharmacy Manufacturing, and Advanced Pharmaceutical Processing.

20. I am a named inventor on numerous U.S. patents and patent applications and an author on multiple publications and book chapters related to drug formulation and delivery. Those include a book chapter that I authored for the 21st Edition of "Remington: The Science and Practice of Pharmacy," ("Remington") in 2005, called "Solutions, Emulsions, Suspensions and Extracts." I have since revised that chapter for subsequent editions of Remington.

21. I have also spoken about various issues related to pharmaceutical drug development and excipients at conferences and symposiums and received numerous distinctions and awards related to my work in the fields of chemistry and pharmaceuticals.

22. In the past five years, I have previously testified as an expert in the following matters:

- Otsuka Pharmaceutical Co., Ltd. et al v. Zenara Pharma Private Ltd. et al, C.A. No. 19-cv-1938-LPS (D. Del.);

- Chiesi USA, Inc, et. al v. Aurobindo Pharma USA, et al, C.A. No. 3-19-CV-18756-FLW-LHG (D.N.J.);
- Merck Sharp & Dohme Corp. v. Mylan Pharmaceuticals Inc., C.A. No. 1-19-CV-1489-RGA (D. Del.);
- Hoffman-La Roche, Inc., et al. v. Fresenius Kabi USA, LLC., et al., C.A. No. 1-20-cv-394-RGA (D. Del.);
- Orexo AB and Orexo US, INC., v. Sun Pharmaceutical Industries Limited et al., C.A. No. 20-cv-12588-GC-DEA (D.N.J.) (consolidated);
- Supernus Pharmaceuticals, Inc. v. Apotex, Inc. and Apotex, Corp., C.A. No. 20-cv-7870-FLW-TJB (D.N.J.);
- Kinderfarms, LLC v. Genexa, Inc., PGR2023-00051 (P.T.A.B.).
- Braintree Laboratories, Inc. and Sebela US Inc., v. Lupin Limited and Lupin Pharmaceuticals, Inc,

## IV. COMPENSATION

23. I am being compensated for my time working on this case at the rate of $750 per hour. My compensation is not in any way related to the outcome of or testimony or opinions given in this case.

## V. MATERIALS CONSIDERED

24. Exhibit B provides a list of the materials I considered in preparing this declaration, in addition to any materials cited or referenced herein. I also relied on my experience, education, and knowledge of the art. While I cite to specific passages from prior art documents in this report, such citations are merely exemplary.

## VI. LEGAL PRINCIPLES

25. I have been instructed by counsel to apply certain legal standards to my analysis. A summary of the legal standards that I have applied is given below.

### A. Obviousness

26. I understand that a claimed invention may be considered obvious even if it is not identically disclosed in any single prior art reference. I understand a claim is considered obvious if the subject matter of the claimed invention as a whole would have been obvious at the time the invention was made to a POSA in which the claimed invention pertains.

27. I understand that this analysis considers: (1) the scope and content of the prior art, (2) differences between the prior art and the claims at issue, (3) the level of ordinary skill in the pertinent art, and (4) any secondary considerations such as unexpected results, commercial success; failure of others; skepticism in the industry; praise in the industry; and/or copying by others.[9]

28. I have been informed that a determination of obviousness may be based on a single prior art reference or a combination of multiple references. In other words, obviousness does not require that every element of the claimed invention be disclosed in a single reference.

29. I understand that a finding of obviousness requires a reason or rationale that would have motivated a POSA to combine the teachings of the prior art to arrive at the claimed invention. This rationale may be found in the references themselves, in the general knowledge of a POSA, or

[9] I am presently unaware of any such secondary considerations that might apply to the Asserted Claims, and in any event, reserve the right to respond to any such assertions that may bear on my opinions of obviousness. I understand that Plaintiff only vaguely references secondary considerations in their validity contentions without sufficient detail to respond. If Plaintiff is permitted by the Court to present and rely on secondary considerations, I reserve the right to respond regarding any such secondary considerations relied upon by Plaintiff's expert(s).

in the nature of the problem to be solved. Moreover, I understand that such a rationale need not be explicitly stated in the prior art.

30. I further understand that a POSA must also have had a reasonable expectation of success in arriving at the claimed invention. However, a reasonable expectation of success does not require absolute certainty.

31. I understand that an obviousness analysis must consider whether the prior art "teaches away" from the claimed invention. However, a mere preference for an alternative approach does not constitute teaching away, unless the prior art explicitly criticizes or discourages the claimed solution.

32. I understand that where the general conditions of a claim are disclosed in the prior art, it is not inventive to determine the optimum or workable ranges by routine experimentation.

33. I understand that in *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727 (2007), the Supreme Court explained that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id*. at 1739.

34. Finally, I understand that while issued patent claims are presumed valid, they may be invalidated upon a showing of obviousness by clear and convincing evidence.

**B. Person of Ordinary Skill in the Art**

35. I understand that the determination of whether the claims of a patented invention are obvious is made from the perspective of a person of ordinary skill in the art ("POSA") to which the claimed invention pertains. The POSA is a hypothetical person presumed to have known all relevant art at the time the invention was made. When I refer to a POSA in this report, I will mean the fictitious person as discussed above as of December 2012.[10] The factors considered in

[10] My reliance on the December 2012 date should not be taken as a concession that any claims are entitled to that priority date.

determining the level of ordinary skill in the art may include: (1) the types of problems encountered in the art; (2) prior art solutions to those problems; (3) the rapidity with which innovations are made; (4) sophistication of the technology; and (5) the educational level of active workers in the field. I understand that obviousness is assessed from the perspective of a POSA at the time of a purported invention.

### C. Claim Construction

36. I understand that the Asserted Patents define certain terms. (*See*, *e.g*., '922 Patent at 4:64-8:67.) For any terms defined by the Asserted Patents, I have applied that definition herein.

37. For any terms not defined by the Asserted Patents, I have applied the plain and ordinary meaning it would have had to a POSA at the time of the invention.

## VII. THE ASSERTED PATENTS

### A. The Asserted Patents

38. I understand that Plaintiffs are asserting certain claims of the '922, '173, '107, and '102 Patents, which are each entitled "Gamma-hydroxybutyrate compositions and their use for the treatment of disorders" and share a common specification. All four Asserted Patents list Clark P. Allphin and Michael DesJardin as the named inventors and are purportedly assigned to Jazz Pharmaceuticals Ireland Limited.

39. The '922 Patent issued on November 26, 2013, from U.S. Patent Application No. 13/739,886, filed January 11, 2013, and purports to claim priority to U.S. Provisional Application No. 61/737,695 (the "'695 provisional application"), which was filed on December 14, 2012.

40. The '173 patent issued on December 2, 2014, from U.S. Patent Application No. 14/172,751, filed February 4, 2014, and purports to claim priority to the '695 provisional application.

41. The ’107 patent issued on September 15, 2015, from U.S. Patent Application No. 14/045,673, filed October 3, 2013, and purports to claim priority to the ’695 provisional application.

42. The ’102 patent issued on January 17, 2023, from U.S. Patent Application No. 15/930,295, filed May 12, 2020, and purports to claim priority to the ’695 provisional application.

**B. The Asserted Claims**

43. I understand that Plaintiffs are specifically asserting the following claims of the Asserted Patents: (i) claim 11 of the ’922 Patent, (ii) claim 11 of the ’173 Patent, (iii) claims 11 and 16 of the ’107 Patent, and (iv) claims 1, 6, 7, 8, 9, 10, and 11 of the ’102 Patent (collectively, the “Asserted Claims”).

44. Claim 11 (and incorporated claims) of the ’922 Patent recite:

> *1*. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.$(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate (Ca.$(GHB)_2$); and optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier.
>
> *2*. The pharmaceutical composition of claim 1, wherein the pharmaceutically acceptable carrier comprises more of a solvent, dispersion medium, coating, antibacterial agent, antifungal agent, isotonic agent, or absorption delaying agent.
>
> 11. The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of 5% to 40%, the K.GHB salt is present in a wt/wt % of 10% to 40%, the Mg$(GHB)_2$ salt is present in a wt/wt % of 5% to 30%, and the Ca.$(GHB)_2$ salt is present in a wt/wt % of 20% to 80%.

45. Claim 11 (and incorporated claims) of the ’173 Patent recite:

> *1*. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture comprises three or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate

(K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.$(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate (Ca.$(GHB)_2$).

*2*. The pharmaceutical composition of claim 1, wherein the mixture comprises Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$.

11. The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of about 5% to about 40%, the K.GHB salt is present in a wt/wt % of about 10% to about 40%, the Mg.GHB$)_2$ salt is present in a wt/wt % of about 5% to about 30%, and the Ca.$(GHB)_2$ salt is present in a wt/wt % of about 20% to about 80%.

46. Claims 11 and 16 (and incorporated claims) of the '107 Patent recite:

*1*. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of at least three salts of GHB, wherein the mixture comprises a calcium salt of gamma-hydroxybutyrate (Ca•$(GHB)_2$), a magnesium salt of gamma-hydroxybutyrate (Mg•$(GHB)_2$), and one or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na•GHB) and a potassium salt of gamma-hydroxybutyrate (K•GHB).

*2*. The pharmaceutical composition of claim 1, wherein the mixture comprises Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$, and wherein the amount of Na•GHB is present at a wt/wt % of about 5% to about 40%.

11. The pharmaceutical composition of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 40%, the K•GHB salt is present in a wt/wt % of about 10% to about 40%, the Mg•$(GHB)_2$ salt is present in a wt/wt % of about 5% to about 30%, and the Ca•$(GHB)_2$ salt is present in a wt/wt % of about 20% to about 80%.

*15*. The pharmaceutical composition of claim 1, wherein the mixture comprises Mg•$GHB_2$, Na•GHB, and Ca•$(GHB)_2$.

16. The pharmaceutical composition of claim 15, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 10%, the Mg•$GHB_2$ salt is present in a wt/wt % of about 20% to about 25%, and the Ca•$(GHB)_2$ salt is present in a wt/wt % of about 40% to about 50%.

47. Claims 1 and 6-11 of the '102 Patent recite:

1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB and a pharmaceutically acceptable carrier, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.$(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate (Ca.$(GHB)_2$), wherein the

Na.GHB salt is present in a % molar equivalents of about 5% to about 40%, the K.GHB salt is present in a % molar equivalents of about 10% to about 40%, the Mg.$(GHB)_2$ salt is present in a % molar equivalents of about 5% to about 30%, and the Ca.$(GHB)_2$ salt is present in a % molar equivalents of about 20% to about 80%, wherein the composition is formulated as a liquid formulation, and wherein the liquid formulation has a total concentration of GHB salts of about 350 mg/mL, about 400 mg/mL, about 450 mg/mL, about 500 mg/mL, about 550 mg/mL, or about 600 mg/mL.

6. The pharmaceutical composition of claim 1, wherein the Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca$(GHB)_2$ salts are present in a % molar equivalents ratio of about 8:23:21:48, respectively.

7. The pharmaceutical composition of claim 1, wherein the total concentration of GHB salts is about 500 mg/mL.

8. The pharmaceutical composition of claim 1, wherein the composition has a pH of about 7.5 to about 9.0.

9. The pharmaceutical composition of claim 1, wherein the composition has a pH of about 8.0 to about 8.5.

10. The pharmaceutical composition of claim 1, wherein the composition has a pH of about 8.3.

11. The pharmaceutical composition of claim 1, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.

### C. The Patent Specification(s)

48. Each of the Asserted Reduced Sodium Mixed-Salt Patents, including the ’922 Patent, share a common specification (referred to herein as the “Specification”).

49. In the Background section, all of the patents acknowledge that, inter alia, the prior art Xyrem sodium oxybate (Na.GHB) product had been approved, was being commercially sold for the treatment of excessive daytime sleepiness and cataplexy in patients with narcolepsy, and that the amount of sodium intake from the drug significantly increased the sodium intake for patients which is undesirable for patients with hypertension, heart disease, renal disease, or at risk of stroke, per the FDA product label (e.g., dated Nov. 13, 2006 for NDA no. 021196). (*See, e.g.*, ’922 patent at 1:47-2:3.)

50. The Specification purports to disclose "pharmaceutical compositions comprising salts of gamma-hydroxybutyrate (GHB) which are useful in the treatment of conditions responsive to GHB," including a variety of sleep disorders such as narcolepsy and cataplexy. (*Id*. at 2:21-27.) The Specification further states that the disclosed compositions are "reduced in sodium content," making them "particularly suitable for the treatment of patients with hypertension, heart disease, or renal disease, or who are at risk of stroke." (*Id*. at 2:28-32.)

51. The Specification identifies that the compositions comprise "two or more salts selected from the group consisting of a sodium salt of hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca.(GHB)_2$)." (*Id*. at 2:33-39.)

52. The Specification also describes various formulation features and optional characteristics of the pharmaceutical compositions, including that: the composition may be a liquid formulation; it may be chemically stable and resistant to microbial growth; it may be preservative-free; the level of gamma-butyrolactone (GBL) may be 0.1% or less; it may be suitable for oral administration; it may include flavoring agents; and it may be administered in either single or multiple doses. (*Id*. at 3:62–4:4.)

53. Notably, the inventors assert that "[l]ittle research has been done on salts of GHB, other than Na.GHB" and that they were unaware of any "combining multiple salts." (*Id*. at 2:4–6.) As discussed further below, this assertion is inaccurate and contradicted by multiple prior art references that disclosed both alternative GHB salts and mixed-salt formulations.

### D. The Prosecution History

#### 1. The ’922 Patent

54. The ’922 Patent originated as U.S. Patent Application No. 13/739,886, filed January 11, 2013, purportedly claiming priority to Provisional Application No. 61/737,695 filed on December 14, 2012.

55. On April 23, 2013, the Examiner issued a non-final rejection of the claims as obvious under 35 U.S.C. §103. The primary prior art cited was Johnson,[11] with supplemental references to Rourke.[12] The Examiner argued that “Johnson is directed to methods and composition for treating Acquired resistance to GABAnergic agents (ARG)” and “recognizes the ineffectiveness of Na.GHB alone for ARG.” The Examiner argued that Johnson “discloses that the invention comprises treatment of ARG and other identified diseases including sleeping disorders with one or more GABAnergic agents, which are independently selected from classes I (e.g. red wine), II (e.g. sodium salt of 4-hydroxyl butanoic acid or GHB), III (e.g. alprazolam), IV (e.g. zolpidem), V (e.g. gabapentin), and VI GABAnergic agents.” The Examiner argued that “Johnson further discloses preferred GHB salts of the present invention include sodium, potassium, lithium, ammonium and calcium” and “indicates that those of ordinary skill in the field of the invention will recognize a wide variety of non-toxic pharmaceutically acceptable addition salts.” The Examiner argued that “While Johnson does not expressly disclose magnesium salt of GHB, such deficiency is cured by Rourke,” which “is directed to immediate release formulations and dosage forms of GHB” and discloses “that suitable salts of GHB include sodium oxybate (synonym of GHB), calcium oxybate, as well as the lithium, potassium, and magnesium salts.” The Examiner also noted that Johnson was directed at “combination therapy” of various classes of GABAnergic

[11] US Patent Publication No. 2008/0293698 (JPIL0024287-24325) (“Johnson”).
[12] US Patent Publication No. 2011/0111027 (JPIL0025329-25345) (“Rourke”).

agent but that it would have been prima facie obvious to "modify the teachings of Johnson and Rourke et al. to use mixture of GHB salts."

56. Applicants responded on July 22, 2013, amending the claims to specify the mixture "consists of" four GHB salts (sodium, potassium, magnesium, calcium) and could "optionally" include buffering agents, sweeteners, flavorings, or colorings. This amendment was pursuant to discussions in an examiner interview dated July 2, 2013.

57. The Examiner then issued a Notice of Allowance on August 23, 2013, stating:

> The closest prior art by Johnson is a dilute and concentrated, aqueous, pharmaceutical compositions comprising gamma-hydroxybutyric acid or pharmaceutically acceptable salts thereof; gamma-butyryl lactone; 1,4-butanediol: 4-hydroxyl pentanoic acid or pharmaceutically acceptable salts thereof; 4-hydroxyl pentanoic acid lactone, or combinations thereof. However, Johnson did not teach or reasonably suggest pharmaceutical compositions comprising a mixture of salts of GHB. In particular, the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg. (GHB)2), and a calcium salt of gamma-hydroxybutyrate (Ca. (GHB)2).

58. The '922 Patent issued on November 26, 2013.

### 2. The '173 Patent

59. The '173 Patent originated from US Patent Application No. 14/172,751 filed on February 4, 2013, also purportedly claiming priority to Provisional Application No. 61/737,695 filed on December 14, 2012.

60. The Examiner issued an Office Action on March 19, 2014 with similar objections to those discussed above regarding the '922 Patent. Specifically, the Examiner rejected the claims as obvious over Johnson in view of Rourke. The Examiner also rejected the claims for obviousness type double patenting over the claims of the '922 Patent.

61. On August 11, 2014, the Applicants submitted an amendment in response. The Applicants argued that Xyrem is a commercially available product with a high sodium load and

that "a GHB product with far less sodium would be desirable," but "providing Xyrem in other salts is not straightforward." Applicants argued that "at the high doses of Xyrem used, providing this drug in another salt form, such as a potassium, calcium, or magnesium form, also increases the load for these alternative salts, such that these alternative salts can become a significant part of dietary intake, and can also be problematic for certain patients." Applicants argued that the invention enables "the sodium load in the highest daily dose is reduced from about 1640 mg/day to about 140 mg/day" and "allows for the administration of minerals like potassium, calcium and magnesium, at levels that are more beneficial to the patient." Applicants further argued "it was unexpected to create a soluble liquid formulation with the presently claimed salt mixture" and it "would not have been obvious that the presently claimed composition would be soluble at the time the invention was made."

62. With respect to Johnson, Applicants argued that it was directed at "combination of agents" from as many as "seven classes of agents" where even "class II comprises a large group of agents, including GHB." Thus, Applicants asserted Johnson was directed at combining different "agents" and "not different salt forms of the same agent."

63. With respect to Rourke, Applicants argued that Rourke discloses "a solid form, immediate release formulation" of GHB, and that "[r]ate of drug release is important to Rourke…as the solid form is different from the liquid form, but its need to be released into the blood system," and nowhere in Rourke "is it suggested that a mixture of three or more salts be combined to arrive at the presently claimed pharmaceutical compositions."

64. Applicants further argued the presently claimed compositions are non-obvious due to "perceived manufacturing difficulties and the potential expense of making multi-salt formulations," because "a manufacturer might find it cumbersome and inefficient to use the

conventional approach of making individual batches of different salts, isolating the salts, and then combining them into a mixture," and thus "would not be included to use that method and it would be unclear as to which other methods might work." They further argued that "merely reacting various bases with GBL to form salts of GHB may cause some of the material to precipitate," but "Applicant discovered methods that solve this problem." Specifically, they argued "Applicant found that the soluble pharmaceutical composition of the GHB salts recited in the claims could be made by adding all bases at once into the reaction mixture, or alternatively, by adding stronger bases (sodium and potassium) first and the weaker bases (calcium and magnesium) second" and "[o]ther methods may cause unacceptable precipitation to occur in the claimed pharmaceutical compositions during processing." They further argued "Applicant found that using magnesium causes the liquid solution to achieve the preferred pH range without the addition of pH adjusting agents" and "it would not have been obvious to one of ordinary skill in the art to make the presently claimed pharmaceutical compositions and formulations."

65. The applicants also argued that "[o]ne of skill in the art would not have known that the presently claimed formulation would be soluble in a liquid solution" because "the salts of monovalent cations, such as sodium and potassium, are generally more soluble than those of divalent cations, such as calcium and magnesium" and "[m]ixing solutions containing calcium or magnesium ions has a risk of forming an insoluble calcium or magnesium salt causing a precipitate within the product." They argued that the mixing of drug salts of calcium, and to a lesser extent magnesium, with phosphates, carbonates, bicarbonates, tartrates or sulfates generally should also be avoided" including because "the 'Common Ion Effect' states that the solubility of a sparingly soluble salt is reduced in a solution that contains an ion in common with that salt" and "suggests that the solubility of ions such as calcium or magnesium may be affected by the simultaneous

inclusion of potassium and sodium," and thus "one of skill in the art would not know beforehand if the claimed formulation would be soluble and therefore effective as a medication." Applicants argued that "[e]ach salt has different properties which were not known until the time of the present invention" and "[i]t was not known that each form would be soluble or co-soluble with the other salts."

66. On September 26, 2014, the Examiner issued a notice of allowance, stating:

> The examiner has determined that the closest prior art, Johnson, does not render obvious the claimed pharmaceutical composition of gamma-hydroxy butyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture comprises three or more salts selected from the group consisting of a sodium salt of gamma-hydroxy butyrate (NaGHB), a potassium salt of gamma-hydroxy butyrate (KGHB), a magnesium salt of gamma-hydroxy butyrate (Mg(GHB)), a calcium salt of gamma-hydroxy butyrate ($Ca(GHB)_2$). Johnson discloses a treatment of GABAnergic agents (ARG) with one or more GABAnergic agents, which are different active entities (e.g. different chemical structures or mode of actions). Of these different active entities, class II comprises NaGHB. Johnson did not teach or suggest combining different salt forms of the same agent, particularly, Mg(GHB)2. Accordingly, claims 1-33 are allowed.

67. The '173 Patent issued on December 2, 2014.

### 3. The '107 Patent

68. The '107 Patent originated from US Patent Application No. 14/045,673 filed on October 3, 2013.

69. The Examiner issued a rejection on January 23, 2015. The Examiner rejected the claims as obvious over Johnson in view of Rourke for the same reasons discussed above. The Examiner further referenced Geekwench et al. (an online chat) as purportedly suggesting the use of "magnesium oxybate or calcium oxybate INSTEAD of sodium oxybate, since calcium is an element most of us could use more of and magnesium is one that has many benefits and so little toxicity that it would seem the natural choice." The Examiner further rejected the claims for obviousness type double patenting over the claims of the '922 Patent and '173 Patent.

70. On June 19, 2015, the Applicants responded and made similar arguments regarding Johnson and Rourke as discussed above. The Applicants further argued that Geekwench is not prior art, and is "chat room discussion among non-technical people on a message board hosted by Talk About Sleep" and that using the Wayback Machine argued the forum was not available prior to the current priority date. Applicants further filed a terminal disclaimer over the '922 and '173 Patents.

71. On July 9, 2015 the Examiner issued a Notice of Allowance, stating "[t]he examiner has determined that the closest prior art, Johnson or Rourke, does not teach or render obvious the claimed mixture of gamma-hydroxy butyrate (GHB) salts, particularly a mixture of calcium salt of gamma-hydroxy butyrate (Ca-(GHB)z) [and] a magnesium salt of gamma-hydroxy butyrate."

72. The '107 Patent issued on September 15, 2015.

**4. The '102 Patent**

73. The '102 patent was originally filed as U.S. Patent Application No. 15/930,295 on May 12, 2020, purportedly claiming priority back to Provisional Application No. 61/737,695 filed on December 14, 2012.

74. On May 11, 2022, the Examiner issued a non-final rejection of the claims based on grounds of nonstatutory double patenting.

75. Specifically, the Examiner found the claims not patentably distinct from: (i) Claims 1-29 of U.S. Patent No. 8,591,922; (ii) Claims 1-29 of U.S. Patent No. 9,132,107; (iii) Claims 1-7 of U.S. Patent No. 10,951,168; (iv) Claims 1-33 of U.S. Patent No. 8,901,173; and (v) Claims 1-36 of U.S. Patent Application No. 17/479,886. The Examiner explained that although the claims were not identical, they were "not patentably distinct" because both claim sets were directed to similar pharmaceutical compositions of GHB comprising mixtures of salts (sodium, potassium, magnesium, and calcium GHB). While the specific claims differed in the molar equivalents and

concentrations, the Examiner reasoned, "it would have been obvious to one of ordinary skill to optimize the amounts of each salt."

76. The Examiner similarly rejected the claims for nonstatutory double patenting over: (i) Claims 1-25 of U.S. Patent No. 9,555,017; (ii) Claims 1-33 of U.S. Patent No. 10,675,258; and (iii) Claims 37-46 of U.S. Patent Application No. 17/479,886, for the same reasons.

77. Applicant filed terminal disclaimers on August 19, 2022, overcoming the double patenting rejections. Subsequently, the Patent Office issued a Notice of Allowance on September 14, 2022, stating: "[t]he prior art is free of any teaching or suggestion of the claimed pharmaceutical composition comprising GHB comprising a particular mixture of salts."

78. The '102 Patent issued on January 17, 2023.

## VIII. LEVEL OF ORDINARY SKILL IN THE ART

79. In my opinion, a POSA for the patents in suit would have had an advanced degree (*i.e.*, a Ph.D., Pharm. D. or M.D.) in fields relevant to pharmaceutical formulations, such as pharmaceutical sciences, pharmacy, chemistry, biochemistry, medicinal chemistry, or a related field, and at least two years of relevant experience in the preparation of pharmaceutical formulations and/or drug development. A POSA could have a lesser degree with increased years (five to six years) of practical experience in research and development of pharmaceutical formulations. The POSA would have been familiar with synthesizing and/or developing salt forms of API, salt screenings including with respect to solubility, and how to measure and evaluate the properties of salts.

80. Such a person would have understood that drug development requires a multidisciplinary approach and may have drawn upon not only his or her own skills, but also could have taken advantage of certain specialized skills of others to solve any given problem.

81. I consider myself to be at minimum a POSA because I meet the requirements outlined above. I met those requirements both at the time of the invention and now.

## IX. INVALIDITY OPINIONS

### A. STATE OF THE PRIOR ART

#### 1. GHB was a Well-Known and Extensively Studied Compound

82. Gamma-hydroxybutyrate ("GHB" or "oxybate") is an endogenous compound naturally present in human tissues, especially within the central nervous system (CNS). Structurally, GHB is closely related to gamma-aminobutyric acid (GABA), differing only in the substitution of a hydroxyl group in GHB for the amine group in GABA:



GABA



GHB

(Pardi[13] at *e.g.*, 994.)

83. Both GHB and GABA have calming effects on the CNS and share similar routes of metabolism and elimination. (*See*, *e.g.*, *id.*; *see also* '922 Patent at *e.g.*, 1:27-46; GHB Fact Sheet[14] at *e.g.*, 1; Xyrem Label at, e.g., 3-4.)

84. GHB has been known for over a century. GHB has been widely investigated for numerous therapeutic uses, including as an anesthetic and treatments for depression, epilepsy, muscle disorders, substance withdrawal including alcoholism, and narcolepsy. It has been

[13] D. Pardi & J. Black, *γ-Hydroxybutyrate/Sodium Oxybate: Neurobiology, and Impact on Sleep and Wakefulness*. 20 CNS drugs 993-1018 (2006) (JPIL0279722-48) ("Pardi").
[14] Office of National Drug Control Policy, *Gamma Hydroxybutyrate (GHB) Fact Sheet* (TEVA_XWAV_00023803-23806) ("GHB Fact Sheet").

approved in various European countries for such uses. (*See*, *e.g.*, Okun[15] at *e.g.*, 167; Conte at *e.g.*, Abstract, 9:48-51; Carter[16] at *e.g.*, 1; Gessa at *e.g.*, 7:22-36.)

85. GHB is easily synthesized from gamma-butyrolactone (GBL) using simple reagents. This simplicity has contributed to its abuse as a recreational or illicit substance. (*See*, *e.g.*, Pal[17] at e.g., 36; GHB Fact Sheet at *e.g.*, 1; Abanades[18] at *e.g.*, 559.)

86. By the late 1980s, GHB was already under investigation for the treatment of narcolepsy and cataplexy. For example, a 1986 study by Mamelak et al. reported long-term therapeutic use of GHB in narcoleptic patients with no observed tolerance, and a 1989 study by Scrima et al. confirmed GHB's efficacy in reducing cataplexy frequency. (*See*, *e.g.*, Mamelak[19] at *e.g.*, 285; Scrima[20] at *e.g.*, 331.)

87. As will be discussed further herein, GHB is almost always administered in the form of a salt, with suitable salts known to include sodium, potassium, magnesium, and calcium. (*See, e.g.*, Gessa at 7:32-35). To function in the body, GHB dissociates from the corresponding cation and forms the free acid or carboxylate (deprotonated acid or conjugate base). Therapeutic activity

---

[15] M.S. Okun, et al., *GHB: An Important Pharmacologic and Clinical Update*. 4 J Pharm Pharm Sci, 4, 167-75 (2001) (TEVA_XWAV_00022980-22988) ("Okun").
[16] L.P. Carter, et al., *Illicit Gammahydroxybutyrate (GHB) and Pharmaceutical Sodium Oxybate (Xyrem®): Differences in Characteristics and Misuse*, 104 Drug and Alcohol Dependence, 1-10 (2009) (TEVA_XWAV_00024037-24057) ("Carter").
[17] R. Pal & A. K. Teotia, *Date Rape Drugs and Their Forensic Analysis: An update*. 12 Int'l J. Med. Toxicol. & Legal Med., 36-47 (2010) (TEVA_XWAV_00025915-25936) ("Pal").
[18] S. Abanades et al. *γ-Hydroxybutyrate (GHB) in Humans: Pharmacodynamics and Pharmacokinetics*. 1074 Annals of the New York Academy of Sciences, 559-76 (2006) (TEVA_XWAV_00022728-22745) ("Abanades").
[19] Mamelak, M., et al., *Treatment of narcolepsy with γ-Hydroxybutyrate. A Review of Clinical and Sleep Laboratory Findings*, 9 Sleep 285-289 (1986) (JPIL0184079-104083) ("Mamelak").
[20] Scrima, L., et al., *Efficacy of Gamma-Hydroxybutyrate Versus Placebo in Treating Narcolepsy-Cataplexy: Double-Blind Subjective Measures*. 26 Biological Psychiatry, 331-43 (1989) (JPIL0185301-185313) ("Scrima").

is attributed to the GHB anion itself, regardless of the cation with which it is administered. This principle will be addressed in greater detail later in the report.

**2. Xyrem (Sodium-GHB) Was FDA-Approved But Caused High Sodium Consumption**

88. In 2002, the U.S. Food and Drug Administration (FDA) approved Xyrem (sodium oxybate) for the treatment of cataplexy in patients with narcolepsy. (*See* Xyrem 2002 Label[21] at *e.g*., 6.) The approval was later expanded in 2005 to include excessive daytime sleepiness associated with narcolepsy. (*See* Xyrem Label at *e.g*., 7.) As recognized in the Asserted Patents, by the priority date, Xyrem was a known and established FDA-approved product.[22] (*See* '922 Patent at *e.g*., 1:47-2:3.)

89. According to the FDA-approved label, sodium oxybate is a white to off-white crystalline powder that is highly soluble in water. (*See* Xyrem Label at *e.g*., 2.) The commercial formulation was supplied as an oral solution containing 500 mg/mL of sodium oxybate in USP Purified Water, neutralized to pH 7.5 using malic acid. (*Id*.)

90. The Xyrem Label directed that it be taken in two equal doses per night: once at bedtime and again 2.5 to 4 hours later. (*Id*. at e.g., 22-23.) The recommended starting dose was 4.5 grams per night (2.25 grams per dose), titratable in 1.5 grams per night increments (0.75 grams per dose) up to a maximum of 9 grams per night. (*Id*.) One to two weeks were recommended between dose increases to monitor clinical response and tolerability. (*Id*.) Each dose had to be diluted in 60 mL (2 ounces) of water before ingestion. (*Id*.)

[21] Xyrem® (Sodium Oxybate) Oral Solution, CIII, FDA Approved Labeling (2002) (TEVA_XWAV_00025927-26021) ("Xyrem 2002 Label").
[22] For convenience, throughout my report, I generally refer to the 2005 version of the Xyrem Label.

91. Importantly, the Xyrem Label highlighted the product's high sodium content. Each nightly dose contained a substantial amount of sodium, and the label included a table detailing sodium content by dosage level:

**Table 5**
**Sodium Content per Total Nightly Dose**

| Xyrem Dose (g) | Xyrem (mL) | Sodium Content/Dose |
|---|---|---|
| 3 | 6 | 546 mg |
| 4.5 | 9 | 819 mg |
| 6 | 12 | 1092 mg |
| 7.5 | 15 | 1365 mg |
| 9 | 18 | 1638 mg |

(*See id*. at 11.)

92. The label contained an explicit warning to clinicians to consider this sodium burden in patients with heart failure, hypertension, or renal impairment. (*See id. at e.g.*, 4 ("It is prudent to reduce the starting dose of sodium oxybate by one-half in patients with liver dysfunction"); 11 ("Patients with compromised liver function will have an increased elimination half-life and systemic exposure to sodium oxybate" and "[t]he starting dose should therefore be decreased by one-half in such patients, and response to dose increments monitored closely."); *see also* at 23.)

93. The label further warned patients directly: "Xyrem contains a lot of sodium (salt) and may not be right for you." (*Id.* at Medication Guide (2).) Patents were advised to inform their doctor if they "are on a salt-restricted diet, have high blood pressure, heart failure, or kidney problems." (*Id.*)

**3. The Need to Limit Sodium Intake Was Well-Recognized in the Art**

94. By 2012, it was widely publicized and well established in the medical and scientific literature and community that excessive sodium intake posed serious public health risks. High

sodium consumption was broadly linked to conditions such as hypertension, cardiovascular disease, and kidney problems.

95. For example, the World Health Organization (WHO) reported in 2005 that high blood pressure caused one in every eight deaths globally, identifying it as the third leading cause of death. (*See* WHO Guidelines[23] at *e.g.*, 5.) WHO emphasized dietary sodium reduction as a primary method of preventing hypertension. (*Id.*)

96. In 2007, Havas published that over 27% of U.S. adults had hypertension and another 31% had prehypertension, and that nearly 90% of Americans were expected to develop hypertension in their lifetimes. (*See* Havas[24] at *e.g.*, 1439.)

97. In 2012, Angell published that the average sodium intake in the United States remained more than twice the recommended limit for half the adult population, and estimated that reducing sodium intake by just 1,200 mg/day could save up to 92,000 lives annually and reduce healthcare costs by as much as $24 billion. (*See* Angell[25] at *e.g.*, 1625.)

98. Public health authorities uniformly recommended daily sodium intake limits. Most guidance recommended limiting intake to between 1,500 and 2,300 mg per day, depending on individual risk factors.

99. For example, in 2010 the United States Department of Agriculture and Department of Health and Human Services advised that while "[s]odium is an essential nutrient and is needed by the body in relatively small quantities" that "[v]irtually all Americans consume more sodium

---

[23] World Health Org. *Clinical Guidelines for the Management of Hypertension*, https://applications.emro.who.int/dsaf/dsa234.pdf (2005) (TEVA_XWAV_00022543-22639) ("WHO Guidelines").
[24] S. Havas, et.al, *The Urgent Need to Reduce Sodium Consumption*. 298 JAMA, 1439-41 (2007) (TEVA_XWAV_00026080-26082) ("Havas").
[25] S.Y. Angell & T.A. Farley, *Can We Finally Make Progress on Sodium Intake?* 102 American Journal of Public Health, 1625-27 (2012) (TEVA_XWAV_00025793-25795) ("Angell").

than they need." (*See* Dietary Guidelines[26] at *e.g.*, 21.) Accordingly, they published recommendations that individuals should "reduce their sodium intake to less than 2,300 mg or 1,500 mg per day depending on age and other individual characteristics." (*Id*. at *e.g*., 24.)

100. In 2012, the American Heart Association went further, recommending a universal sodium limit of 1,500 mg per day for the entire US population, regardless of age or health status. (*See* Whelton[27] at *e.g*., 2.)

101. These public health concerns extended to pharmaceuticals. By the mid-1990s, regulatory authorities recognized that drug formulations could significantly contribute to a patient's total sodium intake, especially for those undergoing long-term treatment or those sensitive to sodium-related conditions.

102. In 1995, the FDA mandated sodium-content labeling for over-the-counter (OTC) drug products containing 5 mg or more sodium per dose, along with explicit warnings for products delivering more than 140 mg of sodium per maximum daily dose. (1995 FDA Regulations[28] at *e.g*., 17798.) Additionally, the FDA stated publicly that "sodium content labeling of prescription drugs would be beneficial" and encouraged "sodium content labeling of prescription drugs on a voluntary basis." (*Id.* at *e.g*., 17800; *see also* Szarfman[29] at *e.g*., 1291 (noting that the FDA "will be working with pharmaceutical organizations to develop voluntary sodium labeling for

[26] U.S. Dietary Guidelines Advisory Committee, *Dietary Guidelines for Americans, 2010*, (U.S. Dep't of Health & Human Servs. & U.S. Dep't of Agric. 2010), https://health.gov/sites/default/files/2019-10/DietaryGuidelines2010.pdf (TEVA_XWAV_00023038-23149) ("Dietary Guidelines").
[27] P.K. Whelton, et. al, *Sodium, Blood Pressure, and Cardiovascular Disease in Humans.* 16 Curr Hypertension Rep., 1-8 (2014) (TEVA_XWAV_00023212-23241) ("Whelton").
[28] Federal Register, Vol. 61, No. 78, Apr. 22, 1995, Rules and Regulations, pp. 17798-17806 (TEVA_XWAV_00022680-22688) ("1995 FDA Regulations").
[29] A. Szarfman, et. al, *Declaring the Sodium Content of Drug Products*. 333 N. Engl. J. Med., 1291 (1995) (TEVA_XWAV_00025650-25656) ("Szarfman").

prescription drugs" and "will recommend that makers of prescription drugs declare the sodium content if it exceeds 5 mg (0.22 mmol) per single recommended dose and that they issue a warning if the sodium content exceeds 140 mg (6.09 mmol) per maximal daily dose").)

103. In 2004, the FDA reaffirmed these labeling and warning thresholds for drug products containing sodium, maintaining the previously established benchmarks of 5 mg per single dose and 140 mg per maximum daily dose. (FDA Regulations[30] at *e.g.*, 13722.)

104. A POSA would have understood that these regulatory concerns and warnings were particularly relevant to Xyrem. As previously discussed, the Xyrem Label disclosed that each nightly dose delivered a significant sodium load, substantially exceeding the FDA warning threshold even at the lowest approved dose and surpassing the entire recommended daily sodium intake at the highest approved dose.

#### 4. Partial Replacement of Sodium with Potassium, Magnesium, and Calcium to Reduce Sodium Burden

105. It was well-established in the art that one effective strategy to mitigate health risks associated with high sodium intake involved partially substituting sodium with other pharmaceutically acceptable cations, notably potassium, magnesium, and calcium. These alternative cations were frequently employed to address the problem of excessive sodium consumption.

106. For example, Karppanen emphasized reducing sodium intake while increasing potassium, calcium, and magnesium intake for preventing and treating elevated blood pressure. (*See* Karppanen at *e.g.*, Abstract ("various methods to decrease the intake of sodium and to increase

---

[30] Federal Register, Vol. 69, No. 57, Mar. 24, 2004, Rules and Regulations, pp. 13717-13725 (TEVA_XWAV_00026064-26072) ("FDA Regulations").

the intakes of potassium, calcium, and magnesium should be comprehensively applied in the communities").)

107. Karppanen further reported that modern diets typically contained excessive sodium and inadequate amounts of potassium, calcium, and magnesium, leading to significant imbalances in essential mineral intake, as demonstrated by Figure 1:




(*Id.* at *e.g.*, Figure 1.)

108. Karppanen highlighted that average sodium intake (3,000–4,500 mg/day) substantially exceeded recommended limits (1,500-2,500 mg/day), whereas potassium, calcium, and magnesium intake fell significantly short of recommended daily targets. (*Id.* at *e.g.*, S12.) Specifically, potassium intake reached only 37% of its recommended 4,700 mg/day; calcium, 35-40% of the 1,000-1,300 mg/day target; and magnesium, only 50% of the recommended 300-420 mg/day. (*Id.*)

109. Karppanen concluded and recommended that simultaneously decreasing sodium and increasing potassium, calcium, and magnesium effectively reduced blood pressure. (*Id.* at *e.g.*, S10-S17.)

110. Consistent with these teachings, it was also known that combining sodium, potassium, calcium, and magnesium salts provided formulation and health benefits.

111. For example, Noro[31] disclosed stable liquid compositions containing sodium chloride (NaCl), potassium chloride (KCl), magnesium chloride ($MgCl_2$), and calcium chloride ($CaCl_2$), formulated to provide improved taste and health benefits. (*See* Noro at *e.g.*, Claims; Abstract; [0006]-[0009], [0018]-[0031].) Noro specifically taught that compositions containing these four salts dissolved in water, with calcium present in the highest proportion and sodium in relatively lower amounts, achieved desirable taste and health characteristics. (*See id*. at *e.g*., Tables 2-3.) Noro's ratios of the four claimed salts prioritize calcium while minimizing sodium (consistent with the motivations reflected in Karppanen and the FDA Regulations).

112. The '878 Patent[32] similarly disclosed low sodium salt compositions and methods for their preparation. ('878 Patent at *e.g*., Abstract.) The '878 Patent explains that excessive sodium intake is a major public health concern, noting that "[e]xceeding the recommended daily intake of sodium is a significant risk factor in developing high blood pressure and a cause or contributing factor in the rising incidence of heart disease." (*Id*. at 1:29–35.) In response to public health recommendations to reduce sodium consumption, the '878 patent discloses methods for preparing salt compositions with reduced sodium content, stating that "[t]he classical approach to production of salt substitutes involves combining the sodium and potassium salts, or occasionally magnesium salts, in various ratios." (*Id*. at 1:43–46.) The patent further teaches that suitable low sodium compositions preferably incorporate salts of "***potassium***, ***magnesium***, ***calcium***, ammonium, and

---

[31] JP 2000060506, *Compositions of a Highly Concentrated Mineral Solution as an Additive and its Production Process*, (2000). (TEVA_XWAV_00024070-24074 (original)) (TEVA_XWAV_00023874-23884 (translated)) ("Noro").
[32] U.S. Patent No. 8,197,878, *Method for Producing a Low Sodium Salt Composition*, (issued June 12, 2012) (LUPIN-XYWAV_0007805-7821) ("the '878 patent").

***combinations thereof***," thereby lowering sodium content compared to traditional table salt formulations. (*Id*. at 2:63–67 (emphasis added); *see also* 3:61-67; Claims 7, 28, 48.)

113. The FDA provided detailed guidance on labeling thresholds for sodium, potassium, magnesium, and calcium content in drug products:

(i) **Sodium**: labeling required at 5 mg per dose, with warnings required at 140 mg per maximum daily dose;

(ii) **Potassium**: labeling required at 5 mg per dose, with warnings required at 975 mg per maximum daily dose;

(iii) **Magnesium**: labeling required at 8 mg per dose, with warnings required at 600 mg per maximum daily dose; and

(iv) **Calcium**: labeling required at 20 mg per dose, with warnings required at 3.2 grams per maximum daily dose.

(*See* FDA Regulations at *e.g*., 13720, 13725; *see also* 1995 FDA Regulations[33] at e.g., 17807.)

114. The FDA further emphasized the importance of coordinating labeling requirements for sodium, potassium, magnesium, and calcium, stating "it was desirable to coordinate implementation of the sodium labeling with the calcium, magnesium, and potassium labeling," and instructing manufacturers to "incorporate calcium, magnesium, and potassium analyses into current plans to do sodium analyses so that all analyses can be completed and new labeling implemented by the effective date." (FDA Regulations at 13718.) Uniform labeling guidelines would thus "reduce the economic impact for ***products containing sodium and one or more of the other cations***." (*Id*. at 13722 (emphasis added).)

115. The FDA specifically highlighted that the warning threshold for sodium (140 mg) was "much lower than the amount of calcium (3.2 g), magnesium (600 mg), or potassium (975 mg) that trigger a similar warning for these cations." (*Id*. at 13720 (emphasis added).) These

[33] One comment in the 1995 FDA Regulations noted that "adequate potassium and calcium intake may protect against salt sensitivity." (*Id*. at 17804.)

labeling and daily intake thresholds for sodium, potassium, calcium, and magnesium were mandatory for over-the-counter (OTC) drug products and recommended for prescription drugs. As noted above, the warning levels for calcium (3.2 grams per day) was much higher than the others, giving flexibility for incorporating much higher amounts of calcium, and the warning amounts for magnesium (600 mg per day) and potassium (975 mg per day), while not as high as calcium, were higher than for sodium (140 mg per day). Thus, as a starting point, a POSA would be motivated to reduce sodium to a level below the FDA recommended sodium-content labeling for drug products requiring explicit warnings for products delivering more than 140 mg of sodium per maximum daily dose (which amount I note is ~8.5% of the maximum daily dose of sodium in the prior Xyrem product).[34] (1995 FDA Regulations[35] at *e.g.*, 17798.; FDA Regulations at 13720.)

#### 5. GHB Formulations Using Sodium, Potassium, Magnesium, and Calcium Salts Were Well Known

116. Numerous prior art references disclosed that GHB could be formulated as salts of sodium, potassium, magnesium, and calcium. While certain prior art references disclose additional potential salts, these 4 salts (which are also the most common salts in pharmaceutical formulations (*see*, *e.g.*, Bighley[36] at *e.g.*, Table 2)) are the only 4 GHB salts common to each of Cook, Conte, and Gessa (and indeed the only GHB salts expressly identified in Gessa). Thus, these 4 salts would have stood out to a POSA motivated to make a lower-sodium alternative GHB formulation.

---

[34] As noted above, the maximum amount of daily sodium in Xyrem was 1638 mg. (*See* Xyrem Label at *e.g.*, 11.) Thus, the threshold for warning recommendation from the FDA was approximately 8.5% of this amount. Thus, a POSA would have been motivated to develop a lower-sodium alternative that avoided the need for such label warnings.

[35] Federal Register, Vol. 61, No. 78, Apr. 22, 1995, Rules and Regulations, pp. 17798-17806 (TEVA_XWAV_00022680-22688) ("1995 FDA Regulations").

[36] L.D. Bighley, et al., *Salt Forms of Drugs and Absorption*. 13 Encyclopedia of Pharmaceutical Technology, 453-499 (1996). (TEVA_XWAV_00022989-23037) ("Bighley").

117. For example, Cook discloses that "[t]he present invention particularly relates to the field of pharmaceutical production of microbiologically resistant and chemically stable preparations or solutions of gamma-hydroxybutyrate (GHB), also known as 4-hydroxybutyrate, and the sodium salt of GHB (sodium oxybate) and other salts such as magnesium, ammonium and calcium, *e.g*." (Cook at [0003].)

118. Cook discloses that its GHB compositions "may contain one or more salts." (Cook at [0022].) Cook further discloses that "[a]lkali metal salts, such as lithium, ***potassium***, ***sodium***, and the like may be used" and "[o]ther salts may comprise ammonium, ***calcium***, ***magnesium*** and the like." (*Id*. at [0022] (emphasis added); *see also* [0012] ("[p]referred GHB salts of the present invention include sodium, ammonium and calcium"); [0010] ("Magnesium and calcium salt have been produced to reduce the hygroscopic nature of GHB or powdered forms.").)

119. While Cook lists lithium and ammonium in the above lists of salts, a POSA would understand that lithium had been administered as a psychiatric drug (e.g., for bipolar disorder) since the 1970s. A POSA would not want to include a known psychiatric drug in a medication (such as GHB) which was already subject to a black box warning. Moreover, a POSA would understand that ammonium has significant taste/smell drawbacks which would not make it functionally suitable for an oral liquid formulation.

120. Cook describes such aqueous formulations of gamma-hydroxybutyrate (GHB) salts as chemically and microbiologically stable. (*Id*. at *e.g*., Abstract; [0003], [0012].) These formulations are disclosed for the treatment of sleep disorders such as narcolepsy, as well as alcohol and opiate withdrawal, reduced levels of growth hormone, increased intracranial pressure, and physical pain. (*Id.* at Abstract.)

121. Cook discloses that such GHB "[c]ompositions that are resistant to microbial growth are created by dissolving or mixing GHB in an aqueous medium to a concentration or content of greater than about 150 mg/ml GHB to the maximal solubility of GHB." (*Id.* at [0012].) Cook teaches that "[t]he solubility of GHB is up to about 750 mg/ml at room temperature (20° C. to about 25° C.)" and that "heating the aqueous medium during preparation up to 100° C. will increase GHB solubility to at least about 1000 mg/ml." (*Id.* at [0012].) Cook discloses a "preferred concentration or content of GHB is about 500 mg/ml." (*Id.*; *see also* Table 16.)

122. Cook discloses that "[t]he amount of GHB that may be mixed or dissolved into an aqueous medium and still be resistant to microbial growth depends upon the pH of the aqueous medium." (*Id.* at [0013].) It teaches that the pH may range from "about 3.0 to about 10.3," and that a "preferred range to produce chemically stable GHB would be from about pH 6 to about pH 9." (*Id.* at [0014], [0019].) It further states that "[c]ompositions with a pH of greater than about 6.0 are preferred to produce chemically stable formulations of GHB." (*Id.* at [0019].)

123. Cook teaches that GHB compositions may be "dissolved or dispersed in a pharmaceutically acceptable carrier and/or an aqueous medium," which "includes any and all solvents, dispersion media, coatings, antibacterial and antifungal agents, isotonic and absorption delaying agents and the like." (*Id.* at [0052]-[0053].) It further teaches that "[t]he carrier can also be a solvent or dispersion medium containing, for example, water, ethanol, polyol (for example, glycerol, propylene glycol, and liquid polyethylene glycol, or the like), suitable mixtures thereof, and vegetable oils." (*Id.* at [0058].)

124. Cook discloses that "[t]he percentage of the compositions and preparations may, of course, be varied and may conveniently be between about 2 to about 75% of the weight of the unit, or preferably between 25-60%." (*Id.* at [0066].) It explains that "[t]he amount of active compounds

in such therapeutically useful compositions is such that a suitable dosage will be obtained." (*Id.* at [0066].)

125. Cook teaches that the GHB composition may be administered orally. (*Id.* at [0026].) It also discloses various liquid formulations for oral use, such as syrups, aromatic powders, honey, and elixirs. (*Id*. at *e.g*., [0023].) The publication notes drawbacks of sodium GHB, stating that "[a] number of patients have also complained about the flavor" associated with its administration. (*Id.* at [0085].)

126. Cook teaches that the compositions may include pH adjusting agents such as malic acid, citric acid, acetic acid, boric acid, lactic acid, hydrochloric acid, phosphoric acid, sulfuric acid, sulfonic acid, and nitric acid. (*Id.* at claim 35; *see also* [0021], [0027]-[0029], [0033]-[0034], [0048], [0068], [0093].) It also discloses that the composition may be free of preservatives. (*Id.* at claim 63.) It also discloses that "diluents or vehicles" may enhance microbial resistance and "act as a preservative." (*Id.* at [0023].)

127. Flavoring agents and sweeteners may be used in the Cook compositions, as noted in several passages. (*Id.* at [0024], [0026], [0067]-[0068], [0115].) Cook emphasizes that salts, excipients, acids, buffers, and flavoring agents "are well known in the art." (*Id.* at [0027].)

128. Cook also includes a protocol for evaluating "alternative salts of gamma-hydroxybutyrate," including data on calcium GHB. (*Id.* at Example 5, [0241]-[0308].) It concludes that all of the disclosed compositions "can be made and executed without undue experimentation." (*Id.* at [0309].)

129. Similarly, Gessa (which patent issued in 1991) teaches the preparation of aqueous pharmaceutical compositions comprising GHB salts, including specifically "the ***sodium*** *salt*, ***potassium*** *salt*, ***calcium*** *salt* and ***magnesium*** salt." (Gessa at 7:26-37 (emphasis added); *see also*

claims 1, 2, 7, and 9; 7:26-31.) Gessa discloses compositions having "an organic or inorganic salt of gamma-hydroxybutyric acid for preparing pharmaceutical compositions suitable for oral or parenteral administration." (*Id*. at 1:16-20.) It further teaches that "[g]amma-hydroxy butyric acid derivatives, which include its simple salts, are substances already known for certain therapeutic uses due for example to their narcotic, hypnotic or anticonvulsive effect." (*Id*. at 3:29-32.)

130. Gessa discloses that "[t]he GHB salt content of the compositions according to the present invention can vary from 12.5 to 50% by weight." (*Id*. at 7:44-46.) It also specifies that "[t]he typical dosage for a GHB salt is from 0.025 to 0.10 g/kg." (*Id*. at 7:47-49.) Gessa discloses multiple compositions comprising Na.GHB, including one with a concentration of 302.5 mg/ml and another with a concentration of 200 mg/ml. (*Id*. at 7:59-8:59.) Notably, the latter composition is free of preservatives. (*Id*. at 8:57-59.) Additionally, Gessa teaches that compositions can be prepared in the "form of syrup, effervescent tablets, sachets containing effervescent powder, fruit jellies or injectable vials" for the treatment of alcoholism. (*Id*. at 7:51-55.) Gessa also teaches suitable excipients, liquid dosage forms, and broad GHB-salt concentration ranges. (*Id.* at *e.g*., 7:25-55; *see also* Examples 1-2.)

131. Similarly, Conte (which patent issued in 1997) discloses that GHB may be formulated using salts "preferably selected from the group consisting of ***sodium***, lithium, ***potassium***, ***magnesium*** and ***calcium*** salts." (Conte at 4:3–6 (emphasis added).) Conte claims pharmaceutical compositions in which "the salts of gamma-hydroxy-butyric acid are selected from the group consisting of sodium, lithium, potassium, magnesium and calcium salts." (*Id*. at claim 6.) Conte explains that "pharmaceutical compositions administrable by oral route, having controlled release containing ***one or more salts*** of the gamma hydroxy butyric acid with pharmaceutically acceptable cations" can overcome prior art drawbacks. (*Id*. at 3:9-13; *see also*

claims 1-3 (reciting "at least one salt of the gamma-hydroxy-butyric acid having a pharmaceutically acceptable cation"); claim 6.) These drawbacks include that "sodium gamma hydroxy butyrate, shows an inconvenient since [sic] is absorbed quickly and shows a maximum peak about 30-45 minutes after the administration and has a half life of 20-25 minutes." (*Id*. at 2:56-60.) While Conte is generally directed to controlled-release formulations, it acknowledges that aqueous solutions of GHB salts can also be used (and indeed were on the market). (*Id*. at e.g., 3:3-6; 7:20-27; 9:48-51.)

132. Ferris[37] also teaches that "[s]odium, potassium, magnesium and calcium salts of gamma-hydroxybutyrate have been synthesized." (Ferris at *e.g*., Abstract.)

#### 6. A POSA Would Have Understood How to Optimize Reduced Sodium Mixed-Salt GHB Compositions Through Routine Experimentation

133. As of December 2012, a POSA would have recognized from the prior art that optimizing the concentrations and ratios of sodium, potassium, magnesium, and calcium salts of GHB was achievable through routine experimentation. The foundational teachings in references such as Cook, Conte, and Gessa provided substantial guidance on suitable salt choices, solubility characteristics, stability considerations, and formulation methodologies, all serving as a reliable starting point for such optimization.

134. Cook explicitly described the solubility properties of GHB noting that GHB had very high solubility, reaching approximately 750 mg/mL at room temperature. (Cook at *e.g*., [0012]; *see also* Figure 1, Table 26 (with respect to sodium and calcium GHB salts).)[38]

---

[37] Ferris and Went, 2012, Forensic Science International 216: 158-162 (TEVA_XWAV_00022660-22677) ("Ferris").

[38] Cook discloses solubility testing of sodium oxybate and calcium oxybate, reporting *inter alia*, solubilities of approximately 750 mg/mL and 700 mg/mL, respectively, depending on pH. (*See* Cook at *e.g*., Table 26). For comparison, the United States Pharmacopeia (USP) defines a

135. Cook provided comprehensive protocols for preparing, testing, and assessing GHB salt formulations, including those involving sodium and calcium salts. These protocols involved systematic evaluation of parameters such as solubility, chemical stability, pH adjustments, and microbial resistance. (*See id*. at Example 5, [0267]-[0309].) These protocols could be used by a POSA to perform step-by-step experimentation with predictable outcomes, and to make incremental adjustments to achieve optimized formulations.

136. For example, Cook teaches that GHB was highly soluble in formulations with pH greater than the Acid Dissociation Constant (pKa) of GHB, which is 4.72 (*see* Page[39] 2007 at 4). Changing the counterion (*e.g.*, from sodium to calcium) of a weak acid salt doesn't significantly change the pKa of the acid. The cation simply balances the negative charge of the deprotonated acid (the conjugate base). Accordingly, a POSA would expect that changing the cation would still maintain a high solubility of the deprotonated acid in a solution with pH greater than its pKa.

137. In addition, changing the counterion of a weak acid salt does not change the permeability because the salt is administered as a solution at the same pH and concentration taught by Cook and practiced by Xyrem. Thus, the pH of the drug product and the local pH at the absorption site are the same, and the ionization state of the drug is expected to be the same.

138. Given the extensive teachings of Cook, a POSA could readily extend these methodologies to salts and mixtures involving potassium and magnesium salts alongside sodium and calcium salts. For instance, solubility testing would have been straightforward and routine,

---

substance as "freely soluble" if 1 to 10 parts of solvent are required for 1 part of solute, corresponding to a solubility range of 100–1000 mg/mL. (*See The Official Compendia of Standards*, USP NF 2005, U.S. Pharmacopeia (2005) (TEVA_XWAV_00066105-66108).)

[39] N. Page, et al., *An Interactive Lesson in Acid/Base and Pro-Drug Chemistry Using Sodium Gamma-Hydroxbutyrate and Commercial Test Coasters*, Am. J. of Pharmaceutical Ed. 2007 (TEVA_XWAV_00066092-66097) ("Page").

allowing a POSA to assess and empirically confirm appropriate ratios and concentrations of salts.[40] Stability and microbial resistance evaluations described by Cook would have provided further assurance, offering clear criteria by which optimized compositions could be identified.

139. Based on fundamental chemical principles known at the time, a POSA would have anticipated that sodium and potassium salts, both containing monovalent cations, would share similarly high solubility profiles. A POSA would also have had an understanding that calcium and magnesium salts, containing divalent cations, would likely have exhibited slightly lower but still adequate solubility. These expectations are supported by Cook's direct testing and validation of sodium and calcium salts, coupled with the explicit disclosures that potassium and magnesium were also suitable candidates for use. Any minor solubility differences could have been resolved through simple, routine experimentation involving adjustments to the proportions of each salt.

140. Cook explicitly reassured that all disclosed methods and formulations could be executed "without undue experimentation." (*Id*. at [0309].) Such explicit guidance strongly reinforced the reasonable expectation that routine optimization efforts to develop reduced sodium mixed-salt GHB formulations were not only achievable but straightforward, predictable, and likely to succeed.

141. In addition, a POSA would have considered the well-established dietary guidelines and FDA thresholds for daily intake of sodium, potassium, calcium, and magnesium in optimizing the formulation to provide a balanced nutritional and electrolyte profile. Given that the prior art clearly identified excessive sodium consumption as a significant health concern, a POSA would

[40] It would have been equally obvious to test and confirm the solubility of the sodium, potassium, magnesium and calcium salts of GHB, and mixtures thereof, and to optimize the ratios of those salts, based on the disclosures of Conte and/or Gessa.

have been motivated to decrease the sodium content by substituting portions with potassium, calcium, and magnesium salts.

142. Among these alternatives, the calcium GHB salt that was made and tested in Cook would have stood out due to its relatively high maximum daily intake threshold (3.2 grams per day, before triggering the FDA's recommended warning), compared to sodium (140 mg), potassium (975 mg), and magnesium (600 mg). This would have provided flexibility in terms of being able to reduce sodium levels by using higher amounts of calcium GHB in formulations without triggering labeling or safety concerns.

143. The FDA-established warning amount for sodium (*i.e.*, 140 mg) would have provided a clear and desirable target for reduced daily sodium content.

144. A POSA would also have been aware of practical formulation trade-offs associated with each salt. While all four salts were pharmaceutically acceptable, a POSA would have understood that high doses of magnesium and potassium could influence the rate of gastrointestinal movement or cause gastrointestinal disturbances, including laxative effects or stomach upset in some patients.[41] Although these effects were dose-dependent and manageable, a POSA optimizing a formulation for chronic use would have been motivated to limit potassium and magnesium to levels consistent with regulatory guidance and patient tolerance. In contrast, calcium was not typically associated with such issues, which further reinforced its attractiveness for use in higher proportions.

[41] On this, I note that many colonoscopy prep drugs (*e.g.*, Suprep) use combinations of sodium, potassium, and magnesium. (*See e.g.,* J. Palma, et al., *Advances in Bowel Preparations*, Soc. Of Gastroenterology Nurses and Associates (2011) (TEVA_XWAV_00066098-66104).)

145. Palatability and taste considerations also would have informed formulation decisions. For example, Cook recognizes that taste is a relevant consideration. (*See* Cook at *e.g.*, [0026], [0048], [0085], [0109].)

146. A POSA would have been motivated to improve taste profiles to enhance patient adherence. Noro, for example, disclosed that combining sodium, potassium, calcium, and magnesium salts in a liquid composition not only provided health benefits but also improved taste. In particular, Noro emphasized that relatively high calcium and low sodium concentrations yielded favorable flavor characteristics. These teachings would have guided a POSA in selecting and balancing salt ratios to achieve better palatability.

147. This optimization process would also have been straightforward using the FDA-approved Xyrem product as a practical and well-characterized starting point, including in terms of its established dosing regimen, therapeutic efficacy, and formulation, comprising 500 mg/mL of sodium oxybate, all of which would have provided a POSA with a reliable benchmark for the target GHB concentration in any alternative formulation. A POSA would have recognized that the active moiety in Xyrem was the GHB anion, which would be fully dissociated in the body, rendering the identity of the cation largely irrelevant to the compound's pharmacodynamic effect. Accordingly, from the teachings of the prior art, a POSA would have understood that sodium could be substituted with potassium, calcium, and magnesium without compromising its therapeutic activity. Routine solubility testing, guided by protocols disclosed in Cook, would have confirmed that the substituted formulations remained within acceptable solubility ranges. Moreover, given the well-documented public health concerns regarding excess sodium intake and the relatively high sodium burden of Xyrem, a POSA would have reasonably expected that replacing sodium with the other commonly used cations (potassium, magnesium, and calcium) would not only maintain

therapeutic activity but also offer improved safety and patient compliance, particularly for those with hypertension, heart failure, or kidney disease. Thus, using Xyrem as a reference product would have made the development of reduced-sodium mixed-salt GHB formulations both scientifically logical and practically feasible for a POSA as of December 2012.

148. In conclusion, the extensive prior art available by December 2012 provided a POSA with abundant guidance, detailed methodologies, and clear criteria for systematically optimizing reduced sodium mixed-salt GHB compositions. Routine experimentation involving adjustments to solubility, stability, taste, and electrolyte balance was fully within the capabilities of a POSA. Given this comprehensive foundation, a POSA would have had a high degree of confidence in successfully developing safe, effective, and patient-friendly reduced sodium mixed-salt GHB formulations.

149. I also note that a POSA would have been aware of the common ion effect which refers to the influence of a shared ion on the solubility of an ionic compound. When two salts share a common ion, such as sodium GHB and calcium GHB, which both contribute $GHB^-$ ions to solution, the presence of that shared ion can reduce the solubility of one or both salts. This is because increasing the concentration of one ion shifts the equilibrium, thereby lowering the concentration of the other to maintain the constant solubility product.

150. While this principle holds true in dilute aqueous systems, its predictive power diminishes in concentrated or complex formulations, such as pharmaceutical compositions of GHB salts. In such systems, additional phenomena—most notably the salt effect—can dominate. The salt effect refers to changes in ionic strength or activity coefficients that can actually enhance solubility of certain salts despite the presence of common ions.

151. Moreover, the pH of the solution and the nature of the counterions (*e.g.*, $Na^{+}$, $K^{+}$, $Ca^{2+}$, $Mg^{2+}$) significantly influence the behavior of GHB salts in solution. These variables are readily adjustable by a formulator. Thus, while the common ion effect is a useful theoretical consideration, it does not pose a significant obstacle to routine formulation efforts. A POSA would recognize that empirical solubility testing within the relevant pH range is a standard and effective approach to optimizing multi-cation GHB salt compositions.[42]

**B. The Asserted Claims Are Obvious Over Cook**

152. In my opinion, the Asserted Claims would have been obvious in view of Cook.[43] As discussed above, Cook discloses stable, microbiologically resistant liquid formulations of GHB salts, and specifically identifies sodium, potassium, magnesium, and calcium as suitable cations, either individually or in combination. It also teaches acceptable concentration ranges, pH values, and formulation techniques using pharmaceutically acceptable carriers, and provides detailed examples to guide implementation. A POSA would have recognized that selecting among these known salts, and adjusting their ratios, concentrations, and formulation parameters, would involve nothing more than routine optimization using well-established pharmaceutical principles, procedures and processes including as described by Cook. Moreover, to my knowledge, there is no evidence that the specific ratios or formulation details in the claims confer any unexpected benefits or critical properties.

---

[42] I note that in my Report I am relying on Noro, FDA Regulations, Page, USP NF, and Palma, solely for scientific background, motivation, and reasonable expectation of success.

[43] I note that Cook is part of a larger patent family that includes multiple related patent applications, publications, and issued patents. While I primarily reference U.S. Patent Application Publication No. 2003/0125385 ("Cook"), the same or substantially similar teachings appear in other members of the Cook patent family, which I understand also qualify as prior art. In addition to Cook, I reserve the right to rely on U.S. Patent No. 8,952,062 ("Cook '062 Patent"). (*See* Cook '062 Patent at *e.g.*, claim 6.)

153. In addition to my analysis of the individual limitations below, and as further detailed below, it is my opinion that the Asserted Claims as a whole, would have been obvious to a POSA in view of Cook. The combination of the recited salts, concentrations, formulation type, pH, and other components reflects the routine assembly of known elements, each serving its expected function, and all directed toward a well-known goal: stable, soluble, orally administered GHB-salt compositions. There is no indication in the record that the specific combination, taken as a whole, yields any unexpected properties. Accordingly, the claimed subject matter would have been obvious when considered in its entirety.[44]

**1. ’102 Patent**

**a. Claim 1**

154. Claim 1 of the ’102 Patent recites:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB and a pharmaceutically acceptable carrier, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.$(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate (Ca.$(GHB)_2$), wherein the Na.GHB salt is present in a % molar equivalents of about 5% to about 40%, the K.GHB salt is present in a % molar equivalents of about 10% to about 40%, the Mg.$(GHB)_2$ salt is present in a % molar equivalents of about 5% to about 30%, and the Ca.$(GHB)_2$ salt is present in a % molar equivalents of about 20% to about 80%, wherein the composition is formulated as a liquid formulation, and wherein the liquid formulation has a total concentration of GHB salts of about 350 mg/mL, about 400 mg/mL, about 450 mg/mL, about 500 mg/mL, about 550 mg/mL, or about 600 mg/mL.

[44] Throughout this Report, I have tried to streamline the discussion by incorporating analysis across similar claim limitations where appropriate, as many claims are substantially duplicative. I expressly reserve the right to rely on any opinion set forth herein regarding a claim element in an Asserted Claim for the same or similar claim element in any other Asserted Claim. For organizational clarity, I have used different section headings for various claim limitations. However, my opinions should be understood in the context of the claims as a whole. I am not offering opinions on individual limitations in isolation. Rather, it is my opinion that the Asserted Claims, when viewed as a combination of limitations, would have been obvious to a POSA.

155. Accordingly claim 1 requires:

(i) a pharmaceutical composition of GHB comprising a mixture of GHB-salts "consisting of" 5-40% (mol/mol) sodium-GHB, 10-40% (mol/mol) potassium-GHB, 5-30% (mol/mol) magnesium-GHB, and 20-80% (mol/mol) calcium-GHB;

(ii) a pharmaceutically acceptable carrier,

(iii) wherein the composition is formulated as a liquid formulation; and

(iv) a total concentration of GHB salts of about 350 mg/mL, about 400 mg/mL, about 450 mg/mL, about 500 mg/mL, about 550 mg/mL, or about 600 mg/mL

156. As discussed below, in my opinion, each of these limitations is obvious over Cook.

i. **<u>Mixture Consisting of 5-40% sodium, 10-40% potassium, 5-30% magnesium and 20-80% calcium GHB salts (mol/mol)</u>**

157. For example, Cook published in 2003 and discloses microbiologically sound and stable aqueous compositions of GHB-salts. (*See* Cook at *e.g*., Abstract, [0003], [0010], [0012], [0022], [0027], [0029], [0057], Example 5, [0267].) A POSA would understand based on Cook that GHB compositions may include mixtures of the GHB salts of sodium, potassium, magnesium, and calcium, either individually or in combination. For instance, Cook teaches that the compositions "may contain one or more salts," including "[a]lkali metal salts, such as lithium, ***potassium***, ***sodium***, and the like," as well as "[o]ther salts [that] may comprise ammonium, ***calcium***, ***magnesium*** and the like." (*Id*. at, e.g., [0022]; *see also, e.g.,* [0003] (noting "the ***sodium*** salt of GHB (sodium oxybate) and other salts such as ***magnesium***, ammonium and ***calcium***, ***e.g***." may be used); [0010] (noting "***Magnesium*** and ***calcium*** salt have been produced to reduce the hygroscopic nature of GHB or powdered forms"); [0012] (noting "[p]referred GHB salts of the present invention include ***sodium***, ammonium and ***calcium***"); claims 27 and 30 (reciting "where the gamma hydroxybutyrate is a ***calcium*** salt"); claims 41 and 42 (reciting "where the gamma-

hydroxybutyrate is a ***sodium*** or ***calcium*** salt" or "wherein said gamma-hydroxybutyrate is ***sodium*** oxybate or ***calcium*** oxybate"); Example 5 (describing a process to "prepare, test, and evaluate" different formulations of "***Sodium*** Oxybate" and "***alternative salts*** of gamma-hydroxybutyrate.") (emphasis added throughout).)

158. A POSA reading Cook would have recognized that combining sodium, calcium, magnesium, and potassium salts of GHB in a pharmaceutical composition was a matter of routine formulation optimization. (*See* Section IX.A.6.)

159. Cook expressly identified these four salts as pharmaceutically acceptable options, both individually and in combination, within a relatively narrow set of alternatives. (Cook at *e.g.*, [0022]; *see also id*. at [0012] [0010].) The claimed compositions merely recite known GHB-salts identified in Cook, which expressly taught that "one or more salts" may be used.[45] (*Id*. at [0022].) To my knowledge, there is no evidence in the intrinsic or extrinsic record indicating that the claimed salt ratios are critical or confer any unexpected benefit.

160. Moreover, a POSA would understand GHB salts dissociate into their constituent ions for GHB to function at its site of action, specifically, into the $GHB^-$ anion and the respective cation (e.g., $Na^+$, $K^+$, $Ca^{2+}$, $Mg^{2+}$). Cook tested the solubility of sodium and calcium salts of GHB, and a POSA would have reasonably expected that potassium GHB would exhibit similar solubility to sodium GHB, as both are monovalent alkali metal salts. Likewise, magnesium GHB would be expected to behave similarly to calcium GHB due to their shared divalent character. Even assuming minor differences in solubility or dissolution rate, a POSA could readily resolve them

[45] I note that claim 6 of the Cook '062 Patent further recites "wherein the aqueous composition contains ***one or more of salts*** selected from the group consisting of lithium, ***potassium***, ***sodium***, ***calcium***, ammonium, and ***magnesium***." This further shows that Cook discloses and enables combinations of the GHB salts because the issued claim is presumed to be sufficiently enabled and described in the specification.

by simple solubility screening and adjusting the ratios of the salts—standard practices in formulation development.

161. Because GHB is the active moiety and the pharmacologically relevant species, and in view of the teachings of Cook (including the express disclosure that all 4 GHB-salts were suitable, and its concomitant solubility testing and guidance), a POSA would have expected that GHB would be fully dissociated at its site of action, and would not have expected the ratio of cations to materially harm the pharmacokinetics, pharmacodynamics, or efficacy of the composition. As such, the specific salt ratio used in the formulation would not have been considered critical to the function of the product. Rather, the selection and balance of cations would have reflected routine formulation considerations, such as reducing sodium content, accounting for daily intake guidelines, improving palatability, and/or minimizing side effects.

162. Further, Cook provides a clear experimental framework, particularly in Example 5, for preparing and evaluating different GHB salt formulations. A POSA could have used Cook's procedures to prepare various combinations of GHB salts and then evaluated their solubility and stability using standard, well-established pharmaceutical methods as described in Cook. A POSA could readily test the solubility, stability, or other properties of combinations of sodium, potassium, magnesium, and calcium GHB salts using standard, well-established pharmaceutical methods including as described in Cook. The idea of varying salt combinations to achieve acceptable formulation characteristics would have been obvious and nothing more than routine optimization for a POSA.

ii. **"pharmaceutically acceptable carrier"**

163. Cook expressly discloses that GHB salt compositions may be formulated with a pharmaceutically acceptable carrier. The Cook specification repeatedly references this element as part of the disclosed formulations. (*See* Cook at *e.g.*, [0035] ("It is understood that the

compositions of the present invention, including those in a set, may be dispersed in a ***pharmaceutically acceptable carrier*** solution as described below.") (emphasis added); [0052] ("Aqueous compositions of the present invention comprise an effective amount of GHB dissolved or dispersed in a ***pharmaceutically acceptable carrier*** and/or an aqueous medium.") (emphasis added); [0053] ("As used herein, "pharmaceutically acceptable carrier" includes any and all solvents, dispersion media, coatings, antibacterial and antifungal agents, isotonic and absorption delaying agents and the like. The use of such media and agents for pharmaceutical active substances is well known in the art."); [0058] ("The carrier can also be a solvent or dispersion medium containing, for example, water, ethanol, polyol (for example, glycerol, propylene glycol, and liquid polyethylene glycol, or the like), suitable mixtures thereof, and vegetable oils.").)

164. Cook also explicitly states that its formulations may be prepared using conventional pharmaceutical techniques and ingredients, including those described in well-known references such as Remington's Pharmaceutical Sciences. (*See id*. at [0027].) Moreover, Cook discloses that "all of the compositions and/or methods disclosed and claimed herein can be made and executed without undue experimentation." (*Id*. at [0309].)

165. In view of these teachings, it would have been entirely routine for a person of ordinary skill in the art to formulate GHB salt compositions using a pharmaceutically acceptable carrier, and to do so with a reasonable expectation of success. Cook not only discloses that such carriers are part of the invention, but also provides exemplary categories (*e.g.*, solvents, dispersion media) and specific examples (*e.g.*, water), all of which are standard in the pharmaceutical arts. Given the clear disclosure and the availability of conventional formulation methods, a POSA would have had both the motivation and the ability to prepare the claimed compositions in a

pharmaceutically acceptable carrier using well-known techniques. Accordingly, this limitation would have been obvious in light of Cook and the general knowledge in the field.

iii. **"liquid formulation"**

166. Cook expressly discloses that its GHB salt compositions are formulated in a liquid or aqueous medium. The specification repeatedly emphasizes formulations of GHB that are dissolved or mixed in water to produce stable, microbiologically resistant, and orally administrable solutions. (*See* Cook at *e.g*., Abstract ("Disclosed are formulations of gamma-hydroxybutyrate in an ***aqueous medium*** that are resistant to microbial growth."); [0006] (noting "GHB has typically been administered in clinical trials as an ***oral solution***."); [0011] ("The present invention overcomes deficiencies in the prior art by providing compositions of GHB in an ***aqueous medium*** that are resistant to microbial growth."); [0012] ("Compositions that are resistant to microbial growth are created by dissolving or mixing GHB in an ***aqueous medium***…"); [0013] ("The amount of GHB that may be mixed or dissolved into an ***aqueous medium*** and still be resistant to microbial growth depends upon the pH of the aqueous medium."); [0034] ("Thus, both ***liquid*** and dry formulations of GHB and other components may be packaged in a set for mixing before administration..."); [0042] ("The present invention arises from the discovery of chemically stable and microorganism resistant formulations of GHB in an ***aqueous medium, preferably a solution***…"); [0049] ("Any of the above formulations may be prepared and/or packaged as a powdered or dry form for mixing with an ***aqueous medium*** before oral administration, or they may be prepared in an ***aqueous medium*** and packaged… These formulations then provide an easily titratable ***liquid medium*** for measuring the dosage of GHB to be administered to a patient.") [0052] ("Aqueous compositions of the present invention comprise an effective amount of GHB dissolved or dispersed in a pharmaceutically acceptable carrier and/or an aqueous medium."); [00054] ("The preparation of an ***aqueous composition*** that contains a GHB agent as an active

component or ingredient will be known to those of skill in the art in light of the present disclosure."); [0066] ("For ***oral therapeutic administration***, the active compounds may be incorporated with excipients and used in the form of tablets, buccal tablets or tabs, troches, capsules, ***elixirs, suspensions, syrups***, wafers, and the like, to be admixed with an ***aqueous medium***."); *see also* Claims (generally directed at "aqueous" solutions) (emphasis added throughout).)

167. Cook further instructs that its formulations may be prepared using conventional pharmaceutical techniques and materials, including those found in standard references such as Remington's Pharmaceutical Sciences. (*See id*. at [0027].) It also states that "all of the compositions and/or methods disclosed and claimed herein can be made and executed without undue experimentation." (*Id*. at [0309].)

168. Based on these teachings, it would have been routine for a POSA to prepare GHB salt compositions in liquid form with a reasonable expectation of success. Cook repeatedly emphasizes aqueous formulations as preferred, and provides sufficient guidance, including references to known pharmaceutical compendia, to enable a POSA to do so using standard techniques. The claimed liquid formulations would therefore have been obvious to prepare in view of Cook's disclosures and the general pharmaceutical knowledge available at the time.

iv. **<u>"total concentration of GHB salts of about 350 mg/mL, about 400 mg/mL, about 450 mg/mL, about 500 mg/mL, about 550 mg/mL, or about 600 mg/mL"</u>**

169. Cook clearly discloses preferred concentrations of GHB salts that fall squarely within the claimed range. For example, Cook teaches that "[c]ompositions that are resistant to microbial growth are created by dissolving or mixing GHB in an aqueous medium to a concentration or content of greater than of about 150 mg/ml GHB to the maximal solubility of GHB." (*Id*. at [0012].) Cook further teaches that "[t]he solubility of GHB is up to about 750 mg/ml

at room temperature (20° C. to about 25° C.), however, heating the aqueous medium during preparation tip to 100° C. will increase GHB solubility to at least about 1000 mg/ml." (*Id.*) Cook further discloses that "[a] preferred concentration or content of GHB is ***about 500 mg/ml***."[46] (*Id.*)

170. Cook also teaches that "a range of GHB content or concentration from about 153 mg/ml to about 750 mg/ml" may be selected and that "all ranges of pH and GHB concentration or content that can be selected from the values herein and as would be understood by those of ordinary skill in the art, are encompassed by the present invention." (*Id*. at [0018].) These ranges not only overlap the claimed concentrations, but expressly include them. In addition, Table 16 of Cook presents multiple specific formulations with "sodium oxybate" concentrations of 250, 350, 450, 500, 550, and 650 mg/cc. (*Id*. at Table 16; *see also* claims 3, 4, 33, 45, 62, 63, 64.)

171. In view of these disclosures, it would have been plainly obvious to a POSA to prepare a composition with a total GHB salt concentration of about 350, 400, 450, 500, 550, or 600 mg/mL. Cook identifies these concentrations as within the solubility range, teaches their use in stable, aqueous formulations, and provides multiple working examples with values that match or closely approximate the claimed amounts. The selection of a specific concentration within this well-defined range would have been a matter of routine design choice or optimization based on

[46] Although the relevant passages in Cook refer to "GHB" rather than "GHB salts," a POSA would have understood these disclosures to pertain to the concentration of GHB in its salt form. GHB is almost never administered as the free acid due to its instability and acidity; rather, it is formulated and delivered exclusively as a salt (e.g., sodium, potassium, calcium, or magnesium GHB). Thus, a POSA would have interpreted Cook's references to "GHB" content in aqueous solutions as referring to the total amount of GHB delivered in salt form. This is consistent with the POSA's understanding of standard formulation practices and aligns with how GHB was actually used in FDA-approved products like Xyrem. In any event, even if Cook's disclosures were understood to refer only to the GHB anion concentration, a POSA would have had no difficulty converting that value into the corresponding GHB salt concentration using routine molecular weight calculations. Thus, either interpretation supports the conclusion that the Asserted Claims would have been obvious.

factors such as dose, volume, especially where no unexpected results are alleged or demonstrated for the specific values recited in the claims.

172. Accordingly, the claimed concentration limitation would have been obvious in view of Cook's express disclosures and a POSA's knowledge of standard pharmaceutical formulation practices.

**b. Claim 6**

173. Claim 6 of the '102 Patent depends from claim 1 and further recites:

> 6. The pharmaceutical composition of claim 1, wherein the Na.GHB, K.GHB, Mg.$(GHB)_2$, and $Ca(GHB)_2$ salts are present in a % molar equivalents ratio of about 8:23:21:48, respectively.

174. I incorporate by reference my analysis of claim 1 above.

175. As discussed above (*see*, *e.g.*, Sections IX.A.5, IX.A.6 and IX.B.1.a.i.), Cook identified sodium, potassium, magnesium, and calcium as pharmaceutically acceptable salts of GHB and expressly taught that "one or more salts" could be used in combination. (*See* Cook at *e.g.*, [0022].)

176. A POSA following Cook's guidance would have been motivated to explore combinations of these known salts to achieve formulation goals such as reducing sodium, improving taste, and ensuring solubility—objectives that were well understood in the art. Because the active moiety is the $GHB^-$ anion, and the cations would be expected to dissociate and function as inert carriers, a POSA would not have viewed the particular ratio of cations as critical to the efficacy or function of the drug at its site of action. I am also not aware of any evidence of criticality or unexpected results with respect to the claimed ratios.

177. Further, Cook provides a clear experimental framework, particularly in Example 5, for preparing and evaluating different GHB salt formulations, including solubility and stability testing. (*Id*. at *e.g.*, Example 5.) Although the formulation examples in Cook's Example 5 involved

individual salts, Cook provided detailed procedures for preparing, testing, and evaluating those salts—including guidance on concentration, solubility, pH adjustment, and microbial stability. A POSA would have used this framework as a starting point: first preparing and characterizing each individual salt, then combining them in varying proportions to develop a mixed-salt formulation that (1) maintained/achieved the known GHB dose, (2) remained soluble, and (3) complied with intake and labeling constraints. This process would have involved routine solubility testing, followed by pH and stability testing as needed.

178. As discussed above, a POSA would also have understood that in aqueous solution, GHB salts would be expected to dissociate into the pharmacologically active $GHB^-$ anion and the respective cation ($Na^+$, $K^+$, $Mg^{2+}$, or $Ca^{2+}$). If any precipitate was formed, minor adjustments of amounts could be modified as needed to ensure a soluble formulation. Because the activity resides in the $GHB^-$ and the cations function as inert carriers, a POSA would not have expected the specific ratio of cations to negatively affect efficacy, pharmacodynamics, or pharmacokinetics. Rather, the relative proportions of the salts would have been selected based on formulation considerations—including sodium reduction, salt tolerability, and taste—and adjusted through standard testing.

179. A POSA could have used Cook's procedures to prepare various combinations of GHB salts and then evaluate their solubility (and eventually stability and/or microbial testing) using standard, well-established pharmaceutical methods as described in Cook.

180. In sum, the recited 8:23:21:48 ratio simply reflects the application of known salts, for a known purpose, using known techniques. A POSA would have arrived at such a ratio through routine, stepwise experimentation guided by Cook, which provides a detailed protocol for evaluating formulations. There is no evidence that the claimed ratio is critical or yields any unexpected result. Accordingly, claim 6 is rendered obvious in view of Cook.

**c. Claim 7**

181. Claim 7 of the '102 Patent depends from claim 1 and further recites:

> 7. The pharmaceutical composition of claim 1, wherein the total concentration of GHB salts is about 500 mg/mL.

182. I incorporate by reference my analysis of claim 1 above.

183. As previously discussed, Cook expressly discloses a preferred GHB salt concentration of about 500 mg/mL. (*See* Cook at *e.g.*, [0012] ("A preferred concentration or content of GHB is about 500 mg/mL."); *see also* claims 62 and 63 (reciting "an aqueous solution of 500 mg/ml sodium gamma-hydroxybutyrate"); Table 16 (identifying compositions having about 500 mg/mL GHB salt); *see also id*. at *e.g.*, [0016] (noting "At a concentration or content of about 500 mg/ml GHB, the pH may be of about 4.75 to about 10.3.").)

184. Because the exact concentration recited in claim 7 (500 mg/mL) is explicitly disclosed as preferred in Cook and appears in both working examples and claims, a POSA would have found it obvious to select this concentration when formulating a GHB salt composition. Accordingly, claim 7 is obvious in view of Cook.

**d. Claim 8**

185. Claim 8 of the '102 Patent depends from claim 1 and further recites:

> 8. The pharmaceutical composition of claim 1, wherein the composition has a pH of about 7.5 to about 9.0.

186. I incorporate by reference my analysis of claim 1 above.

187. Cook clearly discloses pH ranges that both encompass and specifically fall in the range recited in claim 8. For example, Cook teaches that "[i]n one embodiment of the present invention, the pH of the aqueous medium of the pharmaceutical composition is about 3 to about 10." (*Id*. at [0013].) Cook goes further, expressly listing specific pH values that fall within the claimed range, including "about 7.5, about 7.6, about 7.7, about 7.8, about 7.9, about 8.0, about

8.1, about 8.2, about 8.3, about 8.4, about 8.5, about 8.6, about 8.7, about 8.8, about 8.9, [and] about 9.0." (*Id*. at [0014].) Cook also states that "[a]t a concentration or content of about 500 mg/mL GHB, the pH may be of about 4.75 to about 10.3." (*Id*. at [0016].) Several of Cook's claims also recite pH ranges that either overlap or fall entirely within the range of 7.5 to 9.0. (*Id*. at claims 5, 6, 32, 44, 61, 62, 63, 64.)

188. Cook provides ample guidance regarding pH selection, including identifying suitable buffering agents, pH-adjusting excipients, and formulation strategies to maintain stability and microbial resistance within the desired pH range. (*Id*. at *e.g*., [0013]-[0022], [0027]-[0030], [0033]-[0034].)

189. In light of these disclosures, a POSA would have found it obvious to select a pH within the range of about 7.5 to about 9.0 when formulating a GHB salt composition. Cook not only expressly identifies values within that range, but also provides the necessary tools and rationale for optimizing pH in liquid pharmaceutical formulations. The claimed range does not reflect any critical or unexpected result and falls squarely within the range taught in the prior art.

190. Accordingly, claim 8 would have been obvious in view of Cook's explicit disclosure of overlapping and identical pH values, and the general knowledge of formulation science at the time.

**e. Claim 9**

191. Claim 9 of the '102 Patent depends from claim 1 and further recites:

> 9. The pharmaceutical composition of claim 1, wherein the composition has a pH of about 8.0 to about 8.5.

192. I incorporate by reference my analysis of claim 1 above. I also incorporate by reference my analysis of the pH limitation of claim 8 above.

193. Cook explicitly discloses individual pH values that fall within the narrower range of about 8.0 to about 8.5. For example, Cook lists "about 8.0, about 8.1, about 8.2, about 8.3, about 8.4, [and] about 8.5" as suitable pH values. (*See* Cook at *e.g.*, [0014].) These values fall entirely within the scope of claim 9 and demonstrate that this range was both recognized and expressly disclosed in the prior art.

194. Cook also teaches that pH values in this range are compatible with aqueous GHB formulations, including those at concentrations of 500 mg/mL. (*Id*. at *e.g*., [0016].) As discussed previously, Cook provides detailed guidance on adjusting and maintaining pH through the use of buffering agents and pharmaceutically acceptable excipients. (*Id*. at *e.g*., 0013]-[0022], [0027]-[0030], [0033]-[0034].)

195. In view of these disclosures, it would have been obvious for a POSA to formulate a composition within the pH range of about 8.0 to about 8.5. This range is not only encompassed by Cook's broader disclosures, but also directly and repeatedly exemplified by more specific disclosures. The selection of this range could have been arrived at by routine formulation optimization and does not appear to confer any unexpected benefits or criticality.

196. Accordingly, claim 9 is obvious in view of Cook and the general knowledge of formulation science at the time.

**f. Claim 10**

197. Claim 10 of the '102 Patent depends from claim 1 and further recites:

> 10. The pharmaceutical composition of claim 1, wherein the composition has a pH of about 8.3.

198. I incorporate by reference my analysis of claim 1 above. I also incorporate by reference my analysis of the pH limitations of claims 8 and 9 above.

199. Cook expressly identifies "about 8.3" as a suitable pH for GHB salt compositions. (*See* Cook at *e.g.*, [0014].) This value is one of the specific examples provided in a list of acceptable pH values for the disclosed formulations.

200. As noted above, Cook teaches that pH values around 8.3 are suitable for formulations containing about 500 mg/mL GHB and that these values may be achieved and maintained using conventional buffering agents. (*Id.* at *e.g.*, [0014], [0016]; *see also* [0013]-[0022], [0027]-[0030], [0033]-[0034].)

201. Because Cook discloses the exact pH recited in claim 10 the limitation of claim 10 would have been obvious to a POSA. The claimed value simply reflects a known and expressly taught option from the prior art.

202. Accordingly, claim 10 is obvious in view of Cook and the general knowledge of formulation science at the time.

**g. Claim 11**

203. Claim 11 of the '102 Patent depends from claim 1 and further recites:

> 11. The pharmaceutical composition of claim 1, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.

204. I incorporate by reference my analysis of claim 1 above.

205. The other limitations are obvious over Cook, as discussed below.

i. **wherein the composition is chemically stable and resistant to microbial growth**

206. Cook expressly discloses pharmaceutical compositions of GHB salts that are both chemically stable and resistant to microbial growth. Indeed, this is a central focus of the Cook invention. (*See* Cook at *e.g.*, Abstract ("Disclosed are formulations of gamma-hydroxybutyrate in an aqueous medium that are ***resistant to microbial growth***."); [0003] ("The present invention

particularly relates to the field of pharmaceutical production of ***microbiologically resistant*** and ***chemically stable*** preparations or solutions of gamma-hydroxybutyrate (GHB), also known as 4-hydroxybutyrate, and the sodium salt of GHB (sodium oxybate) and other salts such as magnesium, ammonium and calcium, e.g."); [0011] ("The compositions of the present invention are ***stable*** compositions of GHB that improve shelf-life…") [0012] ("The invention first provides a pharmaceutical composition of GHB rendered ***chemically stable*** and/or ***resistant to microbial growth*** in an aqueous medium."); *see also* [0029], [0031], [0035], [0042]; claims (generally directed to GHB compositions that are "***chemically stable and resistant to microbial growth***").)

207. Cook also provides detailed guidance for achieving chemical stability and microbial resistance, including the role of pH, solubility, and buffering agents. (*See id*. at *e.g*., [0019] ("The chemical stability of GHB is affected by pH, with compositions of GHB in an aqueous medium with a pH below about 6 being less effective in maintaining the chemical stability of GHB. Compositions with a pH of greater than about 6.0 are preferred to produce chemically stable formulations of GHB. Thus, a preferred range to produce chemically stable GHB would be from about pH 6 to about pH 9."); *see also* [0021] ("In other preferred embodiments, a weak acid and its conjugate base are used to form a buffering agent to help stabilize the composition's pH"); *see also* [0047], [0048], Figure 1; Tables 1-2; [0103]-[0110].) Because Cook provides the methods and procedures to make the stability assessment, a POSA would understand this process to be routine.

208. In view of these disclosures, the limitation that the composition be chemically stable and resistant to microbial growth would have been obvious to a POSA. Cook explicitly teaches how to achieve this result using standard formulation practices, and there is no indication

that the claimed stability or microbial resistance reflects any unexpected result or inventive departure from the teachings of Cook.

ii. **wherein the composition is free of preservatives**

209. Cook clearly discloses that its GHB salt compositions can be formulated without preservatives, and in fact teaches that avoiding preservatives may be desirable under certain conditions. For example, Cook states that "the contamination by microorganisms in GHB solutions rapidly surpass acceptable limits, and preservatives can adversely affect the pH and thus, GHB's stability." (*Id*. at [0010].) Cook further states that "[m]aintenance of pH becomes important for long term storage since preservatives are known to degrade in formulations having pH levels above approximately pH 6." (Id. at [0108].) This guidance highlights a known trade-off between the inclusion of preservatives and the chemical stability of the GHB formulation.

210. While Cook identifies certain preservatives and antimicrobial agents as potentially suitable (*id*. at [0024]), it makes clear that these components are optional and only applicable to some embodiments. This further confirms that preservative-free formulations are within the scope of Cook's disclosure. Notably, claim 63 of Cook expressly recites "a composition that is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives."[47]

211. Thus, Cook teaches not only that preservative-free formulations are possible, but that they may be preferable under conditions where preservatives could undermine formulation stability. A POSA would have recognized that a preservative-free composition could be achieved

[47] Claims 4 and 10 of the Cook '062 Patent also recite that the solution "does not require preservatives."

using the techniques and conditions disclosed in Cook, such as pH control, and that doing so would represent a routine and predictable design choice, not an inventive advance.

212. Accordingly, both aspects of claim 11 (chemical stability and microbial resistance, and the absence of preservatives) are expressly disclosed and/or directly suggested by Cook. In the absence of any evidence of criticality or unexpected results, this claim reflects routine optimization of known formulation parameters, and would have been obvious to a POSA in view of Cook.

### 2. ’922 Patent

#### a. Claim 11

213. Claim 11 of the ’922 Patent (which depends from claims 1 and 2) recites the following:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.$(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate (Ca.$(GHB)_2$); and optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier.
>
> 2. The pharmaceutical composition of claim 1, wherein the pharmaceutically acceptable carrier comprises more of a solvent, dispersion medium, coating, antibacterial agent, antifungal agent, isotonic agent, or absorption delaying agent.
>
> 11. The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of 5% to 40%, the K.GHB salt is present in a wt/wt % of 10% to 40%, the Mg$(GHB)_2$ salt is present in a wt/wt % of 5% to 30%, and the Ca.$(GHB)_2$ salt is present in a wt/wt % of 20% to 80%.

214. Accordingly, claim 11 includes the following substantive limitations:

(i) pharmaceutical composition including a mixture consisting of 5-40% (wt/wt) sodium-GHB, 10-40% (wt/wt) potassium-GHB, 5-30% (wt/wt) magnesium-GHB, 20-80% (wt/wt) calcium GHB;

(ii) optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier; and

(iii) wherein the pharmaceutically acceptable carrier comprises more of a solvent, dispersion medium, coating, antibacterial agent, antifungal agent, isotonic agent, or absorption delaying agent.

215. As an initial matter, I note that claim 11 is substantially duplicative of the Asserted Claims of the ’102 Patent. I incorporate by reference my analysis of those claims, including the disclosures of Cook that relate to salt identity, concentration, formulation, and carrier components.

216. As set forth below, each of the limitations of claim 11 of the ’922 Patent would have been obvious to a POSA over Cook.

i. **Mixture Comprising 5-40% sodium, 10-40% potassium, 5-30% magnesium and 20-80% calcium GHB salts (w/w)**

217. This limitation recites the same mixture of GHB salts as claim 1 of the ’102 Patent, except the concentrations are in wt/wt rather than mol/mol. The recitation of wt/wt rather than mol/mol does not impact my analysis as it pertains to obviousness over Cook. A POSA would readily know how to convert mol/mol concentrations to wt/wt.[48] As discussed above with respect to the Asserted Claims of the ’102 Patent, the pharmaceutical composition is obvious, the amounts of each salt would have been a matter of routine optimization, and there is no evidence of which I am aware concerning any alleged unexpected results or criticality associated therewith. Accordingly, this limitation is obvious over Cook for the same reasons discussed above with respect to the Asserted Claims of the ’102 Patent (*e.g.*, claim 1 and 6).

[48] A POSA would have readily understood how to convert from molar ratios (mol/mol) to weight percentages (wt/wt) using basic stoichiometric principles. Specifically, the POSA would multiply the number of moles of each GHB salt by its respective molecular weight to determine the mass of each salt in the mixture. The weight percentage of each salt would then be calculated by dividing the mass of that salt by the total mass of all salts in the mixture and multiplying by 100. This is a standard calculation in pharmaceutical formulation and would have involved no difficulty for a POSA. For example, given a known molar ratio of Na.GHB, K.GHB, $Mg(GHB)_2$, and $Ca(GHB)_2$, and their respective molecular weights, the total mass of the mixture could be computed and converted into a weight fraction for each salt

ii. **<u>"optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier"</u>**

218. I incorporate by reference my prior analysis of Cook's disclosure of a pharmaceutically acceptable carrier, as discussed above with respect to claim 1 of the '102 Patent.

219. In addition to disclosing a pharmaceutically acceptable carrier, Cook also expressly teaches that the composition may optionally include excipients such as buffering agents, sweetening agents, flavoring agents, and other additives.

220. For example, Cook states: "In certain other embodiments of the present invention, the pharmaceutical composition may comprise a pH adjusting or buffering agent. Such agents may be acids, bases, or combinations thereof…" and identifies numerous examples. (Cook at *e.g.*, [0021]); *see also* [0027]-[0030].)

221. Cook further teaches that flavoring and sweetening agents may be optionally included, disclosing that "[i]n certain embodiments, the pharmaceutical composition may also contain a flavoring agent. A 'flavoring agent' is understood herein to mean certain embodiments which are substances that alters the flavor of the composition during oral consumption. A type of 'flavoring agent' would be a sweetener.")

222. Although Cook does not specifically mention coloring agents, it is well known in the art that such additives are routinely used in oral liquid formulations to enhance patient compliance, distinguish products, or match flavors with expected visual cues. A POSA would have understood that coloring agents are functionally interchangeable with flavoring or sweetening agents in terms of their optional and non-functional nature. Their inclusion would have been a routine and obvious formulation choice.

223. Accordingly, because Cook expressly teaches the optional inclusion of buffering, sweetening, and flavoring agents, and because the addition of coloring agents would have been

obvious and within the routine skill of a POSA, this limitation is fully met and rendered obvious by Cook's disclosures and the general knowledge in the field.

iii. **wherein the pharmaceutically acceptable carrier comprises more of a solvent, dispersion medium, coating, antibacterial agent, antifungal agent, isotonic agent, or absorption delaying agent**

224. Cook expressly discloses that the compositions of GHB salts may be "dissolved or dispersed in a pharmaceutically acceptable carrier and/or an aqueous medium," and further defines the term pharmaceutically acceptable carrier to include "any and all ***solvents***, ***dispersion media***, coatings, ***antibacterial and antifungal agents***, isotonic and ***absorption delaying agents***, and the like." (Cook at *e.g.*, [0052]-[0053]; *see also* [0058], [0068].)

225. Cook further states that "the use of such media and agents for pharmaceutical active substances is well known in the art," and provides examples of suitable carrier materials, including water, ethanol, glycerol, polyethylene glycol, vegetable oils, and others. (*Id*. at *e.g.*, [0058].) These are standard formulation components known to a POSA and commonly used in oral pharmaceutical compositions.

226. Accordingly, Cook not only discloses the use of a pharmaceutically acceptable carrier but also expressly identifies all of the specific categories of agents recited in claim 11, making clear that these components are known, conventional, and suitable for use in GHB salt formulations. The inclusion of such agents would have been an obvious and routine design choice for a POSA seeking to develop a stable, orally administrable pharmaceutical composition.

227. Therefore, this limitation is taught by Cook and would have been obvious to a POSA in light of Cook's disclosures and the well-established use of such excipients in the pharmaceutical arts.

**3. ’173 Patent**

**a. Claim 11**

228. Claim 11 of the ’173 Patent (which depends from claims 1 and 2) recites:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture comprises three or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.$(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate (Ca.$(GHB)_2$).
>
> 2. The pharmaceutical composition of claim 1, wherein the mixture comprises Na.GHB, K.GHB, M.$(GHB)_2$, and Ca.$(GHB)_2$.
>
> 11. The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of about 5% to about 40%, the K.GHB salt is present in a wt/wt % of about 10% to about 40%, the Mg.$GHB)_2$ salt is present in a wt/wt % of about 5% to about 30%, and the Ca.$(GHB)_2$ salt is present in a wt/wt % of about 20% to about 80%.

229. Claim 11 of the ’173 Patent requires a pharmaceutical composition of GHB that includes a mixture “comprising” 5-40% (wt/wt) sodium-GHB, 10-40% (wt/wt) potassium GHB, 5-30% (wt/wt) magnesium-GHB, and 20-80% (wt/wt) calcium-GHB.

230. I note that this claim is substantially similar to the Asserted Claims of the ’102 and ’922 Patents. The only difference is that claim 11 of the ’173 Patent uses the open-ended transitional phrase “comprises” rather than “consists of.” As a result, the claim is broader in scope, as it allows for the presence of additional, unrecited GHB salts.

231. Accordingly, I incorporate by reference my prior analysis of the Asserted Claims of the ’102 and ’922 Patents. For the same reasons discussed therein, the composition recited in claim 11 of the ’173 Patent would have been obvious to a POSA in view of Cook.

**4. ’107 Patent**

**a. Claim 11**

232. Claim 11 of the ’107 Patent (which depends from claims 1 and 2) recites the following:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of at least three salts of GHB, wherein the mixture comprises a calcium salt of gamma-hydroxybutyrate ($Ca•(GHB)_2$), a magnesium salt of gamma-hydroxybutyrate ($Mg•(GHB)_2$), and one or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na•GHB) and a potassium salt of gamma-hydroxybutyrate (K•GHB).
>
> 2. The pharmaceutical composition of claim 1, wherein the mixture comprises Na•GHB, K•GHB, $Mg•(GHB)_2$, and $Ca•(GHB)_2$, and wherein the amount of Na•GHB is present at a wt/wt % of about 5% to about 40%.
>
> 11. The pharmaceutical composition of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 40%, the K•GHB salt is present in a wt/wt % of about 10% to about 40%, the $Mg•(GHB)_2$ salt is present in a wt/wt % of about 5% to about 30%, and the $Ca•(GHB)_2$ salt is present in a wt/wt % of about 20% to about 80%.

233. Therefore, claim 11 of the ’107 patent requires a pharmaceutical composition of GHB including a mixture “comprising” 5-40% (wt/wt) sodium-GHB, 10-40% (wt/wt) potassium-GHB, 5-30% (wt/wt) magnesium-GHB, and 20-80% (wt/wt) calcium-GHB.

234. I note that this claim is substantially similar to the Asserted Claims of the ’102 and ’922 Patents. The only difference is that it uses the open-ended transitional phrase “comprises” rather than “consists of.” As a result, the claim is broader in scope, as it allows for the presence of additional, unrecited GHB salts.

235. Accordingly, I incorporate by reference my prior analysis of the Asserted Claims of the ’102 and ’922 Patents. For the same reasons discussed therein, the composition recited in claim 11 of the ’107 Patent would have been obvious to a POSA in view of Cook.

**b. Claim 16**

236. Claim 16 of the '107 Patent (which depends from claims 1 and 15) recites the following:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of at least three salts of GHB, wherein the mixture comprises a calcium salt of gamma-hydroxybutyrate (Ca•(GHB)2), a magnesium salt of gamma-hydroxybutyrate (Mg•(GHB)2), and one or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na•GHB) and a potassium salt of gamma-hydroxybutyrate (K•GHB).
>
> 15. The pharmaceutical composition of claim 1, wherein the mixture comprises $Mg•GHB_2$, Na•GHB, and $Ca•(GHB)_2$.
>
> 16. The pharmaceutical composition of claim 15, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 10%, the $Mg•GHB_2$ salt is present in a wt/wt % of about 20% to about 25%, and the $Ca•(GHB)_2$ salt is present in a wt/wt % of about 40% to about 50%.

237. Accordingly, claim 16 of the '107 Patent requires a pharmaceutical composition of GHB including a mixture "comprising" 5-10% (wt/wt) sodium-GHB, 20-25% (wt/wt) magnesium-GHB, 40-50% (wt/wt) calcium-GHB, and optionally potassium-GHB (as the claim only requires at least 3 of the 4 salts and requires the other 3 at certain amounts).

238. I note that this claim is substantially similar to the Asserted Claims of the '102 and '922 Patents. The only difference is that it uses the open-ended transitional phrase "comprises" rather than "consists of" and does not recite a specific potassium-GHB amount. As a result, the claim is broader in scope, as it allows for the presence of additional, unrecited GHB salts, and doesn't require a specific potassium amount.

239. Accordingly, I incorporate by reference my prior analysis of the Asserted Claims of the '102 and '922 Patents. For the same reasons discussed therein, the composition recited in claim 16 of the '107 Patent would have been obvious to a POSA in view of Cook.

### C. The Asserted Claims are Obvious Over Cook in View of One or More of Conte, Gessa, and/or Karppanen

240. As discussed above, it is my opinion that each of the Asserted Claims is obvious over the Cook reference alone. I incorporate by reference my prior analysis of Cook in this report.

241. Each of the Asserted Claims requires a specific combination and/or relative amounts of sodium, potassium, magnesium, and calcium salts of GHB (collectively referred to here as the "Reduced Sodium Mixed Salt Limitations"), including:

- A mixture consisting of 5-40% sodium, 10-40% potassium, 5-30% Magnesium, and 20-80 calcium salts of GHB (mol/mol basis) ('102 Patent, claims 1, 6-11);
- A mixture comprising 5-40% sodium, 10-40% potassium, 5-30% Magnesium, and 20-80 calcium salts of GHB (w/w basis) ('922 Patent, claim 11, '107 Patent, claim 11);
- A mixture comprising 5-10% sodium, 20-25% magnesium, and 40-50% calcium ('107 Patent, claim 16);
- A specific salt ratio of sodium:potassium:magnesium:calcium = 8:23:21:48 ('102 Patent, claim 6).

242. As set forth above, these Reduced Sodium Mixed Salt Limitations are rendered obvious by Cook alone. (*See* Section IX.B (incorporated by reference herein).) Cook discloses the use of each of the four recited GHB salts, and provides an experimental framework for evaluating different salts. A POSA would have arrived at the claimed mixtures through routine optimization using well-known formulation techniques, and I am not aware of any evidence suggesting the claimed ratios or concentrations are critical or yield unexpected results. (*See* Section IX.A (incorporated by reference herein).)

243. In any event, to the extent the specific combinations, concentrations, or ratios of sodium, potassium, magnesium, and calcium GHB salts are not rendered obvious by Cook standing alone, they are certainly rendered obvious when Cook is considered in view of one or more of Conte, Gessa, and/or Karppanen.

244. A POSA would have been motivated to combine Cook with Conte and/or Gessa, as all of these references relate to pharmaceutical compositions containing GHB salts and each explicitly identifies sodium, potassium, magnesium, and calcium as preferred and suitable salts. Additionally, a POSA would have been motivated to combine Cook with Karppanen, as Cook relates to compositions with sodium, potassium, magnesium, and calcium, and these references provide well-established rationale for reducing sodium content and increasing the levels of potassium, magnesium, and calcium in consumable compositions, and provide guidance on appropriate amounts.

245. In particular, both Conte and Gessa provide specific support for selecting a mixture consisting of sodium, potassium, magnesium, and calcium GHB salts. These references reinforce the obviousness of the claimed combinations by defining narrow groups of pharmaceutically acceptable GHB salts and teaching and suggesting the exact four-salt combination recited in the Asserted Claims.

246. Conte (1997) discloses controlled-release pharmaceutical compositions containing salts of gamma-hydroxybutyric acid. (*See* Conte at *e.g*., Abstract; 1:10-18; 3:9-13; 4:3-6; Claims 1-12.) Conte identifies a closed, preferred group of salts—sodium, lithium, potassium, magnesium, and calcium—and states that the salts used in the invention are "preferably selected from the group consisting of" those five. (*See id*. at *e.g*., 4:3-6; *see also* claim 6.) A POSA would have understood this language to define a finite set of preferred salts, with sodium, potassium, magnesium, and calcium forming the most pharmaceutically relevant subset, given their prevalence and acceptance in oral drug products. The four-salt mixture of the Asserted Claims falls squarely within this closed group.

247. Gessa (1991) discloses the same four suitable GHB salts, i.e., sodium, potassium, magnesium, and calcium, that are claimed in the patent as suitable for the oral pharmaceutical composition (including liquid formulations). (*See* Gessa, *e.g*., Abstract; 1:9-20; 3:19-21; 3:29-44; 5:61-67; 7:22-55; Examples 1-5; Claims 1-10.) Gessa states that "suitable gamma-hydroxybutyric acid salts include the sodium salt, potassium salt, calcium salt and magnesium salt." (*Id*. at *e.g*., 7:32-34.) This closed list is repeated in the claims. (*See*, *e.g*., claims 2, 7, 9.) Gessa thus defines a closed universe of acceptable GHB salts identical to that of the Asserted Claims, directly supporting the selection of a combination consisting of sodium, potassium, magnesium, and calcium. In the absence of any teaching or any indication that this combination would be problematic, a POSA would have viewed this four-salt formulation as an obvious and logical selection.

248. As previously discussed, I am not aware of any evidence suggesting that the specific concentrations or ratios recited in the claims are critical or confer unexpected advantages. Accordingly, the claimed compositions would have been obvious over Cook alone and certainly in view of Conte and/or Gessa.

249. Moreover, numerous references in the literature strongly favored reducing sodium and increasing intake of potassium, calcium, and magnesium, providing a clear motivation for the relative proportions of these salts in pharmaceutical compositions.

250. As discussed above, a POSA would also be motivated to balance the reduction in sodium through the use of the other salts (*i.e*., potassium, magnesium and calcium) that were known to be suitable for GHB in the prior art. In this regard, in addition to the teachings of Cook, Gessa and Conte with respect to GHB formulations, Karppanen teaches that for the prevention and treatment of elevated high blood pressures, one should "***decrease the intake of sodium and to***

***increase the intakes of potassium, calcium, and magnesium***." (Karppanen at *e.g.*, Abstract (emphasis added).) Karppanen teaches that there was substantial excess of sodium, and deficiency of potassium, calcium, and magnesium in modern diets. (*See id*. at *e.g.*, Figure 1.) Karppanen teaches that average sodium intake (3,000-4,500 mg/day) significantly exceeded the recommended limits (1,500-2,500 mg/day), while intake of potassium, calcium, and magnesium fell far short of the recommended daily targets—potassium at only 37% of the 4,700 mg target, calcium at 35-40% of the 1,000-1,300 mg target, and magnesium at 50% of the recommended 300-420 mg. (*Id*. at *e.g.*, S12.) A POSA would have been motivated to reduce sodium and at the same time increase each of the other three cations for health, safety, and compliance reasons, particularly in an orally administered product.

251. Thus, a POSA also could have considered Cook (and/or Conte and/or Gessa) with Karpannen to arrive at the claimed amounts as a matter of routine optimization based on recommended daily amounts, known side effects, taste preferences and the like. A POSA would have been motivated to combine these references because they relate to sodium, potassium, calcium, and magnesium consumption.

252. A POSA would have understood that there was considerable flexibility to incorporate relatively high amounts of calcium, potassium, and magnesium—and especially calcium.

253. A POSA also would have been aware that excessive potassium and magnesium can cause gastrointestinal discomfort, and thus their levels should be balanced accordingly. However, a POSA would not have been motivated to eliminate sodium entirely. Sodium was already known to be a suitable and effective salt form of GHB (*e.g.*, sodium oxybate), widely used in

pharmaceutical formulations, and could be incorporated at lower levels—allowing retention of its beneficial properties while minimizing regulatory or safety concerns.

254. To avoid any doubt, it is also my opinion that the Asserted Claims would have been obvious when viewed as a whole. Although I address the individual limitations in detail, my conclusions are not limited to a piecemeal approach. Rather, I have considered whether the specific combinations of salt types, concentration ranges, pH values, and formulation conditions recited in the claims present a non-obvious invention when viewed together. In my opinion, they do not. Each component was known in the art, and their combination would have represented nothing more than the application of routine formulation strategies to achieve predictable results.

255. In sum, even if Cook alone were not sufficient to render the Asserted Claims obvious, they are plainly obvious in view of Cook in combination with one or more of Conte, Gessa, and/or Karppanen. Each of these references reinforces the obviousness of selecting a combination consisting of sodium, potassium, magnesium, and calcium salts in the claimed proportions for use in stable, orally administered GHB formulations. A POSA, equipped with these teachings and standard formulation tools, would have arrived at the claimed compositions through routine experimentation. (*See* Section IX.A.6.)

### D. The Asserted Claims are Obvious Over the Xyrem Label in View of One or More of Cook, Conte, Gessa, and/or Karppanen

256. The Asserted Claims of the ’102, ’922, ’107, and ’173 Patents would have been obvious to a POSA based on the FDA-approved Xyrem Label in view of one or more of Cook, Conte, Gessa, and/or Karppanen.

257. As discussed above, the Xyrem Label disclosed a high-sodium, liquid GHB formulation at a concentration of 500 mg/mL and a pH of 7.5, but flagged the formulation’s high sodium burden as a safety concern, particularly for patients with cardiovascular or renal risks. (*See*

Section IX.A.2 (incorporated by reference herein); *see also* Xyrem Label at *e.g.*, 11, Medication Guide (2).) A POSA would have been motivated to reduce the sodium content while maintaining the same therapeutic dose of GHB, and would have looked to the prior art for guidance on how to do so.

258. As detailed above, Cook, Conte, and Gessa each taught that sodium, potassium, magnesium, and calcium were suitable and preferred counterions for GHB. (*See* Section IX.A.5 (incorporated by reference herein).) Karppanen provided clinical, nutritional, and regulatory reasons to reduce sodium and increase other cations, including specifically calcium, potassium and magnesium. (*See* Section IX.A.4 (incorporated by reference herein).) Together, these references offered clear motivation(s) and direction for selecting and balancing alternative GHB salts to achieve the claimed reduced sodium mixed salt formulation. (*See* Section IX.A.6 (incorporated by reference herein).) Cook also provided explicit guidance on optimizing pH, solubility, and stability using standard formulation techniques. (*Id.*) In light of these teachings, a POSA would have found the claimed formulations obvious.

259. In addition to my analysis of the individual limitations below, and as further detailed below, it is my opinion that the Asserted Claims as a whole, would have been obvious to a POSA in view of the Xyrem Label in combination with one or more of Cook, Conte, Gessa, and/or Karppanen. The combination of the recited salts, concentrations, formulation type, pH, and other components reflects the routine assembly of known elements, each serving its expected function, and all directed toward a well-known goal: stable, orally administered GHB compositions. There is no indication in the record that the specific combination, taken as a whole, yields any unexpected properties. Accordingly, the claimed subject matter would have been obvious when considered in its entirety.

### 1. ’102 Patent

#### a. Claim 1

260. Claim 1 of the ’102 Patent recites:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB and a pharmaceutically acceptable carrier, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca.(GHB)_2$), wherein the Na.GHB salt is present in a % molar equivalents of about 5% to about 40%, the K.GHB salt is present in a % molar equivalents of about 10% to about 40%, the $Mg.(GHB)_2$ salt is present in a % molar equivalents of about 5% to about 30%, and the $Ca.(GHB)_2$ salt is present in a % molar equivalents of about 20% to about 80%, wherein the composition is formulated as a liquid formulation, and wherein the liquid formulation has a total concentration of GHB salts of about 350 mg/mL, about 400 mg/mL, about 450 mg/mL, about 500 mg/mL, about 550 mg/mL, or about 600 mg/mL.

261. Accordingly claim 1 requires:

(i) a pharmaceutical composition of GHB including a mixture of 5-40% (mol/mol) sodium-GHB, 10-40% (mol/mol) potassium-GHB, 5-30% (mol/mol) magnesium-GHB, and 20-80% (mol/mol) calcium-GHB;

(ii) as a liquid formulation;

(iii) having a total concentration of GHB salts of about 350 mg/mL, about 400 mg/mL, about 450 mg/mL, about 500 mg/mL, about 550 mg/mL, or about 600 mg/mL

262. In my opinion, claim 1 of the ’102 Patent would have been obvious over the Xyrem Label in view of one or more of Cook, Conte, Gessa, and/or Karppanen.

##### i. <u>**Mixture Consisting of 5-40% sodium, 10-40% potassium, 5-30% magnesium and 20-80% calcium GHB salts (mol/mol)**</u>

263. A POSA would have been well aware that Xyrem (sodium oxybate) had been FDA-approved since 2002 for the treatment of narcolepsy. However, a POSA also would have

recognized that Xyrem required high doses of GHB—administered twice nightly in large volumes—which resulted in a correspondingly high sodium burden.

264. The approved dosing regimen involved two equal nightly doses, beginning at 4.5 grams per night (2.25 g per dose), titratable in 1.5 g increments to a maximum of 9 grams per night. Patients were instructed to dilute each dose in 60 mL (2 ounces) of water prior to ingestion. (Xyrem Label at *e.g.*, 22-23.)

265. Critically, the Xyrem Label emphasized the product's high sodium content. For instance, it included a dosing table correlating GHB dose with sodium load per nightly regimen:

**Table 5**
**Sodium Content per Total Nightly Dose**

| Xyrem Dose (g) | Xyrem (mL) | Sodium Content/Dose |
|---|---|---|
| 3 | 6 | 546 mg |
| 4.5 | 9 | 819 mg |
| 6 | 12 | 1092 mg |
| 7.5 | 15 | 1365 mg |
| 9 | 18 | 1638 mg |

(*See id*. at *e.g.*, 11.)

266. The Xyrem Label warned clinicians to consider this sodium burden in patients with heart failure, hypertension, or renal impairment. (*See id*. at *e.g.*, 4 ("It is prudent to reduce the starting dose of sodium oxybate by one-half in patients with liver dysfunction"); 11 ("Daily sodium intake in patients taking sodium oxybate is provided below and should be considered in patients with heart failure, hypertension or compromised renal function"); *id*. ("Patients with compromised liver function will have an increased elimination half-life and systemic exposure to sodium oxybate" and "[t]he starting dose should therefore be decreased by one-half in such patients, and response to dose increments monitored closely.")

267. The label further warned patients directly: "Xyrem contains a lot of sodium (salt) and may not be right for you." (*See id*. at *e.g*., 2.) Patents were advised to inform their doctor if they "are on a salt-restricted diet, have high blood pressure, heart failure, or kidney problems." (*Id*.)

268. Against this backdrop, a POSA would have clearly understood that Xyrem's high sodium content presented a clinical limitation and that improving the salt profile, specifically by reducing sodium, was desirable. A POSA would have been motivated to reformulate the product to reduce the sodium load while maintaining GHB efficacy.

269. To that end, a POSA would have been motivated to combine the teachings of the Xyrem Label with: (1) Cook, Conte, and/or Gessa, each of which discloses the use of GHB salts, including sodium, potassium, magnesium, and calcium; and/or (2) Karppanen, which addresses sodium intake, the health risks of excessive sodium, and the benefits of potassium, magnesium, and calcium supplementation. There would have been a clear motivation to make these combinations based on the desire to make a lower-sodium alternative to Xyrem.

270. A POSA would have been motivated to combine the teachings of the Xyrem Label with Cook, which as discussed above, discloses aqueous pharmaceutical compositions of GHB that are chemically stable and resistant to microbial growth and expressly teaches that sodium, potassium, magnesium, and calcium salts of GHB may be used individually or in combination. (*See* Section IX.A.5.; *see also* Sections IX.B and IX.C (each incorporated by reference herein).)

271. A POSA would have been motivated to combine the teachings of the Xyrem Label with Conte, which as discussed above, discloses controlled-release GHB compositions using salts from a closed group of five preferred cations—sodium, potassium, magnesium, calcium, and

lithium—thereby supporting the selection of a specific subset consisting of sodium, potassium, magnesium, and calcium. (*See* Section IX.A.5.; Section IX.C. (incorporated by reference herein).)

272. A POSA would have been motivated to combine the teachings of the Xyrem Label with Gessa, which as discussed above, discloses GHB compositions limited to only four acceptable salts—sodium, potassium, magnesium, and calcium—making clear that this specific four-salt combination was both suitable and preferred. (*See* Section IX.A.5.; Section IX.C. (incorporated by reference herein).)

273. A POSA would have been motivated to combine the teachings of the Xyrem Label with Karppanen, which as discussed above, emphasizes the importance of reducing dietary sodium and increasing potassium, magnesium, and calcium for cardiovascular health, providing a strong clinical rationale to rebalance the salt profile in oral formulations, and providing guidance on recommended daily amounts. (*See* Section IX.A.4.; Section IX.C. (incorporated by reference herein).)

274. As discussed above, a POSA would have viewed it as a matter of routine formulation optimization to maintain the total daily (or per-dose) amount of GHB from Xyrem, but to reduce sodium content and increase potassium, magnesium, and calcium content to improve the safety profile, taste, and regulatory compliance while avoiding potential side effects. (*See* Section IX.A.6 (incorporated by reference herein).)

275. As discussed above, a POSA would have been aware of the relevant dietary intake data and labeling thresholds—including that sodium was commonly overconsumed and tightly restricted, while calcium, magnesium, and potassium were under consumed and permissible at higher levels. (*See* Section IX.A.(2)-(4) (incorporated by reference herein).) This understanding would have further supported increasing calcium in particular, while moderating potassium and

magnesium to avoid potential gastrointestinal side effects. (*See* Section IX.A.4., IX.A.6., IX.C.; *see also* Karppanen.)

276. Additionally, because GHB salts dissociate to function, a POSA would have understood that altering the counterion composition would not materially affect the pharmacokinetics or efficacy of the active GHB anion at its site of action. If any formulation-specific questions remained, a POSA could have easily conducted routine solubility and stability studies using well-established methods, such as those set forth in Cook (e.g., Example 5). Thus, starting from the Xyrem Label, a POSA—motivated by safety concerns and aided by the teachings of Cook, Conte, Gessa, and/or Karppanen—would have arrived at the claimed reduced sodium salt mixture through routine experimentation using known components for known purposes, rendering claim 1 of the '102 Patent obvious. (*See* Section IX.A.6 (incorporated by reference herein).)

ii. **<u>"pharmaceutically acceptable carrier"</u>**

277. The Xyrem Label discloses that "sodium oxybate is a white to off-white, crystalline powder that is very soluble in aqueous solutions," and that the Xyrem oral solution contains "500 mg of sodium oxybate per milliliter of USP Purified Water, neutralized to pH 7.5 with malic acid." (*See* Xyrem Label at 11.) Thus, the Xyrem Label itself demonstrates the use of purified water as the pharmaceutically acceptable carrier, which would have been well understood to a POSA

278. As discussed above, Cook likewise teaches the use of pharmaceutically acceptable carriers, including aqueous solutions, for formulating GHB salts. Cook explicitly identifies water and other common pharmaceutical excipients as suitable carriers and explains that such carriers are widely used in the art. (*See* Section I.X.5; IX.B.; *see also*, *e.g.*, Gessa at *e.g.*, 7:32-43.)

279. In light of these teachings, a POSA would have found it obvious to use a pharmaceutically acceptable carrier such as water when formulating GHB salt compositions. Both the Xyrem Label and Cook point to the same solution—aqueous formulations using known

carriers—and there is no evidence that the use of such a carrier was inventive or produced any unexpected results. Rather, it reflects standard formulation practice in the pharmaceutical field.

iii. **"liquid formulation"**

280. The Xyrem Label expressly discloses that the product is administered as an oral solution—specifically, "500 mg of sodium oxybate per milliliter of USP Purified Water, neutralized to pH 7.5 with malic acid." (*See* Xyrem Label at 1-2; *see also* 22-24.) The label further instructs that each dose be diluted in 60 mL of water prior to administration, confirming that Xyrem is formulated and delivered as a liquid. (*Id*. at *e.g*., 23; *see also id.* at Medication Guide.)

281. As discussed above, Cook also teaches liquid pharmaceutical formulations of GHB salts. Cook repeatedly describes compositions in aqueous media, including solutions and suspensions, and provides detailed guidance on preparing and packaging such liquid formulations. (*See* Section IX.5; IX.B., incorporated by reference.)

282. In view of the teachings of both the Xyrem Label and Cook (and the other prior art), a POSA would have found it obvious to formulate GHB salts as a liquid formulation. This was the standard dosage form for sodium oxybate at the time, and both the prior art and regulatory approval history confirm that liquid delivery was known, expected, and routine for GHB-based pharmaceutical compositions.

iv. **total concentration of GHB salts of about 350 mg/mL, about 400 mg/mL, about 450 mg/mL, about 500 mg/mL, about 550 mg/mL, or about 600 mg/mL**

283. The Xyrem Label expressly discloses a GHB concentration of 500 mg/mL, which is the formulation approved by the FDA and commercially available at the time. (*See* Section IX.A.2. (incorporated by reference herein); Xyrem Label at *e.g*., 1-2.) This concentration was well known and accepted for oral administration of GHB, and would have served as the baseline standard in clinical use.

284. As discussed above, Cook also teaches GHB compositions formulated at concentrations within the claimed range. (*See* Section IX.A.5; IX.B. (incorporated by reference herein).) For example, Cook specifically discloses a preferred concentration of 500 mg/mL, and teaches that concentrations may range from approximately 150 mg/mL up to 750 mg/mL, depending on formulation variables. (*See* Cook at *e.g.*, [0012], [0018]-[0020], Examples, Table 16, Table 26.)

285. In light of these disclosures, a POSA would have found it obvious to formulate a GHB composition at a total concentration of about 500 mg/mL, or any of the nearby claimed concentrations, such as 350, 400, 450, 550, or 600 mg/mL. The use of these amounts reflects well-established formulation norms, and simply substituting a portion of the sodium with other pharmaceutically acceptable salts, such as potassium, calcium, or magnesium, would not have required inventive skill. This would have constituted routine optimization using known salts at known concentrations, for the same purpose disclosed in the prior art.

**b. Claim 6**

286. Claim 6 of the '102 Patent depends from claim 1 and further recites:

> 6. The pharmaceutical composition of claim 1, wherein the Na.GHB, K.GHB, Mg.$(GHB)_2$, and $Ca(GHB)_2$ salts are present in a % molar equivalents ratio of about 8:23:21:48, respectively.

287. I incorporate by reference my discussion of claim 1.

288. As discussed above, a POSA would have recognized from the Xyrem Label that sodium oxybate was effective but included multiple warnings related to sodium intake and advised dose adjustments in patients with cardiovascular, renal, or hepatic issues. (*See* Section IX.A.2 (incorporated by reference herein).)

289. However, a POSA would not have been motivated to remove sodium entirely. Sodium was known to be the most commonly used pharmaceutical counterion. It had already been

proven effective with GHB (*e.g.*, as set disclosed in Xyrem Label, Cook, Conte, and Gessa), contributed to taste and solubility, and its inclusion in modest amounts remained consistent with dietary guidance. A POSA seeking to reduce sodium would have reasonably retained a small proportion of sodium, while replacing part of it with other pharmaceutically acceptable cations.

290. The art at the time provided clear guidance on which alternative cations to consider. Cook, Conte, and Gessa each disclosed sodium, potassium, magnesium, and calcium as suitable salts of GHB. (*See* Section IX.A.5 (incorporated by reference).) Gessa, in particular, identified only those four salts, signaling a closed and preferred group. A POSA would have viewed these as the leading alternatives for use in GHB formulations and would have understood that they could be used either individually or in combination.

291. With respect to the relative amounts of these salts, the prior art also provided direction. Karppanen consistently documented that sodium intake in modern diets far exceeded recommended levels, while potassium, calcium, and magnesium were typically under-consumed, and recommended decreasing sodium and increasing potassium, calcium, and magnesium simultaneously. (Karppanen at *e.g.*, S11-S17.). A POSA would have used this guidance in designing formulations aimed at minimizing sodium while incorporating safe and beneficial levels of the other cations.

292. Importantly, a POSA would have recognized that calcium could be safely used in relatively large amounts. Calcium had favorable regulatory tolerability, contributed positively to taste, and addressed known dietary deficiencies. Similarly, a POSA would have known that potassium and magnesium could be beneficially incorporated, though typically at more moderate levels due to potential gastrointestinal side effects at higher doses, particularly in oral liquid formulations.

293. Based on this body of prior art, a POSA formulating a mixed-salt GHB composition would have been guided to reduce sodium to a minor component, incorporate calcium at relatively high levels, and include potassium and magnesium in moderate, tolerable amounts. This would have been a matter of routine optimization in order to reduce sodium amounts, and then balance electrolytes, improve taste, maintain solubility, and stay within recommended daily intake amounts with respect to the known and recommended calcium, magnesium and potassium constituents. (*See* Section IX.A.6 (incorporated herein by reference).)

294. To my knowledge, there is no evidence that this particular ratio leads to unexpected results, nor that it reflects any critical threshold or inventive insight. Instead, it is the type of routine optimization that a POSA would have carried out using known salts for known purposes based on existing motivations in the art. Accordingly, claim 6 would have been obvious in view of the Xyrem Label and the teachings of Cook, Conte, Gessa, and/or Karppanen.

**c. Claim 7**

295. Claim 7 of the '102 Patent depends from claim 1 and further recites:

> 7. The pharmaceutical composition of claim 1, wherein the total concentration of GHB salts is about 500 mg/mL.

296. I incorporate by reference my discussion of claim 1.

297. As discussed above, the FDA-approved formulation of Xyrem contained 500 mg/mL of sodium oxybate, a concentration that had been demonstrated to be safe, effective, and well-tolerated in clinical use. (*See* Section IX.A.2. (incorporated by reference herein); *see also* Xyrem Label at *e.g.*, 1-2.) A POSA would have recognized this concentration as a well-established and therapeutically relevant concentration for delivering GHB in a liquid formulation.

298. This same concentration is also disclosed in Cook as a preferred concentration for GHB compositions. Cook teaches that GHB may be formulated at concentrations ranging from

approximately 150 mg/mL up to 750 mg/mL, with 500 mg/mL identified as a particularly preferred amount based on stability, solubility, and microbial resistance. (*See* Cook at *e.g.*, [0012], [0018]-[0020], Examples, Table 16, Table 26.)

299. In light of these teachings, a POSA would have been motivated to modify the Xyrem formulation to address the high sodium content by substituting some of the sodium with potassium, magnesium, and calcium salts while maintaining the same total GHB concentration. This would allow the POSA to preserve the well-established dosing regimen and bioavailability profile while improving the overall safety profile of the formulation. There was no reason or motivation to deviate from this concentration, especially given its endorsement in both the Xyrem Label and Cook.

300. Accordingly, the concentration recited in claim 7 (500 mg/mL) is directly taught in the prior art in an approved commercial product (as well as taught by Cook) and reflects a standard, well-accepted formulation level for GHB to provide a known dose the same way. Incorporating alternative salts in place of some of the sodium, while maintaining this total concentration, would have been a predictable and routine adjustment within the skill of a POSA. I am not aware of any evidence that the specific concentration recited in claim 7 leads to any unexpected results or is critical to the invention. Therefore, claim 7 would have been obvious in view of the Xyrem Label and Cook.

#### d. Claim 8

301. Claim 8 of the ’102 Patent depends from claim 1 and further recites:

> 8. The pharmaceutical composition of claim 1, wherein the composition has a pH of about 7.5 to about 9.0.

302. I incorporate by reference my discussion of claim 1.

303. The Xyrem Label discloses that the formulation is neutralized to a pH of 7.5 using malic acid (*see* Xyrem Label at *e.g.*, 2), placing it at the lower bound of the range recited in claim 8.

304. A POSA seeking to improve the Xyrem formulation, such as by reducing sodium and incorporating other known GHB salts like potassium, calcium, and magnesium, would have recognized that these changes could impact the formulation's pH and solubility profile. To address that, a POSA would have looked to Cook, which is directed to aqueous GHB formulations and provides detailed instruction on how pH affects solubility, stability, and microbial resistance.

305. As discussed above, Cook teaches pH ranges that both encompass and specifically fall in the range recited in claim 8. (*See* Section IX.A, IX.B, each incorporated by reference; *see also* Cook at e.g., [0013]-[0022], [0027]-[0030], [0033]-[0034]; *see also* Table 26.)

306. For example, Cook explains that pH directly influences both the chemical stability and solubility of GHB in aqueous media. (*See* Cook at *e.g.*, [0013], [0019].) For example, Cook teaches that solubility of GHB can reach up to 750 mg/mL at room temperature, but that this value—and the stability of the formulation—varies with pH. Cook identifies preferred pH values for stable formulations and teaches that pH control is essential for producing compositions that are resistant to microbial growth, especially when formulated without preservatives. Cook also discloses that aqueous formulations of GHB can be prepared across a wide range of pH values (*e.g.*, pH 3 to 10), and specifically lists individual values spanning the entire range of about 7.5 to 9.0, including 7.5, 8.0, 8.5, and 9.0. (*Id*. at [0014].)

307. Importantly, Cook does not merely identify acceptable pH values—it provides a clear protocol for how to evaluate and adjust pH based on the properties of the composition being developed. This includes guidance on the use of buffering agents, pH-adjusting excipients, and

methods for assessing solubility and stability across pH ranges. (*See*, *e.g.*, Cook at [0013]-[0022], [0027]-[0030], [0033]-[0034] *see also* Example 5.)

308. In light of these disclosures, it would have been obvious to a POSA, based on the Xyrem Label and the teachings of Cook, to select or adjust the formulation's pH to fall within the range of about 7.5 to about 9.0. This would have been part of routine formulation optimization, informed by Cook's explicit instruction that pH influences solubility and that pH adjustments are necessary when working with alternative GHB salts. (*See also* Section IX.A.6 (incorporated by reference).)

**e. Claim 9**

309. Claim 9 of the '102 Patent depends from claim 1 and further recites:

> 9. The pharmaceutical composition of claim 1, wherein the composition has a pH of about 8.0 to about 8.5.

310. I incorporate by reference my analysis of claim 1 and the pH limitation of claim 8 above. (*See* Section IX.D.1.(a) and (d).)

311. As discussed above, the Xyrem Label discloses that the formulation is neutralized to a pH of 7.5 using malic acid. (*See* Xyrem Label at *e.g.*, 2.) As discussed above, a POSA modifying the formulation to incorporate additional salts would have looked to Cook for guidance.

312. Cook explicitly discloses individual pH values that fall within the narrower range of about 8.0 to about 8.5. For example, Cook lists "about 8.0, about 8.1, about 8.2, about 8.3, about 8.4, [and] about 8.5" as suitable pH values. (*See* Cook at *e.g.*, [0014].) These values fall entirely within the scope of claim 9 and demonstrate that this range was both recognized and expressly disclosed in the prior art.

313. Cook also teaches that pH values in this range are compatible with aqueous GHB formulations, including those at concentrations of 500 mg/mL. (*Id*. at *e.g.*, [0016].) As discussed

previously, Cook provides detailed guidance on adjusting and maintaining pH through the use of buffering agents and pharmaceutically acceptable excipients. (*Id*. at *e.g*., 0013]-[0022], [0027]-[0030], [0033]-[0034].)

314. In view of these disclosures, it would have been obvious for a POSA to formulate a composition within the pH range of about 8.0 to about 8.5. This range is not only encompassed by Cook's broader disclosures, but also directly and repeatedly exemplified by more specific disclosures. The selection of this range could have been arrived at by routine formulation optimization and does not appear to confer any unexpected benefits or criticality.

**f. Claim 10**

315. Claim 10 of the '102 Patent depends from claim 1 and further recites:

> 10. The pharmaceutical composition of claim 1, wherein the composition has a pH of about 8.3.

316. I incorporate by reference my analysis of claim 1 and the pH limitation of claims 8 and 9 above. (*See* Section IX.D.1.a, d and e.)

317. As discussed above, the Xyrem Label discloses that the formulation is neutralized to a pH of 7.5 using malic acid. (*See* Xyrem Label at *e.g*., 2.) As discussed above a POSA modifying the formulation to incorporate additional salts would have looked to Cook for guidance.

318. Cook expressly identifies "about 8.3" as a suitable pH for GHB salt compositions. (*See* Cook at *e.g*., [0014].) This value is one of the specific examples provided in a list of acceptable pH values for the disclosed formulations.

319. As noted above, Cook teaches that pH values around 8.3 are suitable for formulations containing about 500 mg/mL GHB and that these values may be achieved and maintained using conventional buffering agents. (*Id*. at *e.g*., [0014], [0016]; *see also* [0013]-[0022], [0027]-[0030], [0033]-[0034].)

320. Because Cook discloses the exact pH recited in claim 10 the limitation of claim 10 would have been obvious to a POSA. The claimed value simply reflects a known and expressly taught option from the prior art.

**g. Claim 11**

321. Claim 11 of the ’102 Patent depends from claim 1 and further recites:

> 11. The pharmaceutical composition of claim 1, wherein the composition is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives.

322. I incorporate my analysis of claim 1. (*See* Section IX.D.1.a.)

i. **<u>wherein the composition is chemically stable and resistant to microbial growth</u>**

323. A POSA would have understood that Xyrem, an FDA-approved pharmaceutical product, was formulated to be both chemically stable and resistant to microbial growth. The Xyrem Label disclosed a shelf-stable aqueous formulation with controlled pH and proper packaging, all of which are standard strategies used in the art to ensure chemical integrity and minimize microbial contamination in liquid dosage forms.

324. In addition, Cook is directly focused on the development of aqueous GHB salt formulations that are both chemically stable and resistant to microbial growth. This is a central and repeated theme throughout Cook’s disclosure. (*See, e.g.,* Cook at Abstract, [0003], [0011], [0012], [0029], [0031], [0035], [0042]; claims.) Cook explains that these properties are essential for improving shelf life and making preservative-free formulations viable.

325. Cook goes beyond identifying these attributes as desirable—it provides detailed instruction on how to achieve them, including guidance on how pH, solubility, and buffering agents affect chemical stability and microbial resistance. For example, Cook teaches that chemical stability improves at pH levels above 6, with a preferred range of pH 6 to 9, and that buffering

agents may be used to maintain that pH during storage and use. (*See, e.g.,* Cook at [0019], [0021], and [0047]–[0048], and supporting data in Figure 1 and Tables 1–2.) Cook also discloses testing methods and experimental data showing the impact of these variables on stability. (*See* Examples.)

326. In view of these disclosures, a POSA tasked with formulating a GHB salt composition—whether starting from the Xyrem formulation or implementing Cook's salt substitutions—would have found it obvious to develop a composition that is chemically stable and resistant to microbial growth. Cook explicitly teaches how to achieve this result using known ingredients and standard formulation techniques. There is no indication that the claimed stability or microbial resistance involves any unexpected result.

327. Accordingly, this limitation would have been obvious in view of the Xyrem Label and/or Cook. Both references disclose stable, aqueous GHB salt compositions and provide clear motivation and guidance for achieving these properties using routine pharmaceutical development methods. (*See also* Sections IX.A., IX.B., and IX.C. (each incorporated by reference).)

ii. **wherein the composition is free of preservatives**

328. A POSA would have recognized from the Xyrem Label that the formulation was preservative-free. (*See*, *e.g*., Xyrem Label at *e.g*., 1-2.) A POSA developing a similar or improved GHB formulation would have understood that a preservative-free composition was not only feasible but clinically desirable.

329. A POSA also would have understood that Cook states "the contamination by microorganisms in GHB solutions rapidly surpass acceptable limits, and preservatives can adversely affect the pH and thus, GHB's stability." (*Id*. at [0010].) Cook further states that "[m]aintenance of pH becomes important for long term storage since preservatives are known to degrade in formulations having pH levels above approximately pH 6." (*Id*. at [0108].) This

guidance highlights a known trade-off between the inclusion of preservatives and the chemical stability of the GHB formulation.

330. While Cook identifies certain preservatives and antimicrobial agents as potentially suitable (*id*. at [0024]), it makes clear that these components are optional and only applicable to some embodiments. This further confirms that preservative-free formulations are within the scope of Cook's disclosure. Notably, claim 63 of Cook expressly recites "a composition that is chemically stable and resistant to microbial growth, and wherein the composition is free of preservatives." (*See* Cook at claim 63.)

331. These disclosures teach not only that preservative-free formulations are possible, but that they may be preferable under conditions where preservatives could undermine formulation stability. A POSA would have recognized that a preservative-free composition could be achieved using the techniques and conditions disclosed in Cook, such as pH control, and that doing so would represent a routine and predictable design choice, not an inventive advance.

332. In view of these teachings, a POSA starting from the known, preservative-free Xyrem formulation and consulting Cook for guidance on how to modify or improve it,such as by changing the salt composition,would have found it obvious to maintain a preservative-free formulation. There is no indication that omitting preservatives from a GHB salt formulation results in any unexpected advantage.

333. Gessa also teaches compositions of GHB salts that are "free of preservatives. (Gessa at *e.g*., 8:57-59.)

334. Accordingly, the preservative-free limitation of claim 11 would have been obvious over the Xyrem Label in view of Cook and/or Gessa. (*See also* Sections IX.A., IX.B., and IX.C. (each incorporated by reference).)

**2. ’922 Patent**

**a. Claim 11**

335. Claim 11 of the ’922 Patent (which depends from claims 1 and 2) recites the following:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.$(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate (Ca.$(GHB)_2$); and optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier.
>
> 2. The pharmaceutical composition of claim 1, wherein the pharmaceutically acceptable carrier comprises more of a solvent, dispersion medium, coating, antibacterial agent, antifungal agent, isotonic agent, or absorption delaying agent.
>
> 11. The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of 5% to 40%, the K.GHB salt is present in a wt/wt % of 10% to 40%, the $Mg(GHB)_2$ salt is present in a wt/wt % of 5% to 30%, and the Ca.$(GHB)_2$ salt is present in a wt/wt % of 20% to 80%.

336. Accordingly claim 11 requires the following:

(iv) pharmaceutical composition including a mixture consisting of 5-40% (wt/wt) sodium-GHB, 10-40% (wt/wt) potassium-GHB, 5-30% (wt/wt) magnesium-GHB, 20-80% (wt/wt) calcium GHB;

(v) optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier; and

(vi) wherein the pharmaceutically acceptable carrier comprises more of a solvent, dispersion medium, coating, antibacterial agent, antifungal agent, isotonic agent, or absorption delaying agent.

337. I discuss each of these limitations below.

i. **<u>Mixture Comprising 5-40% sodium, 10-40% potassium, 5-30% magnesium and 20-80% calcium GHB salts (w/w)</u>**

338. This limitation recites the same mixture of GHB salts as claim 1 of the ’102 Patent, except the concentrations are in wt/wt rather than mol/mol. The recitation of wt/wt rather than

mol/mol does not impact my analysis as it pertains to obviousness over the Xyrem Label in combination with one or more of the cited references. A POSA would readily know how to convert mol/mol concentrations to wt/wt. As discussed above with respect to the Asserted Claims of the '102 Patent, the pharmaceutical composition is obvious and the amounts of each salt would have been a matter of routine optimization, and I'm not aware of any unexpected results or criticality associated with these. Accordingly, this limitation is obvious over the Xyrem Label in view of one or more of the cited references for the same reasons discussed above with respect to the Asserted Claims of the '102 Patent (*e.g.*, claim 1 and 6). (*See* Section IX.D.1.a and b (each incorporated by reference); *see also* Sections IX.A., IX.B., and IX.C. (each incorporated by reference).)

ii. **"optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier"**

339. A POSA would have understood that Xyrem is formulated in a pharmaceutically acceptable aqueous carrier and includes malic acid as a pH-adjusting agent, thereby inherently disclosing at least one buffering agent in the composition. (*See* Xyrem Label at e.g., 2.) A POSA seeking to improve or modify Xyrem, such as by substituting or reducing sodium content using other known GHB salts, would have been motivated to evaluate and adjust pH and other excipients accordingly

340. In doing so, a POSA would have been guided by Cook, which expressly discloses the use of a pharmaceutically acceptable carrier and teaches that the composition may optionally include excipients such as buffering agents, sweetening agents, flavoring agents, and others. (*See* Cook at *e.g.*, [0021], [0024]–[0030], [0068]; *see also* Section IX.A.5 (incorporated by reference).)

341. For example, Cook states that "[i]n certain other embodiments of the present invention, the pharmaceutical composition may comprise a pH adjusting or buffering agent," and

goes on to identify specific examples. (Cook at *e.g.*, [0021].) These teachings would have directly informed a POSA how to adjust the formulation after modifying the salt content.

342. Cook further discloses that flavoring and sweetening agents may be added, teaching: "In certain embodiments, the pharmaceutical composition may also contain a flavoring agent... A type of 'flavoring agent' would be a sweetener." (Cook at *e.g.*, [0026].) These disclosures confirm that such excipients were known and available for optional inclusion.

343. Although Cook does not expressly mention coloring agents, a POSA would have recognized that coloring agents are functionally interchangeable with flavoring or sweetening agents in oral liquid formulations. Coloring agents are commonly included to match visual appearance with flavor cues, to support branding or dosing clarity, and to improve patient compliance. Their use would have been a routine and expected design choice within the POSA's skill set.

344. Accordingly, the inclusion of a buffering agent, sweetening agent, flavoring agent, or coloring agent would have been obvious to a POSA starting from the Xyrem Label in view of Cook. (*See also* Sections IX.A., IX.B., and IX.C. (each incorporated by reference).)

iii. **<u>wherein the pharmaceutically acceptable carrier comprises more of a solvent, dispersion medium, coating, antibacterial agent, antifungal agent, isotonic agent, or absorption delaying agent</u>**

345. The Xyrem formulation is prepared in USP Purified Water, a pharmaceutically acceptable solvent, and was well understood in the art to be free of preservatives but sufficiently stable and microbially resistant. (*See* Xyrem Label at e.g., 1-2, 22-24.) A POSA would have recognized that water is a conventional carrier in liquid oral formulations and that other carrier components could be added as needed based on the desired formulation profile.

346. Cook expressly defines "pharmaceutically acceptable carrier" to include "any and all solvents, dispersion media, coatings, antibacterial and antifungal agents, isotonic and absorption delaying agents, and the like." (*See* Cook at *e.g.*, [0052]-[0053]; *see also* [0052], [0068].) Cook also explains that "the use of such media and agents for pharmaceutical active substances is well known in the art," and provides examples including water, ethanol, glycerol, polyethylene glycol, and vegetable oils—all well-established excipients used by a POSA in liquid oral formulations. (*Id*. at *e.g.*, [0053], [0058].)

347. These disclosures confirm that the components listed in this limitation, solvents, dispersion media, coatings, antibacterial/antifungal agents, isotonic agents, and absorption delaying agents, were not only known and conventional, but also expressly identified by Cook as within the scope of acceptable pharmaceutical carriers.

348. Therefore, starting from Xyrem's aqueous carrier and applying Cook's explicit formulation guidance, it would have been obvious to a POSA to include one or more of the recited carrier components as needed. This limitation reflects routine formulation design based on well-known excipients and would have been obvious over the Xyrem Label in view of Cook. (*See also* Sections IX.A., IX.B., and IX.C. (each incorporated by reference).)

**3. '173 Patent**

**a. Claim 11**

349. Claim 11 of the '173 Patent (which depends from claims 1 and 2) recites the following:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture comprises three or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.$(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate (Ca.$(GHB)_2$).

> 2. The pharmaceutical composition of claim 1, wherein the mixture comprises Na.GHB, K.GHB, M.$(GHB)_2$, and Ca.$(GHB)_2$.
>
> 11. The pharmaceutical composition of claim 2, wherein the Na.GHB salt is present in a wt/wt % of about 5% to about 40%, the K.GHB salt is present in a wt/wt % of about 10% to about 40%, the M.$GHB)_2$ salt is present in a wt/wt % of about 5% to about 30%, and the Ca.$(GHB)_2$ salt is present in a wt/wt % of about 20% to about 80%.

350. Therefore, claim 11 of the ’173 Patent requires a pharmaceutical composition of GHB including a mixture comprising 5-40% (wt/wt) sodium-GHB, 10-40% (wt/wt) potassium GHB, 5-30% (wt/wt) magnesium-GHB, and 20-80% (wt/wt) calcium-GHB.

351. I note that this claim is substantially similar to the Asserted Claims of the ’102 and ’922 Patents. The only difference is that claim 11 of the ’173 Patent uses the open-ended transitional phrase “comprises” rather than “consists of.” As a result, the claim is broader in scope, as it allows for the presence of additional, unrecited GHB salts.

352. Accordingly, I incorporate by reference my prior analysis of the Asserted Claims of the ’102 and ’922 Patents. For the same reasons discussed therein, the composition recited in claim 11 of the ’173 Patent would have been obvious. (*See* Sections IX.A., IX.B., and IX.C. (each incorporated by reference).)

**4. ’107 Patent**

**a. Claim 11**

353. Claim 11 of the ’107 Patent (which depends from claims 1 and 2) recites the following:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of at least three salts of GHB, wherein the mixture comprises a calcium salt of gamma-hydroxybutyrate (Ca•$(GHB)_2$), a magnesium salt of gamma-hydroxybutyrate (Mg•$(GHB)_2$), and one or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na•GHB) and a potassium salt of gamma-hydroxybutyrate (K•GHB).

> 2. The pharmaceutical composition of claim 1, wherein the mixture comprises Na•GHB, K•GHB, Mg•$(GHB)_2$, and Ca•$(GHB)_2$, and wherein the amount of Na•GHB is present at a wt/wt % of about 5% to about 40%.
>
> 11. The pharmaceutical composition of claim 2, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 40%, the K•GHB salt is present in a wt/wt % of about 10% to about 40%, the Mg•$(GHB)_2$ salt is present in a wt/wt % of about 5% to about 30%, and the Ca•$(GHB)_2$ salt is present in a wt/wt % of about 20% to about 80%.

354. Therefore, claim 11 of the ’107 patent requires a pharmaceutical composition of GHB including a mixture comprising 5-40% (wt/wt) sodium-GHB, 10-40% (wt/wt) potassium-GHB, 5-30% (wt/wt) magnesium-GHB, and 20-80% (wt/wt) calcium-GHB.

355. I note that this claim is substantially similar to the Asserted Claims of the ’102 and ’922 Patents. The only difference is that it uses the open-ended transitional phrase “comprises” rather than “consists of.” As a result, the claim is broader in scope, as it allows for the presence of additional, unrecited GHB salts.

356. Accordingly, I incorporate by reference my prior analysis of the Asserted Claims of the ’102 and ’922 Patents. For the same reasons discussed therein, the composition recited in claim 11 of the ’107 Patent would have been obvious. (*See* Sections IX.A., IX.B., and IX.C. (each incorporated by reference).)

**b. Claim 16**

357. Claim 16 of the ’107 Patent (which depends from claims 1 and 15) recites the following:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of at least three salts of GHB, wherein the mixture comprises a calcium salt of gamma-hydroxybutyrate (Ca•(GHB)2), a magnesium salt of gamma-hydroxybutyrate (Mg•(GHB)2), and one or more salts selected from the group consisting of a sodium salt of gamma-hydroxybutyrate (Na•GHB) and a potassium salt of gamma-hydroxybutyrate (K•GHB).

> 15. The pharmaceutical composition of claim 1, wherein the mixture comprises Mg•$GHB_2$, Na•GHB, and Ca•$(GHB)_2$.
>
> 16. The pharmaceutical composition of claim 15, wherein the Na•GHB salt is present in a wt/wt % of about 5% to about 10%, the Mg•$GHB_2$ salt is present in a wt/wt % of about 20% to about 25%, and the Ca•$(GHB)_2$ salt is present in a wt/wt % of about 40% to about 50%.

358. Accordingly, claim 16 of the '107 Patent requires a pharmaceutical composition of GHB including a mixture comprising 5-10% (wt/wt) sodium-GHB, 20-25% (wt/wt) magnesium-GHB, 40-50% (wt/wt) calcium-GHB, and optionally potassium-GHB.

359. I note that this claim is substantially similar to the Asserted Claims of the '102 and '922 Patents. The only difference is that it uses the open-ended transitional phrase "comprises" rather than "consists of" and doesn't recite a specific potassium-GHB amount. As a result, the claim is broader in scope, as it allows for the presence of additional, unrecited GHB salts, and doesn't require a specific potassium amount.

360. Accordingly, I incorporate by reference my prior analysis of the Asserted Claims of the '102 and '922 Patents. For the same reasons discussed therein, the composition recited in claim 16 of the '107 Patent would have been obvious. (*See* Sections IX.A., IX.B., and IX.C. (each incorporated by reference).)

## X. CONCLUSION

361. For the aforementioned reasons, it is my opinion that the Asserted Claims of the Asserted Patents would have been obvious to a POSA in view of the prior art and general knowledge in the field.

# EXHIBIT A

# *Michael M. Crowley, Ph.D.*

13305 Council Bluff Drive, Austin, Texas 78727
512-659-6900
mcrowley@theridian.com

## *I. PERSONAL*

| | |
|---|---|
| Date of Birth: | February 24, 1966 |
| Place of Birth: | Creve Coeur, MO, USA |
| Citizenship: | United States of America |
| Marital Status: | Married; Three Children |

## *II. EDUCATION*

The University of Texas at Austin, Austin, TX — 1/00 to 4/03
Ph.D. in Molecular Pharmaceutics, supervised by Dr. James W. McGinity,
Dissertation Title: "Physicochemical and Mechanical Characterization of Hot-Melt Extruded Dosage Forms"

Washington University, St. Louis, MO — 8/90 to 12/91
M.A., Organic Chemistry, *Cum Laude*

University of Missouri, St. Louis, MO — 9/87 to 5/90
B.S., Chemistry, *Summa Cum Laude*

## *III. WORK & RESEARCH EXPERIENCE*

**Theridian Technologies, LLC**
**President** — **3/09 to Present**

Providing consulting services for drug product development and corporate / business development. Technical consulting services include product and process development, CMC project management, selection and management of CRO's / CMO's, application of proprietary and non-proprietary delivery technologies, scale up and technology transfer, and IP development. Scientific expert for patent litigation. Corporate and business development services include product and platform technology valuation and assessment, due diligence, strategy / tactics / planning, product and technology licensing and asset brokering.

**Oticara, Inc. (formerly Oticus Labs, LLC)**
**Co-Founder** — **1/15 to Present**

Specialty pharmaceutical company developing novel treatments for infectious disease.

**The University of Texas at Austin**
**Adjunct Professor, College of Pharmacy** **1/20 to Present**

Responsibilities include lectures to undergraduate and graduate students in the Molecular Pharmaceutics and Drug Delivery division. Courses include Product Development (PGS 381 F), Advanced Manufacturing Pharmacy (PGS 381 G), Advanced Pharmaceutical Processing (PGS 381 H), and division seminar.

**Nanopore Therapeutics Inc.**
**Board of Directors** **6/20 to Present**

Nanopore is a startup company developing novel technologies for drug delivery.

**Texas EnteroSorbents, Inc. ("TxESI")**
**Board of Directors** **6/11 to 12/19**

TxESI was the first private company funded and owned by Texas A&M University System (TAMUS) based on innovative technology developed at TAMUS. TxESI products and technologies mitigate and/or remove toxins and inflammatory products from animals and humans. TxESI technologies have been included in food, animal feed, drugs and cosmetics.

**PharmaForm, LLC**
**Vice President, Business Development** **5/06 to 3/09**

Responsible for new and existing business development activities including management of sales, marketing, advertising and contract generation / negotiation. Contracts include proposals, development / service agreements, term sheets, license agreements and CDA's. Assess resource requirements for new and existing projects. Identify marketing opportunities and represent the company at trade shows and conventions. Identify, generate and coordinate intellectual property applications and filings with internal resources and attorneys. Manage and coordinate company sales, marketing and advertising efforts. Managed 4 employees. Closed $28M in contracts last 2 years, in-licensed 2 drug delivery technologies, executed 2 out-license agreements and 1 option agreement, and increased sales contracts an average of 28% per year and backlog an average of 12% per year.

**PharmaForm, LLC**
**Vice President, Quality Control & Analytical R&D** **5/05 to 5/06**

Responsible for management of the Quality Control Laboratory and Analytical Research & Development Laboratory. These labs develop methodology to analyze raw materials, API's, in process samples, bulk and finished product in a GMP environment. Additional scientific responsibilities include studying physical and chemical interaction between the pharmaceutical raw excipients and drug substances, development and validation of stability indicating analytical methodology and development of cleaning methodology to support clinical and commercial manufacturing. Managed 36 employees.

**PharmaForm, LLC**
**Vice President, Drug Delivery Technology & Manufacturing Services** **4/03 to 5/05**

Responsible for management of multiple customer oriented drug development projects from pre-formulation to clinical trials and commercial production, including identification of manufacturing equipment and process technology, scale up studies and trouble shooting. Products under development include solid oral dosage forms,

transdermal, trans-mucosal, semi-solid and liquids of both small and large compounds. Managed 24 employees. Developed two products resulting in the company's first two out-licensing agreements. Responsible for the technical transfer and contract manufacture of the company's first commercial product and resulting PAI.

**The University of Texas at Austin** **1/00 to 4/03**
**Graduate Student & Teaching Assistant**

Responsibilities involved class work and planning experiments in support of a Ph. D. dissertation in Pharmaceutics. Experienced in hot-melt extrusion, wet granulation, extrusion / spheronization, fluidized bed granulating and coating, film coating and tableting. Analytical techniques encompassed USP test methodology including HPLC, GPC, x-ray diffraction, scanning electron microscopy and differential scanning calorimetry. As lead TA for the undergraduate Compounding Laboratory, teaching responsibilities involved writing quizzes, midterms, finals exams, arranging 22 preparations for the semester, preparing a pre-lab discussion and demonstration each week, and evaluating the students work. Additionally, I supervised two undergraduates as part of an industry sponsored internship.

**Mission Pharmacal Co., San Antonio, TX** **7/95 to 1/00**
**Research & Development, Operations Manager**

Responsible for product and process development for both nutritional supplements and drug products (NDA, 505B2, ANDA) in solid oral and topical dosage forms. Duties included pre-formulation, formulation and product development, analytical and physico-chemical characterization, scale-up, packaging engineering, validation and troubleshooting under GMPs. Generated data and documents for CMC section of regulatory filings. Evaluated and reviewed products in stability programs to support development activities, clinical trials and regulatory submissions. Experimental data and reports were presented in technical reports and oral presentations to senior management. Managed 16 - 24 employees.

**Warner-Jenkinson Company Inc., St. Louis, MO** **1/92 to 7/95**
**Chemist, Pharmaceuticals**

Managed pharmaceutical projects involving the application of excipients in film coating, tablets, pellets, solutions, suspensions, topicals, printing inks and medical devices. Other responsibilities included writing technical data bulletins, developing analytical methods and product brochures, maintaining regulatory information, determining product pricing, making field service calls and representing the company at trade shows and conventions.

**Sigma Chemical Company, St. Louis, MO** **5/90 to 8/90**
**Analyst, Summer Intern**

I worked as a summer intern and analyst in the Product Assay Laboratory. Responsible for all flame emission, atomic absorption and atomic fluorescence spectrometry for the Sigma product line. The instrument was computer interfaced and employed a Zeeman Effect background correction using standard atomization and electrothermal methods. Programmed the computer for statistical analysis of calibration curves, sample preparation and instrumental performance.

**University of Missouri, St. Louis, MO** **5/89 to 5/90**
**Undergraduate Research Associate**

The topic of my undergraduate research was the thermodynamics of binding to transferrin. Binding coefficients are needed for the rational design of pharmaceutical chelating agents, which must be able to compete with transferrin in

vivo. The binding coefficients were evaluated by direct titration of metal free protein with metals and/or anionic ligands as measured by UV/Vis spectrometry. Nonlinear least squares refinement of the observed data yielded binding coefficients. The results of our research were published in *Inorganic Chemistry*.

**Monsanto Co., St. Louis, MO** **5/88 to 12/89**
**Animal Sciences Division, Formulations Chemistry, Research Analyst**

Responsible for generation of data using analytical methods: HPLC, SE-HPLC, atomic absorption, UV/Vis spectrometry, in vitro dissolution, particle size determination by laser light diffraction, viscometry, fluorimetry, moisture content by Karl Fischer and several wet techniques. Trained in GLP/GMP operations and analytical method validations in support of clinical trials and stability studies for somatotropin proteins. Trained and qualified other analysts in analytical methods, equipment operations and troubleshooting.

## IV. PROFESSIONAL MEMBERSHIPS

1. American Association of Pharmaceutical Scientists
   (Sections of Pharmaceutical Technology, Pharmaceutics and Drug Delivery)
2. Controlled Release Society
3. American Chemical Society (past)
4. Licensing Executives Society (past)

## V. RESEARCH INTERESTS

1. Amorphous Solid Dispersions
2. Development of novel drug delivery systems.
3. Solubility enhancement, particle engineering, microencapsulation and emulsion techniques.
4. Sustained release oral dosage forms and mechanism(s) of drug release.
5. Melt extrusion and thermal processing techniques.
6. Bioadhesive drug delivery systems.
7. Novel controlled release film coating formulations using acrylic and cellulosic polymers.
8. Analytical characterization and stability of active pharmaceutical agents and excipients.

## VI. COURSES PRESENTED

1. Pharmaceutics I Laboratory – The University of Texas at Austin.
2. Chemistry I Laboratory – Washington University.

## VII. HONORS & AWARDS

2012 “Most Downloaded Manuscript Published in Drug Development & Industrial Pharmacy” Award for M.M. Crowley, F. Zhang, et al, “Pharmaceutical Applications of Hot-Melt Extrusion: Part I”, Drug Development and Industrial Pharmacy, 33 (9): 909-926 (2007)
2011 “Most Downloaded Manuscript Published in Drug Development & Industrial Pharmacy” Award for M.M. Crowley, F. Zhang, et al, “Pharmaceutical Applications of Hot-Melt Extrusion: Part I”, Drug Development and Industrial Pharmacy, 33 (9): 909-926 (2007)
2002 – 2003 University Continuing Fellow, the University of Texas at Austin
2002 – 2003 American Foundation for Pharmaceutical Education Fellow
2001 – 2002 Texas Excellence in Teaching Award

2001 – 2002 American Society for Quality Control Scholarship
2001 – 2002 American Foundation for Pharmaceutical Education Fellow
1990 – 1991 Washington University Full Tuition Scholarship
1990 – 1991 Washington University Fellow
1988 – 1990 University of Missouri Scholars Scholarship
1990 American Institute of Chemists Outstanding Senior Award
1990 Alan F. Berndt, Ph.D. Outstanding Senior in Chemistry Award
1989 – 1990 Eric G. Brunngraber, Ph.D. Undergraduate Research Fellowship
1989 American Chemical Society Outstanding Chemical Technology Student Award

## VIII. CONTRIBUTIONS TO SCIENTIFIC LITERATURE

1. Journal of Pharmaceutical Sciences – referee.
2. Drug Development and Industrial Pharmacy – referee.
3. European Journal of Pharmaceutics and Biopharmaceutics – referee.
4. Journal of Pharmacy and Pharmacology – referee.
5. European Journal of Pharmaceutical Sciences – referee.
6. Pharmaceutical Research – referee.
7. American Association of Pharmaceutical Scientists – Abstract Screener
8. International Journal of Pharmaceutics – referee.
9. Journal of Microencapsulation – referee.
10. S.T.P. Pharma Sciences (France) – referee.
11. Pharmaceutical Development and Technology – referee.
12. Journal of Controlled Release – referee.
13. AAPS PharmSciTech – referee.

## IX. PUBLICATIONS

1. WR Harris, PK Bali, MM Crowley, "Kinetics of Iron Removal from Monoferric and Cobalt-Labeled Monoferric Transferrins by Diethylenetriaminepenta (methylenephosphonic acid) and Diethylenetriaminepentaacetic Acid", Inorganic Chemistry, 1992; 31: 2700 - 2705.

2. MM Crowley, F Zhang, JJ Koleng, JW McGinity, "Stability of Polyethylene Oxide in Matrix Tablets Prepared by Hot-Melt Extrusion", Biomaterials, 2002; 23(21): 4241 – 4248.

3. MM Crowley, B Schroeder, A Fredersdorf, S Obara, M Talarico, S Kucera, JW McGinity, "Physicochemical Properties and Mechanism of Drug Release from Ethyl Cellulose Matrix Tablets prepared by Direct Compression and Hot-melt Extrusion", International Journal of Pharmaceutics, 2004; 269(2): 509 – 522.

4. MM Crowley, A Fredersdorf, B Schroeder, S Prodduturi, MA Repka, JW McGinity, "The Influence of Guaifenesin and Ketoprofen on the Properties of Hot-melt Extruded Polyethylene Oxide Films", European Journal of Pharmaceutical Science, 2004; 22(5): 409 – 418.

5. S Venkata, S Tumuluri, S Prodduturi, MM Crowley, BA Avery, MA Repka, JW McGinity, "The Use of Near-Infrared Spectroscopy for The Quantitation of An Active In Hot-Melt Extruded Films", Drug Development and Industrial Pharmacy, 2004; 30(5): 505-511.

6. CR Young, MM Crowley, JW McGinity, "Physicochemical properties of film-coated melt-extruded pellets", Journal of Microencapsulation, 2007; 24(1): 57-71.

7. MM Crowley, F Zhang, MA Repka, S Thumma, SB Upadye, S Kumar, JW McGinity, C Martin, "Pharmaceutical Applications of Hot-Melt Extrusion: Part 1", Drug Delivery & Industrial Pharmacy, 2007; 33(9): 909-926.

8. MA Repka, S Thumma, SB Upadye, S Kumar, MM Crowley, F Zhang, C Martin, JW McGinity, "Pharmaceutical Applications of Hot-Melt Extrusion: Part 2", Drug Delivery & Industrial Pharmacy, 2007; 33(10) 1043-1057.

9. KA Overhoff, R Clayborough, MM Crowley, "Review of the TAIFUN® Multi-dose Dry Powder Inhaler Technology", Drug Delivery & Industrial Pharmacy, 2008; 34(9) 960 – 965.

10. C Berkland, G Laurence, S Lermer and MM Crowley, "An Overview of the NanoCluster Powder Formulation Technology", Pharmaceutical Technology, 2010 34(10) 72-78.

11. T Listro, M Borek, MM Crowley, K Nollenberger, "Analytical Tools & Techniques in Hot Melt Extrusion & Case Studies on Formulation Development & Process Scale-Up" Drug Development & Delivery, 2012 12(7) 36-40.

12. SA. Kucera, MS Zamloot, MM Crowley, LH Burns, N Friedmann and R Barbier. Abuse-deterrent properties of REMOXY® ER, a high-viscosity extended-release oxycodone formulation. Journal of Opioid Management, 2018 14(6) 429 – 436.

## X. BOOK CHAPTERS

1. M.M. Crowley. "Solutions, Emulsions, Suspensions and Extracts" in Remington: The Science and Practice of Pharmacy, 21st Edition. Edited by R. Hendrickson. Lippincott, Williams & Wilkins (2005).

2. M.M. Crowley. "Solutions, Emulsions, Suspensions and Extracts" in Remington: The Science and Practice of Pharmacy, 22nd Edition. Edited by R. Hendrickson. Pharmaceutical Press, (2013).

3. M.M. Crowley. "Solutions, Emulsions, Suspensions and Extracts" in Remington: Essentials of Pharmaceutics, 1st Edition. Edited by L. Felton. Pharmaceutical Press, (2013).

4. M.M. Crowley. "Pharmaceutical Dosage Forms: Manufacturing and Compounding" in Remington: An Introduction to Pharmacy, 1st Edition. Edited by L.V. Allen. Pharmaceutical Press, (2013).

## XI. PRESENTATIONS & INVITED LECTURES

1. CA Signorino, MM Crowley, L Forcellini, "Assessing the Uniformity of Aqueous Film Coatings Applied to Compressed Tablets", Ninth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists, San Diego, CA., November, 1994.

2. MM Crowley, F Zhang, JJ Koleng, JW McGinity, "Evaluation of a Hot-Melt Extrusion Technique using a Hydrophilic Thermal Polymer and Retardant for the Preparation of Extended Release Chlorpheniramine Maleate Tablets", Fourteenth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists, Indianapolis, Indiana. October, 2000.

3. MM Crowley, "Properties of Hot-Melt Extruded CPM Tablets Using Hydrophilic Polymers", Seminar, College of Pharmacy Fall 2000 Pharmaceutics Seminar Series, The University of Texas at Austin, Austin, Texas. November, 2000.

4. MM Crowley, "Properties of Potassium Chloride Controlled Release Dosage Forms", Seminar, College of Pharmacy Spring 2001 Pharmaceutics Seminar Series, The University of Texas at Austin, Austin, Texas. April, 2001.

5. KA Overhoff, DP Jones, JR Hunt, LD Bruce, MM Crowley, CR Young, JW McGinity, "Influence of pH, Neutralizing Agent, Storage Temperature and Packaging on the Stability of Methylparaben and Propylparaben in a Hydrophilic Gel", Fifteenth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists, Denver, CO. October, 2001.

6. MM Crowley, F Zhang, JJ Koleng, JW McGinity, "The Stability of Polyethylene Oxide in Matrix Tablets Prepared by Hot-Melt Extrusion", Fifteenth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists, Denver, CO. October, 2001.

7. MM Crowley, S Obara, JW McGinity, "The Influence of Low Substituted Hydroxypropyl Cellulose on the Properties of Hot-Melt Extruded Tablets, Fifteenth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists, Denver, CO. October, 2001.

8. S Prodduturi, MM Crowley, SP Stodghill, MA Repka, "Solid State Characterization of Hot-Melt Extruded Films Containing Clotrimazole", Sixteenth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists, Toronto, Ontario, Canada. October, 2002.

9. MM Crowley, A Fredersdorf, B Schröder, S Obara, S Kucera, JW McGinity, "Properties of Ethyl Cellulose Matrix Tablets", Sixteenth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists, Toronto, Ontario, Canada. October, 2002.

10. MM Crowley, MA Repka, B Avery, V Tumuluri, S. Prodduturi, "The Use Of Near-infrared Spectroscopy For The Quantitation Of An Active In A Hot-melt Extruded Film" Seventeenth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists, Salt Lake City, Utah. October, 2003.

11. S Prodduturi, MM Crowley, MA Repka, "Influence Of Water-soluble Polymeric Matrix Carriers On The Bioadhesive And Release Properties Of Hot-melt Extruded Films Containing A Water Insoluble Drug",

Seventeenth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists, Salt Lake City, Utah. October, 2003.

12. M Kemper, I Lewis, S. Prodduturi, V. Tumuluri, MM Crowley, B. Avery, MA Repka, "The Use Of Off-line And On-line Raman Spectroscopy To Quantify Ketoprofen And Clotrimazole In Hot-melt Extruded Film Formulations", Seventeenth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists National Meeting, Salt Lake City, Utah. October, 2003.

13. JW McGinity, CR Young, M Cerea, MM Crowley, "Properties Of Film-coated Polyethylene Oxide Pellets Prepared By A Hot-melt Extrusion And Spheronization Process", Seventeenth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists National Meeting, Salt Lake City, Utah. October, 2003.

14. J.W. McGinity, CR Young, M Cerea, MM Crowley, C Dietzsch, T. Farrell, K. Fegely, "Properties Of Acryl-eze® Matrix Tablets Prepared Using A Hot-melt Extrusion Process", Seventeenth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists National Meeting, Salt Lake City, Utah. October, 2003.

15. C. Dietzsche, D. Sauer, CR Young, MM Crowley, J.W. McGinity, "Physicochemical Properties of Film-Coated Melt-Extruded Pellets", Proceedings of the 15th International Symposium on Microencapsulation, Parma, Italy. September, 2005.

16. Pharmaceutical Applications of Hot-Melt Extrusion, Leistritz Pharmaceutical Extrusion Seminar, Bridgewater, New Jersey. June, 2007.

17. "Pharmaceutical Applications of Hot-Melt Extrusion", Proceedings of the 12th Annual Drug Delivery Technologies & Deal-Making, New Brunswick, New Jersey. September, 2007.

18. Drug Delivery Executive Interview, Drug Delivery Technology, April, 2008 Volume 8, Number 4, pages 50 – 52.

19. "Physical and Chemical Properties of Hot-Melt Extruded Dosage Forms", Leistritz Pharmaceutical Extrusion Seminar, Bridgewater, New Jersey. June, 2008.

20. "Business Development in the Pharmaceutical Industry", Contemporary Drug Development Seminar, Course UG302, The University of Texas at Austin, Austin, Texas. October, 2009.

21. "Shape of Innovation: Polymer Processing and New Product Possibilities", Leistritz Pharmaceutical Extrusion Seminar, Bridgewater, New Jersey. June, 2013.

22. "Applications of Hot Melt Extrusion: Pharmaceutical Products and Medical Devices", The University of Houston, College of Pharmacy Invited Speaker Series, Houston, TX. March, 2014

23. AE. Listro, MM Crowley, T. Appleton, LA. Acquarulo. "A Comparison of Saturated Solubility Enhancement via Spray Drying and Hot Melt Extrusion Processing", 9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology, Lisbon, Portugal. April, 2014.

24. "Melt Coextrusion for Special Drug Products." St. John's University, College of Pharmacy and Health Sciences, The 8th Annual Charles Jarowski Industrial Pharmacy Symposium. Queens, New York June 17, 2015.

25. AE Listro, A Miller, F Zhang, MM Crowley, LA Acquarulo. "Effect of Processing Methods on Physical Stabilities of Amorphous Solid Dispersions Consisting of Naproxen and Povidone" Controlled Release Society 2015 Annual Meeting, Edinburgh, Scotland, July, 2015.

26. "Rapid Screening Techniques and Polymer Considerations for Hot Melt Extruded Amorphous Solid Dispersions" 2015 Dow Solubility Symposium. Collegeville, PA October 6, 2015.

27. A. Miller, T. Listro, M Crowley, F. Zhang and L. Acquarulo, "The Effect of Processing Methods on Physical Stability of Amorphous Solid Dispersions Consisting of Naproxen and Povidone" Twenty-ninth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists National Meeting, Orlando, FL. October, 2015.

28. A. Miller, T. Listro, M Crowley, F. Zhang and L. Acquarulo, "A Novel Analytical Method Based On Ultrafiltration Technique Has Been Developed To Measure The Free Drug Concentration In Aqueous Medium Containing Amorphous Solid Dispersions" Twenty-ninth Annual Meeting, Proceedings of the American Association of Pharmaceutical Scientists National Meeting, Orlando, FL. October, 2015.

29. "Business Development in the Pharmaceutical Industry", Interdisciplinary Collaboration and Career Development, Course PGS 191Q, The University of Texas at Austin, Austin, Texas. February, 2017.

30. "Business Development in the Pharmaceutical Industry", Interdisciplinary Collaboration and Career Development, Course PGS 192Q, The University of Texas at Austin, Austin, Texas. February, 2018.

31. "Regulatory Affairs in Pharmaceutical Drug Development", Pharmaceutical Product Development, Course PGS 381F, The University of Texas at Austin, Austin, Texas. October, 2018.

32. "Business Development in the Pharmaceutical Industry", Interdisciplinary Collaboration and Career Development, Course PGS 192Q, The University of Texas at Austin, Austin, Texas. February, 2019.

33. "Careers in Pharmaceutical Science and Drug Discovery", Career Series, St Michael's Catholic High School. March, 2020.

34. "Regulatory Affairs in Pharmaceutical Drug Development", Pharmaceutical Product Development, Course PGS 381F, The University of Texas at Austin, Austin, Texas. September, 2020.

35. "Recent Advances in the Development of Amorphous Dispersions", AustinPx Pharmaceutics and Manufacturing Workshop, Austin, Texas. September 2023.

36. "Downstream Aspects of Amorphous Solid Dispersions", AustinPx Pharmaceutics and Manufacturing Workshop, Austin, Texas. February 2025.

## XII. PATENTS & PATENT APPLICATIONS

1. C.R. Young, M.M. Crowley, T.P. Farrell, K.A. Fegely, J.W. McGinity. “Method for Preparing Thermoformed Compositions Containing Acrylic Polymer Binders, Pharmaceutical Dosage Forms and Methods of Preparing the Same”. U.S. Provisional Patent Application Number 2004/014109.

2. J.J. Koleng and M.M. Crowley. “Compressed Composition Comprising Magnesium Salt”, U.S. Patent Application Number 20050220865 BPH-1 (Serial 10-816,771); International Patent Application Number BPH-3 (PCT/US05/10979).

3. M. M. Crowley, F. Zhang, J. J. Koleng and J. Keen, “Process For The Preparation Of A Hot-Melt Extruded Laminate”, U.S. Patent No. 8,465,759.

4. M. M. Crowley, F. Zhang, J. J. Koleng and J. Keen, “Hot Melt Extruded Transdermal Compositions Containing Testosterone”, Filed March, 2006, U.S. Provisional Application for Patent No. 60/785,501.

5. M. M. Crowley, F. Zhang, J. J. Koleng and J. Keen, “Stabilized Compositions Containing Alkaline Labile Drugs”, U.S. Patent No. 8,173,152; EP 2,010,156

6. M. M. Crowley, F. Zhang, J. J. Koleng and J. Keen, “Hydrophobic Abuse Deterrent Delivery System”, Filed July 21, 2006, U.S. Provisional Application for Patent No. 60/820,091.

7. J.M. Vaughn, M. M. Crowley, F. Zhang, J. J. Koleng, J. Keen and J.R. Hughey, “Hydrophobic Opioid Abuse Deterrent Delivery System Using Opioid Antagonists”, Filed July 20, 2007, U.S. Provisional Application for Patent No. 20080075768.

8. M. M. Crowley, F. Zhang, J. J. Koleng and J. Keen, “Hydrophilic Abuse Deterrent Delivery System”, Filed August 30, 2006, U.S. Provisional Application for Patent No. 60/824057.

9. J.M. Vaughn, M. M. Crowley, F. Zhang, J. J. Koleng, J. Keen and J.R. Hughey, “Hydrophilic Opioid Abuse Deterrent Delivery System Using Opioid Antagonists”, Filed July 20, 2007, U.S. Provisional Application for Patent No. 20080075771.

10. M. M. Crowley, F. Zhang, J. Vaughn and J. J. Koleng, Bioadhesive Film Drug Delivery System”, Filed August 30, 2006, U.S. Provisional Application for Patent No. 60/824059.

11. M. M. Crowley, F. Zhang, J. J. Koleng, J. Keen, J. Vaughn, J Hughey. “Hydrophobic Abuse Deterrent Delivery System For Hydromorphone,” Filed July 20, 2007, U.S. Provisional Application for Patent No. 2008/0020032.

12. A. Grattoni, E. de Rosa, R. Goodall, L. Hudson, M. Crowley. “Device And Method For Sustained Release Of Therapeutic Agent” U.S. Provisional Application filed October 24, 2011.

13. M.M. Crowley, R. Goodall, L. Hudson. “Device And Method For Sustained Release Of Low Water Solubility Therapeutic Agent In Solubilizer” U.S Provisional Application Serial No 61/864,768 filed August 12, 2013.

14. M. M. Crowley, J. Keen, J.J. Koleng and F. Zhang, "Stabilized Compositions Containing Alkaline Labile Drugs", U.S. Patent No. 8,883,187.

15. M. M. Crowley, J. Keen, J.J. Koleng and F. Zhang, "Stabilized Compositions Containing Alkaline Labile Drugs", U.S. Patent No. 9,364,445.

16. M. M. Crowley, J. Keen, J.J. Koleng and F. Zhang, "Stabilized Compositions Containing Alkaline Labile Drugs", U.S. Patent No. 9,867,786.

17. M.M. Crowley, P. Slater, C. Marich, "Compositions, Devices and Methods for Treating Nasal, Otic And Other Tissue Infection And/Or Inflammation" US Provisional Application filed August 26, 2020, U.S. Application No. 63/070,812.

# EXHIBIT B

**EXHIBIT B**

**Documents Considered by Michael M. Crowley, Ph.D.**

In connection with my analysis in this lawsuit, in addition to the documents and other information referenced in the body of my report, I have also considered the following:

| Description | Bates No. |
|---|---|
| U.S. Patent No. 8,591,922 | TEVA_XWAV_00015737-15760 |
| Prosecution History of U.S. Patent No. 8,591,922 | TEVA_XWAV_00014724-15736 |
| U.S. Patent No. 9,132,107 | TEVA_XWAV_00020065-20088 |
| Prosecution History of U.S. Patent No. 9,132,107 | TEVA_XWAV_00019809-20064 |
| U.S. Patent No. 8,901,173 | TEVA_XWAV_00017440-17464 |
| Prosecution History of U.S. Patent No. 8,901,173 | TEVA_XWAV_00017186-17439 |
| U.S. Patent No. 11,554,102 | TEVA_XWAV_00014701-14723 |
| Prosecution History of U.S. Patent No. 11,554,102 | TEVA_XWAV_00014475-14700 |
| U.S. Patent No. 10,675,258 | TEVA_XWAV_00007287-07309 |
| Prosecution History of U.S. Patent No. 10,675,258 | TEVA_XWAV_00007090-07286 |
| U.S. Patent No. 10,195,168 | TEVA_XWAV_00005871-05892 |
| Prosecution History of U.S. Patent No. 10,195,168 | TEVA_XWAV_00005269-05870 |
| U.S. Patent Application Publication No. 2003/0125385 (“Cook”) | TEVA_XWAV_00022746-22785 |
| U.S. Patent No. 8,952,062 (“Cook ’062 Patent”) | TEVA_XWAV_00023242 |
| U.S. Patent No. 5,594,030 (“Conte”) | TEVA_XWAV_00022640-22651 |
| U.S. Patent No. 4,983,632 (“Gessa”) | JPIL0023856-23861 |

**EXHIBIT B**

**Documents Considered by Michael M. Crowley, Ph.D.**

| Description | Bates No. |
|---|---|
| H. Karppanen, et. al, *Why and How to Implement Sodium, Potassium, Calcium, and Magnesium Changes in Food Items and Diets?*, 19 Journal of Human Hypertension, S10-S19 (2005) ("Karppanen") | TEVA_XWAV_00025783-25792 |
| Japanese Patent Application No. 2000060506 ("Noro") (translated) | TEVA_XWAV_00023874-23884 |
| Federal Register, Vol. 69, No. 57, Mar. 24, 2004, Rules and Regulations ("FDA Regulations") | TEVA_XWAV_00026064-26072 |
| Xyrem® (Sodium Oxybate) Oral Solution, CIII, FDA Approved Labeling (2002) ("Xyrem 2002 Label") | TEVA_XWAV_00025927-26021 |
| Xyrem® (Sodium Oxybate) Oral Solution, CIII, FDA Approved Labeling (approved 2002, rev. Nov. 2005) ("Xyrem Label") | TEVA_XWAV_00023318-23376 |
| US Patent Publication No. 2008/0293698 (JPIL0024287-24325) ("Johnson") | JPIL0024287-24325 |
| US Patent Publication No. 2011/0111027 ("Rourke") | JPIL0025329-25345 |
| U.S. Patent No. 8,197,878 ("the '878 patent"). | LUPIN-XYWAV_0007805-7821 |
| D. Pardi & J. Black, *γ-Hydroxybutyrate/Sodium Oxybate: Neurobiology, and Impact on Sleep and Wakefulness*. 20 CNS drugs 993-1018 (2006) ("Pardi"). | JPIL0279722-79748 |
| Office of National Drug Control Policy, *Gamma Hydroxybutyrate (GHB) Fact Sheet* ("GHB Fact Sheet") | TEVA_XWAV_00023803-23806 |
| M.S. Okun, et al., *GHB: An Important Pharmacologic and Clinical Update*. 4 J Pharm Pharm Sci, 4, 167-75 (2001) ("Okun") | TEVA_XWAV_00022980-22988 |
| L.P. Carter, et al., *Illicit Gammahydroxybutyrate (GHB) and Pharmaceutical Sodium Oxybate (Xyrem®): Differences in Characteristics and Misuse*, 104 Drug and Alcohol Dependence, 1-10 (2009) ("Carter") | TEVA_XWAV_00024037-24057 |
| R. Pal & A. K. Teotia, *Date Rape Drugs and Their Forensic Analysis: An update*. 12 Int'l J. Med. Toxicol. & Legal Med., 36-47 (2010) ("Pal"). | TEVA_XWAV_00025915-25936 |
| S. Abanades et al. *γ-Hydroxybutyrate (GHB) in Humans: Pharmacodynamics and Pharmacokinetics*. 1074 Annals of | TEVA_XWAV_00022728-22745 |

**EXHIBIT B**

**Documents Considered by Michael M. Crowley, Ph.D.**

| Description | Bates No. |
|---|---|
| the New York Academy of Sciences, 559-76 (2006) ("Abanades") | |
| Mamelak, M., et al., *Treatment of narcolepsy with γ-Hydroxybutyrate. A Review of Clinical and Sleep Laboratory Findings*, 9 Sleep 285-289 (1986) ("Mamelak") | JPIL0184079-104083 |
| Scrima, L., et al., *Efficacy of Gamma-Hydroxybutyrate Versus Placebo in Treating Narcolepsy-Cataplexy: Double-Blind Subjective Measures*. 26 Biological Psychiatry, 331-43 (1989) ("Scrima") | JPIL0185301-185313 |
| World Health Org. *Clinical Guidelines for the Management of Hypertension*, https://applications.emro.who.int/dsaf/dsa234.pdf (2005) ("WHO Guidelines") | TEVA_XWAV_00022543-22639 |
| S. Havas, et.al, *The Urgent Need to Reduce Sodium Consumption*. 298 JAMA, 1439-41 (2007) ("Havas") | TEVA_XWAV_00026080-26082 |
| S.Y. Angell & T.A. Farley, *Can We Finally Make Progress on Sodium Intake?* 102 American Journal of Public Health, 1625-27 (2012) ("Angell") | TEVA_XWAV_00025793-25795 |
| U.S. Dietary Guidelines Advisory Committee, *Dietary Guidelines for Americans, 2010*, (U.S. Dep't of Health & Human Servs. & U.S. Dep't of Agric. 2010), https://health.gov/sites/default/files/2019-10/DietaryGuidelines2010.pdf ("Dietary Guidelines"). | TEVA_XWAV_00023038-23149 |
| P.K. Whelton, et. al, *Sodium, Blood Pressure, and Cardiovascular Disease in Humans.* 16 Curr Hypertension Rep., 1-8 (2014) ("Whelton"). | TEVA_XWAV_00023212-23241 |
| Federal Register, Vol. 61, No. 78, Apr. 22, 1995, Rules and Regulations, pp. 17798-17806 ("1995 FDA Regulations") | TEVA_XWAV_00022680-22688 |
| A. Szarfman, et. al, *Declaring the Sodium Content of Drug Products*. 333 N. Engl. J. Med., 1291 (1995) ("Szarfman") | TEVA_XWAV_00025650-25656 |
| L.D. Bighley, et al., *Salt Forms of Drugs and Absorption*. 13 Encyclopedia of Pharmaceutical Technology, 453-499 (1996) ("Bighley") | TEVA_XWAV_00022989-23037 |
| Ferris and Went, 2012, Forensic Science International 216: 158-162 ("Ferris") | TEVA_XWAV_00022660-22677 |

**EXHIBIT B**

**Documents Considered by Michael M. Crowley, Ph.D.**

| Description | Bates No. |
|---|---|
| *The Official Compendia of Standards*, USP NF 2005, U.S. Pharmacopeia (2005) | TEVA_XWAV_00066105-66108 |
| N. Page, et al., *An Interactive Lesson in Acid/Base and Pro-Drug Chemistry Using Sodium Gamma-Hydroxbutyrate and Commercial Test Coasters*, Am. J. of Pharmaceutical Ed. 2007 ("Page"). | TEVA_XWAV_00066092-66097 |
| J. Palma, et al., *Advances in Bowel Preparations*, Soc. Of Gastroenterology Nurses and Associates (2011) | TEVA_XWAV_00066098-66104 |

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JAZZ PHARMACEUTICALS IRELAND LIMITED<br><br>*Plaintiff*,<br><br>v.<br><br>LUPIN INC, LUPIN PHARMACEUTICALS, INC., and TEVA PHARMACEUTICALS, INC.<br><br>*Defendants*. | Civil Action No. 21-14271 (SRC) (JSA) (consolidated) |

**OPENING EXPERT REPORT OF S. CRAIG DYAR, PH.D., REGARDING INVALIDITY OF U.S. PATENT NO. 11,426,373**

**S. Craig Dyar**

**April 21, 2025**

**Table of Contents**

I. INTRODUCTION ........ 1
II. COMPENSATION AND PRIOR TESTIMONY ........ 2
III. QUALIFICATIONS AND EXPERIENCE ........ 3
IV. MATERIALS CONSIDERED ........ 7
V. SUMMARY OF OPINIONS ........ 7
VI. LEGAL PRINCIPLES AND ASSUMPTIONS ........ 8
A. Person of Ordinary Skill in the Art ........ 8
B. Legal Principles Related to Obviousness ........ 9
C. Legal Principles Related to Anticipation ........ 14
VII. THE ’373 PATENT ........ 14
A. The Asserted Claims of the ’373 Patent ........ 15
B. The Specification of the ’373 Patent ........ 16
C. Prosecution History of the ’373 Patent ........ 17
VIII. CLAIM CONSTRUCTION ........ 24
IX. SCOPE AND CONTENT OF THE PRIOR ART ........ 26
A. U.S. Patent No. 8,591,922 (“the ’922 patent”) ........ 27
B. Xyrem® (Sodium Oxybate), 2005 Label/Xyrem® label (Sodium Oxybate) Oral Solution 2008/ Prescribing Information for Xyrem® label (PDR 2008) 28
C. Borgen ........ 30
X. RELEVANT DATES FOR PRIOR ART PURPOSES AGAINST THE ’373 PATENT ........ 33
XI. TECHNICAL BACKGROUND/STATE OF THE ART/GENERAL KNOWLEDGE OF A POSA ........ 34
A. Food Effect ........ 34
B. $C_{max}$ in Food Effect Measurements ........ 36
C. AUC in Food Effect Measurements ........ 38
XII. THE ASSERTED CLAIMS OF THE ’373 PATENT ARE INVALID ........ 39
A. Claims 3, 4, 5, 6, and 11 of the ’373 Patent Would Have Been Obvious Over the ’922 Patent ........ 39
1. The Level of Skill in the Art ........ 39
2. Scope and Content of the Prior Art/Technical Background/State of the Art ........ 39
3. Differences Between the Prior Art and the Claimed Invention ........ 40

a. The POSA Would Have Selected the Reduced Sodium Mixed GHB Salts of the '922 Patent Over Na.GHB/Xyrem® ........... 40

b. The POSA Would Have Been Motivated to Select Certain GHB Compositions from the '922 Patent ........................................ 42

c. The POSA Would Have Been Motivated to Do a Comparative Food Effect Study With the Reduced Sodium Mixed GHB Salts of the '922 Patent Against Xyrem® (i.e., Na.GHB) Shortly After a Meal ........................................................................... 46

d. Whenever POSA Would Have Done a Comparative Food Effect Study, the POSA Would Have Used the Same Conditions, Including, *Inter Alia*, Dose Amounts/Equivalents and Dosing Schedule ....................................................................... 48

4. Claim 1 Would Have Been Obvious in Light of the '922 Patent ........ 52

a. "A method of reducing food effect due to administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:" ..................................................................... 57

b. "orally administering to a patient in need thereof" ................ 58

c. "a pharmaceutically effective amount of a pharmaceutical composition of GHB" ............................................................... 58

d. "in a unit dosage comprising at least one salt of GHB" .......... 60

e. "and a pharmaceutically acceptable carrier" ......................... 61

f. "within four hours after eating" .............................................. 62

g. "wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB" ....................... 68

h. "wherein the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of $Ca.(GHB)_2$; and about 20% to about 25% of $Mg.(GHB)_2$" ................................................................ 81

5. Claims 3-6 Would Have Been Obvious in Light of the '922 Patent ... 83

6. Claim 11 Would Have Been Obvious in Light of the '922 Patent ...... 88

7. Conclusion of Obviousness of Claims 3-6 and 11 of the '373 Patent in View of the '922 Patent ................................................................... 90

B. Claims 3, 4, 5, 6, and 11 of the '373 Patent Would Have Been Obvious Over the '922 Patent in View of Borgen ............................................................ 90

1. The Level of Skill in the Art .................................................................. 90

2. Scope and Content of the Prior Art ...................................................... 90

3. **Differences Between the Prior Art and the Claimed Invention.......... 91**

a. **The POSA Would Have Selected the Mixed GHB Salts Over Xyrem® (Na.GHB) .......................................................... 91**

b. **The POSA Would Have Been Motivated to Select Certain GHB Compositions From the '922 Patent......................................... 91**

c. **The POSA Would Have Been Motivated to Do a Comparative Food Effect Study With the Reduced Sodium Mixed GHB Salts of the '922 Patent Against Xyrem® (i.e., Na.GHB) ................. 91**

d. **Whenever POSA Would Have Done a Comparative Food Effect Study, the POSA Would Have Used the Same Conditions, Including, *Inter Alia*, Dose Amounts/Equivalents and Dosing Schedule ........................................................................... 91**

4. **The POSA Would Have Been Motivated to Combine the Teachings of the '922 Patent and Borgen................................................................ 91**

5. **Claim 1 Would Have Been Obvious Over the '922 Patent in View of Borgen ......................................................................................... 93**

a. **"A method of reducing food effect due to administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:" ................................................................... 94**

b. **"orally administering to a patient in need thereof"................. 95**

c. **"a pharmaceutically effective amount of a pharmaceutical composition of GHB"................................................................ 95**

d. **"in a unit dosage comprising at least one salt of GHB" .......... 95**

e. **"and a pharmaceutically acceptable carrier" .......................... 96**

f. **"within four hours after eating"............................................... 96**

g. **"wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB" ....................... 98**

h. **"wherein the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of $Ca.(GHB)_2$; and about 20% to about 25% of $Mg.(GHB)_2$"............................................................ 111**

6. **Claims 3-6 Would Have Been Obvious over the '922 Patent in View of Borgen ....................................................................................... 111**

a. **Further Discussion for Claims 3 and 4 (AUC Claims).......... 113**

b. **Further Discussion for Claims 5 and 6 ($C_{max}$ Claims)........... 115**

7. **Claim 11 Would Have Been Obvious over the '922 Patent in View of Borgen ....................................................................................... 117**

8. **Conclusion of Obviousness of Claims 3-6 and 11 of the '373 Patent in View of the '922 Patent and Borgen .......... 118**

C. **Claims 3, 4, 5, 6, and 11 of the '373 Patent Would Have Been Obvious over the '922 Patent in View of the Xyrem® label .......... 118**

1. **The Level of Skill in the Art .......... 118**

2. **Scope and Content of the Prior Art .......... 119**

3. **Differences Between the Prior Art and the Claimed Invention .......... 119**

a. **The POSA Would Have Selected the Mixed GHB Salts over Xyrem® (Na.GHB) .......... 119**

b. **The POSA Would Have Been Motivated to Select Certain GHB Compositions from the '922 Patent .......... 119**

c. **The POSA Would Have Been Motivated to Do a Comparative Food Effect Study With the Reduced Sodium Mixed GHB Salts of the '922 Patent Against Xyrem® (i.e., Na.GHB) .......... 119**

d. **Whenever POSA Would Have Done a Comparative Food Effect Study, the POSA Would Have Used the Same Conditions, Including, *Inter Alia*, Dose Amounts/Equivalents and Dosing Schedule .......... 119**

4. **The POSA Would Have Been Motivated to Combine the Teachings of the '922 Patent and the Xyrem® label .......... 119**

5. **Claim 1 Would Have Been Obvious over the '922 Patent in View of the Xyrem® Label .......... 121**

a. **"A method of reducing food effect due to administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:" .......... 121**

b. **"orally administering to a patient in need thereof" .......... 122**

c. **"a pharmaceutically effective amount of a pharmaceutical composition of GHB" .......... 122**

d. **"in a unit dosage comprising at least one salt of GHB" .......... 123**

e. **"and a pharmaceutically acceptable carrier" .......... 123**

f. **"within four hours after eating" .......... 123**

g. **"wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB" .......... 125**

h. **"wherein the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of $Ca.(GHB)_2$; and about 20% to about 25% of $Mg.(GHB)_2$" .......... 136**

6. Claims 3-6 Would Have Been Obvious over the ’922 Patent in View of the Xyrem® label ........ 136

a. Further Discussion for Claims 3 and 4 (AUC Claims) .......... 138

b. Further Discussion for Claims 5 and 6 ($C_{max}$ Claims) ........... 140

7. Claim 11 Would Have Been Obvious over the ’922 Patent in View of Xyrem® label ........ 143

8. Conclusion of Obviousness of Claims 3-6 and 11 of the ’373 Patent in View of the ’922 Patent and the Xyrem® Label ........ 143

D. Objective Indicia of Non-Obviousness ........ 144

E. Asserted Claims 3, 4, 5, 6, and 11 of the ’373 Patent Are Anticipated by the ’922 Patent ........ 144

a. “A method of reducing food effect due to administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:” ........ 149

b. “orally administering to a patient in need thereof” .............. 149

c. “a pharmaceutically effective amount of a pharmaceutical composition of GHB” ........ 150

d. “in a unit dosage comprising at least one salt of GHB” ........ 150

e. “and a pharmaceutically acceptable carrier” ........ 150

f. “within four hours after eating” ........ 150

g. “wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB” ........ 150

h. “wherein the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.$(GHB)_2$; and about 20% to about 25% of Mg.$(GHB)_2$” ........ 154

9. Claims 3-6 Are Anticipated by the ’922 Patent ........ 155

10. Claim 11 Is Anticipated by the ’922 Patent ........ 158

F. Summary of Anticipation of the Asserted Claims of the ’373 patent ........... 158

XIII. SUPPLEMENTATION ........ 159

# I. INTRODUCTION

**1.** I, S. Craig Dyar, Ph.D., have been asked to provide my opinions regarding the validity of U.S. Patent No. 11,426,373 ("the '373 patent")[1] on behalf of the Lupin and Teva Defendants (collectively, "Defendants").

**2.** If called upon to testify at trial, I expect to testify, *inter alia*, about the following:

- my professional background, qualifications, and experience;
- the knowledge of a person of ordinary skill in the art;
- background of drug discovery, including the formulation of pharmaceutical compositions of the chemical compounds claimed and described within the scope of the asserted patent and claims;
- food effect and food effect studies including any regulatory guidance;
- pharmacokinetics including $C_{max}$ and AUC;
- any other topic discussed in this report; and
- my opinions concerning the invalidity of the Asserted Claims.

**3.** I may also testify in rebuttal to any opinions offered by expert(s) testifying on behalf of Jazz ("Jazz" or "Plaintiff") at deposition or trial.

**4.** It is my understanding this litigation has been brought by Plaintiff, makers of the drug products XYWAV® and XYREM®.

**5.** I understand that Claims 3, 4, 5, 6, and 11 of the '373 patent ("the Asserted Claims") have been asserted against both Defendants at this time. Each of these Asserted Claims depend directly from Claim 1 of the '373 patent.

**6.** I reserve the right to amend or supplement my opinions in light of any evidence Plaintiff or its expert(s) offers or if additional information is made available to me in the future. If Plaintiff

[1] I have been informed that other patents are involved in this litigation; however, at this time, my opinions are limited to validity issues related to the '373 patent.

or its expert(s) provides additional statements, opinions, or conclusions, including any responsive or reply reports, I may offer further opinions. I also reserve the right to make corrections to this report. I also reserve the right to convey my opinions using demonstrative exhibits at trial. I have not yet created the exhibits I expect to use at trial, but they will likely include diagrams, presentations, videos, animations, still images, or callouts to illustrate or explain the opinions described in this report. I also reserve the right to provide a technology tutorial at trial. In addition, I may use the cited materials to assist me in preparing demonstratives, such as graphics and animations, for my testimony or in the event that I am asked to provide a technology tutorial.

## II. COMPENSATION AND PRIOR TESTIMONY

**7.** I am being compensated for my time at the rate of $450 per hour. My compensation is not contingent on the outcome of this litigation.

**8.** In the last four years, I have given testimony either at trial or at deposition as an expert in the following matters:

- UCB, Inc., et al. v. Mylan Technologies, Inc., No. 2:19-cv-00128-cr (2021)
- ABEONA THERAPEUTICS INC. v. REGENXBIO INC., AAA No.: 01-20-0005-3750 (2021)
- Merck, Sharp and Dohme vs Mylan Pharmaceuticals, No. 1:19CV101 (2021)
- Bial - Portela & CA S.A., et al. v. Apotex Inc., et al., US District Court for Delaware Civil action No. 18-382-CFC (2022)
- AMPHASTAR PHARMACEUTICALS, INC., v. AEGIS THERAPEUTICS, LLC., Case IPR2021-01324 (2022)
- ALCON INC., ALCON VISION, LLC, and ALCON LABORATORIES, INC., v. Padagis US LLC and Padagis Israel Pharmaceuticals Limited, Civil Action No. 1:22-cv-1422 in Delaware Federal Court (2024)
- UCB, Inc. et al. v. Mylan Technologies, Inc., et al., Case No. 2:22-cv-00216-CR in Vermont District Court (2024)

## III. QUALIFICATIONS AND EXPERIENCE

**9.** I have over 40 years of experience and training in the pharmaceutical sciences, including pharmacy, industry, teaching and research experience.

**10.** I hold a bachelor's degree in biology from the University of South Carolina-Spartanburg, a bachelor's degree in pharmacy from the Medical University of South Carolina-Charleston, and a Ph.D. in pharmaceutical science from the Medical University of South Carolina-Charleston.

**11.** I am president of SCD Pharma Consulting, LLC, a position I have held since 2008. Concurrently to my position at SCD Pharma Consulting, I was a senior director and head of quality at Roivant, Inc. from 2022 to 2024 and an assistant professor for eight years from 2008 to 2016 in the School of Pharmacy at South University. Prior to my position at South University, I worked at Pfizer for ten years where I held numerous positions, with my most recent positions being associate research fellow and team leader.

**12.** In my capacity as president of SCD Pharma Consulting, I primarily work as a pharmaceutical consultant, providing advice on drug development from discovery to post-launch, life-cycle planning, project management, compound licensing, and business development with a focus on drug delivery technologies, including immediate and sustained release oral tablets, capsules, transdermal formulations (including patches), topical solutions, creams and ointments (dermal and ophthalmic), sublingual tablets, suppositories, targeted delivery systems (dendrimer and others), orally dissolving tablets, and injectables, among others.

**13.** I have hands-on experience with these various dosage forms, including formulating and designing, as well as changing and measuring pharmacokinetic parameters (for example, $C_{max}$, $T_{max}$ and AUC among others). This includes food effect measurements and determinations. In connection with my work, I have selected excipients (and determined the amounts of these

excipients) in the various dosage forms. I have also performed active pharmaceutical ingredient (API) compatibility studies with these various dosage forms. This work includes making changes to formulations based on the impact of food effect on the measured pharmacokinetic data.

**14.** Throughout my career, I have dealt with issues related to food effect, including predicting food effect, measuring the impact of food on various pharmacokinetic parameters including drug absorption, conducting food effect studies under fed and fasted conditions, and doing comparative food effect studies against a comparator/benchmark drug. My work on amantadine (circa 1984) included conducting the actual food effect studies and reviewing data generated from such studies (which would, of course, include pharmacokinetic data). I have been doing such food effect studies ever since. Even today, as an industry consultant, I routinely consult in the areas of conducting and evaluating food effect studies and the effects of food generally on pharmaceutical development. In connection with my work, since the beginning I have reviewed and used any applicable FDA Guidance documents on food effect studies.

**15.** As an assistant professor at South University, I taught graduate courses in pharmacy where the course material consisted of topics including many different delivery systems, pharmacokinetics, including food effect studies and parameters used to measure food effect, drug solubility, drug absorption, and formulation development. The pharmacokinetics courses that I taught provided students with an understanding of conceptual and mathematical treatment of Absorption, Distribution, Metabolism and Excretion processes (ADME), including the ability to apply this knowledge clinically to support the safe and effective management of drug development and treatment for individual patients. I have done research

and development work in all of these areas starting from my time in industry and continuing today through SCD Pharma Consulting.

**16.** As an assistant professor, I also lectured on topics such as design of drug dosage regimens, food effect, therapeutic drug monitoring, and adjustment of drug therapy. The application of these principles was illustrated and reinforced through discussion of pertinent drugs and case examples in a small team learning environment. The pharmaceutics courses covered the evolution of modern dosage forms, governing laws, fundamentals of physical pharmacy, pharmacokinetic principles, and topics pertinent to the design, production, and stability of drugs and dosage forms.

**17.** The course lectures included the study and application of physical-chemical principles and quantitative skills necessary for the design, formulation, and effective use of dosage forms to assure product performance and achieve the desired therapeutic outcomes. Lectures also focused on the rationale for design, intended performance characteristics, and the proper use of dosage forms to optimize clinical outcomes which also involved outcomes from food effect studies.

**18.** The laboratory segments of these courses complemented and supplemented topics covered in pharmaceutics and pharmacokinetics lectures. Students worked in small groups to solve problems or elucidate theories. Students utilized reading material and other resources to perform and evaluate *in vitro* experiments (including computer simulations). I also directed graduate students in the laboratory to develop novel drug delivery systems.

**19.** As an associate director and team leader at Pfizer, I led pharmaceutical sciences teams in various projects by serving as the single point of accountability and technical expert for projects in stages of development from Preclinical to Phase III. I was responsible for managing

the timelines and resources, including a multimillion-dollar budget. I led multidisciplinary global teams composed of eight to twelve colleagues in analytical, formulation, regulatory, quality assurance, and supply chain areas in the resolution of several manufacturing issues and developed guidelines to improve manufacturing practices. I also had responsibilities at Pfizer for drug delivery technology development where I utilized solubilization enhancement techniques that involved hot melt extrusion, super critical fluids, lipids, and cyclodextrins. During my ten years at Pfizer, I was also responsible for evaluating external drug delivery technology available from any company in the world.

**20.** While at Pfizer, I also managed the COX-2 franchise for Worldwide Pharmaceutical Science by serving as the pharmaceutical science member of the COX-2 life-cycle team composed of members from marketing, regulatory, clinical pharmacokinetics, medical, and legal. My specific responsibilities included the following: I chaired the celecoxib reformulation team composed of members from the previously listed groups; I developed a proposal and obtained endorsement of the same for multimillion-dollar proof of concept studies leading to a program in late-stage development; I defined the pharmaceutical science strategy for COX-2 programs and obtained endorsement from senior leaders in marketing, regulatory, clinical pharmacokinetics, medical, and legal, then provided guidance to pharmaceutical science COX-2 teams regarding this strategy. I also pioneered an endorsed idea, which used an alternate formulation approach reducing cost ($8 million) and time (two years) required to reach the market; additionally, I chaired two cross-functional product enhancement management teams. As part of these responsibilities, I interacted extensively with medical professionals with regard to designing and interpreting clinical studies to assess pain relief, including the use of the Visual Analog Scale (VAS), among others.

**21.** Throughout my career, I have published peer-reviewed articles related to pharmaceutical sciences. I have also been invited to give presentations at national meetings, including "How to Pursue and Assess Potential Technologies as Synergistic Fits for Your Program," "Navigating the Challenges of Early Phase Development in Ophthalmology," and "Technology Differentiation: How Are Similar Technologies Effectively Evaluated?"

**22.** I am a member of the Rho Chi Honor Society, which is an academic pharmacy honor society. I am also member of the American Association of Pharmaceutical Sciences. Additionally, I am a fellow of the American Foundation for Pharmaceutical Education (AFPE)—an organization that supports pharmaceutical education and from which I received a fellowship during my graduate work.

**23.** Additional details regarding my background and qualifications, including a list of all of my publications, are described in my *curriculum vitae*, attached as Exhibit A.

## IV. MATERIALS CONSIDERED

**24.** In forming the opinions set forth in this report, I have considered and relied on the references cited or otherwise referred to in this report and/or what is listed in Exhibit B ("Materials Considered List"), which includes the asserted patent and its associated file history. I reviewed each material referenced in this report and Exhibit B in its entirety.

## V. SUMMARY OF OPINIONS

**25.** It is my opinion that Claims 3, 4, 5, 6, and 11 of the '373 patent are invalid in view of the general knowledge in the art of the person of ordinary skill (as defined below) for the following reasons:

a. obvious in light of U.S. Patent No. 8,591,922;

b. obvious in light of U.S. Patent No. 8,591,922 and Borgen;

c. obvious in light of U.S. Patent No. 8,591,922 and the Xyrem® label; and

d. anticipated by U.S. Patent No. 8,591,922.

## VI. LEGAL PRINCIPLES AND ASSUMPTIONS

**26.** I am neither a lawyer nor an expert in patent law. Counsel for Defendants have provided me with a basic overview of certain legal concepts, which I summarize below.

### A. Person of Ordinary Skill in the Art

**27.** I understand that patent invalidity is evaluated from the perspective of a person of ordinary skill in the art ("POSA") to which the patent pertains at the time of the invention. I have been advised that the relevant time for my analysis of the patent is the earliest claimed priority date for the '373 patent which is **March 17, 2017**.[2] I understand that the priority date may also be referred to as the "time of the invention." In offering my opinions in this report, I do so from the perspective of a POSA at this priority date, though my opinions would not change if a different priority date were used.

**28.** I understand that in determining the level of skill of a POSA, the following factors may be considered: (1) the educational level of the named inventor(s);[3] (2) the type of problems encountered in the art; (3) the prior art solutions to those problems; (4) the rapidity with which innovations are made; and (5) the sophistication of the technology and educational level of active workers in the field. I have considered each of these factors in view of my experience in this field.

**29.** In my opinion, a POSA for the patent in suit would have had an advanced degree (i.e., a Ph.D., Pharm. D. or M.D.) in fields relevant to pharmaceutical formulations, such as pharmaceutical sciences, pharmacy, chemistry, biochemistry, medicinal chemistry, or a related field, and at

[2] I have not been asked to evaluate or opine on the earliest priority date for each of the patent in suit.

[3] The education level of some of the named inventors can be found at the following locations: Eller Dep. at 20:18-21:3; Chen Dep. at 24:18-24; Allphin Dep. at 13:15-20.

least two years of relevant experience in the preparation of pharmaceutical formulations and/or drug development. A POSA could have a lesser degree with increased years (five to six years) of practical experience in research and development of pharmaceutical formulations. The POSA would have been familiar with food effect, evaluating and developing food effect studies, evaluating and using pharmacokinetic parameters, and pharmaceutical dosage forms and excipients. The POSA would have been aware of the relevant regulatory guidance for conducting food effect studies. Such a person would have understood that drug development requires a multidisciplinary approach and may have drawn upon not only his or her own skills, but also could have taken advantage of certain specialized skills of others to solve any given problem.

**30.** I consider myself to be at least a POSA having the requisite education and experience as outlined above, both at the time of the invention and now.[4]

### B. Legal Principles Related to Obviousness

**31.** It is my understanding that a patent claim is invalid as obvious if the claimed subject matter would have been obvious to a POSA at the time the alleged invention was made. I understand that a claimed invention may be considered obvious even if it is not identically disclosed in any single prior art reference. I understand a claim is considered obvious if the subject matter of the claimed invention as a whole would have been obvious at the time the invention was made to a POSA in which the claimed invention pertains. This analysis considers: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) any secondary considerations such as

[4] I have more experience than a POSA as defined. That said, the opinions provided in this report are from the perspective of a POSA as I have defined it.

unexpected results, commercial success, long-felt but unsolved need, skepticism of experts, and failure of others. I have been informed that these factors are sometimes referred to as the *Graham* factors.

**32.** I also have been advised that in considering obviousness, care must be taken to not employ a hindsight analysis. Thus, throughout this report, I am careful to take into account only knowledge that was within the level of ordinary skill in the art at the time the claimed invention was made. I understand that in performing this analysis, I am not to use the claims of the patent in suit as a blueprint or roadmap for conducting my obviousness analysis.

**33.** However, this is not to say that I did not review the patent in conducting my analysis (I did). For example, to determine the proper experience level of the POSA several of the factors outlined above and in this report make a review of the patent prudent. As another example, one of the obviousness factors is the difference or differences (if any) between the claimed subject matter and the prior art. This necessarily involves an understanding of the claimed invention. I also understand that a claim term should be accorded the full breadth of its plain and ordinary meaning as understood by a POSA when read in the context of the specification (including any definitions provided in the patent) and prosecution history. Again, to do this analysis, it means that a review of the patent is needed.

**34.** The assignment that I was given was, in view of the relevant prior art, what (if anything) would have been obvious to the POSA without using the patent as a roadmap to piece together the prior art or using hindsight. To do this analysis, I imagined that I was the POSA around the time of the priority date (March 17, 2017). I would **not** have access to the '373 patent and only would have been aware of the relevant prior art. From that, I made an analysis of what the POSA would have known and reasonably expected (i.e., what would have been obvious) based

on the available prior art and knowledge of the POSA (as I discuss more fully throughout this report).

**35.** I understand from counsel that prior art includes information that existed prior to the date of the alleged invention or the date of filing of the patent application. I further understand from counsel that prior art is defined by statute under 35 U.S.C. § 102, where the earliest effective filing date determines which specific statutes are applicable.

**36.** I have been informed that obviousness may be based on one reference, or more than one reference. In other words, I understand that obviousness does not require that every element of an invention be necessarily disclosed in a single reference. If every element of a claim is found in a single reference as a whole, however, this is referred to as single-reference obviousness. Alternatively, the elements of an invention can be disclosed in the prior art as a whole (i.e., more than one reference), including in multiple references or as part of the general knowledge in the art.

**37.** I understand that for a patent claim to be obvious, there must be some rationale to combine the teachings of the prior art to arrive at the claimed invention. The rationale for a POSA to combine the prior art in a particular way may be found in the references themselves, in the general knowledge of one of ordinary skill in the art, or in the nature of the problem to be solved. A rationale to combine the teachings of the prior art need not be explicit in the prior art.

**38.** I further understand that to find whether the prior art renders an invention obvious, I must explain why a POSA would have had a reasonable expectation of success in arriving at the claimed subject matter. My understanding is that a reasonable expectation of success does not

require an absolute certainty of success. I understand there can be a reasonable probability of success even if there is some degree of unpredictability or uncertainty.

**39.** An invention may not be obvious if the prior art teaches away from the invention. It is my understanding that a reference teaches away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference or would be led in a direction divergent from the path that was taken. However, I have been informed that a reference that merely expresses a general preference for an alternative invention, but does not criticize, discredit, or otherwise discourage investigation into the claimed invention, does not teach away. Furthermore, the mere disclosure of alternative designs does not teach away. Indeed, my understanding is even if better alternatives exist in the prior art, under the law, it does not mean that an inferior combination is inapt for obviousness purposes.

**40.** It is my understanding that a POSA is also a person of ordinary creativity. When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a POSA has a good reason to pursue the known options within his or her grasp. If this leads to the claimed subject matter, it is likely the product of ordinary skill and common sense and not of innovation.

**41.** To determine obviousness, it is proper to look at the interrelated teachings of multiple pieces of prior art, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art. The determination should be based upon whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue. The analysis of obviousness need not seek out precise teachings directed to the specific subject matter of the

challenged claim, but the analysis can consider inferences and creative steps that a person of skill in the art would employ.

**42.** I have been informed by counsel that inherency may supply a missing claim limitation in an obviousness analysis. Indeed, in the context of obviousness, the mere recitation of a newly discovered function or property, inherently possessed by things in the prior art, does not distinguish a claim drawn to those things from the prior art. A composition suggested by the prior art is not simply patentable because it also possesses an inherent property, which the patentee claims to have discovered. Mere recitation of a newly discovered function or property inherently possessed by things in the prior art does not distinguish a claim drawn to those things from the prior art. I understand that an obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the result. In the case where the claimed ranges overlap or lie inside ranges disclosed by a prior art reference, I have been informed that a prima facie case of obviousness exists.

**43.** Furthermore, a claimed invention would have been "obvious to try" where there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions a person of ordinary skill has good reason to pursue the known options within his or her technical grasp with a reasonable expectation of success.

**44.** Although I will not address them in this report (but reserve the right to do so later), I also understand that in determining the obviousness of the claimed subject matter of an alleged invention, so-called "secondary considerations of non-obviousness" such as, *inter alia*, unexpected results, commercial success, long-felt but unsolved needs, failure of others, etc., to the extent they exist, should be considered. I reserve the right to address any of these

"secondary considerations" issues should Plaintiff or their expert(s) assert one or more of them as evidence of non-obviousness.

**C. Legal Principles Related to Anticipation**

**45.** It is my understanding that a claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference. Additional references and extrinsic evidence can be used to show the reference contains an enabled disclosure. Furthermore, I have been informed that a reference may be relied upon for all that it would have reasonably suggested to one having ordinary skill in the art, including non-preferred embodiments.

**46.** I have been further informed that a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily (or naturally) present or if a POSA would envision its presence based on the disclosure of the anticipating reference. Additional references or evidence can be used to show that a POSA would recognize the inherent characteristic of the thing taught by the primary reference.

**47.** Of note, inherent anticipation, however, does not require a person of ordinary skill in the art to recognize the inherent disclosure in the prior art at the time the prior art is created.

* * * *

**48.** I understand that the obviousness and anticipation of a patent claim is determined independently (i.e., a claim-by-claim analysis). I further understand that patent invalidity must be proven by "clear and convincing evidence." I understand that "clear and convincing" means that the evidence is highly and substantially more likely to be true than untrue. In other words, the fact finder must be convinced that the contention is highly probable.

## VII. <u>THE '373 PATENT</u>

**49.** U.S. Patent No. 11,426,373 ("the '373 patent"), entitled "Gamma-hydroxybutyrate compositions and their use for the treatment of disorders," issued on or about August 30, 2022.

Clark P. Allphin, Gunjan Junnarkar, Roman Skowronski, Cuiping Chen, Katayoun Zomorodi, and Mark Eller are identified as the inventors on the face of the ’373 patent. The ’373 patent issued from U.S. Patent Application No. 17/131,418 (“the ’418 application”), filed on December 22, 2020, and also purports to claim the benefit of priority of U.S. Provisional Application Serial No. 62/473,232, filed March 17, 2017.

**50.** I have reviewed and considered the ’373 patent (and its file history) in view of the general knowledge in the relevant field measured from the relevant priority date for the ’373 patent from the perspective of a POSA as defined above.

### A. The Asserted Claims of the ’373 Patent

**51.** The ’373 patent issued with 11 claims of which Claims 3, 4, 5, 6, and 11 are asserted against Defendants at this time.[5] Although Claim 1 is not asserted since the Asserted Claims depend directly from Claim 1, I have also reproduced Claim 1 below:

> 1. A method of reducing food effect due to administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:
>
>> orally administering to a patient in need thereof a pharmaceutically effective amount of a pharmaceutical composition of GHB in a unit dosage comprising at least one salt of GHB and a pharmaceutically acceptable carrier within four hours after eating;
>>
>> wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB, wherein the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of $Ca.(GHB)_2$; and about 20% to about 25% of $Mg.(GHB)_2$.

[5] In connection with this report, I reviewed every claim of the ’373 patent.

> 3. The method of claim 1, wherein the composition provides an AUC when administered within four hours after eating that is 80%-95% of the AUC when the composition is administered while fasting.
>
> 4. The method of claim 1, wherein the composition provides an AUC when administered within four hours after eating that is 85%-90% of the AUC when the composition is administered while fasting.
>
> 5. The method of claim 1, wherein the composition provides a $C_{max}$ when administered within four hours after eating that is 55%-80% of the $C_{max}$ when the composition is administered while fasting.
>
> 6. The method of claim 1, wherein the composition provides a $C_{max}$ when administered within four hours after eating that is 60%-75% of the $C_{max}$ when the composition is administered while fasting.
>
> 11. The method of claim 1, wherein the pharmaceutical composition comprises 8% of Na.GHB; 23% of K.GHB; 48% of $Ca.(GHB)_2$; and 21% of $Mg.(GHB)_2$.

### B. The Specification of the '373 Patent

**52.** I will discuss the specification of the '373 patent throughout this report, but at a high level, the specification of the '373 patent purports to disclose a method of reducing food effect through administering "pharmaceutical compositions and formulations comprising salts of gamma-hydroxybutyrate ('GHB') which are useful in the treatment of conditions responsive to GHB, for example, fibromyalgia and sleep disorders such as apnea, sleep time disturbances, narcolepsy, cataplexy, sleep paralysis, hypnagogic hallucination, sleep arousal, insomnia, and nocturnal myoclonus." The '373 patent at 1:66–2:6.

**53.** Similarly, the '373 patent asserts that "there is a need for GHB formulations with lower sodium, such as those provided herein, particularly for patients with hypertension, heart disease, renal disease or at risk of stroke, yet provide additional health benefits from the presence of other salts." The '373 patent at 6:23–28.

**54.** The '373 patent provides for a "pharmaceutical composition of GHB comprising a mixture of two or more salts of GHB," and including a sodium salt of gamma-hydroxybutyrate (Na.GHB),

a potassium salt of gamma-hydroxybutyrate (K.GHB), a calcium salt of gamma-hydroxybutyrate ($Ca.(GHB)_2$), and a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$). *See id.* at 2:22–35, 4:34–46.

**55.** The '373 patent also states that "[i]n certain embodiments, the pharmaceutical composition is formulated as a liquid formulation, wherein the Na.GHB salt is present at less than 40%. In these embodiments, the pharmaceutical composition is more resistant to a food effect and has a lower $C_{max}$ compared to Na.GHB." *Id.* at 18:15–19.

**56.** The '373 patent also discusses Xyrem® as being commercially available as of the priority date of the '373 patent:

> Xyrem®, as disclosed herein, is a commercially sold product comprised of 100% sodium oxybate (Na.GHB), and is prescribed for twice nightly use for the treatment of excessive daytime sleepiness and cataplexy in patients with narcolepsy. Accordingly, in another aspect, provided herein is a first dose of a first pharmaceutical composition and/or formulation having a Na.GHB of less than 50% and a second dose of a second pharmaceutical composition and/or formulation having a Na.GHB above 50%. Another embodiment has the doses in reverse order and a further embodiment uses similar doses of either formulation. In certain embodiments, the first dose can be administered within 4 hours of eating and produces a GHB $C_{max}$ lower than the $C_{max}$ of Na.GHB, but may have less of a food effect.

*Id.* at 3:16-29; *see also id.* at 1:32-35 ("Sodium oxybate (Na.GHB), commercially sold as Xyrem® (Jazz Pharmaceuticals), is approved for the treatment of excessive daytime sleepiness and cataplexy in patients with narcolepsy.").

**57.** As discussed throughout this report, the '373 patent discusses certain food effect properties of the pharmaceutical compositions containing at least one GHB salt. *Id.* at 3:26-29 ("In certain embodiments, the first dose can be administered within 4 hours of eating and produces a GHB $C_{max}$ lower than the $C_{max}$ of Na.GHB, but may have less of a food effect.").

### C. Prosecution History of the '373 Patent

**58.** Although I have reviewed the entire file history of the '373 patent, I provide the following summary of the file history of the '373 patent, but it is not meant to be exhaustive. I also discuss the prosecution history throughout this report.

**59.** On December 22, 2020, Applicant filed U.S. Patent Application No. 14/131,418 ("the '418 application"), which eventually led to U.S. Patent No. 11,426,373. Applicants presented 30 claims with 2 independent claims (Claims 1 and 17) reproduced below:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate comprising a mixture of two or more salts of gamma-hydroxybutyrate (GHB), wherein the mixture comprises at least 50% of a sodium salt of gamma-hydroxybutyrate (Na•GHB) and further comprises one or more of a potassium salt of gamma-hydroxybutyrate (K•GHB) and a calcium salt of gamma-hydroxybutyrate (Ca•$(GHB)_2$).
>
> 17. A pharmaceutical composition of GHB comprising less than 100 mL of an aqueous solution, wherein the aqueous solution comprises a mixture of two or more salts of GHB, the mixture comprising about 40% to about 50% Na•GHB, and further comprising one or more salts selected from K•GHB, Ca•$(GHB)_2$, and Mg•$(GHB)_2$.

**60.** Applicant filed a Preliminary Amendment, canceling Claims 1-30, and presenting new Claims 31-60. Independent Claims 31 and 51 are reproduced below:

> 31. (New) An oral pharmaceutical composition for the treatment of narcolepsy, cataplexy, or excessive daytime sleepiness comprising gamma-hydroxybutyrate (GHB) in a unit dosage form suitable for administration within four hours after eating.
>
> 51. (New) A method of reducing food effect due to administration of GHB in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:
>
> orally administering to a patient in need thereof a pharmaceutically effective amount of pharmaceutical composition of GHB in a unit dosage comprising at least one salt of GHB and a pharmaceutically acceptable carrier within four hours after eating;
>
> wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na•GHB.

**61.** On March 9, 2021, the Examiner issued a Restriction Requirement, which I've been informed means that the Examiner was asking the Applicant to select a subset of the claims for prosecution. In response, on May 5, 2021, Applicant elected Claims 51-60, drawn to a method for reducing food effect due to the administration of GHB.

**62.** On June 10, 2021, the Examiner issued a Non-Final Office Action, rejecting all pending Claims 51-60. The Examiner included written description rejections and prior art rejections. Specifically, the Examiner rejected pending Claims 51-60 as being obvious over WO 2014/093791 A1 in view of Borgen.

**63.** The Examiner's positioning is summarized by the following comment from the Examiner:

> One of ordinary skill in the art would have because both Jazz Pharmaceuticals and Borgen concern oral GHB salt formulations. Specifically, Jazz Pharmaceuticals disclosed GHB compositions containing different salt formulations including Na-GHB, K-GHB, Mg-GHB and Ca-GHB and disclose that the compositions provide effective and consistent doses and display acceptable pharmacokinetic and pharmacodynamic properties while Borgen teaches how a study is conducted to analyze the effects of food on the bioavailability, pharmacokinetic and pharmacodynamic properties (i.e., $C_{max}$, AUC, etc.) by administering the GHB composition about 30 minutes after eating a meal. One of ordinary skill in the art would have found it prima facie obvious to administer the GHB salt composition of Jazz Pharmaceuticals to a patient with narcolepsy about 30 minutes after eating as described by Borgen to study the food effect on the Jazz Pharmaceuticals composition in the patient. Given that both references seek to provide effective and consistent doses of GHB to patients as well as provide acceptable pharmacodynamic and pharmacokinetic properties, the skilled artisan would look to discover the food effect on the availability GHB salt composition, such as those of Jazz Pharmaceuticals and adjust the time between eating and drug administration to optimize the pharmacokinetic/ pharmacodynamic profile of the drug.
>
> Regarding the $C_{max}$ limitations in Claims 51 and 55-60 and the AUC in Claims 53 and 54, the composition H of Jazz Pharmaceuticals is substantially the same compositions as instant Formulation O, which is shown to possess these features. Thus, Jazz Pharmaceuticals would also possess the same features when it is administered as currently claimed.

**64.** On September 10, 2021, Applicant responded to the Examiner's rejections. In that response, Applicant amended Claim 51 and added new Claim 61, as shown below:

> 51. (Currently amended) A method of reducing food effect due to administration of GHB in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:
>
> orally administering to a patient in need thereof a pharmaceutically effective amount of pharmaceutical composition of GHB in a unit dosage comprising at least one salt of GHB and a pharmaceutically acceptable carrier within four hours after eating;
>
> wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na•GHB, wherein the pharmaceutical composition comprises: about 5% to about 10% of Na•GHB; about 20% to about 25% of K•GHB; about 45% to about 50% of $Ca•(GHB)_2$; and about 20% to about 25% of $Mg•(GHB)_2$.
>
> 61. (New) The method of claim 51, wherein the pharmaceutical composition comprises 8% of Na•GHB; 23% of K•GHB; 48% of $Ca•(GHB)_2$; and 21% of $Mg•(GHB)_2$.

**65.** With the amendments, Applicant claimed that the written description rejections by the Examiner were obviated. Turning to the Examiner's obviousness rejections, Applicant argued that the Examiner had not provided a legally sufficient motivation to administer the claim compositions within four hours of eating, explaining that:

> The present claims require the administration of the claim-recited reduced sodium mixed salt GHB composition within four hours after eating to reduce food effects due to GHB administration.
>
> Here, the Examiner asserts that, from Borgen, a skilled artisan would have been motivated to administer the Jazz Pharmaceuticals' compositions within four hours of eating. Among other things, Borgen discloses the results of food effect studies carried out by orally administering an immediate release Na•GHB solution to healthy patients 30 minutes after a high fat meal (i.e., fed state). Borgen reports a "significant" food effect for the Na•GHB solution and, in particular, significant reductions in GHB plasma concentrations in the fed state compared to the fasted state (as indicated by reduced $C_{max}$ and AUC).[5] Nonetheless, Borgen concludes that this substantial food effect "is likely to be minimal in

> patients if they follow the recommended dose schedule of taking the first dose of sodium at bedtime, which is usually several hours after their evening meal."[6]
>
> Thus, if anything, Borgen itself teaches away administering a GHB-containing composition shortly after eating, as required by the present claims, since Borgen (1) recognizes a substantial food effect for Na•GHB (the only GHB-containing product tested by Borgen) and (2) recommends administering the GHB compositions hours after eating to avoid this food effect.
>
> Furthermore, when the present application was effectively filed, Xyrem® (an immediate release Na•GHB solution) was the only FDA-approved GHB-containing product. In the "Important Administration Instructions" section of Xyrem® prescribing information that was approved at the time of filing the present application, patients are expressly instructed to "[t]ake the first dose of Xyrem at least 2 hours after eating because food significantly reduces the bioavailability of sodium oxybate."[7]
>
> Simply put, the Examiner has not provided a legally sufficient motivation why a POSA would go against the express teachings of Borgen and the FDA-approved Xyrem prescribing label instructions and administer any GHB composition, let alone the claim-recited reduced sodium mixed salt GHB composition, within 4 hours after eating. As such, the claims are not obvious over the cited references.

**66.** In response, on October 26, 2021, the Examiner rejected all pending claims (Claims 51-61), maintaining his rejection as Claims 51-61 being unpatentable over WO 2014/093791 A1 in view of Borgen.

**67.** On February 16, 2022, Applicant had an interview with the Examiner where according to the Interview Summary, the following was discussed:

> XYREM is a known commercially available product of sodium oxybate (Na-GHB) for treating excessive daytime sleepiness and cataplexy in narcolepsy patients. However, adverse effects are known to be associated with its administration. Applicant argues that the claimed invention using a mixture of salts of GHB (Na-, K-, with Ca-, Mg-GHB) obtains a surprising effect compared to XYREM (Na-GHB). Specifically, Applicant alleges that Formulation "O" (GHB composition of the invention) have less of a food effect than XYREM. Applicant points to Table 4 at p. 49 of the specification which Applicant alleges to show the difference

> between the fasted and fed state $C_{max}$ levels of formulation O is less than the difference between the fasted and fed state $C_{max}$ levels for XYREM. Applicant further argues that because of the lower $C_{max}$, formulation O presents less concern for the occurrence of adverse effects. No agreement was reached.

**68.** On April 8, 2022, Applicant responded to the Examiner's obviousness rejection, among other things, Applicant claimed that the claims provided unexpected results not present in the prior art and that a skilled artisan would have had no reasonable expectation of success of achieving the claims invention. In part, Applicant stated:

> When the present application was filed, it was known that there was a substantial food effect associated with the sodium GHB product Xyrem®. In fact, the Xyrem® label instructed patients to "[t]ake the first dose of Xyrem at least 2 hours after eating because food significantly reduces the bioavailability of sodium oxybate."[] Because the active ingredient in the claim recited reduced sodium mixed salt GHB composition and Xyrem® is the same (i.e., GHB), it was expected that the claim-recited reduced sodium mixed salt GHB composition would have a food effect of about the same magnitude as Xyrem®. Contrary to these expectations, the food effect for the claim-recited reduced sodium mixed salt GHB is substantially lower than the sodium GHB.
>
> . . . .

| Treatment | Cmax (mg/mL) | % Cmax reduction fed vs. fasted | % equivalent | | | |
|---|---|---|---|---|---|---|
| | | | Na | K | Ca | Mg |
| Formulation O, fasted | 102.3 | 24% | 8 | 23 | 48 | 21 |
| Formulation O, fed | 77.7 | | 8 | 23 | 48 | 21 |
| Formulation X, fasted | 134.6 | 37% | 100 | 0 | 0 | 0 |
| Formulation X, fed | 84.9 | | 100 | 0 | 0 | 0 |

> These data show that the claimed method (which comprises administering a reduced sodium mixed salt GHB in the fed state) exhibits a substantially smaller food effect compared to the administration of a Na•GHB formulation as evidenced by the smaller reduction in $C_{max}$ in the fed vs. fasted state. Thus, the food effect for the reduced sodium mixed salt GHB composition is about 35% less than the food effect for the Na•GHB. This could not have been predicted by the prior art.

> When the application was filed, it was known that the sodium GHB product Xyrem® exhibited a substantial food effect such that the Xyrem prescribing information instructs patients to "[t]ake the first dose of Xyrem at least 2 hours after eating because food significantly reduces the bioavailability of sodium oxybate." Similarly, Borgen (which is cited by the Examiner) reports a "significant" food effect for a Na•GHB solution and, in particular, significant reductions in GHB plasma concentrations in the fed state compared to the fasted state (as indicated by reduced $C_{max}$ and AUC).
>
> Because of the prior art recognized food effect, the skilled artisan would have no reasonable expectation that administering a reduced sodium mixed salt GHB product within 4 hours of eating would provide a reduced food effect compared to sodium GHB for treatment for cataplexy or EDS with narcolepsy. Contrary to the prior art expectations, it was unexpectedly found that the food effect for the reduced sodium mixed salt GHB composition was substantially lower than that observed for a sodium GHB composition administered at an equal dose (*supra*).
>
> Thus, considering the prior art as a whole, a skilled artisan reading Jazz Pharmaceuticals together with Borgen and the Xyrem Label would not have had a reasonable expectation of successfully achieving the claimed methods.

**69.** In Response, the Examiner issued a Notice of Allowance. The Examiner gave the following "Reasons for Allowance":

> [T]he prior art does not teach the presently-claimed methods provide the unexpected result that there is a reduced food effect in patients administered a composition having the claimed GHB salt mixture (as exemplified by Formulation O from the present specification) for the treatment of cataplexy or excessive daytime sleepiness with narcolepsy compared to patients administered an equal dose of immediate release liquid solution of Na*GHB (as exemplified by XYREM®). This result of the claimed methods was unexpected based on the prior art.

**70.** After the Notice of Allowance, the Applicant presented additional amendments to Claim 51. The text of which is reproduced below:

> 51. (Currently Amended) A method of reducing food effect due to ~~administration of GHB~~ administration of gamma-hydroxybutyrate

> (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:
>
> orally administering to a patient in need thereof a pharmaceutically effective amount of a pharmaceutical composition of GHB in a unit dosage comprising at least one salt of GHB and a pharmaceutically acceptable carrier within four hours after eating;
>
> wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na•GHB, wherein the pharmaceutical composition comprises: about 5% to about 10% of Na•GHB; about 20% to about 25% of K•GHB; about 45% to about 50% of Ca•$(GHB)_2$; and about 20% to about 25% of Mg•$(GHB)_2$.

**71.** The '373 patent issued with 11 claims.

## VIII. CLAIM CONSTRUCTION

**72.** I understand from counsel that the claims of a patent define the invention to which the patentee is entitled the right to exclude. Counsel has informed me that claim terms are generally given their ordinary and customary meaning. In other words, claim terms are generally defined by the meaning that the term would have had to a POSA as of the priority date of the asserted patent. Furthermore, I understand that a claim term should be accorded the full breadth of its plain and ordinary meaning as understood by a POSA when read in the context of the specification and prosecution history. In ascertaining the meaning of the claims, I have also been informed that because the claims are directed to the invention that is described in the specification, they do not have meanings when removed from the context from which they arose. Indeed, the specification necessarily informs the proper construction of the claims.

**73.** The '373 patent defines certain terms. *See*, *e.g.*, *id*. at col. 7 ("6.1 Definitions"). To the extent any defined term is a claim term, I use the definitions in the specification.

**74.** I also understand that by agreement of the parties, the term "an equal dose of immediate release liquid solution of Na.GHB" in the '373 patent means "a single dose of GHB salt(s) equivalent

to a single dose of immediate release liquid solution of Na.GHB." Stipulation and Order Regarding Claim Construction and Amending Contentions. Dkt. 112 (12/05/23). I have used this definition in connection with my report whenever the term appears in a claim.

**75.** I also understand in connection with the '373 patent, the parties have agreed to the following construction (Joint Claim Construction and Prehearing Statement, Dkt. 138 (03/05/24)):

| Claim Term | The '373 Patent Claim | Construction |
|---|---|---|
| "a unit dosage" | '373 patent, claim 1 | Plain & ordinary meaning: i.e., a single dosage form for delivery |
| "an equal dose of immediate release liquid solution of Na.GHB" | '373 patent, claims 1, 7-10 | Plain & ordinary meaning: i.e., a single dose of GHB salt(s) equivalent to a single dose of immediate release liquid solution of Na.GHB |
| "pharmaceutically effective amount" | '373 patent, claim 1 | Plain & ordinary meaning: i.e., an amount of GHB salt(s), including any FDA approved amounts, sufficient to elicit a biological response when administered to a patient |
| "reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB" | '373 patent, claim 1 | Plain & ordinary meaning: i.e., smaller difference in $C_{max}$ between fed and fasted states for a single dose of GHB salt(s) compared to an equal dose of immediate release liquid solution of Na.GHB |
| "the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.$(GHB)_2$; and about 20% to about to about 25% of Mg.$(GHB)_2$" | '373 patent, claim 1 | the pharmaceutical composition comprises in % molar equivalents: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.$(GHB)_2$; and about 20% to about 25% of Mg.$(GHB)_2$ |
| "the pharmaceutical composition comprises 8% | '373 patent, claim 11 | the pharmaceutical composition comprises in % |

| | | |
|---|---|---|
| of Na.GHB; 23% of K.GHB; 48% of $Ca.(GHB)_2$; and 21% of $Mg.(GHB)_2$" | | molar equivalents 8% of Na.GHB; 23% of K.GHB; 48% of $Ca.(GHB)_2$; and 21% of $Mg.(GHB)_2$ |

I have used these definitions in connection with my report whenever the term appears in a claim.

**76.** Notwithstanding the above, I understand that the parties have not asked the Court to further construe any of the terms used in the Asserted Claims, and the Court at present has not offered any further guidance as to the meaning of the claims. Accordingly, all other claim terms are to be construed consistent with their meaning to a POSA at the time of the invention, in view of the specification and prosecution history. In reaching the opinions set forth in this report, I have ascribed such meaning to the claim terms, unless otherwise noted.

**77.** Finally, I understand that the term "comprising" is synonymous with "including," "containing," or "characterized by," is inclusive or open-ended, and does not exclude additional, unrecited elements.

## IX. SCOPE AND CONTENT OF THE PRIOR ART[6]

**78.** In forming my opinions, I considered at least the following references in addition to the knowledge of a POSA.

**79.** As explained to me by counsel, I understand that a POSA is considered to have knowledge of all relevant prior art, and my discussion of a subset of that prior art, or a particular section of a reference, is not intended to limit the POSA's knowledge for purposes of my analysis. Furthermore, the discussion below is not meant to be exhaustive, and further details are provided in the claim-by-claim analysis provided throughout this report.

[6] I provide an overview of the prior art in this section. However, further teachings of the prior art as well as other references are discussed throughout this report. I reserve the right to rely on all teachings and disclosures of the prior art in this report whether specifically referenced herein or not.

### A. U.S. Patent No. 8,591,922 ("the '922 patent")

**80.** The '922 patent teaches compositions or formulations comprising reduced sodium mixed salts of GHB useful in the treatment of cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy. '922 patent at 22:32-35.

**81.** The '922 patent is directed to a pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, wherein the mixture consists of a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate (Mg.$(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate (Ca.$(GHB)_2$) and, optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier. This is the same pharmaceutical composition claimed in the '373 patent. *See*, *e.g.*, *id.* at Claim 1.

**82.** The '922 patent discloses a pharmaceutical composition, wherein the Na.GHB salt is present in a wt/wt % of about 5%, about 10% (Claim 3); about 20% to about 25% of K.GHB (Claim 4); about 45% to about 50% of Ca.$(GHB)_2$ (Claim 6); and about 20% to about 25% of Mg.$(GHB)_2$ (Claim 5). The '922 patent further discloses a pharmaceutical composition wherein Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$, salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively. *Id.* at 12:63-67, 15:52-56, 35:6-15, Claim 14.

**83.** Table 7 of the '922 patent discloses a "Target Formula," i.e., mixture H that is comprised of 8.0% molar equivalent Na.GHB, 23.0% molar equivalent K.GHB, 48.0% molar equivalent Ca.$(GHB)_2$, and 21.0% molar equivalent Mg.$(GHB)_2$:

TABLE 7

| Conditions and Results | | |
|---|---|---|
| | Mixture H | Mixture I |
| Target Formula (% molar equiv): | | |
| Na—GHB | 8.0% | 0.0% |
| K—GHB | 23.0% | 33.0% |
| Ca—$(GHB)_2$ | 48.0% | 25.0% |
| Mg—$(GHB)_2$ | 21.0% | 42.0% |

**84.** The ’922 patent also discloses that “the multiple dosage regimen comprises one or more steps, as follows: (i) diluting an aqueous solution comprising about 500 mg/mL of the mixture of salts of gamma-hydroxybutyrate with an aqueous medium to provide a first dose of about 2.25 to about 4.5 grams of the mixture of salts; (ii) diluting an aqueous solution comprising about 500 mg/mL of the mixture of salts of gamma-hydroxy butyrate with an aqueous medium to provide a second dose of about 2.25 to about 4.5 grams of the mixture of salts; (iii) orally administering to a patient having narcolepsy the first dose within an hour prior to initial sleep onset; and (iv) orally administering to the patient having narcolepsy the second dose within 2.5 to 4 hours following initial sleep onset.” *Id*. at 22:63-23:8.

**B. Xyrem® (Sodium Oxybate), 2005 Label/Xyrem® label (Sodium Oxybate) Oral Solution 2008/ Prescribing Information for Xyrem® label (PDR 2008)**

**85.** In this report, I will use the label of Xyrem® (sodium oxybate) oral solution as approved for use by the FDA on November 18, 2005[7] (Lupin-Xywav_0011768-0011826). Likewise, the

[7] https://www.accessdata.fda.gov/drugsatfda_docs/label/2005/021196s005lbl.pdf

Xyrem® (sodium oxybate) Oral Solution 2008 also approved for use in 2008 ("Xyrem® label") (TEVA_XWAV_00023820). *See also* PDR 2008 at 1722 (providing Xyrem® 2008 label) (LUPIN_XYWAV_EXPERTS_000001-000007). These Xyrem® labels have the same information in all material respects as it pertains to my analysis. All of these labels are before the March 17, 2017 priority date of the '373 patent.

**86.** For this report, I will refer to the Xyrem® label bearing the bates number Lupin-Xywav_0011768-0011826. For the purposes of citations, Lupin-Xywav_0011768-0011826 has page numbers at the top right of the document (although I reserve the right to refer to the Bates numbers). If for any reason, Plaintiff challenges the use of Lupin-Xywav_0011768-0011826, I reserve the right to use the other labels which have the same material information.

**87.** The Xyrem® label teaches that sodium oxybate (chemically known as sodium γ hydroxybutyrate) "is a central nervous system depressant that reduces excessive daytime sleepiness and cataplexy in patients with narcolepsy." Xyrem® label at 1. The recommended starting dose for Xyrem® is 4.5 g/night, which can be increased to a dose of 9 g/night, and the effective dose range is taught as being 6 to 9 g/night. Xyrem® label at 22–23. The recommended starting dosage of 4.5 grams per night is administered orally in two equal divided doses: 2.25 grams at bedtime and 2.25 grams taken 2.5 to 4 hours later. Xyrem® label at 22-23 ("The recommended starting dose is 4.5 g/night divided into two equal doses of 2.25 g . . . . The first dose is to be taken at bedtime and the second taken 2.5 to 4 hours later.").

---

NDA 21-196/S-005 Page 1
FDA Approved Labeling Text dated 11/18/05

**$R_x$ only**

**Xyrem® (sodium oxybate) oral solution**

**88.** According to the Xyrem® label, the pharmacokinetics of sodium oxybate "are nonlinear with blood levels increasing 3.7-fold as dose is doubled from 4.5 to 9 grams (g)." Xyrem® label at 2. Furthermore, "absorption [of sodium oxybate] is delayed and decreased by a high fat meal." *Id*.

**89.** The Xyrem® label explains: "[b]ecause food significantly reduces the bioavailability of sodium oxybate, the patient should allow at least 2 hours after eating before taking the first dose of sodium oxybate." Xyrem® label at 23. Further, it teaches that "[a]dministration of sodium oxybate immediately after a high fat meal resulted in delayed absorption (average $T_{max}$ increased from 0.75 hr to 2.0 hr) and a reduction in peak plasma level ($C_{max}$) by a mean of 58% and of systemic exposure (AUC) by 37%." Xyrem® label at 2.

**90.** The Xyrem® label also provides the following "Dosing Considerations":

Xyrem Dosing Considerations:

- It is a concentrated liquid that **must** be diluted with water (approximately 60 mL, 2 oz, ¼ cup, or 4 tablespoons).
- It is taken nightly in 2 equal doses.
- Both doses are prepared before bedtime in the provided dosing cups.
- Patients should be instructed to take their first Xyrem dose at bedtime.
- On awakening, 2½ – 4 hours later, the second dose of Xyrem is taken before continuing sleep.
- Both doses should be taken when seated in bed.

Xyrem® label at 5.

### C. Borgen

**91.** Borgen, L. A., *et al*. published "The influence of gender and food on the pharmacokinetics of sodium oxybate oral solution in healthy subjects." *The Journal of Clinical Pharmacology* 43(1), 59-65 ("Borgen") in 2003. Lupin-Xywav_0007926-7932.

**92.** Borgen analyzed and documented the effect of food on the bioavailability, pharmacokinetic and pharmacodynamic properties (i.e., $C_{max}$, AUC, etc.) of a GHB composition taken about

30 minutes after eating a meal. *Id.* at 60. *Borgen* specifically analyzed the effects of food on the bioavailability, pharmacokinetic and pharmacodynamic properties (i.e., $C_{max}$, AUC, etc.) of a Na.GHB composition taken about 30 minutes after eating which is described as a "high-fat" meal.[8] *Id.*

**93.** Borgen reported a "significant" food effect for the GHB composition including reductions in GHB plasma concentrations in the fed state as compared to the fasted state (as indicated by reduced $C_{max}$ and AUC). *See*, *e.g.*, *id.* at 62.[9]

**94.** Borgen provided the following table of mean (average) values:

**Table III** Effect of Food on the Pharmacokinetics of Sodium Oxybate

| Parameter | Fasted State ($n$ = 34) | | Fed State ($n$ = 34) | |
|---|---|---|---|---|
| $AUC_{0-\infty}$ (μg•h/mL) | 289 | (109) | 188* | (80.0) |
| $C_{max}$ (ng/mL) | 142 | (34.2) | 60.1* | (20.1) |
| $t_{max}^{a}$ (h) | 0.75 | | 2.00** | |
| $t_{1/2}$ (h) | 0.57 | (0.30) | 0.68 | (0.22) |
| CL/F (mL/min/kg) | 3.7 | (1.4) | 6.2 | (3.2) |
| $V_z$/F (mL/kg) | 192 | (193) | 384 | (324) |
| Urinary recovery (%) | 3.8 | (2.0) | 3.5 | (1.8) |
| $CL_R$ (mL/h) | 490 | (251) | 826 | (462) |

Data presented as mean ± standard deviation.
a. Median.
*$p < 0.05$. **$p = 0.001$.

**95.** The POSA would draw the following understandings from Borgen:

[8] According to Borgen, the meal "consisted of 2 fried eggs, 2 pieces of bacon, 4 ounces of hash brown potatoes, 2 slices of buttered toast, 8 ounces of whole milk, and 8 ounces of orange juice." *Id.* I note that all of the foods (with the exception of orange juice and milk (100 mg)) in the meal are also generally considered to be high sodium content foods (i.e., contain 20% or more of the daily recommended intake value of 2300 mg for sodium).

[9] Borgen's results were consistent with the information on the Xyrem® label. *See*, *e.g.*, Xyrem® label, at 11-12 ("Food significantly decreases the bioavailability of sodium oxybate …").

**Absorption and Peak Plasma Concentration:**

- Fasted State: When sodium oxybate was administered after an overnight fast, plasma concentrations of the drug were higher. The mean peak plasma concentration ($C_{max}$) was 142 µg/mL, and the median time to reach peak concentration ($T_{max}$) was 0.75 hours. *Id*. 62-63; Table 3.
- Fed State: When administered after a high-fat meal (and high sodium), the absorption of sodium oxybate was slower, and the peak plasma concentration was lower. The mean $C_{max}$ was reduced to 60.1 µg/mL, and the median $T_{max}$ was delayed to 2.00 hours. *Id*. 62-63; Table 3.

**Systemic Exposure:**

- The area under the concentration-time curve (AUC) was higher in the fasted state (289 µgh/mL) compared to the fed state (188 µgh/mL). Table 3. This indicates that administration with the meal reduces the overall bioavailability of sodium oxybate. *Id*. at 62-63; Table 3.

**96.** Borgen also reported that patients reached a maximum GHB concentration in a median time of two hours after a high-fat meal versus 45 minutes when GHB was taken without food. *Id.* at 63. Borgen further noted that food "delayed the absorption of oxybate on average by more than an hour compared to the fasted state." *Id.* Borgen further observed that "[s]ince the bioavailability was lower when oxybate was ingested immediately after a meal, there were fewer adverse events compared to the ingestion of oxybate in a fasted state." *Id.* at 64. Borgen also reported fewer adverse events when oxybate was ingested immediately after the meal, compared to the ingestion of oxybate in a fasted state. *Id.* at 64.

**97.** In summary, Borgen teaches that the administered meal significantly reduces the bioavailability of sodium oxybate by decreasing the peak plasma concentration and delaying the time to reach peak concentration. To maximize the systemic exposure and therapeutic efficacy of sodium oxybate, it is recommended that patients take the medication on an empty stomach, typically several hours after their evening meal. This practice helps to minimize the food effect and ensures more consistent drug absorption. *Id.* at 64.

## X. RELEVANT DATES FOR PRIOR ART PURPOSES AGAINST THE '373 PATENT

**98.** I understand that whether something is prior art is something for the Court to decide. However, in connection with forming my opinions, I did review the dates to confirm that a document would be available to the POSA before **March 17, 2017**. The primary references I discuss in this report have the following dates:

| Reference | Date available to a POSA |
|---|---|
| The '922 Patent | November 26, 2013 |
| Xyrem® (sodium oxybate), 2005 Label | 2005 |
| Xyrem® (sodium oxybate) oral solution 2008. Prescribing Information | 2008 |
| PDR 2008 at 1722 (providing Xyrem® 2008 label). | 2008 |
| Borgen, L. A., et al. (2003). The influence of gender and food on the pharmacokinetics of sodium oxybate oral solution in healthy subjects. The *Journal of Clinical Pharmacology*, 43(1), 59-65. | 2003 |

## XI. TECHNICAL BACKGROUND/STATE OF THE ART/GENERAL KNOWLEDGE OF A POSA

**99.** The following technical background/state of the art information would have been well known to a POSA as of **March 17, 2017**.

### A. Food Effect

**100.** Food effect studies are conducted to determine how the presence of food affects the pharmacokinetics of a drug. These studies are essential because food, *inter alia*, can alter the absorption rate and pharmacological effect of a drug, potentially impacting its efficacy and safety. The primary goal is to assess whether food increases, decreases, or has no effect on the drug's ability to function as intended.

**101.** Food effect studies are commonplace for the POSA and would be considered routine and ordinary. Indeed, the POSA would consider food effects as part of normal drug development and would consider doing a food effect study every time. *See generally*, FDA Guidance for Industry: Food Effect Bioavailability and Fed Bioequivalence Studies. Available at https://www.fda.gov/files/drugs/published/Food-Effect-Bioavailability-and-Fed-Bioequivalence-Studies.pdf (2002) ("FDA Guidance") (LUPIN_XYWAV_EXPERTS_000151-000162).

**102.** The fact that the ingestion of food may influence the pharmacokinetics and absorption of a drug was well known before the priority date of the '373 patent. *See generally*, FDA Guidance. To that effect, as the FDA Guidance states, the FDA recommends providing information on the impact of food intake on any drug product with any submission. *Id*. To a POSA, the FDA regulations alone provide motivation to do food effect studies.

**103.** As the FDA Guidance explains, studies should be conducted on such parameters as food effect bioavailability (BA) and bioequivalence (BE) for orally administered drug products as

part of investigational new drug applications (INDs), new drug applications (NDAs), abbreviated new drug applications (ANDAs), and supplements to these applications. This applies to immediate-release and modified-release drug products and is intended to meet BA and BE requirements. *Id*. at 1.

**104.** As the FDA Guidance explains "[f]ood effect BA studies are usually conducted for new drugs and drug products during the IND period to assess the effects of food on the rate and extent of absorption of a drug when the drug product is administered shortly after a meal (fed conditions), as compared to administration under fasting conditions. Fed BE studies, on the other hand, are conducted for ANDAs to demonstrate their bioequivalence to the reference listed drug (RLD) under fed conditions." *Id*. at 1.

**105.** It goes on to explain: "[f]ood effects on BA are generally greatest when the drug product is administered shortly after a meal is ingested. The nutrient and caloric contents of the meal, the meal volume, and the meal temperature can cause physiological changes in the GI tract in a way that affects drug product transit time, luminal dissolution, drug permeability, and systemic availability. In general, meals that are high in total calories and fat content are more likely to affect the GI physiology and thereby result in a larger effect on the BA of a drug substance or drug product." *Id*. at 2.

**106.** The FDA Guidance provides some routine and easily determined parameters that can be used to measure food effect (*id*. at 6):

> The following exposure measures and pharmacokinetic parameters should be obtained from the resulting concentration-time curves for the test and reference products in food-effect BA and fed BE studies:
>
> - Total exposure, or area under the concentration-time curve ($AUC_{0\text{-}inf}$, $AUC_{0\text{-}t}$)
> - Peak exposure ($C_{max}$)
> - Time to peak exposure ($T_{max}$)
> - Lag-time ($t_{lag}$) for modified-release products, if present

- Terminal elimination half-life
- Other relevant pharmacokinetic parameters[10]

> Individual subject measurements, as well as summary statistics (e.g., group averages, standard deviations, coefficients of variation) should be reported. An equivalence approach is recommended for food-effect BA (to make a claim of no food effects) and fed BE studies, analyzing data using an average criterion. Log-transformation of exposure measurements (AUC and $C_{max}$) prior to analysis is recommended.

**107.** Measurements such as $C_{max}$ and AUC (as well as the other pharmacokinetic parameters discussed in the FDA guidance) are routinely done and easily determined by the POSA. I have measured them and interpreted them. Such pharmacokinetic parameters are well understood by the POSA as well as the relevant regulatory authorities.

**108.** Under the FDA Guidance, the dosing regimen (i.e., the amount, time and number of times a specific quantity of the drug is administered) must be clearly defined and should be the same for the two drugs/drug products. FDA Guidance (A. General Guidance & E. Administration).

**109.** There are three possible scenarios involving the effect of food on drug absorption: (a) no food effect, e.g., where the same AUC and $C_{max}$ values are obtained for the fasted and fed states; (b) positive food effect, e.g., where the AUC and $C_{max}$ values for the fed state are greater than the corresponding values for the fasted state; and (c) negative food effect, e.g., where the $C_{max}$ and AUC values for the fed state are lower than the corresponding values for the fasted state. FDA Guidance at 7-8.

### B. $C_{max}$ in Food Effect Measurements

**110.** $C_{max}$ is well understood by a POSA and refers to the maximum concentration of a drug in the bloodstream after administration. *See generally*, Ansel's Pharmaceutical Dosage Forms

[10] I have evaluated, measured and researched all of these parameters in connection with my work with food effect.

and Drug Delivery Systems (9th Ed. 2011) at 154-158, 174-182 ("Ansel") (LUPIN_XYWAV_EXPERTS_000008-000024); FDA Guidance at 6-7. As discussed above, $C_{max}$ is routinely measured by the POSA without any difficulty and the resulting data are easily and well understood by a POSA.

**111.** $C_{max}$ is typically measured in units of mass per volume (e.g., ng/mL or µg/mL) and is determined through blood plasma samples taken at various time points following drug administration. Ansel at 155-56. I note the specification of the '373 patent states "'$C_{max}$' refers to the average of the maximum plasma concentration (in oxybate mg/L or ug/mL) achieved in individual patients." 35:19-22. Furthermore, Table 4 of the '373 patent reports $C_{max}$ values in mg/L. The value of $C_{max}$ helps in understanding the drug's absorption, distribution, metabolism, and excretion. $C_{max}$ is used in clinical studies to evaluate the impact of various factors, including food, on drug bioavailability. Ansel at 155.

**112.** $C_{max}$ in food effect, *inter alia*, allows for comparison of fed versus fasted states of the same drug, or against a comparator drug. For example, in a food effect study, $C_{max}$ may be measured under two conditions, after fasting and after consuming a meal. By comparing the $C_{max}$ values in these two states, a POSA can determine the influence of food on the drug's peak concentration. FDA Guidance at 6-7, "A. General Design." Changes in $C_{max}$ can indicate alterations in the rate of drug absorption. A higher $C_{max}$ in the fed state may suggest enhanced absorption due to food, while a lower $C_{max}$ may indicate reduced absorption or delayed peak concentration. These are some of the reasons $C_{max}$ is measured when ingesting food and is typically done as part of pharmaceutical development. *See* FDA Guidance.

**113.** Furthermore, pharmacokinetic parameters, including $C_{max}$, are analyzed using statistical methods to determine the significance of food effects. FDA Guidance at 5, 7. Pharmacokinetic

parameters provide insights into how food influences drug absorption and peak concentration. FDA Guidance at 2. By understanding these effects, a drug company can make decisions about dosing and administration to ensure optimal drug performance and patient safety. *See* FDA Guidance.

### C. AUC in Food Effect Measurements

**114.** The area under the curve (AUC) is a pharmacokinetic parameter that represents the total exposure of the body to a drug over time. Ansel at 157-158. It is well understood by the POSA. AUC is derived from the plot of drug concentration in the bloodstream versus time after administration. The calculation of AUC can be performed using various methods, such as the trapezoidal rule, which approximates the area under the curve by dividing it into small trapezoids and summing their areas. As discussed above, AUC is routinely measured by the POSA without any difficulty and the resulting data are easily and well-understood by a POSA.

**115.** I note that the '373 patent states "'AUC' refers to the area under the curve of plasma vs time, either the last time point where the concentration was above the limit of quantitation or projected out to infinite time and expressed in units of h*mg/L." 35:38-42. Furthermore, Table 4 of the '373 patent reports AUC values in mg·h/L. The use of mg·h/L to express AUC values is typical.

**116.** AUC helps a POSA understand how a drug is absorbed, distributed, metabolized, and excreted. Ansel at 157-158. When it comes to food effect measurements, AUC can be used to determine how the presence of food affects the bioavailability of a drug. FDA Guidance at 6-7. For food effect studies, AUC helps in assessing the bioavailability of a drug, which is the proportion of the drug that enters the systemic circulation and is available for therapeutic action.

**117.** By comparing the AUC of a drug taken with food to the AUC of the drug taken on an empty stomach, a POSA can determine the extent to which food affects the drug's absorption. Understanding the food effect on AUC can help in making necessary dose adjustments. For instance, if food significantly increases the AUC, a lower dose might be recommended when the drug is taken with food.

**118.** A higher AUC when the drug composition is taken with food indicates that food enhances the drug's absorption. A lower AUC in the presence of food suggests that food inhibits the drug's absorption. If there is no difference in AUC between fed and fasted states, it indicates that food does not have a substantial effect on the drug's bioavailability. *See*, *e.g*., FDA Guidance at 7-8.

**119.** For these reasons, AUC is a useful parameter to establish as part of food effect studies, providing insights into how food impacts drug absorption and bioavailability. By understanding these effects, a POSA can make decisions about dosing and administration to ensure optimal therapeutic outcomes. AUC is used in clinical studies to evaluate the impact of various factors, including food, on drug bioavailability. Ansel at 157-158; FDA Guidance.

## XII. THE ASSERTED CLAIMS OF THE '373 PATENT ARE INVALID

### A. Claims 3, 4, 5, 6, and 11 of the '373 Patent Would Have Been Obvious Over the '922 Patent

#### 1. The Level of Skill in the Art

**120.** The level of skill has been provided above and is incorporated by reference. *Supra* at ¶¶27-30.

#### 2. Scope and Content of the Prior Art/Technical Background/State of the Art

**121.** The scope and content of the prior art and the technical background has been provided above and is incorporated by reference. *Supra* at ¶¶78-119.

### 3. Differences Between the Prior Art and the Claimed Invention

#### a. The POSA Would Have Selected the Reduced Sodium Mixed GHB Salts of the ’922 Patent Over Na.GHB/Xyrem®

**122.** As explained in the ’922 patent, Xyrem® is a pharmaceutical formulation containing sodium oxybate, i.e., sodium salt of gamma-hydroxybutyrate (GHB). GHB is an endogenous compound with hypnotic and sedative properties, utilized therapeutically in the management of narcolepsy—a sleep disorder marked by excessive daytime somnolence and cataplexy. The ’922 patent at 1:27-41; 1:47-56.

**123.** Despite its clinical efficacy, Xyrem® presented significant drawbacks and risks particularly for patients with comorbid conditions such as hypertension, cardiovascular disease, renal impairment, or those predisposed to cerebrovascular events. A primary concern with Xyrem® was its elevated sodium content, which can substantially augment the dietary sodium intake of patients thereby exacerbating cardiovascular and renal pathologies. *Id*. at 1:60-2:3. In other words, the doses of Xyrem® meant that patients would also ingest a large sodium load.

**124.** The Xyrem® label provides for dosing from 4.5 to 9 grams of the drug product daily. Xyrem®’s high sodium loads were no mystery to the POSA and are reported directly on the Xyrem® label warning the POSA that the sodium intake should be “considered”:

**Sodium Intake**

Daily sodium intake in patients taking sodium oxybate is provided below and should be considered in patients with heart failure, hypertension or compromised renal function.

**Table 5**
**Sodium Content per Total Nightly Dose**

| Xyrem Dose (g) | Xyrem (mL) | Sodium Content/Dose |
|---|---|---|
| 3 | 6 | 546 mg |
| 4.5 | 9 | 819 mg |
| 6 | 12 | 1092 mg |
| 7.5 | 15 | 1365 mg |
| 9 | 18 | 1638 mg |

Xyrem® label at 11.

**125.** The Xyrem® sodium load is extremely high even at the lower daily doses being prescribed. For example, American dietary guidelines at the time encouraged individuals to monitor and limit their sodium intake as part of a healthy diet, independent of any pharmaceutical treatments. For example, the 2010 U.S. Department of Health and Human Services issued dietary guidelines in 2010 that recommended no more than 2,300 milligrams of sodium a day for all Americans, and for people 51 and older, that drops to less than 1,500 milligrams per day. *See*, *e.g.*, Dietary Guidelines for Americans 2010 available at https://health.gov/sites/default/files/2019-10/DietaryGuidelines2010.pdf at 21-24. (LUPIN_XYWAV_EXPERTS_000039-000150).

**126.** Excessive sodium intake poses significant risks for patients with hypertension, cardiovascular disease, renal impairment, or those at risk of cerebrovascular incidents. The '922 patent at 1:60-65. As the '922 patent, therefore, explains, "there is a need for GHB formulations that minimize the undesirable side effects of the sodium, particularly in patients with hypertension, heart disease, renal disease or at risk of stroke, yet provide additional health benefits from the presence of the other salts." The '922 patent at 2:9-14.

**127.** Thus, the POSA would—as the ’922 patent explains—look to alternative GHB formulations that have reduced sodium content. Furthermore, the ’922 patent provides such a solution:

> Provided herein are pharmaceutical compositions comprising salts of gamma-hydroxybutyrate (GHB) which are useful in the treatment of conditions responsive to GHB, for example, fibromyalgia and sleep disorders such as apnea, sleep time disturbances, narcolepsy, cataplexy, sleep paralysis, hypnagogic hallucination, sleep arousal, insomnia, and nocturnal myoclonus. In certain embodiments, the pharmaceutical compositions provided herein are reduced in sodium content, which would render them particularly suitable for the treatment of patients with hypertension, heart disease, or renal disease, or who are at risk of stroke.

The ’922 patent at 2:21-32.

**128.** Therefore, the POSA would have selected the reduced sodium GHB mixed salts of the ’922 patent over Xyrem® (Na.GHB).

**b. The POSA Would Have Been Motivated to Select Certain GHB Compositions from the ’922 Patent**

**129.** Next, reviewing the ’922 patent, the POSA would have noted that only a few reduced sodium mixed salt GHB compositions were made into pharmaceutical compositions (i.e., solutions) and tested for chemical stability and microbial growth by the patentee. *Id.* at Example 9, 34:35-35:26. Specifically, Example 9 uses Mixture A, Mixture B, Mixture G, Mixture H, and Mixture I.

**130.** The formulations of Mixture A, Mixture B, Mixture G, Mixture H, and Mixture I in Example 9 in % molar eq. are provided below:

| Mixture | Na.GHB (% molar eq.) | K.GHB (% molar eq.) | $Ca.(GHB)_2$ (% molar eq.) | $Mg.(GHB)_2$ (% molar eq.) |
|---|---|---|---|---|
| A[11] | 8.5 | 28.0 | 41.1 | 22.0 |
| B[12] | 10.9 | 35.9 | 53.2 | 0 |
| G[13] | 29.2 | 28.0 | 27.9 | 14.8 |
| I[14] | 0.0 | 33.0 | 25.0 | 42.0 |
| H[15] | 8.0 | 23.0 | 48.0 | 21.0 |

**131.** I note that in Example 9 of the ’922 patent when describing Mixtures A, B, G, H, & I, the patentee switched from using % molar eq. to wt/wt % ratio of “**about**” followed by the wt/wt % percentage of mixed salts.

**132.** In the context of the ’922 patent, “[a]s used herein, the term “**about**” or “approximately” means an acceptable error for a particular value as determined by those skilled in the art, which depends in part on how the value is measured or determined. In certain embodiments, the term “about” or “approximately” means within 1, 2, 3, or 4 standard deviations. In certain embodiments, the term “about” or “approximately” means within 50%, 20%, 15%, 10%, 9%, 8%, 7%, 6%, 5%, 4%, 3%, 2%, 1%, 0.5%, or 0.05% of a given value or range.” *Id.* at 6:25-33.

**133.** Molar equivalent percentage (% molar equivalents) and wt/wt % are usually close (but not identical) to one another. The ’373 patent at Col. 2:14-19 (“For convenience in comparing

[11] Composition can be found in Table 5 of the ’922 patent (27:1-13).

[12] Composition can be found in Table 5 of the ’922 patent (27:1-13).

[13] Composition can be found in Table 5 of the ’922 patent (27:1-13).

[14] Composition can be found in Table 7 of the ’922 patent (29:29-43).

[15] Composition can be found in Table 7 of the ’922 patent (29:29-43).

various salt compositions at the same oxybate or GHB molar dose, compositions expressed as percentages in this application refer to molar equivalent percentage (% molar equivalents) of each salt of oxybate or GHB. **This is usually close to, but not the same as, a composition that would be expressed as wt/wt %**."); the '922 patent at Table 1. Therefore, even if the patentee has switched units from % molar eq. to wt/wt % ratio when describing Mixtures A, B, G, H, & I in Example 9, it would not cause any confusion to the POSA. The patentee is talking about the same formulations just using different units which the POSA can convert back and forth as s/he so chooses.

**134.** That said, for the purposes of this report, where possible, I will use the '922 patent's % molar eq. values because, as my table provided above (*supra* at ¶130) shows, the '922 patent provides precise % molar eq. values (to one decimal place) rather than the more imprecise "about" terminology associated with wt/wt % ratios. It also allows for an apples-to-apples comparison in terms of units/compositions from the '922 patent and the '373 patent since the claims in the '373 patent are in terms of % molar eq. values. *See* Joint Claim Construction Statement.

**135.** Returning to the fact that the POSA would note that only Mixtures A, B, G, H, and I were made into pharmaceutical compositions and tested for chemical stability and microbial growth in the '922 patent: the POSA would then note that of those compositions, the '922 patent only specifically claimed three of them. Of course, the claims are in terms of wt/wt % ratio (which as explained in the above two paragraphs, the POSA would know which compositions were being referred to in the '922 claims in terms of % molar eq. because of the use of the "about" and the fact that % molar eq. to wt/wt % ratio are "usually close"):

| Claim | Text of Claim of '922 patent | Mixture Description in '922 patent | Mixture in terms of % mol. eq. |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Claim 12 | **12**. The pharmaceutical composition of claim **2**, wherein the Na.GHB, K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$ salts are present in a wt/wt % ratio of about 8%:32%:20%:40%, respectively. | Mixture A<br><br>The '922 patent at 34:43-47 | Mixture A (% mol. eq.)<br><br>Na.GHB: 8.5%<br>K.GHB: 28.0%<br>$Ca.(GHB)_2$: 41.1%<br>$Mg.(GHB)_2$: 22.0% |
| Claim 13 | **13**. The pharmaceutical composition of claim **2**, wherein the Na.GHB, K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$ salts are present in a wt/wt % ratio of about 29%:31%:13%:27%, respectively. | Mixture G<br><br>The '922 patent at 34:63-67 | Mixture G (% mol. eq.)<br><br>Na.GHB: 29.2%<br>K.GHB: 28.0%<br>$Ca.(GHB)_2$: 27.9%<br>$Mg.(GHB)_2$: 14.8% |
| Claim 14 | **14**. The pharmaceutical composition of claim **2**, wherein the Na.GHB, K.GHB, $Mg.(GHB)_2$, and $Ca.(GHB)_2$ salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively. | Mixture H<br><br>The '922 patent at 35:6-11 | Mixture H (% mol. eq.)<br><br>Na.GHB: 8.0%<br>K.GHB: 23.0%<br>$Ca.(GHB)_2$: 48.0%<br>$Mg.(GHB)_2$: 21.0% |

**136.** The POSA would further note that Mixture B contains **no** $Mg.(GHB)_2$ and Mixture I contains **no** Na.GHB. When reviewing the claims of the '922 patent, the POSA would also note that the patentee did not even bother claiming compositions having **no** $Mg.(GHB)_2$ or Na.GHB. Claim 1 of the '922 patent (the only independent claim) is reproduced below:

> 1. A pharmaceutical composition of gamma-hydroxybutyrate (GHB) comprising a mixture of salts of GHB, **wherein the mixture consists of[16] a sodium salt of gamma-hydroxybutyrate (Na.GHB), a potassium salt of gamma-hydroxybutyrate (K.GHB), a magnesium salt of gamma-hydroxybutyrate ($Mg.(GHB)_2$), and a calcium salt of gamma-hydroxybutyrate ($Ca.(GHB)_2$)**; and optionally, one or more of a buffering agent, sweetening agent, flavoring agent or coloring agent, in a pharmaceutically acceptable carrier.

[16] I have been informed that "consists of" excludes any element, step, or ingredient not specified. Therefore, the mixture of salts of GHB must contain some Na.GHB, K.GHB, $Ca.(GHB)_2$, $Mg.(GHB)_2$. As further support, all of the mixtures dependent to Claim 1 include some amount of these salts: Na.GHB (Claim 3), K.GHB (Claim 4), $Ca.(GHB)_2$ (Claim 6), and $Mg.(GHB)_2$ (Claim 5). Furthermore, the claim for other ingredients uses the term "optionally." It does not use such a term in connection with reciting the four GHB salts.

**137.** Therefore, the POSA would believe that patentee of the ’922 patent compositions with no $Mg.(GHB)_2$ (Mixture B) or Na.GHB (Mixture I) of lesser value since the patentee did not bother claiming them. Therefore, the POSA would focus on the compositions that the patentee specifically claimed, i.e., Mixtures A, G and H.

**138.** Of the three remaining mixtures, A, G and H, the POSA would note that Mixture G has the highest amount of sodium, which for the reasons explained in the previous section and in the ’922 patent would be unattractive to the POSA when compared to Mixtures A (Na.GHB: 8.5%, K.GHB: 28.0%, $Ca.(GHB)_2$: 41.1%, $Mg.(GHB)_2$: 22.0%) and H (Na.GHB: 8.0%, K.GHB: 23.0%, $Ca.(GHB)_2$: 48.0%, $Mg.(GHB)_2$: 21.0%) which have lower amounts of sodium, with Mixture H having the lowest amount of sodium.

**139.** Therefore, from the teachings of the ’922 patent only Mixtures A and H would stand out to the POSA.

**c. The POSA Would Have Been Motivated to Do a Comparative Food Effect Study With the Reduced Sodium Mixed GHB Salts of the ’922 Patent Against Xyrem® (i.e., Na.GHB) Shortly After a Meal**

**140.** Food effect studies are conducted to determine how the presence of food affects the pharmacokinetics of a drug. These studies are essential and routinely done because food can alter the absorption rate and extent of a drug, potentially impacting its efficacy and safety. The primary goal is to assess whether food increases, decreases, or has no effect on the drug’s ability to function as intended. To assess the effects of food, as the FDA Guidance explains, “Food effect BA studies are usually conducted . . . when the drug product is administered shortly after a meal (fed conditions), as compared to administration under fasting conditions.” FDA Guidance at 1.

**141.** Food effect studies are commonplace for the POSA and would be considered routine. The POSA would consider food effects and conducting a food effect study as part of normal drug development and would consider doing such a study every time. *See generally* FDA Guidance for Industry: Food Effect Bioavailability and Fed Bioequivalence Studies. Available at https://www.fda.gov/files/drugs/published/Food-Effect-Bioavailability-and-Fed-Bioequivalence-Studies.pdf (2002) ("FDA Guidance"). To that effect, as the FDA Guidance indicates, the FDA recommends providing information on the impact of food intake on any drug product with any submission. *Id*. To a POSA, the FDA regulations alone provide motivation to do food effect studies.

**142.** As the Applicant explained to the Examiner during prosecution of the '373 patent, however, "[w]hen the present application[17] was filed, it was known that there was a substantial food effect associated with the sodium GHB product Xyrem®." April 8, 2022 Applicant Response. In other words, this was known before the filing of the '373 patent. This knowledge would have motivated the POSA to study the food effect properties of the '922 patent's reduced sodium reduced sodium mixed salt GHB compositions against Xyrem®. And as the FDA Guidance explains, such a study would involve administering the reduced sodium reduced sodium mixed salt GHB composition and Xyrem® "shortly after a meal (fed conditions), as compared to administration under fasting conditions" and comparing the results.

**143.** Moreover, the '922 patent explains the connection between Xyrem® and its reduced sodium reduced sodium mixed salt GHB composition. *Supra* section entitled, "The POSA Would Have Selected the Reduced Sodium Mixed GHB Salts of the '922 patent over Xyrem®

[17] The "present application" refers to the application that led to the '922 patent.

(Na.GHB)." This would motivate the POSA to measure the food effect properties of the reduced sodium salt GHB compositions against Xyrem®.

**144.** The '922 patent also includes a comparative analysis of its reduced sodium reduced sodium mixed salt GHB compositions against Xyrem® in the context of gastrointestinal motility study (Example 7). This would further motivate the POSA to measure the food effect properties of the reduced sodium GHB mixed salt compositions against Xyrem®.

**d. Whenever POSA Would Have Done a Comparative Food Effect Study, the POSA Would Have Used the Same Conditions, Including, *Inter Alia*, Dose Amounts/Equivalents and Dosing Schedule**

**145.** A comparator/benchmark is used when reporting pharmacokinetic data to provide a reference set of data that allows for the evaluation and interpretation of the pharmacokinetic properties vis-à-vis the reference. This allows for a more meaningful interpretation of the data. The comparator/benchmark can be thought of as a control or baseline against which a formulation can be compared. By comparing the pharmacokinetic parameters, such as $C_{max}$ (or AUC) of a composition to another composition, the comparative analysis helps in identifying any differences or similarities, thereby aiding in the development process, regulatory approval, and clinical use. Benchmarking against a known standard is a common technique to get performance data.

**146.** As explained throughout this report, Table 8 of the '922 patent shows a comparative study involving the reduced sodium reduced sodium mixed salt GHB compositions and Xyrem®. As Table 8, and its accompanying discussion shows, the same conditions were used in the comparative/benchmark study:

TABLE 8

| Study Design | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Treatment Group | Test Compound | Dosing Route | Animals N= | Dose mg/kg | Dosing Solution Conc. mg/mL (Sodium Oxybate Molar Equivalent basis) | Dosing Volume mL/kg | Vehicle | Sampling Time Point |
| 1* | NA | PO | 10 | NA | NA | 5 | Saline | 20 minutes post marker compound dose |
| 2* | Xyrem ® solution (Sodium Oxybate) | PO | 10 | 200 | 40 | 5 | Sterile Water | 20 minutes post marker compound dose |
| 3* | Mixture G | PO | 10 | 200 | 40 | 5 | Sterile Water | 20 minutes post marker compound dose |
| 4* | Mixture A | PO | 10 | 200 | 40 | 5 | Sterile Water | 20 minutes post marker compound dose |

*20 minutes after test compound dose, 6% Ca urine (w/v) in 0.5% methyl cellulose, low viscosity in tap water was administered PO at 0.3 mL/mouse (Carai et al., Life Sciences 70 (2002) 3059-3067). Mice were sacrificed 20 minutes after this second dose.

**147.** Table 8 shows that in each case the same dose amount, dosing solution, molar equivalent, dosing volume, dosing vehicle, and sampling time point was used. Where possible, every variable was the same except the variable of interest.

**148.** In the accompanying description to Table 8, the '922 patent explains that all animals were dosed such that the timing of the dose was designated as "time 0." *Id.* at 30:59-60 ("Animals were dosed via the appropriate route at time 0 on the appropriate day."). During the study, the samples were collected "[a]t 20 minutes." *Id.* at 30:64-67. This again shows that all conditions (including timing conditions) were held the same so that meaningful comparative data could be obtained.

**149.** There are other teachings in the '922 patent showing that a POSA would go to great lengths to hold all conditions as close to the same in any comparative experiment. For example, the '922 patent explains that "[a]ll dosing solutions were prepared fresh on the day of dosing and were dosed within one hour of preparation." *Id.* at 30:40-41. The '922 patent also states that

the mice were under the same food conditions. *Id*. at 30:50-55 ("Animals were supplied with water and a commercial rodent diet ad libitum prior to the study initiation. Food was withheld from the animals for a minimum of twelve hours before the study and during the study. Water was supplied ad libitum."). The comparative study of the '922 patent also used the same number of animals. Table 8.

**150.** Only when the test conditions are held the same (as much as feasibly possible) could the inventors of the '922 patent make the relevant comparisons: "Test compound treated groups showed lower transit rate compared to the control (saline) group; whereas Mixtures A and G displayed transit rates similar to those of Xyrem®." *Id*. at 33:24-27. Again, all of this is to show that in a typical comparative study, all variables are held the same (as much as feasibility possible) except for the variable being studied.

**151.** The '922 patent's teachings are consistent with the FDA Guidance. The FDA Guidance would teach the POSA to use the same conditions including, *inter alia*, dosing amounts, concentration and schedule, in any comparative study. Below, I have reproduced "E. Administration" from the FDA guidance:

**E. Administration**

**Fasted Treatments:** Following an overnight fast of at least 10 hours, subjects should be administered the drug product with 240 mL (8 fluid ounces) of water. No food should be allowed for at least 4 hours post-dose. Water can be allowed as desired except for one hour before and after drug administration. Subjects should receive standardized meals scheduled at the same time in each period of the study.

**Fed Treatments:** Following an overnight fast of at least 10 hours, subjects should start the recommended meal 30 minutes prior to administration of the drug product. Study subjects should eat this meal in 30 minutes or less; however, the drug product should be administered 30 minutes after start of the meal. The drug product should be administered with 240 mL (8 fluid ounces) of water. No food should be allowed for at least 4 hours post-dose. Water can be allowed as desired except for one hour before and after drug administration. Subjects should receive standardized meals scheduled at the same time in each period of the study.

**152.** As the FDA Guidance tells the POSA, in a fasted and fed treatment food effect study, the same conditions are used except for the variable of interest (fed versus fasted). Indeed, for the most part, the identical language is used.[18]

**153.** Another area where the FDA Guidance emphasizes the use of the same conditions is when it states, "[w]e recommend a **similar**, two-treatment, two-period, two-sequence crossover design for a fed BE study except that the treatments should consist of both test and reference formulations administered following a test meal (fed condition)." FDA Guidance at 5 (emphasis added). By "recommend[ing] a **similar**" design, here again the FDA is saying to use the same conditions. And as mentioned above, the FDA Guidance explains statistical methods to determine the significance of food effects. FDA Guidance at 5, 7. This means that average values must be obtained from a cohort and to allow statistical analysis, variances should be controlled as much as possible including running experiments with controls and under similar conditions.

**154.** In summary, the '922 patent and (separately) the FDA guidance are describing typical benchmarking studies where all variables are the same (as much as feasibly possible) except for the one that is being studied. In conducting any comparative study—whether a food effect study or some other study—from the teachings of the '922 patent and the FDA study, the POSA would have known to use the same conditions, including dosing amounts/equivalents, dosing schedule, dosing regimen, dosing frequency, dosing schedule, dosing volume, dosing concentration, etc.

[18] Indeed, the conclusions that the POSA would draw from the FDA Guidance could hardly be disputed by Jazz. As the '373 patent states: "The study was compliant with the FDA guidance for food effect studies ("Guidance for Industry: Food Effect bioavailability and Fed Bioequivalence Studies," FDA December 2002), incorporated herein by reference in its entirety. In both fasted and fed treatments, the Guidance indicates that the drug product should be administered with 240 mL of water." The '373 patent at 36:14-21. In other words, the fed and fast conditions from the FDA guidance, according to the '373 patent, were done under the same conditions (i.e., 240 mL of water).

**155.** In fact, whenever I have done food effect studies, I used the same dosing conditions including amounts, dosing schedule, dosing regimen, dosing frequency, dosing volume, dosing concentration, etc., and held all variables the same as much as possible except the variable of interest.

### 4. Claim 1 Would Have Been Obvious in Light of the '922 Patent

**156.** In addition to my analysis of the individual limitations below, and as further detailed below, it is my opinion that the Asserted Claims as a whole would have been obvious to a POSA in view of the '922 patent. The reduced sodium mixed salt GHB compositions, reduced food effects, recited pharmacokinetic parameters, the recited disease states, measuring those recited pharmacokinetic parameters, making comparisons to an immediate release liquid solution of Na.GHB, the "within four hours after eating" time frame, the use of dosages forms and pharmaceutical excipients, dosing, food effect studies, and any other recited components reflects the routine use and measurement of known elements, each serving its expected function, and all directed toward a well-known goal: measuring reduced food effects of a known reduced sodium mixed salt GHB compositions against a comparator (Xyrem®). There is no indication in the record that the specific combination, taken as a whole, yields any unexpected properties. Accordingly, the claimed subject matter would have been obvious when considered in its entirety. The text of Claim 1 of the '922 patent (from which the Asserted Claims depend) is reproduced below:

> 1. A method of reducing food effect due to administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:
>
> orally administering to a patient in need thereof a pharmaceutically effective amount of a pharmaceutical composition of GHB in a unit dosage comprising at least one salt of GHB and a pharmaceutically acceptable carrier within four hours after eating;

> wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB,
>
> wherein the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of $Ca.(GHB)_2$; and about 20% to about 25% of $Mg.(GHB)_2$.

**157.** In my opinion, Claim 1 is invalid as obvious over the '922 patent. To begin my analysis, I provide the following claim chart which provides exemplary citations to the '922 patent. After the chart, I provide further discussion to support obviousness. The claim chart and the accompanying discussion are intended to be used together in this report.

| Claim 1 | Exemplary Citations |
|---|---|
| 1. A method of reducing food effect due to administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising: | The '922 patent discloses "GHB compositions and formulations comprising mixed salts of GHB, disclosed herein, may be prepared and administered by any of the means described herein, particularly those described in the sections 'Formulations' and the examples, or by any means as would be known to those of skill in the art." '922 patent at 22:23–28.<br><br>Table 7 of the '922 patent discloses a "Target Formula" that is comprised of 8.0% molar equivalent Na.GHB, 23.0% molar equivalent K.GHB, 48.0% molar equivalent $Ca.(GHB)_2$, and 21.0% molar equivalent $Mg.(GHB)_2$.<br><br>'922 patent further discloses "the compositions or formulations comprising mixed salts of GHB, disclosed herein, are useful in the treatment of cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy." '922 patent at 22:32–35; *see also id.* at Abstract, 1:14–23, 2:21–27, 4:8–17, 4:17–43. |
| orally administering to a patient in need thereof | "[i]n certain embodiments, the formulation is suitable for oral administration." *Id.* at 18:10–11; *see also id.* at 3:67–4:1, 4:17–31, 18:45–48, 20:40–44, 20:56–60, 22:46–49, Claim 29. |

| | |
|---|---|
| | "In certain embodiments, the pharmaceutical compositions provided herein are reduced in sodium content, which would render them particularly suitable for the treatment of patients with hypertension, heart disease, or renal disease, or who are at risk of stroke." *Id.* at 2:28-33.<br><br>"As used herein, the term "patient" refers to a mammal, particularly a human." *Id.* at 6:20-21.[19] |
| a pharmaceutically effective amount of a pharmaceutical composition of GHB | "solutions will be administered in a manner compatible with the dosage formulation and in such amount as is therapeutically effective." *Id.* at 19:58–60; *see also id.* at 2:13–17, 17:51–54.<br><br>"GHB compositions and formulations comprising mixed salts of GHB, disclosed herein, may be prepared and administered by any of the means described herein, particularly those described in the sections 'Formulations' and the examples, or by any means as would be known to those of skill in the art." '922 patent at 22:23–28.<br><br>Table 7 of the '922 patent discloses a "Target Formula" that is comprised of 8.0% molar equivalent Na.GHB, 23.0% molar equivalent K.GHB, 48.0% molar equivalent $Ca.(GHB)_2$, and 21.0% molar equivalent $Mg.(GHB)_2$. |
| in a unit dosage comprising | "GHB compositions and formulations comprising mixed salts of GHB, disclosed herein, may be prepared and administered by any of the means described herein, particularly those described in the sections 'Formulations' and the examples, or by any means as would be known to those of skill in the art." '922 patent at 22:23–28.<br><br>The '922 patent discloses that "[i]n certain embodiments, the formulation is administered |

[19] This is the same definition of patient provided in the '373 patent. 8:36-36.

| | |
|---|---|
| | in a **single** or multiple dosage regiment." *Id.* at 4:3–4.<br><br>The '922 patent discloses "orally administering to a patient having narcolepsy the first dose within an hour prior to initial sleep onset." *Id.* at 4:26–27.<br><br>"the pharmaceutical composition is formulated as a liquid formulation." *Id.* at 3:62–63; *see also id.* at 18:2–3, 18:53–55, 18:63–19:1, 21:66–22:2, Claim 27. |
| at least one salt of GHB | Table 7 of the '922 patent discloses a "Target Formula" that is comprised of 8.0% molar equivalent Na.GHB, 23.0% molar equivalent K.GHB, 48.0% molar equivalent $Ca.(GHB)_2$, and 21.0% molar equivalent $Mg.(GHB)_2$. |
| and a pharmaceutically acceptable carrier | "The aqueous solutions disclosed herein typically comprise an effective amount of GHB, which may be dissolved or dispersed in a pharmaceutically acceptable carrier and/or an aqueous medium.<br><br>As used herein, "pharmaceutically acceptable carrier" includes any and all solvents, dispersion media, coatings, antibacterial and antifungal agents, isotonic and absorption delaying agents and the like. The use of such media and agents for pharmaceutical active Substances is well known in the art. Insofar as any conventional media or agent is incompatible with the active ingredient, its use in the therapeutic compositions is not appropriate. Supplementary compatible active ingredients can be incorporated into the compositions. For human administration, preparations should meet sterility, pyrogenicity, general safety and purity standards as required by the Food and Drug Administration (FDA)." *Id.* at 17:51-67.<br><br>Claim 1 ("pharmaceutically acceptable carrier.") and Claim 2 ("pharmaceutically acceptable carrier."). |

| | |
|---|---|
| within four hours after eating; | "The preferred oral formulations . . . may be incorporated directly with the food (i.e. a beverage) of the diet." *Id*. at 20:40-55.<br><br>"In certain embodiments, the method comprises oral administration of the formulation in a multiple dosage regimen. In certain embodiments, the multiple dosage regimen comprises: (i) diluting an aqueous solution comprising about 500 mg/mL of the mixture of salts of gamma-hydroxybutyrate with an aqueous medium to provide a first dose of about 2.25 to about 4.5 grams of the mixture of salts; (ii) diluting an aqueous Solution comprising about 500 mg/mL of the mixture of salts of gamma-hydroxybutyrate with an aqueous medium to provide a second dose of about 2.25 to about 4.5 grams of the mixture of salts; (iii) orally administering to a patient having narcolepsy the first dose within an hour prior to initial sleep onset; and (iv) orally administering to the patient having narcolepsy the second dose within 2.5 to 4 hours following initial sleep onset.<br><br>In certain embodiments, the multiple dosage regimen comprises: (i) diluting an aqueous solution comprising about 500 mg/mL of the mixture of salts of gamma-hydroxybutyrate with an aqueous medium to provide a first dose of about 1.0 to about 4.5 grams of the mixture of salts; (ii) diluting an aqueous solution comprising about 500 mg/mL of the mixture of salts of gamma-hydroxybutyrate with an aqueous medium to provide a second dose of about 1.0 to about 4.5 grams of the mixture of salts; (iii) orally administering to a patient having narcolepsy the first dose within an hour prior to initial sleep onset; and (iv) orally administering to the patient having narcolepsy the second dose within 2.5 to 4 hours following initial sleep onset." *Id*. at 4:17-44. |
| wherein the pharmaceutical composition of GHB has reduced food effect as measured by | "The preferred oral formulations . . . may be incorporated directly with the food (i.e. a beverage) of the diet." *Id*. at 20:40-55. |

| | |
|---|---|
| $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB,[20] | The '922 patent disclosing comparisons to Xyrem®: "the pharmaceutical compositions comprising mixed salts of oxybate, disclosed herein, display acceptable pharmacokinetic properties (measured as GastroIntestinal transit rates), similar to those of Xyrem®." *Id.* at 30:5–10. |
| wherein the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.(GHB)2; and about 20% to about 25% of Mg.(GHB)2. | "In certain embodiments, where the pharmaceutical composition comprises a mixture of Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.(GHB)2, the Na.GHB salt is present in a wt/wt % of about 5% to about 40%, the K.GHB salt is present in a wt/wt % of about 10% to about 40%, the Mg.(GHB)2 salt is present in a wt/wt % of about 5% to about 30%, and the Ca.(GHB)2 salt is present in a wt/wt % of about 20% to about 80%." *Id.* at 3:21–26.<br><br>Table 7 of the '922 patent discloses a "Target Formula" that is comprised of 8.0% molar equivalent Na.GHB, 23.0% molar equivalent K.GHB, 48.0% molar equivalent Ca.$(GHB)_2$, and 21.0% molar equivalent Mg.$(GHB)_2$. |

**a. "A method of reducing food effect due to administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:"**

**158.** This is the preamble of the claim. The '922 patent discloses using its GHB composition for the "administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy." For example, the '922 patent explains that "the compositions or formulations comprising mixed salts of GHB, disclosed herein, are useful in the treatment of cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy." '922 patent at 22:32–35; *see also id.* at Abstract, 1:14–23, 2:21–

[20] By agreement of the parties, the term "an equal dose of immediate release liquid solution of Na.GHB" means "a single dose of GHB salt(s) equivalent to a single dose of immediate release liquid solution of Na.GHB."

27, 4:8–17, 4:17–43. This is the only active step that is described in the preamble, i.e., the administration of GHB to a patient exhibiting a certain condition, which is taught by the ’922 patent.

**159.** As to the preamble phrase, "[a] method of reducing food effect," I do not believe it is limiting or contains an active step. Rather, it is only reciting the resultant reduction of the food effect (as measured by the pharmacokinetic parameters recited in the claims) of the administration of GHB when compared to an equal dose of immediate-release liquid solution of Na.GHB in a patient. In any event, even if it were limiting, this portion of the preamble would be addressed in connection with my discussion dealing with food effect (below). *Infra* at Section XII(A)(4)(g) starting at p. 67.

**160.** These same teachings would have given the POSA a reasonable expectation of success since the conditions the reduced sodium reduced sodium mixed salt GHB compositions can be used for are discussed in the ’922 patent. I discuss the reasonable expectation of success of the resultant reduction of the food effect later.

**b. "orally administering to a patient in need thereof"**

**161.** The ’922 patent teaches "orally administering to a patient in need thereof." For example, the ’922 patent teaches that "[i]n certain embodiments, the formulation is suitable for oral administration." *Id*. at 18:10–11; *see also id.* at 3:67–4:1, 4:17–31, 18:45–48, 20:40–44, 20:56–60, 22:46–49, Claim 29 ("The formulation of claim 27, which is suitable for oral administration.").

**162.** These same teachings would have given the POSA a reasonable expectation of success.

**c. "a pharmaceutically effective amount of a pharmaceutical composition of GHB"**

**163.** According to the Joint Claim Construction Document: "pharmaceutically effective amount" means "Plain & ordinary meaning: i.e., an amount of GHB salt(s), including any FDA approved amounts, sufficient to elicit a biological response when administered to a patient." The '922 patent teaches this recitation within the meaning of the claim construction.

**164.** The '922 patent teaches "a pharmaceutically effective amount of a pharmaceutical composition of GHB." For example, the '922 patent teaches that "solutions will be administered in a manner compatible with the dosage formulation and in **such amount as is therapeutically effective**." *Id.* at 19:58–60; *see also id.* at 2:13–17, 17:51–54; 20:15-17. Thus, the '922 patent teaches "an amount of GHB salt(s), including any FDA approved amounts, sufficient to elicit a biological response when administered to a patient."

**165.** As to the disclosure of a "pharmaceutical composition of GHB," Table 7 of the '922 patent discloses a pharmaceutical composition with 8.0 % of Na.GHB; 23.0 % of K.GHB; 48.0 % of Ca.$(GHB)_2$; and 21.0 % of Mg.$(GHB)_2$, i.e., Mixture H:

TABLE 7

| Conditions and Results | | |
|---|---|---|
| | Mixture H | Mixture I |
| Target Formula (% molar equiv): | | |
| Na—GHB | 8.0% | 0.0% |
| K—GHB | 23.0% | 33.0% |
| Ca—$(GHB)_2$ | 48.0% | 25.0% |
| Mg—$(GHB)_2$ | 21.0% | 42.0% |
| Amounts charged (grams): | | |

**166.** The ’922 patent also teaches that Mixture H was also made into a pharmaceutical composition. *Id*. at 35:6-15 (Example 9).

**167.** As yet another example, Claim 14 of the ’922 patent recites “[t]he pharmaceutical composition of claim 2, wherein the Na.GHB, K.GHB, Mg.$(GHB)_2$, and Ca.$(GHB)_2$, salts are present in a wt/wt % ratio of about 8%:23%:21%:48%, respectively.” Claim 14 is Mixture H. *Supra* at ¶¶130, 135; *see also* Claims 1 and 2 reciting pharmaceutical compositions.

**168.** These same teachings would have given the POSA a reasonable expectation of success, i.e., that the reduced sodium mixed salt GHB composition when administered where “**such amount as is therapeutically effective**” would result in “a pharmaceutically effective amount of a pharmaceutical composition of GHB.”

**d. “in a unit dosage comprising at least one salt of GHB”**

**169.** The ’922 patent teaches “at least one salt of GHB.” *Supra* at ¶¶81-83, 135-139, 165-167; *infra* at ¶¶232-237. According to the Joint Claim Construction Document: “a unit dose” means “Plain & ordinary meaning: i.e., a single dosage form for delivery.” The ’922 patent teaches this recitation within the meaning of the claim construction.

**170.** The ’922 discloses that the GHB can be administered as a unit dose *including a liquid solution*: “[i]n certain embodiments, the formulation is administered in a single or multiple dosage regiment.” *Id.* at 4:3–4 (“the formulation is administered in a **single** or multiple dosage regimen”); 18:43–44; *see also* 22:23–28 (“GHB compositions and formulations comprising mixed salts of GHB, disclosed herein, may be prepared and administered by any of the means described herein, particularly those described in the sections ‘Formulations’ and the examples, or by any means as would be known to those of skill in the art”); *id*. at 4:26–27 (“orally administering to a patient having narcolepsy the first dose within an hour prior to initial sleep onset”); *id*. at 3:62–63; *id*. at 18:2–3, 18:53–55, 18:63–19:1, 21:66–22:2, Claim 27; *id*. at 3:62–

63 ("the pharmaceutical composition is formulated as a liquid formulation"); *see also id.* at 18:2–3, 18:53–55, 18:63–19:1, 21:66–22:2, Claim 27.

**171.** The study described in Example 7 (including Table 8) describes the use of a single dosage form for delivery, i.e., a single dose solution. Example 9 also shows pharmaceutical compositions made from reduced sodium mixed salt GHB compositions are solutions. See also the '922 patent at 18:2-3 ("In certain embodiments, the compositions disclosed herein are provided in a formulation, preferably, a liquid formulation").

**172.** These same teachings would have given the POSA a reasonable expectation of success in making a unit dosage including a liquid solution with the reduced sodium reduced sodium mixed salt GHB compositions. Making a unit dose, e.g., a solution, would have been an easy exercise for the POSA.

#### e. "and a pharmaceutically acceptable carrier"

**173.** The '922 patent teaches the use of a pharmaceutical acceptable carrier. *Id*. at 17:51-67; Claim 1 ("pharmaceutically acceptable carrier") and Claim 2 ("pharmaceutically acceptable carrier"). The '922 patent explains "[b]y 'pharmaceutically acceptable' it is meant the active ingredient, cation, salt, diluent, excipient or carrier must be compatible with the other ingredients of the formulation and not unduly deleterious, for example, that the active ingredient, cation, salt, diluent, excipient or carrier does not produce an adverse, allergic or other untoward reaction, when administered to an animal, or a human, as appropriate." *Id*. at 6:34-40.[21]

[21] This is the same definition as provided in the '373 patent at 8:49-55 (defining "pharmaceutically acceptable").

**174.** These same teachings would have given the POSA a reasonable expectation of success, i.e., use of a (generic) pharmaceutically acceptable carrier. The POSA would be well versed in the use and selection of a pharmaceutically acceptable carrier.

**f. "within four hours after eating"**

**175.** The '922 patent teaches administration of GHB composition "within four hours after eating" as recited in Claim 1 of the '373 patent. As the '373 patent explains "[t]he term, "eating" as used herein, refers to ingesting or consuming calories and/or nutrients by way of solid *or liquid food substances*." The '373 patent at 11:15-17.

**176.** At the outset, I note that under the plain meaning, "within four hours after eating" includes administering the GHB composition with food, and up to four hours after eating. Support for this understanding comes from the language of Claim 2 of the '373 patent. Claim 2 ("The method of claim 1, **wherein the composition is administered with food, immediately after eating, up to 30 minutes after eating, or up to two hours after eating**."). Claim 2 narrows the end of the window of Claim 1 "within four hours after eating" to "up to two hours after eating" but also provides an understanding of the beginning point of the administration, i.e., the "composition is administered with food." Because Claim 2 depends from Claim 1, I have been informed by Counsel that the scope of Claim 1 must include whatever is recited in Claim 2.

**177.** In other words, "within four hours after eating" includes administering the GHB composition at the same time as food, i.e., time 0.

**178.** As explained in detail below, there are two separate bases where the '922 patent teaches "within four hours after eating": (1) it teaches administration directly with food; and/or (2) it teaches "orally administering . . . the first dose within an hour prior to initial sleep onset" which the POSA would understand overlaps with "within four hours after eating."

**(1) Basis 1: "Administration directly with food"**

**179.** The '922 patent teaches administration with food: "[t]he preferred oral formulations . . . may **be incorporated directly with the food (i.e. a beverage) of the diet**." *Id*. at 20:40-55. Thus, the '922 patent is teaching administering the GHB composition at the same time as food, i.e., time 0. This teaching in the '922 patent would have motivated the POSA to administer the reduced sodium mixed salt GHB compositions with food.

**180.** The '922 patent's teaching of "food (i.e. a beverage) of the diet" would meet the definition of "eating" as provided in the '373 patent: "[t]he term, "eating" as used herein, refers to ingesting or consuming calories and/or nutrients by way of solid *or liquid food substances*." 11:15-17. The POSA would consider the '922 patent teaching of "food (i.e. a beverage) of the diet" synonymous with the '373 patent definition of "eating" which includes "nutrients by way . . . liquid food substances." There is no question it is teaching the same thing and/or has overlap.[22]

**181.** As I explained above (*supra* at ¶¶175-177), "within four hours after eating" includes administering the GHB composition at the same time as food, i.e., time 0. The '922 patent teaches administration with food, i.e., time 0. *Id*. at 20:40-55 ("[t]he preferred oral formulations . . . may **be incorporated directly with the food (i.e. a beverage) of the diet**."). Thus, the '922 patent teaches "within four hours after eating."

[22] If Jazz's expert attempts to get into a protracted discussion about whether water would fall into the definition of "food (i.e. a beverage) of the diet" and/or whether water is considered a food or whether water would fall into the '373 patent "nutrients by way of . . . liquid food substances," it does not save the claim. Whether or not "food (i.e. a beverage) of the diet" covers water (and whether water provides any nutrients) misses the point. The '922 patent's "food (i.e. a beverage) of the diet" covers more than just water, including juice, milk, energy drinks, smoothies, tea, coffee, soft drinks, plant-based beverages etc. *See, e.g.*, https://www.healthyeating.org/nutrition-topics/general/food-groups/beverages (including water in the hyperlink's content). But putting water aside, I doubt even Plaintiff's experts would dispute "nutrients by way . . . liquid food substances" would include juice, milk, energy drinks, smoothies, tea, coffee, soft drinks, plant-based beverages etc. Id. "[F]ood (i.e. a beverage) of the diet" is broader than just water.

**(2) Basis 2: "orally administering . . . the first dose within an hour prior to initial sleep onset"**

**182.** Even though the '922 patent's teaching of administering its GHB composition at the same time as eating, i.e., time 0 is (alone) sufficient to teach the claim limitation "within four hours after eating," the '922 patent's discussion of "orally administering . . . the first dose within an hour prior to initial sleep onset" separately and independently teaches "within four hours after eating."

**183.** Specifically, the '922 patent discloses that the multiple dosage regimen comprises one or more steps, as follows: "(i) diluting an aqueous solution comprising about 500 mg/mL of the mixture of salts of gamma-hydroxybutyrate with an aqueous medium to provide a first dose of about 2.25 to about 4.5 grams of the mixture of salts; (ii) diluting an aqueous solution comprising about 500 mg/mL of the mixture of salts of gamma-hydroxy butyrate with an aqueous medium to provide a second dose of about 2.25 to about 4.5 grams of the mixture of salts; (iii) orally administering to a patient having narcolepsy **the first dose within an hour prior to initial sleep onset**; and (iv) orally administering to the patient having narcolepsy the second dose within 2.5 to 4 hours following initial sleep onset." *Id*. at 22:63-23:8; *see also id*. at 4:27; 4:41; 22:59-60; 23:19; 23:32; 23:45.[23]

---

[23] While it is true that the above disclosure in the '922 patent refers to a "first dose" and a "second dose," that fact alone does not save the claim. To the contrary, Claim 1 of the '373 patent is a "comprising" claim, which means the claim is open-ended. *Supra* at ¶77. Therefore, the '922 patent's teaching of the "the first dose within an hour prior to initial sleep onset" is sufficient to disclose the "within four hours after eating" limitation, even if its teaching may then go on to discuss a second dose following sleep onset (because of the "comprising" term in the claims of the '373 patent).

As further support for my position, I note that dependent Claims 8-10 (depend on Claim 1) recite a two-dose regime. For example, dependent Claim 10 recites "administer[ing] at least four hours after eating and within four hours after eating." There are two doses recited in dependent Claim 10, a first dose administered "within four hours after eating," and a second dose administered "at least four hours after eating." Since dependent Claims 8-10 depend from Claim 1, it is axiomatic that Claim 1 can also include a two dose regime (i.e., first dose and second dose) within its scope (like the '922 patent).

**184.** With this disclosure, the ’922 patent teaches of administering the first dose of the GHB composition “within an hour before initial sleep onset,” which significantly overlaps the range of “within four hours after eating.”

**185.** In my experience, dinner is typically eaten between 6 p.m. and 10 p.m. by the vast majority of Americans. *See* also https://today.yougov.com/society/articles/51523-most-americans-watch-tv-during-dinner-41-percent-talk-to-people-they-are-with-poll (“Two-thirds (65%) of Americans eat dinner at 7 p.m. or earlier. The most common time to eat dinner is at 7 p.m. (17%). Americans 65 and older tend to eat dinner earlier: 68% eat at 6:30 or earlier. About half as many adults under 30 (32%) eat dinner in the same time period. 42% of adults under 30 eat dinner at 8 p.m. or later.”) (LUPIN_XYWAV_EXPERTS_000163-000172).

**186.** I focus on dinner because the ’922 patent is focused on sleep disorders making nighttime the relevant time frame. *Id*. at 1:14-24. This is further confirmed by the ’922 teaching of “orally administering to the patient . . . the second dose within 2.5 to 4 hours following initial sleep onset.” *Id*. at 22:63-23:8. Clearly with a second dose within 2.5 to 4 hours following initial sleep onset, the POSA would understand the ’922 patent is not talking about an afternoon nap. For this reason, when analyzing the ’922 patent’s teaching of “the first dose within an hour prior to initial sleep onset,” the proper focus is on dinner.

**187.** The ’922 patent discloses that the first dosage should be taken “within an hour prior to initial sleep onset,” i.e., *up to* an hour before sleep. As an example, assuming a patient goes to bed at 10 p.m., then the patient would take the first dose, consistent with the teachings of the ’922 patent, starting at 9 p.m. (but before 10 p.m.). Four hours before 9 p.m. means the patient may eat as early as approximately 5 p.m. Given dinner is typically eaten at some time between

6 p.m. and 10 p.m., the teachings of the '922 patent overlap with administration of the GHB composition "within four hours after eating."

**188.** The table below provides the set of conditions the POSA would understand based on typical dinner times, typical sleep times,[24] and the instructions provided in the '922 patent, which clearly shows the overlap with the claimed "within an hour before initial sleep onset":

| Patient Sleep Time[25] | Time to take first dose per '922 patent: "**the first dose within an hour prior to initial sleep onset**" | dinner times, i.e., typically eaten between 6 p.m. and 10 p.m.: [26] | Difference between dose time and eating (i.e., dinner time) | "within four hours after eating" |
|---|---|---|---|---|
| 9 p.m. | 8 p.m.[27] | 6 p.m.<br>7 p.m.<br>8 p.m. | 2 hours[28]<br>1 hour<br>0 hours | Yes<br>Yes<br>Yes |
| 10 p.m. | 9 p.m. | 6 p.m.<br>7 p.m.<br>8 p.m.<br>9 p.m. | 3 hours<br>2 hours<br>1 hour<br>0 hours | Yes<br>Yes<br>Yes<br>Yes |
| 11 p.m. | 10 p.m. | 6 p.m.<br>7 p.m.<br>8 p.m.<br>9 p.m.<br>10 p.m. | 4 hours<br>3 hours<br>2 hours<br>1 hour<br>0 hours | Yes<br>Yes<br>Yes<br>Yes<br>Yes |
| 12 a.m. | 11 p.m. | 6 p.m.<br>7 p.m.<br>8 p.m.<br>9 p.m. | 5 hours<br>4 hours<br>3 hours<br>2 hours | No<br>Yes<br>Yes<br>Yes |

[24] "In many Western countries, the average bedtime for adults tends to fall between 10:00 PM and midnight. However, this seemingly narrow window masks a wealth of variation both within and between nations. For instance, a study published in the journal Sleep Medicine found that the average bedtime in the United States is around 11:21 PM, while in Germany, it's closer to 10:57 PM." https://neurolaunch.com/when-do-most-people-go-to-sleep/ (LUPIN_XYWAV_EXPERTS_000173-000189). This is consistent with my own experience.

[25] https://neurolaunch.com/when-do-most-people-go-to-sleep/

[26] https://today.yougov.com/society/articles/51523-most-americans-watch-tv-during-dinner-41-percent-talk-to-people-they-are-with-poll

[27] Calculated as follows: "Patient Sleep Time" (from first column) minus 1 hour. So, in the first entry 9 p.m. minus 1 hour = 8 p.m.

[28] Calculated as follows: "Time to take first dose per '922 patent" (from second column) minus dinner time (from third column). So, in the first entry 8 p.m. minus 6 p.m. = 2 hours.

| | | | | |
|---|---|---|---|---|
| | | 10 p.m.<br>11 p.m. | 1 hour<br>0 hours | Yes<br>Yes |

**189.** The table above includes references to "0 hours." "0 hours" would be eating at the same time as administration which is within the scope of "within four hours after eating." *See*, *e.g.*, Claim 2 of the '373 patent ("administered with food"). As mentioned above, administering with food is taught by the '922 patent's teaching of "[t]he preferred oral formulations . . . may be incorporated directly with the food (i.e. a beverage) of the diet." The '922 patent at 20:40-55. Even if Plaintiff's expert were to point to situations where the '922 patent's instruction of administering "the first dose within an hour prior to initial sleep onset" may result in administration of the GHB composition that falls out "within four hours after eating"—e.g., the chart above including an instance of "5 hours"—they would miss the point.

**190.** As the chart shows, there is substantial overlap between the GHB administration range defined by the '922 patent's teaching of administering "the first dose within an hour prior to initial sleep onset" and the administering range defined by the claimed "within four hours after eating."

**191.** Therefore, the '922 patent's teaching of orally administering the GHB composition "within an hour prior to initial sleep onset" also teaches the Claim 1 recitation of "within four hours after eating" separately from its teaching of administration directly with food.

**192.** These same teachings would have given the POSA a reasonable expectation of success for the reasons explained with respect to Basis 1 and Basis 2 above. As explained above, the '922 patent teaches administering its reduced sodium mixed salt GHB composition with food (Basis 1), and/or orally administering the first dose within an hour prior to initial sleep onset which would have been within four hours after eating.

**g. "wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB"**

**193.** The chart below compiles the constructions in the Joint Claim Construction Document and the agreed upon construction:

| | |
|---|---|
| "wherein the pharmaceutical composition of GHB has" | |
| "reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB" | Plain & ordinary meaning: i.e., smaller difference in $C_{max}$ between fed and fasted states for a single dose of GHB salt(s) compared to *an equal dose of immediate release liquid solution of Na.GHB*. |
| *"an equal dose of immediate release liquid solution of Na.GHB"* | a single dose of GHB salt(s) equivalent to a single dose of immediate release liquid solution of Na.GHB. |

**(1) "an equal dose of immediate release liquid solution of Na.GHB"/"a single dose of GHB salt(s) equivalent to a single dose of immediate release liquid solution of Na.GHB"**

**194.** The '922 patent teaches "wherein the pharmaceutical composition of GHB." *Supra* at ¶¶81-83, 135-139, 165-167; *infra* at ¶¶232-237. The '922 patent also teaches that the proper comparator/benchmark (i.e., a known standard) of its "pharmaceutical composition of GHB" is a dose of Xyrem®. The '922 patent at 4:56-59; 30:1-33:27 (Example 7); Figures 1-6 (including accompanying description of figures at 4:56-5:43); Table 8.

**195.** As explained herein, a dose of Xyrem® is "a single dose of immediate release liquid solution of Na.GHB." *Id*. at 1:47-49 ("Sodium oxybate (Na.GHB), commercially sold as Xyrem®, is approved for the treatment of excessive daytime sleepiness and cataplexy in patients with narcolepsy."); 4:56-59 ("Xyrem® **solution** (Sodium Oxybate)"); Table 9 ("Group 2, Xyrem® solution (Sodium Oxybate)"); *see also* Reference Cited on face of the '373 patent: "Jazz Pharmaceuticals, Inc., "XYREM® (sodium oxybate) **oral solution**

Prescribing Information." XYREM® US Package Insert available at httn://www.xvrem.com/xyrem-Qi.Qdf (downloaded May 3, 2013)." Furthermore, the accompanying description explains that the single dose occurred one time at "time 0" with the mice euthanized 20 minutes later. *Id*. at 30:59-67. Therefore, use of a "a single dose of immediate release liquid solution of Na.GHB" as a comparator against the reduced sodium mixed salt GHB composition would have been obvious.

**196.** Indeed, there can be no dispute that Xyrem® is "a single dose of immediate release liquid solution of Na.GHB." Table 4 of the '373 patent explains that Xyrem® was the comparator (Xyrem® is "Formulation X") that was used. The '373 patent at 36:10-14 ("Formulation "O" was tested for bioequivalence relative to Xyrem® (Formulation "X," commercial sodium oxybate solution of the same molar concentration and comparable pH as "O") and in the fasted as well as fed state.").

**197.** In the Examiner's "Reasons for Allowance" for the '373 patent, the Examiner referred to Xyrem® as an "immediate release liquid solution of Na*GHB." *Id*. ("immediate release liquid solution of Na*GHB (as exemplified by XYREM®)"). Therefore, Xyrem® would be an "immediate release liquid solution of Na.GHB," i.e., "a single dose of immediate release liquid solution of Na.GHB" within the meaning of the claims. Therefore, use of a "a single dose of immediate release liquid solution of Na.GHB" as a comparator against the reduced sodium mixed salt GHB composition would have been obvious.

**198.** Based on the teachings of the '922 patent, it would have been obvious to do any comparison under the same conditions including for a food effect study, i.e., "a single dose of GHB salt(s) equivalent to a single dose of immediate release liquid solution of Na.GHB."

**199.** Table 8 of the '922 patent shows that the comparison between the reduced sodium mixed salt GHB compositions of the '922 patent and Xyrem® was: (1) given in equal doses, i.e., 200 mg/kg; (2) given a single dose (30:60-61 ("Animals were dosed via the appropriate route at time 0 on the appropriate day"); *see also id.* at 4:3–4 ("the formulation is administered in a **single** or multiple dosage regimen")); and (3) and provided in molar equivalent basis,[29] i.e., 40 mg/mL.

TABLE 8

Study Design

| Treatment Group | Test Compound | Dosing Route | Animals N= | Dose mg/kg | Dosing Solution Conc. mg/mL (Sodium Oxybate Molar Equivalent basis) | Dosing Volume mL/kg | Vehicle | Sampling Time Point |
|---|---|---|---|---|---|---|---|---|
| 1* | NA | PO | 10 | NA | NA | 5 | Saline | 20 minutes post marker compound dose |
| 2* | Xyrem ® solution (Sodium Oxybate) | PO | 10 | 200 | 40 | 5 | Sterile Water | 20 minutes post marker compound dose |
| 3* | Mixture G | PO | 10 | 200 | 40 | 5 | Sterile Water | 20 minutes post marker compound dose |
| 4* | Mixture A | PO | 10 | 200 | 40 | 5 | Sterile Water | 20 minutes post marker compound dose |

*20 minutes after test compound dose, 6% Ca urine (w/v) in 0.5% methyl cellulose, low viscosity in tap water was administered PO at 0.3 mL/mouse (Carai et al., Life Sciences 70 (2002) 3059-3067). Mice were sacrificed 20 minutes after this second dose.

**200.** Thus, Table 8/Example 7 and the accompany description (col. 30:1-33:27) provide for comparing "a single dose of GHB salt(s)." Furthermore, the dose of the reduced sodium mixed salt GHB compositions and Xyrem® are "equivalent" both using 40 mg/ml of sodium oxybate molar equivalent basis. *See* the '373 patent at 9:59-10:8 (explaining "For convenience in

[29] The '373 patent explains what it means by equivalent: "For convenience in comparing various salt compositions at the same oxybate or GHB molar dose, compositions expressed as percentages in this application refer to molar equivalent percentage (% molar equivalents) of each salt of oxybate or GHB." 2:14-18. Based on this description in the '373 patent, the Table 4 of the '933 patent with 40 mg/mL (sodium oxybate molar equivalent basis) of Xyrem® and mixed salt GHB compositions A and G would be equivalent.

comparing various salt compositions at the same oxybate molar dose, compositions expressed as percentages in this application refer to molar equivalent percentage (% molar equivalents) of each oxybate salt."). And as explained herein, the Xyrem® used in the comparative study in Example 7 of the '922 patent would be "a single dose of immediate release liquid solution of Na.GHB." Therefore, use of "an equal dose of immediate release liquid solution of Na.GHB"/"a single dose of GHB salt(s) equivalent to a single dose of immediate release liquid solution of Na.GHB" would have been obvious to the POSA.

**201.** Even separate from the teachings of the '922 patent, this would have been obvious to the POSA to do a comparison under like conditions including using equal/single/equivalent dose and dosing schedules. *Supra* at Section entitled "Whenever POSA Would Have Done a Comparative Food Effect Study, the POSA Would Have Used the Same Conditions, Including, *Inter Alia*, Dose Amounts and Dosing Schedule."

**202.** These same teachings would have given the POSA a reasonable expectation of success using equal dose/dosing schedule when conducting any food effect study against a comparator, e.g., Xyrem®. As explained throughout this report, this is commonplace in a food effect study.

**203.** For all these reasons, *"an equal dose of immediate release liquid solution of Na.GHB" in the '373 patent /* "a single dose of GHB salt(s) equivalent to a single dose of immediate release liquid solution of Na.GHB" would have been obvious in light of the teachings of '922 patent

**(2) "between fed and fasted states"**

**204.** The joint claim construction also requires that any such food effect study comparison be done between fed and fasted states.

**205.** As explained above, it would have been obvious to do a food effect study. *Supra* section "The POSA Would Have Been Motivated to Do a Comparative Food Effect Study With the Reduced Sodium Mixed GHB Salts of the '922 Patent Against Xyrem® (i.e., Na.GHB)."

**206.** This would be particularly true given when the application that led to the ’922 patent “was filed, it was known that there was a substantial food effect associated with the sodium GHB product Xyrem®.” April 8, 2022 Applicant Response. This knowledge would have motivated the POSA to study the food effect properties of the ’922 patent’s reduced sodium mixed salt GHB compositions against Xyrem®. In other words, given this knowledge of the food effect of Xyrem® (a sodium GHB salt), the POSA would have been motivated to determine how the reduced sodium mixed salt GHB composition of the ’922 patent (where one of the four salts in sodium GHB salt but at a much lesser amount) would compare to Xyrem®.

**207.** Thus, it would have been obvious, or obvious to try, to do the food effect study. And given a food effect study is a routine experiment for the POSA, s/he would have had a reasonable expectation of success that they could conduct a food effect study. Indeed, the design need/market need existed because of the known food effects of Xyrem®.

**208.** As explained above, a food effect study is done by gathering data between fed and fasted states. *See* FDA Guidance; *supra* at ¶¶104-107, 151-153. Therefore, the requirement of the Joint Claim Construction that any such food effect study comparison be done between fed and fasted states would have been obvious to the POSA.

**(3) “smaller difference in $C_{max}$”**

**209.** $C_{max}$ (and AUC) is typical pharmacokinetic parameter used in food effect studies, so its choice would have been obvious. *See* FDA guidance; *supra* at ¶¶106-119. As explained above, the POSA would have been motivated to conduct a food effect study using the reduced sodium mixed salt GHB compositions of the ’922 patent against Xyrem® under “equal dose” conditions within the meaning of the claim.

**210.** An ordinary food effect study would have taken the known reduced sodium mixed salt GHB composition of the ’922 patent, and (1) measured the $C_{max}$ in a fed state; (2) measured

the $C_{max}$ in a fasted state; and (3) used subtraction to calculate the difference. Since, as explained above, the POSA would have been motivated to do the food effect study comparison against "an equal dose of immediate release liquid solution of Na.GHB" within the meaning of the joint claim construction/agreed upon construction, s/he would have taken an "equal dose," i.e., of Xyrem® and (1) measured the $C_{max}$ in a fed state; (2) measured the $C_{max}$ in a fed fasted; and (3) used subtraction to calculate the difference. Therefore, the comparison of "a single dose of GHB salt(s) equivalent to a single dose of immediate release liquid solution of Na.GHB" using $C_{max}$ (or AUC) would have been obvious.

**211.** From this, the POSA would have determined that there is "a smaller difference in $C_{max}$ between fed and fasted states for a single dose of GHB salt(s)" when "compared to an equal dose of immediate release liquid solution of Na.GHB." Indeed, in light of the teachings of the '922 patent, the POSA would have reasonably expected smaller differences in $C_{max}$ between fed and fasted states for a single dose of GHB salt(s) when "compared to an equal dose of immediate release liquid solution of Na.GHB."

**212.** At the time of the priority date of the '373 patent, the POSA knew about the substantial food effect associated with Xyrem®, i.e., there is a large difference in $C_{max}$ between the fed and fasted states for immediate release liquid solution of Na.GHB, i.e., Xyrem® As the patentee explained to the Examiner "[w]hen the present application was filed, it was known that there was a substantial food effect associated with the sodium GHB product Xyrem®." April 8, 2022 Applicant Response. This knowledge would have motivated the POSA to do a food effect study with the '922 patent's reduced sodium mixed salt GHB compositions.

**213.** Yet despite the knowledge of the substantial food effect of Xyrem®, the '922 patent teaches that its reduced sodium pharmaceutical compositions of GHB "may be incorporated

directly with the food (i.e. a beverage) of the diet." *Id*. at 20:40-55. This would teach the POSA that the food effect of the reduced sodium mixed salt GHB compositions of the '922 patent in terms of $C_{max}$ between fed and fasted states when "compared to an equal dose of immediate release liquid solution of Na.GHB" is smaller. This would allow the patient to "incorporate[] directly [the reduced sodium GHB mixed salts of the '922 patent] with the food (i.e. a beverage) of the diet." *Id*. at 20:40-55.

**214.** Said another way, the POSA would have known about the food effect issues with Xyrem®, however, at no time did the inventors of the '922 patent—who clearly knew about Xyrem®—raise any food effect concerns with the '922 patent's reduced sodium mixed salt GHB compositions. To the contrary, they seem to have no concerns about food effect because they taught giving the '922 patent's reduced sodium mixed salt GHB compositions with food. In other words, the POSA would have expected a reduced food effect when comparing the fed/fasted states of the reduced sodium mixed salt GHB compositions of '922 patent against an equal dose of a NaGHB composition.

**215.** Furthermore, the teachings of the '922 patent that the reduced sodium GHB mixed salt composition had a reduced food effect compared to a composition made only from sodium GHB would not be surprising to the POSA. Rather, this expectation would have been consistent with a POSA's knowledge that the pharmacokinetics of drugs can be significantly influenced by the presence of sodium. As discussed above, the POSA knew that the administered meal and Xyrem® itself both introduced high amounts of sodium to a patent. In the context of other drugs, two prior art studies highlighted the impact of sodium content on their pharmacokinetics.

**216.** For example, Azizi *et al*., "Effect of Contrasted Sodium Diets on the Pharmacokinetics and Pharmacodynamic Effects of Renin–Angiotensin System Blockers," HYPERTENSION (2013) (LUPIN_XYWAV_EXPERTS_0000025-000031) investigated how dietary sodium affects the pharmacokinetics and pharmacodynamic responses of various renin-angiotensin system (RAS) blockers in healthy male subjects. Azizi at p. 1239. Azizi showed that a high-sodium diet (SR) led to a substantial decrease in the bioavailability of both candesartan cilexetil and atenolol. Azizi at 1243 ("We found that a high-sodium diet was associated with a ≈30% decrease in exposure to a single oral dose of 8 mg candesartan cilexetil or of 50 mg atenolol in healthy male subjects, as shown by the AUCs and $C_{max}$ values obtained, which were lower than those for SD conditions."). For candesartan cilexetil, the area under the curve (AUC0–∞) for plasma concentration was 0.74 (90% CI, 0.66–0.82) during SR compared to SD, indicating a reduction in bioavailability. Azizi at Abstract. Similarly, atenolol exhibited a 31% reduction in bioavailability with an AUC0–∞ ratio of 0.69 (90% CI, 0.54–0.88) during SR. Azizi at Abstract. These findings suggest that sodium intake can significantly alter the absorption and systemic availability of these drugs. Azizi at 1244.

**217.** Likewise, Darbar *et al.*, "Modulation by Dietary Salt of Verapamil Disposition in Humans" CIRCULATION (1998) (LUPIN_XYWAV_EXPERTS_000032-000038) demonstrates that dietary sodium significantly influences the pharmacokinetics of verapamil, a drug that undergoes extensive first-pass metabolism. Darbar at Abstract. The POSA would be aware that Xyrem® also undergoes significant first-pass metabolism. Xyrem® label at 4 ("Sodium oxybate undergoes significant presystemic (hepatic first-pass) metabolism").

**218.** Darbar showed that plasma concentrations of verapamil were significantly lower during the high-salt diet phase. Darbar at Abstract, p. 2704.




**219.** For instance, the mean area under the time-concentration curve (AUC) for S-verapamil was 7765 ± 2591 ng·min·mL$^{-1}$ on the high-salt diet compared to 12,514 ± 3527 ng·min·mL$^{-1}$ on the low-salt diet ($P < 0.05$). Darbar at Abstract. This decrease in AUC indicates that a high dietary salt intake enhances the first-pass metabolism of verapamil, leading to lower systemic availability of the drug. Darbar at 2705. Additionally, peak plasma concentrations (Cmax) were also reduced, with S-verapamil showing a $C_{max}$ of 16.5 ± 10 ng/mL on the high-salt diet versus 29.2 ± 18 ng/mL on the low-salt diet ($P < 0.05$). Darbar at Abstract. Darbar explains that high dietary salt intake enhances the first-pass metabolism of verapamil, leading to lower systemic availability of the drug. Darbar at Abstract.

**220.** Thus, the POSA knew that sodium content impacts the pharmacokinetics of certain drugs. Azizi et al. showed that a high-sodium diet decreases the bioavailability of candesartan cilexetil and atenolol, while Darbar found that high dietary salt intake reduces the plasma concentrations and efficacy of verapamil.

**221.** Therefore, a smaller difference in $C_{max}$ between fed and fasted states for a single dose of reduced sodium GHB salt(s) compared to an equal dose of immediate release liquid solution

of Na.GHB (i.e., a reduced food effect) would have been obvious and reasonably expected by the POSA.

**(4) "a smaller difference in $C_{max}$ between fed and fasted states for a single dose of GHB salt(s) compared to an equal dose of immediate release liquid solution of Na.GHB" would have been necessarily present**

**222.** As explained above, the choice of parameter to measure the reduced food effect, i.e., $C_{max}$ (or AUC) would have been obvious because these are typical measurable parameters used in food effect studies. *See* FDA Guidance; *supra* at ¶¶104-107, 151-153. The recitation of a typical parameter, i.e., $C_{max}$, to report a reduction in food effect adds nothing to the claim. Simply put, this claim is nothing more than measuring and claiming the resulting reduction in food effect (in terms of $C_{max}$) which is an inherent property of the '922 patent's reduced sodium mixed salt GHB composition relative to a benchmark (i.e., Xyrem®) when given "within four hours after eating." The limitation of a "reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB" is an inherent characteristic of the administration of the '922 patent composition and any resulting $C_{max}$ (or AUC) would have been necessarily present when doing the obvious comparative using Xyrem® under the obvious conditions; pharmacokinetic parameter, which would include $C_{max}$ (and AUC), are a natural property of the prior art composition.

**223.** As explained throughout this report, the '922 patent discloses using a reduced sodium mixed salt GHB pharmaceutical composition within the meaning of the claims. *Supra* at ¶¶81-83, 135-139, 165-167; *infra* at ¶¶232-237. And as explained above, the '922 patent discloses a head-to-head comparison of the reduced sodium mixed salt GHB composition with Xyrem®. *See*, *e.g.*, Table 8; *supra* at ¶¶194-203. The reduction in $C_{max}$ when the two formulations are compared under the conditions and meaning of Claim 1 is necessarily present.

**224.** The fact it is necessarily present is evident from reviewing the ’373 patent (including the figures and data), which does not provide any statement in its specification that, when testing, a reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate-release liquid solution of Na.GHB a reduction in $C_{max}$ did **not** occur—it provides no data or statement to the contrary.

**225.** Likewise, the file of the ’373 patent history contains a discussion between the Applicant and the Examiner about the reduction in food effect as demonstrated by a reduced $C_{max}$ during the comparison. At no point did the Applicant ever tell the Examiner that the reduction in food effect on $C_{max}$ when the comparison was made within the meaning of the claims did **not** occur. *See* April 8, 2022 Applicant Response, *supra* Section VII.(C) (discussing the ‘373 file history).

**226.** To the extent Plaintiff (or its expert) attempts to point to data from a patient cohort where there may be data at the edges of the normal distribution (hereinafter referred to as “outliers”) where the claimed food effect reduction is not observed for a particular sample set or patient, this would not save the claim. For the purposes of these claims, the pharmacokinetic parameters (including $C_{max}$ and AUC) would still be necessarily present even if Plaintiff was able to point to some outliers because “‘$C_{max}$’ refers to the **average** of the maximum plasma concentration (in oxybate mg/L or ug/mL) achieved in individual patients.” 35:19-22 (the ’373 patent defining $C_{max}$).

**227.** For example, Table 4 of the ’373 patent is reproduced below:

TABLE 4

| | Conditions and Results in Study 13-010 Using 240 mL Liquid Volume | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Vol | Cmax | Cmax | AUC | AUC | % equivalent | | | |
| Treatment | of Patients | (mL) | (mg/L) | ratio | (mg•h/L) | ratio | Na | K | Ca | Mg |
| O, fasted | 34 | 240 | 102.3 | 76% | 238.7 | 89% | 8 | 23 | 48 | 21 |
| O, fed | 36 | 240 | 77.7 | 58% | 216.0 | 81% | 8 | 23 | 48 | 21 |
| X, fasted | 32 | 240 | 134.6 | 100% | 268.1 | 100% | 100 | 0 | 0 | 0 |
| X, fed | 36 | 240 | 84.9 | 63% | 233.0 | 87% | 100 | 0 | 0 | 0 |

**228.** A selection of the data in Table 4[30] was also provided to the Examiner in Applicants April 8, 2022, Response to secure allowance of the '373 patent claims:[31]

> The following table[6] compares the food effect (as measured by the reduction in $C_{max}$) that is observed when patients are administered a claim-recited mixed salt GHB as exemplified by Formulation O (*i.e.*, a mixed salt GHB composition comprising 8% of Na•GHB; 23% of K•GHB; 48% of Ca•$(GHB)_2$; and 21% of Mg•$(GHB)_2$) or Formulation X (*i.e.*, an immediate release liquid formulation of Na•GHB) in the fed and fasted states:

| Treatment | Cmax (mg/mL) | % Cmax reduction fed vs. fasted | % equivalent | | | |
|---|---|---|---|---|---|---|
| | | | Na | K | Ca | Mg |
| Formulation O, fasted | 102.3 | 24% | 8 | 23 | 48 | 21 |
| Formulation O, fed | 77.7 | | 8 | 23 | 48 | 21 |
| Formulation X, fasted | 134.6 | 37% | 100 | 0 | 0 | 0 |
| Formulation X, fed | 84.9 | | 100 | 0 | 0 | 0 |

> These data show that the claimed method (which comprises administering a mixed salt GHB in the fed state) exhibits a substantially smaller food effect compared to the administration of a Na•GHB formulation as evidenced by the smaller reduction in $C_{max}$ in the fed vs. fasted state. Thus, the food effect for the mixed salt GHB composition is about 35% less than the food effect for the Na•GHB. This could not have been predicted by the prior art.

**229.** As Table 4 of the '373 patent shows, the population sample size was more than 30 patients. Table 4, however, only reports a single data point for the patient cohort including $C_{max}$ and

[30] In the below excerpt from the Applicant to the Examiner, the Applicant included footnote six. The text of footnote six is: "The data presented in the table are produced from Table 4 of the present application."

[31] After the April 8, 2022 Applicant Response the Examiner issued a Notice of Allowance.

AUC values and ratios for all patients within the sample. This value represents the average value of the patient cohort. 35:19-22 (the '373 patent defining $C_{max}$ as "the **average** of the maximum plasma concentration (in oxybate mg/L or ug/mL) achieved in individual patients."). Therefore, even if there were outliers within a patient cohort, what the claims of the '373 patent are covering in terms of $C_{max}$ and AUC (as evident from the intrinsic records) are the average values within a patient sample. In other words, even if outliers existed in a particular patient or patients in the data set in Table 4, those outlier values would have been included in the average value.

**230.** Furthermore, other parts of the specification confirm that the $C_{max}$ and AUC values in the claims are the average values:

- "the pharmaceutical composition, when administered to a patient, is bioequivalent to the **average** maximum GHB plasma concentration ($C_{max}$) and the **average** maximum GHB plasma area under the curve (AUC) of the $C_{max}$ of Na.GHB within 80% to 125%." The '373 patent at 2:39-43;
- "In another embodiment, the pharmaceutical compositions and/or formulations disclosed herein, when administered to a patient, have a lower **average** maximum GHB plasma concentration ($C_{max}$) than the $C_{max}$ of Na.GHB." *Id*. at 3:12-15;
- "[A] pharmaceutical composition is bioequivalent to a reference pharmaceutical composition when the pharmaceutical composition produces an **average** $C_{max}$ and/or AUC that is substantially the same as the $C_{max}$ and/or AUC of the reference pharmaceutical composition when administered under the same conditions." *Id*. at 12:18-23;

- "[A] pharmaceutical composition is bioequivalent to Xyrem® when the pharmaceutical composition produces an **average** $C_{max}$ and/[*sic* (or)] AUC is between 80% and 125% of the $C_{max}$ and/or AUC of Xyrem® when administered under the same conditions." *Id*. at 12:29-33;
- "In certain embodiments, the **average** maximum GHB plasma concentration ($C_{max}$) is within 10% of the $C_{max}$ of a pharmaceutical composition comprising about the same amount of 100% Na.GHB when administered to a patient." *Id*. at 18:4-11;
- "In certain embodiments, the pharmaceutical composition produces an **average** maximum GHB plasma concentration ($C_{max}$) that is substantially the same as the $C_{max}$ of Na.GHB." *Id*. at 17:58-62; and
- "In certain embodiments, the pharmaceutical composition produces an **average** maximum GHB plasma area under the curve (AUC) and $C_{max}$ that is substantially the same as Na.GHB." *Id*. at 17:65-18:1.

**231.** Therefore, within the meaning of the Asserted Claims, it is the average value of $C_{max}$ and AUC that matters, not whether a single value/patient exists that falls at the edge of the dataset within a given cohort. For these reasons, the reduction in $C_{max}$ (or AUC) when the two formulations are compared under the conditions and meaning of the Asserted Claims is necessarily present.

**h. "wherein the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of $Ca.(GHB)_2$; and about 20% to about 25% of $Mg.(GHB)_2$"**

**232.** This GHB pharmaceutical composition is taught in the '922 patent.

**233.** According to the Joint Claim Construction Document: "the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about

45% to about 50% of Ca.$(GHB)_2$; and about 20% to about to about 25% of Mg.$(GHB)_2$" means "the pharmaceutical composition comprises in % molar equivalents: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.$(GHB)_2$; and about 20% to about 25% of Mg.$(GHB)_2$."[32]

**234.** This limitation is taught by the '922 patent in Table 7:

| Claim recitation | Exemplary Disclosure of '922 patent |
|---|---|
| wherein the pharmaceutical composition comprises:<br><br>about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.$(GHB)_2$; and about 20% to about 25% of Mg.$(GHB)_2$ | TABLE 7<br><br>Conditions and Results<br><br>\| \| Mixture H \| Mixture I \|<br>Target Formula (% molar equiv):<br>Na—GHB \| 8.0% \| 0.0%<br>K—GHB \| 23.0% \| 33.0%<br>Ca—$(GHB)_2$ \| 48.0% \| 25.0%<br>Mg—$(GHB)_2$ \| 21.0% \| 42.0%<br><br>The '922 patent at 29:29-43. |

**235.** Specifically, Mixture H contains:

- 8 % mol. eq. of Na.GHB which falls squarely in the claimed "about 5% to about 10% of Na.GHB";
- 23 % mol. eq. of Na.GHB which falls squarely in the claimed "about 20% to about 25% of K.GHB";

[32] Furthermore, the '373 patent states in its specification, "[f]or convenience in comparing various salt compositions at the same oxybate or GHB molar dose, compositions expressed as percentages in this application refer to molar equivalent percentage (% molar equivalents) of each salt of oxybate or GHB. This is usually close to, but not the same as, a composition that would be expressed as wt/wt %." The '373 patent at 2:14-19.

- 48 % mol. eq. of Na.GHB which falls squarely in the claimed "about 45% to about 50% of Ca.$(GHB)_2$"; and
- 21 % mol. eq. of Mg.$(GHB)_2$ which falls squarely in the claimed "about 20% to about 25% of Mg.$(GHB)_2$."

**236.** As explained above, from the teachings of the '922 patent only Mixtures A and H would stand out to the POSA. *Supra* Section entitled "The POSA Would Have Been Motivated to Select Certain GHB Compositions from the '922 Patent". Therefore, this recitation of Claim 1 is taught by the '922 patent.

**237.** These same teachings of a known composition discussed and claimed in the '922 patent would have given the POSA a reasonable expectation of success.

**5. Claims 3-6 Would Have Been Obvious in Light of the '922 Patent**

**238.** The text of Claims 3-6 is reproduced below:

> 3. The method of claim 1, wherein the composition provides an AUC when administered within four hours after eating that is 80%-95% of the AUC when the composition is administered while fasting.
>
> 4. The method of claim 1, wherein the composition provides an AUC when administered within four hours after eating that is 85%-90% of the AUC when the composition is administered while fasting.
>
> 5. The method of claim 1, wherein the composition provides a $C_{max}$ when administered within four hours after eating that is 55%-80% of the $C_{max}$ when the composition is administered while fasting.
>
> 6. The method of claim 1, wherein the composition provides a $C_{max}$ when administered within four hours after eating that is 60%-75% of the $C_{max}$ when the composition is administered while fasting.

**239.** These claims all have the following structure: "The method of claim 1, wherein the composition provides [AUC/$C_{max}$] when administered within four hours after eating that is [recited percentage range] of the [AUC/$C_{max}$] when the composition is administered while fasting." As explained below, this represents nothing more than how a typical food effect

study is conducted by a POSA and recording and claiming the inherent/natural results of that food effect study.

**240.** Generally speaking, Claims 3-6 recite certain pharmacokinetic parameters where they are comparing the AUC/ $C_{max}$ when the reduced sodium mixed salt GHB composition is given to a patient "when administered within four hours after eating" and comparing it to the results of the same composition when given during a fasted state.

**241.** Running a typical fed/fasting food effect study using a known reduced sodium mixed salt GHB composition from the '922 patent would have given the POSA a reasonable expectation of success that they would run the study using "equal doses" "within four hours after eating" and measure typical food effect pharmacokinetic parameters, i.e., $C_{max}$ and AUC. From that study, they have a reasonable expectation of determining any difference between the fed and fast states using a calculator. This would be considered a routine part of a food effect study. *See* FDA Guidance describing such a study.

**242.** As explained above "when administered within four hours after eating" includes administering reduced sodium mixed salt GHB compositions at the same time as eating (starting point) and up to "within four hours after eating." This would have been obvious. *Supra* at ¶¶176-177. Using the same doses and dosing schedule would have been an obvious choice to the POSA given that Table 8 of the '922 patent uses the same dosing amounts and schedule. *Supra* at Section entitled "Whenever POSA Would Have Done a Comparative Food Effect Study, the POSA Would Have Used the Same Conditions, Including, *Inter Alia*, Dose Amounts and Dosing Schedule."

**243.** If Jazz's expert contends that the "within four hours after eating" of Claims 3-6 requires a further analysis beyond that provided above with respect to the "within four hours after eating"

of Claim 1, the further analysis is as follows: whatever time the POSA selected for Claim 1 for "within four hours after eating," s/he would have selected the same time for Claim 4's "within four hours after eating." The POSA would have used the same time frame for the reduced sodium mixed salt GHB/Xyrem® food effect study (Claim 1) and the reduced sodium mixed salt GHB fed/fast study (Claims 3-6) for a simple reason. Claim 1 requires that the reduced sodium mixed salt GHB composition be measured "within four hours after eating." The fed/fasting study of Claims 3-6 requires comparison of that same fed data, i.e., the reduced sodium mixed salt GHB composition, against the fasting studying using the reduced sodium mixed salt GHB composition. By using the same time frame as Claim 1 for the fed/fast studies of Claims 3-6, it would mean the previous data could be used and one less experiment needed to be done.

**244.** Claims 3-6 add the further requirement to Claim 1 of a relative comparison of the performance of the reduced sodium mixed salt GHB composition (in terms of AUC/$C_{max}$) while in the fed and fasted state. This is how a typical food effect study is conducted where the fed and fasted states are compared:

> **E. Administration**
>
> **Fasted Treatments:** Following an overnight fast of at least 10 hours, subjects should be administered the drug product with 240 mL (8 fluid ounces) of water. No food should be allowed for at least 4 hours post-dose. Water can be allowed as desired except for one hour before and after drug administration. Subjects should receive standardized meals scheduled at the same time in each period of the study.
>
> **Fed Treatments:** Following an overnight fast of at least 10 hours, subjects should start the recommended meal 30 minutes prior to administration of the drug product. Study subjects should eat this meal in 30 minutes or less; however, the drug product should be administered 30 minutes after start of the meal. The drug product should be administered with 240 mL (8 fluid ounces) of water. No food should be allowed for at least 4 hours post-dose. Water can be allowed as desired except for one hour before and after drug administration. Subjects should receive standardized meals scheduled at the same time in each period of the study.
>
> **F. Sample Collection**
>
> For both fasted and fed treatment periods, timed samples in biological fluid, usually plasma, should be collected from the subjects to permit characterization of the complete shape of the plasma concentration-time profile for the parent drug. It may be advisable to measure other moieties in the plasma, such as active metabolites, and sponsors should refer to the guidance on *Bioavailability and Bioequivalence Studies for Orally Administered Drug Products — General Considerations* for recommendations on these issues. Consideration should be given to the possibility that co-administration of a dosage form with food can alter the time course of plasma drug concentrations so that fasted and fed treatments can have different sample collection times.

FDA Guidance at 6; *supra* at ¶¶104-107, 151-153.

**245.** In other words, as the FDA guidance shows, a typical food effect study is done in a fed and fasted state. For the fasted state (no food), the drug composition under investigation is given with water. For the fed state, the drug composition is given 30 minutes after the meal, i.e., "within four hours after eating." FDA Guidance at 6 ("subjects should start the recommended meal 30 minutes prior to the administration of the drug product"). Furthermore, the FDA guidance would have motivated the POSA to do a comparative study under fed and fasted states to properly advise doctors and patients. FDA Guidance at 4-5.

**246.** Next, as to the choice of parameter to measure the reduced food effect, i.e., AUC/$C_{max}$, as explained above (*supra* at ¶¶106-119), this is just a typical measurable parameter to report the reduction. FDA Guidance at 6:

Food-effect BA studies may be exploratory and descriptive, or a sponsor may want to use a food-effect BA study to make a label claim.[5] The following exposure measures and pharmacokinetic parameters should be obtained from the resulting concentration-time curves for the test and reference products in food-effect BA and fed BE studies:

- Total exposure, or area under the concentration-time curve ($AUC_{0\text{-}inf}$, $AUC_{0\text{-}t}$)
- Peak exposure ($C_{max}$)
- Time to peak exposure ($T_{max}$)
- Lag-time ($t_{lag}$) for modified-release products, if present
- Terminal elimination half-life
- Other relevant pharmacokinetic parameters

**247.** Separately and independently from the teachings of the '922 patent, as explained above, the POSA would have known that the FDA recommends (if not requires) food effect studies done under fed and fasted conditions "shortly after a meal", i.e., "within four hours after eating". FDA Guidance at 1, 4. The POSA would have known that when the reduced sodium mixed salt GHB compositions of the '922 patent was compared to the Xyrem® benchmark in an FDA food effect study under fed or fasted conditions, there would be only three possibilities: a reduction in the food effect, no change in the food effect, or an increase in the food effect. It would have been obvious, or obvious to try, to do the food effect study and then, upon doing the experiment, record the result with a reasonable expectation of success. Furthermore, the known issues with high sodium-containing Xyrem® and its food effect would have motivated the POSA to do the food effect study under fed and fasted conditions and provided a design need/market need. Upon doing such a study, the POSA would have found that the food effect would have been reduced.

**248.** Finally, the recited pharmacokinetic parameters in these claims, AUC/ $C_{max}$, add nothing to these claims. Simply put, these claims are nothing more than measuring and claiming the certain pharmacokinetic parameters which are inherent properties of the '922 patent's reduced

sodium mixed salt GHB composition when given "within four hours after eating" relative to "when the composition is administered while fasting."

**249.** The pharmacokinetic parameters, which would include $C_{max}$ and AUC, are a natural property of that composition. In that food study, such pharmacokinetics of the reduced sodium mixed salt GHB pharmaceutical composition would be necessarily present because it represents nothing more than a routine measurement taken in a food effect study. *See also supra* at ¶¶226-231 (discussing $C_{max}$ and AUC in the '373 patent specification in terms of average value).

**250.** Again, this is nothing more than taking the known reduced sodium mixed salt GHB composition of the '922 patent, and (1) measuring the AUC/ $C_{max}$ in a fed state; (2) measuring the AUC/ $C_{max}$ in a fed fasted; and (3) claiming the difference in value. The AUC/ $C_{max}$ pharmacokinetic values would be necessarily present in the fed and fasted state as natural properties. *Supra* at ¶¶222-231. The difference is nothing more than a subtraction calculation. The POSA would reasonably expect they could conduct this ordinary food effect study with the known composition of the reduced sodium mixed salt GHB composition of the '922 patent in fed and fast states.

**251.** Simply put, this claim is nothing more than measuring and claiming certain pharmacokinetic properties in a fed and fasted state which would be an inherent property of the '922 patent's reduced sodium mixed salt GHB composition when given "within four hours after eating."

### 6. Claim 11 Would Have Been Obvious in Light of the '922 Patent

**252.** The text of Claim 11 is reproduced below:

> 11. The method of claim 1, wherein the pharmaceutical composition comprises 8% of Na.GHB; 23% of K.GHB; 48% of $Ca.(GHB)_2$; and 21% of $Mg.(GHB)_2$.

**253.** This GHB pharmaceutical composition is taught in the ’922 patent.

**254.** According to the Joint Claim Construction Document: “the pharmaceutical composition comprises 8% of Na.GHB; 23% of K.GHB; 48% of Ca.$(GHB)_2$; and 21% of Mg.$(GHB)_2$” means “the pharmaceutical composition comprises in % molar equivalents 8% of Na.GHB; 23% of K.GHB; 48% of Ca.$(GHB)_2$; and 21% of Mg.$(GHB)_2$.”[33]

**255.** This limitation is taught by the ’922 patent in Table 7:

<table>
<tr><th>Claim recitation</th><th>Exemplary Disclosure of ’922 patent</th></tr>
<tr><td>11. The method of claim 1, wherein the pharmaceutical composition comprises<br><br>8% of Na.GHB;<br>23% of K.GHB;<br>48% of Ca.$(GHB)_2$;<br>and 21% of Mg.$(GHB)_2$.</td><td>TABLE 7
<table>
<tr><th colspan="3">Conditions and Results</th></tr>
<tr><th></th><th>Mixture H</th><th>Mixture I</th></tr>
<tr><th colspan="3">Target Formula (% molar equiv):</th></tr>
<tr><td>Na—GHB</td><td>8.0%</td><td>0.0%</td></tr>
<tr><td>K—GHB</td><td>23.0%</td><td>33.0%</td></tr>
<tr><td>Ca—$(GHB)_2$</td><td>48.0%</td><td>25.0%</td></tr>
<tr><td>Mg—$(GHB)_2$</td><td>21.0%</td><td>42.0%</td></tr>
</table>
’922 patent at 29:29-43.</td></tr>
</table>

**256.** Mixture H of the ’922 patent and Claim 11 of the ’373 patent have identical percentages of Na.GHB, K.GHB, Ca.$(GHB)_2$ and Mg.$(GHB)_2$ in % molar equivalents.

**257.** As explained above, from the teachings of the ’922 patent only Mixtures A and H would stand out to the POSA. *Supra* Section entitled “The POSA Would Have Been Motivated to Select Certain GHB Compositions from the ’922 Patent”. Therefore, Claim 11 would have been obvious over the ’922 patent.

[33] The ’373 patent states in its specification, “[f]or convenience in comparing various salt compositions at the same oxybate or GHB molar dose, compositions expressed as percentages in this application refer to molar equivalent percentage (% molar equivalents) of each salt of oxybate or GHB. This is usually close to, but not the same as, a composition that would be expressed as wt/wt %.” The ’373 patent at 2:14-19.

**258.** These same teachings of a known composition discussed and claimed in the '922 patent would have given the POSA a reasonable expectation of success.

#### 7. Conclusion of Obviousness of Claims 3-6 and 11 of the '373 Patent in View of the '922 Patent

**259.** In summary, for the reasons explained above, Claims 3-6 and 11 would have been obvious to the POSA in light of the '922 patent.

**260.** To avoid any doubt, it is also my opinion that the Asserted Claims would have been obvious when viewed as a whole. Although I address the individual limitations in detail, my conclusions are not limited to a piecemeal approach. Rather, I have considered whether the reduced sodium mixed salt GHB compositions, reduced food effects, recited pharmacokinetic parameters, the recited disease states, measuring those recited pharmacokinetic parameters, making comparisons to an immediate release liquid solution of Na.GHB, the "within four hours after eating" time frame, the use of dosages forms and pharmaceutical excipients, dosing, food effect studies, and any other recited components present a non-obvious invention when viewed together. In my opinion, they do not. Everything was known in the art, and their combination would have represented nothing more than the application of routine strategies and measurement to achieve predictable results.

### B. Claims 3, 4, 5, 6, and 11 of the '373 Patent Would Have Been Obvious Over the '922 Patent in View of Borgen

#### 1. The Level of Skill in the Art

**261.** The level of skill has been provided above and is incorporated by reference. *Supra* at ¶¶27-30.

#### 2. Scope and Content of the Prior Art

**262.** The scope and content of the prior art has been provided above and is incorporated by reference. *Supra* at ¶¶78-119.

### 3. Differences Between the Prior Art and the Claimed Invention

#### a. The POSA Would Have Selected the Mixed GHB Salts Over Xyrem® (Na.GHB)

**263.** *See supra* at ¶¶122-128.

#### b. The POSA Would Have Been Motivated to Select Certain GHB Compositions From the '922 Patent

**264.** *See supra* at ¶¶129-139.

#### c. The POSA Would Have Been Motivated to Do a Comparative Food Effect Study With the Reduced Sodium Mixed GHB Salts of the '922 Patent Against Xyrem® (i.e., Na.GHB)

**265.** *See supra* at ¶¶140-144.

#### d. Whenever POSA Would Have Done a Comparative Food Effect Study, the POSA Would Have Used the Same Conditions, Including, *Inter Alia*, Dose Amounts/Equivalents and Dosing Schedule

**266.** *See supra* at ¶¶145-155.

### 4. The POSA Would Have Been Motivated to Combine the Teachings of the '922 Patent and Borgen

**267.** The POSA would have been motivated to combine the teachings of the '922 patent and Borgen with a reasonable expectation of success for at least the following reasons.

**268.** Both the '922 patent and Borgen focus on the pharmaceutical applications and properties of gamma-hydroxybutyrate (GHB). They also discuss the use of GHB in treating the same medical conditions, including sleep disorders such as narcolepsy and cataplexy. Given they are in the same space using the same active ingredient (GHB), a POSA would have been motivated to review both references and combine them.

**269.** While the '922 patent discusses reduced sodium mixed salt GHB compositions, one of the mixed salts in its composition is sodium. Borgen discusses sodium oxybate, one of the four

salts discussed in the ’922 patent. Thus, given the common salt in both references, the POSA would have been motivated to combine the references.

**270.** Furthermore, a POSA would recognize that the teachings of the ’922 patent about reducing sodium content in GHB formulations are connected to the teachings of Borgen. Borgen discusses the pharmacokinetics of sodium oxybate and the potential for side effects due to its sodium content. By combining these teachings, a POSA will better understand the therapeutic benefits of a GHB composition while minimizing the sodium-related side effects, thus improving patient safety and compliance.

**271.** Moreover, the pharmacokinetic data from Borgen provides insights into how GHB is absorbed, distributed, and eliminated in the body, including its food effect properties after administration of a high fat/high sodium meal. Information at this level of detail is not provided in the ’922 patent which would motivate the POSA to combine the references. However, as mentioned above, one of the four GHB mixed salts in the ’922 patent composition is the focus of Borgen. Therefore, the POSA would look to Borgen to better understand the properties of the reduced sodium mixed salt GHB compositions in the ’922 patent, including to understand the food effect properties of the sodium oxybate after administration of a high fat/high sodium meal and how that would compare to the food effect properties of the reduced sodium mixed salt GHB compositions of the ’922 patent.

**272.** The ’922 patent also discusses Xyrem® extensively (*see* Cols. 1 and 2) as well as uses Xyrem® for benchmarking studies. Given these facts, it would be reasonable for a POSA to look for references discussing the performance of Xyrem® to better understand the GHB technology, thus arriving at the teachings of Borgen.

**273.** Borgen also teaches divided doses in the context of Xyrem®. Borgen at 63 ("Sodium oxybate oral solution is the first drug approved in the United States for the treatment of cataplexy in patients with narcolepsy. The maximum recommended daily dose is 9 g, in divided portions of 4.5 g given at bedtime and 2.5 to 4 hours later."); Borgen at 59-60 ("a divided dosing schedule, with total doses of 3 to 9 g sodium oxybate given in two portions at bedtime and 2.5 to 4 hours later, is most effective in the treatment of narcolepsy."). Likewise, the '922 patent also teaches using a divided dose schedule. The common dosing instructions would have further motivated a POSA to combine the reference given it would allow the POSA to develop a fuller understanding of the pharmacokinetic profile.

**274.** In short, given the common and complementary subject matter of the '922 patent and Borgen, such teachings from both documents about GHB salt compositions for the treatment of the same disease state would provide the POSA a better understanding of the performance of GHB compositions in patients. This would motivate the POSA to combine the references.

**275.** That said, even though the POSA would have been motivated to combine the teachings of the '922 patent with Borgen, the POSA would have supplemented his/her understanding of the technology of the '922 patent with the teachings of Borgen because the '922 patent describes the reduced sodium mixed salt GHB compositions, which were improvements over the Xyrem® technology described in the Borgen reference. However, this would not deter the POSA from reviewing and combining Borgen given its relevance to the technology of the '922 patent.

#### 5. Claim 1 Would Have Been Obvious Over the '922 Patent in View of Borgen[34]

[34] I incorporate by reference by entire discussion of the '922 patent in obviousness discussion above to every asserted claim of the '373 patent.

**276.** In addition to my analysis of the individual limitations below, and as further detailed below, it is my opinion that the Asserted Claims as a whole, would have been obvious to a POSA in view of the ’922 patent in view of Borgen. The reduced sodium mixed salt GHB compositions, reduced food effects, recited pharmacokinetic parameters, the recited disease states, measuring those recited pharmacokinetic parameters, making comparisons to an immediate release liquid solution of Na.GHB, the “within four hours after eating” time frame, the use of dosages forms, pharmaceutical excipients, dosing, food effect studies, and any other recited components reflects the routine use and measurements of known elements, each serving its expected function, and all directed toward a well-known goal: measuring reduced food effects of a known reduced sodium mixed salt GHB compositions against a comparator (Xyrem®). There is no indication in the record that the specific combination, taken as a whole, yields any unexpected properties. Accordingly, the claimed subject matter would have been obvious when considered in its entirety.

**a. “A method of reducing food effect due to administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:”**

**277.** As discussed in my previous section, the ’922 patent discloses using its reduced sodium mixed GHB salt composition for the “administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy.” ’922 patent at 22:32–35; *see also id*. at Abstract, 1:14–23, 2:21–27, 4:8–17, 4:17–43. *Supra* at ¶158.

**278.** As to the preamble phrase “[a] method of reducing food effect,” I do not believe it is limiting or contains an active step. Rather, it is only reciting the resultant reduction in the food effect (as measured by the pharmacokinetic parameters recited in the claims) of the administration of the reduced sodium mixed salt GHB when compared to an equal dose of an

immediate-release liquid solution of Na.GHB. In any event, even if it were limiting, I address this portion of the preamble further below. *Infra* at Section XII(B)(5)(g) starting at p. 98.

**279.** These same teachings would have given the POSA a reasonable expectation of success since the conditions the reduced sodium mixed salt GHB compositions can be used for are discussed in the '922 patent. I discuss the reasonable expectation of success of the resultant reduction of the food effect later.

**b. "orally administering to a patient in need thereof"**

**280.** See my discussion of this same limitation above in the obviousness section regarding the '922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶161-162. These same teachings would have given the POSA a reasonable expectation of success.

**c. "a pharmaceutically effective amount of a pharmaceutical composition of GHB"**

**281.** See my discussion of this same limitation above in the obviousness section regarding the '922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶163-168. Furthermore, as explained above, the POSA would have been motivated to only select two of the reduced sodium mixed salt GHB compositions from the teachings of the '922 patent. *Supra* at Section entitled "The POSA Would Have Been Motivated to Select Certain GHB Compositions from the '922 Patent".

**282.** These same teachings would have given the POSA a reasonable expectation of success, i.e., that the reduced sodium mixed salt GHB composition when administered where "**such amount as is therapeutically effective**" would result in "a pharmaceutically effective amount of a pharmaceutical composition of GHB."

**d. "in a unit dosage comprising at least one salt of GHB"**

**283.** See my discussion of this same limitation above in the obviousness section regarding the ’922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶169-172. These same teachings would have given the POSA a reasonable expectation of success of making a unit dosage with a reduced sodium mixed salt GHB compositions.

**e. “and a pharmaceutically acceptable carrier”**

**284.** See my discussion of this same limitation above in the obviousness section regarding the ’922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶173-174. These same teachings would have given the POSA a reasonable expectation of success, i.e., use of a (generic) pharmaceutically acceptable carrier.

**f. “within four hours after eating”**

**285.** See my discussion of this same limitation above in the obviousness section regarding the ’922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶175-192. These same teachings would have given the POSA a reasonable expectation of success for the reasons explained with respect to Basis 1 and Basis 2 above. As explained above, the ’922 patent teaches administering its reduced sodium mixed salt GHB composition with food (Basis 1), and/or orally administering the first dose within an hour prior to initial sleep onset which would have been within four hours after eating (Basis 2).

**286.** In addition, Borgen’s food effect study of Xyrem® involved the following protocol: “Eligible subjects were randomized to one of two treatment sequences. In one sequence, subjects received a 4.5-g sodium oxybate oral dosage after an overnight fast; after a 7-day washout, they received the same study medication **30 minutes after a standardized high-fat meal**.”

**287.** The ’373 patent Claim 1’s recitation of “within four hours after eating” includes up to 30 minutes after eating. Claim 2 of the ’373 patent (“up to 30 minutes after eating”).

**288.** While the POSA would have been aware from Borgen of the "significant" food effects of Xyrem®, here the POSA would be motivated to use or compare the pharmacokinetic data in Borgen where the dose was administered 30 minutes after eating, i.e., "within four hours after eating." To use or compare the pharmacokinetic data in the Borgen, the POSA would have used the same time frame, i.e. 30 minutes after eating.

**289.** In other words, in doing the study, the POSA would replicate the Xyrem® food effect protocol of Borgen including using the same meal conditions/time conditions but using the '922 patent's reduced sodium mixed salt GHB composition. The data from the '922 patent's reduced sodium mixed salt GHB composition food effect study could then be compared to the Xyrem® data in Borgen, thereby saving an experiment. I discussed below, in the next section, why it would have been obvious to use Xyrem® as the comparator.

**290.** Even if the POSA elected to do new food effect studies using the '922 patent's reduced sodium mixed salt GHB composition and Xyrem®, and not elect to use the data provided directly in Borgen, they would still be motivated to maintain the 30 minutes after eating window of Borgen. While it is true that they would have fresh data on hand for Xyrem® rather than relying on the Xyrem® data in Borgen®, by maintaining the 30 minutes after eating of Borgen, the POSA could still be able to compare his/her newly generated Xyrem® data to prior Xyrem® provided in Borgen for confirmatory purposes. Using a time frame other than Borgen's 30 minutes after eating would mean the data in Borgen could not be used.

**291.** To be clear, the direct administration with food (Basis 1), the overlapping range when following the instruction to orally administering the first dose within an hour prior to initial sleep onset (Basis 2), or if the POSA wished to use (or compare) the pharmacokinetic data in Borgen that was generated 30 minutes after eating, point to the time frame encompassed by

"within four hours after eating" of the Asserted Claims. Thus, for all the above reasons, "within four hours after eating" would have been obvious.

**g. "wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB"**

**292.** The chart below provides any prior constructions in connection with this claim recitation:

| | |
|---|---|
| "wherein the pharmaceutical composition of GHB has" | |
| "reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB" | Plain & ordinary meaning: i.e., smaller difference in $C_{max}$ between fed and fasted states for a single dose of GHB salt(s) compared to an equal dose of immediate release liquid solution of Na.GHB |
| "an equal dose of immediate release liquid solution of Na.GHB" | "a single dose of GHB salt(s) equivalent to a single dose of immediate release liquid solution of Na.GHB." |

**293.** See my discussion of this same limitation above in the obviousness section regarding the '922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶193-231.

**294.** As explained above, it would have been obvious to combine the teachings of the '922 patent with Borgen.

**(1) "Pharmaceutical composition of GHB"**

**295.** The '922 patent teaches a "pharmaceutical composition of GHB," i.e., reduced sodium mixed salt GHB composition. *Supra* at ¶¶81-83, 135-139, 163-167, 232-237.

**(2) Borgen Would Have Motivated the POSA to Do a Food Effect Study with '922 Patent Mixed Salts GHB Composition**

**296.** Putting aside the fact that the FDA recommends/requires doing food effect study in a fasted and fed state, it would have been obvious to do such a study from Borgen. Borgen reported a "significant" food effect for Xyrem® (sodium oxybate) including reductions in GHB plasma concentrations in the fed state (in conjunction with a high fat/high sodium meal) as compared

to the fasted state (as indicated by reduced $C_{max}$ and AUC). *See*, *e.g.*, *id.* at 62; Table 3.[35] As Borgen explains in its Abstract: "Sodium oxybate pharmacokinetics was not significantly different between sexes. However, food significantly altered the bioavailability of oxybate by decreasing mean peak plasma concentration, increasing median time-to-peak concentration, and decreasing the area under the plasma concentration-time curve."

**297.** Even separately from Borgen, as the Patentee explained to the Examiner, "[w]hen the present application was filed, it was known that there was a substantial food effect associated with the sodium GHB product Xyrem®." April 8, 2022 Applicant Response.

**298.** The knowledge of the food effects of Xyrem® from Borgen would have motivated the POSA to study the food effect profile of the reduced sodium mixed salt GHB compositions of the '922 patent, including comparing it to Xyrem® including using the same 30 minute after eating window taught in Borgen, i.e., "within four hours after eating".

**299.** The POSA would be motivated to do so for all of the reasons described above, including because Xyrem® contains sodium oxybate, which is also common to the reduced sodium mixed salt GHB compositions of the '922 patent. Borgen at Abstract ("Sodium oxybate (Xyrem®; gamma-hydroxybutyrate) oral solution was recently approved in the United States for the treatment of cataplexy in patients with narcolepsy."). Given the presence of the common salt, the POSA would want to know how the '922 patent's reduced sodium mixed salt GHB compositions compare to the "significant" food effect of Xyrem® given, as explained below, they would have expected an improvement in the performance of food effect properties of the reduced sodium mixed salt GHB composition. This anticipated improvement would

---

[35] Borgen's results were consistent with the information on the Xyrem® label. *See*, *e.g.*, Xyrem® label, at 11-12 ("Food significantly decreases the bioavailability of sodium oxybate").

further motivate a POSA to do a food effect study for the ’922 patent’s reduced sodium mixed salt GHB composition.

**300.** For these reasons, in light of the teachings of Borgen, it would have been obvious, or obvious to try, to do the food effect study and then upon doing the experiment, record the results with a reasonable expectation of success. The POSA would have been motivated to do such a study because of the known food effects with Xyrem® as taught in Borgen. The known food effects of Xyrem® would have provided a design need/market need. Upon doing such a study, the POSA would have found that the food effect would have been reduced.

#### (3) It Would Have Been Obvious to Use Xyrem® as a Comparator From the Teachings of Borgen and the ’922 Patent

**301.** It would have been obvious for the POSA to use Xyrem® (i.e., an “immediate release liquid solution of Na.GHB”) as the comparator for the performance of the reduced sodium mixed salt GHB composition of the ’922 patent.

**302.** First, the reasons in the previous section would have made Xyrem® the obvious choice to do a comparative food effect study. *Supra* at ¶¶296-300.

**303.** Second, the ’922 patent uses Xyrem® as its comparator. *See*, *e.g.*, Table 8; *supra* at ¶¶198-200.

**304.** Third, Borgen provides food effect data on Xyrem® that could be used in any comparative study. *Supra* at ¶¶91-97, 268-275, 296.

**305.** As explained above, Xyrem® is an immediate release liquid solution of Na.GHB. *Supra* at ¶¶194-197.

#### (4) Measuring Food Effect Using $C_{max}$ (or AUC)

**306.** Borgen teaches that pharmacokinetic parameters used to measure food effect include $C_{max}$ and AUC for Xyrem®. *See*, *e.g.*, Tables 2 and 3; Figure 1; *infra* at ¶308. In fact, $C_{max}$ and AUC are discussed throughout the entire text of Borgen. *See generally* Borgen.

**307.** Therefore, from the teachings of Borgen it would have been obvious to select the use of $C_{max}$ to measure any food effect study when comparing the performance of the ’922 patent reduced sodium mixed salt GHB compositions to Xyrem®.[36]

**(5) Borgen Shows That a Food Effect Study Involves Measuring Data in Fed/Fast States**

**308.** Borgen provides food effect studies for Xyrem®. *See*, *e.g.*, Tables 2 and Figure 2:

**Table III** Effect of Food on the Pharmacokinetics of Sodium Oxybate

| Parameter | Fasted State ($n$ = 34) | | Fed State ($n$ = 34) | |
|---|---|---|---|---|
| $AUC_{0-\infty}$ (μg•h/mL) | 289 | (109) | 188* | (80.0) |
| $C_{max}$ (ng/mL) | 142 | (34.2) | 60.1* | (20.1) |
| $t_{max}{}^{a}$ (h) | 0.75 | | 2.00** | |
| $t_{1/2}$ (h) | 0.57 | (0.30) | 0.68 | (0.22) |
| CL/F (mL/min/kg) | 3.7 | (1.4) | 6.2 | (3.2) |
| $V_z$/F (mL/kg) | 192 | (193) | 384 | (324) |
| Urinary recovery (%) | 3.8 | (2.0) | 3.5 | (1.8) |
| $CL_R$ (mL/h) | 490 | (251) | 826 | (462) |

Data presented as mean ± standard deviation.
a. Median.
$*p < 0.05$. $**p = 0.001$.



*Figure 2. Mean (± SEM) plasma oxybate (GHB) concentration-time profiles in healthy adult females (n = 34) following a single oral dose of 4.5 g sodium oxybate oral solution under fasted and fed conditions.*

[36] Furthermore, the teachings of Borgen and its selection of $C_{max}$ to measure food effect is in line with the FDA guidance:

> Food-effect BA studies may be exploratory and descriptive, or a sponsor may want to use a food-effect BA study to make a label claim.[5] The following exposure measures and pharmacokinetic parameters should be obtained from the resulting concentration-time curves for the test and reference products in food-effect BA and fed BE studies:
>
> - Total exposure, or area under the concentration-time curve ($AUC_{0\text{-inf}}$, $AUC_{0\text{-t}}$)
> - Peak exposure ($C_{max}$)
> - Time to peak exposure ($T_{max}$)
> - Lag-time ($t_{lag}$) for modified-release products, if present
> - Terminal elimination half-life
> - Other relevant pharmacokinetic parameters

**309.** As Borgen shows, a food effect study involves studying fasted and fed states. Figure 1, Table 3, "Study Design and Procedures "Food Study"" at pp. 60-61; "Effect of Food on the Bioavailability of Sodium Oxybate" at pp. 62-63; Abstract. The way Borgen conducts the food effect study is nothing out of the ordinary and is consistent with the FDA guidance. *Supra* at *Supra* at ¶¶100-108, 151-153, 208.

**310.** As Borgen shows, when collecting food effect pharmacokinetic data for Xyrem®, fasted and fed data must be collected for Xyrem®. In light of the teachings of Borgen, the POSA would have measured food effect pharmacokinetic data for the '922 patent's reduced sodium mixed salt GHB compositions in fasted and fed states.

**311.** As explained above, considering the teachings of Borgen, it would have been obvious to wait 30 minutes after eating before administering the '922 patent's reduced sodium mixed salt GHB compositions. By collecting the fed and fasted pharmacokinetic data for '922 patent's reduced sodium mixed salt GHB compositions under the same conditions as Borgen, the POSA could then compare the fed and fasted pharmacokinetic data for '922 patent's reduced sodium mixed salt GHB compositions against the Xyrem® data in Borgen, thereby saving an experiment. Even if the POSA was motivated to conduct a new food effect study using the '922 patent's reduced sodium mixed salt GHB composition and Xyrem® "within four hours after eating," e.g., 30 minutes after eating, by maintaining the 30 minutes after eating in Borgen, the POSA would still be able to compare his/her Xyrem® data to Borgen for confirmatory purposes. However, in order for the POSA to perform any such comparison, s/he would have to get data under the same fed/fasted conditions as Borgen.

**(6) "Equal Dose"**

**312.** As mentioned above, to use the fed/fasted pharmacokinetic Xyrem® data in Borgen, the POSA would have been motivated to use the same conditions as Borgen but for the '922 patent's reduced sodium mixed salt GHB compositions.

**313.** Borgen provides information about the protocol used in the food effect study:

> *Food Study.* Eligible subjects were randomized to one of two treatment sequences. In one sequence, subjects received a 4.5-g sodium oxybate oral dosage after an overnight fast; after a 7-day washout, they received the same study medication 30 minutes after a standardized high-fat meal. The standard meal consisted of 2 fried eggs, 2 pieces of bacon, 4 ounces of hash brown potatoes, 2 slices of buttered toast, 8 ounces of whole milk, and 8 ounces of orange juice. This meal represents approximately 150 protein calories, 250 carbohydrate calories, and 500 fat calories. In the other sequence, subjects received the 4.5-g dose of sodium oxybate in the opposite order, first after the high-fat meal and then after an overnight fast.
>
> Each dose of sodium oxybate was administered at approximately 7 a.m. In each treatment period, 18 subjects received the study medication after an overnight fast and 18 after a high-fat meal. Blood (5 mL) was collected before dosing (0 hour); at 10, 20, 30, 45, and 60 minutes after dosing; at 30-minute intervals thereafter until 8 hours after dosing; and at 9 and 10 hours after dosing. A 25-mL urine aliquot was collected during the hour before dosing, and all urine was collected in 2-hour segments during the 10-hour period after dosing. In each treatment phase, subjects were required to enter the research facility on the evening before dosing and remain there until after the final blood and urine collection (10 h after dosing). Subjects received a light meal in the evening; thereafter, they did not receive any food (apart from the high-fat breakfast if appropriate)

> until after the 4-hour blood sample was collected or water or other fluids in the 2-hour periods before and after dosing.
>
> Safety was assessed in both studies by monitoring vital signs and occurrence of adverse events throughout the study.

Borgen at 60-61.

**314.** As a general matter, it would have been obvious to the POSA to use the same doses/conditions when benchmarking the reduced sodium mixed salt GHB combinations of the '922 patent against Xyrem® data in Borgen. *Supra* at Section entitled "Whenever POSA Would Have Done a Comparative Food Effect Study, the POSA Would Have Used the Same Conditions, Including, *Inter Alia*, Dose Amounts and Dosing Schedule."

**315.** For example, Example 7 and Table 8 of the '922 provides a comparative "Gastrointestinal Motility Study" for the '922 patent's reduced sodium mixed salt GHB composition vis-à-vis Xyrem®. In that study, the dosing conditions were held the same including administrating the composition at the same times, i.e., "time 0," in an equal dose (200 mg/kg), single dose, in an equal dose volume, using an equal vehicle, and molar equivalent basis of sodium oxybate. Table 8; *supra* at 145-150, 199-200; *see also* Section entitled "Whenever POSA Would Have Done a Comparative Food Effect Study, the POSA Would Have Used the Same Conditions, Including, *Inter Alia*, Dose Amounts and Dosing Schedule."

**316.** Turning to the teachings of Borgen, as explained above, the POSA could have for comparative purposes against the '922 patent's reduced sodium mixed salt GHB compositions: (1) elected to use the pharmacokinetic food effect data in Borgen to save gathering the same experimental data on Xyrem®; or (2) repeated the food effect study of Borgen anew for Xyrem®, and used Borgen's Xyrem® food effect data for confirmatory purposes only. Either

way, for the Borgen data to be any use when comparing it against any food effect study involving the ’922 patent’s reduced sodium mixed salt GHB composition, the dosing conditions must by the same i.e., “equal dose”.

**317.** The teachings of Borgen provide dosing conditions for its Xyrem® study, and the POSA could use equivalent conditions. For example, Borgen teaches using a “**single oral dose”** of Xyrem® in its food study. Borgen at 60 (“The dose of sodium oxybate used in both studies was 4.5 g, which was chosen because it represents the maximum dose that is given in a **single administration** to patients with narcolepsy”); Figure 2 (“Mean(± SEM) plasma oxybate (GHB) concentration-time profiles in healthy adult females (n = 34) following a **single oral dose of 4.5 g sodium oxybate oral solution** under fasted and fed conditions.”); Abstract (“single oral 4.5-g doses of sodium oxybate”); “Study Design and Procedures: Food Study” at pp. 60-61 (“Each dose of sodium oxybate was administered at approximately 7 a.m.”). In doing any comparative food effect study so that s/he could use the data of Borgen, the POSA would have been motivated from the teachings of Borgen to use a single dose of the ’922 patent’s reduced sodium mixed salt GHB composition.

**318.** The claim construction equates “equal dose” with “equivalent” amount. Borgen teaches a “single oral dose of 4.5 g sodium oxybate oral solution.” Borgen at Figure 2; Borgen at “Study Design and Procedures: Food Study” at pp. 60-61; Abstract. In doing any comparative food effect study so that s/he could use the data of Borgen, the POSA would have been motivated from the teachings of Borgen to use an equivalent amount of oxybate using the ’922 patent’s reduced sodium mixed salt GHB composition. As explained above, from the teachings of the ’922 patent only Mixtures A and H would stand out to the POSA. *Supra* at Section entitled

"The POSA Would Have Been Motivated to Select Certain GHB Compositions from the '922 Patent".

**319.** Specifically, from the dose information in Borgen the POSA could work out the moles and molar concentration of sodium oxybate for the single dose given to each patient. Borgen at 59 ("4.5 g sodium oxybate oral solution (500 mg/mL; Orphan Medical, Inc.)"); *see generally*, "Study Design and Procedures: Food Study" at pp. 60-61.

**320.** As explained above, from the teachings of the '922 patent only Mixtures A and H would stand out to the POSA. *Supra* Section entitled "The POSA Would Have Been Motivated to Select Certain GHB Compositions from the '922 Patent". The POSA could easily work out the molar equivalent such that when receiving a single dose of the '922 patent's reduced sodium mixed salt GHB composition, the patient would get the same amount of moles and molar concentration of oxybate ions used in the 4.5 g sodium oxybate oral solution of Borgen, albeit with the reduced sodium mixed salt GHB compositions. *See* the '373 patent at 9:59-10:8 (explaining "For convenience in comparing various salt compositions at the same oxybate molar dose, compositions expressed as percentages in this application refer to molar equivalent percentage (% molar equivalents) of each oxybate salt.").

**321.** Furthermore, it makes sense to provide the equivalent amount of oxybate in doing any comparative food effect study since it would make sure the patient got the same amount of active component in the single oral dose. As the '922 patent and Borgen make clear, this is GHB, aka oxybate. The '922 patent at 1:27-30; Borgen generally discussing oxybate pharmacokinetics.

**322.** Table 1 of the '922 patent provides the information needed to make the conversion.

TABLE 1

| Example calculation | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base | Base MW | Purity | Grams Amount | Base mMols | Stoich. Ratio | Base mEQ | % molar equiv GHB | Salt | Salt MW | Salt mass grams | Salt wt/wt % | Conc mg/ml |
| NaOH | 40.00 | 98.50% | 1.398 | 34.43 | 1 | 34.43 | 8.5% | Na•GHB | 126.09 | 4.34 | 8.5% | 42.61 |
| KOH | 56.11 | 86.72% | 7.337 | 113.40 | 1 | 113.40 | 28.0% | K•GHB | 142.20 | 16.12 | 31.4% | 158.29 |
| $Ca(OH)_2$ | 74.10 | 99.00% | 6.268 | 83.74 | 2 | 167.49 | 41.4% | $Ca•(GHB)_2$ | 246.27 | 20.62 | 40.2% | 202.46 |
| $Mg(OH)_2$ | 58.32 | 99.50% | 2.611 | 44.55 | 2 | 89.09 | 22.0% | $Mg•(GHB)_2$ | 230.50 | 10.27 | 20.0% | 100.80 |
| Total | | | 17.614 | 276.11 | | 404.40 | 100.0% | | | 51.36 | 100.0% | 504.17 |

| | |
|---|---|
| Base | Each of four bases used in this example |
| Base MW | Molecular weight of the base |
| Purity | Purity provided by manufacturer. It is assumed that impurities are non-reactive. |
| Gram Amount | Amount, in grams, of each base charged to the reaction |
| Base mMols | Corresponding amount, in millimoles, of pure base (that is, Purity × Gram-Amount × 1000/Base-MW) |
| Stoichiometry Ratio | The number of GHB moles reacted with each mole of base |
| Base mEQ | Base equivalents for reaction with GHB (that is, Base-mMols × Stiochiometry-Ratio). This is also the Oxybate or GHB equivalents value. |
| % molar equiv GHB | Molar composition of salts expressed as Percent of Oxybate Equivalents |
| Salt | The oxybate salt species |
| Salt MW | Molecular weight of the oxybate salt |
| Salt-mass-grams | Mass of salt produced by reaction (that is, Base-mMols × Salt-MW/1000) |
| Salt wt/wt % | Normalized weight percent |
| Conc (mg/ml) | Concentration in mg/ml equivalent to a 3.97M Na—GHB solution (500 mg/ml sodium oxybate). That is, 3.97 × (% equiv-GHB) × (Salt-MW)/(Stoich. Ratio) |

**323.** Starting with the 4.5 grams of sodium oxybate: NaGHB Dose = 4.5 g and concentration is 0.5 g/mL. This means that NaGHB Vol = 4.5 g ÷ 0.5 g/ml = 9 ml = 0.009 L. The molecular weight of NaGHB is 126.09 g/mol. Table 1 of the '922 patent. Since Molarity (M) = Dose (g) x 1/MW (mol/g) ÷ L = X moles/L), NaGHB M = 4.5 g x 1/126.09 mol/g ÷ 0.009 L = 3.97 M.

**324.** The POSA would have noted that the '922 patent (Table 1) includes the following conversion formula:

| | |
|---|---|
| Conc (mg/ml) | Concentration in mg/ml equivalent to a 3.97M Na—GHB solution (500 mg/ml sodium oxybate). That is, 3.97 × (% equiv-GHB) × (Salt-MW)/(Stoich. Ratio) |

**325.** The POSA would know this conversion formula applies because s/he got the same concentration equivalent, i.e., 3.97 M.

**326.** Applying the conversion formula of Table 1 of the '922 patent to Mixture H:

| GHB Salt | % molar eq | molar eq. | MW (Table 1) | Stoich Ratio (Table 1) | Conc mg/ml |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| NaGHB | 8 | 0.08 | 126.09 | 1 | 40.04618 |
| KGHB | 23 | 0.23 | 142.2 | 1 | 129.8428 |
| Ca(GHB)2 | 48 | 0.48 | 246.27 | 2 | 234.6461 |
| Mg(GHB)2 | 21 | 0.21 | 230.5 | 2 | 96.08393 |
| **Total** | **100** | **1** | | | **500.619** |

**(7) Reduction of Food Effect Would Have Been Reasonably Expected from the Teachings of Borgen**

**327.** After conducting the comparative food effect study using the known reduced sodium mixed salt GHB composition of the '922 patent, the POSA would have measured the $C_{max}$ (and AUC) values in a fed and fasted state. From the teachings of Borgen, they had measured the $C_{max}$ (and AUC) values in a fed and fasted state of Xyrem® (or they could repeat the Xyrem® experiment and used the equivalent conditions as Borgen in a food effect study and used Borgen for confirmation purposes). From this, the POSA would have determined that there is "a smaller difference in $C_{max}$ between fed and fasted states for a single dose of GHB salt(s)" when "compared to an equal dose of immediate release liquid solution of Na.GHB."

**328.** Furthermore, Borgen reported a "significant" food effect for Xyrem® (sodium oxybate) under fasted and fed conditions. Yet despite this knowledge of Xyrem's® significant food effect, the '922 patent teaches that its pharmaceutical composition of GHB "may be incorporated directly with the food (i.e. a beverage) of the diet." *Id*. at 20:40-55. As the '373 patent explains, "[t]he term, "eating" as used herein, refers to ingesting or consuming calories and/or nutrients by way of solid *or liquid food substances*." 11:15-17.

**329.** Said another way: the POSA would have known about the food effect issues with Xyrem® including from the teachings of Borgen. At no time, however, did the inventors of the '922 patent—who clearly knew about Xyrem® and its issues—raise any food effect concerns with the '922 patent's reduced sodium mixed salt GHB compositions. Instead, they seem to have

no concerns about the food effect because they instructed giving the '922 patent's reduced sodium mixed salt GHB compositions with food. This would lead the POSA to conclude, regardless of the measured parameter, that the food effect was ameliorated for the '922 patent's reduced sodium mixed salt GHB compositions when compared to an equal dose of an immediate-release liquid solution of Na.GHB (i.e., Xyrem®). Thus, the POSA would have known and reasonably expected that the '922 patent's reduced sodium mixed salt GHB composition would have had a reduced food effect when compared to Xyrem®, i.e., an "immediate release liquid solution of Na.GHB."[37]

**330.** Furthermore, the teachings of the '922 patent that the reduced sodium GHB mixed salt composition had a reduced food effect compared to a composition made only from sodium GHB is not surprising to the POSA. As explained above, it was known that the pharmacokinetics of drugs can be significantly influenced by the presence of high amounts of sodium. *Supra* at ¶¶215-220. As discussed above, the POSA knew that Xyrem® would have introduced high amounts of sodium in addition to the high amounts of sodium in the high fat meal that was administered in Borgen.

**331.** In the context of other drugs, two prior art studies highlighted the impact of high sodium content on their pharmacokinetics. *Supra* at ¶¶215-220. In the context of other drugs, Azizi and Darbar highlighted the impact of high sodium intake on their pharmacokinetics. *Supra* at

---

[37] Separately and independently from the teachings of the '922 patent, as explained above, the POSA would have known that that the FDA recommends (if not requires) food effect studies. FDA Guidance at 4. Even putting aside the teachings of the '922 patent, the POSA would have known when comparing the mixed salt GHB compositions of the '922 patent to the Xyrem® benchmark in an FDA food effect study, there would be only three possibilities: a reduction in the food effect, no change in the food effect, or an increase in the food effect. It would have been obvious, or obvious to try, to do the food effect study and then upon doing the experiment, record the result. The known food effects of Xyrem® would have provided a design need/market need. Upon doing such a study, the POSA would have found that the food effect would have been reduced.

¶¶215-220. The POSA knew that Xyrem® introduced additional high amounts of sodium to a patent (in addition to the sodium introduced to the patient as a result of their regular diet).

**332.** For these reasons, the POSA would have known and reasonably expected that the ’922 patent’s reduced sodium mixed salt GHB composition would have had a reduced food effect when compared to Xyrem®, i.e., an “immediate release liquid solution of Na.GHB” given the teachings of the ’922 patent of giving its reduced sodium GHB mixed salt composition with food.

**333.** Furthermore, the recitation of a typical parameter, i.e., $C_{max}$, to report a reduction in food effect adds nothing to the claim. Simply put, this claim is nothing more than measuring and claiming the resulting reduction in food effect (in terms of $C_{max}$) which is an inherent property of the ’922 patent’s reduced sodium mixed salt GHB compositions relative to a benchmark (i.e., Xyrem®) when given “within four hours after eating.”

**(8) “Reduced food effect as measured by $C_{max}$”, i.e., Smaller Difference in $C_{max}$ Would Have Been Necessarily Present**

**334.** In addition, it is important to note that the limitation of a “reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB” is an inherent characteristic of the administration of the ’922 patent compositions, which would be necessarily present when compared to Xyrem®. The pharmacokinetic parameters, which would include $C_{max}$ (and AUC), are a natural property of that composition.

**335.** In the food effect study motivated by Borgen, a reduction in $C_{max}$ of the reduced sodium mixed salt GHB pharmaceutical compositions would be necessarily present when compared to Xyrem® because it represents nothing more than a measurement of the peak concentration of a drug in the bloodstream following administration. S*upra* at ¶¶222-231 (discussing $C_{max}$ and AUC in the ’373 patent specification in terms of average value).

**h. "wherein the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.$(GHB)_2$; and about 20% to about 25% of Mg.$(GHB)_2$"**

**336.** See my discussion of this same limitation above in the obviousness section regarding the '922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶252-258.

**337.** As explained above, the POSA would have been motivated to select two of the reduced sodium mixed salt GHB compositions, Mixtures A and H, from the '922 patent. *Supra* at Section entitled "The POSA Would Have Been Motivated to Select Certain GHB Compositions from the '922 Patent". Mixture H (Table 7) has the following composition: Na.GHB: 8.0%, K.GHB: 23.0%, Ca.$(GHB)_2$: 48.0%, Mg.$(GHB)_2$: 21.0%.

**338.** As explained above, the units of Claim 1 for each of the four salts are in (% molar eq.). The % molar eq. of each of the four salts in Mixture H of the '922 patent fall squarely into the ranges of Claim 1 of the '373 patent.

**339.** As explained above, from the teachings of the '922 patent only Mixtures A and H would stand out to the POSA. *Supra* at Section entitled "The POSA Would Have Been Motivated to Select Certain GHB Compositions from the '922 Patent

**340.** These same teachings of a known composition discussed and claimed in the '922 patent would have given the POSA a reasonable expectation of success.

### 6. Claims 3-6 Would Have Been Obvious over the '922 Patent in View of Borgen

**341.** See my discussion of this same limitation above in the obviousness section regarding the '922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶238-251.

**342.** These claims all have the following structure: "The method of claim 1, wherein the composition provides [AUC/$C_{max}$] when administered within four hours after eating that is [recited percentage range] of the AUC/$C_{max}$ when the composition is administered while fasting."

**343.** Generally speaking, Claims 3-6 recite certain pharmacokinetic parameters where they are comparing the AUC/ $C_{max}$ when the reduced sodium mixed salt GHB composition is given to a patient "when administered within four hours after eating" and comparing it to the results of the same composition when given during a fasted state. In other words, Claims 3-6 add a relative comparison of the performance of the reduced sodium mixed salt GHB composition (in terms of AUC/$C_{max}$) while in the fed and fasted state.

**344.** As explained above, "when administered within four hours after eating" also includes administering reduced sodium mixed salt GHB compositions at the same time as eating (starting point) and up to "within four hours after eating." As explained above, the '922 patent teaches "within four hours after eating." *Supra* at ¶¶175-192. These claims add the further requirement to Claim 1 of a relative comparison of the performance of the reduced sodium mixed salt GHB composition (in terms of AUC/ $C_{max}$) while in the fed and fasted state over that same time frame, i.e., "within four hours after eating."

**345.** As explained above, "within four hours after eating" would have been obvious. *Supra* at ¶¶175-192. Whatever time the POSA selected for Claim 1 for "within four hours after eating," s/he would have selected the same time for Claim 4's "within four hours after eating." The fed/fasting study of Claims 3-6 requires comparison of that same data for reduced sodium mixed salt GHB composition already generated above in my analysis for Claim 1. By using

the same time frame as Claim 1 for the fed/fast studies of Claim 3-6, it would mean the previous data could be used and one less experiment needed to be done.

**346.** As to the choice of a parameter to measure the reduced food effect, i.e., AUC/$C_{max}$, as explained above, Borgen uses these same parameters to study food effect, rendering their choice obvious to a POSA including being able to use data for comparative purposes to the data already generated in Borgen.[38] *Supra* at ¶¶306-307.

**347.** Furthermore, the recited pharmacokinetic parameters in these claims, AUC/$C_{max}$, add nothing to these claims. Simply put, these claims are nothing more than measuring and claiming the certain pharmacokinetic parameters which are an inherent property of the '922 patent's reduced sodium mixed salt GHB compositions relative to a benchmark (i.e., Xyrem®), either when given "within four hours after eating" or "when the composition is administered while fasting."

**348.** The pharmacokinetic parameters, which would include $C_{max}$ and AUC, are a natural property of that composition. In that food study, such pharmacokinetic parameters of the reduced sodium mixed salt GHB pharmaceutical composition would be necessarily present because it represents nothing more than a routine measurement taken in a food effect study. *Supra* ¶¶222-231 (discussing $C_{max}$ and AUC in the '373 patent specification in terms of average value).

**a. Further Discussion for Claims 3 and 4 (AUC Claims)**

**349.** Claims 3 and 4 recite, "the composition provides an AUC when administered within four hours after eating that is 80%-95% of the AUC when the composition is administered while

[38] As mentioned above, the choice of $C_{max}$ and AUC are typical parameters used to measure food effect. *See* FDA Guidance.

fasting" and "the composition provides an AUC when administered within four hours after eating that is 85%-90% of the AUC when the composition is administered while fasting." In other words, in both claims, the reduced sodium mixed salt GHB composition has a larger AUC in the fasted state when compared to the fed state.

**350.** While the exact magnitude of the difference ("80%-95%"/"85%-90%") is just claiming the result of the AUC difference measurement in the fed and fasted states, the POSA would have reasonably expected from the teachings of Borgen that the '922 patent's reduced sodium mixed salt GHB composition would have had a larger AUC in the fasted state when compared to the fed state.

**351.** As Table 3 of Borgen indicates, the AUC in the fasted state is higher than the fed state for Xyrem®.

**Table III** Effect of Food on the Pharmacokinetics of Sodium Oxybate

| Parameter | Fasted State ($n$ = 34) | Fed State ($n$ = 34) |
|---|---|---|
| $AUC_{0-\infty}$ (µg•h/mL) | 289 (109) | 188* (80.0) |
| $C_{max}$ (ng/mL) | 142 (34.2) | 60.1* (20.1) |

**352.** The data in Borgen (Table III) shows the POSA that the $AUC_{Fed}$ is 65.1% of $AUC_{Fasted}$.[39]

**353.** In the case of the '922 patent's reduced sodium mixed salt GHB compositions from the data in Borgen, the POSA would have known and reasonably expected that the AUC in the fasted state would be higher than the fed state because of the common presence of the sodium salt in Xyrem® and the '922 patent's reduced sodium mixed salt GHB compositions. The

[39] 188/289 x 100 = 65.1%

POSA also would have known and reasonably expected the same trend to occur when measuring a reduced sodium mixed salt GHB composition of the ’922 patent, i.e., having an AUC in the fasted state that is higher than the fed state because it also contains the sodium salt.

**354.** Furthermore, because the ’922 patent teaches that a reduced food effect exists for its reduced sodium mixed salt GHB compositions because they can be given with food, the POSA would know and reasonably expect that the percentage difference between $AUC_{Fed}$ and $AUC_{Fasted}$ would be higher than the 65.1% reported in Borgen for Xyrem®.

**355.** But given both Xyrem® and the ’922 patent’s reduced sodium mixed salt GHB compositions still both contain the sodium salt, which from Borgen the POSA would know is the major source of the food effects, the POSA would know and reasonably expect the ’922 patent’s reduced sodium mixed salt GHB compositions would still exhibit some food effect meaning $AUC_{Fed}$ and $AUC_{Fasted}$ are not the same value, i.e., 100%.

**356.** Therefore, from the teachings of the ’922 patent and Borgen a POSA would know and reasonably expect where the percentage range would be, and all the patentee has done is measured and claimed the value within that range of what otherwise would have been obvious.

**b. Further Discussion for Claims 5 and 6 ($C_{max}$ Claims)**

**357.** Likewise, Claims 5 and 6 recite “the composition provides a $C_{max}$ when administered within four hours after eating that is 55%-80% of the $C_{max}$ when the composition is administered while fasting” and “the composition provides a $C_{max}$ when administered within four hours after eating that is 60%-75% of the $C_{max}$ when the composition is administered while fasting.” In other words, in both claims, the reduced sodium mixed salt GHB composition has a larger $C_{max}$ in the fasted state when compared to the fed state.

**358.** While the exact magnitude of the difference (“55%-80%”/ “60%-75%”) is just claiming the result of the $C_{max}$ difference measurement in the fed and fasted states, the POSA would

know and have reasonably expected from the teachings of Borgen that the ’922 patent’s reduced sodium mixed salt GHB composition would have had a larger $C_{max}$ in the fasted state when compared to the fed state.

**359.** As Table 3 of Borgen (reproduced above) indicates, the $C_{max}$ in the fasted state is higher than the fed state for Xyrem®. The data in Borgen (Table III) shows the POSA the $C_{max(Fed)}$ is 42.3% of $C_{max(Fasted)}$.[40]

**360.** In the case of the ’922 patent’s reduced sodium mixed salt GHB compositions from the data in Borgen, the POSA would know and have reasonably expected that the $C_{max}$ in the fasted state would be higher than the fed state because of the common presence of the sodium salt in Xyrem® and the ’922 patent’s reduced sodium mixed salt GHB compositions. The POSA also would know and reasonably expect the same trend to occur when measuring a reduced sodium mixed salt GHB composition of the ’922 patent, i.e., having a $C_{max}$ in the fasted state that is higher than the fed state because it also contains the sodium salt.

**361.** Furthermore, because the ’922 patent teaches that a reduced food effect exists for its reduced sodium mixed salt GHB compositions because they can be given with food, the POSA would know and reasonably expect that the percentage difference between the $C_{max(Fed)}$ and $C_{max(Fasted)}$ would be higher than the 42.3% reported in Borgen for Xyrem®. But given both Xyrem® and the ’922 patent’s reduced sodium mixed salt GHB compositions both contain the sodium salt, which from Borgen the POSA would know is the major source of the food effects, the POSA would reasonably expect the ’922 patent’s reduced sodium mixed salt GHB compositions would still exhibit some food effect meaning $C_{max(Fed)}$ and $C_{max(Fasted)}$ are not the same value, i.e., 100%.

[40] 60.1/142 x 100 = 42.3%

**362.** Therefore, from the teachings of the ’922 patent and Borgen a POSA would know and reasonably expect where the percentage range would be, and all the patentee has done is measured and claimed the value within that range of what otherwise would have been obvious.

**363.** In summary, Claims 3-6 are nothing more than taking the known reduced sodium mixed salt GHB composition of the ’922 patent and (1) measuring the AUC/$C_{max}$ in a fed state; (2) measuring the AUC/$C_{max}$ in a fasted state; and (3) claiming the difference in value. The AUC/$C_{max}$ pharmacokinetic values would be necessarily present in the fed and fasted state as natural properties. *Supra* at ¶¶222-231 (discussing $C_{max}$ and AUC in the ’373 patent specification in terms of average value). The difference is nothing more than a subtraction calculation. Simply put, this claim is nothing more than measuring and claiming certain pharmacokinetic properties in a fed and fasted state which would be an inherent property of the ’922 patent’s reduced sodium mixed salt GHB composition when given “within four hours after eating.”

#### 7. Claim 11 Would Have Been Obvious over the ’922 Patent in View of Borgen

**364.** See my discussion of this same limitation above in the obviousness section regarding the ’922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶252-258. I note that the recited composition with the individual percentages of the four salts was a known composition since it was disclosed in the ’922 patent.

**365.** As explained above, the POSA would have been motivated to select two of the reduced sodium mixed salt GHB compositions, Mixtures A and H, from the ’922 patent. *Supra* at Section entitled “The POSA Would Have Been Motivated to Select Certain GHB Compositions from the ’922 Patent”. Mixture H (Table 7) has the following composition (% molar eq.): Na.GHB: 8.0%, K.GHB: 23.0%, Ca.$(GHB)_2$: 48.0%, Mg.$(GHB)_2$: 21.0%.

**366.** As explained above, the units of Claim 11 for each of the four salts are in % molar eq. which are identical to the % molar eq. of each of the four salts in Mixture H of the '922 patent. *Supra* at ¶¶233-237; the '922 patent at Table 7 ("% molar equiv.").

**367.** These same teachings of a known composition discussed and claimed in the '922 patent would have given the POSA a reasonable expectation of success.

### 8. Conclusion of Obviousness of Claims 3-6 and 11 of the '373 Patent in View of the '922 Patent and Borgen

**368.** In summary, for the reasons explained above, Claims 3-6 and 11 would have been obvious to the POSA in light of the '922 patent and Borgen.

**369.** To avoid any doubt, it is also my opinion that the Asserted Claims would have been obvious when viewed as a whole. Although I address the individual limitations in detail, my conclusions are not limited to a piecemeal approach. Rather, I have considered whether the reduced sodium mixed salt GHB compositions, reduced food effects, recited pharmacokinetic parameters, the recited disease states, measuring those recited pharmacokinetic parameters, making comparisons to an immediate release liquid solution of Na.GHB, the "within four hours after eating" time frame, the use of dosages forms and pharmaceutical excipients, dosing and food effect studies, and any other recited components present a non-obvious invention when viewed together. In my opinion, they do not. Everything was known in the art, and their combination would have represented nothing more than the application of routine strategies and measurement to achieve predictable results.

## C. Claims 3, 4, 5, 6, and 11 of the '373 Patent Would Have Been Obvious over the '922 Patent in View of the Xyrem® label

### 1. The Level of Skill in the Art

**370.** The level of skill has been provided above and is incorporated by reference. *Supra* at ¶¶27-30.

### 2. Scope and Content of the Prior Art

**371.** The scope and content of the prior art has been provided above and is incorporated by reference. *Supra* at ¶¶78-119.

### 3. Differences Between the Prior Art and the Claimed Invention

#### a. The POSA Would Have Selected the Mixed GHB Salts over Xyrem® (Na.GHB)

**372.** *See supra* at ¶¶122-128.

#### b. The POSA Would Have Been Motivated to Select Certain GHB Compositions from the '922 Patent

**373.** *See supra* at ¶¶129-139.

#### c. The POSA Would Have Been Motivated to Do a Comparative Food Effect Study With the Reduced Sodium Mixed GHB Salts of the '922 Patent Against Xyrem® (i.e., Na.GHB)

**374.** *See supra* at ¶¶140-144.

#### d. Whenever POSA Would Have Done a Comparative Food Effect Study, the POSA Would Have Used the Same Conditions, Including, *Inter Alia*, Dose Amounts/Equivalents and Dosing Schedule

**375.** *See supra* at ¶¶145-155.

### 4. The POSA Would Have Been Motivated to Combine the Teachings of the '922 Patent and the Xyrem® label

**376.** The POSA would have been motivated to combine the teachings of the '922 patent and the Xyrem® label with a reasonable expectation of success for at least the following reasons.

**377.** Both the '922 patent and the Xyrem® label focus on the pharmaceutical applications and properties of gamma-hydroxybutyrate (GHB). They also discuss the use of GHB in treating the same medical conditions, including sleep disorders such as narcolepsy and cataplexy. Given they are in the same space using the same active ingredient (GHB), a POSA would have been motivated to review both references and combine them. Furthermore, the Xyrem® label

provides administration, dosage, pharmacokinetic parameters and other data on Xyrem®, which given the common active ingredient (GHB), would have motivated the POSA to combine the references. In other words, while the ’922 patent discusses reduced sodium mixed salt GHB compositions, one of the mixed salts in its composition is sodium. The Xyrem® label discusses sodium oxybate, one of the four salts discussed in the ’922 patent. Thus, given the common salt in both references, the POSA would have been motivated to combine the references.

**378.** Furthermore, the ’922 patent discusses Xyrem® extensively (*see* Cols 1 and 2), as well as uses Xyrem® for benchmarking studies. Given these facts, it would be reasonable for a POSA to review the Xyrem® label and combine its teachings with the ’922 patent.

**379.** The Xyrem® label also teaches divided doses in the context of Xyrem®. Likewise, the ’922 patent, as explained above, also teaches using a divided dose schedule. The common dosing instructions would have further motivated a POSA to combine the reference given it would allow the POSA to develop a fuller understanding of the pharmacokinetic profile.

**380.** In short, given the common subject matter of the ’922 patent and the Xyrem® label, the complementary teachings from both documents about GHB salt combinations for the treatment of the same disease would provide the POSA a better understanding of the performance of GHB compositions in patients.

**381.** That said, even though the POSA would have been motivated to combine the teachings of the ’922 patent with the Xyrem® label, the POSA would have supplemented his/her understanding of the technology of the ’922 patent with the teachings of the Xyrem® label because the ’922 patent describes the reduced sodium mixed salt GHB compositions, which were improvements over the Xyrem® technology. However, this would not deter the POSA

from reviewing and combining the Xyrem® label given its relevance to the technology of the '922 patent.

### 5. Claim 1 Would Have Been Obvious over the '922 Patent in View of the Xyrem® Label[41]

**382.** In addition to my analysis of the individual limitations below, and as further detailed below, it is my opinion that the Asserted Claims as a whole, would have been obvious to a POSA in view of the '922 patent in view of the Xyrem® label. The reduced sodium mixed salt GHB compositions, reduced food effects, recited pharmacokinetic parameters, the recited disease states, measuring those recited pharmacokinetic parameters, making comparisons to an immediate release liquid solution of Na.GHB, the "within four hours after eating" time frame, the use of dosages forms, pharmaceutical excipients, dosing, food effect studies, and any other recited components reflects the routine use and measurements of known elements, each serving its expected function, and all directed toward a well-known goal: measuring reduced food effects of a known reduced sodium mixed salt GHB compositions against a comparator (Xyrem®). There is no indication in the record that the specific combination, taken as a whole, yields any unexpected properties. Accordingly, the claimed subject matter would have been obvious when considered in its entirety.

#### a. "A method of reducing food effect due to administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:"

**383.** See my discussion of this same limitation above in the obviousness section regarding the '922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶158.

---

[41] I incorporate by reference by entire discussion of the '922 patent in the obviousness discussion above to every asserted claim of the '373 patent.

**384.** Briefly, as discussed in my previous section, the ’922 patent discloses using its GHB composition for the “administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy.” ’922 patent at 22:32–35; *see also id*. at Abstract, 1:14–23, 2:21–27, 4:8–17, 4:17–43 *Supra* at ¶158.

**385.** As to the preamble phrase “[a] method of reducing food effect,” I do not believe it is limiting or contains an active step. Rather, it is only reciting the resultant reduction of the food effect (as measured by the pharmacokinetic parameters recited in the claims) of the administration of GHB when compared to an equal dose of an immediate-release liquid solution of Na.GHB. In any event, even if it were limiting, I address this portion of the preamble further below. *Infra* at Section XII(C)(5)(g) starting at p. 125.

**386.** These same teachings would have given the POSA a reasonable expectation of success since the conditions the reduced sodium mixed salt GHB compositions can be used for are discussed in the ’922 patent. I discuss the reasonable expectation of success of the resultant reduction of the food effect later.

**b. “orally administering to a patient in need thereof”**

**387.** See my discussion of this same limitation above in the obviousness section regarding the ’922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶161-162. These same teachings would have given the POSA a reasonable expectation of success.

**c. “a pharmaceutically effective amount of a pharmaceutical composition of GHB”**

**388.** See my discussion of this same limitation above in the obviousness section regarding the ’922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶163-168. Furthermore, as explained above, the POSA would have been motivated to select two of the reduced sodium mixed salt GHB compositions from the teachings of the ’922 patent. *Supra*

at Section entitled "The POSA Would Have Been Motivated to Select Certain GHB Compositions from the '922 Patent".

**389.** These same teachings would have given the POSA a reasonable expectation of success, i.e., that the reduced sodium mixed salt GHB composition when administered where "**such amount as is therapeutically effective**" would result in "a pharmaceutically effective amount of a pharmaceutical composition of GHB."

**d. "in a unit dosage comprising at least one salt of GHB"**

**390.** See my discussion of this same limitation above in the obviousness section regarding the '922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶169-172. These same teachings would have given the POSA a reasonable expectation of success.

**e. "and a pharmaceutically acceptable carrier"**

**391.** See my discussion of this same limitation above in the obviousness section regarding the '922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶173-174. These same teachings would have given the POSA a reasonable expectation of success, i.e., use of a (generic) pharmaceutically acceptable carrier.

**f. "within four hours after eating"**

**392.** See my discussion of this same limitation above in the obviousness section regarding the '922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶175-192. These same teachings would have given the POSA a reasonable expectation of success for the reasons explained with respect to Basis 1 and Basis 2 above. As explained above, the '922 patent teaches administering its reduced sodium mixed salt GHB composition with food (Basis 1), and/or orally administering the first dose within an hour prior to initial sleep onset which would have been within four hours after eating (Basis 2).

**393.** Furthermore, if the POSA wanted to use or compare the pharmacokinetic data in the Xyrem® label, then the Xyrem® label would also motivate the POSA and render obvious the "within four hours after eating" recitation. As the Xyrem® label teaches with respect to the pharmacokinetic data it provides: "[a]dministration of sodium oxybate **immediately after a high fat meal** resulted in delayed absorption (average $T_{max}$ increased from 0.75 hr to 2.0 hr) and a reduction in peak plasma level ($C_{max}$) by a mean of 58% and of systemic exposure (AUC) by 37%." Xyrem® label at 2. "[W]ithin four hours after eating" includes immediately after eating. Claim 2 of the '373 patent ("immediately after eating").

**394.** While the POSA would understand the Xyrem® label at 23 teaches "[b]ecause food significantly reduces the bioavailability of sodium oxybate, the patient should allow at least 2 hours after eating before taking the first dose of sodium oxybate," here the POSA would be motivated to use or compare the pharmacokinetic data in the Xyrem® label where the dose was administered "immediately after a high fat meal." To use or compare the pharmacokinetic data in the Xyrem® label, the POSA would have used the same time frame, i.e. immediately after eating. The data from the '922 patent's reduced sodium mixed salt GHB composition food effect study could then be compared to the $C_{max}$ and AUC Xyrem® data in the Xyrem® label. I discussed throughout this report and in the next section, why it would have been obvious to use Xyrem® as the comparator.

**395.** Even if the POSA elected to do a new food effect study using the '922 patent's reduced sodium mixed salt GHB composition and Xyrem®, and not elect to directly use the data provided directly in the Xyrem® data in the Xyrem® label, but by maintaining 'the immediately after eating' conditions of the Xyrem® label the POSA could still be able to compare his/her data to the Xyrem® label data for confirmatory purposes. Using a time frame

other than 'immediately after eating' would mean the $C_{max}$ and AUC data in Xyrem® could not be used.

**396.** To be clear, under direct administration with food (Basis 1), the overlapping range when following the instruction to orally administer the first dose within an hour prior to initial sleep onset (Basis 2), or if the POSA wished to use (or compare) the Xyrem® label data providing $C_{max}$ and AUC data immediate after eating, point to the time frame encompassed by "within four hours after eating." Thus, for all the above reasons, "within four hours after eating" would have been obvious.

**g. "wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB"**

**397.** The chart below provides any prior constructions in connection with this claim recitation:

| | |
|---|---|
| "wherein the pharmaceutical composition of GHB has" | |
| "reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB" | Plain & ordinary meaning: i.e., smaller difference in $C_{max}$ between fed and fasted states for a single dose of GHB salt(s) compared to an equal dose of immediate release liquid solution of Na.GHB |
| "an equal dose of immediate release liquid solution of Na.GHB" | "a single dose of GHB salt(s) equivalent to a single dose of immediate release liquid solution of Na.GHB." |

**398.** See my discussion of this same limitation above in the obviousness section regarding the '922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶193-231.

**399.** As explained above, it would have been obvious to combine the teachings of the '922 patent with the Xyrem® label.

**(1) "Pharmaceutical composition of GHB"**

**400.** The ’922 patent teaches a “pharmaceutical composition of GHB,” i.e., a reduced sodium mixed salt GHB composition. *Supra* at ¶¶81-83, 135-139, 163-167, 232-237.

**(2) The Xyrem® label Would Have Motivated the POSA To Do a Food Effect Study with ’922 Patent Mixed Salts GHB Composition**

**401.** Putting aside the fact that the FDA recommends/requires doing a food effect study in a fasted and fed state, it would have been obvious to do such a study from the teachings of the Xyrem® label.

**402.** The Xyrem® label teaches “[f]ood significantly decreases the bioavailability of sodium oxybate (see Pharmacokinetics).” Xyrem® label at 11; *see also* Xyrem® label at 23 (“[b]ecause food significantly reduces the bioavailability of sodium oxybate, the patient should allow at least 2 hours after eating before taking the first dose of sodium oxybate.”); *supra* at ¶¶87-89 (providing other warnings about the significant food effect of Xyrem®). The Xyrem® label also explains that “[w]hether sodium oxybate is taken in the fed or fasted state may affect both the efficacy and safety of sodium oxybate for a given patient.” Xyrem® label at 11; *id.* at 22 (“Patient presentation following overdose is influenced by the dose ingested, the time since ingestion, the co-ingestion of other drugs and alcohol, and the fed or fasted state.”).

**403.** Given the Xyrem® label is saying that fed versus fasted conditions are “influenced by. . . the fed or fasted state” and that the “efficacy and **safety** of sodium oxybate” may be impacted “whether sodium oxybate is taken in the fed or fasted state,” this would motivate the POSA to conduct fed and fasted studies for the ’922 patent’s reduced sodium mixed salt GHB compositions.

**404.** Even separately from the Xyrem® label, as the Patentee explained to the Examiner, “[w]hen the present application was filed, it was known that there was a substantial food effect associated with the sodium GHB product Xyrem®.” April 8, 2022 Applicant Response.

**405.** The knowledge of the food effects of Xyrem® would have motivated the POSA to study the food effect profile of the reduced sodium mixed salt GHB compositions of the '922 patent, including comparing it to Xyrem®. The POSA would be motivated to do so because Xyrem® contains sodium oxybate, which is common to the reduced sodium mixed salt GHB compositions of the '922 patent. Given the presence of the common salt, the POSA would want to know how the '922 patent's reduced sodium mixed salt GHB compositions compare to the "significant" food effect of Xyrem®. And, as explained below, they would have expected an improvement in the performance of food effect properties of the reduced sodium mixed salt GHB composition. This anticipated improvement would further motivate a POSA to do a food effect study for the '922 patent's reduced sodium mixed salt GHB composition.

**406.** For these reasons, in light of the teachings of the Xyrem® label, it would have been obvious, or obvious to try, to do the food effect study and then upon doing the experiment, record the results with a reasonable expectation of success. The POSA would have been motivated to do such a study because of the known food effects with Xyrem®. The known food effects of Xyrem® would have provided a design need/market need. Upon doing such a study, the POSA would have found that the food effect would have been reduced.

**(3) It Would Have Been Obvious to Use Xyrem® as a Comparator From the Teachings of the Xyrem® label and the '922 Patent**

**407.** It would have been obvious for the POSA to use Xyrem® (i.e., an "immediate release liquid solution of Na.GHB") as the comparator for the performance of the reduced sodium mixed salt GHB composition of the '922 patent.

**408.** First, the reasons in the previous section would have made Xyrem® the obvious choice to do a comparative food effect study. *Supra* at ¶¶401-406.

**409.** Second, the ’922 patent uses Xyrem® as its comparator. *See*, *e.g.*, Table 8; *supra* at at ¶¶198-200.

**410.** Third, Xyrem® provides food effect data that could be used in any comparator study. Xyrem® label at 2 (“Administration of sodium oxybate immediately after a high fat meal resulted in delayed absorption (average $T_{max}$ increased from 0.75 hr to 2.0 hr) and a reduction in peak plasma level ($C_{max}$) by a mean of 58% and of systemic exposure (AUC) by 37%.”).

**411.** As explained above, Xyrem® is an immediate release liquid solution of Na.GHB. *Supra* at ¶¶194-197.

**(4) Measuring Food Effect Using $C_{max}$ (or AUC)**

**412.** The Xyrem® label teaches pharmacokinetic parameters that are used to measure food effect which include $C_{max}$ and AUC for Xyrem®. Xyrem® label at 2 (“Administration of sodium oxybate immediately after a high fat meal resulted in delayed absorption (average $T_{max}$ increased from 0.75 hr to 2.0 hr) and a reduction in peak plasma level ($C_{max}$) by a mean of 58% and of systemic exposure (AUC) by 37%.”).

**413.** Therefore, from the teachings of the Xyrem® label, it would have been obvious to select the use of $C_{max}$ (and AUC) to measure any food effect study when comparing the performance of the ’922 patent reduced sodium mixed salt GHB compositions to Xyrem®.[42]

[42] Furthermore, the teachings of the Xyrem® and its selection of $C_{max}$ to measure food effect is in line with the FDA Guidance:

> Food-effect BA studies may be exploratory and descriptive, or a sponsor may want to use a food-effect BA study to make a label claim.[5] The following exposure measures and pharmacokinetic parameters should be obtained from the resulting concentration-time curves for the test and reference products in food-effect BA and fed BE studies:
>
> - Total exposure, or area under the concentration-time curve ($AUC_{0\text{-}inf}$, $AUC_{0\text{-}t}$)
> - Peak exposure ($C_{max}$)
> - Time to peak exposure ($T_{max}$)
> - Lag-time ($t_{lag}$) for modified-release products, if present
> - Terminal elimination half-life
> - Other relevant pharmacokinetic parameters

**(5) The Xyrem® label Teaches that a Food Effect Study Involves Measuring Data in Fed/Fast States**

**414.** The Xyrem® label teaches that "[f]ood significantly decreases the bioavailability of sodium oxybate (see Pharmacokinetics). **Whether sodium oxybate is taken in the fed or fasted state may affect both the efficacy and safety of sodium oxybate for a given patient**. Patients should be made aware of this and try to take the first dose several hours after a meal." Xyrem® label at 11-12. The Xyrem® label also teaches that "[a]dministration of sodium oxybate immediately after a high fat meal resulted in delayed absorption (average $T_{max}$ increased from 0.75 hr to 2.0 hr) and a reduction in peak plasma level ($C_{max}$) by a mean of 58% and of systemic exposure (AUC) by 37%.". Xyrem® label at 2. Furthermore, "Sodium oxybate is rapidly but incompletely absorbed after oral administration; absorption is delayed and decreased by a high fat meal." Xyrem® label at 2.

**415.** Given the Xyrem® label is saying that fed versus fasted conditions are "influenced by. . . the fed or fasted state" and that "efficacy and **safety** of sodium oxybate" may be impacted "whether sodium oxybate is taken in the fed or fasted state," this would motivate the POSA to conduct fed and fasted studies for the '922 patent's reduced sodium mixed salt GHB compositions.

**416.** Furthermore, it would just have been obvious, or obvious to try, to do the food effect study and then upon doing the experiment, record the results with a reasonable expectation of success. The POSA would have been motivated to do such a study because of the known food effects of Xyrem® (as taught in the Xyrem® label). The known food effects of Xyrem® would have provided a design need/market need. Upon doing such a study, the POSA would have expected that the food effect would have been reduced.

**417.** As explained above, in light of the teaching of the Xyrem® label, it would have been obvious to wait immediately after eating before administering the ’922 patent’s reduced sodium mixed salt GHB compositions. By collecting the fed and fasted pharmacokinetic data for ’922 patent’s reduced sodium mixed salt GHB compositions under the same conditions as the Xyrem® label, the POSA could then compare the fed and fasted pharmacokinetic data for ’922 patent’s reduced sodium mixed salt GHB compositions against the Xyrem® data in the Xyrem® label, thereby saving an experiment. Xyrem® label at 2 (“Administration of sodium oxybate immediately after a high fat meal resulted in delayed absorption (average $T_{max}$ increased from 0.75 hr to 2.0 hr) and a reduction in peak plasma level ($C_{max}$) by a mean of 58% and of systemic exposure (AUC) by 37%.”).

**418.** Even if the POSA was motivated to conduct a new food effect study using the ’922 patent’s reduced sodium mixed salt GHB composition and Xyrem® “within four hours after eating” e.g., immediately after eating, and not directly use the data contained in the Xyrem® label, by maintaining the same condition, the POSA could still be able to compare his/her Xyrem® data to the data provided in the Xyrem® label for confirmatory purposes.

**419.** However, in order for the POSA to perform any such comparison, s/he would have to get data under the same fed/fasted conditions as the Xyrem® label.

**(6) “Equal Dose”**

**420.** As a general matter, it would have been obvious to the POSA to use the same doses/conditions when benchmarking the reduced sodium mixed salt GHB combinations of the ’922 patent against Xyrem®. *Supra* at Section entitled “Whenever POSA Would Have Done a Comparative Food Effect Study, the POSA Would Have Used the Same Conditions, Including, *Inter Alia*, Dose Amounts and Dosing Schedule.”

**421.** For example, Example 7 and Table 8 of the ’922 patent provides a comparative “Gastrointestinal Motility Study” for the ’922 patent’s reduced sodium mixed salt GHB composition vis-à-vis Xyrem®. In that study, the dosing conditions were held the same including administering the composition at the same times i.e., “time 0,” in an equal dose (200 mg/kg), single dose, in an equal dose volume, using an equal vehicle, and molar equivalent basis of sodium oxybate. Table 8; *supra* at 145-150, 199-200; *see also* Section entitled “Whenever POSA Would Have Done a Comparative Food Effect Study, the POSA Would Have Used the Same Conditions, Including, *Inter Alia*, Dose Amounts and Dosing Schedule.”

**422.** Turning to the teachings of the Xyrem® label, as explained above, the POSA could have for comparative purposes against the ’922 patent’s reduced sodium mixed salt GHB compositions: (1) elected to use the pharmacokinetic food effect data in the Xyrem® label to save gathering the same experimental data provided therein; or (2) repeated the food effect study for Xyrem® anew, and used Xyrem® label’s food effect data for confirmatory purposes only.

**423.** Either way, for the Xyrem® label data to be any use when comparing it against any food effect study involving the ’922 patent’s reduced sodium mixed salt GHB composition, the dosing conditions must be the same.

**424.** The Xyrem® label provides the following information:

> Sodium oxybate is absorbed rapidly following oral administration with an absolute bioavailability of about 25%. The average peak plasma concentrations (1st and 2nd peak) following administration of a 9 g daily dose divided into two equivalent doses given four hours apart were 78 and 142 micrograms/milliliter (mcg/mL), respectively. The average time to peak plasma concentration ($T_{max}$) ranged from 0.5 to 1.25 hours in eight pharmacokinetic studies. Following oral administration, the plasma levels of sodium oxybate increase more than proportionally with increasing dose. Single doses greater than 4.5 g have not been studied. Administration of

> sodium oxybate immediately after a high fat meal resulted in delayed absorption (average $T_{max}$ increased from 0.75 hr to 2.0 hr) and a reduction in peak plasma level ($C_{max}$) by a mean of 58% and of systemic exposure (AUC) by 37%.

Xyrem® label at 2.

**425.** The Time to maximum concentration ($T_{max}$) is the time when $C_{max}$ is observed. Therefore, the Xyrem® label would teach the POSA that $C_{max}$ occurred between 0.75 and 2 hours. As the label explains, the 9 g daily dose is divided into two equivalent doses given four hours apart. Therefore, $C_{max}$ occurred when the first 4.5 g dose of Xyrem® was given following administration. Therefore, the POSA would have been motivated to give a single oral dose of 4.5 g dose of Xyrem® in any food effect study.

**426.** The claim construction equates "equal dose" with "equivalent" amount. In doing any comparative food effect study so that s/he could use the data of the Xyrem® label, the POSA would have been motivated to use an equivalent amount of oxybate using the '922 patent's reduced sodium mixed salt GHB composition. As explained above, from the teachings of the '922 patent only Mixtures A and H would stand out to the POSA. *Supra* Section entitled "The POSA Would Have Been Motivated to Select Certain GHB Compositions from the '922 Patent."

**427.** The POSA could easily work out the molar equivalent such that when receiving a single dose of the '922 patent's reduced sodium mixed salt GHB composition, the patient would get the same amount of moles and molar concentration of oxybate ions as the 4.5 g used in the Xyrem® label, albeit with the reduced sodium mixed salt GHB compositions. *See* the '373 patent at 9:59-10:8 (explaining "For convenience in comparing various salt compositions at the same oxybate molar dose, compositions expressed as percentages in this application refer to molar equivalent percentage (% molar equivalents) of each oxybate salt.").

**428.** Furthermore, it makes sense to provide the equivalent amount of oxybate in doing any comparative food effect study, since such a study would focus on making sure the patients got the same active component. As the '922 patent makes clear, this is GHB aka oxybate. The '922 patent at 1:27-30.

**429.** Table 1 of the '922 patent provides the stoichiometric ratio and the molecular weight which are all that is needed for the POSA. But I would note that the POSA could work this information out easily enough for themselves.

**430.** The calculation for a 4.5 g dose is provided above. *Supra* at ¶¶322-326.

**(7) Reduction of Food Effect Would Have Been Reasonably Expected**

**431.** After conducting the comparative food effect study using the known reduced sodium mixed salt GHB composition of the '922 patent, the POSA would have measured the $C_{max}$ (and AUC) values in a fed and fasted state. From the teachings of the Xyrem® label, they had measured the $C_{max}$ (and AUC) values in a fed and fasted state of Xyrem® (or they could repeat the Xyrem® experiment and use the equivalent conditions in a food effect study and used the $C_{max}$ (and AUC) values for confirmation purposes only).

**432.** From this, the POSA would have determined that there is "a smaller difference in $C_{max}$ between fed and fasted states for a single dose of GHB salt(s)" when "compared to an equal dose of immediate release liquid solution of Na.GHB."

**433.** As explained above the Xyrem® label teaches "[f]ood significantly decreases the bioavailability of sodium oxybate (see Pharmacokinetics)." Xyrem® label at 11; *see also* Xyrem® label at 23 ("[b]ecause food significantly reduces the bioavailability of sodium oxybate, the patient should allow at least 2 hours after eating before taking the first dose of sodium oxybate."). Yet despite this knowledge of Xyrem®'s significant food effect, the '922

patent teaches that its pharmaceutical composition of GHB "may be incorporated directly with the food (i.e. a beverage) of the diet." *Id*. at 20:40-55. As the '373 patent explains "[t]he term, "eating" as used herein, refers to ingesting or consuming calories and/or nutrients by way of solid *or liquid food substances*." *Id*. at 11:15-17.

**434.** Said another way: the POSA would have known about the food effect issues with Xyrem® including from the teachings of the Xyrem® label. At no time, however, did the inventors of the '922 patent—who clearly knew about Xyrem® and its issues—raise any food effect concerns with the '922 patent's reduced sodium mixed salt GHB compositions. Instead, they seem to have no concerns about the food effect because they instructed giving the '922 patent's reduced sodium mixed salt GHB compositions with food. This would lead the POSA to conclude, regardless of the measured parameter, that the food effect was reduced for the '922 patent's reduced sodium mixed salt GHB compositions when compared to an equal dose of an immediate-release liquid solution of Na.GHB (i.e., Xyrem®). Thus, the POSA would have known and reasonably expected that the '922 patent's reduced sodium mixed salt GHB composition would have had a reduced food effect when compared to Xyrem®, i.e., an "immediate release liquid solution of Na.GHB."[43]

**435.** As explained above, the teachings of the '922 patent that the reduced sodium mixed salt GHB composition had a reduced food effect compared to a composition made only from sodium GHB would not be surprising to the POSA. In the context of other drugs, Azizi and

[43] Separately and independently from the teachings of the '922 patent, as explained above, the POSA would have known that the FDA recommends (if not requires) food effect studies. FDA Guidance at 4. Even putting aside the teachings of the '922 patent, the POSA would have known when comparing the mixed salt GHB compositions of the '922 patent to the Xyrem® benchmark in an FDA food effect study there would be only three possibilities: a reduction in the food effect, no change in the food effect, or an increase in the food effect. It would have been obvious to do the food effect study and then upon doing the experiment, record the result. Upon doing such a study, the POSA would have found that the food effect would have been reduced.

Darbar highlighted the impact of sodium on their pharmacokinetics. *Supra* at ¶¶215-220. The POSA knew that Xyrem® introduced high amounts of additional sodium to a patent (in addition to what the patient ingested in their diet).

**436.** For these reasons, the POSA would have known and reasonably expected that the '922 patent's reduced sodium mixed salt GHB composition would have had a reduced food effect when compared to Xyrem®, i.e., an "immediate release liquid solution of Na.GHB" given the teachings of the '922 patent of giving its reduced sodium mixed salt GHB composition with food.

**437.** Furthermore, the recitation of a typical parameter, i.e., $C_{max}$, to report a reduction in food effect adds nothing to the claim. Simply put, this claim is nothing more than measuring and claiming the resulting reduction in food effect (in terms of $C_{max}$), which is an inherent property of the '922 patent's reduced sodium mixed salt GHB compositions relative to a benchmark (i.e., Xyrem®) when given "within four hours after eating."

**(8) "Reduced food effect as measured by $C_{max}$," i.e., Smaller Difference in $C_{max}$ Would Have Been Necessarily Present**

**438.** In addition, it is important to note that the limitation of a "reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB" is an inherent characteristic of the administration of the '922 patent compositions which would be necessarily present when compared to Xyrem®. The pharmacokinetic parameters, which would include $C_{max}$ (and AUC), are a natural properties of that composition.

**439.** In the food effect study motivated by the Xyrem® label, a reduction in $C_{max}$ of the reduced sodium mixed salt GHB pharmaceutical compositions would be necessarily present when compared to Xyrem® because it represents nothing more than a measurement of the peak

concentration of a drug in the bloodstream following administration. *Supra* at ¶¶222-231 (discussing $C_{max}$ and AUC in the ’373 patent specification in terms of average value).

**h. “wherein the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.$(GHB)_2$; and about 20% to about 25% of Mg.$(GHB)_2$”**

**440.** See my discussion of this same limitation above in the obviousness section regarding the ’922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶252-258.

**441.** As explained above, the POSA would have been motivated to select two of the reduced sodium mixed salt GHB compositions, Mixtures A and H, from the ’922 patent. *Supra* at Section entitled “The POSA Would Have Been Motivated to Select Certain GHB Compositions from the ’922 Patent”. Mixture H (Table 7) has the following composition: Na.GHB: 8.0%, K.GHB: 23.0%, Ca.$(GHB)_2$: 48.0%, Mg.$(GHB)_2$: 21.0%.

**442.** As explained above, the units of Claim 1 for each of the four salts are in % molar eq. The % molar eq. of each of the four salts in Mixture H of the ’922 patent fall squarely into the ranges of Claim 1 of the ’373 patent.

**443.** As explained above, from the teachings of the ’922 patent, only Mixtures A and H would stand out to the POSA. *Supra* at Section entitled “The POSA Would Have Been Motivated to Select Certain GHB Compositions from the ’922 Patent

**444.** These same teachings of a known composition discussed and claimed in the ’922 patent would have given the POSA a reasonable expectation of success.

**6. Claims 3-6 Would Have Been Obvious over the ’922 Patent in View of the Xyrem® label**

**445.** See my discussion of this same limitation above in the obviousness section regarding the ’922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶238-251.

**446.** These claims all have the following structure: “The method of claim 1, wherein the composition provides [AUC/$C_{max}$] when administered within four hours after eating that is [recited percentage range] of the AUC/$C_{max}$ when the composition is administered while fasting.” Generally speaking, Claims 3-6 recite certain pharmacokinetic parameters where they are comparing the AUC/ $C_{max}$ when the reduced sodium mixed salt GHB composition is given to a patient “when administered within four hours after eating” and comparing it to the results of the same composition when given during a fasted state. In other words, Claims 3-6 add a relative comparison of the performance of the reduced sodium mixed salt GHB composition (in terms of AUC/$C_{max}$) while in the fed and fasted state.

**447.** As explained above, “when administered within four hours after eating” also includes administering reduced sodium mixed salt GHB compositions at the same time as eating (starting point) and up to “within four hours after eating.” As explained above, the ’922 patent teaches “within four hours after eating.” *Supra* at ¶¶175-192. These claims add the further requirement to Claim 1 of a relative comparison of the performance of the reduced sodium mixed salt GHB composition (in terms of AUC/ $C_{max}$) while in the fed and fasted state over that same time frame, i.e., “within four hours after eating.”

**448.** As explained above, “within four hours after eating” would have been obvious. *Supra* at ¶¶175-192. Whatever time the POSA selected for Claim 1 “within four hours after eating,” s/he would have selected the same time for Claim 4’s “within four hours after eating.” The fed/fasting study of Claims 3-6 requires comparison of that same data for reduced sodium

mixed salt GHB compositions already generated above in my analysis for Claim 1. By using the same time frame as Claim 1 for the fed/fasted studies of Claim 3-6, it would mean the previous data could be used and one less experiment needed to be done.

**449.** As to the choice of parameter to measure the reduced food effect, i.e., AUC/$C_{max}$, as explained above, the Xyrem® label uses these same parameters to study food effect, rendering their choice obvious to a POSA, including being able to use data for comparative purposes to the data already generated.[44] *Supra* at ¶¶412-413.

**450.** Furthermore, the recited pharmacokinetic parameters in these claims, AUC/$C_{max}$, add nothing to these claims. Simply put, these claims are nothing more than measuring and claiming the certain pharmacokinetic parameters which are an inherent property of the '922 patent's reduced sodium mixed salt GHB compositions relative to a benchmark (i.e., Xyrem®), either when given "within four hours after eating" or "when the composition is administered while fasting."

**451.** The pharmacokinetic parameters, which would include $C_{max}$ and AUC, are a natural property of that composition. In that food study, such pharmacokinetic parameters of the reduced sodium mixed salt GHB pharmaceutical composition would be necessarily present because they represent nothing more than routine measurements taken in a food effect study. *Supra* at ¶¶222-231 (discussing $C_{max}$ and AUC in the '373 patent specification in terms of average value).

**a. Further Discussion for Claims 3 and 4 (AUC Claims)**

[44] As mentioned above, the choice of $C_{max}$ and AUC are typical parameters used to measure food effect. *See* FDA Guidance.

**452.** Claims 3 and 4 recite "the composition provides an AUC when administered within four hours after eating that is 80%-95% of the AUC when the composition is administered while fasting," and "the composition provides an AUC when administered within four hours after eating that is 85%-90% of the AUC when the composition is administered while fasting." In other words, in both claims, the reduced sodium mixed salt GHB composition has a larger AUC in the fasting state when compared to the fed state.

**453.** While the exact magnitude of the difference ("80%-95%" / "85%-90%") is just claiming the result of the AUC difference in measurement in the fed and fasted states, the POSA would have reasonably expected from the teachings of the Xyrem® label that the '922 patent's reduced sodium mixed salt GHB composition would have had a larger AUC in the fasted state when compared to the fed state.

**454.** As the Xyrem® label teaches: "[a]dministration of sodium oxybate immediately after a high fat meal resulted in delayed absorption (average $T_{max}$ increased from 0.75 hr to 2.0 hr) and a reduction in peak plasma level ($C_{max}$) by a mean of 58% and of systemic exposure (AUC) by 37%." Xyrem® label at 2. In the case of AUC data, the Xyrem® label is saying "[a]dministration of sodium oxybate immediately after a high fat meal resulted in . . . a **reduction** in peak plasma level ($C_{max}$) by a mean of 58% and of systemic exposure (AUC) by 37%." "Reduction" means relative to another variable, which in this case is the reduction between fed and fasted state.[45] Therefore, the Xyrem® label is explaining that for Xyrem®, $AUC_{fed}$ is 37% of $AUC_{fasted}$.

[45] Furthermore, elsewhere in the Xyrem® label, we know that fed and fasted studies were conducted. As the Xyrem® label explains, "[whether sodium oxybate is taken in the fed or fasted state may affect both the efficacy and safety of sodium oxybate for a given patient." Xyrem® label at 11; *id.* at 22 ("Patient presentation following overdose is influenced by the dose ingested, the time since ingestion, the co-ingestion of other drugs and alcohol, and the fed or fasted state.").

**455.** In the case of the ’922 patent’s reduced sodium mixed salt GHB compositions from the data in the Xyrem® label, the POSA would know and have reasonably expected that the AUC in the fasted state would be higher than the fed state because of the common presence of the sodium salt in Xyrem® and the ’922 patent’s reduced sodium mixed salt GHB compositions. The POSA would know and reasonably expect the same trend to occur when measuring a reduced sodium mixed salt GHB composition of the ’922 patent, i.e., having an AUC in the fasted state that is higher than the fed state because it also contains the sodium salt.

**456.** Furthermore, because the ’922 patent teaches that a reduced food effect exists for its reduced sodium mixed salt GHB compositions because they can be given with food, the POSA would know and reasonably expect that the percentage difference between $AUC_{Fed}$ and $AUC_{Fasted}$ would be higher than the 37% reported in the Xyrem® label.

**457.** But given that Xyrem® and the ’922 patent’s reduced sodium mixed salt GHB compositions both contain the sodium salt, which from the Xyrem® label the POSA would know is the major source of the food effects, the POSA would know and reasonably expect the ’922 patent’s reduced sodium mixed salt GHB compositions would still exhibit some food effect meaning $AUC_{Fed}$ and $AUC_{Fasted}$ are not the same value, i.e., 100%.

**458.** Therefore, from the teachings of the ’922 patent and the Xyrem® label a POSA would know and reasonably expect where the percentage range would be, and all the patentee has done is measured and claimed the value within that range of what otherwise would have been obvious.

**b. Further Discussion for Claims 5 and 6 ($C_{max}$ Claims)**

**459.** Likewise, Claims 5 and 6 recite “the composition provides a $C_{max}$ when administered within four hours after eating that is 55%-80% of the $C_{max}$ when the composition is administered while fasting” and “the composition provides a $C_{max}$ when administered within

four hours after eating that is 60%-75% of the $C_{max}$ when the composition is administered while fasting." In other words, in both claims, the reduced sodium mixed salt GHB composition has a larger $C_{max}$ in the fasted state when compared to the fed state.

**460.** While the exact magnitude of the difference ("55%-80%" / "60%-75%") is just claiming the result of the $C_{max}$ difference measurement in the fed and fasted states, the POSA would have reasonably expected from the teachings of the Xyrem® label that the '922 patent's reduced sodium mixed salt GHB composition would have had a larger $C_{max}$ in the fasted state when compared to the fed state.

**461.** As the Xyrem® label teaches: "Administration of sodium oxybate immediately after a high fat meal resulted in delayed absorption (average $T_{max}$ increased from 0.75 hr to 2.0 hr) and a reduction in peak plasma level ($C_{max}$) by a mean of 58% and of systemic exposure (AUC) by 37%." Xyrem® label at 2. In the case of $C_{max}$ data, the Xyrem® label is saying "[a]dministration of sodium oxybate immediately after a high fat meal resulted in . . . a reduction in peak plasma level ($C_{max}$) by a mean of 58%." "Reduction" means relative to another variable, which in this case is the reduction between fed and fasted state.[46] Therefore, the Xyrem® label is explaining that for Xyrem®, $C_{max(fed)}$ is 58% of $C_{max(fasted)}$.

**462.** In the case of the '922 patent's reduced sodium mixed salt GHB compositions from the data in the Xyrem® label, the POSA would have known and have reasonably expected that the $C_{max}$ in the fasted state would be higher than the fed state because of the common presence of the sodium salt in Xyrem® and the '922 patent's reduced sodium mixed salt GHB

[46] Furthermore, elsewhere in the Xyrem® label, we know that fed and fasted studies were conducted. As the Xyrem® label explains, "[whether sodium oxybate is taken in the fed or fasted state may affect both the efficacy and safety of sodium oxybate for a given patient." Xyrem® label at 11; *id.* at 22 ("Patient presentation following overdose is influenced by the dose ingested, the time since ingestion, the co-ingestion of other drugs and alcohol, and the fed or fasted state.").

compositions. The POSA would know and reasonably expect the same trend to occur when measuring a reduced sodium mixed salt GHB composition of the '922 patent, i.e., having a $C_{max}$ in the fasted state that is higher than the fed state because it also contains the sodium salt.

**463.** Furthermore, because the '922 patent teaches that a reduced food effect exists for its reduced sodium mixed salt GHB compositions because they can be given with food, the POSA would know and reasonably expect that the percentage difference between the $C_{max(Fed)}$ and $C_{max(Fasted)}$ would be higher than the 58% reported in the Xyrem® label.

**464.** But given that Xyrem® and the '922 patent's reduced sodium mixed salt GHB compositions both contain the sodium salt, which from the Xyrem® label the POSA would know is the major source of the food effects, the POSA would reasonably expect the '922 patent's reduced sodium mixed salt GHB compositions would still exhibit some food effect meaning $C_{max(Fed)}$ and $C_{max(Fasted)}$ are not the same value, i.e., 100%.

**465.** Therefore, from the teachings of the '922 patent and Xyrem® label a POSA would know and reasonably expect where the percentage range would be, and all the patentee has done is measured and claimed the value within that range of what otherwise would have been obvious.

**466.** In summary, Claims 3-6 are nothing more than taking the known reduced sodium mixed salt GHB composition of the '922 patent and (1) measuring the AUC/ $C_{max}$ in a fed state; (2) measuring the AUC/$C_{max}$ in a fasted state; and (3) claiming the difference in value. The AUC/$C_{max}$ pharmacokinetic values would be necessarily present in the fed and fasted state as natural properties. *Supra* ¶¶222-231 (discussing $C_{max}$ and AUC in the '373 patent specification in terms of average value). The difference is nothing more than a subtraction calculation. Simply put, this claim is nothing more than measuring and claiming certain pharmacokinetic

properties in a fed and fasted state which would be an inherent property of the ’922 patent’s reduced sodium mixed salt GHB composition when given “within four hours after eating.”

#### 7. Claim 11 Would Have Been Obvious over the ’922 Patent in View of Xyrem® Label

**467.** See my discussion of this same limitation above in the obviousness section regarding the ’922 patent; my analysis remains the same and is incorporated by reference. *Supra* at ¶¶252-258.

**468.** I note that the recited composition with the individual percentages of the four salts was a known composition since it was disclosed in the ’922 patent.

**469.** As explained above, the POSA would have been motivated to select two of the reduced sodium mixed salt GHB compositions, Mixtures A and H, from the ’922 patent. *Supra* at . *Supra* at Section entitled “The POSA Would Have Been Motivated to Select Certain GHB Compositions from the ’922 Patent”. Mixture H (Table 7) has the following composition (% molar eq.): Na.GHB: 8.0%, K.GHB: 23.0%, $Ca.(GHB)_2$: 48.0%, $Mg.(GHB)_2$: 21.0%.

**470.** As explained above, the units of Claim 11 for each of the four salts are in % molar eq. which are identical to the % molar eq. of each of the four salts in Mixture H of the ’922 patent. *Supra* at ¶¶233-237; the ’922 patent at Table 7 (“% molar equiv.”).

**471.** These same teachings of a known composition discussed and claimed in the ’922 patent would have given the POSA a reasonable expectation of success.

#### 8. Conclusion of Obviousness of Claims 3-6 and 11 of the ’373 Patent in View of the ’922 Patent and the Xyrem® Label

**472.** In summary, for the reasons explained above, Claims 3-6 and 11 would have been obvious to the POSA in light of the ’922 patent and the Xyrem® label.

**473.** To avoid any doubt, it is also my opinion that the Asserted Claims would have been obvious when viewed as a whole. Although I address the individual limitations in detail, my

conclusions are not limited to a piecemeal approach. Rather, I have considered whether the reduced sodium mixed salt GHB compositions, reduced food effects, recited pharmacokinetic parameters, the recited disease states, measuring those recited pharmacokinetic parameters, making comparisons to an immediate release liquid solution of Na.GHB, the "within four hours after eating" time frame, the use of dosages forms and pharmaceutical excipients, dosing and food effect studies, and any other recited components present a non-obvious invention when viewed together. In my opinion, they do not. Everything was known in the art, and their combination would have represented nothing more than the application of routine strategies and measurements to achieve predictable results.

### D. Objective Indicia of Non-Obviousness

**474.** It is my understanding that I do not need to address any objective indicia of non-obviousness (i.e., "secondary considerations") that Plaintiff (or their experts) may allege for the Asserted Claims at this time.

**475.** Should Plaintiff (or their experts) raise such secondary considerations, I reserve my right to present further testimony in the form of another report regarding these issues according to the Court's schedule.

### E. Asserted Claims 3, 4, 5, 6, and 11 of the '373 Patent Are Anticipated by the '922 Patent

**476.** In my opinion, the Asserted Claims are invalid as anticipated by the '922 patent. The prior art '922 patent discloses the same composition that is claimed in the '373 patent. The '373 patent merely claims the inherent and natural properties of the prior art composition disclosed in the '922 patent. All of the composition and administration limitations are expressly disclosed in the '922 patent, and the claims of the '373 patent simply recite inherent pharmacokinetic properties of a prior art composition. To begin my analysis, I provide the following claim chart

which provides exemplary citations for Claim 1. After the chart, I provide further discussion on an element-by-element basis for Claim 1 and then address asserted Claims 3-6 and 11.

| Claim 1 | Exemplary Citations |
|---|---|
| 1. A method of reducing food effect due to administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising: | The ’922 patent discloses “GHB compositions and formulations comprising mixed salts of GHB, disclosed herein, may be prepared and administered by any of the means described herein, particularly those described in the sections ‘Formulations’ and the examples, or by any means as would be known to those of skill in the art.” ’922 patent at 22:23–28.<br><br>Table 7 of the ’922 patent discloses a “Target Formula” that is comprised of 8.0% molar equivalent Na.GHB, 23.0% molar equivalent K.GHB, 48.0% molar equivalent $Ca.(GHB)_2$, and 21.0% molar equivalent $Mg.(GHB)_2$.<br><br>’922 patent further discloses “the compositions or formulations comprising mixed salts of GHB, disclosed herein, are useful in the treatment of cataplexy or daytime sleepiness in a patient who has been diagnosed with narcolepsy.” ’922 patent at 22:32–35; *see also id.* at Abstract, 1:14–23, 2:21–27, 4:8–17, 4:17–43. |
| orally administering to a patient in need thereof | “[i]n certain embodiments, the formulation is suitable for oral administration.” *Id.* at 18:10–11; *see also id.* at 3:67–4:1, 4:17–31, 18:45–48, 20:40–44, 20:56–60, 22:46–49, Claim 29.<br><br>“In certain embodiments, the pharmaceutical compositions provided herein are reduced in sodium content, which would render them particularly suitable for the treatment of patients with hypertension, heart disease, or renal disease, or who are at risk of stroke.” *Id.* at 2:28-33.<br><br>“As used herein, the term “patient” refers to a mammal, particularly a human.” *Id.* at 6:20-21.[47] |

[47] This is the same definition of patient provided in the ’373 patent. 8:36-36.

| | |
|---|---|
| a pharmaceutically effective amount of a pharmaceutical composition of GHB | "solutions will be administered in a manner compatible with the dosage formulation and in such amount as is therapeutically effective." *Id.* at 19:58–60; *see also id.* at 2:13–17, 17:51–54.<br><br>"GHB compositions and formulations comprising mixed salts of GHB, disclosed herein, may be prepared and administered by any of the means described herein, particularly those described in the sections 'Formulations' and the examples, or by any means as would be known to those of skill in the art." '922 patent at 22:23–28.<br><br>Table 7 of the '922 patent discloses a "Target Formula" that is comprised of 8.0% molar equivalent Na.GHB, 23.0% molar equivalent K.GHB, 48.0% molar equivalent $Ca.(GHB)_2$, and 21.0% molar equivalent $Mg.(GHB)_2$. |
| in a unit dosage comprising | "GHB compositions and formulations comprising mixed salts of GHB, disclosed herein, may be prepared and administered by any of the means described herein, particularly those described in the sections 'Formulations' and the examples, or by any means as would be known to those of skill in the art." '922 patent at 22:23–28.<br><br>The '922 patent discloses that "[i]n certain embodiments, the formulation is administered in a **single** or multiple dosage regiment." *Id.* at 4:3–4.<br><br>The '922 patent discloses "orally administering to a patient having narcolepsy the first dose within an hour prior to initial sleep onset." *Id.* at 4:26–27.<br><br>"the pharmaceutical composition is formulated as a liquid formulation." *Id.* at 3:62–63; *see also id.* at 18:2–3, 18:53–55, 18:63–19:1, 21:66–22:2, Claim 27. |
| at least one salt of GHB | Table 7 of the '922 patent discloses a "Target Formula" that is comprised of 8.0% molar equivalent Na.GHB, 23.0% molar equivalent |

| | |
|---|---|
| | K.GHB, 48.0% molar equivalent Ca.$(GHB)_2$, and 21.0% molar equivalent Mg.$(GHB)_2$. |
| and a pharmaceutically acceptable carrier | "The aqueous solutions disclosed herein typically comprise an effective amount of GHB, which may be dissolved or dispersed in a pharmaceutically acceptable carrier and/or an aqueous medium.<br><br>As used herein, "pharmaceutically acceptable carrier" includes any and all solvents, dispersion media, coatings, antibacterial and antifungal agents, isotonic and absorption delaying agents and the like. The use of such media and agents for pharmaceutical active Substances is well known in the art. Insofar as any conventional media or agent is incompatible with the active ingredient, its use in the therapeutic compositions is not appropriate. Supplementary compatible active ingredients can be incorporated into the compositions. For human administration, preparations should meet sterility, pyrogenicity, general safety and purity standards as required by the Food and Drug Administration (FDA)." *Id.* at 17:51-67.<br><br>Claim 1 ("pharmaceutically acceptable carrier.") and Claim 2 ("pharmaceutically acceptable carrier."). |
| within four hours after eating; | "The preferred oral formulations . . . may be incorporated directly with the food (i.e. a beverage) of the diet." *Id.* at 20:40-55.<br><br>"In certain embodiments, the method comprises oral administration of the formulation in a multiple dosage regimen. In certain embodiments, the multiple dosage regimen comprises: (i) diluting an aqueous solution comprising about 500 mg/mL of the mixture of salts of gamma-hydroxybutyrate with an aqueous medium to provide a first dose of about 2.25 to about 4.5 grams of the mixture of salts; (ii) diluting an aqueous Solution comprising about 500 mg/mL of the mixture of salts of gamma-hydroxybutyrate with an |

| | |
|---|---|
| | aqueous medium to provide a second dose of about 2.25 to about 4.5 grams of the mixture of salts; (iii) orally administering to a patient having narcolepsy the first dose within an hour prior to initial sleep onset; and (iv) orally administering to the patient having narcolepsy the second dose within 2.5 to 4 hours following initial sleep onset.<br><br>In certain embodiments, the multiple dosage regimen comprises: (i) diluting an aqueous solution comprising about 500 mg/mL of the mixture of salts of gamma-hydroxybutyrate with an aqueous medium to provide a first dose of about 1.0 to about 4.5 grams of the mixture of salts; (ii) diluting an aqueous solution comprising about 500 mg/mL of the mixture of salts of gamma-hydroxybutyrate with an aqueous medium to provide a second dose of about 1.0 to about 4.5 grams of the mixture of salts; (iii) orally administering to a patient having narcolepsy the first dose within an hour prior to initial sleep onset; and (iv) orally administering to the patient having narcolepsy the second dose within 2.5 to 4 hours following initial sleep onset." *Id.* at 4:17-44. |
| wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB,[48] | "The preferred oral formulations . . . may be incorporated directly with the food (i.e. a beverage) of the diet." *Id.* at 20:40-55.<br><br>The '922 patent disclosing comparisons to Xyrem®: "the pharmaceutical compositions comprising mixed salts of oxybate, disclosed herein, display acceptable pharmacokinetic properties (measured as GastroIntestinal transit rates), similar to those of Xyrem®." *Id.* at 30:5–10. |
| wherein the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; | "In certain embodiments, where the pharmaceutical composition comprises a mixture of Na.GHB, K.GHB, $Mg.(GHB)_2$, and Ca.(GHB)2, the Na.GHB salt is present in a |

[48] By agreement of the parties, the term "an equal dose of immediate release liquid solution of Na.GHB" means "a single dose of GHB salt(s) equivalent to a single dose of immediate release liquid solution of Na.GHB."

| | |
|---|---|
| about 45% to about 50% of Ca.(GHB)2; and about 20% to about 25% of Mg.(GHB)2. | wt/wt % of about 5% to about 40%, the K.GHB salt is present in a wt/wt % of about 10% to about 40%, the Mg.(GHB)2 salt is present in a wt/wt % of about 5% to about 30%, and the Ca.(GHB)2 salt is present in a wt/wt % of about 20% to about 80%." *Id*. at 3:21–26.<br><br>Table 7 of the '922 patent discloses a "Target Formula" that is comprised of 8.0% molar equivalent Na.GHB, 23.0% molar equivalent K.GHB, 48.0% molar equivalent Ca.$(GHB)_2$, and 21.0% molar equivalent Mg.$(GHB)_2$. |

**a. "A method of reducing food effect due to administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy, comprising:"**

**477.** As discussed above and included in the chart, the '922 patent discloses using its GHB composition for the "administration of gamma-hydroxybutyrate (GHB) in a patient having cataplexy in narcolepsy or excessive daytime sleepiness in narcolepsy." '922 patent at, e.g. 22:32–35; *see also id*. at Abstract, 1:14–23, 2:21–27, 4:8–17, 4:17–43; *Supra* at ¶158.

**478.** As to the preamble phrase "[a] method of reducing food effect," I do not believe it is limiting or contains an active step. Rather, it is only reciting the resultant reduction of the food effect (as measured by the pharmacokinetic parameters recited in the claims) of the administration of GHB when compared to an equal dose of an immediate-release liquid solution of Na.GHB. In any event, even if it were limiting, I address this portion of the preamble further below, which merely recites an inherent property of the '922 patent's prior art composition. Section XII(E)(g) starting at p. 150.

**b. "orally administering to a patient in need thereof"**

**479.** As discussed above and included in the chart, the '922 patent teaches "orally administering to a patient in need thereof." *Supra* at ¶161.

**c. "a pharmaceutically effective amount of a pharmaceutical composition of GHB"**

**480.** As discussed above and included in the chart, the '922 patent teaches "a pharmaceutically effective amount of a pharmaceutical composition of GHB", i.e., that the reduced sodium mixed salt GHB composition when administered where "**such amount as is therapeutically effective**" would result in "a pharmaceutically effective amount of a pharmaceutical composition of GHB." *Supra* at ¶¶163-167.

**d. "in a unit dosage comprising at least one salt of GHB"**

**481.** As discussed above and included in the chart, the '922 patent teaches "in a unit dosage comprising at least one salt of GHB." *Supra* at ¶¶169-171.

**e. "and a pharmaceutically acceptable carrier"**

**482.** As discussed above and included in the chart, the '922 patent teaches "and a pharmaceutically acceptable carrier." *Supra* at ¶173.

**f. "within four hours after eating"**

**483.** As discussed above and included in the chart, the '922 patent teaches administering its reduced sodium mixed salt GHB composition with food (Basis 1), and/or orally administering the first dose within an hour prior to initial sleep onset which would have been within four hours after eating (Basis 2). *Supra* at ¶¶175-191.

**484.** Therefore, the '922 patent teaches "within four hours after eating."

**g. "wherein the pharmaceutical composition of GHB has reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB"**

**485.** The chart below compiles the constructions in the Joint Claim Construction Document and the agreed upon construction:

| | |
|---|---|
| "reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB" | Plain & ordinary meaning: i.e., smaller difference in $C_{max}$ between fed and fasted states for a single dose of GHB salt(s) compared to *an equal dose of immediate release liquid solution of Na.GHB*. |
| *"an equal dose of immediate release liquid solution of Na.GHB"* | a single dose of GHB salt(s) equivalent to a single dose of immediate release liquid solution of Na.GHB. |

**486.** The '922 patent teaches "wherein the pharmaceutical composition of GHB." *Supra* at ¶¶81-83, 135-139, 165-167, 232-237. The '922 patent also teaches that the proper comparator/benchmark (i.e., a known standard) of its "pharmaceutical composition of GHB" is a dose of Xyrem®. *Id.* at e.g., 4:56-59; 30:1-33:27 (Example 7); Figures 1-6 (including accompanying description of figures at 4:56-5:43); Table 8. As explained above, a dose of Xyrem® is "a single dose of immediate release liquid solution of Na.GHB." *Supra* at ¶¶194-203.

**487.** Table 8 of the '922 patent shows that the comparison between the reduced sodium mixed salt GHB compositions of the '922 patent and Xyrem® was: (1) given in equal doses, i.e., 200 mg/kg; (2) given a single dose (30:60-61 ("Animals were dosed via the appropriate route at time 0 on the appropriate day"); *see also id.* at 4:3–4 ("the formulation is administered in a **single** or multiple dosage regimen")); and (3) and provided in molar equivalent basis,[49] i.e., 40 mg/mL.

[49] The '373 patent explains what it means by equivalent: "For convenience in comparing various salt compositions at the same oxybate or GHB molar dose, compositions expressed as percentages in this application refer to molar equivalent percentage (% molar equivalents) of each salt of oxybate or GHB." 2:14-18. Based on this description in the '373 patent, Table 4 of the '933 patent with 40 mg/mL (sodium oxybate molar equivalent basis) of Xyrem® and mixed salt GHB compositions A and G would be equivalent.

TABLE 8

| Study Design | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Treatment Group | Test Compound | Dosing Route | Animals N= | Dose mg/kg | Dosing Solution Conc. mg/mL (Sodium Oxybate Molar Equivalent basis) | Dosing Volume mL/kg | Vehicle | Sampling Time Point |
| 1* | NA | PO | 10 | NA | NA | 5 | Saline | 20 minutes post marker compound dose |
| 2* | Xyrem ® solution (Sodium Oxybate) | PO | 10 | 200 | 40 | 5 | Sterile Water | 20 minutes post marker compound dose |
| 3* | Mixture G | PO | 10 | 200 | 40 | 5 | Sterile Water | 20 minutes post marker compound dose |
| 4* | Mixture A | PO | 10 | 200 | 40 | 5 | Sterile Water | 20 minutes post marker compound dose |

*20 minutes after test compound dose, 6% Ca urine (w/v) in 0.5% methyl cellulose, low viscosity in tap water was administered PO at 0.3 mL/mouse (Carai et al., Life Sciences 70 (2002) 3059-3067). Mice were sacrificed 20 minutes after this second dose.

**488.** Thus, Table 8/Example 7 and the accompany description (col. 30:1-33:27) provide for comparing "a single dose of GHB salt(s)." Furthermore, the doses of the reduced sodium mixed salt GHB compositions and Xyrem® are "equivalent" with both using 40 mg/ml of sodium oxybate molar equivalent basis. *See* the '373 patent at 9:59-10:8.

**489.** Next, the '922 patent also teaches a POSA that its "pharmaceutical composition of GHB" would have a reduced food effect compared to Xyrem®. First, any reduced food effect is an inherent property of the '922 patent's reduced sodium mixed salt GHB compositions, i.e., Mixture H.

**490.** The POSA knew of the food effect associated with Xyrem®. As the patentee explained to the Examiner "[w]hen the present application was filed, it was known that there was a substantial food effect associated with the sodium GHB product Xyrem®." April 8, 2022 Applicant Response. Thus, despite knowing of "substantial food effect associated with the sodium GHB product Xyrem®", the '922 patent expressly instructs providing its GHB composition "directly with the food (i.e. a beverage) of the diet." This would teach the POSA

that the food effect of the reduced sodium mixed salt GHB compositions of the ’922 patent is reduced when compared to Xyrem®, i.e., an immediate release liquid solution of Na.GHB within the meaning of the claims (and the parties’ agreed upon construction). Said another way: the POSA would have known about the food effect issues with Xyrem®. At no time, however, did the inventors of the ’922 patent—who clearly knew about Xyrem® and its issues—raise any food effect concerns with the ’922 patent’s reduced sodium mixed salt GHB compositions. Instead, they seem to have no concerns about the food effect because they instructed giving the ’922 patent’s reduced sodium mixed salt GHB compositions with food. This would lead the POSA to conclude, regardless of the measured parameter, that the food effect was reduced for the ’922 patent’s reduced sodium mixed salt GHB compositions when compared to an equal dose of an immediate-release liquid solution of Na.GHB (i.e., Xyrem®).

**491.** As to the choice of parameter to measure the reduced food effect, i.e., $C_{max}$, this is just a typical measurable parameter to report the reduction with respect to the inherent property of the prior art composition. *See* FDA Guidance. The recitation of a typical parameter i.e., $C_{max}$, to report a reduction in food effect adds nothing to the claim. Simply put, this claim is nothing more than measuring and claiming the resulting reduction in food effect (in terms of $C_{max}$) which is an inseparable property of the ’922 patent’s reduced sodium mixed salt GHB composition relative to a benchmark (i.e., Xyrem®) when given “within four hours after eating”. A chemical composition and its properties are inseparable.

**492.** The joint claim construction also requires that any such food effect study comparison be done between fed and fasted states. As explained above, a food effect study is done by gathering data between fed and fasted states. An ordinary food effect study would have taken the known reduced sodium mixed salt GHB composition of the ’922 patent, and (1) measured

the $C_{max}$ in a fed state; (2) measured the $C_{max}$ in a fasted state; and (3) used subtraction to calculate the difference. For the comparison to Xyrem®, the ordinary food effect study would have taken Xyrem®, and (1) measured the $C_{max}$ in a fed state; (2) measured the $C_{max}$ in a fasted state; and (3) used subtraction to calculate the difference. Any pharmacokinetic values measured from this study including "a smaller difference in $C_{max}$ between fed and fasted states for a single dose of GHB salt(s)" when "compared to an equal dose of immediate release liquid solution of Na.GHB" would have also been necessarily present and inherent. S*upra* at ¶¶222-231 (discussing $C_{max}$ and AUC in the '373 patent specification in terms of average value).

**493.** Thus, the '922 Patent expressly teaches all of the composition and administration limitations and the food effect/$C_{max}$/AUC limitations are inherent properties of the prior art composition that would necessarily be present.

**h. "wherein the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.(GHB)$_2$; and about 20% to about 25% of Mg.(GHB)$_2$"**

**494.** This GHB pharmaceutical composition and disclosed is taught in the '922 patent as Mixture H. According to the Joint Claim Construction Document: "the pharmaceutical composition comprises: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.(GHB)$_2$; and about 20% to about to about 25% of Mg.(GHB)$_2$" means "the pharmaceutical composition comprises in % molar equivalents: about 5% to about 10% of Na.GHB; about 20% to about 25% of K.GHB; about 45% to about 50% of Ca.(GHB)$_2$; and about 20% to about 25% of Mg.(GHB)$_2$."

**495.** This limitation is taught by the '922 patent in Table 7:

| Claim recitation | Exemplary Disclosure of '922 patent |
|---|---|

| wherein the pharmaceutical composition comprises:<br><br>about 5% to about 10% of Na.GHB;<br>about 20% to about 25% of K.GHB;<br>about 45% to about 50% of Ca.(GHB)2;<br>and about 20% to about 25% of Mg.(GHB)2 | TABLE 7<br><br>Conditions and Results<br><br>\| \| Mixture H \| Mixture I \|<br>Target Formula (% molar equiv):<br>Na—GHB 8.0% 0.0%<br>K—GHB 23.0% 33.0%<br>Ca—(GHB)$_2$ 48.0% 25.0%<br>Mg—(GHB)$_2$ 21.0% 42.0%<br><br>The '922 patent at 29:29-43. |
|---|---|

TABLE 7

Conditions and Results

| | Mixture H | Mixture I |
|---|---|---|
| Target Formula (% molar equiv): | | |
| Na—GHB | 8.0% | 0.0% |
| K—GHB | 23.0% | 33.0% |
| Ca—(GHB)$_2$ | 48.0% | 25.0% |
| Mg—(GHB)$_2$ | 21.0% | 42.0% |

The '922 patent at 29:29-43.

**496.** Specifically, Mixture H contains:

- 8 % mol. eq. of Na.GHB which falls squarely in the claimed "about 5% to about 10% of Na.GHB";
- 23 % mol. eq. of Na.GHB which falls squarely in the claimed "about 20% to about 25% of K.GHB";
- 48 % mol. eq. of Na.GHB which falls squarely in the claimed "about 45% to about 50% of Ca.(GHB)2"; and
- 21 % mol. eq. of Mg.(GHB)2 which falls squarely in the claimed "about 20% to about 25% of Mg.(GHB)2."

**497.** Therefore, Claim 1 is anticipated. I also note that Mixture H also anticipates Claim 11. *Infra* at *Supra* at ¶¶507-511.

### 9. Claims 3-6 Are Anticipated by the '922 Patent

**498.** Because Claim 11 is narrower than Claim 1, it follows that the '922 patent also expressly discloses the pharmaceutical composition recited in Claim 1—and by extension, dependent Claims 3, 4, 5, and 6. The reduced food effect, and the particular pharmacokinetic results

recited in Claims 3–6, are inherent properties of the '922 patent's composition and use. The '373 patent merely claims an inherent property of a known formulation (i.e., Mixture H of the '922 patent).

**499.** The text of Claims 3-6 is reproduced below:

> 3. The method of claim 1, wherein the composition provides an AUC when administered within four hours after eating that is 80%-95% of the AUC when the composition is administered while fasting.
>
> 4. The method of claim 1, wherein the composition provides an AUC when administered within four hours after eating that is 85%-90% of the AUC when the composition is administered while fasting.
>
> 5. The method of claim 1, wherein the composition provides a $C_{max}$ when administered within four hours after eating that is 55%-80% of the $C_{max}$ when the composition is administered while fasting.
>
> 6. The method of claim 1, wherein the composition provides a $C_{max}$ when administered within four hours after eating that is 60%-75% of the $C_{max}$ when the composition is administered while fasting.

**500.** These claims all have the following structure: "The method of claim 1, wherein the composition provides [AUC/$C_{max}$] when administered within four hours after eating that is [recited percentage range] of the [AUC/$C_{max}$] when the composition is administered while fasting." As explained below, this represents nothing more than how a typical food effect study is conducted by a POSA and is recording and claiming the results of that food effect study.

**501.** Generally speaking, Claims 3-6 recite certain pharmacokinetic parameters where they are comparing the AUC/ $C_{max}$ when the reduced sodium mixed salt GHB composition is given to a patient "when administered within four hours after eating" and comparing it to the results of the same composition when given during a fasted state.

**502.** As explained above "when administered within four hours after eating" includes administering reduced sodium mixed salt GHB compositions at the same time as eating

(starting point) and up to "within four hours after eating." *Supra* at ¶¶175-191, 483. Claims 3-6 add the further requirement to Claim 1 of a relative comparison of the performance of the reduced sodium mixed salt GHB composition (in terms of AUC/$C_{max}$) while in the fed and fasted state.

**503.** These limitations represent nothing more than taking a known reduced sodium mixed salt GHB composition and measuring its pharmacokinetic parameters (AUC/$C_{max}$) in a fed and fasted state and then patenting the result. The reduced sodium mixed salt GHB compositions, Mixture H, would have had an inherent AUC/$C_{max}$ when measured under fasting and fed conditions "when administered within four hours after eating."[50] The pharmacokinetic parameters, which would include $C_{max}$ and AUC, are natural properties of that composition, which would be necessarily present because it represents nothing more than routine measurements of inherent properties taken in a food effect study. *Supra* ¶¶222-231 (discussing $C_{max}$ and AUC in the '373 patent specification in terms of average value).

**504.** Again, this is nothing more than taking the known reduced sodium mixed salt GHB composition of the '922 patent, and (1) measuring the inherent properties of AUC/$C_{max}$ in a fed state; (2) measuring the inherent properties of AUC/$C_{max}$ in a fasted state; and (3) then claiming the difference in value in such inherent properties. The AUC/$C_{max}$ pharmacokinetic values would be necessarily present in the fed and fasted state as natural and inherent properties. *Supra* ¶¶222-231. The difference is nothing more than a subtraction calculation.

---

[50] If Jazz's expert contends that the "within four hours after eating" of Claims 3-6 requires a further analysis beyond that provided above with respect to the "within four hours after eating" of Claim 1, the further analysis is as follows: Whatever time the POSA selected for Claim 1 for "within four hours after eating," s/he would have selected the same time for Claim 4's "within four hours after eating" because the fed/fasting study of Claims 3-6 requires comparison of that same fed data using the mixed salt GHB composition against the fasting studying using the mixed salt GHB composition. By using the same time frame as Claim 1 for the fed/fasting studies of Claims 3-6, it would mean the previous data could be used and one less experiment needed to be done.

**505.** In summary, the reduced food effect, and the particular pharmacokinetic results recited in Claims 3-6 are inherent properties of the ’922 patent’s composition. The ’373 patent merely claims an inherent property of a known formulation.

**506.** Therefore, Claims 3-6 are anticipated.

**10. Claim 11 Is Anticipated by the ’922 Patent**

**507.** The text of Claim 11 is reproduced below:

> 11. The method of claim 1, wherein the pharmaceutical composition comprises 8% of Na.GHB; 23% of K.GHB; 48% of Ca.$(GHB)_2$; and 21% of Mg.$(GHB)_2$.

**508.** According to the joint claim construction, Claim 11 is construed to mean “the pharmaceutical composition comprises in % molar equivalents 8% of Na.GHB; 23% of K.GHB; 48% of Ca.$(GHB)_2$; and 21% of Mg.$(GHB)_2$”

**509.** This GHB pharmaceutical composition is taught in the ’922 patent (Table 7)

TABLE 7

| Conditions and Results | | |
|---|---|---|
| | Mixture H | Mixture I |
| Target Formula (% molar equiv): | | |
| Na—GHB | 8.0% | 0.0% |
| K—GHB | 23.0% | 33.0% |
| Ca—$(GHB)_2$ | 48.0% | 25.0% |
| Mg—$(GHB)_2$ | 21.0% | 42.0% |

**510.** Mixture H of the ’922 patent and Claim 11 of the ’373 patent have identical percentages of Na.GHB, K.GHB, Ca.$(GHB)_2$ and Mg.$(GHB)_2$ in % molar equivalents.

**511.** Therefore, Claim 11 is anticipated.

**F. Summary of Anticipation of the Asserted Claims of the ’373 patent**

**512.** As explained above, each and every claim limitation of the Asserted Claims are expressly or inherently disclosed by the '922 patent.

**513.** I also think it is important to step back and consider anticipation from another perspective. As explained throughout this section, the '922 patent discloses using a reduced sodium mixed salt GHB pharmaceutical composition within the meaning of the claims. Furthermore, as explained in this section, the '922 patent discloses a head-to-head comparison with Xyrem® under the various conditions/timing sequences of the claims.

**514.** Simply measuring the $C_{max}$ or AUC during a food effect study replicating the teachings of the '922 patent would have resulted in the reduced sodium mixed salt GHB composition of the '922 patent having reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB under the same conditions/dosing schedule.

**515.** Mixture H of the '922 patent is identical to the mixture claimed in Claim 11 of the '373 patent. Any properties that Mixture H exhibits under any condition or study would be exhibited by the composition of Claim 11 of the '373 patent. That would also be true for the $C_{max}$ values as it relates to Claim 1, i.e., Mixture H would have a reduced food effect as measured by $C_{max}$ compared to an equal dose of immediate release liquid solution of Na.GHB under the same conditions/dosing schedule within the meaning of the claim. It would also be true if Mixture H's $C_{max}$ and AUC values were measured in a fed and fasted stated under the conditions referenced in Claims 3-6 within the meaning of the claims.

**516.** Therefore, the '922 patent reduced sodium mixed salt GHB compositions (e.g., Mixture H) anticipates each Asserted Claim of the '373 patent.

## XIII. SUPPLEMENTATION

**517.** I reserve the right to supplement this report if I become aware of additional pertinent information. I also reserve the right to make corrections to this report. I may also testify or

provide an opinion in rebuttal to testimony or opinions offered by other witnesses in response to the opinions stated herein.

**518.** If called to testify, I will, as needed, explain the principles and terminology used in this report. I may use demonstrative aids and exhibits to illustrate these principles and the opinions expressed. I have not yet prepared any such demonstrative aids or exhibits for use at trial, but I may do so.

# EXHIBIT A

**S. Craig Dyar, Ph.D.**

SCD Pharma Consulting
101 Melinda Circle
Savannah, GA 31406
Telephone: 734-834-7099
E-mail: craigdyar@scdpharmaconsulting.com

## SUMMARY

Pharmaceutical research and development consultant with the following strengths:

- Highly organized critical thinker with strong engineering and mechanical knowledge
- Recognized expert in drug delivery technology for oral, sublingual, topical, parenteral, ophthalmic, and transdermal drug delivery systems

## CAREER HIGHLIGHTS

- Consultant to the pharmaceutical industry on drug development including ensuring quality products are developed from discovery to post-launch, life-cycle planning, intellectual property, project management, compound licensing and business development with a focus on drug delivery technologies including immediate, sustained (including osmotic systems) and dual release oral tablets, topical solutions, creams and ointments (dermal and ophthalmic), sublingual tablets, transdermal formulations, targeted delivery systems (dendrimer and others), orally dissolving tablets, and others.
- Directed Drug Delivery Assessment group to enable compound development and product enhancement for early- and late-stage compounds.
  - Served on global drug delivery group to define strategy for external collaborations based upon a careful review of the current portfolio
  - Managed the science for drug delivery projects for immediate and sustained release oral tablets, topical creams and ointments, sublingual tablets, transdermal formulations, targeted delivery systems (dendrimer and others), orally dissolving tablets and others
  - Designed, developed, and maintained a global database of 300 drug delivery technology companies by directly contacting each company
  - Adapted technology from the food, plastics, and other industries for use in the pharmaceutical industry to solve issues related to polymer mixing
  - Directed scale-up of a hot-melt extruded solid dispersion formulation for a launched product, troglitazone
- Led Pharmaceutical Sciences Teams on ophthalmology and dermatology projects
  - Serve as the single point of accountability and technical expert for projects from Preclinical to Phase III stages of development. Responsible for managing the timelines and resources including a multimillion-dollar budget
  - Led multi-disciplinary global teams composed of 8 – 12 colleagues in analytical, formulation, regulatory, quality assurance and supply chain areas
  - Led team in the resolution of several manufacturing and formulation issues and developed guidelines to improve the manufacture practices to ensure the quality of the products
- Utilized Quality by Design principles to develop novel conventional and controlled-release solid dose for tablet and capsule drug delivery systems using solubility and bioavailability enhancement techniques such as hot-melt solid dispersions, supercritical fluids, and lipids
- Defined procedures and led compound licensing activities for pharmaceutical science in Michigan and served on global licensing team. Responsible for the due diligence activities for 8 licensing opportunities, which led to 3 Phase III licensing deals
- Authored numerous Good Manufacturing Practice/Good Laboratory Practice guidelines (GMP/GLP) and standard operating procedures (SOP)
- Managed the COX-2 (celecoxib and others) franchise for Worldwide Pharmaceutical Science at Pfizer

- Served as the pharmaceutical science member of COX-2 lifecycle team composed of members from Marketing, Regulatory, Clinical PK, Medical, Legal
- Chaired celecoxib reformulation team composed of members from above groups
- Developed proposal and obtained endorsement for multimillion dollar proof of concept studies leading to a program in late-stage development
- Defined pharmaceutical science strategy for COX-2 programs and obtained endorsement from senior leaders in marketing, medical, regulatory, and legal
- Provided guidance to pharmaceutical science COX-2 teams regarding above strategy
- Pioneered endorsed idea, which used an alternate formulation approach reducing cost ($8 M) and time (2 years), required to reach the market
- Chaired two cross-functional product enhancement management teams

- Taught graduate level courses in Pharmacokinetics and Pharmaceutics covering topics such as formulation development of solutions, tablets (immediate and controlled release), emulsions, transdermal, injectable and topicals (dermal and ophthalmic) including release profiles.
- Chaired local Pharmaceutical Science Technology Board and was an inaugural member.
- Acted as Intellectual Property Liaison for scientists, management, and patent attorneys.
    - Ensured intellectual property protection by interfacing with scientist and patent attorneys on a daily basis. Recognized expert in defining compound IP strategy.
- Defined site and global IP strategy and procedures while serving on the global Intellectual Property Board composed of 3 senior scientists and 3 patent attorneys.

## EXPERIENCE

SCD Pharma Consulting
- **President** 2008-Present

Roivant Sciences
- **Senior Director, Quality Operations** 2022-2024

South University – School of Pharmacy
- **Assistant Professor** 2008-2016

Pfizer US
- **Associate Research Fellow** 2004-2008
- **Senior Principal Scientist** 2001-2004
- **Senior Scientist** 2000-2001
- **Scientist** 1998-2000

Registered Pharmacist, Pharmacist in Charge 1987-1994

## EDUCATION AND PROFESSIONAL DEVELOPMENT

**Doctor of Philosophy in Pharmaceutical Science,** Medical University of South Carolina, Charleston
Bachelor of Science in Pharmacy, Medical University of South Carolina, Charleston
Bachelor of Science in Biology, University of South Carolina, Spartanburg
Level II and III Management Training, University of Michigan, Executive Education Center
Kepner-Tregoe Certification in Problem Solving and Decision Making

## ACHIEVEMENTS AND AWARDS

Member of Rho Chi Honor Society and American Association of Pharmaceutical Sciences
Fellow of the American Foundation for Pharmaceutical Education (AFPE)
Chair, AAPS Year-round Task Force on Novel Drug Delivery Technology

**PATENTS, PUBLICATIONS, PRESENTATIONS and POSTERS**

**S. Craig Dyar,** Curtis E. Jones, John P. Kennedy, Kiowa Kavovit, and Andrew Kavovit. Patent publication entitled "Liquid Bandage", December,3, 2015 – US Patent Application Publication (US 20150343112 A1)

Curtis E. Jones, **S. Craig Dyar**, and Andrea L. McKeever, Small-Team Active Learning in an Integrated Pharmacokinetics Course Series Am J Pharm Educ. 2012 Oct 12; 76(8): 153.

**S. Craig Dyar**, Numerous lectures (25-30 per year) in Pharmaceutics and Pharmacokinetics at South University School of Pharmacy on topics such as Chemical Kinetics, Solutions, Suspensions, Topicals, Transdermals, Solid Oral Dosage Forms, Novel Drug Delivery Systems, Protein and Peptide Delivery Systems, and numerous other physical pharmacy topics. (2008 to Current).

**S. Craig Dyar**, Invited panelist and moderator on "How to Pursue and Assess Potential Technologies as Synergistic Fits for your Program" at the Institute for International Research's 12th Annual Drug Delivery Partnerships Conference. San Diego, CA (2008).

**S. Craig Dyar**, Invited presentation on "Navigating the Challenges of Early Phase Development in Ophthalmology" at Financial Research Associates' 2nd Annual Drug Delivery Conference. San Diego, CA (2007).

**S. Craig Dyar**, Patent publication entitled "Pharmaceutical Compositions of Amorphous Atorvastatin and Process for Preparing Same" (WO06059224 A1 2006, CA2589537 AA 2006, EP1819319 A1 2007).

**S. Craig Dyar**, Keynote Panelist on "The Next Wave of Partnerships and Investment in Drug Delivery and Specialty Pharmaceuticals" at Strategic Research Institute's 11th Annual Forum on Drug Delivery Technologies & Deal-Making. New Brunswick, NJ (2006).

**S. Craig Dyar**, Patent publication entitled "Process and System for Controlled-Release Drug Delivery" (AT293439 E 2005, BRPI0105909 A 2002, CA2363902 AA 2002, C 2006, DE60110192 D1 2005, DE60110192 T2 2006, EP1213014 A2 2002, A3 2002, B1 2005, ES2240313 T3 2005, JP2002212061 A2 2002, MXPA01012456 A1 2005, US2002119197 AA 2002).

**S. Craig Dyar**, Invited presentation on "Language of Marketing – A Scientist's Interpretation" at Strategic Research Institute's 11th Annual Forum on Drug Delivery Technologies & Deal-Making. New Brunswick, NJ (2006).

**S. Craig Dyar** and Michael Wider, Workshop on "Constructing Mutually Beneficial Drug Delivery Licensing Agreements" at CBI's 7th Forum on Drug Delivery Systems. Philadelphia, Pa (2004).

**S. Craig Dyar**, Panelist on "Technology Differentiation: How are Similar Technologies Effectively Evaluated?" at the 8th Annual Drug Delivery Partnerships meeting. Beverly Hills, CA (2004).

**S. Craig Dyar**, Melt-Extruded Particulate Dispersions in Pharmaceutical Extrusion Technology (I. Ghebre-Sellassie, ed.), Marcel Dekker, Inc, New York, (2003), pp. 261-276.

**S. Craig Dyar**, M. Mollan, S. Khan, L. Tang, J. Cook and I. Ghebre-Sellassie, Evaluation of three dissolution enhancement methods on bioavailability, AAPS Poster in New Orleans (1999).

**S. Craig Dyar** and Robert E. Notari, A nomogram to evaluate intrinsic absorption rate constants of potential oral prolonged-release candidates, Pharmaceutical Development and Technology, 4(3): 305-312 (1999); AAPS Poster in San Francisco (1998).

**S. Craig Dyar** and Robert E. Notari, Hydrolysis kinetics and stability predictions for a mixture of R and S temocillin isomers, International Journal of Pharmaceutics, 173(1,2): 225-236 (1998).

**S. Craig Dyar** and Robert E. Notari, Defining the rate-controlling step for absorption following oral administration of zero-order prolonged-release formulations, Pharmaceutical Research, 14(11): 243 (1997); AAPS Poster in Boston (1997).

# EXHIBIT B

**Materials Considered**

To the extent not listed below, documents considered include all documents cited in my Expert Report,

- US Patent No. 11,426,373 and its file history.
- US Patent No. 8,591,922
- Xyrem® label (Lupin-Xywav_0011768-0011826)
- Deposition of Mark Eller
- Deposition of Cuiping Chen
- Deposition of Clark Allphin
- PDR 2008
- Darbar, Dawood et al. "Modulation by Dietary Salt of Verapamil Disposition in Humans." American Heart Association, Inc. (1998)\
- Azizi, Michel et al. "Effect of Contrasted Sodium Diets on the Pharmacokinetics and Pharmacodynamic Effects of Renin-Angiotensin System Blockers." American Heart Association (2013)
- Borgen, L. A., et al., "The influence of gender and food on the pharmacokinetics of sodium oxybate oral solution in healthy subjects." The Journal of Clinical Pharmacology 43(1), 59-65 ("Borgen") in 2003. (Lupin-Xywav_0007926-7932)
- FDA Guidance for Industry: Food-Effect Bioavailability and Fed Bioequivalence Studies. Available at https://www.fda.gov/files/drugs/published/Food-Effect-Bioavailability-and-Fed-Bioequivalence-Studies.pdf (2002) ("FDA Guidance").
- Ansel's Pharmaceutical Dosage Forms and Drug Delivery Systems (9th Ed. 2011) at 154-158, 174-182 ("Ansel")
- https://neurolaunch.com/when-do-most-people-go-to-sleep/
- https://today.yougov.com/society/articles/51523-most-americans-watch-tv-during-dinner-41-percent-talk-to-people-they-are-with-poll
- Dietary Guidelines for Americans 2010 available at https://health.gov/sites/default/files/2019-10/DietaryGuidelines2010.pd
- https://www.fda.gov/files/drugs/published/Food-Effect-Bioavailability-and-Fed-Bioequivalence-Studies.pdf (2002) ("FDA Guidance").
- https://www.healthyeating.org/nutrition-topics/general/food-groups/beverages

# Exhibit 5

| | |
|---|---|
| **From:** | Gabriel Brier |
| **To:** | GT-Teva-Xywav; Liza Walsh; Christine Gannon; Gerhard W. Buehning; USR-Lupin_Xywav; jrichter@midlige-richter.com |
| **Cc:** | Jazz212690; Lizza, Charles M.; Baton, William C.; Sullivan, Sarah A.; Callo, Alexander |
| **Subject:** | Jazz v. Lupin, et al., No. 21-14271 (D.N.J.) |
| **Date:** | Friday, May 2, 2025 2:36:39 PM |

***EXTERNAL TO GT***

Counsel,

We write to follow up on the parties' meet and confer yesterday concerning new theories, prior art, and prior art combinations improperly raised for the first time in Defendants' expert reports.

With respect to Dr. Crowley's report, we agree that the Johnson, Pardi, and Scrima references cited in his report are properly cited as background. However, we maintain that Defendants have improperly introduced the new references Page, USP NF, and Palma in an attempt to use those references to directly challenge the asserted claims. Specifically, Page, USP NF, and Palma all appear in section IX.A.6 of Dr. Crowley's report, which Dr. Crowley then "incorporates by reference" throughout the sections of his report addressing the validity of the claims. *See* Crowley ¶¶ 158, 175, 242, 257, 260, 278, 279, 280, 281, 299, 311, 314, 333, 340, 344, 350, 354, 358, 362, 366. This attempt to use new references that were not disclosed in Defendants' invalidity contentions to address the validity of the claims is improper. Please confirm whether Defendants will agree to strike the Page, USP NF, and Palma references and related arguments from Dr. Crowley's report.

Also, with respect to the two new prior art combinations raised by Dr. Crowley (i.e., Cook in View of One or More of Conte, Gessa, Karppanen, Noro and/or FDA Regulations; and Xyrem Label in View of One or More of Cook, Conte, Gessa, Karppanen, Noro, and/or FDA Regulations) please confirm that Defendants agree to strike these sections from Dr. Crowley's report. Jazz would be agreeable to Defendants' re-serving Dr. Crowley's report with the specific prior art combinations that were disclosed in their contentions (i.e., (1) Cook in View of One or More of Conte, Gessa, and/or Karppanen; and (2) Xyrem Label in View of One or More of Cook, Conte, Gessa, and/or Karppanen).

With respect to Dr. Radtke's report, it is our understanding that Defendants are willing to re-serve his report without the new prior art combination (i.e., Xyrem 2005 PI in View of Waszkielewicz, Frucht 2009, and/or Frucht 2011) and replace it with the specific prior art combination that was disclosed in Defendants' contentions (i.e., Xyrem 2005 PI in View of Waszkielewicz, and/or Frucht 2009). We also understand that Defendants agreed to strike the footnote that purports to "reserve the right to rely on other combinations of the addressed art not specifically described." Please confirm that is the case and provide the revised version of Dr. Radtke's report as soon as possible.

The reports of Dr. Crowley and Dr. Dyar also include improper purported reservations of rights. *See* below:

- Crowley ¶ 24 ("While I cite to specific passages from prior art documents in this report, such citations are merely exemplary, and I reserve the right to rely on other portions of the same documents.");
- Crowley ¶ 23, n.14 (attempting to "reserve the right to rely on any prior art versions of the Xyrem Label to support [his] opinions"), ¶ 152, n.40 (attempting to "reserve the right to rely on any [ ] related references [to Cook]");
- Crowley ¶ 153, n.41 ("I expressly reserve the right to rely on any portion of the analysis in this Report in connection with any Asserted Claim.");
- Dyar § IX, n. 6 (attempting to "reserve the right to rely on all teachings and disclosures of the prior art in this report whether specifically referenced herein or not");
- Dyar ¶ 86 (attempting to "reserve the right to use the other [Xyrem] labels").

Please confirm that Defendants agree to strike the reservations of rights identified above from the Crowley and Dyar reports.

With respect to Dr. Dyar's report, Jazz maintains its objections raised in its April 25, 2025 email to Defendants and requests that Defendants agree to withdraw the new prior art and invalidity theories identified in that email.

Please provide your response as soon as possible so that we may update the Court by May 9 as ordered during yesterday's status conference.

Regards,

Gabe

**Gabe Brier** | quinn emanuel urquhart & sullivan, llp
295 5th Avenue, New York, NY 10016 | Office: (212) 849-7000 | Direct: (212) 849-7486 | Mobile: (917) 576-3454 | Fax: (212) 849-7100 | gabrielbrier@quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.